# IN THE UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

---------------------------------------------------------x
                                                         :
In re                                                    :   Chapter 11
                                                         :
Premier International Holdings Inc., *et al.*,[1]        :   Case No. 09-_____ (____)
                                                         :
        Debtors.    :   (Joint Administration Requested)
                                                         :
---------------------------------------------------------x

## AFFIDAVIT OF JEFFREY R. SPEED IN SUPPORT OF FIRST DAY PLEADINGS

STATE OF                 )
                                 ) ss
COUNTY OF            )

        1.         I am the Executive Vice President and Chief Financial Officer of Six Flags, Inc. ("Six Flags"). I have served in these positions since April 2006. Prior to joining Six Flags, I served as Senior Vice President and Chief Financial Officer of Euro Disney S.A.S. and, prior to that, as Vice President of Corporate Finance and Assistant Treasurer for The Walt Disney Company. I am a current board member and audit committee member for World Wrestling Entertainment, Inc. (NYSE: WWE).

---

[1] The Debtors are the following thirty-seven entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Astroworld GP LLC (0431), Astroworld LP (0445), Astroworld LP LLC (0460), Fiesta Texas Inc. (2900), Funtime, Inc. (7495), Funtime Parks, Inc. (0042), Great America LLC (7907), Great Escape Holding Inc. (2284), Great Escape Rides L.P. (9906), Great Escape Theme Park L.P. (3322), Hurricane Harbor GP LLC (0376), Hurricane Harbor LP (0408), Hurricane Harbor LP LLC (0417), KKI, LLC (2287), Magic Mountain LLC (8004), Park Management Corp. (1641), PP Data Services Inc. (8826), Premier International Holdings Inc. (6510), Premier Parks of Colorado Inc. (3464), Premier Parks Holdings Inc. (9961), Premier Waterworld Sacramento Inc. (8406), Riverside Park Enterprises, Inc. (7486), SF HWP Management LLC (5651), SFJ Management Inc. (4280), SFRCC Corp. (1638), Six Flags, Inc. (5059), Six Flags America LP (8165), Six Flags America Property Corporation (5464), Six Flags Great Adventure LLC (8235), Six Flags Great Escape L.P. (8306), Six Flags Operations Inc. (7714), Six Flags Services, Inc. (6089), Six Flags Services of Illinois, Inc. (2550), Six Flags St. Louis LLC (8376), Six Flags Theme Parks Inc. (4873), South Street Holdings LLC (7486), Stuart Amusement Company (2016). The mailing address of each of the Debtors solely for purposes of notices and communications is 1540 Broadway, 15th Floor, New York, NY 10036 (Attn: James Coughlin).

2. On the date hereof (the "Petition Date"), each of the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed with this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), as well as certain motions and other pleadings (the "First Day Pleadings"). I am authorized by the Debtors to submit this Affidavit on their behalf in support of the First Day Pleadings.

3. The First Day Pleadings are intended to enable the Debtors to operate effectively and efficiently during these chapter 11 cases (the "Bankruptcy Cases"), as well as to avoid certain adverse consequences that otherwise might result from the commencement of these Bankruptcy Cases. Among other things, the First Day Pleadings seek relief aimed at maintaining the confidence of the Debtors' various stakeholders and vendors, as well as the morale of the Debtors' employees. Gaining and retaining the support of these key constituencies is critical to the Debtors' efforts to reorganize successfully. I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is necessary to (a) avoid immediate and irreparable harm to, and ensure the uninterrupted operation of, the Debtors' business and (b) maximize and preserve the value of the Debtors' chapter 11 estates.

4. In my capacity as Chief Financial Officer of Six Flags, I am familiar with the Debtors' day-to-day operations, financial condition, business affairs, and books and records. Except as otherwise indicated, all facts set forth in this Affidavit are based upon (a) my personal knowledge, (b) my review of relevant documents, (c) information supplied to me by other members of the Debtors' management team or professionals retained by the Debtors, or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If called upon, I could and would testify competently to the facts set forth herein.

5.      **Part I** of this Affidavit provides an overview of the Debtors' business. **Part II** provides a description of the Debtors' corporate and capital structures. **Part III** provides a discussion of the events that compelled the commencement of these Bankruptcy Cases. **Part IV** affirms and incorporates the facts that support the relief requested in the First Day Pleadings, including the immediate and irreparable harm that would result if the Debtors were unable to implement immediately certain of the relief sought in the First Day Pleadings.

## Part I

### Overview of the Debtors' Business

6.      Six Flags is the largest regional theme park operator in the world. From its headquarters in New York City, Six Flags indirectly owns or operates twenty parks located in geographically diverse markets across North America, including eighteen domestic parks, one park in Mexico, and one park in Canada. Eighteen of the twenty parks are branded as "Six Flags" parks. Six Flags intends to expand its operations beyond North America with destinations in Dubai and Qatar.

7.      Six Flags' theme parks offer a complete family-oriented entertainment experience, including a broad selection of state-of-the-art and traditional thrill rides, water attractions, themed areas, concerts and shows, restaurants, game venues, and retail outlets. During 2008, the theme parks offered more than 800 rides, including over 120 roller coasters, making Six Flags the leading provider of "thrill rides" in the industry.

8.      Six Flags and its affiliates, including certain non-Debtor affiliates, currently employ approximately 2,040 full-time employees. Six Flags and its affiliates employed approximately 28,500 seasonal employees during the 2008 operating season. Approximately 16% of full-time employees are subject to labor agreements with local chapters of national unions. These labor agreements expire in December 2010 (Six Flags Over Georgia), December

2011 (Six Flags Magic Mountain and one union at Six Flags Great Adventure), and January 2012 (Six Flags Over Texas, Six Flags St. Louis, and another union located at Six Flags Great Adventure). Certain foreign non-Debtor affiliates of Six Flags also have unionized employees.

9. Six Flags holds exclusive long-term licenses for theme park usage throughout the United States (excluding the Las Vegas area), Canada, and Mexico of certain Warner Brothers© and DC Comics© characters, including Bugs Bunny, Daffy Duck, Tweety Bird, Yosemite Sam, Batman, Superman, and others. In addition, Six Flags promotes an enhanced family experience through the use of many Hanna-Barbera© and Cartoon Network© characters, including Yogi Bear, Scooby-Doo, the Flintstones, and others. Six Flags uses these characters and other licensed intellectual property to market their theme parks and to provide a family-friendly entertainment experience to attract guests of all ages. Six Flags also relies on extensive marketing and promotional programs that utilize the full panoply of available media outlets, including online promotions, direct mail, telemarketing, direct response media, and targeted multi-media programs, to attract individual visitors, groups, and season pass holders, as well as to lengthen the number of hours spent by guests in order to increase per capita revenue.

10. Six Flags' operations are highly seasonal in that approximately 80% of park attendance and revenues are generated during the second and third quarters of the calendar year, with the most significant revenue generation occurring between Memorial Day and Labor Day. During the 2008 operating season, Six Flags generated approximately $535 million in ticket sales and an additional $487 million in food, merchandise, and other sales, including sponsorship and licensing revenues, achieving a positive Free Cash Flow[2] for the first time, with operating

---

[2] "Free Cash Flow" is defined as Adjusted EBITDA excluding (i) cash interest expense (net) and debt issuance costs, dividends and taxes paid in cash and (ii) capital expenditures, net of property insurance recoveries. "Adjusted EBITDA" is defined as Six Flags' net income (loss) before cumulative effect of

income more than tripling from the previous year. For the 2008 season, group sales accounted for approximately 29% of Six Flags' aggregate attendance. Season pass sales, which occur primarily in advance of each season, accounted for approximately 28% of Six Flags' aggregate attendance in 2008. Overall attendance during the 2008 season increased by approximately 2% from the previous year and revenue increased by approximately 5%.

## Part II

## Corporate and Capital Structure of the Debtors

### *Corporate Structure*

11.   Six Flags, a publicly traded entity, directly owns three subsidiaries: Six Flags Operations Inc. ("Operations"), a Debtor, SF HWP Management LLC ("Management"), a Debtor, and GP Holdings, Inc., a non-Debtor. Six Flags conducts the majority of its business through Operations, which, in turn, owns all of the capital stock of Six Flags Theme Parks Inc. ("SFTP"). SFTP owns, directly or through subsidiaries, all of Six Flags' domestic parks other than the Partnership Parks (as defined below), Six Flags' Mexico theme park located in Mexico City, Mexico, and the La Ronde theme park located in Montreal, Canada. SFTP also owns the lead Debtor in these Bankruptcy Cases, Premier International Holdings Inc.

12.   GP Holdings, Inc., through its subsidiaries, is the general partner of the partnerships that own portions of both Six Flags Over Georgia (including Six Flags White Water Atlanta) and Six Flags Over Texas (collectively, the "Partnership Parks"). GP Holdings, Inc. and

---

changes in accounting principles, discontinued operations, income tax expense (benefit), other expense, early repurchase of debt, equity in operations of partnerships, minority interest in earnings (losses), interest expense (net), amortization, depreciation, stock-based compensation, gain (loss) on disposal of assets, interests of third parties in the Adjusted EBITDA of four parks that are less than wholly owned (consisting of Six Flags Over Georgia, Six Flags Over Texas, Six Flags White Water Atlanta, and Six Flags Discovery Kingdom), AND Six Flags' interest in the Adjusted EBITDA of Six Flags Great Escape Lodge & Indoor Waterpark and dick clark productions, inc.

its subsidiaries, including the Partnership Parks, are not Debtors in these Bankruptcy Cases. Attached hereto as Exhibit A is a comprehensive corporate structure chart that shows the relationships among the Debtors.

***Capital Structure***

13. The Debtors' primary liabilities consist of: (a) three tranches of unsecured notes issued by Six Flags maturing in years 2010, 2013, and 2014 respectively (collectively, the "Unsecured Notes"); (b) one tranche of convertible notes issued by Six Flags maturing in 2015 (the "Convertible Notes"); (c) one tranche of unsecured notes issued by Operations and guaranteed by Six Flags maturing in the year 2016 (the "2016 Notes"); (d) an SFTP senior secured Credit Facility (defined below), guaranteed by Operations and subsidiaries of SFTP; (e) outstanding preferred income equity redeemable shares (the "PIERS"), which are required to be redeemed for cash on August 15, 2009; and (f) unsecured trade debt. Overall, in the first quarter of 2009, the Debtors reported approximately $3,431,647,000 in total liabilities and approximately $2,907,335,000 in total assets.

14. In addition to these liabilities, the Debtors also are obligated to make annual distributions to partners in the Partnership Parks, which will amount to approximately $60.7 million in 2009, of which Six Flags is entitled to receive approximately $25.6 million, which amount has been designated to service a loan from a subsidiary of Time Warner, Inc. (see below). Further, the Debtors are obligated to make an annual offer to purchase a maximum number of limited partnership units in the Partnership Parks at specified prices. As a result of this annual Six Flags obligation, in 2009, Six Flags received acceptances of its offer amounting to an aggregate obligation of approximately $65.5 million to various limited partners in the Partnership Parks. A subsidiary of Time Warner, Inc. guarantees the obligations of Six Flags with respect to its Partnership Parks.

LEGAL_US_E # 83235897.22
RLF1-3405399-1

15. In order to obtain financing to meet such obligations, certain non-Debtor affiliates of Six Flags (the "Partnership Park Subsidiaries") entered into a loan agreement, dated May 15, 2009, with TW-SF LLC, a subsidiary of Time Warner Inc., whereby TW-SF LLC loaned the Partnership Park Subsidiaries approximately $52.5 million. Interest on this loan accrues at a rate of 14% per annum and the loan matures on March 15, 2011. Pursuant to a contemporaneously executed guaranty agreement, Six Flags, Operations, and SFTP have guaranteed up to an aggregate of $10 million of this loan. The guaranty agreement is subject to customary conditions and contains customary representations, warranties and affirmative covenants. In addition, the guaranty contains restrictive covenants that limit, among other things, the ability of Six Flags, Operations, and SFTP to incur indebtedness, issue redeemable capital stock or preferred stock, create liens, or amend the Credit Facility, charter documents, or bylaws in certain manners.

*Unsecured Notes*

16. As of the Petition Date, the Debtors' debt included approximately $1,268.3 million of fixed-rate senior unsecured notes.[3] More specifically, there are four tranches of unsecured notes issued or guaranteed by Six Flags as follows:

   (a) On February 11, 2002, Six Flags issued $480,000,000 of 8 ⅞% Senior Notes maturing in the year 2010 (the "2010s"). Subsequently, Six Flags repurchased $199,700,000 of the 2010s and exchanged $149,223,000 of the 2010s for the 2016 Notes, described below. The 2010s are senior unsecured obligations of Six Flags and are not guaranteed by any of Six Flags' subsidiaries. The 2010s require annual interest payments of approximately $11,633,000 and, absent certain limited exceptions, such as changes in control of Six Flags and its subsidiaries, do not require any principal payments or repurchases prior to their maturity in 2010.

   (b) On April 16, 2003, Six Flags issued $430,000,000 of 9 ¾% Senior Notes maturing in the year 2013 (the "2013s"). Subsequently, Six Flags repurchased $56,000,000 of the 2013s and exchanged $231,559,000 of the

---

[3] The Bank of New York Mellon serves as indenture trustee for all such senior unsecured notes with the exception of the 2016 Notes, for which HSBC Bank USA, National Association serves as indenture trustee.

2013s for the 2016 Notes. The 2013s are senior unsecured obligations of Six Flags and are not guaranteed by any of Six Flags' subsidiaries. The 2013s require annual interest payments of approximately $13,888,000 and, absent certain limited exceptions, such as changes in control of Six Flags and asset sales, do not require any principal payments or repurchases prior to their maturity in 2013.

(c) On December 5, 2003, Six Flags issued $325,000,000 of 9 ⅝% Senior Notes maturing in the year 2014 (the "2014s"). In January 2005, Six Flags issued an addition $195,000,000 of the 2014s, the proceeds of which were used to fund the redemption of other senior notes of Six Flags. Six Flags has repurchased a total of $55,350,000 of the principal amount of the 2014s and has exchanged $149,863,000 of the 2014s for the 2016 Notes. The 2014s are senior unsecured obligations of Six Flags and are not guaranteed by any of Six Flags' subsidiaries. The 2014s require annual interest payments of approximately $30,298,000 and, subject to certain limited exceptions, such as changes in control of Six Flags and asset sales, do not require any principal payments or repurchases prior to their maturity in 2014.

(d) On June 16, 2008, Six Flags and Operations completed a private debt exchange in which Operations issued $400,000,000 of 12 ¼% Senior Notes maturing in the year 2016 which require annual interest payments of approximately $49,000,000 and are guaranteed by Six Flags and, subject to certain limited exceptions, such as changes in control of Six Flags or operations and asset sales, do not require any principal payments or repurchases prior to their maturity in 2016.

*Convertible Notes*

17. On November 19, 2004, Six Flags issued $299,000,000 principal amount of Convertible Notes, which are convertible into common stock in Six Flags at an initial conversion rate of 157.4803 shares for each $1,000 principal amount of Convertible Notes, subject to certain adjustments. During June and July of 2007, Six Flags repurchased $19,000,000 of the principal amount of the Convertible Notes. The Convertible Notes are senior unsecured obligations of Six Flags and are not guaranteed by any of Six Flags' subsidiaries. The Convertible Notes require annual interest payments of approximately $12,600,000, representing an interest rate of 4 ½% per year, and, subject to certain limited exceptions, such as fundamental changes of Six Flags, do not require any principal payments or repurchases prior to their maturity in 2015.

*Senior Secured Credit Facility*

18.  On May 25, 2007, certain of the Debtors entered into a senior secured credit agreement (the "Credit Facility") with a syndicate of lenders (the "Prepetition Lenders"), which provides for (i) an $850 million term loan maturing in April 2015 ($835,125,000 of which was outstanding as of March 31, 2009) (the "Term Credit Agreement") and (ii) a revolving facility (the "Revolver") totaling $275 million ($242,658,000 of which was outstanding as of March 31, 2009, as well as letters of credit in the amount of $31,402,000 on such date) and an uncommitted optional term loan tranche of up to $300 million. JPMorgan Chase Bank, N.A. serves as agent for the Prepetition Lenders. The Debtors are dependent on the Revolver to fund off-season expenses and must remain compliant with certain conditions, including a senior secured leverage ratio and certain other covenants. The Revolver matures on March 31, 2013.

19.  SFTP is the borrower under the Credit Facility, and its direct parent, Operations, along with its domestic subsidiaries, are guarantors. The Credit Facility contains customary representations and warranties, as well as affirmative and negative covenants. The Credit Facility requires quarterly principal repayments in the amount of $2.125 million, which commenced on September 30, 2007, with all remaining principal under the Credit Facility due at maturity on April 30, 2015 (other than with respect to the Revolver, which matures on March 31, 2013). As consideration for the Credit Facility, SFTP and Operations granted the agent for the Prepetition Lenders a security interest in substantially all of the Debtors' assets, including those of its wholly-owned domestic subsidiaries.

*PIERS*

20.  In January 2001, Six Flags issued 11,500,000 PIERS, for proceeds of $277,834,000. Each PIERS represents one one-hundredth (1/100) beneficial interest in a share of Six Flags' 7 ¼% convertible Preferred Stock. Six Flags' PIERS are required to be redeemed

- 9 -

on August 15, 2009 for cash at 100% of the liquidation preference, which will amount to approximately $287.5 million, in addition to accrued and unpaid dividends, which will total $31.3 million, assuming dividends are accrued and not paid through the mandatory redemption date. Subject to certain limited exceptions, such as changes in control of Six Flags, the PIERS do not require any redemption payments or repurchases prior to the redemption date.

*Trade Debt*

21. In connection with their nationwide operations, the Debtors have purchased a variety of goods and services from vendors. Such goods and services were purchased through purchase orders and other customary procedures used by such vendors in the ordinary course of business. A substantial portion of the merchandise sold in the Debtors' amusement parks is imprinted with or utilizes the Six Flags logo or other licensed designs, and many of the Debtors' commitments extend six to nine months into the future and may not be cancelled. As of the Petition Date, the Debtors estimate that they owe approximately $17 million for goods and services provided to them on an unsecured basis.

**Part III**

**Events Leading to the Commencement of These
Bankruptcy Cases and the Debtors' Chapter 11 Plans and Strategies**

22. Several internal and external factors have impacted the Debtors severely, prompting the liquidity pressures that precipitated the decision to commence these Bankruptcy Cases. From 1998 through 2005, Six Flags amassed over $2.4 billion of debt and PIERS obligations in connection with the acquisition of parks and various capital expenditure programs. As a result, the current management team, installed in late 2005 and early 2006, inherited a highly leveraged balance sheet, a burdensome cost structure, and significant legacy costs needing financial reorganization. The current management team has worked diligently to diversify and

grow revenues, increase operational efficiency and operating cash flows, and reduce the inherited debt obligations through, among other things, the sale of ten parks, a successful negotiation and execution of the Credit Facility on more favorable terms and with an extended maturity, and the completion of an exchange offer for the 2010s, 2013s, and 2014s in exchange for $400 million of the 2016 Notes, reducing principal by approximately $130.6 million and extending the debt maturities of such instruments.

23.    The current management's efforts have been successful.  In 2008, Six Flags achieved every one of its five key strategic goals that it had determined to accomplish by the end of the current management's third year.  In fact, in 2008, a year which was difficult for many enterprises reliant on discretionary consumer spending, Six Flags: (i) improved the overall guest experience and repositioned the brand by diversifying product offerings, resulting in guest satisfaction scores at or above all-time highs; (ii) created and grew new high margin and low capital sponsorship and licensing businesses, and achieved annual revenues in excess of the targeted $50 million, reaching approximately $59 million in 2008; (iii) achieved total revenue per capita of at least $40, or 20% cumulative growth from 2005; (iv) operated at a Modified EBITDA[4] margin of at least 30%; and (v) became Free Cash Flow positive for the first time in Six Flags' history, with an Adjusted EBITDA in excess of $275 million.

24.    The Debtors have material ongoing capital expenditure requirements and remain highly leveraged, with substantial cash interest costs as well as significant portions of their debt maturing, and the PIERS being mandatorily redeemable, in the near future.  In fact, as noted above, the Debtors' obligations under the PIERS mature on August 15, 2009, and certain of the

---

[4]    "Modified EBITDA" is defined as Adjusted EBITDA plus the interests of third parties in the Adjusted EBITDA of the four parks that are less than wholly owned less Six Flags' interest in the Adjusted EBITDA of Six Flags Great Escape Lodge & Indoor Waterpark and dick clark productions, inc.

Unsecured Notes, specifically, the 2010s, mature in February 2010. Moreover, the Debtors have been impacted by the deterioration of global economic conditions generally, the credit markets in particular, reduced consumer and advertising spending which has led to downward pressure on performance, negative performance impacts due to swine flu and reduced ongoing liquidity due to the unexpected high level of required purchases of limited partnership units in the Partnership Parks. Accordingly, the Debtors believe that commencement of bankruptcy proceedings will afford them the best opportunity to restructure their debt comprehensively and decisively.

25.     Prior to the commencement of the Bankruptcy Cases, the Debtors had meaningful discussions with their major creditor constituencies regarding the Debtors' restructuring alternatives. In fact, in October 2008, the Debtors retained a financial advisor, Houlihan, Lokey, Howard & Zukin Capital, Inc. ("Houlihan Lokey"), to assist in their efforts to complete an out-of-court restructuring. As part of this effort, on April 17, 2009 and May 6, 2009, the Debtors issued offering memoranda to holders of the Unsecured Notes and the Convertible Notes, among others, offering to exchange equity in Six Flags for extant debt owned by such holders (the "Exchange Offers"). The Exchange Offers required that at least 95% of the outstanding principal amount of the Unsecured Notes and the Convertible Notes be validly tendered for exchange by May 28, 2009. On May 29, 2009, the Debtors extended the tender deadline to June 12, 2009 in order provide additional time for holders to consider tendering as well as for the Debtors to evaluate and explore other restructuring alternatives in light of the low numbers of tenders and the implications of the negative performance trends as a result of the economic environment and the impact of swine flu.

26.     Unfortunately, the Debtors were unable to consummate an out-of-court restructuring of their existing obligations on terms sufficient to ensure the long-term viability of

the Debtors within the necessary timeframe. Accordingly, the Debtors engaged major creditor constituencies regarding the potential viability of a pre-packaged or pre-arranged chapter 11 process, but the parties were unable to reach a satisfactory conclusion to such negotiations prior to a prudent filing date.

27. The Debtors' primary goal is to effect a speedy and decisive restructuring of the Debtors' balance sheet to create a viable capital structure to enable it to generate long-term profitability. To this end, the Debtors entered into negotiations with a Steering Committee of the Prepetition Lenders to the Credit Facility regarding the terms of a comprehensive balance sheet financial restructuring that would involve the conversion of approximately $1.8 billion of debt into equity. These negotiations have resulted in a Restructuring Term Sheet that is supported by JP Morgan Chase Bank, N.A., as agent of the Credit Facility, and unanimously by the Steering Committee of Prepetition Lenders to the Credit Facility, which together represent approximately fifty percent of the outstanding Credit Facility obligations. These restructuring efforts will allow the Debtors to focus their resources on the operations of their parks and to continue management's recent operational successes. It is the Debtors' intention to restructure their operations and emerge from chapter 11 as soon as practicable.

## Part IV

### Facts Relevant to the First Day Pleadings

28. Together with the filing of these Bankruptcy Cases, the Debtors also filed the First Day Pleadings, which request various types of relief. Generally, the First Day Pleadings have been designed to meet the Debtors' goals of: (a) continuing their operations as debtors in possession with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of their guests, employees, vendors, suppliers, and service providers

during the Debtors' reorganization process; and (c) establishing procedures for the smooth and efficient administration of these Bankruptcy Cases.

29. It is my belief that, with respect to those First Day Pleadings requesting the authority to pay discrete prepetition claims or continue selected prepetition programs (e.g., those First Day Pleadings seeking relief related to the Debtors' obligations to their employees, guests, vendors and taxing authorities), the relief requested is essential to the Debtors' reorganization and necessary to avoid immediate and irreparable harm to the Debtors and their employees, guests, and affected vendors. Impairment of the Debtors' business operations or their relationships with their employees or vendors – at the very time when the smooth function of those operations and the dedication, confidence, and cooperation of those constituencies is critical, given that approximately 80% of the Debtors' revenue is generated by seasonal operations in the second and third calendar quarters, with the most significant period falling between Memorial Day and Labor Day – clearly would imperil the Debtors' chances of a successful reorganization. The Debtors operate in an industry that relies upon the ability to satisfy and exceed guests' expectations. Any diminution in the Debtors' ability to maintain their operations in the ordinary course of business will have an immediate and irreparable harmful impact upon the going concern value of the Debtors' estates, to the detriment of all of the Debtors' stakeholder constituencies. The Debtors believe that payment of those selected prepetition claims identified in the First Day Pleadings will forestall irreparable harm and that all creditors of the Debtors ultimately will benefit from the relief requested therein.

30. I have reviewed each of the First Day Pleadings filed contemporaneously herewith (including the exhibits thereto and supporting memoranda) and incorporate by reference the factual statements set forth in the First Day Pleadings. It is my belief that the relief

sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve a successful reorganization. The following paragraph sets forth facts specifically relating to the Debtors' severance program.

***The Debtors' Severance Program***

31.     The Debtors do not anticipate terminating any employees in connection with these Bankruptcy Cases. In the event that terminations are necessary, however, the Debtors have a written policy, generally applicable to all full-time employees of the Debtors and listed in the Full-Time Employee Handbook, of providing one week of pay per year of service in severance payments when employees are terminated without cause by the Debtors (the "Termination Payments"). Except for limited instances in which certain employees are entitled to an alternative severance arrangement pursuant to contracts with Six Flags, Termination Payments are offered uniformly to all such full-time employees at both the park and corporate levels. No Termination Payment to any individual employee will exceed $10,950, either alone or in combination with any other prepetition compensation except in the limited circumstances referenced above. No employee who may potentially receive a Termination Payment would be an "insider" as defined by section 503(c) of the Bankruptcy Code, and in all events, as noted above, the Debtors currently do not anticipate that any reduction in force will be necessary and, accordingly, the Debtors believe that no employees will qualify for Termination Payments.

Further affiant sayeth not.

Dated: June 13, 2009
New York, New York

_____
Jeffrey R. Speed

Sworn to and subscribed before me, a notary public for the State of NY, County of NY, this 13 day of June, 2009.

_____
Notary Public

DANIELLE J. BERNTHAL
NOTARY PUBLIC-STATE OF NEW YORK
No. 02BE6156370
Qualified in New York County
My Commission Expires November 27, 2010

18

# EXHIBIT A

## Corporate Structure Chart of Debtor Entities

