IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Premier International Holdings Inc., et al.,[1] | ) | Case No. 09-12019 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related Docket Nos. 615 and 655** |
| | ) | |

Objection Deadline: October 22, 2009 at 5:00 p.m.(prevailing Eastern Time)
Hearing Date: October 29, 2009

# OMNIBUS RESPONSE OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO (I) EMERGENCY MOTION OF THE INFORMAL COMMITTEE OF SFO NOTEHOLDERS FOR AN ORDER (A) TERMINATING THE DEBTORS' EXCLUSIVE PERIODS IN WHICH TO FILE A PLAN OF REORGANIZATION AND SOLICIT ACCEPTANCES THEREOF AND (B) ADJOURNING THE HEARING TO APPROVE THE DEBTORS' DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PLAN OF REORGANIZATION AND (II) THE DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE EXTENDING THEIR EXCLUSIVE PERIODS IN WHICH TO FILE A CHAPTER 11 PLAN AND SOLICIT VOTES THEREON

The Official Committee of Unsecured Creditors (the "Official Committee") of Premier International Holdings, Inc. and certain of its subsidiaries and affiliates (collectively, the "Debtors"), by and through its undersigned co-counsel, hereby submits this omnibus response (the "Response") to the (I) Emergency Motion (the "Exclusivity Termination Motion") of the

---

[1] The Debtors are the following thirty-seven entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Astroworld GP LLC (0431), Astroworld LP (0445), Astroworld LP LLC (0460), Fiesta Texas Inc. (2900), Funtime, Inc. (7495), Funtime Parks, Inc. (0042), Great America LLC (7907), Great Escape Holding Inc. (2284), Great Escape Rides L.P. (9906), Great Escape Theme Park L.P. (3322), Hurricane Harbor GP LLC (0376), Hurricane Harbor LP (0408), Hurricane Harbor LP LLC (0417), KKI, LLC (2287), Magic Mountain LLC (8004), Park Management Corp. (1641), PP Data Services Inc. (8826), Premier International Holdings Inc. (6510), Premier Parks of Colorado Inc. (3464), Premier Parks Holdings Inc. (9961), Premier Waterworld Sacramento Inc. (8406), Riverside Park Enterprises, Inc. (7486), SF HWP Management LLC (5651), SFJ Management Inc. (4280), SFRCC Corp. (1638), Six Flags, Inc. (5059), Six Flags America LP (8165), Six Flags America Property Corporation (5464), Six Flags Great Adventure LLC (8235), Six Flags Great Escape L.P. (8306), Six Flags Operations Inc. (7714), Six Flags Services, Inc. (6089), Six Flags Services of Illinois, Inc. (2550), Six Flags St. Louis LLC (8376), Six Flags Theme Parks Inc. (4873), South Street Holdings LLC (7486), Stuart Amusement Company (2016). The mailing address of each of the Debtors solely for purposes of notices and communications is 1540 Broadway, 15th Floor, New York, NY 10036 (Attn: James Coughlin).

Informal Committee of SFO Noteholders (the "SFO Noteholders Committee") for an Order Terminating the Debtors' Exclusivity Period to File a Plan of Reorganization (the "Exclusivity Period") pursuant to Section 1121(d) of title 11 of the United States Code (the "Bankruptcy Code") and (II) the Debtors' Motion to For Entry of an Order Pursuant to Section 1121 of the Bankruptcy Code Extending Their Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Votes Thereon ("Exclusivity Extension Motion"). The Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1. The Committee is composed of creditor representatives from each of the three levels of the Debtors' capital structure – Six Flags Theme Parks, Inc. ("SFTP"), the entity which operates the Debtors' parks, Six Flags Operations, Inc. ("SFO"), the intermediate holding company, and Six Flags, Inc. ("SFI"), the ultimate parent.[2] In furtherance of its fiduciary duty to creditors of all such entities, the Committee has an obligation to give serious consideration to feasible alternatives to the Debtors' First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Debtors' Plan"). The Committee believes that the Informal Committee of SFO Noteholders' Joint Plan of Reorganization under chapter 11 of the Bankruptcy Code (the "Alternative Plan") may present such an alternative.

2. In fact, in recent weeks the Committee has been engaged in discussions with both the Debtors and the agents under the Prepetition Credit Facility (defined below), on the one hand, and the SFO Noteholders Committee, on the other, in an effort to better understand the

---

[2] As part of its response to the Motion, the Ad Hoc Committee of SFI Noteholders suggested that it may seek the appointment of a separate official committee or representative of SFI creditors. See SFI Noteholders Limited Response (I) In Support of the Exclusivity Extension Motion and (II) In Opposition to the Exclusivity Termination Motion, ¶ 5. While the Committee need not adopt a position on this issue because no motion or formal request for the appointment of a separate committee of SFI creditors is pending, the Committee, nevertheless, wishes to apprise the Court that it is mindful that it has a fiduciary duty to creditors of all estates, including SFI. Moreover, the Committee includes several holders of SFI Notes as well as the indenture trustee for such Notes.

details of their proposals and to attempt to negotiate changes designed to provide for an acceptable allocation of the Debtors' true going concern value amongst various creditor constituencies. In particular, the Committee's ongoing diligence and discussions concern confirmation issues which both plans will have to overcome in their present form. In sum, the Committee's professionals are currently engaged in a complex analysis of the economic and legal issues raised by both proposed plans in an effort to determine which plan is, or can be made to be, fair and equitable to all general unsecured creditors.

3. While progress is being made, the Committee respectfully submits that it would be in the best interest of its creditor constituents and the estates for this Court to force all parties to slow down and maintain the status quo while diligence and negotiations continue at least through the next scheduled omnibus hearing on November 5, 2009.

4. A brief delay would enable the Court to defer a decision on whether to lift the Exclusivity Period, as the SFO Noteholders seek, which would be a decision with broader consequences, or to extend such period for another ninety (90) days, as the Debtors seek, which would effectively foreclose the possibility of an alternative plan. While the Committee is supportive of an open, competitive plan process and may ultimately urge this Court to terminate the Exclusivity Period if necessary to ensure such a process, it respectfully submits that at this stage of these cases a decision on such request is not yet ripe. Similarly, it would be premature to foreclose the possibility of a competing plan by granting the Debtors' Exclusivity Extension Motion. A brief adjournment of both the SFO Noteholders' Committee's Exclusivity Termination Motion and the Debtors' Exclusivity Extension Motion, while exclusivity remained in place, would be a far less restrictive alternative, one which would allow the negotiation process to continue on a more level playing field.

5. Finally, for continued negotiations to be fruitful, the Court must also ensure that the process is open and transparent and that the Debtors fully cooperate with the SFO Noteholders Committee and any other viable plan proponent.

## BACKGROUND

### I. General Background

6. On June 13, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On June 13, 2009, the Court entered an order approving joint administration of these Chapter 11 Cases. As of the date of this filing, the Debtors remain in possession of their assets and manage their business as debtors-in-possession, pursuant to Bankruptcy Code Sections 1107(a) and 1108.

7. On June 26, 2009 (the "Committee Formation Date"), the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Official Committee. On the Committee Formation Date, the Official Committee retained Brown Rudnick LLP as bankruptcy counsel to the Official Committee. On June 30, 2009, the Official Committee retained Pachulski Stang Ziehl & Jones LLP as Delaware counsel to the Official Committee.

### II. The Debtors' Capital Structure.

8. The Debtors' primary liabilities consist of: (a) three tranches of unsecured notes issued by SFI maturing in years 2010, 2103, and 2014 respectively (collectively, the "Unsecured Notes"); (b) one tranche of convertible notes issued by SFI maturing in 2015 (the "Convertible Notes"); (c) one tranche of unsecured notes issued by SFO and guaranteed by SFI maturing in the year 2016 (the "SFO Notes"); (d) the Six Flags Theme Parks Inc. ("SFTP") senior secured Credit Facilities (defined below) ("Prepetition Credit Facility") guaranteed by SFO and subsidiaries of SFTP with an aggregate outstanding principal balance of approximately $1.1 million as of the Petition Date; (e) outstanding preferred income equity redeemable shares

("PIERS"), which were required to be redeemed for cash on August 15, 2009; and (f) unsecured trade debt.[3] The outstanding balance of the SFI Unsecured Notes and Convertible Notes as of the Petition Date was approximately $868.3 million; the outstanding balance of the SFO Notes as of the Petition Date was approximately $400 million.

### III. The Lenders' Prepetition Credit Facility and Their Resulting Leverage.

9. On May 25, 2007, SFI, SFO, and SFTP, the direct and indirect parents of Premier, entered into an Amended and Restated Credit Agreement (the "Credit Agreement") with JPMorgan Chase Bank, N.A., as administrative agent, (the "Agent") and the lenders from time to time party thereto (the "Lenders"), which amended and restated a previous credit facility among substantially the same parties. Certain subsidiaries of SFI, including Premier and the other Debtors, (the "Guarantors"), guaranteed the obligations arising under the Credit Agreement and gave security therefore. The Credit Agreement establishes a revolving facility for working capital purposes (as subsequently amended and supplemented, or modified, the "Revolving Facility") and a term loan facility (the "Term Facility," and together with the Revolving Facility, the "Credit Facilities"). As of the Petition Date, approximately $242 million was due and owing under the Revolving Facility and approximately $850 million was due and owing under the Term Facility.

### IV. The Exchange Offer, Lock Up Agreement, Debtors' Plan and Phantom Decline in Debtors' Value.

10. In October 2008, the Debtors retained a financial advisor, Houlihan, Lokey, Howard & Zukin Capital, Inc. ("Houlihan Lokey"), to assist in their efforts to complete an out-of-court restructuring. See Speed Affidavit ¶ 25 at 12. As part of this effort, on April 17, 2009 and May 6, 2009, the Debtors issued offering memoranda to holders of the Unsecured Notes and

---

[3] See Affidavit Of Jeffrey R. Speed In Support Of First Day Pleadings (the "Speed Affidavit") ¶ 13 at 6.

the Convertible Notes, among others, setting forth the Exchange Offer. See Id. The Exchange Offer required that at least 95 percent of the outstanding principal amount of the Unsecured Notes and the Convertible Notes be validly tendered for exchange by May 28, 2009 (later extended to June 12, 2009). See Id. Pursuant to the Exchange Offer, 85 percent of the equity of SFI would accrue to holders of the Unsecured Notes and Convertible Notes, 10 percent to the PIERS holders and 5 percent would go to SFI equity holders. Obligations under the Credit Facilities would have remained in place.

11. Before the expiration of the Exchange Offer, the Debtors began fast-track negotiations with a Steering Committee of the Lenders (the "Lender Steering Committee"). Speed Affidavit ¶ 27 at p. 13. These restructuring negotiations resulted in a letter agreement, dated June 13, 2009 (the "Lock Up Agreement") between SFI and certain Lenders setting forth the conditions pursuant to which the Debtors are required to propose a chapter 11 plan of reorganization supported by the participating Lenders and under which substantially all of the Debtors' value will be allocated to the Lenders.

12. As required by the Lock Up Agreement, the Debtors filed their joint plan of reorganization and disclosure statement (the "Disclosure Statement") on July 22, 2009 that, consistent with the Lock Up Agreement, provides for a balance sheet financial restructuring that would confer 92 percent of the SFI equity to the Lenders, and allow them to retain term and revolving loans totaling $750 million. Holders of the SFO Notes would receive 7 percent of the equity; SFI creditors would receive 1 percent, all subject to dilution by the issuance of up to 10 percent of the equity to the Debtors' senior management.[4]

---

[4] The Committee has been informed that the Debtors are contemplating filing an amended plan of reorganization and disclosure statement which may materially alter the terms of the plan currently on file with this Court, and would likely include material changes to the treatment of certain classes of creditors. Pending its review of any such amended plan and disclosure statement, the Committee reserves its rights to argue that such an amended plan is, in

13. Because substantially all of the enterprise value of the reorganized Debtors would go to the Lenders under the plan contemplated by the Lock Up Agreement and very little to SFO and SFI creditors, it is premised on the notion that there was a precipitous fall in the Debtors' enterprise value over the two-month period after the Exchange Offer was announced.

## V. The Alternative Plan Proposed by the SFO Noteholders Committee

14. Given that the SFO Noteholders Committee has filed the Alternative Plan under seal, the Committee is only at liberty to discuss the terms of the plan to the extent they are referenced in the Motion or other related pleadings filed by the SFO Noteholders Committee. As such, the Committee will not address in this publicly filed response many of its concerns with proposed terms of the Alternative Plan. Suffice it to say, the Committee believes, *inter alia*, that the Alternative Plan, while facially preferable to the Debtors' Plan in some respects, could face confirmation hurdles.

## VI. The Committee is Engaged in Ongoing Negotiations and Discussions with the Plan Proponents

15. Shortly before filing its Motion, the SFO Noteholders Committee presented the outline of its Alternative Plan to the Committee. Since that time, the Committee and its professionals have had (and hope to continue to have) several meetings and discussions with the SFO Noteholders Committee and their professionals to better understand and negotiate the terms of the Alternative Plan. The Committee and its professionals also have had (and hope to continue to have) meetings and discussions with the Debtors and their professionals regarding

---

fact, a new plan filed outside the 120 day Exclusivity Period. Moreover, the Committee retains its rights to argue that the Debtors' filing of an materially amended plan and disclosure statement approximately a week prior to the hearing scheduled to consider approval of the disclosure statement would be in violation of Rule 2002(b)(1) of the Federal Rules of Bankruptcy Procedure which require that parties in interest be given 25 days notice of the time "fixed for fling objections and the hearing to consider approval of a disclosure statement." Fed. R. Bankr. P. 2002(b)(1).

their plan. While some progress is being made in both sets of negotiations, neither of them has reached their conclusion.

16. On September 18, 2009, the Debtors filed the Exclusivity Extension Motion seeking an extension of their Exclusivity Period for 90 days, from October 11, 2009 until and through January 9, 2010. The Exclusivity Extension Motion also seeks an extension of their exclusive period in which to solicit votes for a plan for an additional 90 days. Both motions were originally scheduled to be heard by this Court on October 8, 2009, but the Debtors and the SFO Noteholders Committee consensually agreed to continue both motions until October 16, 2009. See Notice of Agenda of Matters Scheduled for Hearing on October 09, 2009 [Docket No. 759]. Moreover, a couple of days prior to the hearing scheduled for October 16, 2009 the Debtors and the SFO Noteholders Committee again agreed to further continue both motions until October 29, 2009. See Notice of Agenda of Matters Scheduled for Hearing on October 16, 2009 [Docket No. 790].

17. While the Committee believes it is possible that, given a short period of additional time, these discussions may prove fruitful and lead to a plan of reorganization which it could support, it is concerned that an October 29 hearing on the merits of the dueling exclusivity motions will cut off discussions and force this case into a very contentious litigation track.

## ARGUMENT

### I. Either Termination or a Ninety (90) Day Extension of the Exclusivity Period Would be Premature at this Juncture

18. The SFO Noteholders Committee and the Debtors are both correct that this Court has the authority to terminate or extend exclusivity under Bankruptcy Code §1121(d)(1) for "cause". The SFO Noteholders also accurately point out that a recent trend in the Third Circuit and other jurisdictions has been to do so to permit creditors to consider a viable, alternative plan

which would arguably afford them a materially greater recovery. See e.g., In re Pliant, Case No. 09-10443 (Bankr. D. Del. 2009); In re TCI 2 Holdings, LLC (a/k/a Trump Entertainment Resorts), Case No. 09-13654 (JHW) (Bankr. D.N.J. Aug. 27, 2009); In re Magnachip Semiconductor Fin. Co., Case No. 09-12008 (PJW) (Bankr. D. Del. Aug. 3, 2009); In re Seitel, Inc., Case No. 03-12227 (PJW) (Bankr. D. Del. Nov. 7, 2003); In re Haw. Telecom Commcn's, Inc., Case No. 08-2005 (Bankr. D. Haw. July 1, 2009). However, as Judge Walrath noted in Pliant, "[while [t]he Court's discretion to terminate exclusivity is broad . . . [t]he Debtors' right to propose a plan to run its case is a very important right in bankruptcy. Termination of exclusivity may have other consequences than simply allowing an alternative plan to be put forward."

19. Judge Walrath's balancing of these interests is consistent with the history and purpose of the section *and* the competing interests which Congress sought to balance when it enacted the 120-day time table plus an additional 60 days to achieve confirmation of a plan filed within the original 120 day period. See In re Lehigh Valley Prof'l Sports Clubs, Inc., 2000 Bankr. LEXIS 237 at *11 (Bankr. E.D. Pa. Mar. 14, 2000) (citing In the Matter of All Seasons Industries, 121 B.R. 1002, 1003 (Bankr. N.D. Ind. 1990) (discussing the bankruptcy court's duty to consider legislative intent)). In electing to change the pre-Code scheme of unlimited exclusivity for the debtor, Congress could have allowed any party to file a plan from the inception of the case, but, rather, chose to grant the debtor exclusivity for 120 days. In recognizing the need to balance interests, Congress stated: "[the] [p]roposed chapter 11 recognizes the need for the debtor to remain in control to some degree, though not to excess. . . ." Id. at *13 (citing H.R. Rep. No. 595, 231-32, 95th Cong., 1st sess. 402 (1977)).

20. Congress developed the Exclusivity Period with the intent "to promote the environment in which the debtor's business may be rehabilitated and a consensual plan may be negotiated" without allowing the debtors to abuse that position to the detriment of creditors. Id. at *14 (citing K. Gross and P. Redmond, In Defense of Debtor's Exclusivity: Assessing Four of the 1994 Amendments to the Bankruptcy Code, 69 American Bankruptcy L.J. 287, 308 n.29 (1995)); see also In re Elder-Beerman Stores, 1997 U.S. Dist. LEXIS 23785, at *14-15 (granting an extension of the debtors' Exclusivity Period and rejecting creditors' committee's argument that extension would contradict Congress' intent); In re Lehigh, 2000 Bankr. LEXIS 237, at *12, (citing All Seasons Indus., 121 B.R. at 1003 (discussing the bankruptcy court's duty to consider legislative intent)).

21. Thus, fundamentally, the Exclusivity Period was designed to foster an environment of negotiation rather than competition. See In re Texaco Inc., 81 B.R. 806, 809 (Bankr. S.D.N.Y. 1988) ("It was intended that at the outset of a chapter 11 case a debtor should be given the unqualified opportunity to negotiate a settlement and propose a plan of reorganization without interference from creditors and other interests" (citing H.R. Rep. No. 595, at 221-221 (1978)). Accordingly, the importance of the Debtors' Exclusivity Period derives from the need to "give the Chapter 11 process of negotiation and compromise an opportunity to be fulfilled, so that a consensual plan can be proposed and confirmed without opposition." All Seasons Indus., 121 B.R. at 1006.

22. In the Motion, the SFO Noteholders Committee cites the seminal decision in Dow Corning for the proposition that in assessing whether the requisite "cause" exists to terminate exclusivity, "the primary consideration should be whether or not doing so would facilitate moving the case forward." In re Dow Corning, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997).

The SFO Noteholders Committee argues that terminating exclusivity to allow consideration of the Alternative Plan will move these Chapter 11 cases forward, yet termination of exclusivity at this time could have the opposite effect. In the event that the Exclusivity Period is terminated, the negotiation processes may, as a practical matter, be disabled. A likely outcome of a termination of exclusivity will be the filing of at least two separate plans (with the possibility of a third or fourth from SFI bondholders and holders of the PIERS), with the consequence that, rather than coming to the same negotiating table, creditors will become polarized, rallying around the plan that best supports their own parochial interests. On the other hand, if the Exclusivity Period were extended for an additional ninety (90) days as the Debtors seek, there would be little reason for the Debtors to negotiate. If the Exclusivity Period were to be left in place for a short period of time, the Debtors, SFO Noteholders Committee and the Committee could continue to work toward a truly consensual and confirmable plan, and in so doing avoid a costly, messy, and time-consuming confirmation hearing. Rather than "mov[ing] the case forward," a decision to either terminate exclusivity at this juncture or to extend exclusivity and proceed full bore with the Debtors' Plan will stymie the progress of these Chapter 11 cases and place them on a course toward intractable litigation.

23. Under these circumstances, the Committee respectfully suggests that the Court enter appropriate orders to maintain the status quo through the omnibus hearing now scheduled for November 5, 2009. Depending on how circumstances develop, the decision as to whether to extend the Exclusivity Period or to terminate the Exclusivity Period can be revisited then.

II. **The Motion to Extend Exclusivity Inaccurately Seeks a 90 day Extension of the Exclusive Period in Which to Solicit Votes for a Plan through April 09, 2010.**

24. Although the Committee is requesting the Court to defer deciding whether the Exclusivity Extension Motion should be granted or denied, it nevertheless, is compelled to point out a factual inconsistency in the Debtors' pleading.

25. The Exclusivity Extension Motion asserts that the Debtors are seeking a 90 day extension of the period the Debtors have the exclusive right to solicit acceptances of a plan filed within the Exclusivity Period (the "Exclusive Acceptance Period"). See Exclusivity Extension Motion, ¶ 14. In the Exclusivity Extension Motion, the Debtors acknowledge that the Exclusive Acceptance Period currently expires on December 10, 2009. See Id. A 90 day extension from December 10, 2009 would run until March 10, 2010. However, the Debtors have requested that the 90 day extension result in the Exclusive Acceptance Period expiring on April 09, 2010, which would, in fact, be a 120 day extension.

## RESERVATION OF RIGHTS

26. The Committee expressly reserves all of its rights to assert additional objections to the Motion either at or prior to any hearing on the Motion.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Committee requests that the Court enter an order which: (i) continues both the Exclusivity Termination Motion until at least November 5, 2009; and (ii) grants such other and further relief as is just and proper.

Dated: October 2, 2009

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
      tcairns@pszjlaw.com

and

BROWN RUDNICK LLP
Edward S. Weisfelner, Esquire
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
Email: eweisfelner@brownrudnick.com

and

BROWN RUDNICK LLP
Steven D. Levine, Esquire
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201
Email: slevine@brownrudnick.com

Co-Counsel to the Official Committee of Unsecured Creditors