## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
: 
In re : Chapter 11
: 
Premier International Holdings Inc., *et al.*,[1] : Case No. 09-12019 (CSS)
: 
Debtors. : (Jointly Administered)
: 
: **Re: Docket Nos. 496-499, 538 and 615**
: 
---------------------------------------------------------------x

## OBJECTION TO EMERGENCY MOTION OF THE INFORMAL COMMITTEE OF SFO NOTEHOLDERS FOR AN ORDER (I) TERMINATING THE DEBTORS' EXCLUSIVE PERIODS IN WHICH TO FILE A PLAN OF REORGANIZATION AND SOLICIT ACCEPTANCES THEREOF AND (II) ADJOURNING THE HEARING TO APPROVE THE DEBTORS' DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PLAN OF REORGANIZATION

The above-captioned debtors and debtors in possession (the "Debtors"), by and through their undersigned counsel, hereby file their objection (the "Objection") to the Emergency Motion of the Informal Committee of SFO Noteholders (the "Informal Committee") for an Order (i) Terminating the Debtors' Exclusive Periods in which to File a Plan of Reorganization and Solicit Acceptances Thereof and (ii) Adjourning the Hearing to Approve the Debtors' Disclosure

---

[1] The Debtors are the following thirty-seven entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Astroworld GP LLC (0431), Astroworld LP (0445), Astroworld LP LLC (0460), Fiesta Texas Inc. (2900), Funtime, Inc. (7495), Funtime Parks, Inc. (0042), Great America LLC (7907), Great Escape Holding Inc. (2284), Great Escape Rides L.P. (9906), Great Escape Theme Park L.P. (3322), Hurricane Harbor GP LLC (0376), Hurricane Harbor LP (0408), Hurricane Harbor LP LLC (0417), KKI, LLC (2287), Magic Mountain LLC (8004), Park Management Corp. (1641), PP Data Services Inc. (8826), Premier International Holdings Inc. (6510), Premier Parks of Colorado Inc. (3464), Premier Parks Holdings Inc. (9961), Premier Waterworld Sacramento Inc. (8406), Riverside Park Enterprises, Inc. (7486), SF HWP Management LLC (5651), SFJ Management Inc. (4280), SFRCC Corp. (1638), Six Flags, Inc. (5059), Six Flags America LP (8165), Six Flags America Property Corporation (5464), Six Flags Great Adventure LLC (8235), Six Flags Great Escape L.P. (8306), Six Flags Operations Inc. (7714), Six Flags Services, Inc. (6089), Six Flags Services of Illinois, Inc. (2550), Six Flags St. Louis LLC (8376), Six Flags Theme Parks Inc. (4873), South Street Holdings LLC (7486), Stuart Amusement Company (2016). The mailing address of each of the Debtors solely for purposes of notices and communications is 1540 Broadway, 15th Floor, New York, NY 10036 (Attn: James Coughlin).

Statement for the Debtors' Joint Plan of Reorganization (the "Emergency Motion"). In support of the Objection, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1. The Emergency Motion's sole premise – that the Debtors are interested exclusively in the retention and enrichment of management to the detriment of all creditor constituencies – is wholly without merit. As recent events have made abundantly clear, the Debtors ongoing engagement and collaboration with all creditor constituencies, including the Informal Committee, is bearing fruit. The Debtors' goal throughout this process has been to reach the broadest possible consensus in support of a plan of reorganization.

2. As just one example, the Debtors agreed to delay a disclosure statement hearing set for October 8, 2009, so that all constituencies would have additional time to reach a consensus. In addition, the Debtors proactively have engaged potential lending resources in order to garner financing in support of a revised plan of reorganization (the "Revised Plan"). The Revised Plan will provide committed exit financing, a rights offering subscription, and recoveries equal to, or greater, that those offered in alternative plan set forth by the Informal Committee (the "Alternative Plan"). The Revised Plan also provides for the retention of management personnel, ensuring a smooth transition from chapter 11 proceedings. In fact, the Revised Plan is expected to build substantially upon the features already set forth in the Alternative Plan, plainly indicating that the Debtors share the Informal Committee's reasonable desire to ensure the maximum possible recovery for the Debtors' stakeholders.

3. To be clear, the Debtors have yet to express any opinion regarding the merits of the Alternative Plan, except to the extent that the Debtors have adopted a substantial portion of the Alternative Plan in constructing the Revised Plan. The Debtors simply are unwilling to adopt wholesale the Alternative Plan without further investigation. In fact, the Debtors have many

unanswered questions regarding the Alternative Plan – specifically, despite repeated requests, the Informal Committee has not provided a business plan, an identification of the proposed new management team, or an explanation of the financial assumptions made by the Alternative Plan, or any information that would indicate that their plan is fully financed. (*See* Emergency Motion at ¶ 29 ("While it is true that, as of the date hereof, the debt financing component of the Alternative Plan is not yet fully committed . . .").)

4. Thus, the Informal Committee's focus on the supposed determination to confirm the previously filed plan of reorganization is misplaced, and in fact recent events only serve to demonstrate the Debtors' good faith in seeking the best possible plan of reorganization with the broadest possible support. Indeed, substantially all of the Informal Committee's bases for termination of exclusivity are unjusitified in light of recent events and the Debtors' continued commitment to engaging their creditor constituencies. Accordingly, the termination of exclusivity will do more harm than good, and the Informal Committee has not and cannot meet their burden of showing "cause" required to warrant termination of the Exclusive Periods (defined below).

## GENERAL BACKGROUND

5. On June 13, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Bankruptcy Cases"). The Debtors are continuing to operate their business as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code. An official committee of unsecured creditors (the "Committee") was appointed on June 26, 2009.

6. Six Flags, Inc. ("Six Flags") is the largest regional theme park operator in the world. From its headquarters in New York City, Six Flags indirectly owns or operates twenty parks located in geographically diverse markets across North America, including eighteen

domestic parks, one park in Mexico, and one park in Canada. Six Flags and its affiliates currently employ approximately 2,040 full-time employees, 16% of whom are subject to labor agreements with local chapters of national unions. In addition, Six Flags and its affiliates employed 28,500 seasonal employees during the 2008 operating season.

7. As of the Petition Date, the Debtors had approximately $1,268.3 million of fixed-rate senior unsecured notes, with staggered maturities ranging from 2010 to 2016 (the "Unsecured Notes"). In addition, certain of the Debtors entered into a senior secured credit agreement (the "Credit Facility") with a syndicate of lenders (the "Prepetition Lenders"), which provides for (i) an $850 million term loan maturing in April 2015 ($835,125,000 of which was outstanding as of the Petition Date) (the "Term Credit Agreement") and (ii) a revolving facility (the "Revolver") totaling $275 million ($243,492,063 of which was outstanding as of the Petition Date), as well as letters of credit in the amount of $31,402,000 on such date) and an uncommitted optional term loan tranche of up to $300 million.

## SPECIFIC BACKGROUND

8. The Emergency Motion presents a skewed history of the negotiations leading up to the Petition Date and the conduct of the Debtors subsequent to the Petition Date that is both conclusory and one-sided. At every turn, the Emergency Motion endeavors to portray the Debtors as malicious and secretive, intent only upon the enrichment of management to the detriment of almost every creditor constituency. Accordingly, the Debtors are compelled to set forth the full history of negotiations leading to the present.

9. In connection with the Debtors' efforts to appropriately evaluate all potential restructuring alternatives, in March 2009, the Debtors entered into good-faith negotiations with Avenue Capital Management ("Avenue") in its capacity as the largest holder of the 2016 Notes, a significant holder of other Unsecured Notes, and a Prepetition Lender, in an attempt to

restructure their balance sheet through a transaction that had the potential to result in a pre-negotiated chapter 11 filing. Negotiations with Avenue focused on the conversion of the 2016 Notes into the bulk of the equity of reorganized Six Flags and were dependent upon reinstatement of the favorable terms of the Credit Facility.

10. As the negotiations ensued, and the Debtors' concerns increased regarding the effects of economic turbulence in the United States and abroad and other negative impacts on the Debtors' businesses and prospects, the Debtors' financial analyses indicated that even with the restructuring proposed by Avenue through the conversion of Unsecured Notes into equity and the reinstatement of the Credit Facility, an additional $200 million of capital, at a minimum, would be required to ensure adequate liquidity for the Debtors' seasonal business, including liquidity to periodically fund potential Partnership Park "puts" at assumed levels. Even with an additional $200 million of capital, the Debtors would still have been exposed to a shortfall in liquidity in the event that "puts" occurred at the maximum possible levels. Moreover, the Debtors made clear to Avenue that this funding would be in addition to any capital needed to address potential breaches of the financial covenant in future periods under the Credit Facility, which was essential to preserve the possibility of reinstatement of those loans, a requirement under Avenue's proposal.

11. After the Debtors communicated these proposals, Avenue initially responded with a convertible debt funding proposal of $175 million on a delayed-draw basis, with a high interest rate and significant fees, and conditioned on a conversion of that capital to common stock in reorganized Six Flags at a 25% discount to the value established in the proposed reorganization plan. The Debtors responded that the terms of this funding were not at-market terms and, in any event, were inadequate to meet the Debtors' financial needs, including the financial covenant

issue. Avenue then presented the Debtors with a revised financing proposal on May 29, 2009, which provided for $175 million of capital to be available upon closing, but with an increased conversion discount of 30% to the proposed plan valuation. This proposal was, therefore, even more expensive in terms of potential equity dilution than the prior Avenue proposal, and remained inadequate to meet the Debtors' liquidity and financial covenant compliance needs.

12. On June 8, 2009, Avenue presented a revised offer of only $100 million of convertible debt capital, with an escalating interest rate, convertible to SFI common stock, at an initial conversion price of a 30% discount to the reorganization plan value, and without resolution of the Debtors' financial covenant concerns. Avenue also requested a new "fee" of 5% of the restructured equity of SFI in return for this dramatically reduced $100 million of capital. On June 12, 2009, the Debtors received a term sheet from Avenue confirming the revised terms as verbally communicated on June 8, 2009.

13. Meanwhile, a thirty-day grace period to make interest payments on account of the 2015 Notes was set to expire on June 14, 2009. Given the tightening liquidity position, the Debtors were facing the possibility of being unable to make the June 14, 2009 payment resulting in a payment default which could have led to the immediate acceleration of most, if not all, of the Debtors' extant funded debt obligations. If these events had transpired, it would have eliminated the possibility of reinstating the favorable terms of the Credit Facility. The Debtors thus had less than a week to reach a final agreement regarding an alternative plan. That culminated in the current plan of reorganization as amended and filed with the Court on August 21, 2009 (the "Original Plan").

14. Since the filing, the Debtors have continued to have extensive discussions and have shared significant information with a wide variety of creditor constituencies, including the

Committee, holders of all unsecured notes, and Time Warner. In concert with these discussions, the Debtors established and made available to both the Committee and the agent for the Prepetition Lenders a datasite containing substantially all of the information and diligence requested by the Committee. Included in this information was a summary of "doctrine of necessity" payments made by the Debtors, and requested in previous correspondence by Avenue.

15. After the Debtors filed the initial amendment to the Original Plan in mid-August, counsel for Avenue sent a letter to the Board on September 2, indicating that it represented Avenue and additional holders of the 2016 Notes who now comprised the Informal Committee of such holders, and presenting a term sheet and other documents outlining the Alternative Plan. The key economic element of the Alternative Plan was that it involved new debt financing and equity through a rights offering sufficient to repay the existing secured debt in full, leaving equity for distribution to the different constituencies of noteholders. Significantly, the debt financing for the Alternative Plan was not committed, and the total amount of proposed new debt and equity was insufficient under the Debtors' business model and financial projections. Nonetheless, the Informal Committee sought the Debtors' commitment – and agreement to a break-up fee if they failed to honor that commitment – to the Alternative Plan by September 8, the first business day after the Labor Day holiday weekend. The Debtors initially responded that they needed additional time and information in order to evaluate the Alternative Plan properly, and then followed up a detailed list of questions and requests for additional information in connection with the Alternative Plan.

16. In response, the Informal Committee filed a motion to terminate the statutorily proscribed periods during which the Debtors possess an exclusive right to pursue a plan or reorganization (the "<u>Exclusive Periods</u>"), in order to enable the Informal Committee to present

the Alternative Plan to all creditors. Notwithstanding this approach, the Debtors sought to engage in a dialogue with the Informal Committee to explore the Alternative Plan approach and determine if it warranted a modification of the Original Plan. Initial efforts at that dialogue proved sufficiently productive to lead the Debtors to secure agreement from a variety of creditors to extend the then-operative timeframe to allow further exploration of modifications to the Original Plan that might secure broader support. A key aspect of that exploration was meeting with the Informal Committee and its advisors. While those meetings did not lead a full agreement between the Debtors and the Informal Committee, the discussions and a variety of additional factors, including significant improvements in the credit markets, led the Debtors to conclude that the Original Plan should be modified; indeed, the Revised Plan incorporates, and improves upon, the basic economic terms of the Informal Committee's Alternative Plan.

## ARGUMENT

### A. The Informal Committee Bears a Substantial Burden in Seeking to Terminate Exclusivity

17. Section 1121(d) of the Bankruptcy Code permits the Court to reduce the Debtors' statutory Exclusive Periods "for cause." *See* 11 U.S.C. § 1121(d); *In re Adelphia Comm'ns Corp.*, 352 B.R. 578, 587 (S.D.N.Y. 2006); *First Am. Bank of N.Y. v. Southwest Glove & Safety Equip. Inc.*, 64 B.R. 963 (D. Del. 1986). A party seeking to terminate exclusivity must show cause and "bears a heavy burden." *In re Geriatrics Nursing Home, Inc.*, 187 B.R. 128, 133-34 (D.N.J. 1995). Indeed, it is well settled that the purpose of exclusivity is "to give the debtor at least the 'first shot' to propose and confirm a plan." *In re Mother Hubbard, Inc.*, 152 B.R. 189, 196 n.15 (Bankr. W.D. Mich. 1993); *see also In re Lehigh Valley Prof'l Sports Club, Inc.*, Case No. 00-11296 (DWS), 2000 WL 290187, at *8 (Bankr. D. Del. 2000) ("[s]o long as the [d]ebtor does not utilize this proceeding to unnecessarily delay creditors and fulfills its post petition

obligations to third parties, it should be provided the opportunity to realize the benefit of the bankruptcy relief it sought, the attempt to reorganize"). More recently, in *In re Tropicana Entertainment, LLC*, Case No. 08-10856 (KJC) (Bankr. D. Del. Jan. 8, 2009), the Court denied a motion to terminate exclusivity where the debtors had filed proposed plans within approximately eight months of the petition date, and Chief Judge Carey observed:

> As I said at the beginning, I do firmly believe that the Code is designed to give the debtor its first shot. [The debtors have] done so . . . in a timely basis here in this case, and so I'm content to let the process at least for now proceed as it should . . . .

(Tr. at 179, Jan. 8, 2009).

18. The Debtors plainly deserve the first shot at confirming a plan of reorganization. The Debtors already have filed the Original Plan, and have signaled a willingness since to cultivate a consensus that will lead to a speedy reorganization. *See e.g., In re All Seasons Indus., Inc.*, 121 B.R. 1002, 1006 ("One of the most important reasons for extending the debtor's period of exclusivity is to give the Chapter 11 process of negotiation an compromise an opportunity to be fulfilled, so that a consensual plan can be proposed and confirmed without opposition.") These efforts have resulted in significant support for the Revised Plan. Simply put, the Revised Plan provides the most significant recoveries for all creditor constituencies yet proposed, and the Revised Plan has the advantage of increased certainty, in terms of both financial backing and feasibility, when compared to the Alternative Plan. Thus, the Debtors should be afforded the opportunity to continue to pursue a plan of reorganization that will be acceptable to the broadest possible group of creditor constituencies.

19. Although the Informal Committee's Emergency Motion purports to adhere to the factors set forth in *In re Dow Corning Corp.*, 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997)

regarding cause for termination of exclusivity[2], the Emergency Motion plainly relies on the assumption that the Debtors will pursue reorganization without the input of its creditor constituencies. (*See* Emergency Motion at ¶ 27 ("Absent termination of the Exclusive Periods, the Debtors will continue to prosecute the Management Plan, which will do nothing but force the Debtors' estates to incur enormous expense and delay their emergence from chapter 11.") As set forth below, this premise is faulty. Contrary to the assertions of the Informal Committee, the Debtors have proceeded in good faith and have made substantial progress in attempting to reach a consensus on a plan of reorganization. The Debtors continued efforts can only be impeded by the termination of the Exclusive periods, and in fact, termination of the Exclusive Periods could work to delay confirmation of a plan of reorganization, resulting in increased costs to the Debtors and their creditors.

### (i) **The Debtors Have Proceeded in Good Faith**

20. The Informal Committee argues that the Debtors, motivated solely by the enrichment of management, have failed to give any meaningful consideration to the Alternative Plan and accordingly that the Debtors breach their fiduciary duties in the prosecution Original Plan. (*See* Emergency Motion at ¶ 33 (". . . the motives of the Debtors in failing to give any meaningful consideration to the Alternative Plan are highly suspect . . . [management's] focus is not on preserving value for these estates, but rather on enriching themselves.").) As an initial matter, the Debtors were afforded only six days to review and accept the Alternative Plan in its totality. That the Informal Committee can conjure a breach of fiduciary duty from failure of the Debtors to commit wholesale with such haste strains credulity. Indeed, in support of the

---

[2] These factors include: (1) the size and complexity of the case; (2) the necessity of sufficient time to negotiate and prepare adequate information; (3) whether the debtor is paying its debts as they become due; (4) whether the debtor has made progress negotiating with creditors; (5) the length of time the case has been pending; (5) whether the debtor is seeking an extension to pressure creditors; and (7) whether or not unresolved contingencies exist.

remarkable assertion that the Debtors have breached their fiduciary duties by not accepting the Alternative Plan wholesale, the Informal Committee offers only two clearly distinguishable opinions. (*See* Emergency Motion at ¶ 27 (citing *In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998)).)

21.  First, the Debtors continue to give meaningful consideration to the Alternative Plan. The Debtors have submitted a number of requests for information only to be rebuffed by the Informal Committee. (*See* Exs. G and H, Emergency Motion.) This information is critical to an evaluation of the Informal Committee's plan – indeed, until the Informal Committee identifies their proposed management team, puts forward a business plan, or provides some evidence that financing for their plan is anything other than hypothetical – the Debtors cannot possibly embrace the Informal Committee's plan wholesale. Despite these major issues, the Informal Committee sought to bind the Debtors to the Alternative Plan after only six days, and included a costly "break-up" fee in the event the Debtor withdrew their commitment. Clearly, the Debtors' fiduciary duty to all creditors compels the Debtors to conduct due diligence regarding any proposed plan of reorganization, including investigation of financing commitments and assumptions supporting such plan, and of course evaluation of the business plan contemplated for Reorganized Six Flags. The Informal Committee's six day review period would prevent "meaningful consideration." Rather, "meaningful consideration" surely requires an evaluation of the key assumptions underlying the Alternative Plan – an evaluation that is impossible without the information reasonably requested by the Debtors. And in all events, over the intervening period, the Debtors have not only considered but embraced the central theories of the Alternative Plan. In fact, the Revised Plan improves upon the Alternative Plan, adopting much of the

Alternative Plan's structure. Thus, the Informal Committee's assertion that no meaningful consideration has taken place rings hollow.

22. <u>Second</u>, the Informal Committee's assertion that the entire goal of this reorganization is the enrichment of management is simply not credible. The goal of these proceedings is to reorganize the Debtors' balance sheet to achieve a viable, profitable Reorganized Six Flags while maximizing the recovery of the Debtors' existing stakeholders. Certainly, the retention of management clearly benefits the Debtors' estates and ultimately contributes to the feasibility of any plan of reorganization. The Debtors' management has continued to operate successfully a multi-national business in a complex and challenging economic environment. The Debtors have obtained support for the Revised Plan, totaling almost $1 billion dollars in financing and commitments to reorganized Six Flags, in no small measure because of the operational successes of the current management team since 2005 – indeed, this financing is contingent on the Debtors' business plan and retention of management. And although the Informal Committee repeatedly attempts to portray the Debtors' management contracts as profligate and unnecessary, the contracts in question were executed only after substantial negotiations between management and a compensation subcommittee of the Six Flags Board of Directors (the "<u>Board</u>"), and near the expiry of managements' then current contracts. In fact, during negotiations leading up to the Petition Date, Avenue originally indicated acceptance of the management contracts, as well as management's business plan. To ensure the propriety of such contracts, the Board retained outside consultants to assist in reaching reasonable cost-effective compensation packages that recognized both the value of previous operational achievements and the substantial challenges of reorganizing the Debtors' capital structure.

23. As with many restructurings, management here stands to benefit from a successful reorganization – in terms of continued employment and financial incentives – but such compensation reflects that a successful reorganization is significantly dependent on, and a result of, management's continued commitment to the Debtors. At all times both prior to and since the renegotiation of the contracts, the Debtors' management has performed their duties assiduously, notwithstanding the uncertainty necessarily presented to employees of any chapter 11 debtor. Here, the retention of management benefits the Debtors' estates, and augments the feasibility of any plan of reorganization, presenting the strongest likelihood of continued operational successes by Reorganized Six Flags.

24. Third, the Informal Committee argues that termination of the Exclusive Periods will substantially advance the Debtors' reorganization because (i) the Alternative Plan is better than the Original Plan and (ii) the Original Plan violates the absolute priority rule. As an initial matter, each of these arguments is moot, inasmuch as the Debtors currently are crafting a Revised Plan which adopts substantially the Alternative Plan's structure, including repayment of the Prepetition Lenders in full, and eliminates the alleged violations of the absolute priority rule in the Original Plan. *See* 11 U.S.C. § 1129(b)(2)(B)(ii). Moreover, the Informal Committee's objection with respect to the retention of equity by SFI in SFO pursuant to the Original Plan is technical and without merit. *See In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 48 (Bankr. D. Del. 2000) (Walrath, J.) ("[F]or purposes of plan confirmation, all the assets of all Debtors will be considered by repayment of creditors. Thus, retention of the corporate structure among the Debtors will not adversely affect any creditors and the only equity retention issue should be at the parent for purposes of section 1129(b)."); *In re Loewen Group Int'l, nc.*, Case No. 99-1244 (PJW), Tr. at 1129 (Bankr. D. Del. Dec. 4, 2001) ("it is appropriate to conclude that [such

treatment] does not violate the absolute priority rule because the value of the enterprise obviously resides in all the subsidiaries, but the plan contemplates that the bulk of the consideration going to the creditors for the enterprise value is in the form of the stock, and the only way that that can be done is to have the parent remain the shareholder of each of the subsidiaries").

### (ii) The Debtors Are Not Improperly Pressuring Creditors to Submit to the Debtors' Plan and Have Made Substantial Progress in Negotiating With Creditors

25. Next, the Informal Committee contends that the Debtors are improperly using exclusivity to pressure creditors to accept the current amended plan of reorganization. The Debtors' agreement to continue the hearing regarding approval of the current amended disclosure statement to November 5, 2009 certainly belies such claims. Indeed, if the goal of the Debtors was to simply force the Original Plan through to confirmation, Debtors would not have agreed to postpone the disclosure statement hearing. Rather, the Debtors agreed to the delay to foster negotiations among the creditor constituencies, with the goal of reaching a broad consensus on an agreed plan of reorganization. The Debtors have aided these negotiations substantially by meeting with numerous creditor constituencies and potential financial backers. And the Debtors have established a comprehensive datasite for the benefit of creditor constituencies, lenders and potential investors. Tellingly, these efforts have resulted in significant support for the Revised Plan. Thus, the Informal Committee's contention that "the Debtors have kept creditors in the dark and single-mindedly prosecuted a plan that benefits no one besides the members of the Management Team," (Emergency Motion at ¶ 37), simply cannot be reconciled with reality. The truth is that the Debtors have at all times been actively engaged with the Committee, their Prepetition Lenders, and other constituencies. This engagement continues, and the Debtors believe it ultimately will result in a broadly supported plan of reorganization.

### (iii) Termination of the Exclusive Periods will Prejudice the Debtors.

26. Finally, the Informal Committee erroneously contends that termination of the Exclusive Periods will not prejudice the Debtors because the Debtors will be free to prosecute the Original Plan. In support of this assertion, the Informal Committee cites to *In re T.G. Pharmacy, Inc.*, 374 B.R. 484, 488 (Bankr. D. Conn. 2007) and *In re All Seasons Indus., Inc.*, 121 B.R. 1002, 1005 (Bankr. N.D. Ind. 1990) for the unremarkable proposition that termination of exclusivity does not bar a debtor from filing a plan,. But as the *All Seasons* court noted, "[o]ne of the most important reasons for extending the debtor's period of exclusivity is to give the Chapter 11 process of negotiation an compromise an opportunity to be fulfilled, so that a consensual plan can be proposed and confirmed without opposition." *Id.* at 2006. Here, termination of exclusivity would inhibit negotiations on a consensual plan of reorganization. At present, it is clear that termination of the Exclusive Periods could give rise to any number of competing plans – in fact, a preferred equity holder recently joined the Informal Committee's proposal to terminate exclusivity and attached therewith a term sheet setting forth the parameters of yet another plan of reorganization. *See In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 590 (Bankr. S.D.N.Y. 2006) (competing plans battle would subject the debtors' estate to "substantial extra costs that might otherwise be avoided"). Indeed, such a development would thrust substantial cost and confusion in what has the potential to be an orderly and speedy reorganization on terms acceptable to a broad range of constituencies.

27. Likewise, the Informal Committee cannot rely on the assumption that a competing plan of reorganization will benefit the Debtors' estates by fostering dialogue among creditor constituencies. In fact, this principal has been rejected in similar contexts. *See In re Geriatrics Nursing Home, Inc.*, 187 B.R. 128, 134 (D.N.J. 1995). In *Geriatrics Nursing Home*, the court

LEGAL_US_E # 85333396.3
RLF1-3455631-1

15

held that it was error to terminate the debtors' Exclusive Periods on the grounds that a more favorable plan might be offered by a creditor constituency. *Id.* In so reasoning, the Court stated "[w]hile the aim of expediting the process of reorganization is commendable, and the prospect of not getting confirmation of debtor's plan might make the potential for other plan appear inviting, this Court is not satisfied that such justifications rise to the level of "cause" . . . ." And in all events, the benefit of any "dialogue" plainly has been realized even absent termination of the Exclusive Periods, as the Debtors' intention to submit the Revised Plan makes clear.

## CONCLUSION

28. At every turn, the Debtors plainly have endeavored to find the best possible plan in the circumstances presented by their creditors and the market. If granted the right to continue on this course, the Debtors have every confidence that a consensual plan of reorganization is possible in these proceedings. The relief requested by the Informal Committee would thwart, not encourage, progress toward confirmation of such a plan. And the current management's presence in an emerging Reorganized Six Flags is essential to continued success and will enhance the feasibility of the eventual plan. For these reasons, the Informal Committee has failed to meet its burden to show "cause," and the Emergency Motion should be denied.

Dated: October 22, 2009
     Wilmington, Delaware

Respectfully submitted,

*/s/ Zachary Shapiro/*

Daniel J. DeFranceschi (DE 2732)
L. Katherine Good (DE 5101)
Zachary I. Shapiro (DE 5103)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: defranceschi@rlf.com
     good@rlf.com
     shapiro@rlf.com

    -and-

Paul E. Harner (IL 6276961)
Steven T. Catlett (IL 6269229)
Christian M. Auty (IL 6285671)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
191 North Wacker Drive, 30th Floor
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100
Email: paulharner@paulhastings.com
     stevencatlett@paulhastings.com
     christianauty@paulhastings.com

ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION