THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE
PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A
DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY
COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR
APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------ x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **Premier International Holdings Inc.,** *et al.*, | : | **Case No. 09-12019 (CSS)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------ x

## DISCLOSURE STATEMENT FOR DEBTORS' SECOND AMENDED JOINT
## PLAN OF REORGANIZATION UNDER
## <u>CHAPTER 11 OF THE BANKRUPTCY CODE</u>

PAUL, HASTINGS, JANOFSKY & WALKER LLP
191 North Wacker Drive, 30th Floor
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100
Attorneys for Debtors and
  Debtors in Possession

PAUL, HASTINGS, JANOFSKY & WALKER LLP
75 East 55th Street
New York, New York 10022
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Attorneys for Debtors and
  Debtors in Possession

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Attorneys for Debtors and
  Debtors in Possession

Dated: November 6, 2009

# TABLE OF CONTENTS

Page

SUMMARY OF PLAN ......................................................................................... 1

I.  INTRODUCTION .................................................................................... 7

    A.  HOLDERS OF CLAIMS ENTITLED TO VOTE.............................. 8
    B.  VOTING PROCEDURES ............................................................... 11
    C.  CONFIRMATION HEARING.......................................................... 12

II. OVERVIEW OF THE PLAN....................................................................... 13

III. GENERAL INFORMATION...................................................................... 19

    A.  OVERVIEW OF CHAPTER 11 ..................................................... 19

    B.  OVERVIEW OF THE DEBTORS AND THEIR PRINCIPAL ASSETS........... 19

        1.   Introduction............................................................................. 19
        2.   Corporate Structure................................................................. 20
        3.   Regional Theme Parks ............................................................ 20
        4.   Theme Park Operations ........................................................... 23
        5.   Marketing and Promotional Activities.................................... 23
        6.   Park Maintenance and Inspection ........................................... 24
        7.   Capital Expenditures................................................................ 24
        8.   Insurance ................................................................................. 25
        9.   Competition.............................................................................. 25
        10.  Seasonality .............................................................................. 25
        11.  Environmental and Other Regulations..................................... 26
        12.  Recent Acquisitions ................................................................ 26
        13.  International Licensing ............................................................ 27
        14.  Six Flags New Orleans and Proposed Settlement of Related
             Litigation................................................................................. 27
        15.  Recent Park Sales and Asset Dispositions............................... 29
        16.  Employees and Labor Matters ................................................ 29
        17.  Pending Legal Proceedings and Claims................................... 30

    C.  CORPORATE GOVERNANCE AND MANAGEMENT................... 31

        1.   Board of Directors................................................................... 31
        2.   Executive Management............................................................ 34
        3.   Executive Compensation ......................................................... 35

    D.  PARTNERSHIP PARKS AND TIME WARNER FINANCING ....... 38

    E.  CAPITAL STRUCTURE AND SIGNIFICANT PREPETITION
        INDEBTEDNESS............................................................................ 42

        1.   Prepetition Credit Agreement ................................................. 42
        2.   Derivative Financial Instruments............................................ 43
        3.   Unsecured Notes ..................................................................... 43
        4.   Preferred Income Equity Redeemable Shares.......................... 45

| | | | |
|---|---|---|---|
| | 5. | Guarantees of Partnership Parks Loan | 45 |
| | 6. | Trade Debt | 46 |
| F. | | RECENT FINANCIAL INFORMATION | 46 |
| IV. | | KEY EVENTS LEADING TO THE COMMENCEMENT OF THE REORGANIZATION CASES | 46 |
| A. | | FINANCIAL CHALLENGES | 46 |
| | 1. | Challenging Market Conditions | 46 |
| | 2. | Exchange Offers | 48 |
| | 3. | Negotiations with Avenue | 49 |
| V. | | THE REORGANIZATION CASES | 50 |
| A. | | FIRST DAY ORDERS | 50 |
| | 1. | Case Administration Orders | 50 |
| | 2. | Critical Obligations | 50 |
| | 3. | Business Operations | 50 |
| | 4. | Financial Operations | 50 |
| B. | | CREDITORS' COMMITTEE | 51 |
| C. | | REJECTION OF CERTAIN AGREEMENTS | 52 |
| D. | | SCHEDULES AND BAR DATE | 52 |
| VI. | | THE PLAN OF REORGANIZATION | 52 |
| A. | | INTRODUCTION | 52 |
| B. | | CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN OF REORGANIZATION | 53 |
| | 1. | Unclassified | 55 |
| | 2. | Classified | 56 |
| | 3. | Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims | 64 |
| | 4. | Special Provision Regarding Unimpaired Claims | 64 |
| C. | | MEANS OF IMPLEMENTING THE PLAN | 64 |
| | 1. | Intercompany Claims | 64 |
| | 2. | Restructuring and Other Transactions | 65 |
| | 3. | Exemption from Securities Laws | 68 |
| | 4. | The Offering | 71 |
| | 5. | Registration Rights Agreement and Securities Exchange Listing | 71 |
| | 6. | Continued Corporate Existence | 72 |

D.     [INTENTIONALLY OMITTED] ........................................................................ 72

E.     PLAN PROVISIONS GOVERNING DISTRIBUTION ...................................... 72

    1.     The Distribution Date ................................................................................ 72
    2.     Distributions on Account of Allowed General Unsecured Claims .......... 72
    3.     Date of Distributions ................................................................................ 73
    4.     Disbursing Agent ...................................................................................... 73
    5.     Expenses of the Disbursing Agent ............................................................ 73
    6.     Rights and Powers of Disbursing Agent ................................................... 73
    7.     Delivery of Distributions .......................................................................... 73
    8.     Unclaimed Distributions ........................................................................... 74
    9.     Distribution Record Date .......................................................................... 74
    10.    Manner of Payment ................................................................................... 74
    11.    No Fractional Distributions ....................................................................... 75
    12.    Limitation on Cash Distributions .............................................................. 75
    13.    Setoffs and Recoupment ........................................................................... 75
    14.    Allocation of Plan Distributions Between Principal and Interest ............. 75

F.     PROCEDURES FOR TREATING DISPUTED CLAIMS ................................. 75

    1.     Objections ................................................................................................. 75
    2.     Adjustment to Certain Claims Without a Filed Objection ........................ 76
    3.     No Distributions Pending Allowance ........................................................ 76
    4.     Distributions After Allowance .................................................................. 76
    5.     Resolution of Administrative Expense Claims and Claims ...................... 76
    6.     Estimation of Claims ................................................................................ 77
    7.     Interest ...................................................................................................... 77
    8.     Disallowance of Certain Claims ............................................................... 77
    9.     Indenture Trustee as Claim Holder ........................................................... 77
    10.    Offer of Judgment ..................................................................................... 78
    11.    Amendments to Claims ............................................................................. 78
    12.    Claims Paid and Payable by Third Parties ................................................ 78
    13.    Personal Injury Claims .............................................................................. 78

G.     PROVISIONS GOVERNING EXECUTORY CONTRACTS AND
    UNEXPIRED LEASES ...................................................................................... 78

    1.     Assumption or Rejection of Executory Contracts and Unexpired
        Leases ........................................................................................................ 78
    2.     Approval of Assumption or Rejection of Executory Contracts and
        Unexpired Leases ...................................................................................... 79
    3.     Inclusiveness ............................................................................................. 79
    4.     Cure of Defaults ........................................................................................ 79

|  | 5. | Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan | 80 |
|  | 6. | Indemnification Obligations | 80 |
|  | 7. | Insurance Policies | 80 |
|  | 8. | Benefit Plans | 80 |
|  | 9. | Retiree Benefits | 81 |
| H. | | CORPORATE GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS | 81 |
|  | 1. | General | 81 |
|  | 2. | Postconfirmation Board | 81 |
|  | 3. | Filing of Postconfirmation Organizational Documents | 81 |
|  | 4. | Officers of the Reorganized Debtors | 81 |
|  | 5. | Long-Term Incentive Plan | 81 |
|  | 6. | Directors & Officers Insurance | 82 |
| I. | | CONDITIONS PRECEDENT TO EFFECTIVE DATE | 82 |
|  | 1. | Conditions Precedent to Effectiveness | 82 |
|  | 2. | Waiver of Conditions | 83 |
|  | 3. | Satisfaction of Conditions | 83 |
| J. | | EFFECT OF CONFIRMATION | 84 |
|  | 1. | Vesting of Assets | 84 |
|  | 2. | Binding Effect | 84 |
|  | 3. | Discharge of Claims and Termination of Preconfirmation Equity Interests | 84 |
|  | 4. | Discharge of Debtors | 84 |
|  | 5. | Exculpation | 85 |
|  | 6. | Limited Releases | 85 |
|  | 7. | Avoidance Actions/Objections | 86 |
|  | 8. | Injunction or Stay | 86 |
| K. | | RETENTION OF JURISDICTION | 87 |
| L. | | MISCELLANEOUS PROVISIONS | 88 |
|  | 1. | Effectuating Documents and Further Transactions | 88 |
|  | 2. | Withholding and Reporting Requirements | 88 |
|  | 3. | Corporate Action | 89 |
|  | 4. | Modification of Plan | 89 |
|  | 5. | Revocation or Withdrawal of the Plan | 90 |
|  | 6. | Plan Supplement | 90 |
|  | 7. | Payment of Statutory Fees | 90 |
|  | 8. | Dissolution of the Creditors' Committee | 91 |

| | | | |
|---|---|---|---|
| | 9. | Exemption from Transfer Taxes | 91 |
| | 10. | Expedited Tax Determination | 91 |
| | 11. | Exhibits/Schedules | 91 |
| | 12. | Substantial Consummation | 91 |
| | 13. | Severability of Plan Provisions | 91 |
| | 14. | Governing Law | 92 |
| | 15. | Notices | 92 |
| VII. | | PROJECTIONS AND VALUATION ANALYSIS | 94 |
| | A. | CONSOLIDATED CONDENSED PROJECTED FINANCIAL STATEMENTS | 94 |
| | | 1. Responsibility for and Purpose of the Projections | 94 |
| | | 2. Pro Forma Financial Projections | 94 |
| | B. | VALUATION | 98 |
| | | 1. Valuation Methodology | 103 |
| VIII. | | CERTAIN FACTORS AFFECTING THE DEBTORS | 106 |
| | A. | CERTAIN BANKRUPTCY LAW CONSIDERATIONS | 106 |
| | | 1. Risk of Non-Confirmation of the Plan of Reorganization | 106 |
| | | 2. Non-Consensual Confirmation | 107 |
| | | 3. Risk of Delay in Confirmation of the Plan | 107 |
| | B. | ADDITIONAL FACTORS TO BE CONSIDERED | 108 |
| | | 1. The Debtors Have No Duty to Update | 108 |
| | | 2. No Representations Outside This Disclosure Statement Are Authorized | 108 |
| | | 3. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary | 108 |
| | | 4. The Amount of Claims Could Be More Than Projected | 108 |
| | | 5. Debtors Could Withdraw the Plan | 108 |
| | | 6. No Legal or Tax Advice Is Provided to You by This Disclosure Statement | 108 |
| | | 7. No Admission Made | 109 |
| | | 8. Even If The Plan Is Confirmed, The Debtors Will Continue To Face Risks | 109 |
| | | 9. The Debtors' Business May Be Negatively Affected If They Are Unable To Assume Key Executory Contracts | 109 |
| | | 10. Business Factors and Competitive Conditions | 110 |
| | | 11. Variances from Projections | 112 |

C.     CERTAIN TAX MATTERS .............................................................. 112

IX.    CONFIRMATION OF THE PLAN OF REORGANIZATION ..................................... 112

A.     CONFIRMATION HEARING .......................................................... 112

B.     REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF
REORGANIZATION ................................................................... 113

     1.     Requirements of Section 1129(a) of the Bankruptcy Code .................. 113
     2.     Requirements of Section 1129(b) of the Bankruptcy Code .................. 116

X.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN OF REORGANIZATION .................................................................. 117

A.     LIQUIDATION UNDER CHAPTER 7 .............................................. 117

B.     ALTERNATIVE PLAN OF REORGANIZATION ............................... 118

XI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............. 118

A.     CONSEQUENCES TO THE DEBTORS .......................................... 119

     1.     Cancellation of Indebtedness Income ...................................... 119
     2.     Section 382 Limitation ...................................................... 119
     3.     Alternative Minimum Tax ................................................... 120

B.     FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF
CLAIMS ................................................................................... 121

     1.     Consequences to Holders of Unsecured Notes Claims Against SFI ...... 122
     2.     Consequences to Holders of General SFI Unsecured Claims and
General SFO Unsecured Claims ............................................. 123
     3.     Consequences to Holders of 2016 Notes Claims ........................... 123
     4.     Distributions in Respect of Accrued but Unpaid Interest .................. 124
     5.     Market Discount and Premium ............................................... 124
     6.     Consequences to Holders of Preconfirmation SFI Equity Interests ...... 125

C.     INFORMATION REPORTING AND WITHHOLDING ................................. 125

XII.    CONCLUSION ........................................................................................ 126

Exhibit A – Debtors' Joint Chapter 11 Plan
Exhibit B – Order of the Bankruptcy Court
Exhibit C – Projected Financial Information
Exhibit D – Debtors' Liquidation Analysis

# SUMMARY OF PLAN

The following is a summary of the Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated as of November 6, 2009 (as the same may be further amended or modified, the "<u>Plan</u>"), of Six Flags, Inc. ("<u>SFI</u>") and certain of its affiliates (collectively, the "<u>Debtors</u>"),[1] the debtors and debtors in possession in these chapter 11 cases. This Disclosure Statement describes the Plan and the distributions contemplated thereunder for each of the Debtors and their creditors. Unless otherwise defined herein, all capitalized terms contained in this Disclosure Statement have the meanings ascribed to them in the Plan. Unless the context requires otherwise, reference to "we," "our," and "us" are to SFI and all of its Debtor and non-Debtor subsidiaries (collectively, "<u>Six Flags</u>" or the "<u>Company</u>").

The Debtors commenced their chapter 11 cases in order to restructure over $2.7 billion of debt and preferred equity obligations that were incurred in connection with a series of strategic decisions made between 1998 and 2005 to acquire theme parks and execute significant capital expenditures for new attractions. The current management team, which was not installed until late 2005 and early 2006, inherited a highly-leveraged balance sheet, a brand that had been tarnished over the course of several years, and a business in need of comprehensive operational restructuring. In an effort to address these issues, the current management team has worked diligently over the past three years to expand and improve the product offerings, diversify and grow revenues, increase operational efficiency and operating cash flows, and reduce the inherited debt obligations through, among other things, the sale of parks, the successful negotiation and execution of the Debtors' Prepetition Credit Agreement on favorable terms, and the completion of an exchange offer for the 2010 Notes, 2013 Notes, and 2014 Notes, which exchanged an aggregate of approximately $530.6 million in principal amount for $400 million of the 2016 Notes, thereby reducing outstanding principal indebtedness by approximately $130.6 million and providing for extended debt maturity of 2016 for the exchanged instruments.

Despite significant success from these endeavors, the Debtors remain highly leveraged, with substantial annual capital expenditure requirements and interest costs, and significant portions of their existing debt and preferred equity obligations maturing in the near future. This capital structure is not sustainable, particularly with the impact of the current recession in the United States, limited access to capital markets, increasing unemployment, and

---

[1] The Debtors are the following thirty-seven entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Astroworld GP LLC (0431), Astroworld LP (0445), Astroworld LP LLC (0460), Fiesta Texas, Inc. (2900), Funtime, Inc. (7495), Funtime Parks, Inc. (0042), Great America LLC (7907), Great Escape Holding Inc. (2284), Great Escape Rides L.P. (9906), Great Escape Theme Park L.P. (3322), Hurricane Harbor GP LLC (0376), Hurricane Harbor LP (0408), Hurricane Harbor LP LLC (0417), KKI, LLC (2287), Magic Mountain LLC (8004), Park Management Corp. (1641), PP Data Services Inc. (8826), Premier International Holdings Inc. (6510), Premier Parks of Colorado Inc. (3464), Premier Parks Holdings Inc. (9961), Premier Waterworld Sacramento Inc. (8406), Riverside Park Enterprises, Inc. (7486), SF HWP Management LLC (5651), SFJ Management Inc. (4280), SFRCC Corp. (1638), Six Flags, Inc. (5059), Six Flags America LP (8165), Six Flags America Property Corporation (5464), Six Flags Great Adventure LLC (8235), Six Flags Great Escape L.P. (8306), Six Flags Operations Inc. (7714), Six Flags Services, Inc. (6089), Six Flags Services of Illinois, Inc. (2550), Six Flags St. Louis LLC (8376), Six Flags Theme Parks Inc. (4873), South Street Holdings LLC (7486), Stuart Amusement Company (2016). The mailing address of each of the Debtors solely for purposes of notices and communications is 1540 Broadway, 15th Floor, New York, NY 10036 (Attn: James Coughlin).

1

reduced disposable income and consumer spending. As a result, in late 2008, the Debtors, with the assistance of their advisors, began to explore capital structure restructuring alternatives, including refinancing options, recapitalizations, and a potential chapter 11 filing.

In April 2009, after discussions with several holders of unsecured notes, the Company instituted the Exchange Offers (as defined herein) to convert such notes into shares of SFI's common stock. The Company determined to institute these Exchange Offers in order to avoid the potentially adverse impact of a chapter 11 filing on its brand and business, while preserving the significant value of the favorable terms of the Prepetition Credit Agreement. This effort, however, was unsuccessful for two primary reasons: (1) the minimum tender thresholds established for such Exchange Offers were not met; and (2) even more importantly, the Company determined that these Exchange Offers would have ultimately been inadequate to resolve its financial challenges due to significant, and unexpected, declines in financial performance and liquidity for reasons beyond management's control (*e.g.*, macro economic turbulence, rising levels of national unemployment, a swine flu epidemic, and adverse weather conditions), as well as higher-than-expected "put" obligations from the Company's Partnership Parks (defined below). Accordingly, even if the minimum tender conditions were satisfied, the Company would have continued to face significant challenges maintaining adequate liquidity and necessary financial covenant compliance under the Prepetition Credit Agreement.

Due to the uncertain prospects of a successful outcome to the Exchange Offers, and consistent with the Company's fiduciary duty to evaluate all potential alternatives, beginning in March 2009, the Debtors and Avenue Capital Management ("Avenue") – the largest holder of 2016 Notes, a significant holder of other unsecured notes, and one of the Company's lenders under the Prepetition Credit Agreement – engaged in discussions regarding a potential restructuring that ultimately would have been premised upon (i) the holders of 2016 Notes receiving a majority of the equity in Reorganized SFI and (ii) the reinstatement of the favorable terms of the Prepetition Credit Agreement. The negotiations surrounding the Avenue Restructuring reached an impasse in early June 2009 and ceased upon the Company filing for chapter 11.

As the Debtors' financial condition continued to decline during late spring, and in an effort to evaluate all potential alternatives, provide a market check and potential pricing competition to the Avenue proposals and ultimately maximize value for all stakeholders, the Debtors initiated discussions with certain of the Prepetition Lenders to the Prepetition Credit Agreement (collectively, the "Participating Lenders") on May 29, 2009, regarding the terms of a comprehensive balance sheet restructuring that would involve the conversion of approximately $1.8 billion of debt into equity. These discussions led to negotiations that ultimately resulted in a reorganization agreement that was supported by JP Morgan Chase Bank, N.A., as administrative agent under the Prepetition Credit Agreement (the "Prepetition Agent"), and the Participating Lenders, which together at that time represented approximately 50% of the outstanding Prepetition Credit Agreement obligations. With the assistance of their financial advisors and legal counsel, the Debtors determined that a pre-negotiated chapter 11 restructuring based upon the reorganization agreement with the Participating Lenders represented an effective and efficient way to de-lever their balance sheet to an appropriate level, enabling the Company to achieve profitability on a sustainable basis. The Debtors believed that their restructuring efforts would allow the Debtors to focus their resources on the operation of their parks and to continue

2

management's recent operational successes with appropriate liquidity and a sustainable capital structure.

Faced with the prospect of impending debt maturities and the expiration of 30-day grace periods for interest payments under certain series of unsecured notes, the Debtors commenced the Reorganization Cases on June 13, 2009 and filed, on July 22, 2009, a disclosure statement and joint plan of reorganization (the "Original Plan") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Original Plan was amended by the Debtors and filed on August 21, 2009 to provide additional detail on the Debtors' financial condition and business projections, but the fundamental structure and creditor treatment remained the same. The Original Plan reflected the reorganization agreement reached with the Participating Lenders. The Original Plan provided for the reorganization of the Debtors as going concerns (the "Reorganized Debtors"). An integral component of the agreement with the Participating Lenders was the conversion of a portion of the Debtors' obligations under the Prepetition Credit Agreement into equity in Reorganized SFI along with the conversion into equity in Reorganized SFI of all of the unsecured bonds at Six Flags Operations Inc. ("SFO") and SFI. The terms of the Original Plan were motivated by, among other factors, the declining condition of the general economy, which was widely expected to have a significant impact on consumer discretionary spending generally; the relatively early point in the Debtors' operating season, which meant ultimate results were unpredictable, and liquidity was near its low point; the need to move through the restructuring process expeditiously in order to mitigate the negative impact of a bankruptcy filing on business operations and customer perceptions; the limited availability of credit and an overall lack of stability in the credit markets; and the unwillingness of some debt holders to negotiate a consensual plan with the Debtors on terms that permitted a successful reorganization.

Under the Original Plan, the holders of Prepetition Credit Agreement Claims against Six Flags Theme Parks Inc. ("SFTP") and certain of its wholly-owned domestic subsidiaries would have converted these Claims into (i) approximately 92% of the New Common Stock to be issued by Reorganized SFI (subject to dilution by the Long-Term Incentive Plan), and (ii) a new term loan in the aggregate principal amount of $600 million (the "Original New Term Loan"). Prepetition Credit Agreement Claims against SFO would have been discharged and exchanged for a new guaranty of the obligations under the Original New Term Loan by Reorganized SFO. All other secured Claims against the Debtors that were Allowed, if any, would have been either paid in full or reinstated, in the Debtors' discretion. Allowed Unsecured Claims against all of the Debtors other than SFI and SFO would have been paid in full or been reinstated (but solely to the extent such Claims were Allowed). Claims against SFTP and SFO, respectively, based on a guaranty of the obligations of SFOG Acquisition A, Inc., SFOG Acquisition B, L.L.C., SFOT Acquisition I, Inc. and SFOT Acquisition II, Inc., each an indirect subsidiary of the Company (the "Acquisition Parties"), and the general partners of the Partnership Parks (as defined herein), to Historic TW Inc. and Warner Bros. Entertainment Inc. and certain of their affiliates (collectively, "Time Warner") under a certain promissory note and a certain Subordinated Indemnity Agreement would have been discharged and exchanged for new guarantees of such obligations (as may be amended in connection with the emergence from chapter 11). The holders of Allowed Unsecured Claims against SFO (which includes Claims arising under or related to the 2016 Notes Indenture ("SFO Note Claims")) would have converted their Claims against SFO into approximately 7% of the New Common Stock to be

3

issued by Reorganized SFI (subject to dilution by the Long-Term Incentive Plan). The holders of Allowed Unsecured Claims against SFI (which includes Claims arising under the 2010 Notes Indenture, the 2013 Notes Indenture, the 2014 Notes Indenture, the 2015 Notes Indenture and the guaranty by SFI of obligations owed to holders of the 2016 Notes under the 2016 Notes Indenture ("SFO Note Guaranty Claim")) would have converted their claims against SFI into approximately 1% of the New Common Stock to be issued by Reorganized SFI (subject to dilution by the Long-Term Incentive Plan). All existing equity interests in SFI would have been cancelled under the Original Plan. All existing equity interests in SFI's direct subsidiary SFO would have been cancelled, and 100% of the newly-issued common stock of SFO would have been issued to SFI on the Effective Date in consideration for SFI's distribution of the New Common Stock in Reorganized SFI to certain holders of Allowed Claims, as described above. The existing equity interests in all Debtors other than SFI and SFO ("Preconfirmation Subsidiary Equity Interests") would have remained unaltered by the Original Plan.

Since the filing of these chapter 11 cases, a variety of factors have led the Debtors to conclude that the Original Plan can and should be modified. As an initial matter, from the outset of these cases, and particularly since the filing of the Original Plan, the Debtors have engaged in extensive discussions with a wide variety of creditor constituencies, including the creditors' committee of the Debtors (the "Creditors' Committee"), an informal committee of holders of the 2016 Notes (the "Informal Committee"), certain holders of the 2010 Notes, 2013 Notes, 2014 Notes and 2015 Notes, and Time Warner. Through these discussions, the Debtors believe that they now can achieve an ultimate plan that will secure broad support, if not be entirely consensual. In addition, the Debtors have aggressively and successfully managed their business operations through challenging economic conditions, and have mitigated the impact of those conditions through effective cost management measures as well as effectively navigated the business through the operational and public relations challenges posed by operating in the wake of the chapter 11 filing. The Debtors' operating season began with significant challenges impacting the Debtors' business, including unusually inclement weather in the Northeast and the swine flu, as well as the general challenges posed by the significant overall economic downturn. Notwithstanding these and other challenges inherent in a highly-cyclical business, the Debtors now have concluded their prime operating season and delivered operating results that met management's projections provided in July 2009. Moreover, the credit markets have begun to stabilize from the virtually unprecedented conditions that prevailed at the commencement of these cases. This stabilization and loosening of the credit markets has created financing opportunities that did not exist at the times these cases were filed and the Original Plan was formulated. The Plan now contemplates $950 million of committed new debt financing, which the Debtors have been able to secure on attractive terms. Taken together, all of these factors have created conditions that the Debtors believe create the opportunity to revise the Original Plan in ways that generate equal or improved recoveries for all constituencies.

It is in this context that the Debtors believe that they now can achieve an ultimate plan that will secure broad support, if not be entirely consensual. In addition, the Debtors have aggressively and successfully managed their business operations through challenging economic conditions, and have mitigated the impact of those conditions through effective cost management measures as well as effectively navigated the business through the operational and public relations challenges posed by operating in the wake of the chapter 11 filing. The Debtors' operating season began with significant challenges impacting the Debtors' business, including

4

unusually inclement weather in the Northeast and the swine flu, as well as the general challenges posed by the significant overall economic downturn. Notwithstanding these and other challenges inherent in a highly-cyclical business, through aggressive management and appropriate cost-cutting, the Debtors now have concluded their prime operating season and delivered operating results that met management's projections provided in July 2009. Moreover, the credit markets have begun to stabilize from the virtually unprecedented conditions that prevailed at the commencement of these cases. This stabilization and loosening of the credit markets has created financing opportunities that did not exist at the times these cases were filed and the Original Plan was formulated. Taken together, all of these factors have created conditions that the Debtors believe create the opportunity to revise the Original Plan in ways that generate equal or improved recoveries for all constituencies.

In broad terms, the Plan now envisions new debt financing and a rights offering that will repay the existing secured debt in full, while allowing enhanced recoveries for senior unsecured noteholders at both the SFI and SFO levels. In this general sense, the Plan incorporates the central features of an alternative plan put forward by the Informal Committee (discussed in more detail below in Article IV.A.3) and the Informal Committee has indicated it will support the Plan (subject to the satisfaction of the terms and conditions set forth in the Backstop Commitment Agreement). Moreover, the Plan has several significant additional strengths in comparison to the Original Plan, including:

- The Plan is based on fully-committed financing on favorable terms from major financial institutions.

- The Plan includes the issuance of additional equity pursuant to a rights offering supported by a fully committed backstop at a level sufficient to ensure post-reorganization operational success and liquidity.

- The Plan provides committed additional future financing from Time Warner that helps mitigate the substantial uncertainties posed by "put" obligations related to the Partnership Parks.

- The Plan is based on a business plan and financial projections that continue the successful operational strategies adopted and implemented by current management.

- The Informal Committee has indicated it will support the Plan (subject to the satisfaction of the terms and conditions set forth in the Backstop Commitment Agreement).

- A steering committee of holders of Prepetition Credit Agreement Claims (the "Steering Committee") has indicated that it will support the Plan.

- Time Warner, a creditor holding Allowed Claims against the Debtors, has indicated that it will support the Plan.

5

Under the Plan, the holders of Prepetition Credit Agreement Claims against SFTP, SFO and certain of its wholly-owned domestic subsidiaries will be paid in full, in Cash, from the proceeds of (i) the Exit Term Loan in the principal amount of $650 million, and (ii) a $450 million rights offering (the "Offering") based on a $1.335 billion total enterprise value of Six Flags to the holders of Allowed Unsecured Claims against SFO (which includes SFO Note Claims) who are "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as amended ("Eligible Holders"), that vote to accept the Plan ("Accepting SFO Noteholder"); *provided, however*, that if the net proceeds from the Offering are less than $450 million, the Backstop Purchasers, pursuant to the terms and subject to the conditions of the Backstop Commitment Agreement, shall subscribe for any such amount of New Common Stock not purchased pursuant to the Offering. All other secured Claims against the Debtors that are Allowed, if any, will either be paid in full or reinstated, in the Debtors' discretion, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld). Allowed Unsecured Claims against all of the Debtors other than SFI and SFO will be paid in full or be reinstated (but solely to the extent such Claims are Allowed).

Claims against SFTP, SFO and SFI, respectively, based on a guaranty of the obligations of the Acquisition Parties and the general partners of the Partnership Parks and, in the case of SFTP and SFO, the entities that are the limited partners in the Partnership Parks shall be affirmed and continued by Reorganized SFTP, Reorganized SFO and Reorganized SFI, respectively (collectively, the "Partnership Parks Claims").

The holders of Allowed Unsecured Claims against SFO will convert their Claims against SFO into approximately 22.89% of the New Common Stock[2] to be issued by Reorganized SFI (subject to dilution by the Long-Term Incentive Plan). The holders of Allowed Unsecured Claims against SFI (Class 14) will convert their claims against SFI into approximately 7.34% of the New Common Stock[3] to be issued by Reorganized SFI (subject to dilution by the Long-Term Incentive Plan). Additionally, each Accepting SFO Noteholder shall have the limited right to participate in the Offering to purchase its Limited Offering Pro Rata Share of up to $450 million of New Common Stock, representing approximately 69.77% of the New Common Stock (including New Common Stock to be acquired by the Backstop Purchasers in the Offering), subject to dilution by the Long-Term Incentive Plan, to be issued by Reorganized SFI.[4]

All existing equity interests in SFI will be cancelled under the Plan. All existing equity interests in SFI's direct subsidiary SFO will be cancelled, and 100% of the newly-issued

---

[2] This amount does not attribute any value associated with the SFO Note Guaranty Claim, which value is attributed to Class 14 (SFI Unsecured Claims).

[3] This amount includes the value attributed to the SFO Note Guaranty Claim.

[4] The net affect of the Offering, (i) assuming the Offering is fully subscribed for by Eligible Holders, and (ii) as a result of the application of each Eligible Holder's Limited Offering Pro Rata Share, all Eligible Holders (including Backstop Purchasers solely in their capacity as Eligible Holders) would acquire approximately 25% of the New Common Stock issued in the Offering (or approximately 5%, excluding purchases by Backstop Purchasers that are Eligible Holders), and the Backstop Purchasers would acquire approximately 75% of such New Common Stock (or approximately 95%, including purchases affected by Backstop Purchasers in their capacity as Eligible Holders).

6

common stock of SFO will be issued to SFI on the Effective Date in consideration for SFI's distribution of the New Common Stock in Reorganized SFI to certain holders of Allowed Claims, as described above. The Preconfirmation Subsidiary Equity Interests will remain unaltered by the Plan. The proposed treatment of Claims and equity interests under the Plan are discussed further in Section VI.B. of this Disclosure Statement.

Based upon the Debtors' estimate of the Allowed Claims as of an assumed Effective Date of the Plan of December 31, 2009 in these Reorganization Cases and the estimated range of reorganization value further detailed herein, the Plan provides for a recovery of 100.0% to holders of SFTP Prepetition Credit Agreement Claims, a 100% recovery for the holders of all Other Secured Claims, a 100% recovery for the holders of Unsecured Claims against all Debtors other than SFO and SFI, 31.2% to 47.1% to holders of SFO Unsecured Claims, 3.2% to 4.8% to holders of SFI Unsecured Claims, and no recovery for holders of Funtime, Inc. Claims, Subordinated Securities Claims and Preconfirmation Equity Interests in SFI. These projections are based on assumptions described herein and are not guaranteed. The Plan is supported by the Debtors and each of the Informal Committee (subject to the satisfaction of the terms and conditions set forth in the Backstop Commitment Agreement), the Steering Committee and Time Warner has indicated that it will support the Plan.

The Exit Facility will consist of an $800,000,000 senior secured credit facility comprised of a $150,000,000 revolving loan facility and a $650,000,000 term loan facility. The maturity date of the revolver will be five years from the closing date and the term loan will be due and payable six years from the closing date, and in each case will be subject to market "flex" provisions. The Exit Facility Loans will be guaranteed by SFI, SFO and each of the current and future direct and indirect domestic subsidiaries of SFTP. The proceeds of the term loan, together with the net proceeds from the Offering, will be used to repay the outstanding amounts, in whole or in part, owed under the Prepetition Credit Agreement. The revolver will be used to meet working capital and other corporate needs of the Debtors, thereby facilitating their emergence from bankruptcy. The Exit Facility Loans will be secured by first priority liens upon substantially all existing and after-acquired assets of SFI, SFO and each of the current and future direct and indirect domestic subsidiaries of SFTP.

Further, subject to certain terms and conditions, Time Warner and Six Flags have agreed to enter into a new loan agreement pursuant to which Time Warner will make a $150 million multi-draw term loan facility available to the Acquisition Parties, with each loan made thereunder having a maturity date five years from the applicable funding date.

**THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO REORGANIZE SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. THE DEBTORS URGE ALL CREDITORS ENTITLED TO VOTE ON THE PLAN TO ACCEPT THE PLAN.**

## I. INTRODUCTION

The Debtors submit this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to holders of equity interests

7

("Preconfirmation Equity Interests") in and Claims against the Debtors in connection with (i) the solicitation of acceptances of the Plan filed by the Debtors with the Bankruptcy Court and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled for _____, 2009 at __:00 _.m. (prevailing Eastern Time).

Annexed as Exhibits to this Disclosure Statement are copies of the following documents:

- The Plan (Exhibit A);

- Order of the Bankruptcy Court, dated November __, 2009 (the "Disclosure Statement Order"), approving, among other things, this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (attached hereto without exhibits) (Exhibit B);

- Projected Financial Information (Exhibit C); and

- The Debtors' Liquidation Analysis (Exhibit D).

A Ballot for the acceptance or rejection of the Plan is enclosed with this Disclosure Statement and mailed to the holders of Claims that the Debtors believe may be entitled to vote to accept or reject the Plan.

On November __, 2009, after notice and a hearing, the Bankruptcy Court signed the Disclosure Statement Order, approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical investor of the relevant classes to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order, a copy of which is annexed hereto as Exhibit B, sets forth in detail, among other things, the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Preconfirmation Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

## A.    HOLDERS OF CLAIMS ENTITLED TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected the proposed plan are entitled to vote to accept or reject a proposed plan.

8

Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. For a detailed description of the treatment of Claims and Preconfirmation Equity Interests under the Plan, see Section VI.B. of this Disclosure Statement.

Claims in Class 5 (SFTP TW Guaranty Claims), Class 8 (SFO Prepetition Credit Agreement Claims), Class 9 (SFO TW Guaranty Claims), Class 11 (SFO Unsecured Claims), Class 12 (SFI TW Guaranty Claims) and Class 14 (SFI Unsecured Claims) of the Plan are impaired and, to the extent Claims in such Classes are Allowed, the holders of such Claims will receive distributions under the Plan. As a result, holders of Claims in those Classes are entitled to vote to accept or reject the Plan.

Claims in Class 1 (Other Priority Claims), Class 2 (Secured Tax Claims), Class 3 (Other Secured Claims), Class 4 (SFTP Prepetition Credit Agreement Claims), Class 6 (SFTP Partnership Parks Claims), Class 7 (SFTP and SFTP Subsidiary Unsecured Claims), Class 10 (SFO Partnership Parks Claims), Class 13 (SFI Partnership Parks Claims) and Class 17 (Preconfirmation Subsidiary Equity Interests) of the Plan are unimpaired. As a result, holders of Claims in those Classes are conclusively presumed to have accepted the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Article IX of this Disclosure Statement.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the rejection of a plan by one or more impaired classes of claims or equity interests. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Section IX.B.2. of this Disclosure Statement.

Holders of Funtime, Inc. Unsecured Claims (Class 15), Subordinated Securities Claims (Class 16), if any, Preconfirmation SFO Equity Interests (Class 18) and Preconfirmation SFI Equity Interests (Class 19) will not receive any distribution under the Plan and are therefore deemed to have rejected the Plan. With respect to the Classes of Claims and equity interests that are deemed to have rejected the Plan, *i.e.*, Class 15, Class 16, Class 18 and Class 19, the Debtors intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

**THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS IN CLASSES 5, 8, 9, 11, 12 AND 14 VOTE TO ACCEPT THE PLAN.**

The Debtors' legal advisors are Paul, Hastings, Janofsky & Walker LLP and Richards, Layton & Finger, P.A. Their financial advisor is Houlihan, Lokey, Howard & Zukin Capital, Inc. ("Houlihan Lokey"). They can be contacted at:

9

HOULIHAN, LOKEY, HOWARD &
ZUKIN CAPITAL, INC.
245 Park Avenue
New York, NY 10167-0001
Phone (212) 497-4100
Facsimile (212) 687-0529
Attn: David Preiser
      David Hilty
      John-Paul Hanson

Financial Advisor and Investment Banker
for the Debtors and Debtors in Possession

PAUL, HASTINGS, JANOFSKY &
WALKER LLP
191 North Wacker Drive, 30th Floor
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100
Attn: Paul E. Harner
      Steven T. Catlett

Counsel for the Debtors and
Debtors in Possession

PAUL, HASTINGS, JANOFSKY &
WALKER LLP
75 East 55th Street
New York, New York 10022
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Attn: William F. Schwitter

Counsel for the Debtors and
Debtors in Possession

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Attn: Daniel J. DeFranceschi

Delaware Counsel for the Debtors and
Debtors in Possession

10

## B.    VOTING PROCEDURES

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims.  The Debtors, with the approval of the Bankruptcy Court, have engaged Kurtzman Carson Consultants LLC to serve as the voting agent with respect to Claims in Classes that are entitled to vote on the Plan.  The voting agent will assist in the solicitation process by, among other things, answering questions, providing additional copies of all solicitation materials, and generally overseeing the solicitation process for Claims.  The voting agent will also process and tabulate ballots for each of the respective Classes that are entitled to vote to accept or reject the Plan and will file a voting report as soon as practicable before the Confirmation Hearing.

Ballots and master ballots ("Master Ballots") should be returned to:

Six Flags Ballot Processing
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA 90245

**If the return envelope provided with your Ballot was addressed to your bank or brokerage firm, please allow sufficient time for that firm to process your vote on Master Ballot before the voting deadline (4 p.m. prevailing Eastern Time, _____, 2009).**

**Do not return your notes, securities, or any other documents with your Ballot.**

MORE DETAILED INSTRUCTIONS REGARDING HOW TO VOTE ON THE PLAN ARE CONTAINED ON THE BALLOTS DISTRIBUTED TO HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN.  TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE <u>RECEIVED</u> BY NO LATER THAN 4:00 P.M. (PREVAILING EASTERN TIME) ON _____, 2009.  ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN SHALL NOT BE COUNTED.

Any Claim in an impaired Class as to which an objection or request for estimation is pending or which is listed on the Schedules as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan.

Pursuant to the Disclosure Statement Order, the Bankruptcy Court set _____, 2009 as the record date for holders of Claims entitled to vote on the Plan.  Accordingly, only holders of record as of the applicable record date that otherwise are entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning

this Disclosure Statement, the Plan or the procedures for voting on the Plan, please call Kurtzman Carson Consultants LLC at (866) 967-1783.

## C.    CONFIRMATION HEARING

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on _____, 2009 at __:00 _.m. (prevailing Eastern Time) before the Honorable Christopher S. Sontchi, Room #6, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before _____, 2009 at 4:00 p.m. (prevailing Eastern Time) in the manner described below in Section IX.A. of this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. HOLDERS OF CLAIMS SHOULD CAREFULLY READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE PLAN, PRIOR TO VOTING ON THE PLAN.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND PRECONFIRMATION EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. ADDITIONAL FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THE FORWARD-LOOKING STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE SET FORTH IN THE REPORTS OR DOCUMENTS THAT WE FILE FROM TIME TO TIME WITH THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), INCLUDING OUR MOST RECENT ANNUAL REPORT ON FORM 10-K FILED WITH THE SEC ON MARCH 11, 2009 (FILE NO. 0000701374), INCLUDING THE AMENDMENT THERETO FILED WITH THE SEC ON APRIL 30, 2009, AND OUR MOST RECENT QUARTERLY REPORT ON

12

FORM 10-Q FILED WITH THE SEC ON AUGUST 14, 2009, EACH OF WHICH IS HEREBY INCORPORATED BY REFERENCE HEREIN.

ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN ARTICLE VIII OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY, REFERENCE TO THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO REORGANIZE SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.

**IRS CIRCULAR 230 NOTICE:** TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND PRECONFIRMATION EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR PRECONFIRMATION EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND PRECONFIRMATION EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## II. OVERVIEW OF THE PLAN

The following table briefly summarizes the classification and treatment of Administrative Expense Claims, Claims and Preconfirmation Equity Interests under the Plan:

| **Class** | **Type of Claim or Equity Interest** | **Treatment** | **Approximate Allowed Amount[5]** | **Approximate Percentage Recovery** |
|---|---|---|---|---|
| -- | Administrative Expense Claims | Paid in full, in Cash, on the later of the Effective Date or | $0.5 million, plus any | 100% |

---

[5] The amounts set forth herein are the Debtors' estimates based on the Debtors' books and records. The Bar Date, which has been set as December 14, 2009, has not yet occurred. Actual amounts will depend upon the amounts of Claims timely filed before the Bar Date, final reconciliation and resolution of all Administrative Expense Claims and Claims, and the negotiation of cure amounts. Accordingly, the actual amounts may vary significantly from the amounts set forth herein.

| | | | | |
|---|---|---|---|---|
| | | when such Claim becomes Allowed, or as soon thereafter as is practicable; Claims incurred in the ordinary course of business will be paid in full or performed, as applicable, in the ordinary course of business. | amounts (i) incurred and payable in the ordinary course of business, and (ii) incurred pursuant to the Plan | |
| -- | Professional Compensation and Reimbursement Claims | Paid in full, in Cash, in accordance with the order of the Bankruptcy Court allowing any such Claim. | Undetermined | 100% |
| -- | Priority Tax Claims | Either (i) paid in full, in Cash, on the Effective Date or as soon thereafter as is practicable, or (ii) commencing on the Effective Date or as soon thereafter as is practicable, paid in full, in Cash, over a period not exceeding five years from and after the Petition Date, in equal semi-annual Cash payments with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law. | Undetermined[6] | 100% |
| 1 | Other Priority Claims | Unimpaired. Paid in full, in Cash, on the later of the Distribution Date and the date such Claim becomes an Allowed Other Priority Claim or as soon thereafter as is practicable. | $11.1 million | 100% |
| 2 | Secured Tax Claims | Unimpaired. Either (i) paid in full, in Cash, on the | $8.9 million[7] | 100% |

---

[6] The Debtors have not yet made a determination as to the correct classification of outstanding tax claims, and as such, the entirety of the estimate is currently included in Class 2 (Secured Tax Claims). Classification of tax claims as secured or priority shall not be deemed to be a waiver of the Debtors' rights or defenses with respect to such Claims.

[7] The Debtors have not yet made a determination as to the correct classification of outstanding tax claims, and as such, the entirety of the estimate is currently included in Class 2 (Secured Tax Claims). Classification of tax claims as secured or priority shall not be deemed to be a waiver of the Debtors' rights or defenses with respect to such Claims. In addition, this amount is subject to change based on the outcome of any pending audits of the Debtors.

| | | Distribution Date or as soon thereafter as is practicable or (ii) commencing on the Distribution Date or as soon thereafter as is practicable, paid in full, in Cash, over a period not exceeding five years from and after the Petition Date, in equal semi-annual Cash payments with interest at the rate determined under applicable non-bankruptcy law. | | |
|---|---|---|---|---|
| 3 | Other Secured Claims | Unimpaired. Either (i) Reinstated, (ii) paid in full, including any required interest, in Cash, on the later of the Distribution Date and the date such Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, or (iii) receive the Collateral securing such Other Allowed Secured Claim and any required interest. | $0 | 100% |
| 4 | SFTP Prepetition Credit Agreement Claims | Unimpaired. On the Distribution Date, each holder of an Allowed Prepetition Credit Agreement Claim shall be paid in full, in Cash, in complete satisfaction of such SFTP Prepetition Credit Agreement Claim. | Approximately $1.140 billion, which includes accrued and unpaid default interest through December 31, 2009 | 100% |
| 5 | SFTP TW Guaranty Claims | Impaired. On the Distribution Date, SFTP's guaranty of the obligations under the Existing TW Loan shall be replaced by an amended and restated guaranty of the obligations under the Existing TW Loan by Reorganized SFTP. | Undetermined | N/A |
| 6 | SFTP Partnership Parks Claims | Unimpaired. On the Distribution Date, SFTP's guaranty of the obligations under the Subordinated Indemnity Agreement and the Continuing Guarantee Agreements shall be affirmed and continued by | Undetermined | N/A |

15

| | | | | |
|---|---|---|---|---|
| | | Reorganized SFTP. | | |
| 7 | SFTP and SFTP Subsidiary Unsecured Claims | Unimpaired. Each Allowed Subsidiary Unsecured Claim shall be either (i) Reinstated, or (ii) paid in full, in Cash, on the Distribution Date or as soon as practicable. | $39.0 million[8] | 100% |
| 8 | SFO Prepetition Credit Agreement Claims | Impaired. On the Distribution Date, SFO's guaranty of the obligations under the Prepetition Credit Agreement shall be discharged. | Contingent and unliquidated | N/A |
| 9 | SFO TW Guaranty Claims | Impaired. On the Distribution Date, SFO's guaranty of the obligations under the Existing TW Loan shall be replaced by an amended and restated guaranty of the obligations under the Existing TW Loan by Reorganized SFO. | Undetermined | N/A |
| 10 | SFO Partnership Parks Claims | Unimpaired. On the Distribution Date, SFO's guaranty of the obligations under the Subordinated Indemnity Agreement and the Continuing Guarantee Agreements shall be affirmed and continued by Reorganized SFO. | Undetermined | N/A |
| 11 | SFO Unsecured Claims | Impaired. On the Distribution Date, each holder of an Allowed SFO Unsecured Claim shall receive its Distribution Pro Rata Share of approximately 22.89% of the New Common Stock[9], subject to dilution by | $420.0 million[10] | 31.2% to 47.1% |

---

[8]  The numbers listed here are estimates. The Bar Date for filing proofs of claim has not yet occurred, and the Debtors have not completed their analysis of all claims.

[9]  This amount does not attribute any value associated with the SFO Note Guaranty Claim, which value is attributed in Class 14 (SFI Unsecured Claims).

16

| | | | | |
|---|---|---|---|---|
| | | the Long-Term Incentive Plan, in full and complete satisfaction of such SFO Unsecured Claim.<br><br>Additionally, each Accepting SFO Noteholder shall have the limited right to participate in the Offering pursuant to the terms of the Offering Procedures to purchase its Limited Offering Pro Rata Share of up to $450 million of New Common Stock, representing approximately 69.77% of the New Common Stock (including New Common Stock to be acquired by the Backstop Purchasers in the Offering), subject to dilution by the Long-Term Incentive Plan. | | |
| 12 | SFI TW Guaranty Claims | Impaired. On the Distribution Date, SFI's guaranty of the obligations under the Existing TW Loan shall be replaced by an amended and restated guaranty of the obligations under the Existing TW Loan by Reorganized SFI. | Undetermined | N/A |
| 13 | SFI Partnership Parks Claims | Unimpaired. On the Distribution Date, SFI's guaranty of the obligations under the Subordinated Indemnity Agreement shall be affirmed and continued by Reorganized SFI. | Undetermined | N/A |
| 14 | SFI Unsecured Claims | Impaired. On each Distribution Date, each holder of an Allowed SFI Unsecured Claim shall receive its Distribution Pro Rata Share of | $1.346 billion[12] | 3.2% to 4.8% |

---

[10] The estimated amount set forth above excludes (a) any claims arising under Executory Contracts and unexpired leases that may be assumed or rejected under the Plan, and (b) future claims that may arise or be filed as the Debtors continue with their reorganization. The numbers listed here are estimates. The Bar Date for filing proofs of claim has not yet occurred, and the Debtors have not completed their analysis of all claims.

| | | approximately 7.34% of the New Common Stock[11], subject to dilution by the Long-Term Incentive Plan, in full and complete satisfaction of such SFI Unsecured Claim. | | |
|---|---|---|---|---|
| 15 | Funtime, Inc. Unsecured Claims | Impaired. No distribution. | $0 | 0% |
| 16 | Subordinated Securities Claims | Impaired. No distribution. | $0 | 0% |
| 17 | Preconfirmation Subsidiary Equity Interests | Unimpaired. Unaltered by the terms of the Plan. | N/A | N/A |
| 18 | Preconfirmation SFO Equity Interests | Impaired. No distribution. | N/A | 0% |
| 19 | Preconfirmation SFI Equity Interests | Impaired. No distribution. | N/A | 0% |

For detailed projected financial information and valuation estimates, see Article VII of this Disclosure Statement, entitled "Projections and Valuation Analysis," as well as Exhibit C to this Disclosure Statement.

---

[11] This amount includes the value attributed to the SFO Note Guaranty Claim.

[12] The estimated amount set forth above excludes (a) any claims arising under Executory Contracts and unexpired leases that may be assumed or rejected under the Plan, and (b) future claims that may arise or be filed as the Debtors continue with their reorganization. The magnitude of claims arising under Executory Contracts or unexpired leases for rejection damages may be substantial and may have a significant dilutive effect on the estimated recovery to holders of SFI Unsecured Claims. The numbers listed here are estimates. The Bar Date for filing proofs of claim has not yet occurred, and the Debtors have not completed their analysis of all claims.

# III. GENERAL INFORMATION

## A.    OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.  The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the Petition Date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan.  Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare, and obtain bankruptcy court approval of, a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical investor of the relevant classes to make an informed judgment regarding the plan.  The Debtors are submitting this Disclosure Statement to holders of Claims against and Preconfirmation Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

## B.    OVERVIEW OF THE DEBTORS AND THEIR PRINCIPAL ASSETS

### 1.    Introduction

From the creation of the Six Flags brand in 1961 with one theme park in Arlington, Texas, to its expansion over the past 48 years both throughout the United States and internationally, Six Flags has established its position as a leader in the amusement and theme park industries.  Today, Six Flags is the largest regional theme park operator in the world.  The 20 parks the Company operates had attendance of approximately 25.3 million during the 2008 season in geographically diverse markets across North America.  Its theme parks offer a complete family-oriented entertainment experience.  Its theme parks generally offer a broad selection of state-of-the-art and traditional thrill rides, water attractions, themed areas, concerts and shows, restaurants, game venues and retail outlets.  In the aggregate, during 2008, the Company's theme parks (excluding Six Flags New Orleans) offered more than 800 rides, including over 120 roller coasters, making it the leading provider of "thrill rides" in the industry.

19

Six Flags believes that its parks benefit from limited direct competition, since the combination of a limited supply of real estate appropriate for theme park development, high initial capital investment, long development lead-time and zoning restrictions provides each of its parks with a significant degree of protection from competitive new theme park openings. Based on the Company's knowledge of the development of other theme parks in the United States, it would cost approximately $300 million and take a minimum of two years to construct a new regional theme park comparable to one of the major Six Flags-branded theme parks.

The Company has worldwide ownership of the "Six Flags" brand name. Six Flags Over Georgia (including Six Flags White Water Atlanta, "SFOG") and Six Flags Over Texas ("SFOT" and together with SFOG, the "Partnership Parks") own the rights to the names "Six Flags Over Texas" and "Six Flags Over Georgia," respectively. The Company also holds exclusive long-term licenses from certain affiliates of Time Warner for theme park usage throughout the United States (except the Las Vegas metropolitan area), Canada, Mexico and other countries of certain Warner Bros. Consumer Products Inc. ("Warner Bros.") and DC Comics characters. These characters include *Bugs Bunny*, *Daffy Duck*, *Tweety Bird*, *Yosemite Sam*, *Batman*, *Superman* and others. In addition, the Company has certain rights to use the Hanna-Barbera and Cartoon Network characters, including *Yogi Bear*, *Scooby-Doo*, *The Flintstones* and others, as well as rights related to *The Wiggles* and *Thomas the Tank Engine and Friends*. The Company uses these characters to market its parks and to provide an enhanced family entertainment experience, including character meet and greets, meals, photograph and autograph opportunities and new retail options. The Company's licenses include the right to sell merchandise featuring the characters at the parks, and to use the characters in advertising, as walk-around characters and themes for rides, attractions and retail outlets. The Company believes using these characters promotes increased attendance, supports higher ticket prices, increases lengths of stay and enhances in-park spending.

2. Corporate Structure

From its headquarters in New York City, Six Flags operates parks throughout North America, and has entered into development agreements to extend its brand beyond North America. SFI, a publicly-traded corporation, is the ultimate parent of each of the other Six Flags entities, including all of the Debtors. SFI directly owns two subsidiaries: SFO, a Debtor, and GP Holdings, Inc., a non-Debtor. Six Flags conducts the majority of its business through SFO which, in turn, owns all of the capital stock of SFTP. SFTP owns, directly or through its subsidiaries, all of Six Flags' parks other than the Partnership Parks.

GP Holdings, Inc., through its subsidiaries, is the general partner of the partnerships that own portions of the Partnership Parks. GP Holdings, Inc. and its subsidiaries, as well as the entities that hold units in the Partnership Parks, are not Debtors in the Reorganization Cases. In addition, the entities that own and operate the Company's foreign parks are not debtors in the Reorganization Cases.

3. Regional Theme Parks

The chart below summarizes key business information about the Company's theme parks.

20

| Name of Park and Location | Description | Market Area(s) | Population Within Radius from Park Location |
|---|---|---|---|
| **Six Flags America** Largo, MD | 523 acres—combination theme and water park and approximately 300 acres of potentially developable land | Washington, D.C. and Baltimore | 7.0 million – 50 miles 11.7 million – 100 miles |
| **Six Flags Discovery Kingdom** Vallejo, CA | 138 acres—theme park plus marine and land animal exhibits | San Francisco/Oakland and Sacramento | 5.5 million – 50 miles 10.2 million – 100 miles |
| **Six Flags Fiesta Texas** San Antonio, TX | 224 acres—combination theme and water park | San Antonio | 2.1 million – 50 miles 3.7 million – 100 miles |
| **Six Flags Great Adventure/Six Flags Hurricane Harbor/ Six Flags Wild Safari** Jackson, NJ | 2,200 acres—separately gated theme park, water park and drive-through safari and approximately 700 acres of potentially developable land | New York City and Philadelphia | 13.7 million – 50 miles 27.2 million – 100 miles |
| **Six Flags Great America** Gurnee, IL | 304 acres—combination theme and water park and approximately 20 acres of potentially developable land | Chicago and Milwaukee | 8.5 million – 50 miles 13.1 million – 100 miles |
| **Six Flags Kentucky Kingdom** Louisville, KY | 58 acres—combination theme and water park | Louisville and Lexington | 1.4 million – 50 miles 4.6 million – 100 miles |
| **Six Flags Magic Mountain/ Six Flags Hurricane Harbor** Valencia, CA | 262 acres—separately gated theme park and water park | Los Angeles | 10.6 million – 50 miles 17.8 million – 100 miles |
| **Six Flags Mexico** Mexico City, Mexico | 110 acres—theme park | Mexico City, Mexico | 30.0 million – 50 miles 42.0 million – 100 miles |

21

| Name of Park and Location | Description | Market Area(s) | Population Within Radius from Park Location |
|---|---|---|---|
| **Six Flags New England** Agawam, MA | 284 acres—combination theme and water park | Springfield, Providence, Hartford/New Haven, and Boston | 3.1 million – 50 miles 15.2 million – 100 miles |
| **Six Flags Over Georgia**[1] Austell, GA/ **Six Flags White Water Atlanta** Marietta, GA | 359 acres—separately gated theme park and water park on 290 acres and 69 acres, respectively | Atlanta | 4.2 million – 50 miles 7.0 million – 100 miles |
| **Six Flags Over Texas/ Six Flags Hurricane Harbor** Arlington, TX | 264 acres—separately gated theme park and water park on 217 and 47 acres, respectively | Dallas/Fort Worth | 6.5 million – 50 miles 7.1 million – 100 miles |
| **Six Flags St. Louis** Eureka, MO | 497 acres—combination theme and water park and approximately 240 acres of potentially developable land | St. Louis | 2.6 million – 50 miles 3.8 million – 100 miles |
| **La Ronde** Montreal, Canada | Theme park on 146 acres | Montreal, Quebec, Canada | 4.3 million – 50 miles 5.8 million – 100 miles |
| **The Great Escape and Splashwater Kingdom/Six Flags Great Escape Lodge & Indoor Waterpark** Lake George, NY | 351 acres—combination theme and water park, plus 200 room hotel and 38,000 square foot indoor waterpark | Albany | 1.1 million – 50 miles 3.1 million – 100 miles |

---

[1]    In late September 2009, a severe storm caused water damage to portions of Six Flags Over Georgia. Nevertheless, the park opened the following weekend and remained open for the balance of the 2009 season. The Company expects to submit an insurance claim of up to $30,000,000.

4.     Theme Park Operations

Each of the Six Flags theme parks is managed by a park president who reports to a regional vice president or senior vice president in the Park Strategy and Management Group. The park president is responsible for all operations and management of the individual park. Local advertising, ticket sales, community relations and hiring and training of personnel are the responsibility of individual park management in coordination with corporate support teams.

Each park president also directs a full-time, on-site management team. Each management team includes senior personnel responsible for operations and maintenance, in-park food, beverage, merchandising and games, marketing and promotion, sponsorships, human resources and finance. Finance directors at Six Flags' parks report to the Senior Vice President, Finance and Chief Accounting Officer, and with their support staff, provide financial services to their respective parks and park management teams. Park management compensation structures are designed to provide financial incentives for individual park managers to execute the Company's strategy and to maximize profitability and free cash flow.

Six Flags' parks are generally open daily from Memorial Day through Labor Day. In addition, most of the parks are open during weekends prior to and following their daily seasons, often in conjunction with holiday-themed events. Due to their location, certain parks have longer operating seasons. Typically, the parks charge a basic daily admission price, which allows unlimited use of all rides and attractions, although in certain cases special rides and attractions require the payment of an additional fee.

5.     Marketing and Promotional Activities

Six Flags attracts visitors through multi-media marketing and promotional programs for each of its parks. The national programs are designed to market and enhance the Six Flags brand name. Regional and local programs are tailored to address the different characteristics of their respective markets and to maximize the impact of specific park attractions and product introductions. All marketing and promotional programs are updated or completely changed each year to address new developments. Marketing programs are supervised by the Company's Executive Vice President, Entertainment and Marketing, with the assistance of its senior management and advertising agencies.

Six Flags frequently develops alliance, sponsorship and co-marketing relationships with well-known national, regional and local consumer goods companies and retailers to supplement its advertising efforts and to provide attendance incentives in the form of discounts and/or premiums. Six Flags also arranges for popular local radio and television programs to be filmed or broadcast live from its parks.

Group sales represented approximately 29% of aggregate attendance in the 2008 season at Six Flags' parks. Each park has a group sales director and a sales staff dedicated to group sales and pre-sold ticket programs through a variety of methods, including online promotions, direct mail, telemarketing and personal sales calls. Six Flags offers discounts on season pass and multi-visit tickets, tickets for specific dates and tickets to affiliated groups such as businesses, schools and religious, fraternal and similar organizations.

23

Season pass sales establish an attendance base in advance of the season, thus reducing, to some extent, exposure to inclement weather. Additionally, season pass holders often bring paying guests and generate "word of mouth" advertising for the parks. During the 2008 season, season pass attendance constituted approximately 28% of the total attendance at Six Flags' parks.

Six Flags also implements promotional programs as a means of targeting specific market segments and geographic locations not generally reached through group or retail sales efforts. The promotional programs utilize coupons, sweepstakes, reward incentives and rebates to attract additional visitors. These programs are implemented through online promotions, direct mail, telemarketing, direct-response media, sponsorship marketing and targeted multi-media programs. The special promotional offers are usually for a limited time and offer a reduced admission price or provide some additional incentive to purchase a ticket.

6.    Park Maintenance and Inspection

Six Flags' rides are inspected daily by maintenance personnel during the operating season. These inspections include safety checks, as well as regular maintenance and are made through both visual inspection of the ride and test operation. The Company's senior management and the individual park personnel evaluate the risk aspects of each park's operation. Potential risks to employees and staff as well as to the public are evaluated. Contingency plans for potential emergency situations have been developed for each facility. During the off-season, maintenance personnel examine the rides and repair, refurbish and rebuild them where necessary. This process includes x-raying and magnafluxing (a further examination for minute cracks and defects) steel portions of certain rides at high-stress points. Six Flags has approximately 800 full-time employees who devote substantially all of their time to maintaining the parks and their rides and attractions.

In addition to the Company's maintenance and inspection procedures, third-party consultants are retained by Six Flags or its insurance carriers to perform an annual inspection of each park and all attractions and related maintenance procedures. The results of these inspections are reported in written evaluation and inspection reports, as well as written suggestions on various aspects of park operations. In certain states, state inspectors also conduct annual ride inspections before the beginning of each season. Other portions of each park are subject to inspections by local fire marshals and health and building department officials. Furthermore, Six Flags uses Ellis & Associates as water safety consultants at its parks in order to train life guards and audit safety procedures.

7.    Capital Expenditures

Six Flags regularly makes capital investments for new rides and attractions at its parks. Six Flags purchases both new and used rides and attractions. In addition, Six Flags rotates rides among parks to provide fresh attractions. Six Flags believes that the selective introduction of new rides and attractions, including family entertainment attractions, is an important factor in promoting each of the parks in order to achieve market penetration and encourage longer visits, which lead to increased attendance and in-park spending.

24

In addition, Six Flags generally makes capital investments in the food, retail, games and other in-park areas to increase per capita guest spending. Six Flags also makes annual enhancements in the theming and landscaping of its parks in order to provide a more complete family oriented entertainment experience. In 2007, Six Flags began a multi-year initiative to improve its information technology infrastructure, which will enhance its operational efficiencies. Capital expenditures are planned on an annual basis with most expenditures made during the off-season. Expenditures for materials and services associated with maintaining assets, such as painting and inspecting existing rides, are expensed as incurred and are not included in capital expenditures.

8. Insurance

Six Flags maintains insurance of the type and in amounts that it believes are commercially reasonable and that are available to businesses in its industry. Six Flags maintains multi-layered general liability policies that provide for excess liability coverage of up to $100.0 million per occurrence. For incidents arising after November 15, 2003, at the Company's U.S. parks, its self-insured retention ("SIR") is $2.5 million per occurrence. In addition, for incidents arising after November 1, 2004, the Company has a one-time additional $500,000 SIR, in the aggregate, applicable to claims in any policy year. For incidents at those parks during the twelve months prior to that date, the SIR is $2.0 million per occurrence. For incidents during the twelve months ended November 15, 2002, the SIR is $1.0 million per occurrence. Retention levels for the Company's international parks are nominal. After November 15, 2003 the Company has a $0.75 million deductible for workers compensation claims ($0.5 million deductible for the two prior years). Six Flags' general liability policies cover the cost of punitive damages only in certain jurisdictions in which a claim occurs. The Company maintains fire and extended coverage, workers' compensation, business interruption, terrorism and other forms of insurance typical to businesses in this industry. The fire and extended coverage policies insure the Company's real and personal properties (other than land) against physical damage resulting from a variety of hazards.

9. Competition

Six Flags' parks compete directly with other theme parks, water parks and amusement parks and indirectly with all other types of recreational facilities and forms of entertainment within their market areas, including movies, sports attractions and vacation travel. Accordingly, the Company's business is and will continue to be subject to factors affecting the recreation and leisure-time industries generally, such as general economic conditions and changes in discretionary consumer spending habits. Within each park's regional market area, the principal factors affecting direct theme park competition include location, price, the uniqueness and perceived quality of the rides and attractions in a particular park, the atmosphere and cleanliness of a park and the quality of its food and entertainment.

10. Seasonality

Six Flags' operations are highly seasonal, with approximately 80% of park attendance and revenues occurring in the second and third calendar quarters of each year, with the most significant period falling between Memorial Day and Labor Day. In 2008, for example,

the Company realized approximately 120% of its annual Adjusted EBITDA (as defined in Exhibit C) during the months of June through October.

11.     Environmental and Other Regulations

Six Flags' operations are subject to federal, state and local environmental laws and regulations including laws and regulations governing water and sewer discharges, air emissions, soil and groundwater contamination, the maintenance of underground and above-ground storage tanks and the disposal of waste and hazardous materials. In addition, the Company's operations are subject to other local, state and federal governmental regulations including, without limitation, labor, health, safety, zoning and land use and minimum wage regulations applicable to theme park operations, and local and state regulations applicable to restaurant operations at each park. Finally, certain of the Company's facilities are subject to laws and regulations relating to the care of animals. Six Flags believes that it is in substantial compliance with applicable environmental and other laws and regulations and, although no assurance can be given, the Company does not foresee the need for any significant expenditure in this area in the near future.

Portions of the undeveloped areas at certain of the Company's parks are classified as wetlands. Accordingly, Six Flags may need to obtain governmental permits and other approvals prior to conducting development activities that affect these areas, and future development may be limited and/or prohibited in some or all of these areas. Additionally, the presence of wetlands in portions of the Company's undeveloped land could adversely affect its ability to dispose of such land and/or the price the Company receives in any such disposition. Moreover, the undeveloped areas that are not wetlands will require comprehensive land-use entitlement in order to make such land developable, which may require substantial time, cost and effort to meet zoning and other regulatory requirements, and there can be no assurances that the outcome of such efforts would be successful, or that the increase in value, if any, will economically justify such expenditures of time, cost and effort.

12.     Recent Acquisitions

On June 18, 2007, SFI acquired a 40% interest in a venture that owns dick clark productions, inc. ("dcp") for a net investment of approximately $39.7 million. In 2008, Six Flags leveraged the dcp library, which includes the Golden Globe Awards, the American Music Awards, the Academy of Country Music Awards, So You Think You Can Dance, American Bandstand and Dick Clark's New Year's Rockin' Eve, to provide additional product offerings in its parks. In addition, the Company believes that its investment in dcp provides it with additional sponsorship and promotional opportunities. Red Zone Capital Partners II, L.P. ("Red Zone"), a private equity fund managed by Daniel M. Snyder and Dwight C. Schar, who are both members of SFI's Board of Directors, is the majority owner of the parent of dcp. During the fourth quarter of 2007, an additional third party investor purchased approximately 2.0% of the interest in dcp from Six Flags and Red Zone. As a result, the Company's ownership interest is approximately 39.2%.

26

On July 31, 2007, Six Flags acquired the minority equity interest in Six Flags Discovery Kingdom that was held by its partner, an agency of the City of Vallejo, California, for a cash purchase price of approximately $52.8 million.

13.    International Licensing

In March 2008, Six Flags entered into an agreement with Tatweer Dubai LLC, a member of Dubai Holding ("Tatweer"), to create a Six Flags-branded theme park in Dubai, United Arab Emirates. Pursuant to the agreement, the Company is required to provide design and development services for the creation of the park, which will be operated and managed by Tatweer or its affiliate. Six Flags also granted Tatweer the exclusive right to use its brand in certain countries for certain time periods, including the United Arab Emirates. As consideration for the Company's services and the exclusivity rights granted in the agreement, the Company is entitled to receive license and other fees over the design and development period plus an ongoing royalty fee once the park opens.

In September 2009, Six Flags entered into an agreement with The Government of Cross River State of Nigeria ("CRSG") to develop a Six Flags branded park in Calabar Cross River State. Pursuant to the agreement, Six Flags will provide concept development and master planning services to CRSG for the creation of the park. The Debtors do not expect to invest any capital in connection with the provision of such services. Once the initial phase is finalized, Six Flags and CRSG will collaborate on the detailed design, development, construction and management of the location.

14.    Six Flags New Orleans and Proposed Settlement of Related Litigation

The Company's New Orleans park sustained extensive damage in Hurricane Katrina in late August, 2005, and has not reopened. The Company has determined that the carrying value for the assets destroyed was approximately $34.0 million, which Six Flags believes should be covered fully by insurance and for which Six Flags recorded a receivable in 2005. This amount does not include the property and equipment owned by the lessor, which is also covered by the Company's insurance policies. The park is covered by up to approximately $180 million in property insurance, subject to a 3% deductible in the case of named storms calculated by the insurers at approximately $5.5 million. The property insurance includes business interruption coverage.

In connection with damage sustained to the New Orleans park during Hurricane Katrina, in December 2006, Six Flags commenced a declaratory action in Louisiana federal district court seeking judicial determination that its flood insurance sublimit was not applicable by virtue of a separate "Named Storm" peril. In February 2008, the court ruled in summary judgment that the flood insurance sublimit was applicable to the policies, including the Named Storm provision. Six Flags appealed this ruling. In April 2009, the U.S. Court of Appeals for the Fifth Circuit upheld the district court ruling, with the exception of one excess policy covering damages over $75 million, providing a possible additional $11 million of property damages coverage if total damages are set at the $129 million claimed amount. Coverage issues as to the one excess policy were remanded to the district court for further consideration of the Company's claim. In addition, damages disputes between Six Flags and its insurers about the total amount

27

of Six Flags' Hurricane Katrina damages and the portion of damages that are covered wind/storm damages (which are not subject to the flood sublimit) are being decided in an ongoing appraisal proceeding in New Orleans before a selected panel of three appraisers, as required by the insurance policies.

In April 2009, the Industrial Development Board of the City of New Orleans and the City of New Orleans ("New Orleans") sought to accept an offer Six Flags made years earlier to buy out of its New Orleans lease for a $10 million cash payment and an exchange of contiguous real estate Six Flags owned. When the Company declined to extend the same offer, the Mayor of New Orleans announced to the press that New Orleans would sue. Six Flags was current on its lease payments to New Orleans, however, and in the Company's view, not in default. New Orleans filed suit in Louisiana state court on May 11, 2009, alleging that Six Flags breached its lease with New Orleans by removing rides and assets from the park property; by failing to secure the property; and by accepting interim insurance payments for Hurricane Katrina damage claims instead of designating New Orleans as loss payee. On May 12, 2009, New Orleans obtained an *ex parte* state court temporary restraining order that enjoined Six Flags from: (a) removing any rides or attractions without New Orleans' approval; (b) not properly securing the premises; and (c) "converting and/or secreting insurance proceeds received . . . as a result of Hurricane Katrina." Six Flags removed the action to the United States District Court for the Eastern District of Louisiana, and the parties stipulated to stay the federal action for sixty days, while leaving the temporary restraining order in place, with the Company reserving the right to contest its propriety at a later time. In an order dated June 1, 2009, the Court imposed the agreed-upon stay but shortened the period to thirty days, until June 29, 2009. The Court issued an order on June 22, 2009, directing the clerk to mark the action as closed but retaining jurisdiction for restoration to the calendar should circumstances change.

Subsequently, however, the parties reached an agreement to settle the matter pursuant to which New Orleans and the Company agreed to enter into a general release of all claims against one another. Additionally, New Orleans will enter a stipulation dismissing, with prejudice, the action pending in the United States District Court for the Eastern District of Louisiana, and dissolving the temporary restraining order obtained by New Orleans on May 12, 2009. New Orleans also has agreed not to file any proof of claim or otherwise assert any entitlement to relief in Six Flags' pending chapter 11 proceedings. Other material terms and conditions of the settlement are as follows:

- Within 35 days of the court's final approval of the final settlement agreement, which approval occurred on October 8, 2009, Six Flags will make a cash payment to New Orleans in the amount of $3 million;

- Six Flags will vacate and deliver to New Orleans the leased premises and 86 acres of land, including any improvements thereto in their current condition, "as is";

- New Orleans will be entitled to receive 25% of any net insurance proceeds Six Flags recovers on its insurance claims for property damage caused by Hurricane Katrina to the extent Six Flags' net recovery exceeds $65 million. Six Flags retains absolute discretion in prosecution, and any

28

potential settlement of, claims with insurers, subject to any required bankruptcy court approval; and

- All other agreements between New Orleans and Six Flags related in any way to the leased premises and any other such related agreements, shall be deemed terminated upon the Bankruptcy Court's final approval of the settlement agreement.

The settlement is expected to occur in early November 2009.

15. Recent Park Sales and Asset Dispositions

In April 2007, Six Flags completed the sale of the stock of its subsidiaries that owned three of the Company's water parks and four of its theme parks (the "Sale Parks") to PARC 7F-Operations Corporation for an aggregate purchase price of $312 million, consisting of $275 million in cash and a note receivable for $37 million. Pursuant to the purchase agreement, SFTP agreed to provide a limited guaranty to a creditor of the buyer related to the future results of operations of the Sale Parks of up to $10 million, decreasing by a minimum of one million dollars annually. The parks sold were Darien Lake near Buffalo, New York; Waterworld USA in Concord, California; Elitch Gardens in Denver, Colorado; Splashtown in Houston, Texas; the Frontier City theme park and the White Water Bay water park in Oklahoma City, Oklahoma; and Wild Waves and Enchanted Village near Seattle, Washington.

Six Flags recorded a non-cash impairment charge against assets held for sale in connection with this transaction in its consolidated financial statements for the year ended December 31, 2006 in the amount of $84.5 million. The net proceeds from the sale were used to repay indebtedness, fund capital expenditures and working capital needs, and acquire the minority interests in Six Flags Discovery Kingdom and dcp, as described above.

16. Employees and Labor Matters

As of March 1, 2009, Six Flags employed approximately 2,040 full-time employees. During the 2008 operating season the Company employed approximately 28,500 seasonal employees. In this regard, Six Flags competes with other local employers for qualified students and other candidates on a season-by-season basis. As part of the seasonal employment program, the Company employs a significant number of teenagers, which subjects the Company to child labor laws.

Approximately 16.2% of the Company's full-time and approximately 13.0% of its seasonal employees are subject to labor agreements with local chapters of national unions. These labor agreements expire in January 2012 (Six Flags Over Texas, Six Flags St. Louis and one union at Six Flags Great Adventure), December 2011 (Six Flags Magic Mountain and the other union at Six Flags Great Adventure) and December 2010 (Six Flags Over Georgia). The labor agreements for La Ronde expire in various years ranging from December 2010 through December 2012. Other than a strike at La Ronde involving five employees, which was settled in January 2004, and recognitional picketing at Six Flags New England in February 2005 by 11

29

employees, Six Flags has not experienced any strikes or work stoppages by its employees. The Company considers its employee relations to be good.

17.    Pending Legal Proceedings and Claims

The nature of the industry in which Six Flags operates tends to expose the Company to claims by visitors, generally for injuries. Historically, the great majority of these claims have been minor. To the extent that such claims existed as of the Petition Date, they are now stayed as a result of the filing of the Reorganization Cases. The Company is also party to the following legal proceedings, among others:

- On February 1, 2007, Images Everywhere, Inc. and John Shawn Productions, Inc. filed a case against Six Flags Theme Parks Inc. and Event Imaging Solutions, Inc. in the Superior Court of the State of California County of Los Angeles, Central District. The plaintiffs provided photographic services to certain of our parks under license agreements and/or under a consulting arrangement. In October 2006, Six Flags terminated its business relationship with the plaintiffs and thereafter entered into a settlement agreement with John Shawn Productions, Inc. regarding certain of the license agreements. As a result of this termination, the plaintiffs brought suit claiming an unspecified amount in "excess of" $20 million in damages, which they later revised to two alternative theories in the respective amounts of approximately $15 million or $11 million. The plaintiffs claimed that their services were wrongfully terminated and asserted causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing. The plaintiffs brought separate claims against defendant Event Imaging Solutions, Inc. for intentional interference with contractual relations. In a summary judgment ruling on December 19, 2007, the Court dismissed additional claims against Six Flags for breach of fiduciary duty, constructive fraud and punitive damages. The case was tried before a jury during the two-week period from March 17 to March 28, 2008, and the jury rendered a verdict in the Company's favor, dismissing the claim. The plaintiffs filed a motion for a new trial, which was dismissed by the Court on May 12, 2008. On May 28, 2008, the plaintiffs filed a notice of appeal with the Court of Appeal of the State of California, Second Appellate District. This action is now stayed.

- On March 1, 2007, Safety Braking Corporation, Magnetar Technologies Corp. and G&T Conveyor Co. filed a Complaint for Patent Infringement (the "Patent Complaint") in the United States District Court for the District of Delaware naming Six Flags, Inc., Six Flags Theme Parks Inc., and certain of our other subsidiaries as defendants, along with other industry theme park owners and operators. The Patent Complaint alleges that the Company is liable for direct or indirect infringement of United States Patent No. 5,277,125 because of its ownership and/or operation of various theme parks and amusement rides. The Patent Complaint does not

30

include specific allegations concerning the location or manner of alleged infringement. The Patent Complaint seeks damages and injunctive relief. On or about July 1, 2008, the Court entered a Stipulation and Order of Dismissal of Safety Braking Corporation. Thus, as of that date, only Magnetar Technologies Corp. and G&T Conveyor Co. remain as plaintiffs. The Company has contacted the manufacturers of the amusement rides that it believes may be impacted by this case, requiring such manufacturers to honor their indemnification obligations with respect to this case. The Company tendered the defense of this matter to certain of the ride manufacturers. Any further action against the Company with respect to this matter is now stayed as a result of the filing of the Reorganization Cases.

- On October 31, 2008, a civil action against the Company was commenced in the District Court of Bexar County, Texas. The plaintiff is seeking damages against the Company for personal injuries as a result of an accident while attempting to board a ride at Six Flags Fiesta Texas. The ride manufacturer is a co-defendant in the litigation. This action has been stayed as a result of the Debtors' bankruptcy filing.

- On January 6, 2009, a civil action against the Company (including non-debtors) was commenced in the State Court of Cobb County, Georgia. The plaintiff sought damages for personal injuries, including an alleged brain injury, as a result of an altercation with a group of individuals on property next to Six Flags Over Georgia on July 3, 2007. Certain of the individuals were employees of the park and were off duty at the time the altercation occurred. The plaintiff, who had exited the park, claims that the Company was negligent in its security of the premises. Four of the individuals who allegedly participated in the altercation are also named as defendants in the litigation.

## C.   CORPORATE GOVERNANCE AND MANAGEMENT

### 1.   Board of Directors

Six Flags' business, property and affairs are managed under the direction of the Board of Directors of the Company (the "Board"). The Board is elected by stockholders to oversee management and to assure that the long-term interests of stockholders are being served. The Board has responsibility for establishing broad corporate policies and for the overall performance of the Company. It is not, however, involved in the operating details on a day-to-day basis. The Board is advised of Six Flags' business through discussions with the Chief Executive Officer and other officers of the Company, by reviewing reports, analyses and materials provided to them and by participating in Board meetings and meetings of the committees of the Board. The Board has four regularly scheduled meetings during the year to review significant developments affecting the Company and to act on matters requiring Board approval. It also regularly holds special meetings when matters require Board action between regularly scheduled meetings.

31

Set forth in the table below are the names, ages, position or positions and biographical information of the current Board. See Section VI.H.2. for information regarding the composition of the Board following implementation of the Plan (the "Postconfirmation Board").

| Name | Age as of April 1, 2009 | Position(s) with the Company |
|---|---|---|
| Charles Elliott Andrews | 57 | Director |
| Mark Jennings | 46 | Director |
| Robert J. McGuire | 72 | Director |
| Perry Rogers | 40 | Director |
| Dwight C. Schar | 67 | Director |
| Mark Shapiro | 39 | CEO, President and Director |
| Daniel M. Snyder | 44 | Chairman of the Board |
| Harvey Weinstein | 56 | Director |

*Charles Elliott Andrews*, Director. Mr. Andrews has served as a Director of Six Flags since January 2006. Effective June 29, 2009, Mr. Andrews was named President of RMS McGladrey Inc., a business services subsidiary of H&R Block, Inc. Mr. Andrews was employed at SLM Corporation, more commonly known as Sallie Mae, from February 2003 through September 2008. Mr. Andrews served in several roles at Sallie Mae including Executive Vice President and Chief Financial Officer, with responsibilities for Finance, Accounting and Risk Management, and President and Chief Executive Officer. Prior to joining Sallie Mae, Mr. Andrews was a partner at Arthur Andersen from September 1984 to February 2003. Mr. Andrews is also a director and member of the Audit Committee of NVR, Inc. and U-Store-It Trust.

*Mark Jennings*, Director. Mr. Jennings has served as a Director of Six Flags since January 2006. Since September 1996, Mr. Jennings has been the Managing Partner and co-founder of Generation Partners, a $345 million private investment firm that acquires and provides growth capital to companies primarily in the business & information services and healthcare and media & entertainment sectors. Prior to founding Generation Partners, Mr. Jennings was a Partner at Centre Partners, a private equity firm affiliated with Lazard Freres, and prior to that, he was employed at Goldman Sachs & Co. Mr. Jennings has served on the Board of Directors of 23 companies and currently serves on the board of two other public companies - inVentiv Health, Inc. and Virtual Radiologic Corporation; as well as four private companies - Post Education, Sterling Infosystems, Agility Recovery Solutions and Medvance Institute.

*Robert J. McGuire*, Director. Mr. McGuire has served as a Director of Six Flags since May 2003. Since June 2005, Mr. McGuire has been an attorney in private practice in New York. From January 1998 through June 2005, Mr. McGuire served as counsel to Morvillo, Abramowitz, Grand, Iason & Silberburg, P.C., a New York law firm. Prior thereto, he served as

Police Commissioner of The City of New York, Chairman and Chief Executive Officer of Pinkerton's Inc. and President of Kroll Associates Inc. Mr. McGuire is Vice Chairman of the Police Athletic League, New York City's largest youth organization. Mr. McGuire is also a director and member of the Audit Committee of Mutual of America, Protection One, Inc. and Artio Global Funds.

*Perry Rogers*, Director. Mr. Rogers has served as a Director of Six Flags since March 2006. Mr. Rogers currently serves as President and Owner of PR Partners, Inc., a sports management company in Las Vegas, Nevada. From 1994 to 2008, Mr. Rogers served as President of Agassi Enterprises, Inc., a management firm. In addition, from 2002 to 2008, Mr. Rogers served as President of Alliance Sports Management Co., a management firm.

*Dwight Schar*, Director. Mr. Schar has served as a Director of Six Flags since December 2005. Mr. Schar has served as the Chairman of NVR, Inc., one of the largest homebuilders in the United States, for over five years. From 1980 until July 1, 2005, Mr. Schar also served as Chief Executive Officer of NVR, Inc. Mr. Schar is a member of the Board of Directors of dick clark productions, inc. Mr. Schar is active in the greater Washington community, involved in numerous business and educational groups, as well as on a political level as former National Finance Chair of the Republican National Committee. He was also an appointee to the President's Advisory Committee on the Arts for the Kennedy Center.

*Mark Shapiro*, President, Chief Executive Officer and Director. Mr. Shapiro has served as President, Chief Executive Officer and a Director of Six Flags since December 2005. From September 2002 to October 2005, Mr. Shapiro served as the Executive Vice President, Programming and Production of ESPN, Inc. Mr. Shapiro is also a Director of Live Nation, Inc. and the Tribune Company, and a Director and Executive Vice Chairman of dick clark productions, inc.

*Daniel M. Snyder*, Chairman of the Board. Mr. Snyder has served as Chairman of the Board of Six Flags since December 2005. Since July 1999, Mr. Snyder has been the Chairman and Principal Owner of the Washington Redskins franchise of the National Football League. Mr. Snyder was also founder and, prior to September 2000, Chairman and Chief Executive Officer of Snyder Communications, Inc. Mr. Snyder currently is Chairman of the Board of dick clark productions, inc., Managing Member of Red Zebra Broadcasting, LLC, and a member of the Board of Directors of Johnny Rockets Group, Inc. He is also Managing Member of RedZone Capital Management Company, LLC, a private investment management firm. Mr. Snyder is Chairman Emeritus of the Board of inVentiv Health, Inc.

*Harvey Weinstein*, Director. Mr. Weinstein has served as a Director of Six Flags since January 2006. Since October 2005, Mr. Weinstein has been the Co-Chairman of The Weinstein Company LLC, a multi-media company. In 1979, Mr. Weinstein and his brother founded Miramax Film Corp., which has released some of the most critically-acclaimed and commercially-successful independent feature films, including The Aviator, Finding Neverland, Chicago, Gangs of New York, Shakespeare in Love, Good Will Hunting, Pulp Fiction and My Left Foot. Mr. Weinstein was Co-Chairman of Miramax from 1979 through September 2005. In 2004, Mr. Weinstein was named a Commander of the Order of the British Empire by Queen Elizabeth II in recognition of his contribution to the British film industry. Mr. Weinstein has also

33

produced several award-winning shows on Broadway and around the world, including The Producers, Gypsy, La Boheme, Wonderful Town and more recently All Shook Up, Sweet Charity and Dirty Rotten Scoundrels.

2.    Executive Management

The current executive management team joined Six Flags in late 2005 and early 2006. The Plan contemplates that the current executive management team will be retained following the Effective Date and that the Company's Employment Agreements (as defined below) with such individuals will be assumed.

The names, titles and biographical information for the Company's executive management are set forth below.

*Mark Shapiro*, Chief Executive Officer and President. Mr. Shapiro has served as President, Chief Executive Officer and a Director of Six Flags since December 2005. From September 2002 to October 2005, Mr. Shapiro served as the Executive Vice President, Programming and Production of ESPN, Inc. Mr. Shapiro is also a Director of Live Nation, Inc. and the Tribune Company, and a Director and Executive Vice Chairman of dick clark productions, inc.

*Jeffrey R. Speed*, Executive Vice President and Chief Financial Officer. Mr. Speed has served as Executive Vice President of Six Flags since February 2006 and Executive Vice President and Chief Financial Officer of Six Flags since April 2006. Before joining Six Flags, Mr. Speed served as Senior Vice President and Chief Financial Officer of Euro Disney S.A.S. Prior to Euro Disney, Mr. Speed served as Vice President, Corporate Finance and Assistant Treasurer for The Walt Disney Company, where he was responsible for worldwide capital markets activities, structured and project finance initiatives (including Euro Disney and Hong Kong Disneyland), syndication of revolving credit facilities and Disney's overall banking and rating agency relationships. Mr. Speed is also a board member and audit committee member of World Wrestling Entertainment, Inc. (NYSE: WWE) and Chief Financial Officer of dick clark productions, inc.

*Mark Quenzel*, Executive Vice President Park Strategy and Management. Mr. Quenzel oversees all park operations, strategy, in-park revenue, ticket sales and safety for the Six Flags parks. Mr. Quenzel joined Six Flags following 15 years with ESPN, where he served as Senior Vice President, Programming and Production. In that capacity, he ran four divisions: Owned Events, Outdoors, Remote Production and Remote Facilities, and supervised 375 full-time employees and over 4,000 seasonal providers. Mr. Quenzel was also part of the team that created the popular X Games franchise as well as the Great Outdoor Games, and during his tenure he oversaw a number of major sport properties and brands such as NASCAR, NHL, MLB and B.A.S.S.

*Michael Antinoro*, Executive Vice President Entertainment and Marketing. Mr. Antinoro oversees all aspects of Six Flags' advertising, promotions, in-park licensing agreements, entertainment, marketing and communications. Mr. Antinoro formerly served as the Executive Producer of ESPN Original Entertainment (EOE), the core creative group that led the

34

ESPN brand into non-traditional sports and entertainment programming. During his tenure at EOE, Mr. Antinoro created a number of successful original movies, a critically acclaimed dramatic series, talk, reality and game shows, documentaries and "The World Series of Poker" franchise. EOE won the prestigious Peabody Award in 2002 and was nominated for more than 20 Sports Emmys. Prior to his work at EOE, Mr. Antinoro served directly under Mark Shapiro as coordinating producer of ESPN's landmark SportsCentury series.

*Louis Koskovolis*, Executive Vice President Corporate Alliances. Mr. Koskovolis oversees the new Corporate Alliances group which focuses on developing key national, regional and local sponsorships for all Six Flags parks and creates cross-promotional platforms which enable Six Flags partners to showcase their products and services while providing Six Flags with added exposure through partners' advertising and marketing assets. Mr. Koskovolis joined Six Flags from his position as Executive Vice President of Multi-Media Sales for ESPN and ABC Sports in addition to serving in leadership roles in the company's National Television Sales and Customer Marketing organizations.

*Andrew Schleimer*, Executive Vice President of Strategic Development and In-Park Services. Mr. Schleimer oversees Six Flags' Strategic Development and In-Park Services, a division that focuses on increasing Company revenue and enhancing the park experience through agreements with branded food, beverage, equipment, service and retail partners. Mr. Schleimer has a background in investment banking with a focus on mergers and acquisitions, and joined Six Flags from UBS Investment Bank, where he served as Vice President in the bank's Mergers and Acquisitions department. At UBS, Mr. Schleimer advised on over $150 billion of transactions in the media, entertainment, technology, telecom and consumer products sectors.

*James Coughlin,* General Counsel. Mr. Coughlin has served as the Company's General Counsel since 1998. Prior to becoming the Company's chief legal counsel, Mr. Coughlin practiced law at several private law firms, most recently at the former Baer Marks & Upham firm in New York City. Mr. Coughlin graduated from Harvard University with a Bachelor of Arts degree, and from Boston University School of Law with a Juris Doctor degree.

3. Executive Compensation

In January 2006, the Board retained independent compensation consultant, Mercer, to advise it with respect to appropriate compensatory terms for the Chief Executive Officer, who joined Six Flags in December 2005. Mercer developed a proposed compensation package that was benchmarked against those of a peer group that included the following companies: Cedar Fair Entertainment Company, Harrah's Entertainment, Inc., MGM Mirage, Boyd Gaming Corporation, Las Vegas Sands Corp., Penn National Gaming, Inc., Trump Entertainment Resorts, Isle of Capri Casinos, Inc., Station Casinos, Inc., Ameristar Casinos, Inc., Aztar Corporation, Pinnacle Entertainment, Inc., Starwood Hotels & Resorts Worldwide, Inc., Hilton Hotels Corporation, Interstate Hotels & Resorts, Gaylord Entertainment Company, Vail Resorts, Inc. and Regal Entertainment Group. In January 2006, the Board considered and approved the salary, bonus and equity incentive compensation for the Chief Executive Officer and authorized the compensation committee of the Board (the "Compensation Committee") to finalize an employment agreement for the Chief Executive Officer incorporating such terms.

35

At its January 2006 meeting, the Board also considered employment terms for the other named executive officers based on the recommendation of the Chief Executive Officer and on each individual's respective prior experience, then-current compensation level and qualifications. The Board approved the compensation terms and authorized the Compensation Committee to finalize the terms of employment for the other named executive officers in an employment agreement for each officer.

In December 2008, due in part to the impending expiration of management's employment agreements, the Compensation Committee commenced a review of such employments agreements and, during that review process, received advice from Mercer and Houlihan Lokey and evaluated compensation proposals in connection with its pending review of the employment agreements for each of the named executive officers. The Compensation Committee also received advice from Cadwalader, Wickersham & Taft LLP, the Committee's outside legal counsel during this process. Mercer and Houlihan Lokey were asked to advise the Compensation Committee on compensation arrangements for the named executive officers in anticipation of the Company's previously-announced exploration of alternatives for the restructuring of the Company's indebtedness and preferred income equity redeemable shares in order to retain current management through any restructuring the Company may undertake.

Between December 2008 and April 2009, Six Flags negotiated and agreed to new employment agreements (the "Employment Agreements") with Mark Shapiro, its President and Chief Executive Officer; Jeffrey R. Speed, its Executive Vice President and Chief Financial Officer; Louis Koskovolis, its Executive Vice President, Corporate Alliances – Sponsorship; Mark Quenzel, its Executive Vice President, Park Strategy and Management; Andrew M. Schleimer, its Executive Vice President, Strategic Development and In-Park Services; Michael Antinoro, its Executive Vice President, Entertainment and Marketing; and James Coughlin, its General Counsel; that supersede and replace the existing employment agreements with such individuals. The Employment Agreements provide for each executive's continued employment with the Company in his current position during the four year period expiring on April 1, 2013, unless sooner terminated by either party.

The Employment Agreements provide for the following annual base salary and target bonus amounts for the executives:

|  | Base Salary | Target Bonus |
| --- | --- | --- |
| Shapiro | $1,300,000 | $1,300,000 |
| Speed | $775,000 | 100% of base salary |
| Koskovolis | $650,000 | $500,000 |
| Quenzel | $500,000 | $500,000 |
| Schleimer | $500,000 | $400,000 |
| Antinoro | $400,000 | $500,000 |
| Coughlin | $500,000 | discretionary |

The Employment Agreements did not increase the rate of base salary for any of the executives from their prior levels, but did increase the target bonus amounts and awards available to the executives. The maximum annual bonus Mr. Shapiro may receive for any fiscal year is $2.6 million. The minimum annual bonus Mr. Speed will receive related to fiscal years

36

2009 through 2012 is $250,000. Bonuses will be determined based upon the level of achievement of the following performance parameters: budgeted Adjusted EBITDA, budgeted Free Cash Flow (as defined in Exhibit C to this Disclosure Statement), budgeted attendance, budgeted in-park net revenue per capita and budgeted sponsorship/licensing revenue, each weighted 20%, except that (i) 50% of Mr. Shapiro's bonus will be based on the attainment of the Adjusted EBITDA target, with the remaining targets weighted 12.5% each, and (ii) 50% of Mr. Koskovolis' bonus will be based on the attainment of the sponsorship revenue target, with the remaining targets weighted 12.5% each. No bonuses are payable if 90% of the Adjusted EBITDA target is not obtained, except for Mr. Koskovolis, who will be entitled to 50% of his bonus amount if the sponsorship revenue target is satisfied.

Upon the Company's emergence from the Reorganization Cases (a "<u>Triggering Event</u>"), the executives will be entitled to receive emergence bonuses in the following amounts:

|            | Emergence Bonus |
|------------|-----------------|
| Shapiro    | $3,000,000      |
| Speed      | $750,000        |
| Koskovolis | $325,000        |
| Quenzel    | $250,000        |
| Coughlin   | $250,000        |
| Schleimer  | $250,000        |
| Antinoro   | $200,000        |

Emergence bonuses are payable in a lump sum cash payment within ten business days of the Triggering Event, except that $1,000,000 of Mr. Shapiro's emergence bonus will become payable on the first anniversary of the Triggering Event, subject to his continued employment through such date, or, earlier, upon the termination of Mr. Shapiro's employment without "cause," for "good reason," without "good reason" in connection with a "change in control" or due to death or "disability" (as such terms are defined in the Employment Agreements). In connection with negotiations with the Informal Committee regarding the Plan, Mr. Shapiro agreed to amend the definition of "change in control" to exclude the consummation of the transactions contemplated by the Plan, as amended or supplemented by the Debtors.

In addition, severance will become payable under the Employment Agreements upon termination of an executive's employment without "cause" or for "good reason" during the contract term. Mr. Shapiro would be entitled to receive the greater of (a) the sum of his base salary and target bonus for the remaining balance of the contract term or (b) three times the sum of his base salary and target bonus; provided that Mr. Shapiro's Employment Agreement will be amended to limit his cash severance to three years base salary plus target bonus; to provide that Mr. Shapiro will not be entitled to any gross-up payments under Internal Revenue Code 280G; and to amend the definition of "good reason" to include certain deviations from the Company's business plan without Mr. Shapiro's approval. Mr. Speed would be entitled to receive the greater of (a) the sum of his base salary and target bonus for the remaining balance of the contract term or (b) two times the sum of his base salary and target bonus. Each other executive would receive an amount equal to the sum of the executive's base salary for the remaining balance of the contract term and the executive's annual bonus for the prior year. In addition, each executive

37

will receive twelve months (36 months for Mr. Shapiro) of continued health and life insurance coverage.

The Employment Agreements also provide that, upon a Triggering Event, the executives will receive stock options and restricted stock under the Long-Term Incentive Plan, which will vest over a four-year period. Although it was originally contemplated that stock options and restricted stock distributable under the Long-Term Incentive Plan would be 12% of the outstanding common stock in SFI, the amount was reduced to 10% of the New Common Stock of Reorganized SFI, on a fully diluted basis. The terms of the Long-Term Incentive Plan are discussed further in Section VI.H.5. of this Disclosure Statement.

## D.    PARTNERSHIP PARKS AND TIME WARNER FINANCING

In connection with the Company's 1998 acquisition of the former Six Flags, it guaranteed certain obligations relating to the Partnership Parks. These obligations continue until 2027, in the case of the Georgia parks, and 2028, in the case of the Texas park. Among such obligations are (i) minimum annual distributions of approximately $60.7 million in 2009 (subject to cost of living adjustments in subsequent years) to limited partners in the partnerships that hold the Partnerships Parks (of which the Company will be entitled to receive in 2009 approximately $25.6 million based on the Company's ownership of approximately 29% of the Georgia limited partner interests and approximately 52% of the Texas limited partner interests at September 30, 2009), (ii) minimum capital expenditures at each park during rolling five-year periods based generally on 6% of park revenues, (iii) an annual offer to purchase a maximum number of 5% per year (accumulating to the extent not purchased in any prior year) of limited partnership units (collectively, "Partnership Park LP Interests") at the Specified Prices (as defined below), which annual offer must remain open from March 31 through late April of each year (the "Put Period"), and any limited partnership interest "put" during such Put Period must be fully paid for no later than May 15th of that year, (iv) making annual ground lease payments, and (v) either (a) purchasing all of the outstanding Partnership Park LP Interests through the exercise of a call option upon the earlier of the occurrence of certain specified events and the end of the term of the partnerships that hold the Partnership Parks in 2027 (in the case of Georgia) and 2028 (in the case of Texas) (the "End-of-Term Option") or (b) causing each of the partnerships that hold the Partnership Parks to have no indebtedness and to meet certain other financial tests as of the end of the term of such partnership.

The purchase price for the annual offer to purchase the maximum number of Partnership Park LP Interests is based on the greater of (i) a total equity value of $250.0 million (in the case of Georgia) and $374.8 million (in the case of Texas) or (ii) a value derived by multiplying the weighted-average four year EBITDA of the respective Partnership Park by 8.0 (in the case of the Georgia park) and 8.5 (in the case of the Texas park) (the "Specified Prices"). As of September 30, 2009, the Company owned approximately 29% and 52% of the Georgia limited partner units and Texas limited partner units, respectively. The remaining redeemable units of approximately 71% and 48% of the Georgia limited partner units and Texas limited partner units, respectively, represent an ultimate redemption value for the Partnership Park LP Interests of approximately $355.9 million at September 30, 2009. As of September 30, 2009, the amount of accumulated and unexercised Partnership Park LP Interests eligible to be "put" during the next Put Period in April 2010 is approximately $307.8 million. In 2027 (in the case of

Georgia) and 2028 (in the case of Texas), the Company will have the option to purchase all remaining Partnership Park LP Interests under the End-of-Term Option, at a price based on the Specified Prices set forth above, increased by a cost of living adjustment.

In addition, when the Company acquired the former Six Flags, the Company entered into a Subordinated Indemnity Agreement, dated as of April 1, 1998 (the "Subordinated Indemnity Agreement"), with certain Six Flags entities, Time Warner and an affiliate of Time Warner, pursuant to which, among other things, the Company agreed to guarantee the performance of certain obligations relating to the Partnership Parks (as described above) when due and to indemnify Time Warner, among others, in the event that such obligations are not performed and Time Warner's guarantee of such obligations is called upon. Under the Subordinated Indemnity Agreement, the Company transferred to Time Warner (which has guaranteed substantially all of the Company's obligations under the Partnership Park arrangements) record title to the corporations which own the Acquisition Parties, the entities that have purchased and will purchase the Partnership Park LP Interests under the annual "put" obligations, and the Company received an assignment from Time Warner of all cash flow received on, and voting rights associated with, such Partnership Park LP Interests until the occurrence and continuance of a default under the Subordinated Indemnity Agreement. Except as described below, Six Flags otherwise controls such entities. Pursuant to the Subordinated Indemnity Agreement, the Company is required to deposit certain calculated amounts into escrow as a source of funds in the event Timer Warner is required to honor its guarantee. In addition, Six Flags issued to Time Warner shares of preferred stock in the entity that indirectly owns 100% of the respective managing general partners of the partnerships. In the event of a default by the Company under the Subordinated Indemnity Agreement or of the Company's obligations to its partners in the Partnership Parks, these arrangements would permit Time Warner to take full control of both the entities that own the Acquisition Parties and the managing general partners. In that event, Time Warner would acquire the Company's interests in approximately $208.5 million in loans made by the managing general partners to the partnerships. Such an event of default would also trigger a termination event under the Company's licensing agreement with Warner Bros. The Company's obligations under the Subordinated Indemnity Agreement are guaranteed by substantially all of the Company's domestic subsidiaries, including SFTP and all its domestic subsidiaries. Unless there is a default under the Subordinated Indemnity Agreement that has not been cured in accordance with the terms thereof, at such time as all of the outstanding Partnership Park LP Interests are acquired by the Acquisition Parties or all obligations of Time Warner under the Partnership Parks arrangements have been satisfied or terminated, Time Warner is required to transfer to the Company the entire equity interests of the entities that own the Acquisition Parties and the managing general partners.

As of the end of the Put Period for 2009, Six Flags received "put" notices from holders of Partnership Park LP Interests, with an aggregate "put" price of approximately $65.5 million. The general partner of the Georgia limited partnership elected to purchase 50% of the Georgia units that were "put" for a total purchase price of approximately $7.0 million. With Time Warner's consent, Six Flags funded "puts" totaling $6.0 million with cash that was in escrow for the benefit of the subsidiaries of Time Warner in connection with the Company's obligations related to the Partnership Parks. Although not required by the existing arrangements with Time Warner concerning the Partnership Parks, TW-SF LLC ("TW-SF"), a subsidiary of

39

Historic TW Inc., provided the Company with a loan (the "Existing TW Loan") to enable the Company to fund its 2009 "put" obligations.

In connection with the Existing TW Loan, the Acquisition Parties executed a promissory note, dated May 15, 2009 (the "Existing TW Promissory Note"), evidencing the loan made by TW-SF in the approximate principal amount of $52.5 million to the Acquisition Parties ($41.2 million principal amount of which was outstanding at September 30, 2009). Interest on the Existing TW Loan accrues at a rate of 14% per annum, and the principal amount of the Existing TW Loan matures on March 15, 2011. The Existing TW Promissory Note requires semi-annual prepayments with the proceeds received by the Acquisition Parties from the Company-owned Partnership Park LP Interests and is prepayable at any time at the option of the Acquisition Parties. The Existing TW Promissory Note contains certain representations, warranties and affirmative covenants, but does not include any financial maintenance covenants. In addition, the Existing TW Promissory Note contains restrictive covenants that limit, among other things, the ability of the Acquisition Parties to incur indebtedness, create liens, engage in mergers, consolidations and other fundamental changes, make investments or loans, engage in transactions with affiliates, pay dividends or repurchase capital stock. The Existing TW Promissory Note contains certain events of default, including changes of control and certain bankruptcy events of the Acquisition Parties or the Existing TW Guarantors (as defined below), but the filing of the Reorganization Cases did not constitute a default.

Up to an aggregate of $10 million of the Existing TW Loan is guaranteed by SFI, SFO, and SFTP (collectively, the "Existing TW Guarantors") under the terms of a guaranty agreement entered into by the Existing TW Guarantors in favor of TW-SF, dated May 15, 2009. The guaranty agreement contains certain representations, warranties and affirmative covenants. In addition, the guaranty agreement contains restrictive covenants that limit, among other things, the ability of the Existing TW Guarantors and their subsidiaries to incur indebtedness, create liens, pay dividends or amend the Company's Prepetition Credit Agreement, charter documents or bylaws in certain adverse manners.

Shortly after commencement of the chapter 11 cases, Six Flags and Time Warner entered into discussions to address the Acquisition Parties' future obligations under the Partnership Park arrangements and Subordinated Indemnity Agreement, as applicable, to purchase future "put" units. As a result of those discussions, Time Warner delivered to Six Flags and the Acquisition Parties an executed commitment letter and related term sheet and fee letter in October 2009 (the "TW Commitment Papers"), pursuant to which Time Warner or an affiliate of Time Warner (the "New TW Lender") has agreed to provide the Acquisition Parties with a $150,000,000 multi-draw term loan facility (the "New TW Loan") on the terms and subject to the conditions summarized in the TW Commitment Papers. Interest on the New TW Loan will accrue at a rate equal to (i) the greater of (a) LIBOR and (b) 2.50% (or to the extent that any LIBOR or similar rate floor under the Exit Term Loan (or under any senior term credit facility that amends, restates, amends and restates, refinances, modifies or extends the Exit Term Loan) is higher than 2.50%, such higher floor) plus (ii) the then "Applicable Margin" under the Exit Term Loan (or, if higher) under any successor term facility plus (iii) 1.00%. In the event that any of the loan parties issue corporate bonds or other public debt, and the then applicable credit default swap spread is higher than the "Applicable Margin" referenced in the foregoing sentence, such "Applicable Margin" will be increased based on the applicable default swap spread then in

40

effect, subject to a fixed cap. Funding during the availability period under the New TW Loan will occur only on May 14th (or the immediately preceding business day) of each fiscal year (each a "Funding Date") in which amounts required to satisfy the "put" obligations exceeds (a) for the fiscal year ending December 31, 2010, $10,000,000, (b) for the fiscal year ending December 31, 2011, $12,500,000 and (c) for each subsequent fiscal year, $15,000,000. The principal amount of the New TW Loan borrowed on each Funding Date will be due and payable five years from such Funding Date. The loan agreement governing the New TW Loan (the "New TW Loan Agreement") will require prepayments with any Cash of the Acquisition Parties (other than up $50,000 per year) including the proceeds received by the Acquisition Parties from the Company-owned Partnership Park LP Interests and is prepayable at any time at the option of the Acquisition Parties; *provided, however*, that so long as any amounts owing under the Existing TW Loan are outstanding, any such cash shall first be applied toward mandatory prepayments of amounts owing thereunder. The New TW Loan will be unconditionally guaranteed on a joint and several and senior unsecured basis by SFI, SFO, SFTP and each of the current direct and indirect domestic subsidiaries of SFI who are or in the future become guarantors under the Exit Facility (collectively, the "New TW Guarantors") under the terms of a guaranty agreement (the "New TW Guarantee Agreement") to be entered into by the New TW Guarantors in favor of the New TW Lender. As set forth in the TW Commitment Papers, the New TW Loan Agreement and New TW Guarantee Agreement will contain representations, warranties, covenants and events of default on substantially similar terms as those contained in the Exit Facility but will be modified, as agreed to by New TW Lender and the New TW Guarantors, to provide additional flexibility to the New TW Guarantors from the covenants in the Exit Facility that are commensurate with the different positions of the Exit Facility and the New TW Loan Agreement in the capital structure of Six Flags. The Exit Facility shall contain terms and conditions that (a) are not in conflict with the terms of the New TW Loan Agreement and do not directly or indirectly restrict the ability of the Acquisition Parties and New TW Guarantors to perform their obligations under the New TW Loan Agreement, the Subordinated Indemnity Agreement, the Partnership Parks arrangements or certain license agreements with Warner Bros., and (b) contain terms and conditions that are no more onerous (as determined by the New TW Lender) to the Acquisition Parties and New TW Guarantors than those set forth in the in the TW Commitment Papers. TW's commitment is subject to certain customary conditions as well as confirmation of the Plan and the retention of the existing senior management of the Debtors continuing as the senior management of SFI following consummation of the Plan. In addition, the New TW Guarantors' payment or other binding obligations under the TW Commitment Papers would be subject to Bankruptcy Court approval.

The commitment of the New TW Lender to provide the New TW Loan shall expire unless the Bankruptcy Court has entered a final order approving the TW Commitment Papers by 5:00 p.m. (New York time) on November 24, 2009.

Notwithstanding the foregoing, any material changes to the New TW Loan as described in the TW Commitment Papers are subject to the approval of the Majority Backstop Purchasers.

41

## E.  CAPITAL STRUCTURE AND SIGNIFICANT PREPETITION INDEBTEDNESS

As of September 30, 2009, the Company had approximately $2.42 billion of indebtedness outstanding and $306.7 million of PIERS obligations, including dividends in arrears, that were mandatorily redeemable (to the extent of assets legally available therefor) on August 15, 2009 for 100% of the liquidation preference, plus accrued and unpaid dividends.



The instruments evidencing these obligations are described below. In addition to the foregoing, the Debtors estimate that as of the Petition Date, they had aggregate trade debt of approximately $39 million for goods and services provided to them on an unsecured basis.

### 1.  Prepetition Credit Agreement

On May 25, 2007, certain of the Debtors entered into the Prepetition Credit Agreement which provided for (i) an $850,000,000 term loan, with a stated maturity of April 30, 2015 (approximately $835,125,000 of which was outstanding as of the Petition Date); (ii) a revolving facility totaling $275,000,000 (approximately $242,658,000 of which was outstanding as of the Petition Date (as well as letters of credit in the approximate amount of $30,133,000)), and (iii) an uncommitted optional term loan tranche of up to $300,000,000. Since the Petition Date, the Company has received notice to draw approximately $27,612,000 in outstanding letters

42

of credit which increased the total balance of the revolver debt to approximately $270,270,000. JPMorgan Chase Bank, N.A. serves as the Prepetition Agent. SFTP is the borrower under the Prepetition Credit Agreement. SFO and all of its domestic subsidiaries are guarantors, other than SFTP (which is the borrower under the Prepetition Credit Agreement) and certain of SFTP's subsidiaries that are specifically excluded in the Prepetition Credit Agreement as guarantors thereof (collectively, the "Guarantors").

The interest rate on borrowings under the Prepetition Credit Agreement can be fixed for periods ranging from one to twelve months, subject to certain conditions. At the Debtors' option, the interest rate is based upon specified levels in excess of the applicable base rate or the London Inter-Bank Offered Rate ("LIBOR"). At March 31, 2009, and after giving effect to then-applicable interest swap arrangements, the weighted average interest rate for borrowings under the term loan and the revolving facility were 4.86% and 3.79%, respectively. Commencing on September 30, 2007, SFTP, as the primary borrower under the Prepetition Credit Agreement, was required to make quarterly principal repayments on the term loan in the amount of $2,125,000 with all remaining principal due on April 30, 2015. The Prepetition Credit Agreement contains customary representations and warranties and affirmative and negative covenants, including, but not limited to, a financial covenant related to the maintenance of a minimum senior secured leverage ratio in the event of utilization of the revolving facility and certain other events, as well as limitations on the ability to dispose of assets, incur additional indebtedness or liens, make restricted payments, make investments and engage in mergers or consolidations.

To secure obligations under the Prepetition Credit Agreement, SFTP and the Guarantors granted the Prepetition Agent security interests and mortgages in and on substantially all of the SFTP's and the Guarantors' assets.

2.    Derivative Financial Instruments

In February 2008, the Debtors entered into two interest rate swap agreements that effectively converted $600,000,000 of the term loan component of the Prepetition Credit Agreement into a fixed rate obligation. The terms of the agreements, each of which had a notional amount of $300,000,000, began in February 2008 and were terminated on the Petition Date. Claims arising in connection with such interest rate swap agreements are treated as Prepetition Credit Agreement Claims under the Plan. As of the Petition Date, swap counterparties held Prepetition Credit Agreement Claims against the Debtors of approximately $20.0 million.

3.    Unsecured Notes

As of the Petition Date, SFI owed approximately $1.27 billion on account of fixed-rate senior unsecured notes having various maturities and rates. More specifically, there are five tranches of unsecured notes issued or guaranteed by Six Flags as follows:

(a)    2010 Notes

On February 11, 2002, SFI issued $480,000,000 of 8⅞% Senior Notes maturing in the year 2010 (the "2010 Notes"). Subsequently, SFI repurchased $199,700,000 of the 2010

43

Notes and exchanged $149,223,000 of such notes for the 2016 Notes described below. The 2010 Notes are senior unsecured obligations of SFI and are not guaranteed by any of its subsidiaries. The 2010 Notes required annual interest payments of approximately $11,633,000 and, absent certain limited exceptions, such as changes in control of SFI and certain asset sales, did not require any principal payments or repurchases prior to their maturity in 2010.

(b)     2013 Notes

On April 16, 2003, SFI issued $430,000,000 of 9¾% Senior Notes maturing in the year 2013 (the "2013 Notes"). Subsequently, SFI repurchased $56,000,000 of the 2013 Notes and exchanged $231,559,000 of such notes for the 2016 Notes. The 2013 Notes are senior unsecured obligations of SFI and are not guaranteed by any of its subsidiaries. The 2013 Notes required annual interest payments of approximately $13,888,000 and, absent certain limited exceptions, such as changes in control of SFI and certain asset sales, did not require any principal payments or repurchases prior to their maturity in 2013.

(c)     2014 Notes

On December 5, 2003, SFI issued $325,000,000 of 9⅝% Senior Notes maturing in the year 2014 (the "2014 Notes"). In January 2005, SFI issued an additional $195,000,000 of 2014 Notes, the proceeds of which were used to fund the redemption of other senior notes of SFI. SFI has repurchased a total of $55,350,000 of the principal amount of the 2014 Notes and has exchanged $149,863,000 of such notes for the 2016 Notes. The 2014 Notes are senior unsecured obligations of SFI and are not guaranteed by any of its subsidiaries. The 2014 Notes required annual interest payments of approximately $30,298,000 and, subject to certain limited exceptions, such as changes in control of SFI and certain asset sales, did not require any principal payments or repurchases prior to their maturity in 2014, absent certain limited exceptions.

(d)     2015 Notes

On November 19, 2004, SFI issued $299,000,000 principal amount of notes maturing in the year 2015 (the "2015 Notes"), which are convertible into SFI's common stock at an initial conversion rate of 157.4803 shares for each $1,000 principal amount of 2015 Notes, subject to certain adjustments. During June and July of 2007, SFI repurchased $19,000,000 of the principal amount of the 2015 Notes. The 2015 Notes are senior unsecured obligations of SFI and are not guaranteed by any of its subsidiaries. The 2015 Notes required annual interest payments of approximately $12,600,000, representing an interest rate of 4½% per year, and, subject to certain limited exceptions, did not require any principal payments or repurchases prior to their maturity in 2015.

(e)     2016 Notes

On June 16, 2008, the Debtors completed a private debt exchange in which it issued $400,000,000 of 12¼% Senior Notes due in the year 2016 ("2016 Notes") of Six Flags Operations Inc. in exchange for (i) $149,223,000 of the 2010 Notes, (ii) $231,559,000 of the 2013 Notes and (iii) $149,863,000 of the 2014 Notes. The benefits of this transaction included reducing debt principal by approximately $130.6 million, extending the Debtors' debt maturities (including a majority of SFI's nearest term debt maturity in 2010) and decreasing annual cash

44

interest expenses. The transaction resulted in a net gain on extinguishment of debt of $107,743,000 related to the 2013 Notes and 2014 Notes (net of $3,264,000 of transaction costs related to the 2010 Notes that were charged to expense immediately as the exchange of the 2010 Notes was not deemed to be a substantial modification under the guidance of Emerging Issues Task Force Issue No. 96-19, "Debtor's Accounting for a Modification or Exchange of Debt Instruments"). The Debtors also recorded a $14,146,000 premium on the 2016 Notes representing the difference between the carrying amount of the 2010 Notes and the carrying amount of the 2016 Notes on the exchange as this portion of the exchange was not deemed a substantial modification. This premium is to be amortized as an offset to interest expense over the life of the 2016 Notes.

The 2016 Notes required annual interest payments of approximately $49,000,000 and are guaranteed by SFI. Subject to certain limited exceptions, such as changes in control of SFI or SFO and certain asset sales, the 2016 Notes did not require any principal payments or repurchases prior to their maturity in 2016.

Each of these Unsecured Notes is structurally and contractually subordinate to the obligations under the Prepetition Credit Agreement.

4. Preferred Income Equity Redeemable Shares

In January 2001, SFI issued 11,500,000 Preferred Income Equity Redeemable Shares ("PIERS"), for proceeds of $277,834,000. Each PIERS represents one one-hundredth (1/100) beneficial interest in a share of SFI's 7¼% convertible preferred stock. The Company has not declared quarterly dividends on the PIERS for the quarters ending June 30, 2008, September 30, 2008, December 31, 2008, March 31, 2009, June 30, 2009 and September 30, 2009. These amounts have been accrued.

By their terms, the PIERS were required to be redeemed on August 15, 2009 for cash at 100% of the liquidation preference, which would have amounted to approximately $275.4 million (after giving effect to the conversion of approximately 483,000 PIERS into common stock prior to the mandatory redemption date) plus accrued and unpaid dividends in the approximate amount of $31.2 million. Subject to certain limited exceptions, such as a change in control of SFI, the PIERS did not require any redemption payments or repurchases prior to the redemption date.

5. Guarantees of Partnership Parks Loan

As described more fully above in Section III.D. of this Disclosure Statement, titled "Partnership Parks and Time Warner Financing," on May 15, 2009, the Existing TW Guarantors entered into agreements to guaranty payment of up to $10 million of the obligations of the Acquisition Parties to TW. As of September 30, 2009, the Acquisition Parties were obligated to TW in the aggregate principal amount of $41,205,000 pursuant to the Existing TW Promissory Note. The Existing TW Guarantors guaranteed prompt and complete payment of all amounts owed by the Acquisition Parties as and when due under the Existing TW Promissory Note; *provided, however*, that under terms of the guaranty agreement the maximum liability of the Existing TW Guarantors will not exceed $10,000,000, in the aggregate.

6. Trade Debt

In connection with their nationwide operations, the Debtors purchase a variety of goods and services from vendors. Such goods and services have been purchased through purchase orders and other customary procedures used by such vendors in the ordinary course of business. A substantial portion of the merchandise sold in Six Flags' amusement parks is imprinted with or utilizes the Six Flags logo or other licensed designs, and many of the Debtor's commitments extend six to nine months into the future and may not be cancelled.

## F. RECENT FINANCIAL INFORMATION

As of September 30, 2009, Six Flags' unaudited consolidated financial statements reflected assets totaling approximately $3,075,739,000 and liabilities totaling approximately $3,184,978,000. As of September 30, 2009, Six Flags' assets included Cash or Cash equivalents of approximately $262,126,000, and accounts receivable of approximately $48,799,000.

Six Flags' total revenues for the nine-month period ending September 30, 2009 amounted to approximately $811,013,000, compared to $903,247,000 in total revenues for the nine-month period ending September 30, 2008. Six Flags' net loss attributable to SFI for the nine-month period ending September 30, 2009 was approximately $113,638,000, compared to net income attributable to SFI of $83,079,000 during the nine-month period ending September 30, 2008.

## IV. KEY EVENTS LEADING TO THE COMMENCEMENT OF THE REORGANIZATION CASES

## A. FINANCIAL CHALLENGES

For several years, Six Flags has faced a number of challenges, most significantly its over-leveraged balance sheet, which has impaired its ability to achieve profitability. Ultimately, these challenges necessitated the commencement of the Reorganization Cases.

1. Challenging Market Conditions

As discussed above, under the direction of the previous Board and management team, by the end of 2005 the Company had amassed more than $2.5 billion of debt and PIERS obligations in order to acquire theme parks and conduct various capital expenditure programs. Faced with a highly leveraged balance sheet, in 2006 the newly-constituted Board approved substantial changes to senior management, including several park presidents (formerly referred to as general managers), and new management began to effectuate a series of long-term operating initiatives. By 2008, new management achieved each of the five key strategic objectives that it set out to achieve by the end of its third year. They are summarized as follows:

- Cleaned up the parks and improved the overall guest experience; repositioned the brand by diversifying the product offering. For the second year in a row, the Company's key guest satisfaction scores were at or above all-time highs.

46

- Created and grew new high margin and low capital sponsorship and licensing businesses and achieved annual revenues in excess of a $50 million target. For 2008, the Company achieved sponsorship, licensing and other fees of approximately $59 million.

- Achieved total revenue per capita of at least $40, or 20% cumulative growth from 2005.

- Operated at a Modified EBITDA (as defined in Exhibit C to this Disclosure Statement) margin of at least 30%.

- Became Free Cash Flow positive, which had never been achieved in the Company's history. The Company was Free Cash Flow positive with an Adjusted EBITDA in excess of $275 million in 2008.

In addition to diversifying and growing revenues, and increasing operational efficiency and operating cash flows, new management also worked to reduce the Company's debt obligations. This was achieved by, among other means, selling ten parks for approximately $400.0 million in gross proceeds, entering into the Prepetition Credit Agreement that reduced interest costs and extended maturities and completing an exchange offer for $530.6 million of SFI notes for $400.0 million of the SFO 2016 Notes, resulting in reduced debt and interest, and extended maturities. Despite these significant achievements, the Company remains highly leveraged and has substantial indebtedness and PIERS obligations, much of which will become due in the next few years, and requires significant associated debt service.

To date, these balance sheet challenges have been exacerbated by the unfavorable conditions described below, including diminishing availability of credit, inclement weather at certain parks, swine flu, and the overall deterioration in the U.S. economy, including rising levels of national unemployment, all of which has caused a reduction in the Company's year-over-year performance:

- The Company is experiencing declines in group ticket sales, in-park per capita spending, as well as sponsorship and licensing revenue, due to rising unemployment and the general deterioration in domestic and international economies.

- The Company has experienced a reduction in earnings from foreign currency exchange rate impacts at its Mexico and Montreal parks.

- Attendance at certain of the Company's parks has been negatively impacted by adverse weather in 2009 compared to 2008.

- During April 2009, the swine flu epidemic led to the closing of Six Flags Mexico for almost two weeks by order of the Mexican government, and caused attendance at the Company's Texas parks to experience a year-over-year decline.

47

Due to the adverse business impact of the above factors, the Company's ability to maintain sufficient liquidity and satisfy its financial covenant requirements under the Prepetition Credit Agreement became unlikely.

2.    Exchange Offers

As previously noted, the PIERS required mandatory redemption by August 15, 2009. The redemption provisions provide for payment in cash at 100% of the liquidation preference, which amounts to approximately $275.4 million (after giving effect to the conversion of approximately 483,000 PIERS into common stock prior to the mandatory redemption date), in addition to accrued and unpaid dividends of approximately $31.2 million. Unable to satisfy this obligation, the Debtors sought to refinance or restructure the PIERS before the mandatory redemption date because a default of the PIERS obligations would also cause a default under the Prepetition Credit Agreement. A default under the Prepetition Credit Agreement, in turn, would permit the Prepetition Lenders to accelerate the Debtors' obligations thereunder. If the Prepetition Lenders were to accelerate the amounts due under the Prepetition Credit Agreement, a cross-default could also be triggered under the Unsecured Notes, resulting in most, if not all, of the Debtors' long-term debt becoming due and payable immediately.

Recognizing the need for a comprehensive solution for these financial issues, prior to commencing the Reorganization Cases the Debtors attempted to effect out-of-court exchange offers designed to reduce unsecured debt and interest expense requirements, leave in place its favorable Prepetition Credit Agreement, and improve financial and operational flexibility to allow the Company to compete more effectively and generate long-term growth (the "Exchange Offers"). Accordingly, SFI (i) announced the commencement of an exchange offer and consent solicitation on April 17, 2009 to exchange the 2010 Notes, 2013 Notes and 2014 Notes for common stock and (ii) announced the commencement of an exchange offer and consent solicitation on May 6, 2009 to exchange the 2015 Notes for common stock. The consummation of the Exchange Offers with respect to such Unsecured Notes was conditioned on, among other things, the valid participation of at least 95% of the aggregate principal amount of each issue of Unsecured Notes. SFI also contemplated soliciting consents from the holders of the PIERS to amend the terms of the PIERS to provide for the automatic conversion of the PIERS into common stock. However, because it became apparent that 95% of the aggregate principal amount of each issue of Unsecured Notes would not participate in the Exchange Offers, SFI did not commence the consent solicitation with respect to the PIERS.

As events unfolded during the early part of the 2009 season, it became apparent that the Exchange Offers ultimately would have been inadequate to resolve the Debtors' financial issues due to significant, and unexpected, declines in financial performance and liquidity for reasons beyond management's control (*e.g.*, macro-economic turbulence, rising levels of national unemployment, a Swine Flu epidemic, and adverse weather conditions), as well as higher-than-expected "put" obligations from the Partnership Parks (defined herein), as described in Section III.D. of this Disclosure Statement.

RLF1-3502315-1

3.    Negotiations with Avenue

In connection with the Debtors' efforts to evaluate appropriately all potential restructuring alternatives, in March 2009, the Debtors entered into good-faith negotiations with Avenue, in its capacity as the largest holder of the 2016 Notes, a significant holder of other Unsecured Notes, and a Prepetition Lender, in an attempt to de-lever their balance sheet through a restructuring transaction that had the potential to result in a pre-negotiated chapter 11 filing. Negotiations with Avenue focused on the conversion of the 2016 Notes into the bulk of the equity of Reorganized SFI and were dependent upon reinstatement of the favorable terms of the Prepetition Credit Agreement. Reinstatement of the Prepetition Credit Agreement was a critical element of these negotiations because, if the Company was left with the full balance of the Prepetition Credit Agreement but was unable to reinstate the favorable terms of the Prepetition Credit Agreement, the Company would have faced the prospect of paying much higher "market" rates of interest on approximately $1.128 billion outstanding at that time under the Prepetition Credit Agreement. The Company estimates, in that case, that its annual interest costs would have increased by at least $40 million, further exacerbating the Company's liquidity and future financial covenant challenges. Under these proposals, Avenue would have become the largest equity holder of Reorganized SFI.

In late Spring 2009 into early June 2009, negotiations continued and the Debtors' concerns increased regarding the effects of economic turbulence in the United States and abroad and other negative impacts on the Debtors' businesses and prospects. In addition, a thirty-day grace period to make interest payments on account of the 2015 Notes was set to expire on June 14, 2009. Negotiations with Avenue had reached an impasse, so the Debtors reached a plan support agreement with the Prepetition Lenders and filed these cases.

Since the filing, the Debtors have continued to have extensive discussions and have shared significant information with a wide variety of creditor constituencies, including the Creditors' Committee, the Informal Committee, certain holders of the 2010 Notes, 2013 Notes, 2014 Notes and 2015 Notes, and Time Warner. After the Debtors filed the initial amendment to the Original Plan in mid-August, counsel for Avenue sent a letter to the Board on September 2, indicating that it represented Avenue and additional holders of the 2016 Notes who now comprised the Informal Committee of such holders, and presenting a term sheet and other documents outlining an alternative plan of reorganization. The key economic element of the alternative plan was that it involved potential new debt financing and equity through a rights offering sufficient to repay the existing secured debt in full, leaving equity for distribution to the different constituencies of noteholders. The Informal Committee sought the Debtors' commitment to the alternative plan and the Debtors responded that they had significant questions concerning the proposal and needed additional time.

The Debtors and the Informal Committee continued their dialogue, and the Debtors and the Informal Committee ultimately pursued committed financing for each plan proposal on parallel paths. They likewise continued to engage in extensive negotiations regarding the development of a fully consensual and backstopped plan of reorganization (subject to the satisfaction of the terms and conditions set forth in the Backstop Commitment Agreement). These efforts and negotiations ultimately resulted in agreement regarding the terms of the Plan, which, in general terms, reflects a new capital structure supported by debt financing

49

obtained through the Debtors' efforts and equity commitments provided or backstopped by members of the Informal Committee. The Plan therefore represents the joint efforts of, and consensus among, the Debtors and their largest unsecured creditor constituency.

## V. THE REORGANIZATION CASES

### A.    FIRST DAY ORDERS

On the Petition Date, the Debtors filed a series of motions seeking various relief from the Bankruptcy Court designed to minimize any disruption of business operations and to facilitate their reorganization.

#### 1.    Case Administration Orders

The Bankruptcy Court issued orders: (i) authorizing the joint administration of the chapter 11 cases and (ii) granting an extension of time to file the Debtors' schedules and statements. In addition, the Debtors have requested that the Bankruptcy Court authorize the retention of legal and financial advisors.

#### 2.    Critical Obligations

The Bankruptcy Court issued orders authorizing the Debtors to satisfy certain critical business obligations such as those relating to (i) critical vendors, (ii) the payment of wages, compensation and employee benefits, (iii) certain value added taxes, (iv) foreign creditors, common carriers and warehousemen, and (v) certain vendors that provided "perishable agricultural commodities" as defined in the Perishable Agricultural Commodities Act of 1930, as amended (7 U.S.C. § 499a *et seq.* ("PACA")), and that have the authority to impose a trust on certain of the Debtors' assets to enforce prompt payment of Claims filed pursuant to PACA.

#### 3.    Business Operations

The Bankruptcy Court issued orders (i) authorizing the Debtors to continue certain workers' compensation and other insurance policies, (ii) permitting the Debtors to continue their existing customer programs and practices and to honor any prepetition obligations in respect thereof and (iii) on an interim and final basis, prohibiting the Debtors' utilities service providers from altering, refusing or discontinuing service and establishing certain procedures for determining adequate assurance of payment.

#### 4.    Financial Operations

The Bankruptcy Court issued orders allowing the Debtors to (i) maintain their existing bank accounts and forms, (ii) continue to use existing investment guidelines, (iii) continue their centralized cash management system and (iv) continue the use of the Prepetition Lenders' cash collateral.

50

## B. CREDITORS' COMMITTEE

On June 26, 2009, the U.S. Trustee, pursuant to its authority under section 1102 of the Bankruptcy Code, appointed the Creditors' Committee.

The current members of the Creditors' Committee are:

| | |
|---|---|
| John J. Gorman<br>8226 Bee Caves Road<br>Austin, TX 78746 | The Coca-Cola Company<br>Attn. Joseph Johnson, Esq.<br>PO Box 1734<br>NAT 2008 Mail Stop<br>Atlanta, GA 30313 |
| Esopus Creek Value<br>Attn. Joseph S. Criscione<br>150 JFK Parkway<br>Ste. 100<br>Short Hills, NJ 07078 | The Bank of New York Mellon<br>Attn. Gary Bush<br>101 Barclay Street<br>Floor 8 West<br>New York, NY 10286 |
| Richard Schottenfeld<br>800 Third Ave.<br>New York, NY 10022 | Whirley Industries<br>Attn. Susan M. Borland<br>618 Fourth Ave.<br>PO Box 988<br>Warren, PA 16365 |

HSBC Bank USA, N.A.
Attn. Robert Conrad
10 East 40th Street
New York, NY 10016

The Creditors' Committee has the following advisors:

| Attorneys | Financial Advisors |
|---|---|
| Brown Rudnick LLP<br>Seven Times Square<br>New York, NY 10036 | Peter J. Solomon Company<br>520 Madison Avenue<br>New York, NY 10022 |
| Pachulski Stang Ziehl & Jones<br>919 North Market Street, 17th Floor<br>Wilmington, DE 19899 | |

Since the appointment of the Creditors' Committee, the Debtors have consulted with the Creditors' Committee concerning the administration of the chapter 11 cases.

## C. REJECTION OF CERTAIN AGREEMENTS

As part of their efforts to reduce their operating expenses, the Debtors engaged in an analysis of their various contracts and agreements (collectively, the "Executory Contracts"), and their unexpired leases. On and after the Petition Date, the Debtors, in consultation with the Prepetition Agent, may reject various Executory Contracts pursuant to orders of the Bankruptcy Court. In accordance with the Plan, all Executory Contracts that exist between the Debtors and any person or entity will be deemed assumed by the Debtors as of the Effective Date, except to the extent previously rejected or as identified for rejection in the Plan and the Plan Supplement. See Section VI.G. of this Disclosure Statement for more information about the Debtors' assumption and rejection of Executory Contracts.

## D. SCHEDULES AND BAR DATE

The Debtors have filed their schedules of assets and liabilities, schedules of current income and expenditures, schedules of Executory Contracts and unexpired leases and statements of financial affairs pursuant to the Bankruptcy Rules and orders of the Bankruptcy Court. The Debtors have requested that the Bankruptcy Court enter an order establishing December 14, 2009 as the general bar date (the "Bar Date") for each person or entity to file proofs of Claim based on prepetition Claims against any of the Debtors.[13] In accordance with this order, the Debtors will mail a notice of the Bar Date and a proof of Claim form to all known holders of Claims.

## VI. THE PLAN OF REORGANIZATION

## A. INTRODUCTION

The Debtors believe that (i) through the Plan, holders of Allowed Claims will receive a greater recovery from the estates of the Debtors than the recovery that they would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) the Plan will afford the Debtors the opportunity and ability to continue in business as a viable going concern and preserve ongoing employment for the Debtors' employees.

The Plan is annexed hereto as Exhibit A and forms a part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan.

Statements as to the rationale underlying the treatment of Claims and Preconfirmation Equity Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

---

[13]     The Debtors have also proposed that the Bankruptcy Court establish December 10, 2009 as the deadline for all governmental units to file Claims.

## B. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN OF REORGANIZATION

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed. These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims and contingent claims for contribution and reimbursement. Additionally, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan of reorganization, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a non-monetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable and contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the consummation date or the date on which amounts owing are actually due and payable, payment in full, in cash, with postpetition interest to the extent appropriate and provided for under the governing agreement (or if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its

53

right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Pursuant to section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the plan. Accordingly, their votes are not solicited. Under the Debtors' Plan, the Claims in Class 1 (Other Priority Claims), Class 2 (Secured Tax Claims), Class 3 (Other Secured Claims), Class 4 (SFTP Prepetition Credit Agreement Claims), Class 6 (SFTP Partnership Parks Claims), Class 7 (SFTP and SFTP Subsidiary Unsecured Claims), Class 10 (SFO Partnership Parks Claims), Class 13 (SFI Partnership Parks Claims) and Class 17 (Preconfirmation Subsidiary Equity Interests) are unimpaired, and therefore, the holders of such Claims are "conclusively presumed" to have voted to accept the Plan.

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan of reorganization. For example, a class is deemed to reject a plan of reorganization under section 1126(g) of the Bankruptcy Code if the holders of claims or interests in such class do not receive or retain property under the plan on account of their claims or equity interests. Under this provision of the Bankruptcy Code, the holders of Funtime, Inc. Unsecured Claims (Class 15), Subordinated Securities Claims (Class 16), Preconfirmation SFO Equity Interests (Class 18), and Preconfirmation SFI Equity Interests (Class 19) are deemed to reject the Plan because they receive no distribution and retain no property interest under the Plan. Because Class 15 (Funtime, Inc. Unsecured Claims), Class 16 (Subordinated Securities Claims), Class 18 (Preconfirmation SFO Equity Interests) and Class 19 (Preconfirmation SFI Equity Interests) are deemed to reject the Plan, the Debtors are required to demonstrate that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to such Classes. Among these are the requirements that the plan be "fair and equitable" with respect to, and not "discriminate unfairly" against, the Claims and Preconfirmation Equity Interests in such Classes. For a more detailed description of the requirements for confirmation, see Section IX.B. of this Disclosure Statement, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION; Requirements for Confirmation of the Plan of Reorganization."

Consistent with these requirements, the Plan divides the Allowed Claims against, and Preconfirmation Equity Interests in, the Debtors into the following Classes:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 4 | SFTP Prepetition Credit Agreement Claims | Unimpaired | No (deemed to accept) |
| 5 | SFTP TW Guaranty Claims | Impaired | Yes |
| 6 | SFTP Partnership Parks Claims | Unimpaired | No (deemed to accept) |
| 7 | SFTP and SFTP Subsidiary Unsecured Claims | Unimpaired | No (deemed to accept) |
| 8 | SFO Prepetition Credit Agreement Claims | Impaired | Yes |

| 9 | SFO TW Guaranty Claims | Impaired | Yes |
|---|---|---|---|
| 10 | SFO Partnership Parks Claims | Unimpaired | No (deemed to accept) |
| 11 | SFO Unsecured Claims | Impaired | Yes |
| 12 | SFI TW Guaranty Claims | Impaired | Yes |
| 13 | SFI Partnership Parks Claims | Unimpaired | No (deemed to accept) |
| 14 | SFI Unsecured Claims | Impaired | Yes |
| 15 | Funtime, Inc. Unsecured Claims | Impaired | No (deemed to reject) |
| 16 | Subordinated Securities Claims | Impaired | No (deemed to reject) |
| 17 | Preconfirmation Subsidiary Equity Interests | Unimpaired | No (deemed to accept) |
| 18 | Preconfirmation SFO Equity Interests | Impaired | No (deemed to reject) |
| 19 | Preconfirmation SFI Equity Interests | Impaired | No (deemed to reject) |

1. Unclassified

    (a) Administrative Expense Claims

    Administrative Expense Claims are the actual and necessary costs and expenses of the Debtors' Reorganization Cases that are allowed under and in accordance with sections 330, 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code. Such expenses will include, but are not limited to, actual and necessary costs and expenses of preserving the Debtors' estates, actual and necessary costs and expenses of operating the Debtors' businesses, indebtedness or obligations incurred or assumed by the Debtors during the Reorganization Cases and compensation for professional services rendered and reimbursement of expenses incurred. Specifically excluded from Administrative Expense Claims are any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code, which fees or charges, if any, will be paid in accordance with Section 14.7 of the Plan.

    Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim will receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors in Possession will be paid in full and performed by the Debtors in Possession or Reorganized Debtors, as the case may be, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions; *provided, further*, that if any such ordinary course expense is not billed or a request for payment is not made within ninety days after the Effective Date, claims for payment of such an ordinary course expense will be barred. The reasonable, documented and unpaid fees and expenses of the Prepetition Agent, including attorneys' fees, will be Allowed Administrative Expense Claims and will be paid without the need for further filing of a proof of Claim and without the need for further Bankruptcy Court approval.

55

(b)     Professional Compensation and Reimbursement Claims

Professional Compensation and Reimbursement Claims are all Claims of entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code ("Professional Compensation and Reimbursement Claims"). All such entities must file, on or before the date that is forty-five days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred.

Pursuant to the Plan, holders of Allowed Professional Compensation and Reimbursement Claims will be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such Administrative Expense Claim. The Reorganized Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course of business without the need for Bankruptcy Court approval.

(c)     Priority Tax Claims

A Priority Tax Claim is any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code ("Priority Tax Claim").

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim will receive, at the option of the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or the Reorganized Debtors, (a) on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to such Allowed Priority Tax Claim or (b) commencing on the Effective Date, or as soon thereafter as is practicable, and continuing over a period not exceeding five years from and after the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject to the option of the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or Reorganized Debtors to prepay the entire amount of the Allowed Priority Tax Claim. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date will be paid in the ordinary course of business as such obligations become due.

2.      Classified

(a)     Class 1 – Other Priority Claims

Under the Plan, Other Priority Claims include Claims entitled to priority in payment as specified in section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code, such as certain wage, salary and other compensation obligations to employees of the Debtors up to a statutory cap of $10,950 per employee. The Debtors estimate that on the Effective Date, the allowed amount of such claims will aggregate approximately $11.1 million.

56

Class 1 is Unimpaired by the Plan. Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Priority Claim agrees to a different treatment, each holder of an Allowed Other Priority Claim will receive Cash in an amount equal to such Allowed Other Priority Claim on the later of the Distribution Date and the date such Allowed Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.

(b)     Class 2 – Secured Tax Claims

Under the Plan, Secured Tax Claims include any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein and including any related Secured Claim for penalties). The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $8.9 million.

Class 2 is Unimpaired by the Plan. Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Secured Tax Claim agrees to a different treatment, each holder of an Allowed Secured Tax Claim will receive, at the option of the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or the Reorganized Debtors, (i) on the Distribution Date, or as soon thereafter as is practicable, Cash in an amount equal to such Allowed Secured Tax Claim or (ii) commencing on the Distribution Date, or as soon thereafter as is practicable, and continuing over a period not exceeding five years from and after the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject to the option of the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or Reorganized Debtors to prepay the entire amount of the Allowed Secured Tax Claim.

(c)     Class 3 – Other Secured Claims

Under the Plan, Other Secured Claims include any Secured Claim other than a Secured Tax Claim, an SFTP Prepetition Credit Agreement Claim or an SFO Prepetition Credit Agreement Claim. The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $0.

Class 3 is Unimpaired by the Plan. Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, at the option of the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or the Reorganized Debtors, (i) on the Distribution Date or as soon thereafter as is practicable, each Allowed Other Secured Claim will be Reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, (ii) each holder of an Allowed Other Secured Claim will receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Distribution Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable or (iii) each holder of an Allowed Other Secured Claim will receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Distribution Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

(d)     Class 4 – SFTP Prepetition Credit Agreement Claims

Under the Plan, SFTP Prepetition Credit Agreement Claims include Claims held by the Prepetition Lenders and/or the Prepetition Agent, and all other Claims against SFTP or SFTP's subsidiaries arising under the Prepetition Credit Agreement. Class 4 SFTP Prepetition Credit Agreement Claims are Allowed in the aggregate approximate amount of $1.140 billion, which includes accrued and unpaid default interest through December 31, 2009.

Class 4 is Unimpaired by the Plan. Each holder of an Allowed SFTP Prepetition Credit Agreement Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

On the Distribution Date, each holder of an Allowed Prepetition Credit Agreement Claim shall be paid in full, in Cash, in complete satisfaction of such SFTP Prepetition Credit Agreement Claim.

(e)     Class 5 – SFTP TW Guaranty Claims

Under the Plan, SFTP TW Guaranty Claims include Claims arising under the guaranty by SFTP of obligations owed to Time Warner and certain of its affiliates under the Existing TW Loan, up to a maximum aggregate amount of $10 million.

Class 5 is Impaired by the Plan. Each holder of an SFTP TW Guaranty Claim is entitled to vote to accept or reject the Plan.

On the Effective Date, SFTP's guaranty of the obligations under the Existing TW Loan shall be replaced by an amended and restated guaranty to be executed by Reorganized SFTP in respect of the obligations under the Existing TW Loan.

(f)     Class 6 – SFTP Partnership Parks Claims

Under the Plan, SFTP Partnership Parks Claims include Claims (i) arising under the guaranty by SFTP and SFTP's subsidiaries of obligations owed to Time Warner and certain of its affiliates under the Subordinated Indemnity Agreement, and (ii) arising under the guaranty by SFTP and SFTP's subsidiaries of obligations owed to certain limited partners with interests in the Partnership Parks under the Continuing Guarantee Agreements (as defined in the Plan).

Class 6 is Unimpaired by the Plan. Each holder of an SFTP Partnership Parks Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

On the Effective Date, SFTP's guaranty of the obligations owed to Time Warner and certain of its affiliates under the Subordinated Indemnity Agreement and the Continuing Guarantee Agreements shall be affirmed and continued by Reorganized SFTP.

(g)     Class 7 – SFTP and SFTP Subsidiary Unsecured Claims

Under the Plan, an Unsecured Claim is any Claim against the Debtors other than an Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Secured Tax Claim, Other Secured Claim, Prepetition Credit Agreement Claim, Funtime, Inc. Unsecured Claim, Subordinated Securities Claim or Intercompany Claim, but shall not include any claim that is disallowed or released, whether by operation of law, Final Order, written agreement, the provisions of this Plan or otherwise. SFTP and SFTP Subsidiary Unsecured Claims include Unsecured Claims against SFTP, or SFTP's subsidiaries (other than Funtime, Inc.). The Debtors estimate that, on the Effective Date, the Allowed amount of such Claims will aggregate to approximately $27.1 million.

Class 7 is Unimpaired by the Plan. Each holder of an Allowed SFTP and SFTP Subsidiary Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed SFTP and SFTP Subsidiary Unsecured Claim agrees to a different treatment, at the sole option of the Reorganized Debtors (i) each Allowed SFTP and SFTP Subsidiary Unsecured Claim will be Reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each holder of an Allowed SFTP and SFTP Subsidiary Unsecured Claim will be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(h)     Class 8 – SFO Prepetition Credit Agreement Claims

Under the Plan, SFO Prepetition Credit Agreement Claims include Claims held by the Prepetition Lenders and/or the Prepetition Agent, and all other Claims against SFO arising under the Prepetition Credit Agreement.

Class 8 is Impaired by the Plan. Each holder of an SFO Prepetition Credit Agreement Claim is entitled to vote to accept or reject the Plan.

On the Effective Date, SFO's guaranty of the obligations under the Prepetition Credit Agreement shall be discharged. All Liens and security interests granted to secure such obligations, whether prior to or during the Reorganization Cases, shall be terminated and of no further force or effect.

(i)     Class 9 – SFO TW Guaranty Claims

Under the Plan, SFO TW Guaranty Claims include Claims arising under the guaranty by SFO of obligations owed to Time Warner and certain of its affiliates under the Existing TW Loan, up to a maximum aggregate amount of $10 million.

Class 9 is Impaired by the Plan. Each holder of an SFO TW Guaranty Claim is entitled to vote to accept or reject the Plan.

On the Effective Date, SFO's guaranty of the obligations under the Existing TW Loan shall be replaced by an amended and restated guaranty to be executed by Reorganized SFO in respect of the obligations under the Existing TW Loan.

(j)     Class 10 – SFO Partnership Parks Claims

Under the Plan, SFO Partnership Parks Claims include Claims (i) arising under the guaranty by SFO of obligations owed to Time Warner and certain of its affiliates under the Subordinated Indemnity Agreement, and (ii) arising under the guaranty by SFO and SFO's subsidiaries of obligations owed to certain limited partners with interests in the Partnership Parks under the Continuing Guarantee Agreements.

Class 10 is Unimpaired by the Plan. Each holder of an SFO Partnership Parks Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

On the Effective Date, SFO's guaranty of the obligations under the Subordinated Indemnity Agreement and the Continuing Guarantee Agreements shall be affirmed and continued by Reorganized SFO.

(k)     Class 11 – SFO Unsecured Claims

Under the Plan, an SFO Unsecured Claim is any Unsecured Claim against SFO. SFO Unsecured Claims include, without limitation, SFO Note Claims. The Debtors estimate that, on the Effective Date, the Allowed amount of such Claims will aggregate to approximately $420.0 million.

Class 11 is Impaired by the Plan. Each holder of an SFO Unsecured Claim is entitled to vote to accept or reject the Plan.

On the Distribution Date, each holder of an Allowed SFO Unsecured Claim shall receive its Distribution Pro Rata Share of approximately 22.89% of the New Common Stock[14], subject to dilution by the Long-Term Incentive Plan, in full and complete satisfaction of such SFO Unsecured Claim. Additionally, each Accepting SFO Noteholder shall have the limited right to participate in the Offering pursuant to the terms of the Offering Procedures to purchase its Limited Offering Pro Rata Share of up to $450 million of New Common Stock, representing approximately 69.77% of the New Common Stock (including New Common Stock to be acquired by the Backstop Purchasers in the Offering), subject to dilution by the Long-Term Incentive Plan.[15] Notwithstanding the foregoing, the Reorganized Debtors shall pay, on or as soon as reasonably practicable after the Effective Date, all Indenture Trustee Fees and Expenses arising under the 2016 Notes Indenture, in its capacity as Indenture Trustee thereunder, and the fees and expenses of legal and financial advisors of each of the Backstop Purchasers as provided in the Approval Order and the Backstop Commitment Agreement, in full in Cash, without application to or approval of the Bankruptcy Court and without a reduction to the recoveries of the holders of the 2016 Notes. Notwithstanding the foregoing, to the extent any Indenture Trustee Fees and Expenses arising under the 2016 Notes Indenture are not paid (including, without limitation, any fees or expenses incurred in connection with any unresolved litigation relating to any disputed claims), the Indenture Trustee for the 2016 Notes may assert its charging lien against any recoveries received on behalf of its holders for payment of such unpaid amounts.

(l)    Class 12 – SFI TW Guaranty Claims

Under the Plan, SFI TW Guaranty Claims include Claims arising under the guaranty by SFI of obligations owed to Time Warner and certain of its affiliates under the Existing TW Loan, up to a maximum aggregate amount of $10 million.

Class 12 is Impaired by the Plan. Each holder of an SFI TW Guaranty Claim is entitled to vote to accept or reject the Plan.

On the Effective Date, SFI's guaranty of the obligations under the Existing TW Loan shall be replaced by an amended and restated guaranty to be executed by Reorganized SFI in respect of the obligations under the Existing TW Loan.

(m)    Class 13 – SFI Partnership Parks Claims

Under the Plan, SFI Partnership Parks Claims include Claims arising under the guaranty by SFI of obligations owed to Time Warner and certain of its affiliates under the Subordinated Indemnity Agreement.

---

[14]    This amount does not attribute any value associated with the SFO Note Guaranty Claim, which value is attributed in Class 14 (SFI Unsecured Claims).

[15]    The net affect of the Offering, (i) assuming the Offering is fully subscribed for by Eligible Holders, and (ii) as a result of the application of each Eligible Holder's Limited Offering Pro Rata Share, all Eligible Holders (including Backstop Purchasers solely in their capacity as Eligible Holders) would acquire approximately 25% of the New Common Stock issued in the Offering (or approximately 5%, excluding purchases by Backstop Purchasers that are Eligible Holders), and the Backstop Purchasers would acquire approximately 75% of such New Common Stock (or approximately 95%, including purchases affected by Backstop Purchasers in their capacity as Eligible Holders).

Class 13 is Unimpaired by the Plan. Each holder of an SFI Partnership Parks Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

On the Effective Date, SFI's guaranty of obligations owed to Time Warner and certain of its affiliates under the Subordinated Indemnity Agreement shall be affirmed and continued by Reorganized SFI.

(n)     Class 14 – SFI Unsecured Claims

Under the Plan, an SFI Unsecured Claim is an Unsecured Claim against SFI. SFI Unsecured Claims include, without limitation, Claims arising under the 2010 Notes Indenture, 2013 Notes Indenture, 2014 Notes Indenture, 2015 Notes Indenture, and SFO Note Guaranty Claims. The Debtors estimate that, on the Effective Date, the Allowed amount of such Claims will aggregate to approximately $1.346 billion.

Class 14 is Impaired by the Plan. Each holder of an SFI Unsecured Claim is entitled to vote to accept or reject the Plan.

On the Distribution Date, each holder of an Allowed SFI Unsecured Claim shall receive its Distribution Pro Rata Share of approximately 7.34% of the New Common Stock[16], subject to dilution by the Long-Term Incentive Plan, in full and complete satisfaction of such SFI Unsecured Claim.

(o)     Class 15 - Funtime, Inc. Unsecured Claim

Funtime, Inc. Unsecured Claims include any Unsecured Claim against Funtime, Inc.

Class 15 is Impaired by the Plan. Each holder of Funtime, Inc. Unsecured Claims is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

Each holder of a Funtime, Inc. Unsecured Claim shall not receive or retain any interest or property under the Plan on account of such Funtime, Inc. Unsecured Claim.

(p)     Class 16 – Subordinated Securities Claims

Subordinated Securities Claims include any Claim against any of the Debtors, whether or not the subject of an existing lawsuit, (i) arising from rescission of a purchase or sale of shares of stock, debt securities or any other securities, if any, of any of the Debtors or an Affiliate of the Debtors, (ii) for damages arising from the purchase or sale of any security, (iii) for violations of the securities laws, misrepresentations or any similar Claims, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, but not limited to, any attorneys' fees, other charges or costs incurred on account of the foregoing claims or (iv) except as otherwise provided for in the Plan, for reimbursement, contribution or indemnification allowed under section 502 of the Bankruptcy

---

[16]     This amount includes the value attributed to the SFO Note Guaranty Claim.

Code on account of any such Claim, including Claims based upon allegations that the Debtors made false and misleading statements and engaged in other deceptive acts in connection with the sale of securities. The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $0.

Class 16 is Impaired by the Plan. Each holder of a Subordinated Securities Claim is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

Each holder of an Allowed Subordinated Securities Claim will not receive or retain any interest or property under the Plan on account of such Allowed Subordinated Securities Claim. The treatment of Subordinated Securities Claims under the Plan is in accordance with and gives effect to the provisions of section 510(b) of the Bankruptcy Code.

(q)     Class 17 – Preconfirmation Subsidiary Equity Interests

Preconfirmation Subsidiary Equity Interests include all instruments evidencing an ownership interest in a Debtor other than SFI or SFO, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests, all as of the Effective Date. Each Preconfirmation Subsidiary Equity Interest shall be deemed Allowed under the Plan.

Class 17 is Unimpaired by the Plan. Each holder of a Preconfirmation Subsidiary Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

On the Effective Date, Preconfirmation Subsidiary Equity Interests shall be Reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(r)     Class 18 – Preconfirmation SFO Equity Interests

Preconfirmation SFO Equity Interests include all instruments evidencing an ownership interest in SFO, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests, all as of the Effective Date.

Class 18 is Impaired by the Plan. Each holder of a Preconfirmation SFO Equity Interest is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

On the Effective Date, the Preconfirmation SFO Equity Interests will be cancelled and the holders of Preconfirmation SFO Equity Interests will not be entitled to, and will not receive or retain, any property or interest in property on account of such Preconfirmation SFO Equity Interests under the Plan.

(s)     Class 19 – Preconfirmation SFI Equity Interests

Preconfirmation SFI Equity Interests include all instruments evidencing an ownership interest in SFI, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests, all as of the Effective Date.

63

Class 19 is Impaired by the Plan. Each holder of a Preconfirmation SFI Equity Interest is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

On the Effective Date, the Preconfirmation SFI Equity Interests will be cancelled and the holders of Preconfirmation SFI Equity Interests will not be entitled to, and will not receive or retain, any property or interest in property on account of such Preconfirmation SFI Equity Interests under the Plan.

3.     Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims

Under the Plan, an Insured Claim is that portion of any Claim arising from an incident or occurrence alleged to have occurred prior to the Effective Date: (i) as to which any Insurer is obligated pursuant to the terms, conditions, limitations, and exclusions of its Insurance Policy, to pay any cost, expense, judgment, settlement, or contractual obligation with respect to the Debtors, or (ii) that any Insurer otherwise agrees to pay as part of a settlement or compromise of a claim made under the applicable Insurance Policy.

Distributions under the Plan to each holder of an Allowed Insured Claim shall be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is within the Debtors' SIR. Amounts in excess of the applicable SIR amount shall be recoverable only from the available Insurer and the Debtors shall be discharged to the extent of any such excess. Nothing in the Plan will constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any entity may hold against any other entity, including the Debtors' Insurer.

4.     Special Provision Regarding Unimpaired Claims

Except as otherwise explicitly provided in the Plan, nothing therein will be deemed to be a waiver or relinquishment of any rights, counterclaims or defenses the Debtors, the Reorganized Debtors or the Majority Backstop Purchasers may have, whether at law or in equity, with respect to any Unimpaired Claim.

## C.    MEANS OF IMPLEMENTING THE PLAN

1.     Intercompany Claims

Notwithstanding anything to the contrary in the Plan, Intercompany Claims, at the election of the Reorganized Debtor, and with the consent of Time Warner (to the extent adversely affected thereby and which consent shall not be unreasonably withheld) and the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), holding such Claim will be (i) adjusted, released, waived and/or discharged as of the Effective Date, (ii) contributed to the capital of the obligor, or (iii) Reinstated and left Unimpaired. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Reorganized Debtors.

2.      Restructuring and Other Transactions

(a)      Restructuring Transactions

On the Effective Date, the following transactions ("Restructuring Transactions") will be effectuated in the order set forth below:

(i)      Simultaneously, (A) all of the Preconfirmation Equity Interests in SFI and SFO will be cancelled, and (B) in consideration for SFI making available the New Common Stock to satisfy certain of SFO's obligations to its creditors and certain of SFI's obligations to its creditors, all of the new equity interests in Reorganized SFO will be issued to Reorganized SFI and all of the new equity interests in Reorganized SFTP will be issued to Reorganized SFO on behalf of the holders of Allowed SFO Unsecured Claims and Allowed SFI Unsecured Claims, respectively, in full satisfaction of their Claims (and in proportion to the relative distributions to be made on account of their Claims); and

(ii)      thereafter, Reorganized SFI will, on behalf of SFO and SFI, contribute all of the New Common Stock in the Reorganized SFI to the applicable Disbursing Agent for distribution on behalf of SFO and SFI to the holders of Allowed SFO Unsecured Claims and Allowed SFI Unsecured Claims, respectively, and in full and complete satisfaction of the Reorganized Debtors' obligations under Sections 4.11 and 4.14 of the Plan.

(b)      Cancellation of Existing Securities and Agreements

Except (i) as otherwise expressly provided in the Plan, (ii) with respect to Executory Contracts or unexpired leases that have been assumed by the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), (iii) for purposes of evidencing a right to distributions under the Plan, or (iv) with respect to any Claim that is Reinstated and rendered Unimpaired under the Plan, on the Effective Date, the Prepetition Credit Agreement, the Unsecured Notes Indentures and all Unsecured Notes issued thereunder, all Preconfirmation SFI Equity Interests, Preconfirmation SFO Equity Interests, and other instruments evidencing any Claims against the Debtors, Preconfirmation SFI Equity Interests, or Preconfirmation SFO Equity Interests shall be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors thereunder shall be discharged; *provided, however,* that the Unsecured Notes and each Unsecured Note Indenture shall continue in effect solely for the purposes of (i) allowing each Indenture Trustee or its agents to make distributions to holders of Unsecured Notes; (ii) allowing holders of the Unsecured Notes to receive distributions hereunder; and (iii) preserving the rights and liens of each Indenture Trustee with respect to its respective Indenture Trustee Fees and Expenses to the extent not otherwise paid. An Unsecured Note Indenture shall terminate completely upon the completion of all distributions to the holders of the applicable Unsecured Notes and the payment in full of the applicable Indenture Trustee Fees and Expenses.

(c)      Surrender of Existing Securities

Subject to the rights of each Indenture Trustee to assert its respective charging lien to the extent its respective Indenture Trustee Fees and Expenses are not paid pursuant to the

65

Plan, each holder of Unsecured Notes is required to surrender such note(s) to the Indenture Trustee, or in the event such note(s) are held in the name of, or by a nominee of, the Depository Trust Company, the Disbursing Agent will seek the cooperation of the Depository Trust Company to provide appropriate instructions to the Indenture Trustee. No distributions under the Plan will be made for or on behalf of any such holder unless and until such note is received by the Indenture Trustee or appropriate instructions from the Depository Trust Company are received by the Indenture Trustee, or the loss, theft or destruction of such note is established to the reasonable satisfaction of the Indenture Trustee, which satisfaction may require such holder to (a) submit a lost instrument affidavit and an indemnity bond and (b) hold the Debtors, the Reorganized Debtors, the Majority Backstop Purchasers, the Disbursing Agent and Indenture Trustee harmless in respect of such note and any distributions made in respect thereof. Upon compliance with this section by a holder of any Unsecured Note, such holder will, for all purposes under the Plan, be deemed to have surrendered such note. Any holder of Unsecured Notes that fails to surrender such note(s) or satisfactorily explain its nonavailability to the Indenture Trustee within one year of the Effective Date will be deemed to have no further Claim against the Debtors and the Reorganized Debtors (or their property) or the Indenture Trustee in respect of such Claim and will not participate in any distribution under the Plan.

### (d) Issuance of the New Common Stock

The issuance by Reorganized SFI of the New Common Stock on and after the Effective Date is authorized pursuant to the Plan without the need for any further corporate action and without any further action by holders of Claims or Preconfirmation Equity Interests. As provided in the Postconfirmation Organizational Documents, which will be included with the Plan Supplement, New Common Stock may be issued in more than one series, will be identical in all respects and will have equal rights and privileges. In compliance with section 1123(a)(6) of the Bankruptcy Code, the Postconfirmation Organizational Documents will provide that Reorganized SFI will not issue nonvoting equity securities to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code. All of the New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued and fully-paid and non-assessable.

### (e) Incurrence of New Indebtedness

The Plan provides for the Debtors to incur new indebtedness upon the Effective Date, consisting of a senior secured credit facility to be provided to SFTP (the "Exit Facility") by JPMorgan Chase Bank, N.A. ("JPMCB"), J.P. Morgan Securities Inc. ("JPMSI"), Bank of America, N.A. ("BANA") and Banc of America Securities LLC ("BAS") (together with JPMCB, JPMSI and BANA, collectively, the "Commitment Parties") and a syndicate of lenders chosen by the Commitment Parties (together with JPMCB, the "Exit Facility Lenders"). Such Exit Facility is described below.

The Exit Facility, as contemplated in the commitment letter and related term sheet and fee letter executed by the Commitment Parties and SFTP in October 2009 (the "Commitment Parties' Commitment Papers"), will consist of an eight hundred million dollar ($800,000,000) senior secured credit facility comprised of a $150,000,000 revolving loan facility (the "Exit Revolving Loan") and a $650,000,000 term loan facility (the "Exit Term Loan" and together with the Exit Revolving Loan, collectively, the "Exit Facility Loans"). Interest on the Exit

Facility will accrue at an annual rate equal to LIBOR + 4.25%, with a 2.00% LIBOR floor and a 1.50% commitment fee on the Exit Revolving Loans on the average daily unused portion of the Exit Revolving Loans. The principal amount of the Exit Revolving Loans will be due and payable five years from the closing date of the Exit Facility and the principal amount of the Exit Term Loan will be due and payable six years from the closing date of the Exit Facility. The loan agreement governing the Exit Facility (the "Exit Facility Loan Agreement") will require quarterly payments on the Exit Term Loan in an amount equal to 0.25% of the initial aggregate principal amount of the Exit Term Loan and the remainder of the balance shall be paid in one final payment on the date that is six years after the closing date of the Exit Facility and is prepayable at any time at the option of SFTP. The Exit Facility will be guaranteed by SFI, SFO and each of the current and future direct and indirect domestic subsidiaries of SFTP; provided that to the extent SFTP acquires any non-wholly owned direct or indirect subsidiary after the Closing Date such subsidiary shall not be required to be a guarantor and/or pledgor of the Exit Facility (together with SFTP, collectively, the "Exit Financing Loan Parties"). The proceeds of the Exit Term Loan together with the net proceeds from the Offering will be used to repay the outstanding amounts owed under the Prepetition Credit Agreement and the Exit Revolving Loans will be used to meet working capital and other corporate needs of the Debtors, thereby facilitating their emergence from bankruptcy. The Exit Facility will be secured by first priority liens upon substantially all existing and after-acquired assets of the Exit Financing Loan Parties. The Exit Facility Loan Agreement will contain certain representations, warranties and affirmative covenants, including minimum interest coverage and maximum senior leverage maintenance covenants. In addition, the Exit Facility Loan Agreement will contain restrictive covenants that limit, among other things, the ability of the Exit Financing Loan Parties to incur indebtedness, create liens, engage in mergers, consolidations and other fundamental changes, make investments or loans, engage in transactions with affiliates, pay dividends, make capital expenditures and repurchase capital stock. The Exit Financing Loan Agreement will contain certain events of default, including payment, breaches of covenants and representations, cross defaults to other material indebtedness, judgment, changes of control and bankruptcy events of default. The Commitment Parties' commitment is subject to certain customary conditions and market "flex" provisions as well as confirmation of the Plan and the retention of the existing senior management of the Debtors continuing as the senior management of SFI following consummation of the Plan. In addition the Debtors' payment or other binding obligations under the Commitment Parties' Commitment Papers would be subject to bankruptcy court approval.

The commitment of the Commitment Parties to provide the Exit Facility Loans shall expire unless the Bankruptcy Court has entered a final order approving the Commitment Parties' Commitment Papers by 5:00 p.m. (New York time) on November 24, 2009.

The Debtors have executed documents evidencing the same together with other documents that the Exit Facility Lenders have required to consummate the Exit Facility and the transactions contemplated thereby. In accordance with the Plan, the Reorganized Debtors' entry into the Exit Facility Loans and the incurrence of the indebtedness thereunder on the Effective Date will be authorized without the need for any further corporate action and without any further action by holders of Claims or Preconfirmation Equity Interests.

Notwithstanding the foregoing, it being acknowledged and agreed that the Majority Backstop Purchasers shall have the right to (i) approve any term or provision in the Exit

Facility Loan Documents that constitutes a material change to any term or condition set forth in the Commitment Parties' Commitment Papers, and (ii) approve all terms and conditions of the Exit Facility not set forth, or left as "to be determined," "customary" or similar descriptions therein, in the Commitment Parties' Commitment Papers.

      3.    <u>Exemption from Securities Laws</u>

The Plan contemplates the issuance of the New Common Stock (collectively, the "<u>1145 Securities</u>")[17] to holders of Allowed SFO Unsecured Claims and Allowed SFI Unsecured Claims, as the case may be. In reliance upon section 1145 of the Bankruptcy Code, the offer and issuance of 1145 Securities will be exempt from the registration requirements of the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), and equivalent provisions in state securities laws. Section 1145(a) of the Bankruptcy Code generally exempts from such registration requirements the issuance of securities if the following conditions are satisfied: (i) the securities are issued or sold under a chapter 11 plan by (a) a debtor, (b) one of its affiliates participating in a joint plan with the debtor or (c) a successor to a debtor under the plan and (ii) the securities are issued entirely in exchange for a claim against or interest in the debtor or such affiliate or are issued principally in such exchange and partly for cash or property. The Debtors believe that the exchange of 1145 Securities for Claims against the Debtors under the circumstances provided in the Plan (other than with respect to entities deemed statutory underwriters, as described below) will satisfy the requirements of section 1145(a) of the Bankruptcy Code.

The 1145 Securities to be issued pursuant to the Plan will be deemed to have been issued in a public offering under the Securities Act and, therefore, may be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b)(1) of the Bankruptcy Code (a "<u>statutory underwriter</u>"). In addition, such securities generally may be resold by the holders thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states. However, holders of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(i) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (i) purchases a claim or interest with a view to distribution of any security to be received in exchange for the claim or interest, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan or (iv) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.

---

[17]    1145 Securities shall not include securities received by underwriters, if any, in connection with the issuance of New Common Stock.

An entity that would not be deemed an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act is not deemed to be an "underwriter" under section 2(a)(11) of the Securities Act with respect to securities received under section 1145(a)(1) which are transferred in "ordinary trading transactions" made on a national securities exchange. Persons that receive New Common Stock should note, however, that there can be no assurances that such securities will be listed on an exchange. What constitutes "ordinary trading transactions" within the meaning of section 1145 of the Bankruptcy Code is the subject of interpretive letters by the staff of the SEC. Generally, ordinary trading transactions are those that do not involve (i) concerted activity by recipients of securities under a plan of reorganization, or by distributors acting on their behalf, in connection with the sale of such securities, (ii) use of informational documents in connection with the sale other than the disclosure statement relating to the plan, any amendments thereto and reports filed by the issuer with the SEC under the Securities Exchange Act of 1934, as amended (the "Securities Exchange Act") or (iii) payment of special compensation to brokers or dealers in connection with the sale.

The term "issuer" is defined in section 2(4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the voting securities of such issuer. Additionally, the legislative history of section 1145 of the Bankruptcy Code provides that a creditor who receives at least 10% of the voting securities of an issuer under a plan of reorganization will be presumed to be a statutory underwriter within the meaning of section 1145(b)(i) of the Bankruptcy Code.

The Debtors believe that any securities to be issued under the Long-Term Incentive Plan (the "Management Securities") as provided under the Plan will be issued on a Registration Statement of Form S-8 or otherwise exempt from the registration requirements of the Securities Act, pursuant to section 4(2) of the Securities Act, as transactions by an issuer not involving any public offering, and equivalent exemptions in state securities laws.

Resales by persons that receive Management Securities or persons deemed to be "underwriters" that receive 1145 Securities pursuant to the Plan (collectively, the "Restricted Holders") would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Restricted Holders may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 under the Securities Act, to the extent available, and in compliance with applicable state and foreign securities laws. Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell restricted securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that the person holds the securities for a six-month period (with respect to a reporting issuer), current public information with respect to the issuer be available, a limitation

69

as to the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the SEC. The Debtors cannot assure, however, that adequate current public information will exist with respect to the Company and therefore, that the safe harbor provisions of Rule 144 of the Securities Act will be available. Under Rule 144(b)(1)(i) of the Securities Act, a non-affiliate Restricted Holder may sell such restricted securities even if adequate current public information is not available so long as such holder has held the restricted securities for one year; *provided, however,* such holder must still satisfy the other conditions of Rule 144. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144 or any other applicable exemption from registration.

Pursuant to the Plan, certificates evidencing New Common Stock or Management Securities received by Restricted Holders or by a holder that the Debtors determine is an underwriter within the meaning of section 1145 of the Bankruptcy Code will bear a legend substantially in the form below:

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

Any person or entity entitled to receive New Common Stock, who the Company determines to be a statutory underwriter that would otherwise receive legended securities as provided above, may instead receive certificates evidencing New Common Stock without such legend if, prior to the distribution of such securities, such person or entity delivers to the Company (i) an opinion of counsel reasonably satisfactory to the Company to the effect that the New Common Stock to be received by such person or entity is not subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code and may be sold without registration under the Securities Act and (ii) a certification that such person or entity is not an "underwriter" within the meaning of section 1145 of the Bankruptcy Code.

Any holder of a certificate evidencing 1145 Securities bearing such legend may present such certificate to the transfer agent for the 1145 Securities in exchange for one or more new certificates not bearing such legend or for transfer to a new holder without such legend at such time as (i) such securities are sold pursuant to an effective registration statement under the Securities Act, (ii) such holder delivers to the Company an opinion of counsel reasonably satisfactory to the Company to the effect that such securities are no longer subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code or (iii) such holder delivers to the Company an opinion of counsel reasonably satisfactory to the Company to the effect that (x) such securities are no longer subject to the restrictions pursuant to an

70

exemption under the Securities Act and such securities may be sold without registration under the Securities Act or (y) such transfer is exempt from registration under the Securities Act, in which event the certificate issued to the transferee shall not bear such legend.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT ALL POTENTIAL RECIPIENTS OF SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES REGARDING COMPLIANCE WITH THE FEDERAL AND STATE SECURITIES LAWS.

### 4. The Offering

The Plan also contemplates that Accepting SFO Noteholders shall have the right to participate in the Offering. The Debtors believe that any shares of New Common Stock issued pursuant to the Offering to Accepting SFO Noteholders or the Backstop Purchasers as provided under the Plan will be exempt from the registration requirements of the Securities Act, pursuant to section 4(2) of the Securities Act and Regulation D promulgated thereunder, as transactions by an issuer not involving any public offering, and equivalent exemptions in state securities laws. Thus, the shares of New Common Stock being issued in the Offering are "restricted securities" within the meaning of Rule 144 under the Securities Act and accordingly may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except in transactions that are exempt from, or in transactions not subject to, the registration requirements of the Securities Act and in compliance with any applicable state securities laws. The New Common Stock issued in the Offering shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

### 5. Registration Rights Agreement and Securities Exchange Listing

On the Effective Date, Reorganized SFI expects to enter into a registration rights agreement (the "Registration Rights Agreement"), in form and substance acceptable to the Majority Backstop Purchasers, with each holder of greater than 5%, on a fully diluted basis, of the New Common Stock. Pursuant to the Registration Rights Agreement, holders collectively owning at least 20% of the outstanding shares of the New Common Stock party thereto would have the right to require Reorganized SFI to effect registered, underwritten secondary offerings of such holders' New Common Stock acquired pursuant to the Plan or the Offering on terms and conditions to be negotiated and reflected in such Registration Rights Agreement. Holders of the New Common Stock entitled to demand such registrations shall be entitled to request an aggregate of three such registrations (or such provisions that the Postconfirmation Board adopts), and other holders of New Common Stock shall have customary piggyback registration rights. A form of the Registration Rights Agreement will be included in the Plan Supplement.

In addition, it is expected that Reorganized SFI will continue as a public reporting company under the Securities Exchange Act. Reorganized SFI expects that it will seek to obtain

71

a listing for the New Common Stock on a national securities exchange to be determined at a later date.

### 6. Continued Corporate Existence

Except as otherwise provided in the Plan, each Debtor will continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except with respect to the Postconfirmation Organizational Documents (or other formation documents) that are amended by the Plan, the Plan Supplement or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval. Notwithstanding the foregoing, on or as of the Effective Date, or as soon as practicable thereafter, and without the need for any further action, the Reorganized Debtors may: (i) cause any or all of the Reorganized Debtors to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors or (iii) engage in any other transaction in furtherance of the Plan.

## D. [INTENTIONALLY OMITTED]

## E. PLAN PROVISIONS GOVERNING DISTRIBUTION

### 1. The Distribution Date

Distributions with respect to holders of Allowed Claims will be made on the applicable Distribution Date. For purposes of the Plan, the Distribution Date is the earliest of the following dates that occurs after any Claim is Allowed: (a) the Effective Date, or as soon thereafter as is practicable, (b) a Subsequent Distribution Date or (c) a Final Distribution Date.

Subsequent Distribution Dates will occur on the twentieth day after the end of each calendar quarter after the occurrence of the Effective Date, until the Final Distribution Date.

The Final Distribution Date will occur on a date after (i) the deadline for the Debtors or the Reorganized Debtors to interpose objections to Claims has passed, (ii) all such objections have been resolved by signed agreement with the Debtors or Reorganized Debtors and/or Final Order, as may be applicable, and (iii) all Claims that are Contingent Claims or Unliquidated Claims have been estimated, but in any event, the Final Distribution Date shall be no later than thirty days thereafter, or such later date as the Bankruptcy Court may establish, upon request by the Reorganized Debtors, for cause shown.

### 2. Distributions on Account of Allowed General Unsecured Claims

All Allowed general Unsecured Claims held by a single creditor against a single Debtor shall be aggregated and treated as a single Claim against such Debtor. At the written request of the Reorganized Debtors or the Disbursing Agent, any creditor holding multiple

72