# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Premier International Holdings Inc., *et al.*,[1] | Case No. 09-12019 (CSS) |
| Debtors. | (Jointly Administered) |
| | **Related to Docket Nos. 498, 538**<br>**Hearing Date: TBD**<br>**Objection Deadline: TBD** |

### SFI NOTEHOLDERS' (I) EMERGENCY MOTION FOR AN ORDER TERMINATING THE DEBTORS' EXCLUSIVE PERIODS IN WHICH TO FILE A CHAPTER 11 PLAN AND SOLICIT VOTES THEREON; AND (II) OBJECTION TO THE DEBTORS' MOTION TO EXTEND THEIR EXCLUSIVE PERIODS IN WHICH TO FILE A CHAPTER 11 PLAN AND SOLICIT VOTES THEREON

The Ad Hoc Committee of Six Flags Noteholders (the "SFI

Noteholders"),[2] as holders and investment advisors to holders of senior notes (the "SFI

Notes") issued by Debtor Six Flags, Inc. ("SFI," and collectively with its affiliated

debtors and debtors in possession, the "Debtors" or the "Company"), hereby file (i) this

motion (the "Motion to Terminate Exclusivity") for entry of an order pursuant to section

---

[1] The Debtors are the following thirty-seven entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Astroworld GP LLC (0431), Astroworld LP (0445), Astroworld LP LLC (0460), Fiesta Texas Inc. (2900), Funtime, Inc. (7495), Funtime Parks, Inc. (0042), Great America LLC (7907), Great Escape Holding Inc. (2284), Great Escape Rides L.P. (9906), Great Escape Theme Park L.P. (3322), Hurricane Harbor GP LLC (0376), Hurricane Harbor LP (0408), Hurricane Harbor LP LLC (0417), KKI, LLC (2287), Magic Mountain LLC (8004), Park Management Corp. (1641), PP Data Services Inc. (8826), Premier International Holdings Inc. (6510), Premier Parks of Colorado Inc. (3464), Premier Parks Holdings Inc. (9961), Premier Waterworld Sacramento Inc. (8406), Riverside Park Enterprises, Inc. (7486), SF HWP Management LLC (5651), SFJ Management Inc. (4280), SFRCC Corp. (1638), Six Flags, Inc. (5059), Six Flags America LP (8165), Six Flags America Property Corporation (5464), Six Flags Great Adventure LLC (8235), Six Flags Great Escape L.P. (8306), Six Flags Operations Inc. (7714), Six Flags Services, Inc. (6089), Six Flags Services of Illinois, Inc. (2550), Six Flags St. Louis LLC (8376), Six Flags Theme Parks Inc. (4873), South Street Holdings LLC (7486), Stuart Amusement Company (20 I6). The mailing address of each of the Debtors solely for purposes of notices and communications is 1540 Broadway, 15th Floor, New York, NY 10036 (Attn: James Coughlin).

[2] The SFI Noteholders are Stark Investments, CQS, Tricadia Capital Management, LLC, 1798 Global Partners, Capital Ventures International, and Altai Capital Management and their affiliates.

1121(d) of title 11, United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code"), terminating the Debtors' exclusive periods (the "Exclusive Periods" or "Exclusivity") to file a plan of reorganization and solicit acceptances thereof and (ii) this objection (the "Objection") to the Debtors' motion to extend Exclusivity [Docket No. 655] (the "Motion to Extend Exclusivity"). The SFI Noteholders respectfully represent as follows:

## PRELIMINARY STATEMENT

1.     As previewed to the Court at the November 13, 2009 hearing in these cases, holders of over $500 million of SFI Notes (approximately 57% of all of the uncontingent, non-insider claims against SFI, see Schedules of Assets and Liabilities for Six Flags, Inc. [Docket No. 460]) have agreed to sponsor a competing plan for the Debtors' estates that will (i) *pay in full* in cash or otherwise reinstate *all* creditors of the Debtors' estates, other than SFI, and (ii) provide a materially enhanced recovery to the creditors of SFI as compared to the low recovery to SFI creditors proposed by the Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Docket No. 944] (the "Second Amended Plan"). This plan (the "SFI Noteholder Plan") is supported by a fully committed and backstopped rights offering for $420 million in cash (the "SFI Rights Offering").

2.     Proceeds of the SFI Rights Offering will *pay in full in cash* all allowed claims of holders of 12 ¼% notes (the "SFO Notes") issued by Six Flags Operations, Inc. ("SFO"). The remaining secured debt of approximately $1.1 billion owed to those certain lenders (the "Prepetition Lenders") under that certain Credit Agreement dated as of May 25, 2007 (the "Prepetition Credit Facility") is *unimpaired* under the SFI Noteholder Plan as follows: (i) the revolving loans of approximately $270

will be refinanced with the proceeds of new secured indebtedness in the amount of $280 million (the "New Debt") and (ii) the term loans of approximately $835 million due in 2015 (the "Term Loans") will be reinstated. Notably, the SFI Noteholders have been in extensive negotiations and are proceeding towards obtaining the New Debt from a third party financial institution. The SFI Noteholders have sought to file under seal a copy of the draft SFI Noteholder Plan as an exhibit to this Motion.

3.    By this Motion (and incorporated Objection to the Debtors' Motion to Extend Exclusivity), the SFI Noteholders respectfully request the Court terminate the Debtors' Exclusivity in order to allow the SFI Noteholders to file and prosecute the SFI Noteholder Plan.    Specifically, in comparison to the Debtors' Second Amended Plan, the SFI Noteholder Plan provides the following recoveries:

Prepetition Lenders: While the Debtors' Second Amended Plan provides cash payment in full, the SFI Noteholder Plan reinstates the Term Loans and pays off the revolver in full in cash as described above.

SFO Notes: While the Debtors' Second Amended Plan provides the holders of SFO Notes (the "SFO Noteholders") with (i) approximately 25% of the new common stock in SFI and (ii) rights to participate in the equity offering to purchase an additional approximately 70% of the new common stock (subject to dilution by management's long term incentive plan), the SFI Noteholder Plan provides the SFO Noteholders with cash payment in full.

SFI Notes: While the Debtors' Second Amended Plan provides the holders of SFI Notes with approximately 5% of the new common stock in SFI, the SFI Noteholder Plan provides the holders of SFI Notes with (i) approximately 19% of the new common stock in SFI and (ii) rights to participate in the convertible preferred stock offering to purchase up to an additional approximately 81% of the new common stock in SFI (subject to dilution by management's long term incentive plan).

4.    On November 20, 2009, counsel to the SFI Noteholders delivered copies of (i) the backstop commitment letter, (ii) proposed plan term sheet and (iii)

preferred stock term sheet in connection with the SFI Noteholder Plan to counsel to the Debtors and the Creditors' Committee on a "professionals' eyes only" basis to begin discussions with such parties regarding the SFI Noteholder Plan, and on November 25, 2009, the SFI Noteholders delivered a letter to SFI's board of directors attaching those documents.[3] By letter dated November 25, 2009 (the "Harner Letter"), Debtors' counsel all but rejected the SFI Noteholder Plan. A copy of the Harner Letter is attached hereto as Exhibit B.

    5.  In addition to the benefits of the SFI Noteholder Plan described above, termination of Exclusivity is in the best interests of the Debtors' estates and creditors because the Debtors' Second Amended Plan is patently unconfirmable. As stated, approximately 57% of all of the uncontingent, non-insider claims against SFI have committed to backstop the SFI Rights Offering under the SFI Noteholder Plan. Such holders do not support the Debtors' Second Amended Plan. This 57% of the outstanding allowable debt at SFI represents a blocking position at SFI's estate based upon the voting requirements of the Bankruptcy Code. Indeed, SFI has its own assets (the "SFI Assets"), including (i) ownership interests in the Debtors' flagship original amusement parks, Six Flags Over Texas and Six Flags Over Georgia (the "Partnership Parks"), (ii) claims and causes of action against other Debtors and third parties, and (iii) residual equity in the Debtors' operating companies. The SFI Assets are not subject to any liens or security interests of the Prepetition Lenders under the Prepetition Credit Facility. Put simply, disposition of SFI Assets is subject to a separate and distinct vote by SFI's creditors, yet the Debtors have not held a single negotiation with the SFI Noteholders over the

---

[3]  A copy of the letter to SFI's board of directors is attached hereto as Exhibit A.

formulation of the Second Amended Plan. As the Harner Letter underscores, the Debtors are seeking to impose their own deal on the SFI Noteholders on the basis that they believe they have "a" confirmable plan, as opposed to "the best" plan. Notably, the Second Amended Plan proposes to consolidate all of the Debtors' assets (including the SFI Assets) for the benefit of creditors of SFI's subsidiaries – not SFI's creditors. Such disposition of SFI Assets under the Debtors' Second Amended Plan is being done without the support of a majority of the holders of SFI Notes and by illegally proposing a deemed substantive consolidation of the SFI Assets with the other Debtors' estates in violation of Third Circuit precedent. Simply put, the Second Amended Plan may have beneficial aspects for the Debtors' enterprise as a whole, but it is not the best plan for SFI.

6.     In sum, the SFI Noteholders – on a self-funded basis - have been forced to remedy the defects in the obvious lack of an unconflicted estate representative for SFI and the Debtors' concomitant desire to maximize recoveries for other estate creditors at the expense of SFI's creditors. From the beginning of these cases in June 2009, the Debtors have had their "deal" in place with the Prepetition Lenders. In September 2009, the SFO Noteholders attacked the Debtors' original plan and alleged claims against the Debtors' management for awarding themselves overly rich compensation packages. The SFO Noteholders also sought to terminate exclusivity. From September until the filing of the Second Amended Plan on November 7, 2009, the Debtors negotiated exclusively with the SFO Noteholders and the Prepetition Lenders over its terms. When asked to be involved in plan negotiations, the SFI Noteholders were told by Debtors' counsel that their involvement was "premature." As is clear now, this

"wait and see" approach by the Debtors was just a smokescreen. Rather, the Debtors' management, the SFO Noteholders and the Prepetition Lenders were collaborating to cement self-interested deals for themselves. Without question and at the expense of SFI's creditors, each of these parties obtains everything possible under the Second Amended Plan: (i) the Debtors' management gets their compensation packages, (ii) the SFO Noteholders get the company at a low valuation, and (iii) the Prepetition Lenders avoid reinstatement of $835 million in Term Loans (which currently enjoy a very low rate of interest and mature in 2015).

7.       In contrast, the SFI Noteholder Plan maximizes the recoveries of all creditors and proposes a one hundred percent recovery for all estates below SFI and substantially higher recoveries to SFI's creditors than the Debtors' Second Amended Plan. As set forth herein, Exclusivity should be terminated to permit the SFI Noteholders to file and prosecute the SFI Noteholder Plan.

## **BACKGROUND**

8.       On June 13, 2009 (the "Petition Date"), the Debtors and the Prepetition Lenders entered into a plan support agreement, which sets forth certain terms and conditions pursuant to which the Debtors would propose a chapter 11 plan with the support of the Prepetition Lenders. That same day, the Debtors each filed a petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing their respective chapter 11 cases with this Court.

9.       On June 15, 2009, the Court entered the Order Granting Motion of the Debtors and Debtors in Possession for an Order Directing the Joint Administration of their Bankruptcy Cases [Docket No. 37] (the "Joint Administration Order"), granting

consolidation of the Debtors' bankruptcy cases "for procedural purposes only." Joint Administration Order at 10.

10. On June 30, 2009, the Office of the United States Trustee for the District of Delaware appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee").

11. On July 22, 2009, the Debtors filed their original plan [Docket No. 239] and disclosure statement in connection therewith [Docket No. 240], which was followed on August 21, 2009 by the Debtors' first amended plan [Docket No. 496] (the "First Amended Plan") and amended disclosure statement in connection therewith [Docket No. 498] (the "First Amended Disclosure Statement"). Under the First Amended Plan, the Debtors proposed to provide the unsecured creditors of SFI with a recovery of approximately 1% of the equity in reorganized SFI. That proposal would have left SFI Noteholders with a recovery of less than 1% of the value of their claims. Consequently, the SFI Noteholders timely filed their preliminary objection to the Debtors' First Amended Disclosure Statement on August 25, 2009 [Docket No. 509].[4]

12. On September 2, 2009, the Debtors filed a notice of hearing to consider approval of the First Amended Disclosure Statement [Docket No. 538], which set October 8, 2009 at 10:00 a.m. as the date and time at which the Court would hold a hearing to consider approval of the First Amended Disclosure Statement (the "Disclosure Statement Hearing").

13. Throughout the month of September, the SFI Noteholders and their advisors repeatedly sought to engage in substantive negotiations with the Debtors, the

---

[4] The SFI Noteholders at that time were Stark Investments and its affiliates.

board of directors of SFI (the "SFI Board") and their respective advisors, as well as all other major stakeholders of the Debtors, regarding the terms of a plan of reorganization. The substantial efforts undertaken by the SFI Noteholders to engage the Debtors and other creditor constituencies are set forth in more detail in the SFI Noteholders' limited response in support of the Debtors' motion to extend exclusivity and in opposition to the SFO Noteholders' motion to terminate exclusivity [Docket No. 786] (the "Limited Response to Exclusivity").

14. On September 14, 2009, certain of the SFO Noteholders filed their motion to terminate exclusivity [Docket No. 615] (the "SFO Motion") and sought to allow such SFO Noteholders to file their alternative plan of reorganization (the "SFO Noteholder Plan"). Shortly thereafter, on September 18, 2009, the Debtors filed their Motion to Extend Exclusivity [Docket No. 655] (together with the SFO Motion, the "Exclusivity Motions"). The SFI Noteholders filed their Limited Response to Exclusivity, in which they supported a limited extension of Exclusivity to allow the Debtors an opportunity to designate an unconflicted estate representative of SFI (the "SFI Estate Representative") to represent the interests of SFI's estate and its creditors and to negotiate a consensual plan of reorganization with SFI's stakeholders. Though the SFI Noteholders supported a limited extension of Exclusivity, if the Debtors failed to designate an SFI Estate Representative, the SFI Noteholders explicitly reserved their right to seek appointment of a chapter 11 trustee for SFI and/or seek to terminate the Debtors' Exclusivity so that the SFI Noteholders could file their own plan of reorganization. Limited Response to Exclusivity ¶ 5.

15. The Court has not yet ruled on the Exclusivity Motions. However, because the Debtors' Exclusivity Motion was filed prior to the expiration of Exclusivity, which otherwise would have expired on October 11, 2009, Rule 9006-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware provided an automatic bridge extending Exclusivity until such time as the Court acts on the Debtors' Exclusivity Motion. The Debtors' Exclusivity Motion is currently scheduled to be heard on December 4, 2009 in connection with the Disclosure Statement Hearing.

16. On October 16, 2009, the Debtors filed a motion to, among other things, approve the First Amended Disclosure Statement [Docket No. 817] (the "Disclosure Statement Motion"). Following that motion, pursuant to the Notice of Agenda of Matters Scheduled for Hearing on November 5, 2009 [Docket No 907], the Disclosure Statement Hearing was again continued to November 20, 2009.

17. On October 30, 2009, the Debtors filed their joint motion with the SFO Noteholders to approve a form of confidentiality agreement pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code [Docket No. 902] (the "Confidentiality Motion"). During the following weekend, counsel to the SFI Noteholders contacted Debtors' counsel regarding the scheduling of certain deposition notices that had been filed by the SFO Noteholders that day. Debtors' counsel stated that a meeting would take place on Monday, November 2, 2009 between the Debtors and the SFO Noteholders. Counsel for the SFI Noteholders again requested to participate in these negotiations stressing the lack of representation for SFI's creditors, but the Debtors never responded to this request and continued to exclude the SFI Noteholders from such substantive discussions.

18. On November 4, 2009, the SFI Noteholders filed a limited objection to the Confidentiality Motion [Docket No. 919], objecting not to the Debtors' ability to enter into a confidentiality agreement with the SFO Noteholders, but that neither the SFI Noteholders nor any other SFI Estate Representative was party to the Debtors' plan negotiations. Only after the SFI Noteholders filed their limited objection to the Confidentiality Motion did the Debtors agree to enter into the same confidentiality agreement with certain individual SFI Noteholders and to schedule a meeting on Tuesday, November 10, 2009.

19. Despite the Debtors' agreement to meet with the SFI Noteholders on November 10, 2009, the Debtors filed the Second Amended Plan and related disclosure statement [Docket No. 943] (the "Second Amended Disclosure Statement") during the early hours of the morning on November 7, 2009 prior to any such meeting. As a result, the Second Amended Plan reflects no input from the SFI Noteholders, who were deliberately excluded from the plan negotiations. Under the Second Amended Plan, the Debtors propose to modestly increase recoveries for SFI's creditors to up to 7.34% of the equity in reorganized SFI, which according to the Second Amended Disclosure Statement, would result in recoveries of approximately 3.2% to 4.8% for the holders of SFI Notes.

20. The Second Amended Disclosure Statement asserts that the Second Amended Plan incorporates the central features of the SFO Noteholder Plan, and that the SFO Noteholders have indicated they will support the Second Amended Plan. See Second Amended Disclosure Statement at 4. Although the Debtors also assert that they have engaged in negotiations with a wide variety of creditor constituencies, including

holders of the SFI Notes, neither the SFI Noteholders nor any other SFI Estate Representative were involved in negotiations over the Debtors' Second Amended Plan.

21.     On the evening of November 6, 2009, the Debtors filed a motion to approve exit financing arrangements [Docket No. 937] (the "Exit Financing Motion") in connection with the Second Amended Plan. Pursuant to the Exit Financing Motion, the Debtors seek approval of (i) a new $800 million secured credit facility (the "Exit Facility"), which the Debtors allege will be used to repay the Prepetition Lenders and for general corporate purposes (Exit Financing Motion, Exhibit B) and (ii) a new $150 million multiple draw loan facility from Time Warner (the "New TW Loan," and together with the Exit Facility, the "Exit Financing Arrangements"), the proceeds of which will be used to fund future Partnership Park obligations (Exit Financing Motion, Exhibit C).

22.     On November 7, 2009, the Debtors also filed a motion to approve a backstop commitment [Docket No. 945] (the "Backstop Motion," and together with the Exit Financing Motion, the "Financing Motions") in support of the Second Amended Plan. The Backstop Motion seeks approval of the agreement (the "SFO Backstop Agreement") of certain SFO Noteholders to backstop a rights offering of $450 million in the aggregate of new common stock to be issued to the SFO Noteholders by reorganized SFI under the Second Amended Plan.

23.     On November 10, 2009, the Debtors held a meeting with the SFI Noteholders as well as the Creditors' Committee and described generally the material changes made by the Second Amended Plan.

24.     On November 12, 2009, the Debtors filed an amended notice of hearing to consider approval of the Second Amended Disclosure Statement [Docket No.

982], which set the Disclosure Statement Hearing for November 20, 2009, and the deadline for filing objections to the Second Amended Disclosure Statement for November 16, 2009. Also on November 12, 2009, the SFI Noteholders filed their motion to adjourn the Disclosure Statement Hearing and hearing to consider approval of the Financing Motions [Docket No. 984] (the "Motion to Adjourn"). At an emergency hearing held November 13, 2009, the Court granted the Motion to Adjourn and adjourned the Financing Motions and the Disclosure Statement Hearing to December 4, 2009 [Docket No. 1013].

25. On Friday, November 20, 2009, the SFI Noteholders obtained commitments to fully backstop the SFI Rights Offering for the SFI Noteholder Plan (the "SFI Backstop Commitments") from holders of more than $500 million of SFI Notes.[5] Specifically, the proposed SFI Noteholder Plan would: (i) reinstate the Term Loans under the Prepetition Credit Facility, (ii) refinance in full the existing revolving facility with a stated maturity date of March 31, 2013 with the cash proceeds of the New Debt, (iii) pay in full in cash the allowed claims of the SFO Noteholders by, among other things, using the proceeds of the SFI Rights Offering, and (iv) distribute 19% of the stock in the reorganized SFI to SFI's creditors with the ability to acquire additional stock through the SFI Rights Offering.

26. On November 25, 2009, the SFI Noteholders sent a letter to the SFI Board attaching their proposal (including the backstop commitment and term sheet for the SFI Noteholder Plan) and requested a meeting to discuss such plan. On that same

---

[5]     A draft of the SFI Noteholder Plan is attached hereto as Exhibit C. Filed concurrently herewith is a Motion to File under Seal requesting that the SFI Noteholder Plan be filed under seal.

day, however, the SFI Noteholders received the Harner Letter which all but rejected the SFI Noteholder Plan.

## JURISDICTION

27.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

28.     In filing this Motion to Terminate Exclusivity and incorporated Objection to the Debtors' Motion to Extend Exclusivity, the SFI Noteholders request that the Court immediately terminate Exclusivity to allow the SFI Noteholders to solicit and prosecute the SFI Noteholder Plan. Despite their best efforts, the SFI Noteholders have been consistently excluded from the Debtors' plan negotiations, there is no unconflicted SFI Estate Representative, and the interests of SFI's creditors have not been adequately represented by the SFI Board. Accordingly, the SFI Noteholders have now been forced to seek a termination of Exclusivity to protect their interests. Further, the holders of SFI Notes should be permitted to have the opportunity to consider the SFI Noteholder Plan, which – unlike the Debtors' Second Amended Plan – was negotiated by SFI creditors and which provides them and all other creditors of the Debtors with superior recoveries.

## BASIS FOR RELIEF

29.     Section 1121(b) of the Bankruptcy Code provides that only the Debtors may file a plan until 120 days after the Petition Date. 11 U.S.C. § 1121(b). Notwithstanding section 1121(b), on request of any party in interest, the court may "for cause" reduce the Debtors' Exclusive Periods. 11 U.S.C. § 1121(d)(1); see also Geriatrics Nursing Home v. First Fidelity Bank, N.A. (In re Geriatrics Nursing Home),

187 B.R. 128, 132 (D. N.J. 1995) ("[Section 1121] grants great latitude to the Bankruptcy Judge in deciding, on a case-specific basis, whether to modify the exclusivity period on a showing of 'cause.'").

30.    In determining whether cause exists to either extend or terminate a debtor's exclusivity, courts generally rely on a non-exclusive list of factors, including: (i) the size and complexity of the case; (ii) the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (iii) the existence of good faith progress toward reorganization; (iv) whether the debtor is paying its bills as they become due; (v) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (vi) whether the debtor has made progress in negotiations with its creditors; (vii) the amount of time which has elapsed in the case; (viii) whether the debtor is using exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (ix) whether an unresolved contingency exists. See In re Dow Corning Corp., 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997); In re McLean Indus., Inc., 87 B.R. 830, 833 (Bankr. S.D.N.Y. 1987); see also In re Crescent Beach Inn, Inc., 22 B.R. 155, 160-61 (Bankr. D. Maine 1982) (shortening the debtor's exclusive period in order to permit parties with a more objective view to file a plan where principal parties had acrimonious relations); Teachers Ins. & Annuity Ass'n of Am. v. Lake in the Woods (In re Lake in the Woods), 10 B.R. 338, 345 (E.D. Mich. 1981) (denying debtor's request to extend exclusivity where the debtor refused to file a plan until a creditor would concede a key issue in the case).

31.    Importantly, "the primary consideration in determining whether to terminate the debtor's exclusivity is whether its termination will move the case forward,

and that this 'is a practical call that can override a mere toting up of the factors.'"

Adelphia Commc'ns Corp., 352 B.R. 578, 590 (Bankr. S.D.N.Y. 1006) (quoting Dow Corning, 208 B.R. at 670). In other words, "the test is better expressed as determining whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case. Certainly practical considerations, or other considerations in the interest of justice, could override, in certain cases, the result after analysis of the nine factors." Id.

I. **The SFI Noteholder Plan Provides Substantially Better Recoveries for All of the Debtors' Stakeholders**

32. Cause exists to terminate Exclusivity here because termination will allow the SFI Noteholders to propose and solicit the SFI Noteholder Plan, which represents the best plan for SFI's creditors and provides substantially better treatment for creditors of all of the Debtors. As discussed previously herein, in comparison to the Debtors' Second Amended Plan, which provides holders of SFI Notes with a mere 5 percent of the equity in reorganized SFI, the SFI Noteholder Plan will provide holders of SFI Notes with approximately 19 percent of the equity in reorganized SFI and rights to participate in the convertible preferred stock offering to purchase up to an additional 81 percent of the new common stock. Importantly, the enterprise under the SFI Noteholder Plan, which contemplates reinstatement of the highly favorable Term Loans, will have substantially the same interest expense as proposed under the Second Amended Plan. Moreover, the allowed claims of the SFO Noteholders will be paid in full in cash, whereas the Debtors' Second Amended Plan proposes to distribute to the SFO Noteholders 25 percent of the equity in reorganized SFI with the right to participate in the equity offering of approximately 70 percent of the equity in reorganized SFI. In addition,

the SFI Backstop Commitments in connection with the SFI Rights Offering for $420 million in connection with the SFI Noteholder Plan will be used to pay the allowed claims under the SFO Notes in full. It is therefore indisputable that the SFI Noteholder Plan is superior to the Debtors' Second Amended Plan, and Exclusivity should be terminated to allow the SFI Noteholders the opportunity to present their plan to creditors pursuant to a Court-approved disclosure statement.

## II. The Unique Interests of SFI's Estate and Creditors Have Not Been Properly Represented

33. Exclusivity also should be terminated for cause because the Debtors have refused to address the conflicts of interest between their estates and creditors by appointing an unconflicted SFI Estate Representative to negotiate with SFI's creditors.

34. As explained by the SFI Noteholders on a number of occasions (which has never been rebutted or contested by the Debtors), the Debtors' estates clearly are conflicted. Unlike many multi-debtor chapter 11 cases, not all of the Debtors' assets here are subject to the claims and liens of the Debtors' various creditor constituencies. For example, the value of the SFI Assets is not available to the Prepetition Lenders because the Prepetition Lenders have no lien or claim against the SFI Assets. As a consequence, the proper administration of these chapter 11 cases requires the Debtors to do more than just determine the enterprise value of all Debtors on a consolidated basis. Rather, the Debtors here act as debtors-in-possession for each of the estates. Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985) ("[D]ebtors' directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession"). As debtor-in-possession, each Debtor and its

board of directors must properly discharge its fiduciary duties in favor of each individual estate, rather than acting for the benefit of creditors of affiliate debtors. Cf. Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.), 860 F.2d 515, 520 (2d Cir. 1988) ("Where . . . creditors . . . knowingly made loans to separate entities and no irremediable commingling of assets has occurred, a creditor cannot be made to sacrifice the priority of its claims against its debtor by fiat based on the bankruptcy court's speculation that it knows the creditor's interests better than does the creditor itself."). Although interrelated, each Debtor and its board of directors, as a debtor-in-possession, has independent fiduciary duties owing to its own estate and its own creditors under sections 1106 and 1107 of the Bankruptcy Code. Cf. Weintraub, 471 U.S. at 355.

35. Indeed, as the Third Circuit has recognized, the separateness of estates within a multi-debtor chapter 11 case must be respected:

> Limiting the cross-creep of liability by respecting entity separateness is a "fundamental ground rule[]." As a result, the general expectation of state law and of the Bankruptcy Code, and thus of commercial markets, is that courts respect entity separateness absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play.

In re Owens Corning, 419 F.3d 195, 211 (3d Cir. 2005) (internal citations omitted). Where the duty to maximize value for one debtor's estate is or becomes adverse to the duty to maximize value for another debtor's estate, an obvious conflict of interest arises for a board of directors acting as the debtor in possession for both such estates. See In re Adelphia Commc'ns Corp., 336 B.R. 610, 671 (Bankr. S.D.N.Y. 2006) (directing the debtors to recuse themselves from certain inter-debtor disputes to give creditors comfort that the debtors would maintain their neutrality and not act to the detriment of particular estates).

36.     Here, the SFI Assets are a discrete set of assets available only to SFI's stakeholders, including, without limitation (i) SFI's equity interests in the Partnership Parks, (ii) ownership or control over $198 million of principal amount of intercompany notes owed by the Partnership Parks, (iii) substantial potential fraudulent transfer and other estate causes of action including, without limitation, claims arising from SFI's acquisition, and subsequent transfer to Six Flags Theme Parks, Inc. ("SFTP") for no consideration, of a 40% equity interest in dick clark productions, inc., and (iv) residual equity in SFO and SFTP. The members of the SFI Board are the same directors and officers of other Debtor entities to whom they also owe fiduciary duties. The corporate structure and discrete set of assets available to only one set of creditors—i.e., SFI's creditors—present an actual conflict of interest, which the Second Amended Disclosure Statement does not discuss. This actual conflict of interest jeopardizes the successful outcome of these cases given that, under the Second Amended Plan, assets belonging to SFI's creditors are being contributed to satisfy the claims of a different set of creditors who have no right to such SFI Assets.

37.     Given the lack of SFI representation in the plan negotiation process, the Court should terminate Exclusivity so that the SFI Noteholder Plan may be proposed and voted upon by SFI's creditors.

**III.    The Debtors' Second Amended Plan is Patently Unconfirmable and SFI's Creditors Should be Permitted to Consider the SFI Noteholder Plan**

38.     Cause also exists for terminating Exclusivity because the Debtors continue to seek approval of an unconfirmable chapter 11 plan.

39.     Simply put, the Second Amended Plan cannot be confirmed because it seeks to substantively consolidate the SFI Assets into the Debtors' other estates.  Without any justification, the Second Amended Plan ignores the exclusive right of SFI's creditors to the SFI Assets and, instead, makes the SFI Assets available for the benefit of the creditors of other Debtors' estates, who have no claims against or interests in them.  The Second Amended Plan, if approved, would thus effectuate an impermissible substantive consolidation of the Debtors' estates in violation of well-established Third Circuit authority.  See Owens Corning, 419 F.3d at 211 (noting that substantive consolidation may not be used offensively where the primary purpose is to disadvantage a group of creditors in the plan process); Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.), 402 F.3d 416, 423 (3d Cir. 2005) (recognizing that substantive consolidation is a sparingly used remedy used only where the debtor's conduct blurs the corporate separateness and creditors deal with them as a single unit); see also Augie/Restivo Baking Co., 860 F.2d at 518 (noting "the sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors.").

40.     Under Third Circuit precedent, in order to substantively consolidate the Debtors' estates, the Debtors must prove that (i) prepetition the Debtors disregarded corporate separateness so significantly that their creditors treated them as one legal entity or (ii) postpetition the Debtors' assets and liabilities are so scrambled among the estates that separating them is prohibitive and hurts all creditors.  Owens Corning, 419 F.3d at 211.  The Debtors simply cannot meet that burden.  The Debtors have not argued—much less proven—that such a consolidation is appropriate here, and they clearly cannot show that the holders of SFI Notes did not rely on the corporate

separateness of the Debtor estates when they acquired notes issued by SFI. Thus, the Second Amended Plan is unconfirmable because it proposes an illegal substantive consolidation of the Debtors' estates in violation of binding Third Circuit precedent.

41.     Moreover, the impact of the proposed Second Amended Plan on SFI's creditors is in fact worse than a traditional substantive consolidation. Although the Second Amended Plan seeks to make the SFI Assets available to all of the Debtors' creditors, SFI's indebtedness (including the SFI Notes) is not consolidated or treated pari passu with the debt of the Debtors' other subsidiaries.

42.     Not surprisingly, holders of more than $500 million of over $870 million of principal amount of the SFI Notes already have indicated their agreement to fund the SFI Backstop Commitments under the SFI Noteholder Plan. This amount of claims is well over the minimum percentage of the one-third in amount required to prevent acceptance of the Second Amended Plan by the creditors of SFI.[6] See 11 U.S.C. § 1126(c) ("A class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . .").

IV.     **Terminating Exclusivity Will Move These Cases Forward**

43.     Terminating Exclusivity to allow consideration of the SFI Noteholder Plan also would have the desirable and practical affect of moving these Chapter 11 Cases forward materially to a degree that otherwise could not occur. On the

---

[6]     $500 million of SFI Notes represents approximately 57.5% of all of the SFI Notes. Even if the guarantee claims of the SFO Notes were entitled to vote at SFI and the total allowable claims at SFI were $1.346 billion as alleged by the Debtors in the Second Amended Disclosure Statement (which figure includes a double recovery for the SFO Notes), $500 million of SFI Notes is still more than a third of such SFI's claims.

other hand, if the Debtors' Exclusivity is maintained, creditors will not have the benefit of reviewing the superior SFI Noteholder Plan. Further, continued pursuit solely of the Debtors' Second Amended Plan will only result in extremely contentious litigation over valuation and other confirmation issues.

44. Terminating Exclusivity now would not sound the "death knell" for the Debtors' reorganization; instead, it "would afford creditors their right to file the plan; there is no negative effect upon the debtor's co-existing right to file its plan." In re All Seasons Indus., Inc., 121 B.R. 1002, 1005 (Bank. N.D. Ind. 1990). Allowing creditors to consider competing proposals will encourage all plan proponents to make their proposals as attractive to creditors as possible with the objective of garnering creditor support prior to solicitation. Such material progress will not occur if the Debtors' Exclusivity is allowed to remain in place and creditors are forced to consider only the Debtors' Second Amended Plan on an expedited take-it-or-leave-it basis. Indeed, several courts have recently opted in favor of terminating exclusivity to provide creditors with an opportunity to consider more than one chapter 11 plan of reorganization. In re TCI 2 Holding, LLC, Case No. 09-13654 (JHW) (Bankr. D.N.J. Aug. 31, 2009) (terminating the debtors' exclusivity upon motion of an ad hoc group of senior secured notes); In re Pliant Corp., Case No. 09-10443 (MFW) (Bankr. D. Del. July 2, 2009) (terminating exclusivity upon motion of the official committee of unsecured creditors).

45. Even if the Court determines that an analysis of the relevant factors does not establish cause, the Court may still terminate the Debtors' Exclusivity in the interests of practicality and justice. See Adelphia Commc'ns Corp., 352 B.R. at 590

("[P]ractical considerations, or other considerations in the interests of justice, could override, in certain cases, the result after analysis of the nine factors." (citing <u>Dow Corning</u>, 208 B.R. at 679)). Here, justice would be served by terminating Exclusivity where the Debtors and other plan proponents are seeking confirmation of an inferior plan without first fully considering the SFI Noteholder Plan. Terminating Exclusivity also serves the interests of practicality, as it is the only way to ensure meaningful consideration of the SFI Noteholder Plan by SFI creditors, who can draw their own conclusions regarding the alternative plan proposals of the Debtors and the SFI Noteholders.

**[Remainder of Page Intentionally Left Blank]**

WHEREFORE, the SFI Noteholders respectfully request that the Court (i) (a) grant the Motion to Terminate Exclusivity and/or (b) deny the Debtors' Motion to Extend Exclusivity and (ii) grant such other and further relief as the Court deems just and proper.

Dated: November 30, 2009
Wilmington, Delaware

BAYARD, P.A.

Neil B. Glassman (No. 2087)
GianClaudio Finizio (No. 4253)
Justin R. Alberto (No. 5126)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395

-and-

Thomas E Lauria
J. Christopher Shore
John K. Cunningham
WHITE & CASE LLP
Wachovia Financial Center
200 South Biscayne Boulevard,
49th Floor
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744

*Attorneys for the SFI Noteholders*