# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

---------------------------------------------------------------x
In re:                                           : Chapter 11
                                                 :
Premier International Holdings Inc., et al.,     : Case No. 09-12019 (CSS)
                                                 :
                 Debtors.                        : Jointly Administered
                                                 :
                                                 : **Re: Docket Nos. 655, 943, 945, 1021, 1081**
                                                 :
---------------------------------------------------------------x

**OMNIBUS RESPONSE OF JPMORGAN CHASE BANK, N.A., AS ADMINISTRATIVE AGENT FOR THE SFTP LENDERS (I) IN SUPPORT OF THE DEBTORS' MOTIONS FOR (A) APPROVAL OF THE DISCLOSURE STATEMENT; (B) EXTENSION OF ITS EXCLUSIVITY PERIODS, AND (C) AN ORDER AUTHORIZING ENTRY INTO EXIT FINANCING ARRANGEMENTS; AND (II) IN OPPOSITION TO THE SFI NOTEHOLDERS' EMERGENCY MOTION FOR AN ORDER TERMINATING THE DEBTORS' EXCLUSIVE PERIODS**

JPMorgan Chase Bank, N.A., in its capacity as Administrative Agent (the "Agent") for itself and a syndicate of prepetition secured lenders (the "SFTP Lenders") party to the SFTP Credit Agreement (as defined below) hereby submits this Omnibus Response ("Response") (I) In Support Of the Debtors' Motions For (A) Approval of the Disclosure Statement; (B) Extension of Its Exclusivity Periods; and (C) An Order Authorizing Entry Into Exit Financing; and (II) In Opposition to the SFI Noteholders' Emergency Motion For An Order Terminating The Debtors' Exclusive Periods, along with the supporting Declaration of Kenneth S. Ziman ("Ziman Decl.").

## PRELIMINARY STATEMENT

1. The SFI Noteholder Group asks this Court to deny the Debtors' motion for approval of the disclosure statement and related financing commitments and to terminate the exclusivity period so that they can pursue a proposed plan of reorganization (the "SFI Plan") that

{519.009-W0004526.}

is fundamentally flawed in numerous respects. The defects in the SFI Plan and the compelling reasons why the termination of exclusivity would be highly detrimental to the progress of this case and the prospects of the Debtors' successful reorganization are well articulated in the Debtors' submissions and will not be repeated here.[1] The Agent, on behalf of the SFTP Lenders, submits this Response to address a central but erroneous assumption underlying the SFI Plan and the request to terminate exclusivity – *i.e.*, that the SFI Plan does not impair the rights of the SFTP Lenders under the SFTP Credit Agreement and that the SFTP Credit Agreement obligations can be reinstated under Section 1124 of the Bankruptcy Code. This assumption is simply wrong.

2.  As explained more fully below, the proposed reinstatement of the SFTP Credit Agreement, that serves as the lynchpin to the SFI Noteholder Group's eleventh-hour plan, is not possible for several reasons. First and foremost, the SFI Plan would unmistakably alter the legal, contractual or equitable rights of the SFTP Lenders, rendering the SFTP Credit Agreement claims impaired within the meaning of Section 1124, thereby foreclosing any attempt at reinstatement. Moreover, as the other parties to this proceeding long ago recognized, reinstatement of the SFTP Credit Agreement is simply not feasible in light of numerous defaults

---

[1] *See* Reply of the Debtors and Debtors in Possession to the SFI Noteholders' Omnibus Objection to the Debtors' Motion to Approve: (I) The Disclosure Statement, Establishing Procedures for Voting on the Second Amended Plan, and Scheduling a Confirmation Hearing; (II) Amended Proposed Solicitation Procedure and Revised Timeline; (III) Backstop Commitment; and (IV) Exit Financing in Connection with the Debtors' Second Amended Plan [Dkt. #___]; *see also* Motion of the Debtors and Debtors in Possession for Entry of an Order Pursuant to Section 1121 of the Bankruptcy Code Extending Their Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Votes [Dkt. # 655]; Motion of the Debtors and Debtors in Possession for an Order Approving (A) the Backstop Commitment Agreement and (B) the Reimbursement of Certain Fees and Expenses Incurred in Connection Thereunder [Dkt. #945]; Debtors' Motion (I) Amending Proposed Solicitation Procedures Order and (II) Seeking Approval of Revised Timeline in Connection Therewith [Dkt. # 1021].

and covenant breaches that have already occurred. This is, no doubt, why neither the Debtors nor the SFO Noteholders have sought to pursue a reinstatement strategy in the reorganization plans that they have proposed or sponsored. Indeed, in depositions taken just this week, representatives of both the Debtors and the SFO Noteholders have testified that, "after careful analysis" they concluded that "reinstatement was not a viable option."[2]

3. The Court should not terminate exclusivity for the purpose of allowing the SFI Noteholder Group to pursue a "reinstatement" plan that cannot possibly be confirmed. To do so would not advance the case. To the contrary, it would result in unnecessary delay and expense that will seriously jeopardize the Debtors' chances of a successful reorganization. Rather, the Court should approve the Debtors' Disclosure Statement[3] and their obligations under the related financing arrangements and extend the Debtors' exclusive periods for the 90 days requested by the Debtors.

**BACKGROUND**

4. The SFTP Lenders are owed approximately $1.13 billion (plus unpaid interest, fees and charges) as a result of loans and other financial accommodations made under the Second Amended and Restated Credit Agreement dated as of May 25, 2007 (the "SFTP Credit Agreement") with Six Flags, Inc. ("SFI"), Six Flags Operations, Inc. ("SFO") and Six

---

[2] Ziman Decl. Ex. A at 162:8-11 [Michael Elkins Deposition Transcript] ("After careful analysis, we concluded that the reinstatement was not a viable option, given the many hurdles, the feasibility and the covenant breach."); Ziman Decl. Ex. E at 51:8-15 [Mark Shapiro 12/2/2009 Deposition Transcript] (SFI CEO's testimony that his advisors told him that a reinstatement strategy was too "uncertain" and that reinstatement "was never going to happen."

[3] All references herein to the "Disclosure Statement" are to the *Disclosure Statement for Debtors' Second Amended Joint Plan of Reorganization* [Dkt. # 943]. We understand that the Debtors are filing a Third Amended Plan and related Disclosure Statement that for the purpose to this Response is not materially different than the Second Amended Plan and Disclosure Statement.

Flags Theme Parks, Inc. ("SFTP" or the "Borrower"). *See* Disclosure Statement at 42-43.
Approximately $835 million of this debt is comprised of a term loan. *Id.* at 42. Approximately
$270 million is outstanding under the revolving facility provided for in the SFTP Credit
Agreement. *Id.* at 43. In addition, additional funds are outstanding in connection with letters of
credit and certain SFTP Lenders or their affiliates are owed approximately $20 million in respect
of terminated swap agreements. A comprehensive background regarding these cases and the
instant motions is fully set forth in the pleadings filed by the Debtors and is incorporated herein
by reference.

## ARGUMENT

### I. The SFI Plan is Fatally Flawed and Does Not Warrant Termination of Exclusivity

5. The SFI Noteholder Group seeks to terminate exclusivity so that they can pursue a plan that they first proposed to the Debtors last week, in the form of a draft preliminary outline,[4] as an alternative to the plan being currently sponsored by the Debtors (the "Debtors Plan") and the SFO Noteholders, with the support of multiple other creditor constituencies. In seeking this relief, the SFI Noteholder Group bears a "heavy burden" of demonstrating that cause exists to terminate exclusivity. *See, e.g., In re Interco*, 137 B.R. 999, 1000 (Bankr. E.D. Mo. 1992) ("A party requesting an immediate termination of the exclusive period as originally authorized by statute or as it may have been extended by the Court, bears a heavy burden"); *In re*

---

[4] The description of the SFI Plan contained herein is based on the preliminary outline that is attached as Exhibit A to the Motion of SFI Noteholders for Emergency Hearing and to Shorten Notice with Respect to Their (I) Emergency Motion for an Order Terminating the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Votes Thereon and (II) Objection to the Debtors' Motion to Extend Their Exclusive Periods to File a Chapter 11 Plan and Solicit Votes Thereon [Dkt. 1081] (the "SFI Noteholder Group's Motion"). Although the SFI Noteholders have apparently drafted a plan document, it has been filed under seal and, notwithstanding a request therefor, has not been shared with the Agent or its counsel.

{519.009-W0004526.}                           4

*Lehigh Valley Prof. Sports Club, Inc.*, No. 00-11296 DWS, 2000 WL 290187, at *2 (Bankr. E.D. Pa. Mar. 14, 2000) ("The party seeking change [in the exclusivity period] has the burden of establishing that cause exists, and when that change is a reduction in the statutory period, the burden is especially heavy"); *In re Grand Traverse Dev. Co.*, 147 B.R. 418, 420 (Bankr. W.D. Mich. 1992) (noting that courts have shortened the exclusivity period in only rare instances).

6. Courts routinely deny motions to terminate exclusivity in cases, such as this, where the debtor is moving forward with a fully financed, viable plan. *See, e.g., In re Geriatrics Nursing Home, Inc.*, 187 B.R. 128, 133 (D.N.J. 1995) (reversing bankruptcy court's termination of exclusive period where the debtors had already presented their plan of restructuring and were in the process of negotiating with creditors and soliciting support for the plan); *see also In re Grand Traverse Dev. Co.*, 147 B.R. at 421 (denying motion to terminate where "the path to a successful negotiated reorganization is still open" and "the filing of a competing plan . . . would seriously erode the Debtors' chance of reaching confirmation, thus effectively diminishing the protection which the exclusivity period of § 1121(b) is intended to afford diligent debtors").

7. Indeed, Congress provided for an exclusivity period in order to "afford the debtor the opportunity to negotiate the settlement of its debts by proposing and soliciting support for its plan of reorganization without interference – in the form of competing plans – from its creditors or others in interest." *In re Geriatrics Nursing Home, Inc.*, 187 B.R. at 131. As the SFI Noteholder Group acknowledges, the "the primary consideration in determining whether to terminate the debtor's exclusivity is whether its termination will move the case forward." SFI Noteholder Group's Motion at 14-15 (quoting *Adelphia Commc'ns Corp.*, 352 B.R. 578, 590 (Bankr. S.D.N.Y. 2006).).

8. The reasons for continuing exclusivity are particularly compelling in this case, where the alternative plan that the SFI Noteholder Group seeks to pursue is fatally flawed and not confirmable. As described more fully below, the SFI Plan, on its face, alters the contractual rights of the SFTP Lenders under the SFTP Credit Agreement, thereby making reinstatement impossible. *See* SFI Noteholder Group's Motion at 3. It is self-evident that lifting exclusivity to enable the SFI Noteholder Group to pursue a manifestly unconfirmable plan will not "move the case forward" but will, instead, result in unnecessary expense and delay that may doom the Debtors' chances to reorganize.

### A. Governing Law

9. Section 1124 of the Bankruptcy Code governs whether a credit agreement can be reinstated in bankruptcy. *See* 11 U.S.C. § 1124. Under Section 1124(1), a creditor is impaired unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1). Section 1124(2) allows for reinstatement only if the subject plan:

> (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured;
>
> (B) reinstates the maturity of such claim or interest as such maturity existed before such default;
>
> (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;
>
> (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

> (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124(2).

10. Thus, if the debtor has defaulted under the credit agreement, or if the plan creates defaults, the lender is "impaired" and the credit agreement cannot be reinstated unless the plan cures all such defaults, excluding so-called *ipso facto* defaults excused from cure under Section 365(b)(2). *See* 11 U.S.C. § 1124(2); *In re Kizzac Mgmt. Corp.*, 44 B.R. 496, 501 (Bankr. S.D.N.Y. 1984) (in order to reinstate under Section 1124 all defaults not expressly excused from cure must be cured).

11. Except where the Plan provides for no distribution, parties with "impaired" claims or interests are entitled to vote on a plan of reorganization. *See* 11 U.S.C. § 1126. If an impaired class votes to reject a plan, the plan cannot be confirmed unless each of the requirements for cram down under Section 1129(b) are met—including, *inter alia*, that with respect to a class of secured claims that the plan pay the holder a full market rate of interest in order to provide such holder the present value of its allowed secured claim. See 11 U.S.C § 1129(b)(2)(A); *see also In re American HomePatient, Inc.*, 420 F.3d 559, 568 (6th Cir. 2005) (lender should receive a market rate of interest in a cram down); *In re Cantwell,* 336 B.R. 688, 693 (Bankr. D.N.J. 2006) (same).

12. Section 1124 of the Bankruptcy Code defines impairment "in the broadest possible terms." *See In re Taddeo*, 685 F.2d 24, 28 (2d Cir. 1982). Any alteration constitutes impairment. *See In re Downtown Athletic Club of N.Y. City, Inc.*, No. 98 B 41419 JLG, 1998 WL 898226, at *6 (Bankr. S.D.N.Y. Dec. 21, 1998) ("Because [Section 1124] focuses on whether a proposed plan of reorganization changes a creditor's rights, any alteration . . . constitutes impairment."); *see also Barakat v. Life Ins. Co. Va. (In re Barakat)*, 99 F.3d 1520,

1527 (9th Cir. 1996) ("Congress intended to define impairment broadly"); *In re Am. Solar King Corp.*, 90 B.R. 808, 819 (Bankr. W.D. Tex. 1988) (even the smallest impairment entitles creditor to participate in voting).

13. The SFI Noteholder Group's submissions acknowledge that preservation of the relatively favorable rates under the SFTP Credit Agreement is essential to the feasibility of the SFI Plan. Moreover, the SFI Plan (even assuming reinstatement) is not feasible, on a practical or legal basis, for numerous reasons described in the Debtors' papers, including, without limitation, the inadequacy of the proposed $700 million capital raise, the excessive post-reorganization leverage, lack of working capital availability and the absence of funding for partnership park obligations.

14. Without unimpairment and reinstatement of the SFTP Credit Agreement claims, the SFI Noteholder Group's proposal crumbles under the interest expense associated with $1.15 billion of funded debt at market rates of interest.[5] As discussed below, the SFI Noteholder Group's proposed plan creates numerous defaults rendering the SFTP Lenders impaired within the meaning of Section 1124.

**B. The Proposed SFI Plan Triggers Numerous Defaults**

**(1) The SFTP Credit Agreement Prohibits Prior Repayment of the SFO Notes**

15. The SFI Plan proposes to repay $420 million of junior debt held by the SFO Noteholders, while the $835 million term loan under the SFTP Credit Agreement remains

---

[5] The $1.15 billion figure is the sum of the "New Debt" of $280 million proposed by the SFI Plan and the reinstatement of the $835 million of SFTP Credit Agreement term loans. Nothing herein should be construed as an admission regarding the viability of a cram down plan. There are fatal impediments to a cram down plan at SFTP that would be raised to the extent the same were to become necessary but those issues are not before the Court at this time.

outstanding. *See* SFI Noteholder Group's Motion at 3. Such a prepayment would result in a breach of Section 9.8 of the SFTP Credit Agreement.

16. Section 9.8 is a negative covenant under which, *inter alia*, SFO commits not to "redeem, retire . . . or make any voluntary payment or prepayment of the principal of or interest on, or any other amount owing in respect of . . . Indebtedness outstanding under any Indenture." Ziman Decl. Ex. B § 9.8. The SFO notes constitute Indebtedness of the kind covered by Section 9.8. The purpose of this provision was to provide the SFTP Credit Agreement obligations with payment priority to complement the structural and collateral priority it enjoyed over the SFO debt. Accordingly, the SFO debt cannot be paid ahead of the SFTP Credit Agreement obligations without causing an Event of Default (as defined in the SFTP Credit Agreement) that would impair the SFTP Lenders' claims and make reinstatement impossible. Ziman Decl. Ex. B § 10(c).

### (2) The New Debt Is Not Permitted To Be Incurred

17. Next, although they acknowledge that they do not have any commitments in place, the SFI Noteholder Group proposes to cause SFTP to borrow $280 million of "New Debt" on a senior, secured basis to pay off the SFTP Credit Agreement revolving facility.[6] *See* SFI Noteholder Group's Motion at 3. Presumably this is to avoid the operation of the leverage covenant in Section 9.1 of the Credit Agreement, which would restrict secured debt at SFO and its subsidiaries to no more than 4.75 times "Credit Facility EBITDA" (as defined in the SFTP Credit Agreement) as of the quarter ending March 31, 2010.[7]

---

[6] It is notable that the SFI Noteholders' backstop commitment would allow this debt to have an interest rate of as much as 13% while they would seek to reinstate the SFTP Credit Agreement term debt at a floating rate of 2.25% above "LIBOR."

[7] As discussed below, the Company is presently in default of this covenant, thus precluding reinstatement in any case.

18. Even assuming the SFI Noteholder Group could secure commitments for the New Debt (which is doubtful), the SFTP Credit Agreement prohibits the incurrence of this additional debt. Under Section 9.2 of the SFTP Credit Agreement, SFO, SFTP and their subsidiaries are prohibited from incurring any additional indebtedness, except for specifically enumerated types of indebtedness described in such subsection. Ziman Decl. Ex. B § 9.2. There is simply no exception to the debt restriction that permits SFO, SFTP or any of their subsidiaries to borrow $280 million.[8] Further, the SFTP Credit Agreement prohibits the creation of any liens on the property of SFO, SFTP or any of their subsidiaries other than for exceptions not applicable here. Ziman Decl. Ex. B § 9.3. Because it is senior secured debt under the SFI Plan, the New Debt would necessarily result in liens on SFO or SFTP property. Accordingly, the New Debt cannot be incurred without triggering Events of Default rendering reinstatement impossible.

### (3) The SFI Plan Would Cause A Change of Control Default

19. The SFI Plan also creates a change of control default. Section 10(l)(i) of the SFTP Credit Agreement provides that it is a default where:

> any "Person" (as such term is used in Sections 13(d) and 14(d) of the Securities and Exchange Act of 1934 (the "Exchange Act") is or becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that a person shall be

---

[8] Notwithstanding the Debtors' requests, the SFI Noteholders have never articulated their rationale for the allowance of the New Debt. Conceivably, they would assert that it is permitted under Section 9.2(b) of the SFTP Credit Agreement as a type of refinancing. Such an assertion, however, would be wrong. That subsection allows SFTP or SFO to have "Indebtedness that was both outstanding on the date of the SFTP Credit Agreement (May 25, 2007) *and* listed on Schedule 9.2(b) thereto, and any Indebtedness of such Person incurred to refinance, refund, replace or renew *any such outstanding Indebtedness.*" Ziman Decl. Ex. B § 9.2(b). While Schedule 9.2(b) refers to the *predecessor* to the SFTP Credit Agreement – it does not refer to the current Credit Agreement or revolver. Thus, the revolving facility is *not* listed on Schedule 9.2(b), and, in fact, was *not* outstanding on May 25, 2007 (except to the extent of approximately $34 million in respect of letters of credit). *See* Ziman Decl. Ex. C at 16-17 [SFI's Form 10-Q for the period ending June 30, 2007].

deemed to have "beneficial ownership" of all shares that any such person has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of more than 35% of the voting stock of [SFI];

Ziman Decl. Ex. B § 10(l)(i). A "Person" under Section 13(d) includes any "group" which is defined as "two or more persons [that] act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer." 15 U.S.C. § 78m(d)(3) (Exchange Act Section 13(d)(2)).

20. The SFI Noteholder Group is undeniably a group working together to acquire the equity securities of a reorganized SFI. They claim to own a 57% stake in SFI notes. *See* SFI Noteholder Group's Motion at 2. They are represented by common counsel and are working together in a coordinated manner to acquire the equity of SFI. To that end, they have agreed as a group to invest $420 million in connection with the backstop commitment under the Plan and have tied themselves to each other as more fully provided in their backstop commitment. In return for their investment, they will receive not less than 57% of the ownership and control of SFI, and conceivably as much as 91% (in each case subject to modest dilution for management equity incentives). *See* SFI Noteholder Group's Motion at 3.[9]

---

[9] The SFI Plan provides that 19% of the equity of SFI will be distributed among all holders of SFI notes. *See* SFI Noteholders Motion at 3. In connection with the rights offering, the holders of SFI notes are committed to purchase up to an additional 81% of the equity of SFI. *See* SFI Noteholders Motion at 3. If all the holders of SFI notes participate in the rights offering, the SFI Noteholder group will acquire 57% of the equity securities of SFI – their claimed pro rata share. If only the members of the SFI Noteholder group participate in the rights offering, the SFI Noteholder group will acquire 91% of the voting stock of SFI (*i.e.*, the sum of 81% from the backstop and their 57% pro rata share of the 19% of common stock distributed to all SFI holders).

### C. Cross-Defaults and Other Breaches of the SFTP Credit Agreement Also Preclude Reinstatement

21. Separate and apart from the breaches and defaults that would be occasioned by the SFI Plan, there have already occurred multiple defaults under the SFTP Credit Agreement that preclude reinstatement.

22. As noted above, Section 9.1 of the SFTP Credit Agreement restricts the leverage of the SFO and SFTP Debtors. The current limit for the ratio of Consolidated Senior Secured Debt to Credit Facility EBITDA (as each are defined in the SFTP Credit Agreement) is 5.25x for the quarter ended September 30, 2009. Based on available information the applicable Debtors senior secured leverage exceeds this limit, thus causing an incurable Event of Default to exist at the present time. This Event of Default, arising under Section 10(c) of the SFTP Credit Agreement, standing alone, is sufficient to sink any reinstatement plan, including the SFI Plan.

23. Sections 10(f) and 10(g) of the SFTP Credit Agreement provide that an Event of Default occurs if SFI or SFO defaults on any indebtedness exceeding $25 million (Section 10(f)) or files a bankruptcy case (Section 10(g)). The debt threshold has been exceeded by both SFI and SFO – SFI has defaulted on over $800 million of bond indebtedness and $300 million of PIERS obligations (which would have matured by their terms on August 15, 2009, but for the earlier acceleration resulting from SFI's bankruptcy filing) and SFO has defaulted on its $400 million of notes. Obviously, both SFI and SFO have filed bankruptcy petitions. *See* Disclosure Statement at 49-50. These are incurable defaults that do not fall within the *ipso facto* exception in Section 1124(2) of the Bankruptcy Code because they do not relate to the financial condition of SFTP. Thus, they are not *ipso facto* defaults that are excused from cure under Section 365(b)(2). *See In re Liljeberg Enters, Inc.*, 304 F.3d 410, 446 (5th Cir. 2002) (cross-

default tied to the financial condition of an affiliate is not an *ipso facto* default under Section 365(b)(2)).

24. SFTP also apparently made a misrepresentation when it requested a letter of credit on March 25, 2009, by bringing down the solvency representation relating to SFO, SFTP and their subsidiaries, at a time when such entities (taken as a whole) were insolvent. *See* Ziman Decl. Ex. B § 6.20 In addition, prior to its bankruptcy petition, SFTP also defaulted under its notice obligations. SFTP failed to give notice of multiple circumstances in early 2009 that could reasonably be expected to have a Material Adverse Effect,[10] including its determination that it needed to pursue a comprehensive balance sheet restructuring as a result in the decline in the company's valuation and its inability to meet upcoming debt payments. *See* Ziman Decl. Ex. B § 8(f) (requiring "prompt notice of any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect."). These prepetition breaches give rise to independent defaults preventing reinstatement under the SFI Plan, or any other plan, of reorganization

25. These are no doubt some of the reasons why the Debtors and the SFO Noteholders chose not to pursue reinstatement in the plans that they have proposed and, instead, decided to work with the SFTP Lenders and, in the case of the Debtors' Plan, repay the SFTP

---

[10] A Material Adverse Effect is defined in the SFTP Credit Agreement as

> a material adverse effect on (a) the Business, Property or financial condition of Holdings and its Subsidiaries taken as a whole or Parent and its Subsidiaries taken as a whole or (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Administrative Agent or the Lenders hereunder or thereunder.

Ziman Decl. Ex. B at 23.

Lenders in full. As the SFO Noteholders' representative testified: "After careful analysis, we concluded that the reinstatement was not a viable option, given the many hurdles, the feasibility and the covenant breach." Ziman Decl. Ex. A at 162:8-11 [Michael Elkins Deposition Transcript]. SFI's CEO, Mark Shapiro, confirmed that he was told by his advisors a reinstatement strategy was too "uncertain" to pursue and that the parties determined that given all the hurdles reinstatement "was never going to happen." Ziman Decl. Ex. E at 51:8-15 [Mark Shapiro 12/2/2009 Deposition Transcript].

## II. The Debtors Have Demonstrated That Exclusivity Should Be Maintained

26. The foregoing readily demonstrates that the SFI Plan is nothing more than a lawyer's whimsy and cannot be the predicate for terminating exclusivity. Moreover, the foregoing demonstrates that the Debtors' decisions to pursue a non-reinstatement alternative plan have been sound, good faith determinations designed to avoid wasteful detours that would have only prolonged the Debtors' bankruptcy cases resulting in a significant loss of value to the enterprise as a whole. Ziman Decl. Ex. D at 78:9-13 [Mark Shapiro 12/1/2009 Deposition Transcript] ("Every season that goes or preseason that goes with this company still in bankruptcy, long-term value is being destroyed and the season itself will be severely negatively impacted."); Ziman Decl. Ex. F at 177:8-178:24 [Jeffrey Speed 12/2/2009 Deposition Transcript] (testifying that costs of staying in bankruptcy beyond January include litigation and professional costs, the "negative impact" on the business "in terms of impact on selling season pass[es], impact on booking groups, impact on signing up sponsorship deals, impact on potential licensing deals" and fact that "we have no source of liquidity…[and] we quickly become…in January as well as with most of the quarter a user of cash.").

27. The SFI Noteholder Group's unhappiness with the Debtors' Plan is understandable as it provides only cents on the dollar but a creditor's mere unhappiness with a

debtor's plan or its desire to file a competing "better" plan is never sufficient cause to terminate exclusivity. *See In re Adelphia Commcn's Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006) (noting that "displeasure with a plan on file...is not a basis for terminating exclusivity"); *In re Geriatrics Nursing Home*, 187 B.R. at 134 (bankruptcy court abused its discretion by terminating exclusivity period because the objections before the court constituted nothing more than unhappiness with the plan among certain creditor constituencies); *In re Eagle Picher Indus., Inc.*, 176 B.R. 143, 147 (Bankr. S.D. Ohio 1994) (a desire to file a competing plan did not constitute cause to terminate exclusivity); *see also In re Standard Mill Ltd.*, No. BKY 4-96-2656, 1996 WL 521190, at *2 (Bankr. D. Minn. Sept. 12, 1996) ("The mere fact that . . . the debtor withdrew a formerly agreed upon plan and replaced it with a new plan is not grounds to reduce the exclusivity period"). This is particularly true where, as here, it is manifest that the alternative SFI Plan cannot be confirmed.

28. Even if the SFI Noteholder Group could convince the Court that there is some remote possibility that they might be able to overcome the insurmountable obstacles to reinstatement, there is no doubt that a reinstatement battle will result in protracted and costly litigation that could very well derail the Debtors' reorganization efforts.[11] The inevitable delay and expense would result in a significant decline in the value of the enterprise, for the dubious purpose of allowing the SFI Noteholder Group to indulge in the folly of an ill-conceived gamble that has already been rejected as unwise by the Debtors and the SFO Noteholders, both economically savvy parties that would have pursued reinstatement if they thought it could succeed.

---

[11] The SFI Noteholders are effectively asking the Debtors to trade litigation concerning the Debtors' Plan, in which the Court will be required to address relatively straightforward valuation issues, for a massive reinstatement/breach of contract/confirmation litigation that will be prompted by the SFI Plan.

### III. The Debtors' Other Motions Should Be Granted

29. The Court should grant the Debtors' motion for approval of the November 6, 2009 Disclosure Statement, so that this case can proceed expeditiously toward a confirmation hearing. As set forth more fully in the Debtors' submission, the Disclosure Statement is a 126-page document (excluding attachments) containing more than adequate information regarding the Debtors' Plan, which is, contrary to the assertions of the SFI Noteholder Group, a confirmable plan of reorganization that has been proposed in good faith.

30. The impaired creditors whose support for the Debtors' Plan would be solicited through the Disclosure Statement – namely, the SFO Noteholders and the SFI Noteholder Group – are sophisticated parties who have been deeply involved in these bankruptcy proceedings and who have had access to extensive information about the Debtors and their business. The SFI Noteholder Group's opposition to the Disclosure Statement is comprised of makeweight objections that, at best, are issues that can and should be addressed at confirmation, and are merely an extension of the SFI Noteholder Group's strategy of trying to gain leverage by interfering with the Debtors' efforts to move forward with the Debtors' Plan.

31. The Debtors' Motion For An Order Authorizing Entry Into Exit Financing should likewise be granted. As set forth more fully in the Debtors' submission, the financing contemplated by this motion is an important part of the Debtors' efforts to successfully reorganize and emerge from bankruptcy expeditiously. Contrary to the unsubstantiated assertions by the SFI Noteholder Group, the fees associated with the exit financing are not excessive, nor can there be any assurance that the expiration dates for the commitments to provide that financing will be extended, especially if the SFI Noteholder Group gets their way and these proceedings descend into a prolonged reinstatement battle with the SFTP Lenders.

## CONCLUSION

For all the foregoing reasons, the SFI Noteholder Group's motion to terminate the exclusive periods for the Debtors to solicit votes for a plan of reorganization and to permit the SFI Noteholder Group to file their own plan of reorganization should be denied and the Debtors' motion to extend their exclusive periods in which to file an amended Chapter 11 plan and solicit votes should be granted.

Dated: December 3, 2009
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Kerri Mumford*

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 Market Street, Suite 1800
P.O. Box 2087
Wilmington, DE 19899
Telephone: (302) 467-4410
Facsimile: (302) 467-4450

-and-

Kenneth S. Ziman
David J. Woll
Steven S. Fitzgerald
Peri L. Zelig
**SIMPSON THACHER & BARTLETT LLP**
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*COUNSEL FOR JPMORGAN CHASE BANK, N.A., AS ADMINISTRATIVE AGENT*