IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Premier International Holdings, Inc., et al.,<br><br>Debtors. | Chapter 11<br>Case No. 09-12019 (CSS)<br>(Jointly Administered)<br><br>**Hearing Date & Time: December 04, 2009 at 10:00 a.m.**<br><br>**Objection Deadline: December 03, 2009 at 5:00 p.m.**<br><br>**Related to Docket: 655, 817, 937, 943, 945, 1009, 1010** |

**OMNIBUS RESPONSE OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' (I) MOTION FOR ENTRY OF AN ORDER EXTENDING THEIR EXCLUSIVE PERIODS IN WHICH TO FILE A CHAPTER 11 PLAN; (II) MOTION FOR AN ORDER APPROVING THE BACKSTOP COMMITMENT AGREEMENT; (III) MOTION FOR AN ORDER AUTHORIZING DEBTORS' ENTRY INTO EXIT FINANCING ARRANGEMENTS; (IV) MOTION FOR AUTHORIZATION TO ENTER INTO LEASE WITH RESPECT TO OFFICE SPACE; (V) THE MOTION TO APPROVE THE DISCLOSURE STATEMENT FOR DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION AND (V) THE SFI NOTEHOLDERS COMMITTEE'S MOTION TO TERMINATE EXCLUSIVITY**

The Official Committee of Unsecured Creditors (the "Committee") of Premier International Holdings, Inc. and certain of its subsidiaries and affiliates (collectively, the "Debtors"), by and through its undersigned co-counsel, hereby submits this response (the "Response") to the Debtors' (I) *Motion For Entry of an Order Extending Their Exclusive Periods in Which to File a Chapter 11 Plan*; [Docket No. 655] (The "Exclusivity Motion"); (II) *Motion for an Order Approving the Backstop Commitment Agreement* [Docket No. 945] (the "Backstop Commitment Motion"); (III) *Motion for an Order Authorizing Debtors' Entry into Exit Financing Arrangements* [Docket No. 937] (the "Exit Financing Motion"); (IV) *Motion for Authorization to Enter into Lease with Respect to Office Space* [Docket No. 1009] (the "Lease Motion"); and (V) the *Disclosure Statement For Debtors' Second Amended Joint Plan of*

*Reorganization Under Chapter 11 of the Bankruptcy Code*, [Docket No. 943] (the "Disclosure Statement", and collectively with the Exclusivity Motion, the Backstop Commitment Motion, the Exit Financing Motion, and the Lease Motion, the "Debtors' Motions"), as well as the *SFI Noteholders' (I) Emergency Motion for an Order Terminating the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Votes Thereon; and (II) Objection to the Debtors' Motion to Extend Their Exclusive Periods in Which to File Chapter 11 Plan and Solicit Votes Thereon* (the "Motion to Terminate Exclusivity"), [Docket no. 1079]. In support of the Response, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1. The Committee is composed of creditor representatives from each of the three levels of the Debtors' capital structure – Six Flags Theme Parks, Inc. ("SFTP"), the entity which operates the Debtors' parks, Six Flags Operations, Inc. ("SFO"), the intermediate holding company, and Six Flags, Inc. ("SFI"), the ultimate parent[1]. The Committee is cognizant of its fiduciary duty to creditors of all such entities and, in furtherance of this duty, the Committee and its professionals negotiated with the Debtors and members of the Informal SFO Noteholders Committee (the "SFO Noteholders Committee") in an effort to enhance the recoveries available to SFI Noteholders under the Debtors' Second Amended Joint Plan of Reorganization (as amended, the "Debtors' Plan"). While progress was made in such negotiations, ultimately the parties were not able to reach agreement.

2. The Committee also has held extensive discussions with the Ad Hoc Committee of

---

[1] To the extent that the Ad Hoc Committee of SFI Noteholders suggests that creditors of SFI have not had a representative in the plan negotiations, the Committee submits that it is mindful that it has a fiduciary duty to creditors of all estates, including SFI. Moreover, the Committee includes several holders of SFI Notes as well as the indenture trustee for such Notes. As the Committee has been actively engaged in negotiations with the Debtors and the SFO Noteholders Committee over the structure of a plan of reorganization, creditors of SFI have accordingly been ably represented in the plan process by the Committee.

SFI Noteholders (the "SFI Noteholders Committee") about their proposed alternative plan (the "Alternative Plan"). After having carefully weighed the benefits and risks of the Debtors' Plan and the Alternative Plan, the Committee is not yet prepared to endorse one plan over the other. Rather, the Committee respectfully submits that it would be in the best interest of all creditors and the estates for the Court to impose a brief slow down of approximately two weeks on the Debtors' and the SFO Noteholders Committee's rush to confirm the Debtors' Plan, and the SFI Noteholders Committee's rush to terminate exclusivity.

3. The inevitable result of either allowing solicitation to begin on the Debtors' Plan or termination of exclusivity would be a firestorm of litigation. Approval of the Disclosure Statement would give rise to hotly contested litigation about a host of plan issues including, among others, the Debtors' overall enterprise value, and whether such value is being fairly allocated under the Debtors' Plan.

4. Similarly, termination of exclusivity to allow a competing plan process, as requested by the SFI Noteholders Committee, would only increase the contentiousness of this case exponentially as it would result in cross litigation by each plan proponent against the other. In addition to the litigation concerning the Debtors' Plan, allowing the SFI Noteholders Committee's Alternative Plan to go forward would give rise to battles regarding reinstatement of the Term Loan Facility (defined below), the fundamental premise of the Alternative Plan, as well as a likely challenge to the feasibility of such plan given that the Debtors would emerge with several hundred million dollars more in indebtedness than under the Debtors' Plan and would not have the benefits of a revolving credit facility to smooth over cash flow issues in the winter months when operations are essentially dormant. Moreover, termination of exclusivity carries with it many other consequences.

5. The Committee respectfully submits that the best course for the Court to follow under the present circumstances would be to force a short breathing spell of approximately two weeks on all parties by adjourning consideration of the Motions while extending exclusivity. This would allow the Debtors and the Committee to consider the Alternative Plan proposal while exclusivity remains in place, but without prematurely foreclosing the possibility of the SFI Noteholders filing a viable competing plan or giving rise to the broader consequences that would occur if exclusivity were terminated. It would also afford more time for all parties to see if they can negotiate toward a truly consensual plan of reorganization and avoid costly and time-consuming litigation.

6. Accordingly, the Committee respectfully requests that the Court briefly delay its consideration of the Debtors' Motions and the SFI Noteholders Committee's Motion to Terminate Exclusivity.

## BACKGROUND

### I. General Background.

7. On June 13, 2009 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On June 13, 2009, the Court entered an order approving joint administration of these Chapter 11 Cases. As of the date of this filing, the Debtors remain in possession of their assets and manage their business as debtors-in-possession, pursuant to Bankruptcy Code Sections 1107(a) and 1108.

8. On June 26, 2009 the United States Trustee for the District of Delaware appointed the Committee.

### II. The Debtors' Capital Structure.

9. The Debtors' primary liabilities consist of: (a) three tranches of unsecured notes issued by SFI maturing in years 2010, 2013, and 2014, respectively, in addition to one tranche of convertible notes issued by SFI maturing in 2015 (collectively, the "SFI Notes"); (b) one tranche of unsecured notes issued by SFO and guaranteed by SFI maturing in the year 2016 (the "SFO Notes"); (c) the Six Flags Theme Parks Inc. ("SFTP") secured credit facilities (the "Credit Facilities") with JPMorgan Chase Bank, N.A., as administrative agent, and the lenders from time to time party thereto (the "Lenders") guaranteed by SFO and subsidiaries of SFTP consisting of a revolving facility for working capital purposes (as subsequently amended and supplemented, or modified, the "Revolving Facility") and a term loan facility (the "Term Facility"); (d) outstanding preferred income equity redeemable shares ("PIERS"), which were required to be redeemed for cash on August 15, 2009; and (e) unsecured trade debt. See Affidavit Of Jeffrey R. Speed In Support Of First Day Pleadings (the "Speed Affidavit") ¶ 13. As of the Petition Date, the outstanding balance of the SFI Notes was approximately $868.3 million; the outstanding balance of the SFO Notes was approximately $400 million; $242 million was due and owing under the Revolving Facility and approximately $850 million was due and owing under the Term Facility for an aggregate outstanding principal balance of approximately $1.1 billion under the Credit Facilities. See id.

### III. The Filing of the Debtors' Plan and Continued Negotiations with the Committee.

10. Prior to filing for chapter 11, the Debtors entered into a lock-up agreement with the Lenders (the "Lock Up Agreement"). In accordance with the Lock Up Agreement, the Debtors filed a joint plan of reorganization on July 22, 2009 that provided for a balance sheet financial restructuring that would confer 92% of the SFI equity to the Lenders, and provide the Lenders with the proceeds of a $600 million term loan. Holders of the SFO Notes would receive 7% of the

equity and SFI creditors would receive 1%. This plan was denounced by the creditors of SFI and SFO. Consequently, on September 14, 2009, the SFO Noteholders Committee filed an emergency motion for an order terminating the Debtors' exclusive periods in which to file a plan of reorganization, along with an alternative plan of reorganization. Shortly after the filing of this motion, the Debtors and the SFO Noteholders Committee commenced negotiations regarding a plan of reorganization that provided a greater recovery to the creditors of SFO and SFI. The Committee was supportive of these discussions[2] as the Committee has throughout these cases sought to promote a consensual solution that would provide a fair recovery to creditors at each level of the Debtors' capital structure.

11. The SFO Noteholders and the Debtors were able to achieve a consensus and accordingly filed the Debtors' Plan on November 2, 2009. The Debtors' Plan provides that the Lenders' claims will be paid in cash from the proceeds of a new $650mm term loan and a $450mm rights offering. Trade creditors will be paid in full in cash upon emergence.

12. Under the Debtors' Plan SFI creditors will receive a distribution of 7.3% of the reorganized SFI equity. Of this amount, 5% will go to the SFI Noteholders and the remainder will go to the SFO Noteholders on account of their guarantee claims. See id., Art. V(2)(d).

13. The SFO Noteholders will also receive the remaining 92.7% of the reorganized SFI equity, comprised of the following: 28.9% of reorganized SFI equity on account of their claims against SFO and 69.77% of reorganized SFI equity through their right to participate in the $450 million rights offering (at a total enterprise valuation of $1.335 billion). See New Plan, Art. V(2).

---

[2] See Omnibus Response of the Committee to (I) Emergency Motion of the Informal Committee of SFO Noteholders for an Order Terminating the Debtors' Exclusive Periods in Which to File a Plan of Reorganization and (II) the Debtors' Motion for Entry of an Order Extending Their Exclusive Periods in Which to File a Chapter 11 Plan, filed on 10/22/2009 [Docket No. 859] (seeking an allowance of additional time for the parties-in-interest to continue negotiations as continued negotiations were in the best interests of the creditor constituents).

14. Under the Debtors' Plan, the Debtors will emerge with indebtedness consisting of a new $650 million term loan and a $150 million revolving credit facility. In addition, Time Warner has agreed to provide them with a $150 million line of credit to fund future puts by limited partners in the Partnership Parks beyond the pre-petition loan Time Warner provided for such purpose on which a balance of approximately $30 million will remain.

**IV.  The Alternative Plan.**

15. Concurrently with its negotiations with the Debtors and the SFO Noteholders Committee, the Committee was also involved in an ongoing dialogue with the SFI Noteholders Committee regarding an alternative plan of reorganization over the last several weeks. On November 20, 2009, the SFI Noteholders Committee presented a confidential copy of the Alternative Plan and supporting documentation to the Committee and the Debtors.

16. The Alternative Plan proposes to reinstate the Term Facility pursuant to Bankruptcy Code section 1124 and to pay the SFO Notes and the loans outstanding under the Revolving Facility in cash in full through the proceeds of a new $280 million junior term loan ("New Junior Term Loan"). The money to cash out the loans outstanding would be raised through a rights offering for a new issuance of convertible preferred stock available to all SFI Noteholders and backstopped by the members of the SFI Noteholders Committee. In satisfaction of their claim, the SFI Noteholders would receive an equity distribution and the right to participate in the rights offering. While SFI Noteholders would receive a materially higher percentage of the issued and outstanding common stock of the reorganized Debtors at confirmation, such stock would be subject to significant dilution upon conversion of the new convertible preferred stock than the Debtors' Plan contemplates. Moreover, such common stock would be behind the approximately $850 million reinstated Term Loan Facility under the Pre-Petition Credit Facility and the $280

million New Junior Term Loan as well as the $420 million in convertible preferred stock. The Alternative Plan proposes to pay off the Revolving Facility by issuing the New Junior Term Loan. As of the filing of this Response, it is unclear whether the SFI Noteholders have obtained a commitment for the New Junior Term Loan

**RESPONSE**

I.  **Consideration of the Debtors' Motions and the SFI Noteholders Committee's Motion to Terminate Exclusivity Should be Adjourned.**

17. Throughout the course of the last few weeks and months, the Committee has been involved in extensive negotiations with the Debtors and other constituencies in these cases. While progress has been made, these negotiations have not culminated in a plan of reorganization that the Committee believes provides fair treatment to creditors of all of the Debtors' separate estates. Among other confirmation issues, the Committee believes that the Debtors' Plan would be contested on the underlying enterprise valuation and the allocation of value.

18. Similarly, while the SFI Noteholders Committee has proposed its own plan that it asserts will afford creditors of all estates an equal or superior recovery, as presently constituted, the Committee perceives several potential legal and economic obstacles to confirmation of this plan. As stated above, the SFI Plan would entail a fight over reinstatement and feasibility.

19. The Committee respectfully submits that, under these circumstances, this Court should adjourn consideration of both the Debtors' Motions and the Motion to Terminate Exclusivity for an approximately two (2) week period while maintaining the Debtors' exclusive period in which to file a plan of reorganization (the "Exclusivity Period"). This would allow the Debtors and the Committee to consider the Alternative Plan proposal while exclusivity remains in place, but would not prematurely foreclose the possibility of the SFI Noteholders Committee

filing a viable competing plan or, give rise to the broader consequences that would occur if exclusivity were terminated. In addition, the Court should defer consideration of the additional pending Motions in furtherance of the Debtors' Plan as they would irrevocably put the Debtors on the path of seeking to confirm the Debtors' Plan and cause the estates to incur administrative liabilities for financing fees or rent under a new lease which might not be needed if the Debtors' Plan is not ultimately confirmed.

20. As the Court may recall, the Committee supported a similar "breathing spell" in response to the dueling request of the SFO Noteholders to terminate exclusivity and the Debtors' request to extend exclusivity as a way of forcing those parties to talk to each other. This decision helped to forge a consensus among the Debtors and the SFO Noteholders. Just as the original delay proved fruitful, a brief adjournment now may also foster productive negotiations among the SFI creditors and all other creditors and avoid needless litigation.

II. **The New Disclosure Statement Provides Inadequate Disclosure on Critical Issues.**

21. To the extent that this Court declines to adjourn consideration of the New Disclosure Statement, the Court must then consider whether the New Disclosure Statement provides "adequate information" to creditors and other parties-in-interest regarding the terms of a proposed plan, allowing for both an informed vote and knowledgeable participation in the confirmation process.

22. Section 1125 of the Bankruptcy Code requires that a disclosure statement provide "adequate information" to creditors and other parties-in-interest about the terms of a proposed plan, allowing for both an informed vote and knowledgeable participation in the confirmation process. See 11 U.S.C. § 1125(a)(1); Kunica v. St Jean Financial, Inc., 233 B.R. 46, 54 (S.D.N.Y. 1999); See also Century Glove, Inc. v. First Am. Bank of N.Y., 860 F.2d 94, 99 (3d Cir. 1988) (citing S.R. 95-989, at pp. 121, 95th Cong., 2d Sess., 124 Cong.Rec. ---, reprinted in 1978

U.S.C.C.A.A.N. 5787, 5907) ("A plan is necessarily predicated on knowledge of the assets and liabilities being dealt with and on factually supported expectations as to the future course of the business . . ."); see also Talarico v. Thomas Crimmins Contracting Co., No. 94-CIV-0420, 1995 U.S. Dist. LEXIS 10053, at *15-16 (S.D.N.Y. July 14, 1995) (ruling that a disclosure statement is evaluated "in terms of whether it provides sufficient information to permit enlightened voting by holders of claims or interests"). "Adequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practical . . . that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 417 (3d Cir. 1988); Momentum Mfg Corp. v. Employee Creditors Committee (In re Momentum Mfg. Corp.), 25 F.3d 1132 (2d Cir. 1994); In re I. Appel Corp., 300 B.R. 564, 569 (S.D.N.Y. 2003); In re BSL Operating Corp., 57 B.R. 945, 950 (Bankr. S.D.N.Y. 1986). The determination of what constitutes adequate information is subjective and made on a case by case basis and is largely within the discretion of the bankruptcy court. In re River Village Assocs., 181 B.R. 795, 804 (E.D. Pa. 1995) (citing Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.), 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court."); In re Worldcom, Inc., No. M-47, 2003 U.S. Dist. LEXIS 11160, at *30 (S.D.N.Y. June 30, 2003); In re Ionsphere Clubs, 179 B.R. 24, 29 (S.D.N.Y. 1995). The New Disclosure Statement fails to provide "adequate information" with regard to many significant aspects of the New Plan and, in some instances, fails to provide any information at all. These deficiencies include:

- The New Disclosure Statement does not adequately explain how the Debtors arrived at the enterprise valuation underlying the Debtors' Plan. Specifically, the New Disclosure

Statement must address the dramatic fluctuations in the valuation from the pre-petition exchange offer that would have swapped the SFI Notes for 85% of the Debtors' equity to the Debtors' initial plan of reorganization filed on July 22, 2009, as well as the subsequent increase in value in the Debtors' Plan. Additionally, the New Disclosure Statement needs to include more detail with respect to valuation methodologies (e.g., the weighted cost of capital and terminal value used in the discounted cash flow analysis, derived multiples obtained from the comparable transaction analysis, the comparable company analysis multiples, and the precedent transactions used in the comparable company transaction). The New Disclosure Statement also should ascribe a value attributable to each asset (e.g., excess real estate, the ownership stake of dick clark productions, inc. ("dcpi") and net operating loss tax) that contributed to the sum-of-the-parts analysis and describe how the Debtors determined the value of each asset used in the analysis.

- The New Disclosure Statement fails to provide adequate information with regard to the value existing solely at the SFI estate. The New Disclosure Statement should articulate and explain the value of the unique interests of the SFI Noteholders vis-à-vis SFI's ownership of Partnership Parks, as well as the SFI Noteholder's interest in potential fraudulent conveyance actions based on its assignment of its interest in dcpi to SFTP for no consideration. With respect to the Partnership Parks, the Disclosure Statement should, at a minimum, (i) describe the scenarios utilized as part of the "puts" analysis, (ii) provide detail on the Monte Carlo simulation used in the "puts" analysis, and (iii) explain the key operating metrics that went into the valuation, including, revenue growth and EBITDA margin and how the assumptions underlying these metrics relate to the assumptions used in the overall enterprise valuation analysis.

- Under the Debtors' Plan the Time Warner guaranty claims against SFTP, SFO and SFI (classes 5, 9 and 12 respectively) are classified as impaired. See Disclosure Statement, Art. VI (B)(2). The Disclosure Statement should include a more fulsome explanation of why the Debtors' believe these claims are impaired.

- The Debtors' Plan separately classifies the unsecured creditors of Funtime, Inc. from the claims of unsecured creditors of the other SFTP subsidiaries (the "SFTP Subsidiary Unsecured Claims"). See id., Art. VI(b)(2)(g)-(o). Moreover, unlike the SFTP Subsidiary Unsecured Claims, which are to be either reinstated or paid in full in cash, the unsecured creditors of Funtime, Inc. will receive no distribution under the Debtors' Plan. See id., Art. VI(b)(2)(o). Yet, the New Disclosure Statement fails to explain the justification for this disparate treatment of unsecured creditors of Funtime, Inc.

- The Debtors' Plan and New Disclosure Statement provide for varying treatment of intercompany claims of the Debtors, which treatment shall be determined by Reorganized SFI. See New Plan, Art. 5.1. However, the New Disclosure Statement provides no disclosure regarding the nature and amount of intercompany claims, including the types of claims and the amount of such claims. See id. Creditors are entitled to information regarding how such claims are to be treated and whether such treatment may entail the

diverting of cash from unsecured creditors in these Cases to the benefit of the Debtors themselves.

### III. Exclusivity Should be Maintained While Negotiations are Ongoing

23. Congress developed the Exclusivity Period with the intent to promote an environment in which a debtor's business may be rehabilitated and a consensual plan may be negotiated. See In re Elder-Beerman Stores, 1997 U.S. Dist. LEXIS 23785, at *14-15 (granting an extension of the debtors' Exclusivity Period and rejecting creditors' committee's argument that extension would contradict Congress' intent); In re Lehigh, 2000 Bankr. LEXIS 237, at *12, (citing All Seasons Indus., 121 B.R. at 1003 (discussing the bankruptcy court's duty to consider legislative intent)). Thus fundamentally, the Exclusivity Period was designed to foster an environment of negotiation rather than competition. See In re Texaco Inc., 81 B.R. 806, 809 (Bankr. S.D.N.Y. 1988) ("It was intended that at the outset of a chapter 11 case a debtor should be given the unqualified opportunity to negotiate a settlement and propose a plan of reorganization without interference from creditors and other interests" (citing H.R. Rep. No. 595, at 221-221 (1978)). Granting the relief requested in either the Motion to Terminate Exclusivity or the Motion to Extend Exclusivity at this juncture would impede the progress of negotiations towards a consensual plan of reorganization and place these cases on a course toward intractable litigation rather than "moving these cases forward." See In re Dow Corning, 208 B.R. 661, 667 (Bankr. E.D. Mich. 1997); In re Adelphia, 352 B.R. at 590, (citing In re Dow Corning, 208 B.R. at 670 ("...practical considerations, or other considerations in the interests of justice, could override, in certain cases, the result after analysis of the nine [Dow Corning] factors.")); In re Dow Corning, 208 B.R. 661, 667 (Bankr. E.D. Mich. 1997) (when a court is determining

whether to extend or terminate the Exclusivity Period, a "primary consideration should be whether doing so would facilitate moving the case forward.)

24. Under these circumstances, the Committee respectfully suggests that the rehabilitation process would be enhanced in current situation if the Court were to enter orders to briefly maintain the status quo regarding exclusivity for an additional brief period of approximately two weeks while disallowing both the Debtors' motion to extend the Exclusivity Period and the SFI Noteholders Committee's Motion to Terminate Exclusivity. Depending on how circumstances develop, the decision as to whether to extend the Exclusivity Period or to terminate the Exclusivity Period can be revisited then.

### IV. Committing to Financing Fees and Rents at this Juncture is Not A Proper Exercise of the Debtors' Business Judgment.

25. Should the Court decide not to adjourn the hearing to approve the New Disclosure Statement and the related Motions for a brief additional period, the Committee respectfully submits that the Court should still decline to grant the relief requested in the Lease Motion and the Backstop Commitment Motion, as entering into each of these transactions is not a proper exercise of business judgment at the current juncture.

26. The relief requested in the Backstop Commitment Motion contemplates the payment of certain unreasonable fees. The Backstop Commitment Motion provides that in the event that the Debtors enter into a financing transaction with parties other than the signatories to the Backstop Commitment Agreement (the "Backstop Parties"), or do not issue the new common stock on the terms set forth in the Debtors' Plan and the new common stock term sheet, the Debtors will pay to the Backstop Parties an aggregate break-up fee (the "Break-Up Fee") equal to 5% of the Offering Amount, i.e. $22.5 million.

27. When the payment of break-up fees or the incurrence of administrative priority

expenses is at issue, more than an "articulated business justification" has generally been required for approval under section 363(b) of the Bankruptcy Code. The proposed use of estate assets must also be both "economically rational" and in the "best interests" of the Debtors' estates. See Calpine Corp. v. O'Brien Environt. Energy, Inc. (In re O'Brien Environt. Energy, Inc.), 181 F.3d 527 (3d Cir. 1997) (applying "business judgment-plus" test and requiring showing that requested payments be "necessary to preserve value of the estate"); In re Hupp Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992) (evaluating section 363(b) application with view to "[w]hether the fee requested correlates with the maximization of value of the debtor's estate"). In this case, the Debtors have not, nor can they, articulate a business justification that justifies paying the Break-Up Fee. Committing to an excessive break-up fee is especially improper in light of the fact that an alternative plan of reorganization has been proposed and may ultimately be confirmed instead of the Debtors' Plan. Moreover, such Break-Up Fee seems excessive compared to similar fees allowed in this District.

28. Similarly, the relief requested in the Lease Motion does not reflect a proper exercise of the Debtors' business judgment. While the act of entering into a new lease for the Debtors' corporate headquarters does not in and of itself reflect an absence of business judgment, it is the timing of such act that fails to meet the requisite business judgment standard. Only after basic questions about the plan of reorganization are answered will it be appropriate to determine where the corporate headquarters should be located. Due to the continuing negotiations over the plan of reorganization, many of the key terms of a plan of reorganization are still in flux. Under these circumstances, this is not an appropriate time for the Debtors to enter into a lease for office space that will effectively require them to keep their headquarters in midtown Manhattan for the next ten years and would result in a significant administrative claim

not subject to the cap contained in Bankruptcy Code §502(b)(6) if such lease were terminated. See H. Rep. No. 95-595, 95th Cong., 1st Sess. 353-54 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 63-64 (1978) (noting that section 502(b)(6) "does not apply to limit administrative expenses claims for use of the leased premises to which the landlord is otherwise entitled"); In re Merry-Go-Round Enters., 208 B.R. 637, 641 (Bankr. D. Md. 1997) ("As a matter of statutory construction, Section 502(b)(6) does not apply to postpetition administrative claims."). As such, the Committee respectfully submits that the relief requested in the Lease Motion is premature and should not be granted at this juncture.

## RESERVATION OF RIGHTS

29. The Committee expressly reserves all of its rights to assert additional objections to the Debtors' Motions or the SFI Noteholders Committee's Motion to Terminate Exclusivity either at or prior to any hearing on the Motions and the Motion to Terminate Exclusivity.

*[Remainder of this page intentionally left blank]*

WHEREFORE, based upon the foregoing, the Committee respectfully requests that the Court enter an Order: (i) briefly adjourning for approximately two weeks the Motions and the Motion to Terminate Exclusivity; and (ii) granting such other and further relief as the Court deems just and appropriate.

Dated: December 3, 2009

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Kathleen P. Makowski (Bar No. 3648)*
Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
      tcairns@pszjlaw.com

and

BROWN RUDNICK LLP
Edward S. Weisfelner, Esquire
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
Email: eweisfelner@brownrudnick.com

and

BROWN RUDNICK LLP
Steven D. Levine, Esquire
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201
Email: slevine@brownrudnick.com

Co-Counsel to the Official Committee of Unsecured Creditors