```
--------------------------------------------------------------x
                                       :
In re                                  :    Chapter 11
                                       :
Premier International Holdings Inc., et al.,   :    Case No. 09-12019 (CSS)
                                       :
       Debtors.                        :    (Jointly Administered)
                                       :
--------------------------------------------------------------X
```

## DEBTORS' THIRD AMENDED JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Six Flags, Inc. and its affiliated debtors[1] propose the following chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code:

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

**A.    Definitions.**

As used in the Plan, the following terms shall have the respective meanings specified below and be equally applicable to the singular and plural of terms defined:

1.1    *2010 Notes* means those certain 8.875% unsecured notes due 2010 and issued by SFI under the 2010 Notes Indenture.

1.2    *2010 Notes Indenture* means that certain indenture, dated February 11, 2002 between SFI and The Bank of New York, pursuant to which the 2010 Notes were issued, as amended from time to time.

1.3    *2013 Notes* means those certain 9.75% unsecured notes due 2013 and issued by SFI under the 2013 Notes Indenture.

1.4    *2013 Notes Indenture* means that certain indenture, dated April 16, 2003, between SFI and The Bank of New York, pursuant to which the 2013 Notes were issued, as amended from time to time.

1.5    *2014 Notes* means those certain 9.625% unsecured notes due 2014 and issued by SFI under the 2014 Notes Indenture.

1.6    *2014 Notes Indenture* means that certain indenture, dated December 5, 2003, between SFI and The Bank of New York, pursuant to which the 2014 Notes were issued, as amended from time to time.

---

[1]    All of the Debtors are identified in Section 1.47 of this Plan.

1.7    **2015 Notes** means those certain 4.5% convertible unsecured notes due 2015 and issued by SFI under the 2015 Notes Indenture.

1.8    **2015 Notes Indenture** means, together, that certain indenture, dated June 30, 1999, and that certain second supplemental indenture, dated November 19, 2004, between SFI and The Bank of New York, pursuant to which the 2015 Notes were issued, each as amended from time to time.

1.9    **2016 Notes** means those certain 12.25% unsecured notes due 2016 and issued by SFO under the 2016 Notes Indenture.

1.10    **2016 Notes Indenture** means that certain indenture, dated June 16, 2008, between SFO, as issuer, SFI, as guarantor, and HSBC Bank USA, N.A., as trustee, pursuant to which the 2016 Notes were issued, as amended from time to time.

1.11    **Accepting SFO Noteholder** means an Eligible Holder that votes to accept the Plan.

1.12    **Accredited Investor** means an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act.

1.13    **Acquisition Parties** means SFOG Acquisition A, Inc., SFOG Acquisition B, L.L.C., SFOT Acquisition I, Inc., and SFOT Acquisition II, Inc.

1.14    **Administrative Expense Claim** means any right to payment constituting a cost or expense of administration of the Reorganization Cases Allowed under sections 330, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' estates, (b) any actual and necessary costs and expenses of operating the Debtors' businesses, (c) any indebtedness or obligations incurred or assumed by the Debtors in Possession during the Reorganization Cases, (d) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the Debtors in the 20 days immediately prior to the Petition Date and sold to the Debtors in the ordinary course of the Debtors' businesses, (e) any compensation for professional services rendered and reimbursement of expenses incurred, and (f) all reasonable and customary fees and expenses of the Indenture Trustee (including, without limitation, all reasonable fees and expenses of legal counsel), as provided in the Unsecured Notes Indentures, without the need for application to or approval of the Bankruptcy Court. Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Section 14.7 of this Plan.

1.15    **Affiliate** has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.16    **Allowed** means, with reference to any Claim against the Debtors, (a) any Claim that has been listed by the Debtors in the Schedules (as such Schedules may be amended by the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), from time to time in accordance with Bankruptcy Rule 1009) as

2

liquidated in amount and not Disputed or contingent, and for which no contrary proof of Claim has been filed, (b) any timely filed proof of Claim as to which no objection to the allowance thereof, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, or as to which an objection has been interposed and such Claim has been allowed in whole or in part by a Final Order, (c) any Claim expressly allowed by a Final Order or under the Plan, (d) any Claim that is compromised, settled or otherwise resolved pursuant to a Final Order of the Bankruptcy Court or the authority granted the Reorganized Debtors under Section 7.5 of this Plan; *provided, however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered Allowed Claims. Unless otherwise specified in the Plan or by order of the Bankruptcy Court, (i) Allowed Administrative Expense Claim or Allowed Claim shall not, for any purpose under the Plan, include interest on such Claim from and after the Petition Date, and (ii) Allowed Claim shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code. For purposes of determining the amount of an Allowed Claim or an Allowed Administrative Expense Claim, there shall be deducted therefrom an amount equal to the amount of any claim which the Debtors may hold against the holder thereof, to the extent such claim may be set off pursuant to applicable bankruptcy and nonbankruptcy law.

1.17 *Amended TW Guaranty Agreements* mean the amended and restated guaranty agreements, the form of which shall be acceptable to Time Warner and the Majority Backstop Purchasers, to be executed and delivered by each of Reorganized SFI, Reorganized SFO, Reorganized SFTP and certain of their respective subsidiaries on the Effective Date in respect of the obligations owed to Time Warner under the Existing TW Loan, up to a maximum aggregate amount of $10 million; it being acknowledged and agreed that the Majority Backstop Purchasers shall have the right to approve all terms and conditions of the Amended TW Guaranty Agreements not set forth, or left as "to be determined," "customary" or similar descriptions therein, in the Time Warner Commitment Papers.

1.18 *Approval Order* means that order, in form and substance satisfactory to the Debtors and the Majority Backstop Purchasers, authorizing and approving the Backstop Commitment Agreement.

1.19 *Backstop Commitment Agreement* means that certain commitment agreement executed by and between the Debtors and each of the Backstop Purchasers in connection with the Offering, which is attached as Annex A to Appendix 1 hereto.

1.20 *Backstop Purchasers* means those certain Persons signatory to the Backstop Commitment Agreement, each of which has agreed to backstop the Offering on the terms and subject to the conditions set forth in the Backstop Commitment Agreement.

1.21 *Ballot* means the form distributed to each holder of an Impaired Claim or Preconfirmation Equity Interest that is entitled to vote to accept or reject the Plan on which is to be indicated an acceptance or rejection of the Plan.

1.22 *BANA* means Bank of America, N.A.

1.23    **_BAS_** means Banc of America Securities LLC.

1.24    **_Bankruptcy Code_** means title 11 of the United States Code, as amended from time to time, as applicable to the Reorganization Cases.

1.25    **_Bankruptcy Court_** means the United States Bankruptcy Court for the District of Delaware or any other court of the United States having jurisdiction over the Reorganization Cases.

1.26    **_Bankruptcy Rules_** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

1.27    **_BBPLC_** means Barclays Bank PLC.

1.28    **_BC_** means Barclays Capital, the investment banking division of BBPLC.

1.29    **_Benefit Plans_** means all employee benefit plans, policies and programs sponsored by any of the Debtors, including, without limitation, all incentive and bonus arrangements, medical and health insurance, life insurance, dental insurance, disability benefits and coverage, leave of absence, savings plans, retirement pension plans and retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code).

1.30    **_Business Day_** means any day other than a Saturday, Sunday, or a "legal holiday" set forth in Bankruptcy Rule 9006(a).

1.31    **_Cash_** means legal tender of the United States of America.

1.32    **_Causes of Action_** means all actions, causes of action, Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims, whether disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, and whether arising in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Reorganization Cases, including through the Effective Date.

1.33    **_Claim_** means a claim, as defined in section 101(5) of the Bankruptcy Code, against a Debtor.

1.34    **_Class_** means a category of holders of Claims or Preconfirmation Equity Interests set forth in Article IV of this Plan.

1.35    **_Closing Date_** means _____, 2010.

1.36    **_Collateral_** means any property or interest in property of the estates of the Debtors subject to a Lien, charge or other encumbrance to secure the payment or performance of

a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.37 ***Commitment Parties*** means collectively, JPMCB, JPMSI, BANA, BAS, BBPLC, BC and DB.

1.38 ***Commitment Parties' Commitment Papers*** means the commitment letter and related term sheet and fee letter executed by the Commitment Parties and SFTP on November 30, 2009.

1.39 ***Company*** means SFI and all of its Debtor and non-Debtor subsidiaries.

1.40 ***Confirmation Date*** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.41 ***Confirmation Hearing*** means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.42 ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan, in form and substance (i) reasonably satisfactory to the Debtors and the Majority Backstop Purchasers, and (ii) satisfactory to Time Warner (to the extent set forth in the TW Commitment Papers).

1.43 ***Contingent Claim*** means any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened or been triggered as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

1.44 ***Continuing Guarantee Agreements*** means collectively, the Texas Guarantee Agreement and the Georgia Guarantee Agreement.

1.45 ***Creditors' Committee*** means the committee of unsecured creditors appointed in the Reorganization Cases pursuant to section 1102(a) of the Bankruptcy Code.

1.46 ***DB*** means Deutsche Bank Trust Company Americas.

1.47 ***Debtors*** means each of Six Flags, Inc., Astroworld GP LLC, Astroworld LP, Astroworld LP LLC, Fiesta Texas, Inc., Funtime, Inc., Funtime Parks, Inc., Great America LLC, Great Escape Holding Inc., Great Escape Rides L.P., Great Escape Theme Park L.P., Hurricane Harbor GP LLC, Hurricane Harbor LP, Hurricane Harbor LP LLC, KKI, LLC, Magic Mountain LLC, Park Management Corp., PP Data Services Inc., Premier International Holdings Inc., Premier Parks of Colorado Inc., Premier Parks Holdings Inc., Premier Waterworld Sacramento Inc., Riverside Park Enterprises, Inc., SF HWP Management LLC, SFJ Management Inc., SFRCC Corp., Six Flags America LP, Six Flags America Property Corporation, Six Flags Great Adventure LLC, Six Flags Great Escape L.P., Six Flags Operations Inc., Six Flags

Services, Inc., Six Flags Services of Illinois, Inc., Six Flags St. Louis LLC, Six Flags Theme Parks Inc., South Street Holdings LLC, and Stuart Amusement Company.

1.48 ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession in the Reorganization Cases under sections 1107(a) and 1108 of the Bankruptcy Code.

1.49 ***Disbursing Agent*** means Reorganized SFI or any other entity in its capacity as a disbursing agent under Sections 6.5 and 6.7 of this Plan.

1.50 ***Disclosure Statement*** means that certain disclosure statement relating to the Plan, including, without limitation, all exhibits and Schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.51 ***Disclosure Statement Order*** means the order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Debtors and the Majority Backstop Purchasers, approving, among other things, the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

1.52 ***Disputed*** means, with reference to any Claim or portion thereof, any Claim against any Debtor which such Debtor, subject to the reasonable consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), believes is unliquidated, disputed or contingent, and which has not become Allowed in accordance with the Plan.

1.53 ***Distribution Date*** means the earliest of the following dates that occurs after any Claim is Allowed: (a) the Effective Date, or as soon thereafter as is practicable, (b) a Subsequent Distribution Date, or (c) a Final Distribution Date.

1.54 ***Distribution Pro Rata Share*** means, with respect to any distribution of New Common Stock to the holders of Allowed SFO Unsecured Claims or Allowed SFI Unsecured Claims, the ratio (expressed as a percentage) that the Allowed amount of such Allowed SFO Unsecured Claim or Allowed SFI Unsecured Claim, as applicable, bears to the aggregate amount of all Allowed SFO Unsecured Claims or Allowed SFI Unsecured Claims, as applicable, on each Distribution Date following such Claim's allowance, which ratio shall be calculated as if no prior distributions had been made on account of such Claim; *provided, however*, that in any distribution made to the holder of an Allowed SFO Unsecured Claim or an Allowed SFI Unsecured Claim, as applicable, there shall be deducted from such distribution the amount of any distribution previously distributed to such holder on account of such Claim in any distribution made prior thereto.

1.55 ***Distribution Record Date*** means December 2, 2009.

1.56 ***DTC*** means the Depository Trust Company.

1.57 ***Effective Date*** means a Business Day selected by the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably

withheld), on or after the Confirmation Date, on which (a) no stay of the Confirmation Order is in effect and (b) the conditions precedent to the effectiveness of the Plan specified in Section 11.1 of this Plan shall have been satisfied or waived as provided in Section 11.2 of this Plan.

1.58    *Eligible Holder* means an SFO Noteholder who is an Accredited Investor as of the Offering Record Date.

1.59    *Employment Agreements* means those certain employment agreements entered into between Six Flags and each of Mark Shapiro, Jeffrey R. Speed, Louis Koskovolis, Mark Quenzel, Andrew M. Schleimer, Michael Antinoro and James Coughlin, each dated April 9, 2009.

1.60    *Exculpated Parties* means (i) the Debtors, (ii) the Prepetition Agent, (iii) the Participating Lenders, (iv) the Backstop Purchasers, (v) each Indenture Trustee, (vi) Time Warner, (vii) the members of the Creditors' Committee (but solely in their respective capacities as such), and (viii) for each of (i) through (vii), their respective directors, officers, partners, members, representatives, employees, attorneys, financial advisors and other professional advisors.

1.61    *Executory Contracts* means the various contracts and agreements to which the Debtors are a party.

1.62    *Existing TW Loan* means that certain loan made by TW to the Acquisition Parties in the original principal amount of $52,507,000, which is evidenced by a promissory note dated as of May 15, 2009 ($41,205,000 principal amount of which was outstanding as of September 30, 2009), to enable the Acquisition Parties to fund 2009 "put" obligations in respect of the Partnership Parks.

1.63    *Exit Facility* means senior secured credit facility to be obtained by SFTP from the Commitment Parties.

1.64    *Exit Facility Loans* means collectively, the Exit Term Loan and Exit Revolving Loans.

1.65    *Exit Facility Loan Documents* means the documents governing the Exit Facility Loans, which documents shall be in form and substance satisfactory to Time Warner (to the extent set forth in the TW Commitment Papers); it being acknowledged and agreed that the Majority Backstop Purchasers shall have the right to (i) approve any term or provision in the Exit Facility Loan Documents that constitutes a material change to any term or condition set forth in the Commitment Parties' Commitment Papers, and (ii) approve all terms and conditions of the Exit Facility not set forth, or left as "to be determined," "customary" or similar descriptions therein, in the Commitment Parties' Commitment Papers.

1.66    *Exit Revolving Loans* means the $150,000,000 revolving loan facility to be obtained by the Debtors on the Effective Date and in connection with the Debtors' emergence from chapter 11, on terms and conditions described in the Commitment Parties' Commitment Papers, the material terms of which are set forth on Schedule 1.63. Notwithstanding the foregoing, any material changes to the Exit Revolving Loans as described in the Commitment

Parties' Commitment Papers shall be subject to the approval of Time Warner (to the extent set forth in the TW Commitment Papers) and the Majority Backstop Purchasers.

1.67 **Exit Term Loan** means the $650,000,000 term loan facility to be obtained by Debtors on the Effective Date and in connection with the Debtors' emergence from chapter 11, on terms and conditions described in the Commitment Parties' Commitment Papers, the material terms of which are set forth on Schedule 1.63 Notwithstanding the foregoing, any material changes to the Exit Term Loan as described in the Commitment Parties' Commitment Papers shall be subject to the approval of Time Warner (to the extent set forth in the TW Commitment Papers) and the Majority Backstop Purchasers.

1.68 **Final Distribution Date** means a date after (a) the deadline for the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or the Reorganized Debtors to interpose objections to Claims has passed, (b) all such objections have been resolved by signed agreement with the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or Reorganized Debtors and/or Final Order, as may be applicable, and (c) all Claims that are Contingent Claims or Unliquidated Claims have been estimated but, in any event, the Final Distribution Date shall be no later than thirty days thereafter, or such later date as the Bankruptcy Court may establish, upon request by the Reorganized Debtors, for cause shown.

1.69 **Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending or, (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

1.70 **Funtime, Inc. Unsecured Claim** means any Unsecured Claim or Claim of a governmental unit of the kind entitled to priority in payment as specified in section 502(i) and 507(a)(8) of the Bankruptcy Code against Funtime, Inc.

1.71 **Georgia Guarantee Agreement** means that certain General Continuing Guarantee, dated as of March 18, 1997, by SFTP and SFO, as successor to Six Flags Entertainment Corporation, in favor of Six Flags Fund, Ltd. SFG-I, LLC, and Six Flags Over Georgia, LLC.

1.72 **Impaired Claim** means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.73 ***Indenture Trustee*** means the applicable indenture trustee for the 2010 Notes Indenture, the 2013 Notes Indenture, the 2014 Notes Indenture, the 2015 Notes Indenture, and the 2016 Notes Indenture.

1.74 ***Indenture Trustee Fees and Expenses*** means any and all reasonable fees, expenses, disbursements and advances of each Indenture Trustee (and its counsel, agents and advisors), in their respective capacities as Indenture Trustee, that are provided for under the respective Unsecured Notes Indentures (including, without limitation, in connection with service on the Creditors' Committee and in connection with distributions under the Plan), which are incurred at any time prior to or after the Effective Date.

1.75 ***Insurance Policy*** means any policy of insurance under which any of the Debtors could have asserted or did assert, or may in the future assert, a right to coverage for any Claim, together with any other contracts which pertain or relate to such policy (including, by way of example and not limitation, any insurance settlement agreements or coverage-in-place agreements).

1.76 ***Insured Claim*** means that portion of any Claim arising from an incident or occurrence that occurred prior to the Effective Date: (i) as to which any Insurer is obligated pursuant to the terms, conditions, limitations, and exclusions of its Insurance Policy, to pay any cost, expense, judgment, settlement, or contractual obligation with respect to the Debtors, or (ii) that any Insurer otherwise agrees to pay as part of a settlement or compromise of a claim made under the applicable Insurance Policy.

1.77 ***Insurer*** means any company or other entity that issued, or is responsible for, an Insurance Policy.

1.78 ***Intercompany Claim*** means any Claim against any Debtor or Non-Debtor Subsidiary held by another Debtor or Non-Debtor Subsidiary.

1.79 ***JPMCB*** means JPMorgan Chase Bank, N.A.

1.80 ***JPMSI*** means J.P. Morgan Securities Inc.

1.81 ***LIBOR*** means, with respect to an interest rate, the London Inter-Bank Offered Rate.

1.82 ***Lien*** means any charge against or interest in property to secure payment of a debt or performance of an obligation.

1.83 ***Limited Offering Pro Rata Share*** means (x) the total principal amount of 2016 Notes held by an Eligible Holder divided by (y) four times the aggregate principal amount of all 2016 Notes outstanding as of the Petition Date.

1.84 ***Local Bankruptcy Rules*** means the Local Bankruptcy Rules for the District of Delaware, as amended from time to time.

1.85    **Long-Term Incentive Plan** means, effective on or about the Effective Date, the incentive plan for management, selected employees and directors of Reorganized SFI, the material terms of which are set forth on Schedule 1.81.

1.86    **Majority Backstop Purchasers** means the Backstop Purchasers that collectively hold a majority of the aggregate commitment percentage set forth in Schedule I of the New Common Stock Term Sheet.

1.87    **New Common Stock** means the shares of common stock of Reorganized SFI authorized to be issued pursuant to Section 5.2 of this Plan.

1.88    **New Common Stock Term Sheet** means the term sheet attached as Exhibit A to the Backstop Commitment Agreement.

1.89    **New TW Loan** means the $150,000,000 unsecured multi-draw term loan facility to be obtained by the Acquisition Parties and guaranteed by the Debtors on the Effective Date in connection with the Debtors' emergence from chapter 11, and is on terms and conditions described in the TW Commitment Papers, the material terms of which are set forth on Schedule 1.63. Notwithstanding the foregoing, any material changes to the New TW Loan as described in the TW Commitment Papers shall be subject to the approval of the Majority Backstop Purchasers.

1.90    **New TW Loan Documents** means the documents governing the New TW Loan to be agreed to with the Acquisition Parties and the New TW Lender; it being acknowledged and agreed that the Majority Backstop Purchasers shall have the right to (i) approve any term or provision in the New TW Loan Documents that constitutes a material change to any term or condition set forth in the TW Commitment Papers, and (ii) approve all terms and conditions of the New TW Loan not set forth, or left as "to be determined," "customary" or similar descriptions therein, in the TW Commitment Papers.

1.91    **Non-Debtor Subsidiary** means any direct or indirect subsidiary of SFI that is not a Debtor.

1.92    **Offering** means the offering of $450.0 million in aggregate of New Common Stock (i) to each Eligible Holder in respect of its Limited Offering Pro Rata Share and (ii) to the extent less than the full Offering Amount is issued to the Eligible Holders, to the Backstop Purchasers.

1.93    **Offering Amount** means $450.0 million.

1.94    **Offering Procedures** means those certain rights offering procedures, setting forth the terms and conditions of the Offering, in substantially the form annexed hereto as Appendix I.

1.95    **Offering Record Date** means December 2, 2009.

1.96    **Other Priority Claim** means a Claim entitled to priority in payment as specified in section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code.

1.97 ***Other Secured Claim*** means any Secured Claim other than a Claim in Class 4 or Class 8.

1.98 ***Partnership Parks*** means the Six Flags Over Georgia, Six Flags White Water Atlanta and the Six Flags Over Texas theme parks.

1.99 ***Partnership Parks Claim*** means any Claim that is an SFTP Partnership Parks Claim, SFO Partnership Parks Claim or an SFI Partnership Parks Claim.

1.100 ***Person*** means an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government or agency or political subdivision thereof or any other form of legal entity.

1.101 ***Personal Injury Claim*** means any Claim against any of the Debtors, whether or not the subject of an existing lawsuit, arising from a personal injury or wrongful death allegation. A Personal Injury Claim may also be an Insured Claim.

1.102 ***Petition Date*** means June 13, 2009, the date on which the Debtors commenced their Reorganization Cases.

1.103 ***PIERS*** means any preferred income equity redeemable shares issued by SFI and outstanding as of the Effective Date.

1.104 ***Plan*** means this Third Amended Joint Plan of Reorganization, including, without limitation, the exhibits and schedules hereto, as the same may be amended, modified or supplemented from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.105 ***Plan Supplement*** means the supplement or supplements to the Plan containing certain documents relevant to the implementation of the Plan specified in Section 14.6 of this Plan.

1.106 ***Postconfirmation Board*** means the board of directors of Reorganized SFI which shall be disclosed in the Plan Supplement.

1.107 ***Postconfirmation Organizational Documents*** means the certificate of incorporation, bylaws, and other organizational documents for Reorganized SFI, the forms of which shall be in form and substance acceptable to the Majority Backstop Purchasers and consistent with section 1123(a)(6) of the Bankruptcy Code. The Postconfirmation Organizational Documents shall be included in the Plan Supplement.

1.108 ***Preconfirmation Equity Interests*** means, collectively, the Preconfirmation SFI Equity Interests, the Preconfirmation SFO Equity Interests and the Preconfirmation Subsidiary Equity Interests in a Debtor, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests, all as of the Effective Date. For the avoidance of doubt, the Preconfirmation SFI Equity Interests shall include the PIERS.

1.109 ***Preconfirmation SFI Equity Interests*** means any instrument evidencing an ownership interest in SFI, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests, all as of the Effective Date.

1.110 ***Preconfirmation SFO Equity Interest*** means any instrument evidencing an ownership interest in SFO, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests, all as of the Effective Date

1.111 ***Preconfirmation Subsidiary Equity Interests*** means any instrument evidencing an ownership interest in a Debtor other than SFI or SFO, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests, all as of the Effective Date. Each Preconfirmation Subsidiary Equity Interest shall be deemed Allowed under the Plan.

1.112 ***Prepetition Agent*** means JPMorgan Chase Bank, N.A. in its capacity as administrative agent under the Prepetition Credit Agreement, or any successor administrative agent thereunder.

1.113 ***Prepetition Credit Agreement*** means that certain Second Amended and Restated Credit Agreement, dated as of May 25, 2007, among: SFI; SFO; SFTP, as primary borrower; certain foreign subsidiaries of SFTP, as borrowers; the Prepetition Lenders; Credit Suisse, Cayman Islands Branch and Lehman Commercial Paper, Inc., as co-syndication agents; the Prepetition Agent; and J.P. Morgan Securities Inc., Credit Suisse Securities (USA) LLC and Lehman Brothers Inc., as joint lead arrangers and joint bookrunners, and all amendments, supplements, ancillary agreements (including but not limited to any and all notes, letters of credit, pledges, collateral agreements, intercreditor agreements, swaps and hedging agreements), side letters, financing statements, and other documents related thereto

1.114 ***Prepetition Credit Agreement Claim*** means an SFTP Prepetition Credit Agreement Claim or an SFO Prepetition Credit Agreement Claim.

1.115 ***Prepetition Lender*** means the holder of a Prepetition Credit Agreement Claim.

1.116 ***Prepetition Period*** means the time period prior to the Petition Date.

1.117 ***Priority Tax Claim*** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code, other than any such Claim against Funtime, Inc.

1.118 ***Registration Rights Agreement*** shall have the meaning set forth in Section 5.4 of this Plan.

1.119 ***Reinstated*** or ***Reinstatement*** means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim or Preconfirmation Equity Interest entitles the holder of such Claim or Preconfirmation Equity Interest, or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Preconfirmation Equity Interest to demand or receive accelerated payment of such Claim or Preconfirmation Equity

Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim or Preconfirmation Equity Interest as such maturity existed before such default; (iii) compensating the holder of such Claim or Preconfirmation Equity Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or applicable law; (iv) if such Claim or such Preconfirmation Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the holder of such Claim or such Preconfirmation Equity Interest (other than the Debtor or an insider of the Debtor) for any actual pecuniary loss incurred by such holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Preconfirmation Equity Interest entitles the holder of such Claim or Preconfirmation Equity Interest.

1.120 **Released Parties** shall have the meaning set forth in Section 12.7 of this Plan.

1.121 **Reorganization Cases** means the jointly administered cases commenced by the Debtors under chapter 11 of the Bankruptcy Code.

1.122 **Reorganized Debtors** means each of the Debtors on and after the Effective Date.

1.123 **Reorganized SFI** means SFI, on and after the Effective Date (the name of which shall be changed, as of the Effective Date, to Six Flags Entertainment Corporation).

1.124 **Reorganized SFO** means SFO, on and after the Effective Date.

1.125 **Reorganized SFTP** means SFTP, on and after the Effective Date.

1.126 **Schedules** means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and unexpired leases and statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007 and the Official Bankruptcy Forms in the Reorganization Cases, as the same may have been amended or supplemented through the Confirmation Date pursuant to Bankruptcy Rules 1007 and 1009. For the avoidance of doubt, Schedules do not include any schedules or exhibits to this Plan or any Plan Supplement.

1.127 **Secured Claim** means any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

1.128 **Secured Tax Claim** means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein and including any related Secured Claim for penalties).

1.129 *Securities Act* means the Securities Act of 1933, as amended.

1.130 *Security* means any instrument that qualifies as a "security" under section 2(a)(1) of the Securities Act.

1.131 *SFI* means Six Flags, Inc., a Delaware corporation.

1.132 *SFI Partnership Parks Claim* means any Claim (i) arising under the guaranty by SFI of obligations owed to Time Warner and certain of its affiliates under the Subordinated Indemnity Agreement, and (ii) arising under the guaranty by SFI and SFI's subsidiaries of obligations owed to certain limited partners with interests in the Partnership Parks under the Continuing Guarantee Agreements.

1.133 *SFI TW Guaranty Claim* means any Claim arising under the guaranty by SFI of obligations owed to Time Warner and certain of its affiliates under the Existing TW Loan, up to a maximum aggregate amount of $10 million when taken together with the SFO TW Guaranty Claim and SFTP TW Guaranty Claim.

1.134 *SFI Unsecured Claim* means any Unsecured Claim against SFI. SFI Unsecured Claims include, without limitation, Claims arising under the 2010 Notes Indenture, 2013 Notes Indenture, 2014 Notes Indenture, 2015 Notes Indenture, and the 2016 Notes Guaranty.

1.135 *SFO* means Six Flags Operations, Inc., a Delaware corporation.

1.136 *SFO Note Claim* means any Claim against SFO arising under or related to the 2016 Notes Indenture. The SFO Note Claims are Allowed in the aggregate amount of $420.0 million.

1.137 *SFO Note Guaranty Claim* means any Claim arising under the guaranty by SFI of obligations owed to holders of the 2016 Notes under the 2016 Notes Indenture.

1.138 *SFO Partnership Parks Claim* means Claims (i) arising under the guaranty by SFO of obligations owed to Time Warner and certain of its affiliates under the Subordinated Indemnity Agreement, and (ii) arising under the guaranty by SFO and SFO's subsidiaries of obligations owed to certain limited partners with interests in the Partnership Parks under the Continuing Guarantee Agreements.

1.139 *SFO Prepetition Credit Agreement Claim* means Claims held by the Prepetition Lenders and/or the Prepetition Agent, and all other Claims against SFO arising under the Prepetition Credit Agreement.

1.140 *SFO TW Guaranty Claim* means Claims arising under the guaranty by SFO of obligations owed to Time Warner and certain of its affiliates under the Existing TW Loan, up to a maximum aggregate amount of $10 million when taken together with the SFI TW Guaranty Claim and SFTP TW Guaranty Claim.

1.141 **SFO Unsecured Claim** means any Unsecured Claim against SFO. SFO Unsecured Claims include, without limitation, SFO Note Claims.

1.142 **SFTP** means Six Flags Theme Parks, Inc. a Delaware corporation.

1.143 **SFTP and SFTP Subsidiary Unsecured Claim** means Unsecured Claims against SFTP, SFTP's subsidiaries (other than Funtime, Inc.), or PP Data Services Inc., other than an SFTP TW Guaranty Claim, an SFTP Partnership Parks Claim or a Funtime, Inc. Unsecured Claim; provided that an Allowed Subsidiary Unsecured Claim shall not include any claim that is disallowed or released, whether by operation of law, Final Order, written agreement, the provisions of this Plan or otherwise.

1.144 **SFTP Partnership Parks Claim** means any Claim (i) arising under the guaranty by SFTP and SFTP's subsidiaries of obligations owed to Time Warner and certain of its affiliates under the Subordinated Indemnity Agreement, and (ii) arising under the guaranty by SFTP and SFTP's subsidiaries of obligations owed to certain limited partners with interests in the Partnership Parks under the Continuing Guarantee Agreements.

1.145 **SFTP Prepetition Credit Agreement Claim** means any Claim held by the Prepetition Lenders and/or the Prepetition Agent, and all other Claims against SFTP or SFTP's subsidiaries arising under the Prepetition Credit Agreement.

1.146 **SFTP TW Guaranty Claim** means any Claim arising under the guaranty by SFTP of obligations owed to Time Warner and certain of its affiliates under the Existing TW Loan, up to a maximum aggregate amount of $10 million when taken together with the SFO TW Guaranty Claim and SFI TW Guaranty Claim.

1.147 **Shapiro Contract** means the employment agreement, dated April 9, 2009 (as amended as of the Effective Date), by and among SFI, SFO, SFTP and Mark Shapiro, as President and Chief Executive Officer (together with any contract, agreement or understanding (including, without limitation, any other contract, agreement or understanding relating to the indemnification, severance and/or benefits) between Mark Shapiro and any of the other foregoing parties), which shall be filed with the Plan Supplement.

1.148 **Subordinated Indemnity Agreement** means that certain Subordinated Indemnity Agreement (as amended, modified or otherwise supplemented from time to time) entered into by and among SFI, Time Warner and an affiliate of Time Warner, dated as of April 1, 1998, the obligations of which are guaranteed by substantially all of SFI's domestic subsidiaries.

1.149 **Subordinated Securities Claim** means any Claim arising from rescission of a purchase or sale of a Security (including any Preconfirmation Equity Interest) of the Debtors, for damages arising from the purchase or sale of such a Security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, as set forth in section 510(b) of the Bankruptcy Code.

1.150 **Subsequent Distribution Date** means the twentieth day after the end of each calendar quarter after the occurrence of the Effective Date.

1.151 **Tax Code** means the Internal Revenue Code of 1986, as amended.

1.152 **Texas Guarantee Agreement** means that certain General Continuing Guarantee, dated as of January 6, 1998, by SFTP and SFO, as successor to Six Flags Entertainment Corporation, in favor of Six Flags Over Texas Fund, Ltd., Flags' Directors, LLC, and Six Flags Fund II, Ltd.

1.153 **Time Warner** means Historic TW Inc. and its subsidiaries and affiliates, including TW and Time Warner, Inc.

1.154 **TW** means TW-SF LLC, a Delaware limited liability company.

1.155 **TW Commitment Papers** means the commitment letter and related term sheet and fee letter executed by TW, Six Flags and the Acquisition Parties on November 30, 2009.

1.156 **TW Guaranty Claim** means any Claim that is an SFTP TW Guaranty Claim, SFO TW Guaranty Claim or SFI TW Guaranty Claim.

1.157 **Unimpaired** means, with respect to a Claim or Preconfirmation Equity Interest, that such Claim or Preconfirmation Equity Interest is not Impaired as a result of being either (a) Reinstated or (b) paid in full in Cash under this Plan.

1.158 **Unliquidated Claim** means any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law or otherwise, as of the date on which such Claim is asserted or sought to be estimated.

1.159 **Unsecured Claim** means any Claim against the Debtors other than an Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Secured Tax Claim, Other Secured Claim, Prepetition Credit Agreement Claim, Subordinated Securities Claim or Intercompany Claim, but shall not include any claim that is disallowed or released, whether by operation of law, Final Order, written agreement, the provisions of this Plan or otherwise.

1.160 **Unsecured Notes** means, collectively, the 2010 Notes, the 2013 Notes, the 2014 Notes, the 2015 Notes, and the 2016 Notes.

1.161 **Unsecured Notes Indentures** means, collectively, the 2010 Notes Indenture, the 2013 Notes Indenture, the 2014 Notes Indenture, the 2015 Notes Indenture, and the 2016 Notes Indenture.

1.162 **U.S. Trustee** means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in Region 3.

1.163 **Voting Record Date** means December 2, 2009.

**B.     Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section, article, schedule or exhibit references in

the Plan are to the respective section in, article of or schedule or exhibit, to the Plan or the Plan Supplement, as the same may be amended, waived or modified from time to time. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan. A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II
## PROVISIONS FOR PAYMENT OF ADMINISTRATIVE
## EXPENSES AND PRIORITY TAX CLAIMS

### 2.1    *Administrative Expense Claims.*

Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors in Possession shall be paid in full and performed by the Debtors in Possession or Reorganized Debtors, as the case may be, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions; *provided, further*, that if any such ordinary course expense is not billed or a request for payment is not made within ninety days after the Effective Date, claims for payment of such an ordinary course expense shall be barred. The reasonable, documented and unpaid fees and expenses of the Backstop Purchasers, including attorneys' fees, shall be Allowed Administrative Expense Claims and shall be paid without the need for further filing of a proof of Claim and without the need for further Bankruptcy Court approval.

### 2.2    *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or the Reorganized Debtors, (a) on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to such Allowed Priority Tax Claim or, (b) commencing on the Effective Date, or as soon thereafter as is practicable, and continuing over a period not exceeding five years from and after the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject to the option of the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be

unreasonably withheld), or Reorganized Debtors to prepay the entire amount of the Allowed Priority Tax Claim. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.

2.3    *Professional Compensation and Reimbursement Claims.*

All entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under section 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is forty-five days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

## ARTICLE III
## CLASSIFICATION OF CLAIMS AND
## PRECONFIRMATION EQUITY INTERESTS, IMPAIRMENT AND VOTING

The following table (i) designates the classes of Claims against and Preconfirmation Equity Interests in the Debtors, (ii) specifies the classes of Claims and Preconfirmation Equity Interests that are Impaired by the Plan and therefore are deemed to reject the Plan or are entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) specifies the classes of Claims and Preconfirmation Equity Interests that are Unimpaired by the Plan and therefore are deemed to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 4 | SFTP Prepetition Credit Agreement Claims | Unimpaired | No (deemed to accept) |
| 5 | SFTP TW Guaranty Claims | Impaired | Yes |
| 6 | SFTP Partnership Parks Claims | Unimpaired | No (deemed to accept) |
| 7 | SFTP and SFTP Subsidiary Unsecured Claims | Unimpaired | No (deemed to accept) |
| 8 | SFO Prepetition Credit Agreement Claims | Impaired | Yes |
| 9 | SFO TW Guaranty Claims | Impaired | Yes |
| 10 | SFO Partnership Parks Claims | Unimpaired | No (deemed to accept) |
| 11 | SFO Unsecured Claims | Impaired | Yes |
| 12 | SFI TW Guaranty Claims | Impaired | Yes |

| 13 | SFI Partnership Parks Claims | Unimpaired | No (deemed to accept) |
|----|------------------------------|------------|------------------------|
| 14 | SFI Unsecured Claims | Impaired | Yes |
| 15 | Funtime, Inc. Unsecured Claims | Impaired | No (deemed to reject) |
| 16 | Subordinated Securities Claims | Impaired | No (deemed to reject) |
| 17 | Preconfirmation Subsidiary Equity Interests | Unimpaired | No (deemed to accept) |
| 18 | Preconfirmation SFO Equity Interests | Impaired | No (deemed to reject) |
| 19 | Preconfirmation SFI Equity Interests | Impaired | No (deemed to reject) |

# ARTICLE IV
## PROVISIONS FOR TREATMENT OF CLAIMS AND
## PRECONFIRMATION EQUITY INTERESTS

4.1 *Other Priority Claims (Class 1)*.

(a) Impairment and Voting. Class 1 is Unimpaired by the Plan. Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) Distributions. Except to the extent that a holder of an Allowed Other Priority Claim agrees to a different treatment, each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim on the later of the Distribution Date and the date such Allowed Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.

4.2 *Secured Tax Claims (Class 2)*.

(a) Impairment and Voting. Class 2 is Unimpaired by the Plan. Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) Distributions. Except to the extent that a holder of an Allowed Secured Tax Claim agrees to a different treatment, each holder of an Allowed Secured Tax Claim shall receive, at the option of the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or the Reorganized Debtors, (i) on the Distribution Date, or as soon thereafter as is practicable, Cash in an amount equal to such Allowed Secured Tax Claim or, (ii) commencing on the Distribution Date, or as soon thereafter as is practicable, and continuing over a period not exceeding five years from and after the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject to the option of the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or Reorganized Debtors to prepay the entire amount of the Allowed Secured Tax Claim.

### 4.3 *Other Secured Claims (Class 3)*

(a) <u>Impairment and Voting.</u> Class 3 is Unimpaired by the Plan. Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, at the option of the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or the Reorganized Debtors, (i) on the Distribution Date or as soon thereafter as is practicable, each Allowed Other Secured Claim shall be Reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Distribution Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Distribution Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

### 4.4 *SFTP Prepetition Credit Agreement Claims (Class 4)*

(a) <u>Impairment and Voting.</u> Class 4 is Unimpaired by the Plan. Each holder of an SFTP Prepetition Credit Agreement Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> On the Distribution Date, each holder of an Allowed Prepetition Credit Agreement Claim shall be paid in full, in Cash, in complete satisfaction of such SFTP Prepetition Credit Agreement Claim.

### 4.5 *SFTP TW Guaranty Claims (Class 5)*

(a) <u>Impairment and Voting.</u> Class 5 is Impaired by the Plan. Each holder of an SFTP TW Guaranty Claim is entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> On the Effective Date, SFTP's guaranty of the obligations under the Existing TW Loan shall be replaced by an Amended TW Guaranty Agreement executed by Reorganized SFTP in respect of the obligations under the Existing TW Loan.

### 4.6 *SFTP Partnership Parks Claims (Class 6)*

(a) <u>Impairment and Voting.</u> Class 6 is Unimpaired by the Plan. Each holder of an SFTP Partnership Parks Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> On the Effective Date, SFTP's guaranty of the obligations under the Subordinated Indemnity Agreement and the Continuing Guarantee Agreements shall be affirmed and continued by Reorganized SFTP.

### 4.7 *SFTP and SFTP Subsidiary Unsecured Claims (Class 7).*

(a) <u>Impairment and Voting.</u> Class 7 is Unimpaired by the Plan. Each holder of an Allowed SFTP and SFTP Subsidiary Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Except to the extent that a holder of an Allowed SFTP and SFTP Subsidiary Unsecured Claim agrees to a different treatment, at the option of the Majority Backstop Purchasers, or the Reorganized Debtors, in consultation with the Majority Bankruptcy Purchasers, (i) each Allowed SFTP and SFTP Subsidiary Unsecured Claim shall be Reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each holder of an Allowed SFTP and SFTP Subsidiary Unsecured Claim shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

### 4.8 *SFO Prepetition Credit Agreement Claims (Class 8).*

(a) <u>Impairment and Voting.</u> Class 8 is Impaired by the Plan. Each holder of an SFO Prepetition Credit Agreement Claim is entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> On the Effective Date, SFO's guaranty of the obligations under the Prepetition Credit Agreement shall be discharged. All Liens and security interests granted to secure such obligations, whether prior to or during the Reorganization Cases, shall be terminated and of no further force or effect.

### 4.9 *SFO TW Guaranty Claims (Class 9).*

(a) <u>Impairment and Voting.</u> Class 9 is Impaired by the Plan. Each holder of a SFO TW Guaranty Claim is entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> On the Effective Date, SFO's guaranty of the obligations under the Existing TW Loan shall be replaced by an Amended TW Guaranty Agreement executed by Reorganized SFO in respect of the obligations under the Existing TW Loan.

### 4.10 *SFO Partnership Parks Claims (Class 10).*

(a) <u>Impairment and Voting.</u> Class 10 is Unimpaired by the Plan. Each holder of a SFO Partnership Parks Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> On the Effective Date, SFO's guaranty of the obligations under the Subordinated Indemnity Agreement and the Continuing Guarantee Agreements shall be affirmed and continued by Reorganized SFO.

### 4.11   *SFO Unsecured Claims (Class 11)*.

(a)   <u>Impairment and Voting</u>.  Class 11 is Impaired by the Plan. Each holder of an SFO Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  On the Distribution Date, each holder of an Allowed SFO Unsecured Claim shall receive its Distribution Pro Rata Share of approximately 22.89% of the New Common Stock[2], subject to dilution by the Long-Term Incentive Plan, in full and complete satisfaction of such SFO Unsecured Claim.  Additionally, each Accepting SFO Noteholder shall have the limited right to participate in the Offering pursuant to the terms of the Offering Procedures to purchase its Limited Offering Pro Rata Share of up to $450 million of New Common Stock, representing approximately 69.77% of the New Common Stock (including New Common Stock to be acquired by the Backstop Purchasers in the Offering), subject to dilution by the Long-Term Incentive Plan.[3]  Notwithstanding the foregoing, the Reorganized Debtors shall pay, on or as soon as reasonably practicable after the Effective Date, all Indenture Trustee Fees and Expenses arising under the 2016 Notes Indenture, in its capacity as Indenture Trustee thereunder, and the fees and expenses of legal and financial advisors of each of the Backstop Purchasers as provided in the Approval Order and the Backstop Commitment Agreement, in full in Cash, without application to or approval of the Bankruptcy Court and without a reduction to the recoveries of the holders of the 2016 Notes.  Notwithstanding the foregoing, to the extent any Indenture Trustee Fees and Expenses arising under the 2016 Notes Indenture are not paid (including, without limitation, any fees or expenses incurred in connection with any unresolved litigation relating to any disputed claims), the Indenture Trustee for the 2016 Notes may assert its charging lien against any recoveries received on behalf of its holders for payment of such unpaid amounts.

### 4.12   *SFI TW Guaranty Claims (Class 12)*.

(a)   <u>Impairment and Voting</u>.  Class 12 is Impaired by the Plan.  Each holder of a SFI TW Guaranty Claim is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  On the Effective Date, SFI's guaranty of the obligations under the Existing TW Loan shall be replaced by an Amended TW Guaranty

---

[2]      This amount does not attribute any value associated with the SFO Note Guaranty Claim, which value is attributed in Class 14 (SFI Unsecured Claims).

[3]      The net affect of the Offering, (i) assuming the Offering is fully subscribed for by Eligible Holders, and (ii) as a result of the application of each Eligible Holder's Limited Offering Pro Rata Share, all Eligible Holders (including Backstop Purchasers solely in their capacity as Eligible Holders) would acquire approximately 25% of the New Common Stock issued in the Offering (or approximately 5%, excluding purchases by Backstop Purchasers that are Eligible Holders), and the Backstop Purchasers would acquire approximately 75% of such New Common Stock (or approximately 95%, including purchases affected by Backstop Purchasers in their capacity as Eligible Holders).

Agreement executed by Reorganized SFI in respect of the obligations under the Existing TW Loan.

### 4.13   *SFI Partnership Parks Claims (Class 13).*

(a)      Impairment and Voting. Class 13 is Unimpaired by the Plan. Each holder of a SFI Partnership Parks Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)      Distributions.   On the Effective Date, SFI's guaranty of the obligations under the Subordinated Indemnity Agreement shall be affirmed and continued by Reorganized SFI.

### 4.14   *SFI Unsecured Claims (Class 14).*

(a)      Impairment and Voting. Class 14 is Impaired by the Plan. Each holder of a SFI Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)      Distributions. On the Distribution Date, each holder of an Allowed SFI Unsecured Claim shall receive its Distribution Pro Rata Share of approximately 7.34% of the New Common Stock[4], subject to dilution by the Long-Term Incentive Plan, in full and complete satisfaction of such SFI Unsecured Claim.  Notwithstanding the foregoing, the Reorganized Debtors shall pay, on or as soon as reasonably practicable after the Effective Date, all Indenture Trustee Fees and Expenses arising under the 2010 Notes Indenture, the 2013 Notes Indenture, the 2014 Notes Indenture and the 2015 Notes Indenture, in their capacities as Indenture Trustee thereunder, in full in Cash, without application to or approval of the Bankruptcy Court and without a reduction to the recoveries of the holders of the SFI Unsecured Claims. Notwithstanding the foregoing, to the extent any Indenture Trustee Fees and Expenses arising under the 2010 Notes Indenture, the 2013 Notes Indenture, the 2014 Notes Indenture and the 2015 Notes Indenture are not paid (including, without limitation, any fees or expenses incurred in connection with any unresolved litigation relating to any disputed claims), the Indenture Trustee for such notes may assert its charging lien against any recoveries received on behalf of its holders for payment of such unpaid amounts.

### 4.15   *Funtime, Inc. Unsecured Claims (Class 15).*

(a)      Impairment and Voting. Class 15 is Impaired by the Plan. Each holder of Funtime, Inc. Unsecured Claims is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(b)      Distributions. Each holder of a Funtime, Inc. Unsecured Claim shall not receive or retain any interest or property under the Plan on account of such Funtime, Inc. Unsecured Claim.

---

[4]      This amount includes the value attributed to the SFO Note Guaranty Claim.

4.16   *Subordinated Securities Claims (Class 16).*

(a)   Impairment and Voting. Class 16 is Impaired by the Plan. Each holder of a Subordinated Securities Claim is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions. Each holder of an Allowed Subordinated Securities Claim will not receive or retain any interest or property under the Plan on account of such Allowed Subordinated Securities Claim. The treatment of Subordinated Securities Claims under the Plan is in accordance with and gives effect to the provisions of section 510(b) of the Bankruptcy Code.

4.17   *Preconfirmation Subsidiary Equity Interests (Class 17).*

(a)   Impairment and Voting. Class 17 is Unimpaired by the Plan. Each holder of a Preconfirmation Subsidiary Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions. On the Effective Date, Preconfirmation Subsidiary Equity Interests shall be Reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

4.18   *Preconfirmation SFO Equity Interests (Class 18).*

(a)   Impairment and Voting. Class 18 is Impaired by the Plan. Each holder of a Preconfirmation SFO Equity Interest is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions. On the Effective Date, the Preconfirmation SFO Equity Interests shall be cancelled and the holders of Preconfirmation SFO Equity Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Preconfirmation SFO Equity Interests under the Plan.

4.19   *Preconfirmation SFI Equity Interests (Class 19).*

(a)   Impairment and Voting. Class 19 is Impaired by the Plan. Each holder of a Preconfirmation SFI Equity Interest is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions. On the Effective Date, the Preconfirmation SFI Equity Interests shall be cancelled and the holders of Preconfirmation SFI Equity Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Preconfirmation SFI Equity Interests under the Plan.

4.20   *Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims.*

Distributions under the Plan to each holder of an Allowed Insured Claim shall be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is within the Debtors' self-insured retention. Amounts in excess of the applicable self-insured retention amount shall be recoverable only from the available Insurer and the Debtors shall be discharged to the extent of any such excess. Nothing in this Section 4.20 shall constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any entity may hold against any other entity, including the Debtors' Insurers.

4.21   *Special Provision Regarding Unimpaired Claims.*

Except as otherwise explicitly provided in this Plan, nothing herein shall be deemed to be a waiver or relinquishment of any rights, counterclaims or defenses the Debtors, the Reorganized Debtors or the Majority Backstop Purchasers may have, whether at law or in equity, with respect to any Unimpaired Claim.

## ARTICLE V
## MEANS OF IMPLEMENTATION

5.1   *Intercompany Claims.*

Notwithstanding anything to the contrary herein, Intercompany Claims, at the election of the Reorganized Debtor, and with the consent of Time Warner (to the extent adversely affected thereby and which consent shall not be unreasonably withheld) and the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), holding such Claim shall be (i) adjusted, released, waived and/or discharged as of the Effective Date, (ii) contributed to the capital of the obligor, or (iii) Reinstated and left Unimpaired. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Reorganized Debtors.

5.2   *Restructuring and Other Transactions.*

(a)   Restructuring Transactions. On the Effective Date, the following transactions ("Restructuring Transactions") shall be effectuated in the order set forth below:

(i)   Simultaneously, (A) all of the Preconfirmation Equity Interests in SFI and SFO will be cancelled, and (B) in consideration for SFI making available the New Common Stock to satisfy certain of SFO's obligations to its creditors and certain of SFI's obligations to its creditors, all of the new equity interests in Reorganized SFO will be issued to Reorganized SFI and all of the new equity interests in Reorganized SFTP will be issued to Reorganized SFO on behalf of the holders of Allowed SFO Unsecured Claims and Allowed SFI Unsecured Claims, respectively, in full satisfaction of their Claims (and in proportion to the relative distributions to be made on account of their Claims); and

(ii)   thereafter, Reorganized SFI will, on behalf of SFO and SFI, contribute all of the New Common Stock in Reorganized SFI to the applicable Disbursing Agent for distribution on behalf of SFO and SFI to the holders of Allowed SFO Unsecured Claims and

Allowed SFI Unsecured Claims, respectively, and in full and complete satisfaction of the Reorganized Debtors' obligations under Sections 4.11 and 4.14 of this Plan.

(b) <u>Cancellation of Existing Securities and Agreements</u>. Except (i) as otherwise expressly provided in the Plan, (ii) with respect to Executory Contracts or unexpired leases that have been assumed by the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), (iii) for purposes of evidencing a right to distributions under the Plan, or (iv) with respect to any Claim that is Reinstated and rendered Unimpaired under the Plan, on the Effective Date, the Prepetition Credit Agreement, the Unsecured Notes Indentures and all Unsecured Notes issued thereunder, all Preconfirmation SFI Equity Interests, Preconfirmation SFO Equity Interests and other instruments evidencing any Claims against the Debtors, Preconfirmation SFO Equity Interests or Preconfirmation SFI Equity Interests shall be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors thereunder shall be discharged; *provided, however*, that the Unsecured Notes and each Unsecured Note Indenture shall continue in effect solely for the purposes of (i) allowing each Indenture Trustee or its agents to make distributions to holders of Unsecured Notes; (ii) allowing holders of the Unsecured Notes to receive distributions hereunder; and (iii) preserving the rights and liens of each Indenture Trustee with respect to its respective Indenture Trustee Fees and Expenses to the extent not otherwise paid. An Unsecured Note Indenture shall terminate completely upon the completion of all distributions to the holders of the applicable Unsecured Notes and the payment in full of the applicable Indenture Trustee Fees and Expenses.

(c) <u>Surrender of Existing Securities</u>. Subject to the rights of each Indenture Trustee to assert its respective charging lien to the extent its respective Indenture Trustee Fees and Expenses are not paid pursuant to the Plan, each holder of the Unsecured Notes shall surrender such note(s) to the Indenture Trustee, or in the event such note(s) are held in the name of, or by a nominee of, the Depository Trust Company, the Disbursing Agent shall seek the cooperation of the Depository Trust Company to provide appropriate instructions to the Indenture Trustee. No distributions under the Plan shall be made for or on behalf of any such holder unless and until such note is received by the Indenture Trustee or appropriate instructions from the Depository Trust Company shall be received by the Indenture Trustee, or the loss, theft or destruction of such note is established to the reasonable satisfaction of the Indenture Trustee, which satisfaction may require such holder to (i) submit a lost instrument affidavit and an indemnity bond and (ii) hold the Debtors, the Reorganized Debtors, the Majority Backstop Purchasers, the Disbursing Agent and Indenture Trustee harmless in respect of such note and any distributions made in respect thereof. Upon compliance with this Section 5.2(c) by a holder of any Unsecured Note, such holder shall, for all purposes under the Plan, be deemed to have surrendered such note. Any holder of Unsecured Notes that fails to surrender such note(s) or satisfactorily explain its nonavailability to the Indenture Trustee within one year of the Effective Date shall be deemed to have no further Claim against the Debtors and the Reorganized Debtors (or their property) or the Indenture Trustee in respect of such Claim and shall not participate in any distribution under the Plan.

(d) <u>Issuance of New Common Stock</u>. The issuance by Reorganized SFI of the New Common Stock on and after the Distribution Date is hereby authorized without the need for any further corporate action and without any further action by holders of Claims or

Preconfirmation Equity Interests. As provided in the Postconfirmation Organizational Documents, which are incorporated herein by reference, New Common Stock may be issued in more than one series, shall be identical in all respects, and shall have equal rights and privileges. In compliance with section 1123(a)(6) of the Bankruptcy Code, the Postconfirmation Organizational Documents shall provide that Reorganized SFI shall not issue nonvoting equity securities to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code.

(e) <u>Incurrence of New Indebtedness</u>. The Reorganized Debtors' entry into the Exit Facility Loans and the New TW Loan and the incurrence of indebtedness under the Exit Term Loan on the Effective Date and the incurrence of the indebtedness under the New TW Loan on any funding date, is hereby authorized without the need for any further corporate action, except as set forth in the Exit Facility Loans or the New TW Loan, as the case may be, and without any further action by holders of Claims or equity interests. Notwithstanding the foregoing, the Exit Facility Loan Documents and the New TW Loan Documents as described in the Commitment Parties' Commitment Papers and the TW Commitment Papers, respectively, shall be subject to the approval of Time Warner (to the extent set forth in the TW Commitment Papers); it being acknowledged and agreed that the Majority Backstop Purchasers shall have the right to (i) approve any term or provision in the Exit Facility Loan Documents or the New TW Loan Documents that constitutes a material change to any term or condition set forth in the Commitment Parties' Commitment Papers or the TW Commitment Papers, as applicable, and (ii) approve all terms and conditions of the Exit Facility or the New TW Loan not set forth, or left as "to be determined," "customary" or similar descriptions therein, in the Commitment Parties' Commitment Papers or the TW Commitment Papers, as applicable.

5.3    ***Exemption from Securities Laws.***

Subject to Section 5.4 hereof, and to the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance under the Plan of the New Common Stock and any other securities pursuant to this Plan and any subsequent sales, resales, transfers, or other distributions of such New Common Stock or other securities shall be exempt from registration under the Securities Act, any other federal or state securities law registration requirements, and all rules and regulations promulgated thereunder; provided, however, that New Common Stock issued pursuant to the Offering will not be exempt from registration pursuant to section 1145 of the Bankruptcy Code. Instead, such New Common Stock will be exempt from registration under the Securities Act by virtue of section 4(2) thereof and Regulation D promulgated thereunder. Thus, the New Common Stock being issued in the Offering is "restricted securities" within the meaning of Rule 144 under the Securities Act and accordingly may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except in transactions that are exempt from, or in transactions not subject to, the registration requirements of the Securities Act and in compliance with any applicable state securities laws. The New Common Stock issued in the Offering shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

5.4    ***Registration Rights Agreement and Securities Exchange Listing.***

On the Effective Date, Reorganized SFI expects to enter into a registration rights agreement (the "Registration Rights Agreement"), in form and substance acceptable to the Majority Backstop Purchasers, with each holder of greater than 5%, on a fully diluted basis, of the New Common Stock. Pursuant to the Registration Rights Agreement, holders collectively owning at least 20% of the outstanding shares of the New Common Stock party thereto would have the right to require Reorganized SFI to effect registered, underwritten secondary offerings of such holders' New Common Stock acquired pursuant to the Plan or the Offering, on terms and conditions to be negotiated and reflected in such Registration Rights Agreement. Holders of the New Common Stock entitled to demand such registrations shall be entitled to request an aggregate of three such registrations (or such provisions that the Postconfirmation Board adopts), and shall have customary piggyback registration rights. A form of the Registration Rights Agreement will be included in the Plan Supplement.

### 5.5 *Continued Corporate Existence*

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except with respect to the Postconfirmation Organizational Documents (or other formation documents) that are amended by the Plan, the Plan Supplement or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval. Notwithstanding the foregoing, on or as of the Effective Date, or as soon as practicable thereafter, and without the need for any further action, the Reorganized Debtors may: (i) cause any or all of the Reorganized Debtors to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, or (iii) engage in any other transaction in furtherance of the Plan.

### 5.6 *The Offering*

(a) <u>Use of the Offering Proceeds</u>. The proceeds of the Offering will be used to make payments required to be made on and after the Effective Date under the Plan, including, without limitation, repayment of all amounts owing under the Prepetition Credit Agreement.

(b) <u>The Offering Procedures</u>. Subject to the terms of the Offering Procedures, Accepting SFO Noteholders will be entitled to subscribe for and acquire their Limited Offering Pro Rata Share of $450 million in aggregate of New Common Stock.

(c) <u>The Offering Backstop</u>. The Backstop Purchasers have agreed to backstop the Offering in accordance with the terms of the Backstop Commitment Agreement.

## ARTICLE VI
## PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS

### 6.1 *Voting of Claims*

Each holder of an Allowed Claim in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Article III and Article IV of this Plan, shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order of the Bankruptcy Court.

### 6.2 *Nonconsensual Confirmation.*

If any impaired Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), reserve the right to amend the Plan in accordance with Section 14.4 of this Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both. With respect to impaired Classes of claims that are deemed to reject the Plan, the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

### 6.3 *Distributions on Allowed Unsecured Claims.*

Distributions with respect to holders of Allowed Unsecured Claims shall only be made on each Distribution Date. All Allowed Unsecured Claims held by a single creditor against a single Debtor shall be aggregated and treated as a single Claim against such Debtor. At the written request of the Reorganized Debtors or the Disbursing Agent, any creditor holding multiple Allowed Unsecured Claims shall provide to the Reorganized Debtors or the Disbursing Agent, as the case may be, a single address to which any distributions shall be sent.

### 6.4 *Date of Distributions.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 6.5 *Disbursing Agent.*

All distributions under the Plan shall be made by Reorganized SFI as Disbursing Agent or such other entity designated by Reorganized SFI as a Disbursing Agent. No Disbursing Agent shall be required to give any bond or surety or other security for the performance of their duties.

### 6.6 *Expenses of the Disbursing Agent.*

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent (including, without limitation, taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

### 6.7    *Rights and Powers of Disbursing Agent*

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof. In furtherance of the rights and powers of the Disbursing Agent, the Disbursing Agent shall have no duty or obligation to make distributions to any holder of an Allowed Claim unless and until such holder executes and delivers, in a form acceptable to the Disbursing Agent, any documents applicable to such distributions.

### 6.8    *Delivery of Distributions*

(a)    Distributions to Last Known Address. Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or its agents, as applicable, unless the Debtors or Reorganized Debtors have been notified in writing of a change of address by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules. Nothing in this Plan shall require the Reorganized Debtors to attempt to locate any holder of an Allowed Claim.

(b)    Distributions to Indenture Trustee. The Indenture Trustee shall be the Disbursing Agent for the Unsecured Notes Claims. Accordingly, distributions for the benefit of the holders of such Claims shall be made to the Indenture Trustee under the applicable Unsecured Notes Indenture. The Indenture Trustees shall, in turn, promptly administer the distribution to the holders of such Allowed Claims in accordance with the Plan and the applicable Unsecured Notes Indenture. The distribution of New Common Stock to the respective Indenture Trustees shall be deemed a distribution to the respective holder of an Allowed Claim. Upon delivery of the distributions required under the Plan to the Indenture Trustee, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

(c)    Distributions to Prepetition Agent. The Prepetition Agent shall be the Disbursing Agent for the holders of Class 4 SFTP Prepetition Credit Agreement Claims and Class 8 SFO Prepetition Credit Agreement Claims. Accordingly, distributions for the benefit of the holders of Class 4 and Class 8 Claims shall be made to the Prepetition Agent. The Prepetition Agent shall, in turn, promptly administer the distribution to the holders of Allowed Claims in Class 4 and Class 8, in accordance with the Plan and the Prepetition Credit Agreement. The issuance, execution and delivery of Exit Facility Loan Documents, shall be deemed a

distribution to the respective holders of Allowed Class 4 and Class 8 Claims. Upon delivery of the distributions required under the Plan as provided in this paragraph, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

### 6.9 *Unclaimed Distributions*

All distributions under the Plan that are unclaimed for a period of one year after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Reorganized Debtors and any entitlement of any holder of any Claims to such distributions shall be extinguished and forever barred.

### 6.10 *Distribution Record Date*

The Claims register shall be closed on the Distribution Record Date, and any subsequent transfer of any Claim shall be prohibited. The Debtors and the Reorganized Debtors shall have no obligation to recognize any transfer of any such Claims occurring after the close of business on such date.

### 6.11 *Manner of Payment*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements. All distributions of Cash, New Common Stock and Subscription Rights (as such term is defined in the Offering Procedures), as applicable, to the creditors of each of the Debtors under the Plan shall be made by, or on behalf of, the applicable Debtor.

### 6.12 *No Fractional Distributions*

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional shares. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number, with no further payment therefor. The total number of authorized shares of New Common Stock to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

### 6.13 *Limitation on Cash Distributions*

No payment of Cash less than one-hundred dollars ($100) shall be made to any holder of an Allowed Claim unless a request therefor is made in writing to the Reorganized Debtors.

### 6.14 *Setoffs and Recoupment*

The Debtors may, but shall not be required to, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), setoff against or

recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such claim they may have against such claimant.

6.15   *Allocation of Plan Distributions Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

## ARTICLE VII
## PROCEDURES FOR TREATING DISPUTED
## CLAIMS UNDER PLAN OF REORGANIZATION

7.1   *Objections.*

As of the Effective Date, objections to, and requests for estimation of, Administrative Expense Claims and Claims against the Debtors may be interposed and prosecuted only by the Reorganized Debtors. Such objections and requests for estimation shall be served on the respective claimant and filed with the Bankruptcy Court on or before the latest of: (i) one hundred twenty days after the Effective Date or (ii) such later date as may be fixed by the Bankruptcy Court (the "Objection Deadline"); *provided, however*, that with respect to Claims that, as of the Objection Deadline, are subject to a pending claim objection, contested matter, or adversary proceeding (an "Initial Objection") wherein the Reorganized Debtors' objection to such claim is ultimately denied, the Objection Deadline shall be extended to the latter of: (a) sixty days from the date on which the Bankruptcy Court enters an order denying such Initial Objection or (b) sixty days from the date on which any appellate court enters a Final Order reversing or vacating an order of the Bankruptcy Court granting such Initial Objection; *provided, further*, that with respect to Claims that (i) are filed (whether as an amended Claim, new Claim, or otherwise) after the Effective Date, and (ii) that are not otherwise subject to adjustment, expunction or disallowance pursuant to Sections 7.2, 7.8, 7.9, 7.11 and 7.12 of this Plan, the Objection Deadline shall be one hundred twenty days after the date on which such Claim was filed. Nothing herein shall affect the Debtors' or the Reorganized Debtors' ability to amend the Schedules in accordance with the Bankruptcy Code and the Bankruptcy Rules.

7.2   *Adjustment to Certain Claims Without a Filed Objection.*

Any Claim that has been settled, paid and satisfied, or amended and superseded, may be adjusted or expunged on the Claims register by the Reorganized Debtors without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, all Claims filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims register as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit, without any further notice to or

action, order or approval of the Bankruptcy Court.

### 7.3 *No Distributions Pending Allowance.*

Notwithstanding any other provision hereof, if any portion of a Claim or Administrative Expense Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim or Administrative Expense Claim unless and until such Disputed Claim or Disputed Administrative Expense Claim becomes Allowed.

### 7.4 *Distributions After Allowance.*

To the extent that a Disputed Claim or Disputed Administrative Expense Claim ultimately becomes an Allowed Claim or Allowed Administrative Expense Claim, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Administrative Expense Claim in accordance with the provisions of the Plan.

### 7.5 *Resolution of Administrative Expense Claims and Claims.*

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Expense Claims and Claims against the Debtors and to compromise, settle or otherwise resolve any Disputed Administrative Expense Claims and Disputed Claims against the Debtors without approval of the Bankruptcy Court.

### 7.6 *Estimation of Claims.*

The Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 7.7 *Interest.*

To the extent that a Disputed Claim becomes an Allowed Claim after the

Effective Date, the holder of such Claim shall not be entitled to any interest thereon, except as may be required by Final Order, or applicable bankruptcy and non-bankruptcy law.

### 7.8 *Disallowance of Certain Claims.*

Any Claims held by Persons from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or by a Person that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and such Persons may not receive any distributions on account of their Claims until such time as such Causes of Action against such Persons have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by that Person have been turned over or paid to the Reorganized Debtors.

### 7.9 *Indenture Trustee as Claim Holder.*

Consistent with Bankruptcy Rule 3003(c), the Reorganized Debtors shall recognize proofs of Claim timely filed by any Indenture Trustee in respect of any Claims under the Unsecured Notes Indentures. Accordingly, any Claim arising under the Unsecured Notes Indentures, proof of which is filed by the registered or beneficial holder of Unsecured Notes, shall be disallowed as duplicative of the Claim of the applicable Indenture Trustee, without any further action of the Bankruptcy Court.

### 7.10 *Offer of Judgment.*

The Reorganized Debtors are authorized to serve upon a holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment. To the extent the holder of a Claim must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors are entitled, in consultation with the Majority Backstop Purchasers, to set off such amounts against the amount of any distribution to be paid to such holder without any further notice to or action, order, or approval of the Bankruptcy Court.

### 7.11 *Amendments to Claims.*

On or after the Effective Date, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors and any such new or amended Claim filed without prior authorization shall be deemed disallowed in full and expunged without any further action.

### 7.12 *Claims Paid and Payable by Third Parties.*

A Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.

To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged from the Claims register without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### 7.13 *Personal Injury Claims.*

All Personal Injury Claims are Disputed Claims. No distributions shall be made on account of any Personal Injury Claim unless and until such Claim is liquidated and becomes and Allowed Claim. Any Personal Injury Claim which has not been liquidated prior to the Effective Date and as to which a proof of claim was timely filed in the Reorganization Cases, shall be determined and liquidated in the administrative or judicial tribunal in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction.

## ARTICLE VIII
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 8.1 *Assumption or Rejection of Executory Contracts and Unexpired Leases.*

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all Executory Contracts and unexpired leases that exist between the Debtors and any person or entity shall be deemed assumed by the Debtors as of the Effective Date, except for any Executory Contract or unexpired lease (1) that has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (2) as to which a motion for approval of the rejection of such Executory Contract or unexpired lease has been filed and served prior to the Effective Date, or (3) that is specifically designated as a contract or lease to be rejected on Schedules 8.1(A) (Executory Contracts) or 8.1(B) (Unexpired Leases), which schedules shall be contained in the Plan Supplement; *provided, however,* that the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), reserve the right, on or prior to the Effective Date, to amend Schedules 8.1(A) and 8.1(B) to delete any Executory Contract or unexpired lease therefrom or add any Executory Contract or unexpired lease thereto, in which event such Executory Contract(s) or unexpired lease(s) shall be deemed to be, respectively, either assumed or rejected as of the Effective Date. The Debtors shall provide notice of any amendments to Schedules 8.1(A) and/or 8.1(B) to the parties to the Executory Contracts and unexpired leases affected thereby. The listing of a document on Schedules 8.1(A) or 8.1(B) shall not constitute an admission by the Debtors or the Majority Backstop Purchasers that such document is an Executory Contract or an unexpired lease or that the Debtors have any liability thereunder.

### 8.2 *Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.*

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the Executory Contracts and unexpired leases assumed pursuant to

Section 8.1 of this Plan, and of the rejection of the Executory Contracts and unexpired leases rejected pursuant to Section 8.1 of this Plan.

### 8.3    *Inclusiveness.*

Unless otherwise specified on Schedules 8.1(A) or 8.1(B) of the Plan Supplement, each Executory Contract and unexpired lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 8.1(A) or 8.1(B).

### 8.4    *Cure of Defaults.*

Except to the extent that a different treatment has been agreed to by the parties, within thirty days after the Effective Date, the Reorganized Debtors shall cure any and all undisputed defaults under any Executory Contract or unexpired lease assumed by the Debtors pursuant to the Plan, in accordance with section 365(b) of the Bankruptcy Code. All disputed defaults that are required to be cured shall be cured either within thirty days of the entry of a Final Order determining the amount, if any, of the Reorganized Debtors' liability with respect thereto, or as may otherwise be agreed to by the parties. Notwithstanding Section 8.1 hereof, the Debtors, subject to the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), shall retain their rights to reject any of their Executory Contracts or unexpired leases that are the subject of a dispute concerning amounts necessary to cure any defaults, in which event the Reorganized Debtors shall make their election to reject such Executory Contracts and unexpired leases within thirty days of the entry of a Final Order determining the amount required to be cured.

### 8.5    *Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.*

Proofs of Claim for damages arising out of the rejection of an Executory Contract or unexpired lease must be filed with the Bankruptcy Court and served upon the attorneys for the Debtors or, on and after the Effective Date, the Reorganized Debtors, no later than thirty days after the later of (a) notice of entry of an order approving the rejection of such Executory Contract or unexpired lease, (b) notice of entry of the Confirmation Order, (c) notice of an amendment to Schedules 8.1(A) or 8.1(B) of the Plan Supplement (solely with respect to the party directly affected by such modification), or (d) notice of the election of the Debtors (subject to the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld)) to reject under Section 8.4 of this Plan. All such proofs of Claim not filed within such time shall be forever barred from assertion against the Debtors and their estates or the Reorganized Debtors and their property.

### 8.6    *Indemnification Obligations.*

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Petition Date to indemnify, defend, reimburse or limit the liability (i) of directors, officers or employees who are directors, officers or employees of the Debtors on or after the

Confirmation Date, respectively, against any claims or causes of action as provided in the Debtors' articles of organization, certificates of incorporation, bylaws, other organizational documents or applicable law and (ii) arising under the Prepetition Credit Agreement shall survive confirmation of the Plan, remain unaffected thereby and not be discharged, irrespective of whether such indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before or after the Petition Date.

### 8.7 *Insurance Policies.*

Unless specifically rejected by a prior order of the Bankruptcy Court, all of the Debtors' Insurance Policies which are executory, if any, and any agreements, documents or instruments relating thereto, shall be assumed under the Plan. Nothing contained in this Section 8.7 shall constitute or be deemed a waiver of any cause of action that the Debtors or Reorganized Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

Notwithstanding anything to the contrary in the Disclosure Statement, this Plan or the Confirmation Order (including, without limitation, any other provision that purports to be preemptory or supervening or grants an injunction or release): (a) nothing therein, amends, modifies, waives or impairs the terms of the insurance policies and agreements and the rights and obligations of the parties thereunder, (b) the Reorganized Debtors shall be liable for all of the Debtors' obligations and liabilities, whether now existing or hereafter arising, under the insurance policies and agreements, (c) the claims of the insurers against the Debtors arising under insurance policies and related agreements (i) shall be Allowed Administrative Expense Claims, (ii) shall be due and payable in the ordinary course of business by the Debtors (or after the Effective Date, by the Reorganized Debtors) pursuant to the terms of the insurance policies and agreements and (iii) shall not be discharged or released by the Plan or the Confirmation Order without the requirement to file or serve a request for payment of any Administrative Expense Claim, and (d) nothing therein limits, diminishes, or otherwise alters or impairs the Debtors', Reorganized Debtors' and/or the insurers' defenses, claims, causes of action, or other rights under applicable non-bankruptcy law with respect to the insurance policies and related agreements.

### 8.8 *Benefit Plans.*

Notwithstanding anything contained in the Plan to the contrary, unless rejected by order of the Bankruptcy Court, the Reorganized Debtors shall continue to honor, in the ordinary course of business, the Benefit Plans of the Debtors, including Benefit Plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated.

### 8.9 *Retiree Benefits.*

Unless rejected by order of the Bankruptcy Court, on and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits of the Debtors (within the meaning of and subject to section 1114 of the Bankruptcy Code) for the duration of the period for which the Debtors had obligated themselves

to provide such benefits and subject to the right of the Reorganized Debtors to modify or terminate such retiree benefits in accordance with the terms thereof.

# ARTICLE IX
## [INTENTIONALLY OMITTED]


# ARTICLE X
## CORPORATE GOVERNANCE AND MANAGEMENT
## OF THE REORGANIZED DEBTORS

### 10.1 *General.*

On the Effective Date, the management, control and operation of Reorganized SFI and the other Reorganized Debtors shall become the general responsibility of the Postconfirmation Board.

### 10.2 *Postconfirmation Board.*

Reorganized SFI shall have a new board of directors, which shall consist of nine directors, including the chief executive officer of Reorganized SFI. The Majority Backstop Purchasers shall select the initial directors of the Postconfirmation Board, a majority of the members of which shall be independent. All such directors shall stand for election annually. The individuals selected by the Majority Backstop Purchasers to serve on the initial Postconfirmation Board shall be listed in the Plan Supplement.

### 10.3 *Filing of Postconfirmation Organizational Documents.*

On the Effective Date, or as soon thereafter as practicable, to the extent necessary, the Reorganized Debtors will file their Postconfirmation Organizational Documents, as required or deemed appropriate, with the appropriate Persons in their respective jurisdictions of incorporation or establishment.

### 10.4 *Officers of the Reorganized Debtors.*

The officers of the Debtors immediately prior to the Effective Date will serve as the initial officers of the Reorganized Debtors on and after the Effective Date. Such officers will serve in accordance with applicable non-bankruptcy law, any employment agreement with the Reorganized Debtors and the Postconfirmation Organizational Documents.

### 10.5 *Long-Term Incentive Plan.*

Effective as of the Effective Date, the Debtors shall implement a management incentive plan for management, selected employees and directors of Reorganized SFI, providing incentive compensation in the form of stock options and/or restricted stock in Reorganized SFI equal to 10% of the New Common Stock, determined on a fully diluted basis. Immediately following the Effective Date, the aggregate allocations to management under the Long-Term

Incentive Plan shall consist of 3.75% of the New Common Stock, determined on a fully diluted basis, in the form of restricted stock, which will vest in annual installments over a four year period, commencing on the effective date of the Employment Agreements (April 1, 2009), and 3.75% of the New Common Stock, determined on a fully diluted basis and with an exercise price based on a $1.335 billion total enterprise value, in the form of options, which will only vest at the expiration of the above four year period. Such stock and options shall be allocated as follows consistent with their respective Employment Agreements:

| | Aggregate Allocation of New Common Stock in Restricted Stock | Aggregate Allocation of New Common Stock in Option |
| --- | --- | --- |
| Mark Shapiro | 1.25% | 1.25% |
| Jeffrey Speed | 0.625% | 0.625% |
| Mark Quenzel | 0.375% | 0.375% |
| Michael Antinoro | 0.375% | 0.375% |
| Louis Koskovolis | 0.375% | 0.375% |
| Andrew Schleimer | 0.375% | 0.375% |
| James Coughlin | 0.375% | 0.375% |

Of the 10% referenced above, any additional allocations (other than those specified above) following the Effective Date shall be determined by the Postconfirmation Board.

The solicitation of votes on the Plan will include, and will be deemed to be, a solicitation for approval of the Long-Term Incentive Plan and the initial grants made thereunder. Entry of the Confirmation Order will constitute approval of the Long-Term Incentive Plan.

10.6 *Directors & Officers Insurance*

In addition to the Reorganized Debtors assuming all existing common law, contractual, statutory indemnification obligations, including, without limitation, those included in the constitutive documents, of the Debtors in favor of the directors and officers as described in Section 8.2 of this Plan, the Reorganized Debtors may purchase director and officer liability insurance for the directors and officers of the Reorganized Debtors (in form and substance satisfactory to the Postconfirmation Board).

10.7 *Name of Reorganized SFI*

On the Effective Date and as reflected in the Postconfirmation Organizational Documents, Reorganized SFI shall be named "Six Flags Entertainment Corporation."

**ARTICLE XI**
**CONDITIONS PRECEDENT TO EFFECTIVE DATE**

11.1 *Conditions Precedent to Effectiveness.*

The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions are satisfied in full or waived in accordance with Section 11.2

of this Plan:

(a) The Confirmation Order, in form and substance acceptable to (i) Time Warner (to the extent set forth in the TW Commitment Papers) and (ii) the Majority Backstop Purchasers in their discretion exercised reasonably, shall have been entered by January 31, 2010, and becomes a Final Order by January 31, 2010, or, if not a Final Order, is not subject to any stay;

(b) The conditions precedent to the effectiveness of the Exit Facility Loans and the New TW Loan are satisfied or waived by the parties thereto and the Reorganized Debtors have access to funding under the Exit Facility Loans and the New TW Loan;

(c) The Offering shall have been consummated;

(d) All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably;

(e) All authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan are obtained and not revoked; and

(f) All conditions set forth in the Backstop Commitment Agreement (including, without limitation, each of the conditions set forth in the New Common Stock Term Sheet attached thereto) have been satisfied.

11.2 *Waiver of Conditions.*

Each of the conditions precedent in Section 11.1 hereof may be waived, in whole or in part, by the Debtors with the prior consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld); provided that in no event shall the conditions set forth in clauses (a)(i) and (b) of Section 11.1 be waived without the consent of Time Warner (with respect to clause (b), only to the extent set forth in the TW Commitment Papers). Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action on the part of the Bankruptcy Court.

11.3 *Satisfaction of Conditions.*

Except as expressly provided or permitted in the Plan, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. In the event that one or more of the conditions specified in Section 11.1 hereof have not occurred or otherwise been waived pursuant to Section 11.2 hereof, (a) the Confirmation Order shall be vacated, (b) the Debtors and all holders of Claims and interests, including any Preconfirmation Equity Interests, shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (c) the Debtors' obligations with respect to Claims and Preconfirmation Equity

Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Preconfirmation Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

# ARTICLE XII
# EFFECT OF CONFIRMATION

### 12.1 *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Debtors, their properties and interests in property and their operations shall be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the estates of the Debtors shall vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan. From and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules, subject to the terms and conditions of the Plan.

### 12.2 *Binding Effect.*

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Preconfirmation Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or interests, including any Preconfirmation Equity Interest, of such holder is Impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a distribution under the Plan.

### 12.3 *Discharge of Claims and Termination of Preconfirmation Equity Interests.*

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan shall terminate all Preconfirmation SFI Equity Interests and discharge all existing debts and Claims of any kind, nature or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and Preconfirmation SFI Equity Interests shall be, and shall be deemed to be, discharged and terminated, and all holders of such Claims and Preconfirmation SFI Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees or any of their assets or properties, any other or further Claim or Preconfirmation SFI Equity Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of interest and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

### 12.4 *Discharge of Debtors.*

Upon the Effective Date, in consideration of the distributions to be made under

the Plan and except as otherwise expressly provided in the Plan, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Preconfirmation SFI Equity Interest and any Affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Preconfirmation SFI Equity Interests, rights and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such Persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Preconfirmation SFI Equity Interest in the Debtors.

### 12.5 *Reservation of Causes of Action/Reservation of Rights.*

Nothing contained in the Plan shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtors, the Reorganized Debtors or the Majority Backstop Purchasers may have or may choose to assert against any Person.

### 12.6 *Exculpation.*

None of the Exculpated Parties, and the Exculpated Parties' respective current or former officers, directors, employees, accountants, financial advisors, investment bankers, agents, restructuring advisors, and attorneys, and each of their respective agents and representatives (but, in each case, solely in connection with their official capacities in the Reorganization Cases), shall have or incur any liability for any Claim, cause of action or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Reorganization Cases, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Reorganization Cases, the Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto; *provided, however*, that the foregoing shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.

### 12.7 *Limited Releases.*

**Except as otherwise expressly provided or contemplated by the Plan, the Plan Supplement or the Confirmation Order, effective as of the Confirmation Date but subject to the occurrence of the Effective Date, and in consideration of the services of and other forms of consideration being provided by (a) the Debtors; (b) the Prepetition Agent; (c) the Prepetition Lenders; (d) the Backstop Purchasers; (e) each Indenture Trustee; (f) Time Warner, other than claims arising from or with respect to ordinary course of business arrangements among SFI and its affiliates, on the one hand, and Time Warner, on the other hand, including without limitation, advertising, marketing, or similar commercial arrangements and any trade payables with respect thereto; (g) the members of the Creditors' Committee (but solely in their capacity as such); and (h) for subsections (a) through (g), each of their respective present and former directors, officers, members, employees, affiliates, agents, financial advisors, restructuring advisors, attorneys and representatives who acted in such capacities after the Petition Date (the parties set forth in subsections (a) through (h), being the "Released Parties"), the Debtors, their respective**

chapter 11 estates and the Reorganized Debtors and all holders of Claims that accept the Plan shall release, waive and discharge unconditionally and forever each of the Released Parties from any and all Claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: (i) taking place before the Petition Date in connection with or relating to any of the Debtors or any of their direct or indirect subsidiaries; and (ii) in connection with, related to, or arising out of these Reorganization Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder; provided that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct or the gross negligence of any Released Party unless such Released Party acted in good faith and in a manner that such Released Party reasonably believed to be in or not opposed to the best interests of the Debtors, and with respect to any criminal action or proceeding, had no reasonable cause to believe such Released Party's conduct was unlawful.

### 12.8    *Avoidance Actions/Objections.*

Other than any releases granted herein, by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, the Reorganized Debtors shall have the right to prosecute any and all avoidance or equitable subordination actions, recovery causes of action and objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession.

### 12.9    *Injunction or Stay*

Except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims against, or Preconfirmation SFI Equity Interests in, the Debtors are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Preconfirmation SFI Equity Interest against any of the Reorganized Debtors or any of the Released Parties, to the extent of the release provided for in Section 12.7 hereof, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor or any of the Released Parties, to the extent of the release provided for in Section 12.7 hereof, with respect to such Claim or Preconfirmation SFI Equity Interest, (c) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor or any of the Released Parties, to the extent of the release provided in Section 12.7 hereof, or against the property or interests in property of any Reorganized Debtor or any of the Released Parties with respect to such Claim or Preconfirmation SFI Equity Interest, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to any Reorganized Debtor or any of the Released Parties, to the extent of the release provided in Section 12.7 hereof, or against the property or interests in property of any Reorganized Debtor or any of the Released Parties with respect to such Claim or

Preconfirmation SFI Equity Interest and (e) pursuing any Claim released pursuant to the Plan.

Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, that are in existence on the Confirmation Date shall remain in full force and effect until the Effective Date; *provided, however*, that no such injunction or stay shall preclude enforcement of parties' rights under the Plan and the related documents.

## ARTICLE XIII
## RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Reorganization Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation:

(a)     To hear and determine pending applications for the assumption or rejection of Executory Contracts or unexpired leases and the allowance of cure amounts and Claims resulting therefrom;

(b)     To determine any and all adversary proceedings, applications and contested matters;

(c)     To hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(d)     To hear and determine any timely objections to, or requests for estimation of Disputed Administrative Expense Claims and Disputed Claims, in whole or in part;

(e)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(f)     To issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(g)     To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h)     To hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court; *provided, however*, that any dispute arising under or in connection with the Exit Facility Loans and the New TW Loan shall be determined in accordance with the governing law designated by the applicable documents;

(i)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld)), prior to the Effective Date or request by the Reorganized Debtors after the Effective Date for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

(j)     To hear and determine all disputes involving the existence, scope and nature of the discharges granted under the Plan, the Confirmation Order or the Bankruptcy Code;

(k)     To issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(l)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     To hear and determine any rights, Claims or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(n)     To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(o)     To enter a final decree closing the Reorganization Cases; and

(p)     To hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

14.1     *Effectuating Documents and Further Transactions.*

On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance reasonably satisfactory to the Majority Backstop Purchasers as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan (which consent shall not be unreasonably withheld, except with respect to any provision in the Plan or action or inaction of the Debtors pursuant to the Plan under which the consent rights of the Majority Backstop Purchasers are not subject to a reasonableness requirement, in which case the consent of the Majority Backstop Purchasers shall not be subject to a reasonableness requirement). The Reorganized Debtors are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to

the Plan.

### 14.2  *Withholding and Reporting Requirements.*

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

### 14.3  *Corporate Action.*

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the managers or directors of one or more of the Debtors or Reorganized Debtors, as the case may be, shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors or the Reorganized Debtors are incorporated or established, without any requirement of further action by the managers or directors of the Debtors or the Reorganized Debtors. On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors shall, if required, file their amended articles of organization or certificates of incorporation, as the case may be, with the Secretary of State of the state in which each such entity is (or shall be) organized, in accordance with the applicable general business law of each such jurisdiction.

### 14.4  *Modification of Plan.*

Alterations, amendments or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, but only after consultation with and consent to such alteration, amendment or modification by Time Warner (to the extent set forth in the TW Commitment Papers), the Majority Backstop Purchasers (which consent shall not be unreasonably withheld, except with respect to any provision in the Plan or action or inaction of the Debtors pursuant to the Plan under which the consent rights of the Majority Backstop Purchasers are not subject to a reasonableness requirement, in which case the consent of the Majority Backstop Purchasers shall not be subject to a reasonableness requirement); provided that the Plan, as altered, amended or modified satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code and the Debtors have complied with section 1125 of the Bankruptcy Code. The Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation, but only after consultation with and consent to such alteration, amendment or modification by Time Warner (to the extent set forth in the TW Commitment Papers) and the Majority Backstop Purchasers (which consent shall not be unreasonably withheld, except with respect to any provision in the Plan or action or inaction of

the Debtors pursuant to the Plan under which the consent rights of the Majority Backstop Purchasers are not subject to a reasonableness requirement, in which case the consent of the Majority Backstop Purchasers shall not be subject to a reasonableness requirement); provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications. A holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Debtors, with the consent of Time Warner (to the extent set forth in the TW Commitment Papers) and the Majority Backstop Purchasers (which consent shall not be unreasonably withheld, except with respect to any provision in the Plan or action or inaction of the Debtors pursuant to the Plan under which the consent rights of the Majority Backstop Purchasers are not subject to a reasonableness requirement, in which case the consent of the Majority Backstop Purchasers shall not be subject to a reasonableness requirement), may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Preconfirmation Equity Interests.

14.5   *Revocation or Withdrawal of the Plan.*

The Debtors, with the consent of Time Warner (to the extent set forth in the TW Commitment Papers) and the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. Subject to the foregoing sentence, if the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Preconfirmation Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

14.6   *Plan Supplement.*

The Plan Supplement and the documents contained therein shall be in form, scope and substance satisfactory to the Debtors, with the consent of Time Warner (to the extent set forth in the TW Commitment Papers) and the Majority Backstop Purchasers (which consent shall not be unreasonably withheld, except with respect to any provision in the Plan or action or inaction of the Debtors pursuant to the Plan under which the consent rights of the Majority Backstop Purchasers are not subject to a reasonableness requirement, in which case the consent of the Majority Backstop Purchasers shall not be subject to a reasonableness requirement), and shall be filed with the Bankruptcy Court no later than five (5) Business Days before the deadline for voting to accept or reject the Plan, provided that the documents included therein may thereafter be amended and supplemented, subject to the consent of Time Warner (to the extent set forth in the TW Commitment Papers) and the Majority Backstop Purchasers (which consent

shall not be unreasonably withheld, except with respect to any provision in the Plan or action or inaction of the Debtors pursuant to the Plan under which the consent rights of the Majority Backstop Purchasers are not subject to a reasonableness requirement, in which case the consent of the Majority Backstop Purchasers shall not be subject to a reasonableness requirement), prior to execution, so long as no such amendment or supplement materially affects the rights of holders of Claims. The Plan Supplement and the documents contained therein are incorporated into and made a part of the Plan as if set forth in full herein.

### 14.7 *Payment of Statutory Fees.*

On or before the Effective Date, all fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid in Cash. Following the Effective Date, all such fees shall be paid by the applicable Reorganized Debtor until the earlier of the conversion or dismissal of the applicable Reorganization Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Reorganization Case pursuant to section 350(a) of the Bankruptcy Code.

### 14.8 *Dissolution of the Creditors' Committee.*

On the Effective Date, except as provided below, the Creditors' Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Reorganization Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants and other agents, if any, shall terminate, except for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

### 14.9 *Exemption from Transfer Taxes.*

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the issuance of the New Common Stock, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

### 14.10 *Expedited Tax Determination.*

The Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), and the Reorganized Debtors are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Petition Date through and including the Effective Date.

14.11  *Exhibits/Schedules.*

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

14.12  **Substantial Consummation.**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

14.13  *Severability of Plan Provisions.*

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall, at the request of the Debtors, subject to the consent of Time Warner (to the extent set forth in the TW Commitment Papers) and the Majority Backstop Purchasers (which consent shall not be unreasonably withheld, except with respect to any provision in the Plan or action or inaction of the Debtors pursuant to the Plan under which the consent rights of the Majority Backstop Purchasers are not subject to a reasonableness requirement, in which case the consent of the Majority Backstop Purchasers shall not be subject to a reasonableness requirement), have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

14.14  *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or Plan Supplement provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its principles of conflict of law.

14.15  *Conflicts.*

Except as set forth in this Plan, to the extent that any provision of the Disclosure Statement conflicts with or is in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

14.16  *Notices.*

All notices, requests and demands to or upon the Debtors and the Majority

Backstop Purchasers must be in writing (including by facsimile transmission) to be effective and, unless otherwise expressly provided under the Plan, will be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> SIX FLAGS, INC.
> 1540 Broadway
> New York, NY 10036
> Attn: James Coughlin
> Telephone: (212) 652-9380
> Facsimile: (212) 354-3089
>
> *with a copy to:*
>
> *On behalf of the Debtors*
>
> PAUL, HASTINGS, JANOFSKY & WALKER LLP
> 191 North Wacker Drive, 30th Floor
> Chicago, Illinois 60606
> Telephone: (312) 499-6000
> Facsimile: (312) 499-6100
> Attn: Paul E. Harner
>      Steven T. Catlett
>
> *- and -*
>
> PAUL, HASTINGS, JANOFSKY & WALKER LLP
> 75 East 55th Street
> New York, New York 10022
> Telephone: (212) 318-6000
> Facsimile: (212) 319-4090
> Attn: William F. Schwitter
>
> *- and -*
>
> RICHARDS, LAYTON & FINGER, P.A.
> One Rodney Square
> 920 North King Street
> Wilmington, Delaware 19801
> Telephone: (302) 651-7700
> Facsimile: (302) 651-7701
> Attn: Daniel J. DeFranceschi
>
> *- and -*
>
> *On behalf of the Majority Backstop Purchasers*

AKIN GUMP STRAUSS HAUER & FELD
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Attn:   Ira Dizengoff
        Shaya Rochester

          *- and -*

DRINKER BIDDLE & REATH LLP
1100 N. Market Street
Wilmington, Delaware 19801-1254
Telephone: (302) 467-4213
Facsimile: (302) 467-4201
Attn:   Howard A. Cohen

Dated: December 3, 2009

Respectfully submitted,

**Six Flags, Inc.,** *et al.*
(for itself and on behalf of each of the other Debtors)

By: /s/ Jeffrey R. Speed
    Name: Jeffrey R. Speed
    Title: Chief Financial Officer

## Schedule 1.63
## Summary of the Material Terms of the Exit Facility Loans

| Borrower: | Reorganized SFTP. |
|---|---|
| Guarantors: | Reorganized SFI, Reorganized SFO and each of the current direct and indirect domestic subsidiaries of Reorganized SFTP; provided that to the extent Reorganized SFTP acquires any non-wholly owned direct or indirect subsidiary after the Closing Date such subsidiary shall not be required to be a guarantor and/or pledgor of the Exit Facility Loans. |
| Principal: | $800,000,000, comprised of a $150,000,000 revolving loan facility and a $650,000,000 term loan facility. |
| Maturity: | The maturity of the Exit Revolving Loans is five years from the closing date and the maturity of the Exit Term Loan is six years from the closing date. |
| Pricing: | LIBOR + 4.25%, with a LIBOR floor of 2.00% and a 1.50% commitment fee on the Exit Revolving Loans. |
| Covenants: | Certain affirmative covenants, including minimum interest coverage and maximum senior leverage maintenance covenants. In addition, the Exit Facility Loan Documents will contain restrictive covenants that limit, among other things, the ability of the Exit Financing Loan Parties to incur indebtedness, create liens, engage in mergers, consolidations and other fundamental changes, make investments or loans, engage in transactions with affiliates, pay dividends, make capital expenditures and repurchase capital stock. |
| Conditions: | The Commitment Parties' commitment is subject to certain customary conditions and market "flex" provisions that could result in material changes to the pricing of the Exit Facility as well as confirmation of the Plan and the retention of the existing senior management of the Debtors continuing as the senior management of SFI following consummation of the Plan. Notwithstanding the foregoing, any material changes to the Exit Facility Loans as described in the Commitment Parties' Commitment Papers shall be subject to the approval of Time Warner (to the extent set forth in the TW Commitment Papers). |
| Collateral: | The Exit Facility Loans will be secured by first priority liens upon substantially all existing and after-acquired assets of the Exit Financing Loan Parties. |

## Summary of the Material Terms of the New TW Loan

| | |
|---|---|
| Borrower: | Acquisition Parties. |
| Guarantors: | Reorganized SFI, Reorganized SFO, Reorganized SFTP and each of the current direct and indirect domestic subsidiaries of Reorganized SFI who are or in the future become guarantors under the Exit Facility Loans. |
| Principal: | $150,000,000 multi-draw term loan facility. |
| Maturity: | The principal amount of the New TW Loan borrowed on each Funding Date will be due and payable five years from such Funding Date. |
| Interest: | At a rate equal to (i) the greater of (a) LIBOR and (b) 2.50% (or to the extent that any LIBOR or similar floor under the Exit Term Loan (or under any senior term credit facility that amends, restates, amends and restates, refinances, modifies or extends the Exit Term Loan) is higher than 2.50%, such higher floor) plus (ii) the then "Applicable Margin" under the Exit Term Loan or under any successor term facility plus (iii) 1.00%. In the event that any of the loan parties issue corporate bonds or other public debt, the "Applicable Margin" referenced in the foregoing sentence will be adjusted based on the applicable default swap spread then in effect, subject to a fixed cap. |
| Covenants: | Certain covenants on similar terms as those contained in the Exit Facility Loan Documents but will be modified to provide additional flexibility to the New TW Guarantors from the covenants in the Exit Facility Loan Documents that are commensurate with their different positions in the capital structure of Six Flags. |
| Conditions: | TW's commitment is subject to certain customary conditions as well as confirmation of the Plan and the retention of the existing senior management of the Debtors continuing as the senior management of SFI following consummation of the Plan. In addition, the New TW Guarantors' payment or other binding obligations under the TW Commitment Papers would be subject to bankruptcy court approval. |
| | Notwithstanding the foregoing, any material changes to the New TW Loan as described in the TW Commitment Papers shall be subject to the approval of the Majority Backstop Purchasers. |

## Schedule 1.81
## Material Terms of the Long-Term Incentive Plan

| Participants: | Management, selected employees and directors of Reorganized SFI. |
|---|---|
| Allocation: | Stock options and/or restricted stock in Reorganized SFI equal to 10% on a fully diluted basis

Effective as of the Effective Date, the Debtors will adopt an incentive plan for management, selected employees and directors of Reorganized SFI, which shall be substantially in the form set forth in the Plan Supplement and shall contain the following material terms and conditions: (i) management, selected employees and directors of Reorganized SFI shall receive stock options and/or restricted stock in Reorganized SFI equal to 10% of the New Common Stock, determined on a fully diluted basis; and (ii) as of the Effective Date, the aggregate allocations to senior management under the Long-Term Incentive Plan will consist of 3.75% of the New Common Stock, determined on a fully diluted basis, in the form of restricted stock, which will vest in equal annual installments over the four year period, commencing on the effective date of the Employment Agreements (April 1, 2009), and 3.75% of the New Common Stock, determined on a fully diluted basis and with exercise prices based on a $1.335 total enterprise value, in the form of options, which will only vest at the expiration of the above four-year period, all of which will be to members of the Reorganized Debtors' management in accordance with their respective employment agreements.

Of the 10% referenced above, any additional allocations (other than those specified in Section 10.5 of the Plan) following the Effective Date shall be determined by the Postconfirmation Board. |

# APPENDIX I

## RIGHTS OFFERING PROCEDURES

The following Offering Procedures set forth the terms and conditions of the Offering (as defined below).

## ARTICLE I
## DEFINITIONS

As used in this <u>Appendix I</u>, the following terms shall have the respective meanings specified below and be equally applicable to the singular and plural of terms defined. Capitalized terms used in this <u>Appendix I</u> and not otherwise defined herein shall have the respective meanings provided in the Plan.

1.1 *2016 Notes* means those certain 12.25% unsecured notes due 2016 and issued by SFO under the 2016 Notes Indenture.

1.2 *2016 Notes Indenture* means that certain indenture, dated June 16, 2008, between SFO, as issuer, SFI, as guarantor, and HSBC Bank USA, N.A., as trustee, pursuant to which the 2016 Notes were issued, as amended from time to time.

1.3 *Accepting SFO Noteholder* means an Eligible Holder that votes to accept the Plan.

1.4 *Accredited Investor* means an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act.

1.5 *Approval Order* means that order, in form and substance satisfactory to the Debtors and Majority Backstop Purchasers, authorizing and approving the Backstop Commitment Agreement.

1.6 *Backstop Commitment* means the "Backstop Commitment" as defined in the Backstop Commitment Agreement.

1.7 *Backstop Commitment Agreement* means that certain commitment agreement executed by and between the Debtors and each of the Backstop Purchasers in connection with the Offering, attached hereto as <u>Annex A</u>, pursuant to which the Backstop Purchasers agreed to backstop the Offering in the respective percentages set forth on <u>Schedule I</u> of the New Common Stock Term Sheet.

1.8 *Backstop Purchasers* means those certain Persons signatory to the Backstop Commitment Agreement, each of which has agreed to backstop the Offering on the terms and subject to the conditions set forth in the Backstop Commitment Agreement.

1.9 *Eligible Holder* means an SFO Noteholder who is an Accredited Investor as of the Offering Record Date.

1.10   ***Limited Offering Pro Rata Share*** means (x) the total principal amount of 2016 Notes held by an Eligible Holder divided by (y) four times the aggregate principal amount of all 2016 Notes outstanding as of the Petition Date.

1.11   ***Majority Backstop Purchasers*** means the Backstop Purchasers that collectively hold a majority of the aggregate commitment percentage set forth on <u>Schedule I</u> of the New Common Stock Term Sheet.

1.12   ***New Common Stock Term Sheet*** means that certain term sheet attached to the Backstop Commitment Agreement as <u>Exhibit A</u> thereto.

1.13   ***Offering*** means the offering of $450.0 million in aggregate of New Common Stock (i) to each Eligible Holder in respect of its Limited Offering Pro Rata Share and (ii) to the extent less than the full Offering Amount is issued to the Eligible Holders, to the Backstop Purchasers.

1.14   ***Offering Amount*** means $450.0 million.

1.15   ***Offering Participant*** means an Accepting SFO Noteholders who participates in the Offering. For the avoidance of doubt, a Backstop Purchaser (i) shall be entitled to participate in the Offering in its capacity as a SFO Noteholder if it votes to accept the Plan and (ii) shall remain a Backstop Purchaser whether or not it votes to accept the Plan.

1.16   ***Offering Procedures*** means the rights offering procedures, setting forth the terms and conditions of the Offering, in substantially the form set forth in this <u>Appendix I</u>.

1.17   ***Offering Record Date*** means December 2, 2009.

1.18   ***Offering Subscription Purchase Price*** means, for each holder of Subscription Rights, such holder's Limited Offering Pro Rata Share multiplied by the Offering Amount. For purposes of the Offering, the New Common Stock shall be priced on the basis of an assumed enterprise value of SFI of $1.335 billion on the Effective Date.

1.19   ***SFO Noteholders*** means, collectively, the "Holders" under and as defined in the 2016 Notes Indenture.

1.20   ***SFO Unsecured Claim*** means any Allowed Unsecured Claim against SFO. SFO Unsecured Claims include, without limitation, Claims against SFO arising under or related to the 2016 Notes Indenture.

1.21   ***Subscription Agent*** means Kurtzman Carson Consultants LLC, in its capacity as a subscription agent in connection with the Offering.

1.22   ***Subscription Commencement Date*** means the date on which the Order approving the Disclosure Statement is entered.

1.23 ***Subscription Expiration Date*** means January 4, 2010, as specified in the Subscription Form, which shall be the final date that an Eligible Holder may elect to subscribe for the Subscription Rights.

1.24 ***Subscription Form*** means the form to be used by an Offering Participant pursuant to which such holder may exercise its respective Subscription Rights, which shall be in form and substance acceptable to the Majority Backstop Purchasers.

1.25 ***Subscription Payment Date*** means the Subscription Expiration Date or such other date to be designated by the Majority Backstop Purchasers, by which such Offering Subscription Purchase Price shall be due.

1.26 ***Subscription Period*** means the period of time between the Subscription Commencement Date and the Subscription Expiration Date.

1.27 ***Subscription Rights*** means the non-transferable, non-certified subscription rights to purchase New Common Stock in connection with the Offering, on the terms and subject to the conditions set forth in the Offering Procedures.

1.28 ***Unsubscribed Shares*** means those shares of New Common Stock to be issued in connection with the Offering (based on the Offering Amount) that are not, or can not be, subscribed for and purchased by Eligible Holders pursuant to the Offering prior to the Subscription Expiration Date.

## ARTICLE II

## THE OFFERING

### 2.1 Issuance of Subscription Rights.

(a) *Offering*. Each of the Eligible Holders shall be entitled to receive Subscription Rights entitling such participant to subscribe for up to its Limited Offering Pro Rata Share of New Common Stock to be issued pursuant to the Offering.

(b) *Equity Ownership in Reorganized SFI*. After giving effect to the issuance of New Common Stock pursuant to the SFO Unsecured Claims distribution, the Offering Participants and the Backstop Purchasers shall be entitled to receive approximately 69.77% of the total outstanding New Common Stock of Reorganized SFI on the Effective Date, which amount shall be subject to dilution in connection with awards issued on or after the Effective Date under the Long-Term Incentive Plan.

The Backstop Purchasers, on the terms and subject to the conditions of the Backstop Commitment Agreement, shall subscribe for and purchase all Unsubscribed Shares as of the Subscription Expiration Date.

## 2.2 Subscription Period.

The Offering shall commence on the Subscription Commencement Date and shall expire on the Subscription Expiration Date. Each Offering Participant intending to participate in the Offering must affirmatively elect to exercise its respective Subscription Rights on or prior to the Subscription Expiration Date. After the Subscription Expiration Date, the Unsubscribed Shares shall be treated as acquired by the Backstop Purchasers on the terms and subject to the conditions contained in the Backstop Commitment Agreement and the Plan, and any exercise of such Subscription Rights by any entity other than the Backstop Purchasers (or any affiliate or permitted assignee of such Backstop Purchasers in accordance with the Backstop Commitment Agreement) shall be null and void and there shall be no obligation to honor any such purported exercise received by the Subscription Agent after the Subscription Expiration Date, regardless of when the documents relating to such exercise were sent.

## 2.3 Subscription Purchase Price.

Each Offering Participant choosing to exercise its Subscription Rights shall be required to pay such participant's Offering Subscription Purchase Price for New Common Stock.

## 2.4 Exercise of Subscription Rights.

In order to exercise the Subscription Rights, each Offering Participant must: (a) return a duly completed Subscription Form to the Subscription Agent so that such form is actually received by the Subscription Agent on or before the Subscription Expiration Date; and (b) pay to the Subscription Agent (on behalf of the Debtors) on or before the Subscription Expiration Date such Offering Participant's Offering Subscription Purchase Price in accordance with the wire instructions set forth on the Subscription Form delivered to the Subscription Agent along with the Subscription Form.

Each Offering Participant may exercise all or any portion of such Offering Participant's Subscription Rights pursuant to the Subscription Form, but the exercise of any Subscription Rights shall be irrevocable. If the Subscription Agent for any reason does not receive from a given Offering Participant: (a) a duly completed Subscription Form on or prior to the Subscription Expiration Date; and (b) immediately available funds in an amount equal to such Offering Participant's Offering Subscription Purchase Price on or prior to the third Business Day prior to the Confirmation Hearing, such Offering Participant shall be deemed to have relinquished and waived its right to participate in the Offering.

The payments made in accordance with the Offering shall be deposited and held by the Subscription Agent in a trust or escrow account, or similarly segregated account or accounts which shall be separate and apart from the Subscription Agent's general operating funds and any other funds subject to any lien or similar encumbrance and which segregated account or accounts shall be maintained for the purpose of holding the money for administration of the Offering until the Effective Date. In the event the Effective Date does not occur within fifteen (15) days after the Confirmation Hearing, the funds will be returned to the Offering Participants unless a later date is selected at the joint option of the Debtors and the Majority

Backstop Purchasers, but in no event later than thirty (30) days after the Confirmation Hearing. The Subscription Agent shall not use such funds for any other purpose prior to such date and shall not encumber or permit such funds to be encumbered with any lien or similar encumbrance.

In order to facilitate the exercise of the Subscription Rights, on or promptly after the Subscription Commencement Date, the Subscription Form shall be provided by mail, electronic mail or facsimile transmission to each SFO Noteholder that any Backstop Purchaser knows to be an Eligible Holder or who identifies itself as an Eligible Holder to the Subscription Agent, together with appropriate instructions for the proper completion, due execution and timely delivery of the Subscription Form, as well as instructions for the payment of the applicable Subscription Purchase Price for that portion of the Subscription Rights sought to be exercised by such Offering Participant.

### 2.5    Offering Procedures.

Notwithstanding anything contained herein to the contrary, the Majority Backstop Purchasers (subject to the Debtors consent, which shall not be unreasonably withheld) may modify these Offering Procedures or adopt such additional detailed procedures consistent with the provisions of these Offering Procedures to more efficiently administer the exercise of the Subscription Rights; provided, however, that the Majority Backstop Purchasers shall provide prompt written notice to the Offering Participants of any material modification to these Offering Procedures.

### 2.6    Transfer Restriction: Revocation.

The Subscription Rights are not transferable. Any such transfer or attempted transfer shall be null and void, and no purported transferee shall be treated as the holder of any Subscription Rights. Once an Offering Participant has properly exercised its Subscription Rights, such exercise cannot be revoked, rescinded or modified.

### 2.7    Offering Backstop.

(a)    *General.* On the terms and subject to the conditions in the Backstop Commitment Agreement, the Backstop Purchasers have agreed to subscribe for and purchase on the Effective Date, at the aggregate Offering Subscription Purchase Price therefor, all Unsubscribed Shares as of the Subscription Expiration Date according to the respective percentages set forth on Schedule I of the New Common Stock Term Sheet. The Backstop Purchasers shall pay to the Subscription Agent, by wire transfer in immediately available funds one business day prior to the Confirmation Hearing, Cash in an amount equal to the aggregate Offering Subscription Purchase Price attributable to such Unsubscribed Shares as provided in the Backstop Commitment Agreement; provided, that such funds shall be immediately refunded to the Backstop Purchasers if the Effective Date does not occur within fifteen (15) days of the Confirmation Hearing unless otherwise decided by the Majority Backstop Purchasers. The Subscription Agent shall deposit such payment into the same trust or escrow account into which were deposited the Offering Subscription Purchase Price payments of Offering Participants on the exercise of their Subscription Rights. The Subscription Agent shall give the Debtors and the Backstop Purchasers by e-mail and electronic facsimile transmission written notification setting

forth a true and accurate calculation of the number of Unsubscribed Shares, together with the aggregate Offering Subscription Purchase Price therefor (the "***Backstop Purchase Notice***") as soon as practicable after the Subscription Expiration Date. In addition, the Subscription Agent shall notify the Backstop Purchasers, on each Friday during the Subscription Period and on each Business Day during the five (5) Business Days prior to the Subscription Expiration Date (and any extensions thereto), or more frequently if requested by the Backstop Purchasers, of the aggregate number of Subscription Rights known by the Subscription Agent to have been exercised pursuant to the Offering as of the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be.

(b)     *Payment.* Subscription Agent shall determine the number of Unsubscribed Shares, if any, in good faith, and provide the Debtors and the Backstop Purchasers with a Backstop Purchase Notice that accurately reflects the number of Unsubscribed Shares as so determined. On the Effective Date, the Backstop Purchasers shall purchase only such number of Unsubscribed Shares as are listed in the Backstop Purchase Notice, without prejudice to the rights of the Backstop Purchasers to seek later an upward or downward adjustment if the number of Unsubscribed Shares in such Backstop Purchase Notice is inaccurate. Delivery of the Unsubscribed Shares shall be made to the account of the Backstop Purchasers (or to such other accounts as the Backstop Purchasers may designate) on the Effective Date against application by the Subscription Agent of the Offering Subscription Purchase Price payments of Offering Participants on the exercise of their Subscription Rights to a bank account in the United States specified by the Debtors to the Backstop Purchasers at least 24 hours in advance. All Unsubscribed Shares shall be delivered with any and all issue, stamp, transfer or similar taxes or duties payable in connection with such delivery duly paid by the Debtors or the Reorganized Debtors to the extent required under the Confirmation Order or applicable law.

(c)     *Transfer of Backstop Commitment.* Notwithstanding anything contained herein to the contrary, the Backstop Purchasers, in their sole discretion, may designate that some or all of the Unsubscribed Shares be issued in the name of, and delivered to, one or more of its affiliates, or to other financial institutions, in each case, reasonably acceptable to the Debtors.

(d)     *Conditions Precedent to Obligations of Backstop Purchasers.* The obligations of the Backstop Purchasers to purchase New Common Stock shall be conditioned upon satisfaction of each of the following; provided, that any or all of the following conditions may be waived in writing by the Majority Backstop Purchasers:

(i)     the Postconfirmation Organizational Documents shall be in form and substance acceptable to the Majority Backstop Purchasers;

(ii)     the Registration Rights Agreement shall be in form and substance acceptable to the Majority Backstop Purchasers;

(iii)     except as otherwise provided, the Plan, the Disclosure Statement, the Solicitation Order, the Confirmation Order and any Plan supplemental documents (collectively, the "***Plan Documents***") shall be in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably;

(iv)      all motions and other documents to be filed with the Bankruptcy Court in connection with the Offering, and payment of the fees contemplated under the Plan, the Backstop Commitment Letter, the New Common Stock Term Sheet and under these Offering Procedures shall be in form and substance acceptable to the Majority Backstop Purchasers;

(v)      all motions and other documents to be filed with the Bankruptcy Court in connection with the approval of the Postconfirmation Organizational Documents shall be in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably;

(vi)      all reasonable out-of-pocket fees and expenses (including reasonable fees and expenses of counsel and, if applicable, the fees and expenses of financial advisors) required to be paid to the Backstop Purchasers under the Plan, the Backstop Commitment Letter, the New Common Stock Term Sheet and/or these Offering Procedures have been paid;

(vii)      the Bankruptcy Court shall have entered the Approval Order, in form and substance satisfactory to the Majority Backstop Purchasers;

(viii)      the Adjusted EBITDA (as such term is defined in the Debtors' financial release dated as of November 2, 2009) for the twelve (12) months ending November 30, 2009 shall exceed $180 million;

(ix)      any and all governmental and third party consents and approvals necessary in connection with the Offering, the execution and filing where applicable, of the Postconfirmation Organizational Documents and the transactions contemplated hereby and thereby shall have been obtained and shall remain in effect;

(x)      the Exit Facility Loan Documents and the documents governing the New TW Loan (as such terms are defined in the Plan) shall be in form and substance acceptable to the Majority Backstop Purchasers; and

(xi)      The Plan shall have become, or simultaneously with the issuance of the Shares will become, effective.

### 2.8    Breakup Fees and Expenses.

Under the Backstop Commitment Agreement, in the event that the Debtors enter into a financing transaction with parties other than the Backstop Purchasers or do not issue the New Common Stock on the terms and subject to the conditions set forth in the Plan and New Common Stock Term Sheet, the Debtors shall pay to the Backstop Purchasers an aggregate breakup fee in Cash equal to 5.0% of the Offering Amount, which fee shall be fully earned upon entry of an order of the Bankruptcy Court authorizing the Debtors to execute the Backstop Commitment Agreement and shall be payable in full on the Effective Date.

Under the Backstop Commitment Agreement, upon the confirmation of any plan of reorganization, the Debtors shall pay all reasonable out-of-pocket fees and expenses

of the Backstop Purchasers to the extent provided in such Backstop Commitment Agreement (including reasonable fees and expenses of counsel and, if applicable, the fees and expenses of financial advisors) on or before the effective date of such plan of reorganization.

### 2.9 Distribution of the New Common Stock.

On the Effective Date, Reorganized SFI shall distribute the New Common Stock purchased by each Offering Participant that has properly exercised its Subscription Rights to such holder and to the Backstop Purchasers. If the exercise of a Subscription Right would result in the issuance of a fractional share of New Common Stock, then the number of shares of New Common Stock to be issued in respect of such Subscription Right shall be rounded down to the closest whole share.

### 2.10 Exemption from Registration under the Securities Act.

The Offering is being made to Eligible Holders only. The New Common Stock issued pursuant to the Offering to the Offering Participants shall be exempt from registration under the Securities Act by virtue of section 4(2) thereof. Unlike the New Common Stock issued to holders of Allowed SFO Unsecured Claims, the New Common Stock issued to the Offering Participants pursuant to the Offering will not be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code.

### 2.11 Validity of Exercise of Subscription Rights.

All questions concerning the timeliness, viability, form and eligibility of any exercise of Subscription Rights shall be determined by the Majority Backstop Purchasers, whose good faith determinations shall be final and binding. The Majority Backstop Purchasers, in their discretion, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights. Subscription Forms shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Majority Backstop Purchasers determine in their discretion. The Majority Backstop Purchasers shall use commercially reasonable efforts to give notice to any Offering Participants regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such participant and, may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Majority Backstop Purchasers nor the Subscription Agent shall incur any liability for failure to give such notification.

### 2.12 Indemnification of Backstop Purchasers.

The Debtors or the Reorganized Debtors, as the case may be, agree to indemnify and hold harmless the Backstop Purchasers and their respective present and former directors, officers, partners, members, representatives, employees, agents, attorneys, financial advisors, restructuring advisors and other professional advisors (each an "*Indemnified Person*") from and against any and all losses, claims, damages, liabilities and expenses, joint or several, to which any such Indemnified Person may incur, have asserted against it or be involved in as a result of or arising out of or in any way related to the Plan, the Offering, the Backstop Commitment

Agreement or the transactions contemplated hereby or thereby, including without limitation distribution of the Subscription Rights, the purchase and sale of New Common Shares in the Offering and purchase and sale of Unsubscribed Shares to the Backstop Purchasers pursuant to the Backstop Commitment Agreement or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any of such Indemnified Persons is a party thereto, and to reimburse each of such Indemnified Persons within 10 days after demand for any legal or other expenses incurred in connection with any of the foregoing; provided, however, that the foregoing indemnity shall not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from the willful misconduct or gross negligence of such Indemnified Person.

Notwithstanding any other provision to the contrary, no Indemnified Person shall be liable for any special, indirect, consequential or punitive damages in connection with its activities related to the Plan, the Offering, the Backstop Commitment Agreement or the transactions contemplated hereby or thereby. The terms set forth in this section 2.12 shall survive termination of the Backstop Commitment Agreement and shall remain in full force and effect regardless of whether the Offering is consummated.

**AVENUE CAPITAL MANAGEMENT**
**FIDELITY MANAGEMENT & RESEARCH CO. AND CERTAIN AFFILIATES**
**HAYMAN ADVISORS, L.P.**
**J.P. MORGAN INVESTMENT MANAGEMENT INC.**
**NORTHEAST INVESTORS TRUST**
**THIRD POINT, LLC**
**WHITEBOX ADVISORS, LLC**

November 6, 2009 (as amended on or about November 30, 2009)

Six Flags, Inc.
1540 Broadway
New York, NY 10036

Attention:    Mr. Jeffrey Speed
              Chief Financial Officer

Re:    $450,000,000 Common Stock Backstop Commitment

Ladies and Gentlemen:

Reference is made to the chapter 11 bankruptcy cases, lead case no. 09-12019 (the "Chapter 11 Cases"), currently pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), in which Six Flags, Inc. and certain of its affiliates are debtors and debtors in possession (collectively, the "Debtors"). Reference is further made to: (i) a Chapter 11 plan of reorganization that will be filed by the Debtors concurrently herewith (as such plan of reorganization may be modified or amended from time to time, the "Plan") and (ii) a disclosure statement that will accompany the Plan (as it may be modified or amended from time to time, the "Disclosure Statement"). Capitalized terms used in this letter agreement (the "Backstop Commitment Agreement") and not otherwise defined herein shall have the meanings provided in the Plan.

The Plan proposes, among other things, to obtain exit financing required for the emergence of the Debtors from Chapter 11 by offering (the "Offering") to eligible holders of pre-petition claims with respect to Six Flags Operations, Inc. ("SFO") 12¼% Senior Notes due 2016 (the "Eligible Holders") a limited right to participate in $450 million in the aggregate (the "Offering Amount") of new common stock (the "New Common Stock") of Six Flags, Inc. ("SFI"), representing, together with the Backstop Commitment, 69.77% of the New Common Stock of SFI on the Effective Date, subject to dilution in connection with awards issued on or after the Effective Date under the Long Term Incentive Plan, as more fully described in the Plan and the offering procedures ("Offering

<u>Procedures</u>") established in the Plan.[1] Pursuant to the Plan and Offering Procedures, each Eligible Holder will receive an offer to participate in the Offering based on its respective Limited Pro Rata Share holdings and will be required to accept such offer by the Subscription Expiration Date as and to the extent set forth in the Offering Procedures. For purposes of the Offering, the term "Limited Pro Rata Share" means (x) the total principal amount of SFO 12¼% Senior Notes (the "<u>SFO Notes</u>") held by an Eligible Holder divided by (y) four times the aggregate principal amount of all SFO Notes outstanding as of the Petition Date.

To provide assurance that the Offering will be fully subscribed and that the Offering is consummated in respect of the entire Offering Amount, the undersigned (collectively, the "<u>Backstop Purchasers</u>") hereby commit, severally and not jointly, to backstop the Offering (the "<u>Backstop Commitment</u>") in the respective percentages set forth on <u>Schedule I</u> of the term sheet relating to the issuance of the New Common Stock (the "<u>New Common Stock Term Sheet</u>") attached hereto as <u>Exhibit A</u>, and on the terms described herein and in the Plan. Each Backstop Purchaser shall fund its pro rata share of the Unsubscribed Shares (as defined in the Offering Procedures) one business day prior to the hearing conducted by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time (the "<u>Confirmation Hearing</u>"). Such funds shall be held in an escrow or trust account to be designated by the Backstop Purchasers and shall be immediately refunded if the Effective Date does not occur within fifteen (15) days following the Confirmation Hearing, unless otherwise extended by the Majority Backstop Purchasers. "<u>Majority Backstop Purchasers</u>" means the Backstop Purchasers that collectively hold a majority of the aggregate commitment percentage set forth on <u>Schedule I</u> of the New Common Stock Term Sheet.

The Debtors hereby agree that, in the event that the Debtors enter into a financing transaction with parties other than the Backstop Purchasers or do not issue the New Common Stock on the terms set forth in the Plan and the New Common Stock Term Sheet, the Debtors shall pay to the Backstop Purchasers an aggregate break up fee equal to 5.0% of the Offering Amount (the "<u>Break Up Fee</u>"), which fee shall be fully earned upon entry of the Approval Order (as defined below) by the Bankruptcy Court and shall be payable in full in Cash upon the confirmation of any Chapter 11 plan of reorganization (other than the Plan) or liquidation with respect of the Debtors.

The agreement of the Backstop Purchasers hereunder is conditioned upon satisfaction of each of the conditions set forth in the Plan, the Offering Procedures and New Common Stock Term Sheet, including (without limitation) the entry of

---

[1] The Plan also contemplates paying off the Prepetition Credit Agreement Claims with the proceeds of the Offering and the Exit Term Loan (as such terms are defined in the Plan).

an order of the Bankruptcy Court on or before December 7, 2009, in form and substance satisfactory to the Majority Backstop Purchasers, which order shall (without limitation) authorize the Debtors to execute this Backstop Commitment Agreement and authorize and approve the transactions contemplated herein and the New Common Stock Term Sheet, including (without limitation) the payment of all consideration and fees contemplated herein and therein, and authorize the indemnification provisions set forth in this Backstop Commitment Agreement, which order shall become a final order not subject to stay, appeal or modification (absent the prior written consent of the Majority Backstop Purchasers) on or before December 22, 2009 (the "Approval Order"). Notwithstanding any other provision herein, no Break Up Fee shall be payable if any non-Debtor party hereto is in breach of its obligations hereunder as of the date on which the Break Up Fee would otherwise be earned or payable unless one or more other Backstop Purchasers have assumed such breaching party's obligations hereunder.

The obligation of the Backstop Purchasers is further conditioned upon (a) the Adjusted EBITDA (as such term is defined in the Debtors' financial release dated as of November 2, 2009) for the twelve (12) months ending November 30, 2009 exceeding $180 million, (b) entry into documentation governing the Exit Revolving Loans, the Exit Term Loan and the New TW Loan (as such terms are defined in the Plan) that is satisfactory in form and substance to the Majority Backstop Purchasers and (c) entry by the Bankruptcy Court of an order (which has become final) confirming the Plan (with such changes as are satisfactory to the Majority Backstop Purchasers) (the Plan in the form confirmed by the Bankruptcy Court, the "Confirmed Plan"), and such Confirmed Plan becoming effective, on or before February 15, 2010.

Whether or not the transactions contemplated hereby are consummated, the Debtors agree to: (x) pay within 10 days of demand the reasonable and documented fees, expenses, disbursements and charges of the Backstop Purchasers incurred previously or in the future relating to the exploration and discussion of the restructuring of the Debtors, alternative financing structures to the Backstop Commitment or to the preparation and negotiation of this Backstop Commitment Agreement, the Plan, the Offering Procedures, the New Common Stock Term Sheet, the Plan Documents or the Postconfirmation Organizational Documents (including, without limitation, in connection with the enforcement or protection of any rights and remedies under the Postconfirmation Organizational Documents) and, in each of the foregoing cases, the proposed documentation and the transactions contemplated thereunder, including, without limitation, the fees and expenses of counsel to the Backstop Purchasers, and the financial advisors to the Backstop Purchasers and (y) indemnify and hold harmless the Backstop Purchasers and their respective general partners, members, managers and equity holders, and the respective officers, employees, affiliates, advisors, agents, attorneys, financial advisors, accountants, consultants of each such entity, and to hold the Backstop Purchasers and such other persons and entities (each an "Indemnified Person") harmless from and against any and all losses, claims,

damages, liabilities and expenses, joint or several, which any such person or entity may incur, have asserted against it or be involved in as a result of or arising out of or in any way related to this letter, the matters referred to herein, the Plan, the New Common Stock Term Sheet, the proposed Backstop Commitment contemplated hereby, the use of proceeds thereunder or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any of such Indemnified Persons is a party thereto, and to reimburse each of such Indemnified Persons upon 10 days of demand for any legal or other expenses incurred in connection with any of the foregoing; provided, however, that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from the willful misconduct or gross negligence of such Indemnified Person. Notwithstanding any other provision of this letter, no Indemnified Person will be liable for any special, indirect, consequential or punitive damages in connection with its activities related to the Backstop Commitment and the Offering. The terms set forth in this paragraph survive termination of this Backstop Commitment Agreement and shall remain in full force and effect regardless of whether the documentation for the Offering is executed and delivered.

This letter (a) is not assignable by the Debtors without the prior written consent of the Majority Backstop Purchasers (and any purported assignment without such consent shall be null and void), and (b) is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. Notwithstanding the foregoing, the Backstop Purchasers may assign all or any portion of their obligations hereunder to one or more financial institutions reasonably acceptable to SFI; provided, that no Debtor's consent shall be required for such an assignment to another Backstop Purchaser or an affiliate of a Backstop Purchaser. Upon any such assignment (other than an assignment with the Debtors' consent or an assignment to another Backstop Purchaser), the obligations of the Backstop Purchasers in respect of the portion of their obligations so assigned shall not terminate. In the event that any Backstop Purchaser fails to meet its obligations under this Backstop Commitment Agreement, the non-breaching Backstop Purchasers shall have the right, but not the obligation, to assume such obligations in such manner as they may agree.

This Backstop Commitment Agreement sets forth the agreement of the Backstop Purchasers to fund the Backstop Commitment on the terms described herein and shall be considered withdrawn if the Backstop Purchasers have not received from the Debtors a fully executed counterpart to this Backstop Commitment Agreement **on or before November 6, 2009 at 11:59 PM (ET)**, unless such deadline is extended by the Majority Backstop Purchasers.

The obligations of the Backstop Purchasers to fund the Backstop Commitment shall terminate and all of the obligations of the Debtors (other than the obligations

of the Debtors to (i) pay the reimbursable fees and expenses, (ii) satisfy their indemnification obligations and (iii) pay the Break Up Fee, in each case, as set forth herein) shall be of no further force or effect, upon the giving of written notice of termination by the Majority Backstop Purchasers, in the event that any of the items set forth in the New Common Stock Term Sheet under the heading "Termination of Backstop Commitments" occurs, each of which may be waived in writing by the Majority Backstop Purchasers.

THIS COMMITMENT LETTER WILL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

This Backstop Commitment Agreement may not be amended or waived except in writing signed by the Debtors and the Majority Backstop Purchasers. This Backstop Commitment Agreement may be executed in any number of counterparts, each of which will be an original, and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of this Backstop Commitment Agreement by facsimile or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Backstop Commitment Agreement.

This Backstop Commitment Agreement and the Plan are part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Backstop Commitment Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Backstop Commitment Agreement.

Execution of this Backstop Commitment Agreement by a Backstop Purchaser shall be deemed a direction by such Backstop Purchaser to direct HSBC Bank USA, National Association ("HSBC"), as indenture trustee, under that certain Indenture, dated as of June 16, 2008, between and among SFO, SFI and HSBC, to (a) engage Akin Gump Strauss Hauer & Feld LLP, as special counsel, effective as of June 13, 2009, with respect to any and all legal services on behalf of holders of SFO Notes related to the Chapter 11 Cases, (b) engage Drinker Biddle & Reath LLP, as local Delaware counsel, effective as of September 4, 2009, with respect to any and all legal services on behalf of holders of SFO Notes related to the Chapter 11 Case and (c) engage Barclays Capital Inc. pursuant to the terms of Barclays Capital's engagement letter dated October 8, 2009.

Notwithstanding anything contained herein, each Backstop Purchaser acknowledges that its decision to enter into this Backstop Commitment Agreement has been made by such Backstop Purchaser independently of any other Backstop Purchaser.

This Backstop Commitment Agreement constitutes the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral, between the parties hereto with respect to the subject matter hereof and shall become effective and binding upon (i) the mutual exchange of fully executed counterparts and (ii) the entry of the Approval Order.

The undersigned represent that they have the authority to execute and deliver this Backstop Commitment Agreement on behalf of their respective affiliate Backstop Purchasers listed on Schedule I to the New Common Stock Term Sheet.

[SIGNATURE PAGES FOLLOW]

If the foregoing is in accordance with your understanding of our agreement, please sign this letter in the space indicated below and return it to us.

Very truly yours,

[SIGNATURE PAGES TO FOLLOW]

**AVENUE CAPITAL MANAGEMENT**

By: _____
    Name:
    Title:

[SIGNATURES CONTINUE ON FOLLOWING PAGES]

**NORTHEAST INVESTORS TRUST**

By: _Bruce H. Monrad_

Name: BRUCE H MONRAD

Title: Trustee, act. individually

[BACKSTOP COMMITMENT AGREEMENT SIGNATURE PAGE]

**Fidelity Summer Street Trust: Fidelity Capital & Income Fund**

By: _____

Name:

Title:         Paul Murphy

                Assistant Treasurer

**Master Trust Bank of Japan Ltd Re: Fidelity US High Yield**

By: _____
Name:
Title:      Paul Murphy
             Assistant Treasurer

**Fidelity Advisor Series I: Fidelity Advisor High Income Advantage Fund**

By: _____

Name: _____

Title: Paul Murphy

Assistant Treasurer

**Fidelity Puritan Trust: Fidelity Puritan Fund**

By: _____

Name:

Title:        Paul Murphy

               Assistant Treasurer

**Fidelity Advisor Series I: Fidelity Advisor
Leveraged Stock Fund**

By: _____

Name:
Title:     Paul Murphy
           Assistant Treasurer

[COMMITMENT LETTER SIGNATURE PAGE]

**Fidelity Summer Street Trust: Fidelity High Income Fund**

By: _____

Name:

Title:      Paul Murphy

           Assistant Treasurer

[COMMITMENT LETTER SIGNATURE PAGE]

**Fidelity Advisor Series II: Fidelity Advisor
Strategic Income Fund**

By: _____
     Name:
     Title:       Paul Murphy
              Assistant Treasurer

**Fidelity School Street Trust: Fidelity Strategic Income Fund**

By: _____

Name:

Title:                Paul Murphy
                      Assistant Treasurer

**Fidelity Funds - US High Income**

By: _____
     Name:
     Title:        Paul Murphy
                 Assistant Treasurer

**Fidelity Investments Canada ULC, As Trustee Of The Fidelity American High Yield Fund**

By: _____

Name:

Title:       Paul Murphy
            Assistant Treasurer

Fidelity Investments Canada ULC, As Trustee Of
The Fidelity Canadian Asset Allocation Fund

By: _____

Name:
Title:          Paul Murphy
                Assistant Treasurer

**Fidelity Investments Canada ULC, As Trustee of The Fidelity Balanced High Income Fund**

By: _____

Name:

Title:      Paul Murphy
          Assistant Treasurer

[COMMITMENT LETTER SIGNATURE PAGE]

**Variable Insurance Products Fund V: Strategic Income Portfolio**

By: _____

Name:

Title:          Paul Murphy
                Assistant Treasurer

**Fidelity Central Investment Portfolios LLC:**
**Fidelity High Income Central Fund 2**

By: _____

Name:

Title:      Paul Murphy
           Assistant Treasurer

**Illinois Municipal Retirement Fund**

By: _____

Name: _____

Title: _____          Dave Censorio
                                        Vice President

[COMMITMENT LETTER SIGNATURE PAGE]

The Japan Trustee Service Bank LTD Re: MATB
Fidelity High Yield Bond Open Mother

By: _____ .
　　Name:
　　Title:　　　　　　Dave Censorio
　　　　　　　　　　Vice President

[COMMITMENT LETTER SIGNATURE PAGE]

**Fidelity Global Bond Series-US Dollar Monthly Income-US High Yield Pool**

By: _____

    Name: _____

    Title:             Dave Censorio

                    Vice President

[COMMITMENT LETTER SIGNATURE PAGE]

**IG CAA High Yield Sec**

By: _____

Name:

Title:

Dave Censorio
Vice President

[COMMITMENT LETTER SIGNATURE PAGE]

The Japan Trustee Services Bank LTD Re: STB
Fidelity Strategic Income Fund Mother

By: _____
    Name:
    Title:               Dave Censorio
                        Vice President

[COMMITMENT LETTER SIGNATURE PAGE]

**HAYMAN CAPITAL MASTER FUND, LP**

By: Hayman Advisors, L.P., its general partner

By: _____
Name:
Title:        Debby LaMoy
              Chief Operating Officer
              Hayman Advisors, LP


[SIGNATURES CONTINUE ON FOLLOWING PAGES]


[COMMITMENT LETTER SIGNATURE PAGE]

**J.P. MORGAN INVESTMENT MANAGEMENT INC., NOT IN ITS INDIVIDUAL CAPACITY BUT ACTING AS INVESTMENT MANAGER WITH FULL DISCRETIONARY AUTHORITY OVER THE ACCOUNTS IDENTIFIED BELOW:**

By:
Name: James P. Shanahan, Jr.
Title: Managing Director

2016 Notes:

JP Morgan High Yield Bond Fund

Principal Funds Inc. – High Yield I

JP Morgan Income Builder Fund

Commingled Pension Trust Fund (High Yield Bond) of JPMorgan Chase Bank, N.A.

Pacholder High Yield Fund, Inc.

JP Morgan Investment Funds – JPM Global Income Fund

JP Morgan Strategic Income Opportunities Fund

JP Morgan Investment Funds – Income Opportunity Fund

JP Morgan Distressed Debt Fund

$
Principal Face Amount of 2016 Notes

[SIGNATURES CONTINUE ON FOLLOWING PAGES]

[COMMITMENT LETTER SIGNATURE PAGE]

**THIRD POINT LLC**

By: _____
Name:
Title:    Mendy R Haas
          CFO

[SIGNATURES CONTINUE ON FOLLOWING PAGES]

**WHITEBOX ADVISORS, LLC**

By: _____

Name: Jonathan Wood
Title: Chief Operating Officer

[SIGNATURES CONTINUE ON FOLLOWING PAGES]

Commitment Letter

ACCEPTED AND AGREED THIS 6th DAY OF
NOVEMBER, 2009:

SIX FLAGS, INC.

By: _____

Name: Jeffrey R. Speed
Title: Chief Financial Officer

# Exhibit A

**New Common Stock Term Sheet**

# SIX FLAGS, INC.

## $450,000,000 COMMON STOCK

### <u>Summary of Principal Terms</u>

      The following Summary of Principal Terms (this "**New Common Stock Term Sheet**") provides an outline of a proposed Common Stock offering by the Issuer identified below in connection with and upon the emergence of the Issuer and its affiliates (collectively, the "**Debtors**") from chapter 11 proceedings pursuant to a chapter 11 plan of reorganization, the terms of which are described in more detail in the Backstop Commitment Agreement (defined below) to which this New Common Stock Term Sheet is attached (the "**Plan**"). The actual terms and conditions upon which any purchaser might purchase the Shares are subject to execution and delivery of definitive legal documentation, by all required parties and such other terms and conditions as are determined by the parties. This New Common Stock Term Sheet and the information contained herein is strictly confidential and may not be shared with any person or entity without the prior written consent of the Majority Backstop Purchasers (as defined below). Unless otherwise defined herein, each capitalized term used in this New Common Stock Term Sheet shall have the same meaning ascribed to such term in the Plan.

| | |
|---|---|
| **Issuer:** | Six Flags, Inc. (the "*Issuer*"). |
| **Securities Offered:** | $450,000,000 in the aggregate (the "*Offering Amount*") of Common Stock (the "*Shares*"). |
| **Offering:** | The Shares, representing 69.77% of the New Common Stock of the Issuer on the Effective Date (as defined below), subject to dilution in connection with awards issued on or after the Effective Date under the Long-Term Incentive Plan, will be offered on a limited basis and as provided in the Offering Procedures (the "*Offering*") (i) to each Eligible Holder its Limited Offering Pro Rata Share and (ii) to the extent less than all of the Shares are issued to the Accepting SFO Noteholders, to the entities which agree to backstop the Offering pursuant to the Backstop Commitment Agreement (defined below), the initial list of which is set forth on <u>Schedule I</u> hereto (the parties listed on Schedule I, the "*Backstop Purchasers*").[6] For the avoidance of doubt, a |

---

[6] The net affect of the Offering, (i) assuming the Offering is fully subscribed for by Eligible Holders and (ii) as a result of the application of each Eligible Holder's Limited Offering Pro Rata Share, all Eligible Holders (including Backstop Purchasers solely in their capacity as Eligible Holders) would acquire approximately 25% of the Shares (or approximately 5%, excluding purchases by Backstop Purchasers that are Eligible Holders), and the Backstop Purchasers would acquire approximately 75% of the Shares (or approximately 95% of the Shares, including purchases by Backstop Purchasers in their capacity as Eligible Holders)

Backstop Purchaser shall be entitled to participate in the Offering in its capacity as a SFO Noteholder.

On the terms and subject to the conditions set forth in that certain backstop commitment agreement, dated as of November 6, 2009 (as amended on or about November 30, 2009, the "*Backstop Commitment Agreement*"), each Backstop Purchaser will severally commit to purchase its respective Commitment Percentage of Shares in the aggregate principal amount equal to $450,000,000. For purposes hereof, a Backstop Purchaser's "*Commitment Percentage*" is the percentage for such Backstop Purchaser set forth on <u>Schedule I</u> hereto. Subject to the terms and conditions of the Backstop Commitment Agreement, the rights to subscribe for the purchase of the Shares shall be non-transferrable.

The Offering will only be made to accredited investors in a fashion that will be exempt from registration under the Securities Act of 1933 as amended (the "*1933 Act*").

**Purchase Price:** The Offering will be at a purchase price based upon an assumed enterprise value of the Issuer on the Effective Date of $1.335 billion.

**Use of Proceeds:** Proceeds of the Shares may only be used to make payments required to be made on and after the Effective Date under the Plan, including, without limitation, repayment of all amounts owing under the Prepetition Credit Agreement.

**Fees:** In the event the Issuer enters into a financing transaction with parties other than the Backstop Purchasers or does not issue the Shares on the terms set forth in this New Common Stock Term Sheet, the Debtors shall pay to the Backstop Purchasers an aggregate break up fee in Cash equal to 5.0% of the Offering Amount (the "*Break Up Fee*"), which fee shall be fully earned upon entry of the Approval Order by the Bankruptcy Court and shall be payable in full in Cash upon the confirmation of any Chapter 11 plan of reorganization (other than the Plan) or liquidation with respect of the Debtors.

**Registration Rights:** To the extent contemplated by the Plan, Purchasers of Shares may be entitled to become party to a Registration Rights Agreement all in form and substance satisfactory to the Majority Backstop Purchasers.

**Conditions Precedent To the Closing:** The obligation of the Backstop Purchasers to purchase the Shares will be conditioned upon satisfaction of each of the following; <u>provided</u>, that each of the following conditions may be waived in

writing by the Majority Backstop Purchasers:

- The Postconfirmation Organizational Documents shall be in form and substance acceptable to the Majority Backstop Purchasers;

- The Registration Rights Agreement shall be in form and substance acceptable to the Majority Backstop Purchasers;

- Except as otherwise provided, the Plan, the Disclosure Statement, the Solicitation Order, the Confirmation Order and any Plan supplemental documents (collectively, the "*Plan Documents*") shall be in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably;

- All motions and other documents to be filed with the Bankruptcy Court in connection with the offer and sale of the Shares, and payment of the fees contemplated under the Plan, the Backstop Commitment Agreement, this New Common Stock Term Sheet and the Offering Procedures shall be in form and substance satisfactory to the Majority Backstop Purchasers;

- All motions and other documents to be filed with the Bankruptcy Court in connection the approval of the Postconfirmation Organizational Documents shall be in form and substance satisfactory to the Majority Backstop Purchasers;

- All reasonable out-of-pocket fees and expenses (including reasonable fees and expenses of counsel and the fees and expenses of financial advisors) required to be paid to the Backstop Purchasers under the Plan, the Backstop Commitment Agreement, this New Common Stock Term Sheet and/or the Offering Procedures have been paid;

- The Bankruptcy Court shall have entered an order (the "*Approval Order*"), in form and substance acceptable to the Majority Backstop Purchasers, which order shall (without limitation) authorize the Debtors to execute the Backstop Commitment Agreement and authorize and approve the transactions contemplated therein and herein, including (without limitation) the payment of all consideration and fees contemplated under the Backstop Commitment Agreement and this New Common Stock Term Sheet, and authorize the indemnification provisions set forth in the Backstop Commitment Agreement, which order shall be in full force and effect and shall not have been reversed, vacated or stayed

and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Majority Backstop Purchasers;

- The Adjusted EBITDA (as such term is defined in the Debtors' financial release dated as of November 2, 2009) for the twelve (12) months ending on November 30, 2009 shall exceed $180 million;

- Any and all governmental and third party consents and approvals necessary in connection with the offer and sale of the Shares, the execution and filing where applicable, of the Postconfirmation Organizational Documents and the transactions contemplated hereby and thereby shall have been obtained and shall remain in effect;

- The Exit Facility Loan Documents and the documents governing the New TW Loan (as such terms are defined in the Plan) shall be in form and substance acceptable to the Majority Backstop Purchasers; and

- The Plan shall have become, or simultaneously with the issuance of the Shares will become, effective.

**Termination of Backstop Commitments:**  The commitment of the Backstop Purchasers to purchase the Shares set forth in the Backstop Commitment Agreement (the "*Backstop Commitment*") shall terminate and all of the obligations of the Debtors (other than the obligations of the Debtors to pay the reimbursable fees and expenses and the Break Up Fee and to satisfy their indemnification obligations set forth in the Backstop Commitment Agreement) shall be of no further force or effect, at the election of and upon the giving of written notice of termination by the Majority Backstop Purchasers, in the event that any of the following occurs, each of which may be waived in writing by the Majority Backstop Purchasers:

- the Plan and Disclosure Statement, each in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably, are not filed by the Debtors with the Bankruptcy Court on or before November 6, 2009;

- the Bankruptcy Court fails to enter the Approval Order on or before December 7, 2009;

- the Solicitation Order, in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably, has not been entered by the Bankruptcy Court on or before December 7, 2009;

- the Debtors fail to commence a solicitation of votes for

acceptance of the Plan on or before December 11, 2009;

- the Approval Order does not become final on or before December 22, 2009;

- the Postconfirmation Organizational Documents, each in form and substance acceptable to the Majority Backstop Purchasers, are not filed under a Plan Supplement on or before the date that is ten days prior to the voting deadline on the Plan;

- the Confirmation Order, in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably, has not been entered by the Bankruptcy Court on or before January 31, 2010;

- the Confirmation Order shall not have become a final order by January 31, 2010;

- the Effective Date does not occur on or before February 15, 2010; provided, that the terminating party is not then in material breach of its obligations hereunder;

- the withdrawal, amendment, modification or filing of a pleading seeking to amend or modify, the Plan, the Disclosure Statement or any document related to the Plan or Disclosure Statement (including, without limitation, any motion, notice, exhibit, appendix or order) by the Debtors, which withdrawal, amendment, modification or filing is inconsistent with this New Common Stock Term Sheet;

- the filing by the Debtors of any motion or other request for relief seeking (i) to voluntarily dismiss any of the Chapter 11 Cases, (ii) conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code, or (iii) appointment of a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

- the entry of an order by the Bankruptcy Court (i) dismissing any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) appointing a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases; or (iv) making a finding of fraud, dishonesty, or misconduct by any officer or director of the Debtors;

- a material breach by the Debtors of any of their obligations under this New Common Stock Term Sheet or the Backstop Commitment Agreement that is not cured within five (5) business days after receipt of written notice thereof to the

Debtors from the Majority Backstop Purchasers;

- any court of competent jurisdiction or other competent governmental or regulatory authority issues an order making illegal or otherwise restricting, preventing, or prohibiting the restructuring set forth in this New Common Stock Term Sheet in a manner that cannot be reasonably remedied by the Debtors or the Majority Backstop Purchasers; and

- one or more of the conditions precedent to occurrence of the Effective Date set forth in this New Common Stock Term Sheet or to the obligations of the Backstop Purchasers set forth in the Backstop Commitment Agreement is not satisfied or, in the judgment of the Majority Backstop Purchasers, becomes impossible to satisfy on or before the Effective Date.

**Effective Date:**   The effective date of the Plan as ordered by the Bankruptcy Court, it being anticipated that such date will occur on or before February 15, 2010 (the "*Effective Date*").

**Expenses:**   Whether or not the transactions contemplated hereunder or the Backstop Commitment Agreement are consummated, the Debtors shall pay within 10 days of demand the reasonable and documented fees, expenses, disbursements and charges of the Backstop Purchasers incurred previously or in the future relating to the exploration and discussion of the restructuring of the Debtors, alternative financing structures to the Backstop Commitment or to the preparation and negotiation of the Backstop Commitment Agreement, the Plan, the Offering Procedures, this New Common Stock Term Sheet, the Plan Documents or the Postconfirmation Organizational Documents (including, without limitation, in connection with the enforcement or protection of any of rights and remedies under the Postconfirmation Organizational Documents) and, in each of the foregoing cases, the proposed documentation and the transactions contemplated thereunder, including, without limitation, the fees and expenses of counsel to the Backstop Purchasers, and the financial advisors to the Backstop Purchasers.