| | |
|---|---|
| | Financing Loan Parties. |

## Summary of the Material Terms of the New TW Loan

| | |
|---|---|
| Borrower: | Acquisition Parties. |
| Guarantors: | Reorganized SFI, Reorganized SFO, Reorganized SFTP and each of the current direct and indirect domestic subsidiaries of Reorganized SFI who are or in the future become guarantors under the Exit Facility Loans. |
| Principal: | $150,000,000 multi-draw term loan facility. |
| Maturity: | The principal amount of the New TW Loan borrowed on each Funding Date will be due and payable five years from such Funding Date. |
| Interest: | At a rate equal to (i) the greater of (a) LIBOR and (b) 2.50% (or to the extent that any LIBOR or similar floor under the Exit Term Loan (or under any senior term credit facility that amends, restates, amends and restates, refinances, modifies or extends the Exit Term Loan) is higher than 2.50%, such higher floor) plus (ii) the then "Applicable Margin" under the Exit Term Loan or under any successor term facility plus (iii) 1.00%. In the event that any of the loan parties issue corporate bonds or other public debt, the "Applicable Margin" referenced in the foregoing sentence will be adjusted based on the applicable default swap spread then in effect, subject to a fixed cap. |
| Covenants: | Certain covenants on similar terms as those contained in the Exit Facility Loan Documents but will be modified to provide additional flexibility to the New TW Guarantors from the covenants in the Exit Facility Loan Documents that are commensurate with their different positions in the capital structure of Six Flags. |
| Conditions: | TW's commitment is subject to certain customary conditions as well as confirmation of the Plan and the retention of the existing senior management of the Debtors continuing as the senior management of SFI following consummation of the Plan. In addition, the New TW Guarantors' payment or other binding obligations under the TW Commitment Papers would be subject to bankruptcy court approval.

Notwithstanding the foregoing, any material changes to the New TW Loan as described in the TW Commitment Papers shall be |

| | subject to the approval of the Majority Backstop Purchasers. |

RLF1 3518269v.1

## Schedule 1.81
## Material Terms of the Long-Term Incentive Plan

| | |
|---|---|
| Participants: | Management, selected employees and directors of Reorganized SFI. |
| Allocation: | Stock options and/or restricted stock in Reorganized SFI equal to 10% on a fully diluted basis.<br><br>Effective as of the Effective Date, the Debtors will adopt an incentive plan for management, selected employees and directors of Reorganized SFI, which shall be substantially in the form set forth in the Plan Supplement and shall contain the following material terms and conditions: (i) management, selected employees and directors of Reorganized SFI shall receive stock options and/or restricted stock in Reorganized SFI equal to 10% of the New Common Stock, determined on a fully diluted basis; and (ii) as of the Effective Date, the aggregate allocations to senior management under the Long-Term Incentive Plan will consist of 3.75% of the New Common Stock, determined on a fully diluted basis, in the form of restricted stock, which will vest in equal annual installments over the four year period, commencing on the effective date of the Employment Agreements (April 1, 2009), and 3.75% of the New Common Stock, determined on a fully diluted basis and with exercise prices based on a $1.335 total enterprise value, in the form of options, which will only vest at the expiration of the above four-year period, all of which will be to members of the Reorganized Debtors' management in accordance with their respective employment agreements.<br><br>Of the 10% referenced above, any additional allocations (other than those specified in Section 10.5 of the Plan) following the Effective Date shall be determined by the Postconfirmation Board. |

## APPENDIX I

## RIGHTS OFFERING PROCEDURES

The following Offering Procedures set forth the terms and conditions of the Offering (as defined below).

## ARTICLE I
## DEFINITIONS

As used in this Appendix I, the following terms shall have the respective meanings specified below and be equally applicable to the singular and plural of terms defined. Capitalized terms used in this Appendix I and not otherwise defined herein shall have the respective meanings provided in the Plan.

1.1     *2016 Notes* means those certain 12.25% unsecured notes due 2016 and issued by SFO under the 2016 Notes Indenture.

1.2     *2016 Notes Indenture* means that certain indenture, dated June 16, 2008, between SFO, as issuer, SFI, as guarantor, and HSBC Bank USA, N.A., as trustee, pursuant to which the 2016 Notes were issued, as amended from time to time.

1.3     *Accepting SFO Noteholder* means an Eligible Holder that votes to accept the Plan.

1.4     *Accredited Investor* means an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act.

1.5     *Approval Order* means that order, in form and substance satisfactory to the Debtors and Majority Backstop Purchasers, authorizing and approving the Backstop Commitment Agreement.

1.6     *Backstop Commitment* means the "Backstop Commitment" as defined in the Backstop Commitment Agreement.

1.7     *Backstop Commitment Agreement* means that certain commitment agreement executed by and between the Debtors and each of the Backstop Purchasers in connection with the Offering, attached hereto as Annex A, pursuant to which the Backstop Purchasers agreed to backstop the Offering in the respective percentages set forth on Schedule I of the New Common Stock Term Sheet.

1.8     *Backstop Purchasers* means those certain Persons signatory to the Backstop Commitment Agreement, each of which has agreed to backstop the Offering on the terms and subject to the conditions set forth in the Backstop Commitment Agreement.

1.9     *Eligible Holder* means an SFO Noteholder who is an Accredited Investor as of the Offering Record Date.

57

1.10 **_Limited Offering Pro Rata Share_** means (x) the total principal amount of 2016 Notes held by an Eligible Holder divided by (y) four times the aggregate principal amount of all 2016 Notes outstanding as of the Petition Date.

1.11 **_Majority Backstop Purchasers_** means the Backstop Purchasers that collectively hold a majority of the aggregate commitment percentage set forth on Schedule I of the New Common Stock Term Sheet.

1.12 **_New Common Stock Term Sheet_** means that certain term sheet attached to the Backstop Commitment Agreement as Exhibit A thereto.

1.13 **_Offering_** means the offering of $450.0 million in aggregate of New Common Stock (i) to each Eligible Holder in respect of its Limited Offering Pro Rata Share and (ii) to the extent less than the full Offering Amount is issued to the Eligible Holders, to the Backstop Purchasers.

1.14 **_Offering Amount_** means $450.0 million.

1.15 **_Offering Participant_** means an Accepting SFO Noteholders who participates in the Offering. For the avoidance of doubt, a Backstop Purchaser (i) shall be entitled to participate in the Offering in its capacity as a SFO Noteholder if it votes to accept the Plan and (ii) shall remain a Backstop Purchaser whether or not it votes to accept the Plan.

1.16 **_Offering Procedures_** means the rights offering procedures, setting forth the terms and conditions of the Offering, in substantially the form set forth in this Appendix I.

1.17 **_Offering Record Date_** means December 2, 2009.

1.18 **_Offering Subscription Purchase Price_** means, for each holder of Subscription Rights, such holder's Limited Offering Pro Rata Share multiplied by the Offering Amount. For purposes of the Offering, the New Common Stock shall be priced on the basis of an assumed enterprise value of SFI of $1.335 billion on the Effective Date.

1.19 **_SFO Noteholders_** means, collectively, the "Holders" under and as defined in the 2016 Notes Indenture.

1.20 **_SFO Unsecured Claim_** means any Allowed Unsecured Claim against SFO. SFO Unsecured Claims include, without limitation, Claims against SFO arising under or related to the 2016 Notes Indenture.

1.21 **_Subscription Agent_** means Kurtzman Carson Consultants LLC, in its capacity as a subscription agent in connection with the Offering.

1.22 **_Subscription Commencement Date_** means the date on which the Order approving the Disclosure Statement is entered.

RLF1 3518269v.1

1.23 **Subscription Expiration Date** means March 3, 2010, as specified in the Subscription Form, which shall be the final date that an Eligible Holder may elect to subscribe for the Subscription Rights.

1.24 **Subscription Form** means the form to be used by an Offering Participant pursuant to which such holder may exercise its respective Subscription Rights, which shall be in form and substance acceptable to the Majority Backstop Purchasers.

1.25 **Subscription Payment Date** means the Subscription Expiration Date or such other date to be designated by the Majority Backstop Purchasers, by which such Offering Subscription Purchase Price shall be due.

1.26 **Subscription Period** means the period of time between the Subscription Commencement Date and the Subscription Expiration Date.

1.27 **Subscription Rights** means the non-transferable, non-certified subscription rights to purchase New Common Stock in connection with the Offering, on the terms and subject to the conditions set forth in the Offering Procedures.

1.28 **Unsubscribed Shares** means those shares of New Common Stock to be issued in connection with the Offering (based on the Offering Amount) that are not, or can not be, subscribed for and purchased by Eligible Holders pursuant to the Offering prior to the Subscription Expiration Date.

## ARTICLE II

## THE OFFERING

2.1 **Issuance of Subscription Rights.**

(a) *Offering.* Each of the Eligible Holders shall be entitled to receive Subscription Rights entitling such participant to subscribe for up to its Limited Offering Pro Rata Share of New Common Stock to be issued pursuant to the Offering.

(b) *Equity Ownership in Reorganized SFI.* After giving effect to the issuance of New Common Stock pursuant to the SFO Unsecured Claims distribution, the Offering Participants and the Backstop Purchasers shall be entitled to receive approximately 69.77% of the total outstanding New Common Stock of Reorganized SFI on the Effective Date, which amount shall be subject to dilution in connection with awards issued on or after the Effective Date under the Long-Term Incentive Plan.

The Backstop Purchasers, on the terms and subject to the conditions of the Backstop Commitment Agreement, shall subscribe for and purchase all Unsubscribed Shares as of the Subscription Expiration Date.

59

2.2     **Subscription Period.**

The Offering shall commence on the Subscription Commencement Date and shall expire on the Subscription Expiration Date. Each Offering Participant intending to participate in the Offering must affirmatively elect to exercise its respective Subscription Rights on or prior to the Subscription Expiration Date. After the Subscription Expiration Date, the Unsubscribed Shares shall be treated as acquired by the Backstop Purchasers on the terms and subject to the conditions contained in the Backstop Commitment Agreement and the Plan, and any exercise of such Subscription Rights by any entity other than the Backstop Purchasers (or any affiliate or permitted assignee of such Backstop Purchasers in accordance with the Backstop Commitment Agreement) shall be null and void and there shall be no obligation to honor any such purported exercise received by the Subscription Agent after the Subscription Expiration Date, regardless of when the documents relating to such exercise were sent.

2.3     **Subscription Purchase Price.**

Each Offering Participant choosing to exercise its Subscription Rights shall be required to pay such participant's Offering Subscription Purchase Price for New Common Stock.

2.4     **Exercise of Subscription Rights.**

In order to exercise the Subscription Rights, each Offering Participant must: (a) return a duly completed Subscription Form to the Subscription Agent so that such form is actually received by the Subscription Agent on or before the Subscription Expiration Date; and (b) pay to the Subscription Agent (on behalf of the Debtors) on or before the Subscription Expiration Date such Offering Participant's Offering Subscription Purchase Price in accordance with the wire instructions set forth on the Subscription Form delivered to the Subscription Agent along with the Subscription Form.

Each Offering Participant may exercise all or any portion of such Offering Participant's Subscription Rights pursuant to the Subscription Form, but the exercise of any Subscription Rights shall be irrevocable. If the Subscription Agent for any reason does not receive from a given Offering Participant: (a) a duly completed Subscription Form on or prior to the Subscription Expiration Date; and (b) immediately available funds in an amount equal to such Offering Participant's Offering Subscription Purchase Price on or prior to the third Business Day prior to the Confirmation Hearing, such Offering Participant shall be deemed to have relinquished and waived its right to participate in the Offering.

The payments made in accordance with the Offering shall be deposited and held by the Subscription Agent in a trust or escrow account, or similarly segregated account or accounts which shall be separate and apart from the Subscription Agent's general operating funds and any other funds subject to any lien or similar encumbrance and which segregated account or accounts shall be maintained for the purpose of holding the money for administration of the Offering until the Effective Date. In the event the Effective Date does not occur within fifteen (15) days after the Confirmation Hearing, the funds will be returned to the Offering Participants unless a later date is selected at the joint option of the Debtors and the Majority

60

Backstop Purchasers, but in no event later than thirty (30) days after the Confirmation Hearing. The Subscription Agent shall not use such funds for any other purpose prior to such date and shall not encumber or permit such funds to be encumbered with any lien or similar encumbrance.

In order to facilitate the exercise of the Subscription Rights, on or promptly after the Subscription Commencement Date, the Subscription Form shall be provided by mail, electronic mail or facsimile transmission to each SFO Noteholder that any Backstop Purchaser knows to be an Eligible Holder or who identifies itself as an Eligible Holder to the Subscription Agent, together with appropriate instructions for the proper completion, due execution and timely delivery of the Subscription Form, as well as instructions for the payment of the applicable Subscription Purchase Price for that portion of the Subscription Rights sought to be exercised by such Offering Participant.

## 2.5    **Offering Procedures.**

Notwithstanding anything contained herein to the contrary, the Majority Backstop Purchasers (subject to the Debtors consent, which shall not be unreasonably withheld) may modify these Offering Procedures or adopt such additional detailed procedures consistent with the provisions of these Offering Procedures to more efficiently administer the exercise of the Subscription Rights; provided, however, that the Majority Backstop Purchasers shall provide prompt written notice to the Offering Participants of any material modification to these Offering Procedures.

## 2.6    **Transfer Restriction: Revocation.**

The Subscription Rights are not transferable. Any such transfer or attempted transfer shall be null and void, and no purported transferee shall be treated as the holder of any Subscription Rights. Once an Offering Participant has properly exercised its Subscription Rights, such exercise cannot be revoked, rescinded or modified.

## 2.7    **Offering Backstop.**

(a)    *General.* On the terms and subject to the conditions in the Backstop Commitment Agreement, the Backstop Purchasers have agreed to subscribe for and purchase on the Effective Date, at the aggregate Offering Subscription Purchase Price therefor, all Unsubscribed Shares as of the Subscription Expiration Date according to the respective percentages set forth on Schedule I of the New Common Stock Term Sheet. The Backstop Purchasers shall pay to the Subscription Agent, by wire transfer in immediately available funds one business day prior to the Confirmation Hearing, Cash in an amount equal to the aggregate Offering Subscription Purchase Price attributable to such Unsubscribed Shares as provided in the Backstop Commitment Agreement; provided, that such funds shall be immediately refunded to the Backstop Purchasers if the Effective Date does not occur within fifteen (15) days of the Confirmation Hearing unless otherwise decided by the Majority Backstop Purchasers. The Subscription Agent shall deposit such payment into the same trust or escrow account into which were deposited the Offering Subscription Purchase Price payments of Offering Participants on the exercise of their Subscription Rights. The Subscription Agent shall give the Debtors and the Backstop Purchasers by e-mail and electronic facsimile transmission written notification setting

61

forth a true and accurate calculation of the number of Unsubscribed Shares, together with the aggregate Offering Subscription Purchase Price therefor (the "***Backstop Purchase Notice***") as soon as practicable after the Subscription Expiration Date. In addition, the Subscription Agent shall notify the Backstop Purchasers, on each Friday during the Subscription Period and on each Business Day during the five (5) Business Days prior to the Subscription Expiration Date (and any extensions thereto), or more frequently if requested by the Backstop Purchasers, of the aggregate number of Subscription Rights known by the Subscription Agent to have been exercised pursuant to the Offering as of the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be.

(b)     *Payment.* Subscription Agent shall determine the number of Unsubscribed Shares, if any, in good faith, and provide the Debtors and the Backstop Purchasers with a Backstop Purchase Notice that accurately reflects the number of Unsubscribed Shares as so determined. On the Effective Date, the Backstop Purchasers shall purchase only such number of Unsubscribed Shares as are listed in the Backstop Purchase Notice, without prejudice to the rights of the Backstop Purchasers to seek later an upward or downward adjustment if the number of Unsubscribed Shares in such Backstop Purchase Notice is inaccurate. Delivery of the Unsubscribed Shares shall be made to the account of the Backstop Purchasers (or to such other accounts as the Backstop Purchasers may designate) on the Effective Date against application by the Subscription Agent of the Offering Subscription Purchase Price payments of Offering Participants on the exercise of their Subscription Rights to a bank account in the United States specified by the Debtors to the Backstop Purchasers at least 24 hours in advance. All Unsubscribed Shares shall be delivered with any and all issue, stamp, transfer or similar taxes or duties payable in connection with such delivery duly paid by the Debtors or the Reorganized Debtors to the extent required under the Confirmation Order or applicable law.

(c)     *Transfer of Backstop Commitment.* Notwithstanding anything contained herein to the contrary, the Backstop Purchasers, in their sole discretion, may designate that some or all of the Unsubscribed Shares be issued in the name of, and delivered to, one or more of its affiliates, or to other financial institutions, in each case, reasonably acceptable to the Debtors.

(d)     *Conditions Precedent to Obligations of Backstop Purchasers.* The obligations of the Backstop Purchasers to purchase New Common Stock shall be conditioned upon satisfaction of each of the following; provided, that any or all of the following conditions may be waived in writing by the Majority Backstop Purchasers:

(i)     the Postconfirmation Organizational Documents shall be in form and substance acceptable to the Majority Backstop Purchasers;

(ii)     the Registration Rights Agreement shall be in form and substance acceptable to the Majority Backstop Purchasers;

(iii)     except as otherwise provided, the Plan, the Disclosure Statement, the Solicitation Order, the Confirmation Order and any Plan supplemental documents (collectively, the "***Plan Documents***") shall be in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably;

(iv)     all motions and other documents to be filed with the Bankruptcy Court in connection with the Offering, and payment of the fees contemplated under the Plan, the Backstop Commitment Letter, the New Common Stock Term Sheet and under these Offering Procedures shall be in form and substance acceptable to the Majority Backstop Purchasers;

(v)     all motions and other documents to be filed with the Bankruptcy Court in connection with the approval of the Postconfirmation Organizational Documents shall be in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably;

(vi)     all reasonable out-of-pocket fees and expenses (including reasonable fees and expenses of counsel and, if applicable, the fees and expenses of financial advisors) required to be paid to the Backstop Purchasers under the Plan, the Backstop Commitment Letter, the New Common Stock Term Sheet and/or these Offering Procedures have been paid;

(vii)     the Bankruptcy Court shall have entered the Approval Order, in form and substance satisfactory to the Majority Backstop Purchasers;

(viii)     the Adjusted EBITDA (as such term is defined in the Debtors' financial release dated as of November 2, 2009) for the twelve (12) months ending November 30, 2009 shall exceed $180 million;

(ix)     any and all governmental and third party consents and approvals necessary in connection with the Offering, the execution and filing where applicable, of the Postconfirmation Organizational Documents and the transactions contemplated hereby and thereby shall have been obtained and shall remain in effect;

(x)     the Exit Facility Loan Documents and the documents governing the New TW Loan (as such terms are defined in the Plan) shall be in form and substance acceptable to the Majority Backstop Purchasers; and

(xi)     The Plan shall have become, or simultaneously with the issuance of the Shares will become, effective.

### 2.8     Breakup Fees and Expenses.

Under the Backstop Commitment Agreement, in the event that the Debtors enter into a financing transaction with parties other than the Backstop Purchasers or do not issue the New Common Stock on the terms and subject to the conditions set forth in the Plan and New Common Stock Term Sheet, the Debtors shall pay to the Backstop Purchasers an aggregate breakup fee in Cash equal to 2.5% of the Offering Amount, which fee shall be fully earned upon entry of an order of the Bankruptcy Court authorizing the Debtors to execute the Backstop Commitment Agreement and shall be payable in full on the Effective Date.

Under the Backstop Commitment Agreement, upon the confirmation of any plan of reorganization, the Debtors shall pay all reasonable out-of-pocket fees and expenses

of the Backstop Purchasers to the extent provided in such Backstop Commitment Agreement (including reasonable fees and expenses of counsel and, if applicable, the fees and expenses of financial advisors) on or before the effective date of such plan of reorganization.

### 2.9 **Distribution of the New Common Stock.**

On the Effective Date, Reorganized SFI shall distribute the New Common Stock purchased by each Offering Participant that has properly exercised its Subscription Rights to such holder and to the Backstop Purchasers. If the exercise of a Subscription Right would result in the issuance of a fractional share of New Common Stock, then the number of shares of New Common Stock to be issued in respect of such Subscription Right shall be rounded down to the closest whole share.

### 2.10 **Exemption from Registration under the Securities Act.**

The Offering is being made to Eligible Holders only. The New Common Stock issued pursuant to the Offering to the Offering Participants shall be exempt from registration under the Securities Act by virtue of section 4(2) thereof. Unlike the New Common Stock issued to holders of Allowed SFO Unsecured Claims, the New Common Stock issued to the Offering Participants pursuant to the Offering will not be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code.

### 2.11 **Validity of Exercise of Subscription Rights.**

All questions concerning the timeliness, viability, form and eligibility of any exercise of Subscription Rights shall be determined by the Majority Backstop Purchasers, whose good faith determinations shall be final and binding. The Majority Backstop Purchasers, in their discretion, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights. Subscription Forms shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Majority Backstop Purchasers determine in their discretion. The Majority Backstop Purchasers shall use commercially reasonable efforts to give notice to any Offering Participants regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such participant and, may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Majority Backstop Purchasers nor the Subscription Agent shall incur any liability for failure to give such notification.

### 2.12 **Indemnification of Backstop Purchasers.**

The Debtors or the Reorganized Debtors, as the case may be, agree to indemnify and hold harmless the Backstop Purchasers and their respective present and former directors, officers, partners, members, representatives, employees, agents, attorneys, financial advisors, restructuring advisors and other professional advisors (each an "***Indemnified Person***") from and against any and all losses, claims, damages, liabilities and expenses, joint or several, to which any such Indemnified Person may incur, have asserted against it or be involved in as a result of or arising out of or in any way related to the Plan, the Offering, the Backstop Commitment

64

Agreement or the transactions contemplated hereby or thereby, including without limitation distribution of the Subscription Rights, the purchase and sale of New Common Shares in the Offering and purchase and sale of Unsubscribed Shares to the Backstop Purchasers pursuant to the Backstop Commitment Agreement or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any of such Indemnified Persons is a party thereto, and to reimburse each of such Indemnified Persons within 10 days after demand for any legal or other expenses incurred in connection with any of the foregoing; provided, however, that the foregoing indemnity shall not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from the willful misconduct or gross negligence of such Indemnified Person.

Notwithstanding any other provision to the contrary, no Indemnified Person shall be liable for any special, indirect, consequential or punitive damages in connection with its activities related to the Plan, the Offering, the Backstop Commitment Agreement or the transactions contemplated hereby or thereby. The terms set forth in this section 2.12 shall survive termination of the Backstop Commitment Agreement and shall remain in full force and effect regardless of whether the Offering is consummated.

65

## ANNEX A

### AVENUE CAPITAL MANAGEMENT
### FIDELITY MANAGEMENT & RESEARCH CO. AND CERTAIN AFFILIATES
### HAYMAN ADVISORS, L.P.
### J.P. MORGAN INVESTMENT MANAGEMENT INC.
### NORTHEAST INVESTORS TRUST
### THIRD POINT, LLC
### WHITEBOX ADVISORS, LLC

November 6, 2009 (as amended on or about November 30, 2009, and as further amended as of December 16, 2009)

Six Flags, Inc.
1540 Broadway
New York, NY 10036

Attention:    Mr. Jeffrey Speed
                    Chief Financial Officer

Re:    <u>$450,000,000 Common Stock Backstop Commitment</u>

Ladies and Gentlemen:

Reference is made to the chapter 11 bankruptcy cases, lead case no. 09-12019 (the "<u>Chapter 11 Cases</u>"), currently pending before the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), in which Six Flags, Inc. and certain of its affiliates are debtors and debtors in possession (collectively, the "<u>Debtors</u>"). Reference is further made to: (i) a Chapter 11 plan of reorganization that will be filed by the Debtors concurrently herewith (as such plan of reorganization may be modified or amended from time to time, the "<u>Plan</u>") and (ii) a disclosure statement that will accompany the Plan (as it may be modified or amended from time to time, the "<u>Disclosure Statement</u>"). Capitalized terms used in this letter agreement (the "<u>Backstop Commitment Agreement</u>") and not otherwise defined herein shall have the meanings provided in the Plan.

The Plan proposes, among other things, to obtain exit financing required for the emergence of the Debtors from Chapter 11 by offering (the "<u>Offering</u>") to eligible holders of pre-petition claims with respect to Six Flags Operations, Inc. ("<u>SFO</u>") 12¼% Senior Notes due 2016 (the "<u>Eligible Holders</u>") a limited right to participate in $450 million in the aggregate (the "<u>Offering Amount</u>") of new common stock (the "<u>New Common Stock</u>") of Six Flags, Inc. ("<u>SFI</u>"), subject to dilution in connection with awards issued on or after the Effective Date under the Long Term Incentive Plan, as more fully described in the Plan and the offering

66

procedures ("Offering Procedures") established in the Plan.[1] Pursuant to the Plan and Offering Procedures, each Eligible Holder will receive an offer to participate in the Offering based on its respective Limited Pro Rata Share holdings and will be required to accept such offer by the Subscription Expiration Date as and to the extent set forth in the Offering Procedures. For purposes of the Offering, the term "Limited Pro Rata Share" means (x) the total principal amount of SFO 12¼% Senior Notes (the "SFO Notes") held by an Eligible Holder divided by (y) four times the aggregate principal amount of all SFO Notes outstanding as of the Petition Date.

To provide assurance that the Offering will be fully subscribed and that the Offering is consummated in respect of the entire Offering Amount, the undersigned (collectively, the "Backstop Purchasers") hereby commit, severally and not jointly, to backstop the Offering (the "Backstop Commitment") in the respective percentages set forth on Schedule I of the term sheet relating to the issuance of the New Common Stock (the "New Common Stock Term Sheet") attached hereto as Exhibit A, and on the terms described herein and in the Plan. Each Backstop Purchaser shall fund its pro rata share of the Unsubscribed Shares (as defined in the Offering Procedures) one business day prior to the hearing conducted by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time (the "Confirmation Hearing"). Such funds shall be held in an escrow or trust account to be designated by the Backstop Purchasers and shall be immediately refunded if the Effective Date does not occur within fifteen (15) days following the Confirmation Hearing, unless otherwise extended by the Majority Backstop Purchasers. "Majority Backstop Purchasers" means the Backstop Purchasers that collectively hold a majority of the aggregate commitment percentage set forth on Schedule I of the New Common Stock Term Sheet.

The Debtors hereby agree that, in the event that the Debtors enter into a financing transaction with parties other than the Backstop Purchasers or do not issue the New Common Stock on the terms set forth in the Plan and the New Common Stock Term Sheet, the Debtors shall pay to the Backstop Purchasers an aggregate break up fee equal to 2.5% of the Offering Amount (the "Break Up Fee"), which fee shall be fully earned upon entry of the Approval Order (as defined below) by the Bankruptcy Court and shall be payable in full in Cash upon the confirmation of any Chapter 11 plan of reorganization (other than the Plan) or liquidation with respect of the Debtors.

The agreement of the Backstop Purchasers hereunder is conditioned upon satisfaction of each of the conditions set forth in the Plan, the Offering Procedures and New Common Stock Term Sheet, including (without limitation) the entry of an order of the Bankruptcy Court on or before December 21, 2009, in form and

---

[1] The Plan also contemplates paying off the Prepetition Credit Agreement Claims with the proceeds of the Offering and the Exit Term Loan (as such terms are defined in the Plan).

substance satisfactory to the Majority Backstop Purchasers, which order shall (without limitation) authorize the Debtors to execute this Backstop Commitment Agreement and authorize and approve the transactions contemplated herein and the New Common Stock Term Sheet, including (without limitation) the payment of all consideration and fees contemplated herein and therein, and authorize the indemnification provisions set forth in this Backstop Commitment Agreement, which order shall become a final order not subject to stay, appeal or modification (absent the prior written consent of the Majority Backstop Purchasers) on or before January 6, 2010 (the "Approval Order"). Notwithstanding any other provision herein, no Break Up Fee shall be payable if any non-Debtor party hereto is in breach of its obligations hereunder as of the date on which the Break Up Fee would otherwise be earned or payable unless one or more other Backstop Purchasers have assumed such breaching party's obligations hereunder.

The obligation of the Backstop Purchasers is further conditioned upon (a) the Adjusted EBITDA (as such term is defined in the Debtors' financial release dated as of November 2, 2009) for the twelve (12) months ending November 30, 2009 exceeding $180 million, (b) entry into documentation governing the Exit Revolving Loans, the Exit Term Loan and the New TW Loan (as such terms are defined in the Plan) that is satisfactory in form and substance to the Majority Backstop Purchasers and (c) entry by the Bankruptcy Court of an order (which has become final) confirming the Plan (with such changes as are satisfactory to the Majority Backstop Purchasers) (the Plan in the form confirmed by the Bankruptcy Court, the "Confirmed Plan"), and such Confirmed Plan becoming effective, on or before April 23, 2010.

Whether or not the transactions contemplated hereby are consummated, the Debtors agree to: (x) pay within 10 days of demand the reasonable and documented fees, expenses, disbursements and charges of the Backstop Purchasers incurred previously or in the future relating to the exploration and discussion of the restructuring of the Debtors, alternative financing structures to the Backstop Commitment or to the preparation and negotiation of this Backstop Commitment Agreement, the Plan, the Offering Procedures, the New Common Stock Term Sheet, the Plan Documents or the Postconfirmation Organizational Documents (including, without limitation, in connection with the enforcement or protection of any rights and remedies under the Postconfirmation Organizational Documents) and, in each of the foregoing cases, the proposed documentation and the transactions contemplated thereunder, including, without limitation, the fees and expenses of counsel to the Backstop Purchasers, and the financial advisors to the Backstop Purchasers and (y) indemnify and hold harmless the Backstop Purchasers and their respective general partners, members, managers and equity holders, and the respective officers, employees, affiliates, advisors, agents, attorneys, financial advisors, accountants, consultants of each such entity, and to hold the Backstop Purchasers and such other persons and entities (each an "Indemnified Person") harmless from and against any and all losses, claims, damages, liabilities and expenses, joint or several, which any such person or

68

entity may incur, have asserted against it or be involved in as a result of or arising out of or in any way related to this letter, the matters referred to herein, the Plan, the New Common Stock Term Sheet, the proposed Backstop Commitment contemplated hereby, the use of proceeds thereunder or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any of such Indemnified Persons is a party thereto, and to reimburse each of such Indemnified Persons upon 10 days of demand for any legal or other expenses incurred in connection with any of the foregoing; provided, however, that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from the willful misconduct or gross negligence of such Indemnified Person. Notwithstanding any other provision of this letter, no Indemnified Person will be liable for any special, indirect, consequential or punitive damages in connection with its activities related to the Backstop Commitment and the Offering. The terms set forth in this paragraph survive termination of this Backstop Commitment Agreement and shall remain in full force and effect regardless of whether the documentation for the Offering is executed and delivered.

This letter (a) is not assignable by the Debtors without the prior written consent of the Majority Backstop Purchasers (and any purported assignment without such consent shall be null and void), and (b) is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. Notwithstanding the foregoing, the Backstop Purchasers may assign all or any portion of their obligations hereunder to one or more financial institutions reasonably acceptable to SFI; provided, that no Debtor's consent shall be required for such an assignment to another Backstop Purchaser or an affiliate of a Backstop Purchaser. Upon any such assignment (other than an assignment with the Debtors' consent or an assignment to another Backstop Purchaser), the obligations of the Backstop Purchasers in respect of the portion of their obligations so assigned shall not terminate. In the event that any Backstop Purchaser fails to meet its obligations under this Backstop Commitment Agreement, the non-breaching Backstop Purchasers shall have the right, but not the obligation, to assume such obligations in such manner as they may agree.

This Backstop Commitment Agreement sets forth the agreement of the Backstop Purchasers to fund the Backstop Commitment on the terms described herein and shall be considered withdrawn if the Backstop Purchasers have not received from the Debtors a fully executed counterpart to this Backstop Commitment Agreement **on or before November 6, 2009 at 11:59 PM (ET)**, unless such deadline is extended by the Majority Backstop Purchasers.

The obligations of the Backstop Purchasers to fund the Backstop Commitment shall terminate and all of the obligations of the Debtors (other than the obligations of the Debtors to (i) pay the reimbursable fees and expenses, (ii) satisfy their

indemnification obligations and (iii) pay the Break Up Fee, in each case, as set forth herein) shall be of no further force or effect, upon the giving of written notice of termination by the Majority Backstop Purchasers, in the event that any of the items set forth in the New Common Stock Term Sheet under the heading "Termination of Backstop Commitments" occurs, each of which may be waived in writing by the Majority Backstop Purchasers.

THIS COMMITMENT LETTER WILL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

This Backstop Commitment Agreement may not be amended or waived except in writing signed by the Debtors and the Majority Backstop Purchasers. This Backstop Commitment Agreement may be executed in any number of counterparts, each of which will be an original, and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of this Backstop Commitment Agreement by facsimile or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Backstop Commitment Agreement.

This Backstop Commitment Agreement and the Plan are part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Backstop Commitment Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Backstop Commitment Agreement.

Execution of this Backstop Commitment Agreement by a Backstop Purchaser shall be deemed a direction by such Backstop Purchaser to direct HSBC Bank USA, National Association ("HSBC"), as indenture trustee, under that certain Indenture, dated as of June 16, 2008, between and among SFO, SFI and HSBC, to (a) engage Akin Gump Strauss Hauer & Feld LLP, as special counsel, effective as of June 13, 2009, with respect to any and all legal services on behalf of holders of SFO Notes related to the Chapter 11 Cases, (b) engage Drinker Biddle & Reath LLP, as local Delaware counsel, effective as of September 4, 2009, with respect to any and all legal services on behalf of holders of SFO Notes related to the Chapter 11 Case and (c) engage Barclays Capital Inc. pursuant to the terms of Barclays Capital's engagement letter dated October 8, 2009.

Notwithstanding anything contained herein, each Backstop Purchaser acknowledges that its decision to enter into this Backstop Commitment Agreement has been made by such Backstop Purchaser independently of any other Backstop Purchaser.

This Backstop Commitment Agreement constitutes the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral, between the parties hereto with respect to the subject matter hereof and shall become effective and binding upon (i) the mutual exchange of fully executed counterparts and (ii) the entry of the Approval Order.

The undersigned represent that they have the authority to execute and deliver this Backstop Commitment Agreement on behalf of their respective affiliate Backstop Purchasers listed on Schedule I to the New Common Stock Term Sheet.

[SIGNATURE PAGES FOLLOW]

71

If the foregoing is in accordance with your understanding of our agreement, please sign this letter in the space indicated below and return it to us.

Very truly yours,

[SIGNATURE PAGES TO FOLLOW]

RLF1 3518269v.1

ACCEPTED AND AGREED THIS 6th DAY OF
NOVEMBER, 2009:

SIX FLAGS, INC.

By: _____
Name: Jeffrey R. Speed
Title: Chief Financial Officer

**AVENUE CAPITAL MANAGEMENT**

By: _____
    Name:
    Title:

[SIGNATURES CONTINUE ON FOLLOWING PAGES]

**Fidelity Summer Street Trust: Fidelity Capital & Income Fund**

By: _____

Name:

Title:        Paul Murphy
            Assistant Treasurer

[COMMITMENT LETTER SIGNATURE PAGE]

**Master Trust Bank of Japan Ltd Re: Fidelity US High Yield**

By: _____

Name: _____

Title:          Paul Murphy
                   Assistant Treasurer

[COMMITMENT LETTER SIGNATURE PAGE]

**Fidelity Advisor Series I: Fidelity Advisor High Income Advantage Fund**

By: _____

    Name:

    Title:      Paul Murphy

                Assistant Treasurer

[COMMITMENT LETTER SIGNATURE PAGE]

**Fidelity Puritan Trust: Fidelity Puritan Fund**

By: _____

Name:

Title:          Paul Murphy
                Assistant Treasurer

[COMMITMENT LETTER SIGNATURE PAGE]

**Fidelity Advisor Series I: Fidelity Advisor
Leveraged Stock Fund**

By: _____

    Name:

    Title:        Paul Murphy
                Assistant Treasurer

[COMMITMENT LETTER SIGNATURE PAGE]

**Fidelity Summer Street Trust: Fidelity High Income Fund**

By: _____

Name:
Title:  Paul Murphy
       Assistant Treasurer

**Fidelity Advisor Series II: Fidelity Advisor
Strategic Income Fund**

By: _____

    Name:

    Title:          Paul Murphy
                  Assistant Treasurer

[COMMITMENT LETTER SIGNATURE PAGE]

**Fidelity School Street Trust: Fidelity Strategic Income Fund**

By: _____

Name:

Title:          Paul Murphy
                  Assistant Treasurer

[COMMITMENT LETTER SIGNATURE PAGE]

**Fidelity Funds - US High Income**

By: _____
Name:
Title:
Paul Murphy
Assistant Treasurer

**Fidelity Investments Canada ULC, As Trustee Of The Fidelity American High Yield Fund**

By: _____

    Name:

    Title:          Paul Murphy

                  Assistant Treasurer

[COMMITMENT LETTER SIGNATURE PAGE]

**Fidelity Investments Canada ULC, As Trustee Of
The Fidelity Canadian Asset Allocation Fund**

By: _____

    Name:

    Title:            Paul Murphy

                   Assistant Treasurer

[COMMITMENT LETTER SIGNATURE PAGE]

**Fidelity Investments Canada ULC, As Trustee of
The Fidelity Balanced High Income Fund**

By: _____

Name:

Title:         Paul Murphy
               Assistant Treasurer

[COMMITMENT LETTER SIGNATURE PAGE]

**Variable Insurance Products Fund V: Strategic
Income Portfolio**

By: _____

Name:
Title:          Paul Murphy
               Assistant Treasurer

**Fidelity Central Investment Portfolios LLC:**
**Fidelity High Income Central Fund 2**

By: _____
      Name:
      Title:       Paul Murphy
                 Assistant Treasurer

**Illinois Municipal Retirement Fund**

By: _____
　　Name:
　　Title:　　　　　　　　　　Dave Censorio
　　　　　　　　　　　　　　　Vice President

[COMMITMENT LETTER SIGNATURE PAGE]

**The Japan Trustee Service Bank LTD Re: MATB
Fidelity High Yield Bond Open Mother**

By: _____

    Name: _____

    Title:                   Dave Censorio

                               Vice President

[COMMITMENT LETTER SIGNATURE PAGE]

**Fidelity Global Bond Series-US Dollar Monthly Income-US High Yield Pool**

By: _____

    Name:

    Title:                   Dave Censorio

                            Vice President

[COMMITMENT LETTER SIGNATURE PAGE]

**IG CAA High Yield Sec**

By: _____

    Name:

    Title:                                    Dave Censorio

                                              Vice President

[COMMITMENT LETTER SIGNATURE PAGE]

The Japan Trustee Services Bank LTD Re: STB
Fidelity Strategic Income Fund Mother

By: _____

    Name:

    Title:                            Dave Censorio

                                       Vice President

[COMMITMENT LETTER SIGNATURE PAGE]

**HAYMAN CAPITAL MASTER FUND, LP**

By: Hayman Advisors, L.P., its general partner

By: _____
Name:
Title:           Debby Lamoy
              Chief Operating Officer
              Hayman Advisors, LP


[SIGNATURES CONTINUE ON FOLLOWING PAGES]

J.P. MORGAN INVESTMENT MANAGEMENT INC., NOT IN ITS INDIVIDUAL
CAPACITY BUT ACTING AS INVESTMENT MANAGER WITH FULL
DISCRETIONARY AUTHORITY OVER THE ACCOUNTS IDENTIFIED BELOW:

By: _____
Name: James P. Shanahan, Jr.
Title: Managing Director

### 2016 Notes:

JP Morgan High Yield Bond Fund

Principal Funds Inc. – High Yield I

JP Morgan Income Builder Fund

Commingled Pension Trust Fund (High Yield Bond) of JPMorgan Chase Bank, N.A.

Pacholder High Yield Fund, Inc.

JP Morgan Investment Funds – JPM Global Income Fund

JP Morgan Strategic Income Opportunities Fund

JP Morgan Investment Funds – Income Opportunity Fund

JP Morgan Distressed Debt Fund

$ _____
Principal Face Amount of 2016 Notes

[SIGNATURES CONTINUE ON FOLLOWING PAGES]

[COMMITMENT LETTER SIGNATURE PAGE]

**THIRD POINT LLC**

By: _____
     Name:
     Title:    **Mendy R Haas**
                 **CFO**

[SIGNATURES CONTINUE ON FOLLOWING PAGES]

[COMMITMENT LETTER SIGNATURE PAGE]

**WHITEBOX ADVISORS, LLC**

By: _____
    Name: Jonathan Wood
    Title: Chief Operating Officer

[SIGNATURES CONTINUE ON FOLLOWING PAGES]

Commitment Letter

NORTHEAST INVESTORS TRUST

By: _Smith. M_

Name: BRUCE H MONROE

Title: trustee, not individually

[BACKSTOP COMMITMENT AGREEMENT SIGNATURE PAGE]

# Exhibit A

## New Common Stock Term Sheet

# SIX FLAGS, INC.

## $450,000,000 COMMON STOCK

### <u>Summary of Principal Terms</u>

The following Summary of Principal Terms (this "**New Common Stock Term Sheet**") provides an outline of a proposed Common Stock offering by the Issuer identified below in connection with and upon the emergence of the Issuer and its affiliates (collectively, the "**Debtors**") from chapter 11 proceedings pursuant to a chapter 11 plan of reorganization, the terms of which are described in more detail in the Backstop Commitment Agreement (defined below) to which this New Common Stock Term Sheet is attached (the "**Plan**"). The actual terms and conditions upon which any purchaser might purchase the Shares are subject to execution and delivery of definitive legal documentation, by all required parties and such other terms and conditions as are determined by the parties. This New Common Stock Term Sheet and the information contained herein is strictly confidential and may not be shared with any person or entity without the prior written consent of the Majority Backstop Purchasers (as defined below). Unless otherwise defined herein, each capitalized term used in this New Common Stock Term Sheet shall have the same meaning ascribed to such term in the Plan.

| | |
|---|---|
| **Issuer:** | Six Flags, Inc. (the "*Issuer*"). |
| **Securities Offered:** | $450,000,000 in the aggregate (the "*Offering Amount*") of Common Stock (the "*Shares*"). |
| **Offering:** | The Shares, representing 69.77% of the New Common Stock of the Issuer on the Effective Date (as defined below), subject to dilution in connection with awards issued on or after the Effective Date under the Long-Term Incentive Plan, will be offered on a limited basis and as provided in the Offering Procedures (the "*Offering*") (i) to each Eligible Holder its Limited Offering Pro Rata Share and (ii) to the extent less than all of the Shares are issued to the Accepting SFO Noteholders, to the entities which agree to backstop the Offering pursuant to the Backstop Commitment Agreement (defined below), the initial list of which is set forth on <u>Schedule I</u> hereto (the parties listed on Schedule I, the "*Backstop Purchasers*").[1] For the avoidance of doubt, a Backstop Purchaser shall be entitled to participate in the Offering |

---

[1] The net effect of the Offering, (i) assuming the Offering is fully subscribed for by Eligible Holders and (ii) as a result of the application of each Eligible Holder's Limited Offering Pro Rata Share, all Eligible Holders (including Backstop Purchasers solely in their capacity as Eligible Holders) would acquire approximately 25% of the Shares (or approximately 4%, excluding purchases by Backstop Purchasers that are Eligible Holders), and the Backstop Purchasers would acquire approximately 75% of the Shares (or approximately 96% of the Shares, including purchases by Backstop Purchasers in their capacity as Eligible Holders).

in its capacity as a SFO Noteholder.

On the terms and subject to the conditions set forth in that certain backstop commitment agreement, dated as of November 6, 2009 (as amended on or about November 30, 2009, and as further amended as of December 16, 2009, the "***Backstop Commitment Agreement***"), each Backstop Purchaser will severally commit to purchase its respective Commitment Percentage of Shares in the aggregate principal amount equal to $450,000,000. For purposes hereof, a Backstop Purchaser's "***Commitment Percentage***" is the percentage for such Backstop Purchaser set forth on <u>Schedule I</u> hereto. Subject to the terms and conditions of the Backstop Commitment Agreement, the rights to subscribe for the purchase of the Shares shall be non-transferrable.

The Offering will only be made to accredited investors in a fashion that will be exempt from registration under the Securities Act of 1933 as amended (the "***1933 Act***").

**Purchase Price:**

The Offering will be at a purchase price based upon an assumed enterprise value of the Issuer on the Effective Date of $1.335 billion.

**Use of Proceeds:**

Proceeds of the Shares may only be used to make payments required to be made on and after the Effective Date under the Plan, including, without limitation, repayment of all amounts owing under the Prepetition Credit Agreement.

**Fees:**

In the event the Issuer enters into a financing transaction with parties other than the Backstop Purchasers or does not issue the Shares on the terms set forth in this New Common Stock Term Sheet, the Debtors shall pay to the Backstop Purchasers an aggregate break up fee in Cash equal to 2.5% of the Offering Amount (the "***Break Up Fee***"), which fee shall be fully earned upon entry of the Approval Order by the Bankruptcy Court and shall be payable in full in Cash upon the confirmation of any Chapter 11 plan of reorganization (other than the Plan) or liquidation with respect of the Debtors.

**Registration Rights:**

To the extent contemplated by the Plan, Purchasers of Shares may be entitled to become party to a Registration Rights Agreement all in form and substance satisfactory to the Majority Backstop Purchasers.

**Conditions Precedent
To the Closing:**

The obligation of the Backstop Purchasers to purchase the Shares will be conditioned upon satisfaction of each of the following; <u>provided</u>, that each of the following conditions may be waived in

2

writing by the Majority Backstop Purchasers:

- The Postconfirmation Organizational Documents shall be in form and substance acceptable to the Majority Backstop Purchasers;

- The Registration Rights Agreement shall be in form and substance acceptable to the Majority Backstop Purchasers;

- Except as otherwise provided, the Plan, the Disclosure Statement, the Solicitation Order, the Confirmation Order and any Plan supplemental documents (collectively, the "*Plan Documents*") shall be in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably;

- All motions and other documents to be filed with the Bankruptcy Court in connection with the offer and sale of the Shares, and payment of the fees contemplated under the Plan, the Backstop Commitment Agreement, this New Common Stock Term Sheet and the Offering Procedures shall be in form and substance satisfactory to the Majority Backstop Purchasers;

- All motions and other documents to be filed with the Bankruptcy Court in connection the approval of the Postconfirmation Organizational Documents shall be in form and substance satisfactory to the Majority Backstop Purchasers;

- All reasonable out-of-pocket fees and expenses (including reasonable fees and expenses of counsel and the fees and expenses of financial advisors) required to be paid to the Backstop Purchasers under the Plan, the Backstop Commitment Agreement, this New Common Stock Term Sheet and/or the Offering Procedures have been paid;

- The Bankruptcy Court shall have entered an order (the "*Approval Order*"), in form and substance acceptable to the Majority Backstop Purchasers, which order shall (without limitation) authorize the Debtors to execute the Backstop Commitment Agreement and authorize and approve the transactions contemplated therein and herein, including (without limitation) the payment of all consideration and fees contemplated under the Backstop Commitment Agreement and this New Common Stock Term Sheet, and authorize the indemnification provisions set forth in the Backstop Commitment Agreement, which order shall be in full force and effect and shall not have been reversed, vacated or stayed

3

and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Majority Backstop Purchasers;

- The Adjusted EBITDA (as such term is defined in the Debtors' financial release dated as of November 2, 2009) for the twelve (12) months ending on November 30, 2009 shall exceed $180 million;

- Any and all governmental and third party consents and approvals necessary in connection with the offer and sale of the Shares, the execution and filing where applicable, of the Postconfirmation Organizational Documents and the transactions contemplated hereby and thereby shall have been obtained and shall remain in effect;

- The Exit Facility Loan Documents and the documents governing the New TW Loan (as such terms are defined in the Plan) shall be in form and substance acceptable to the Majority Backstop Purchasers; and

- The Plan shall have become, or simultaneously with the issuance of the Shares will become, effective.

**Termination of Backstop Commitments:** The commitment of the Backstop Purchasers to purchase the Shares set forth in the Backstop Commitment Agreement (the "*Backstop Commitment*") shall terminate and all of the obligations of the Debtors (other than the obligations of the Debtors to pay the reimbursable fees and expenses and the Break Up Fee and to satisfy their indemnification obligations set forth in the Backstop Commitment Agreement) shall be of no further force or effect, at the election of and upon the giving of written notice of termination by the Majority Backstop Purchasers, in the event that any of the following occurs, each of which may be waived in writing by the Majority Backstop Purchasers:

- the Plan and Disclosure Statement, each in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably, are not filed by the Debtors with the Bankruptcy Court on or before November 6, 2009;

- the Bankruptcy Court fails to enter the Approval Order on or before December 21, 2009;

- the Solicitation Order, in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably, has not been entered by the Bankruptcy Court on or before December 21, 2009;

- the Debtors fail to commence a solicitation of votes for

4

acceptance of the Plan on or before December 24, 2009;

- the Approval Order does not become final on or before January 6, 2010;

- the Postconfirmation Organizational Documents, each in form and substance acceptable to the Majority Backstop Purchasers, are not filed under a Plan Supplement on or before the date that is ten days prior to the voting deadline on the Plan;

- the Confirmation Order, in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably, has not been entered by the Bankruptcy Court on or before March 31, 2010;

- the Confirmation Order shall not have become a final order by April 15, 2010;

- the Effective Date does not occur on or before April 23, 2010; provided, that the terminating party is not then in material breach of its obligations hereunder;

- the withdrawal, amendment, modification or filing of a pleading seeking to amend or modify, the Plan, the Disclosure Statement or any document related to the Plan or Disclosure Statement (including, without limitation, any motion, notice, exhibit, appendix or order) by the Debtors, which withdrawal, amendment, modification or filing is inconsistent with this New Common Stock Term Sheet;

- the filing by the Debtors of any motion or other request for relief seeking (i) to voluntarily dismiss any of the Chapter 11 Cases, (ii) conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code, or (iii) appointment of a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

- the entry of an order by the Bankruptcy Court (i) dismissing any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) appointing a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases; or (iv) making a finding of fraud, dishonesty, or misconduct by any officer or director of the Debtors;

- a material breach by the Debtors of any of their obligations under this New Common Stock Term Sheet or the Backstop Commitment Agreement that is not cured within five (5) business days after receipt of written notice thereof to the

5

Debtors from the Majority Backstop Purchasers;

- any court of competent jurisdiction or other competent governmental or regulatory authority issues an order making illegal or otherwise restricting, preventing, or prohibiting the restructuring set forth in this New Common Stock Term Sheet in a manner that cannot be reasonably remedied by the Debtors or the Majority Backstop Purchasers; and

- one or more of the conditions precedent to occurrence of the Effective Date set forth in this New Common Stock Term Sheet or to the obligations of the Backstop Purchasers set forth in the Backstop Commitment Agreement is not satisfied or, in the judgment of the Majority Backstop Purchasers, becomes impossible to satisfy on or before the Effective Date.

**Effective Date:**

The effective date of the Plan as ordered by the Bankruptcy Court, it being anticipated that such date will occur on or before April 23, 2010 (the "*Effective Date*").

**Expenses:**

Whether or not the transactions contemplated hereunder or the Backstop Commitment Agreement are consummated, the Debtors shall pay within 10 days of demand the reasonable and documented fees, expenses, disbursements and charges of the Backstop Purchasers incurred previously or in the future relating to the exploration and discussion of the restructuring of the Debtors, alternative financing structures to the Backstop Commitment or to the preparation and negotiation of the Backstop Commitment Agreement, the Plan, the Offering Procedures, this New Common Stock Term Sheet, the Plan Documents or the Postconfirmation Organizational Documents (including, without limitation, in connection with the enforcement or protection of any of rights and remedies under the Postconfirmation Organizational Documents) and, in each of the foregoing cases, the proposed documentation and the transactions contemplated thereunder, including, without limitation, the fees and expenses of counsel to the Backstop Purchasers, and the financial advisors to the Backstop Purchasers.