2.  Critical Obligations

The Bankruptcy Court issued orders authorizing the Debtors to satisfy certain critical business obligations such as those relating to (i) critical vendors, (ii) the payment of wages, compensation and employee benefits, (iii) certain value added taxes, (iv) foreign creditors, common carriers and warehousemen, and (v) certain vendors that provided "perishable agricultural commodities" as defined in the Perishable Agricultural Commodities Act of 1930, as amended (7 U.S.C. § 499a *et seq.* ("PACA")), and that have the authority to impose a trust on certain of the Debtors' assets to enforce prompt payment of Claims filed pursuant to PACA.

3.  Business Operations

The Bankruptcy Court issued orders (i) authorizing the Debtors to continue certain workers' compensation and other insurance policies, (ii) permitting the Debtors to continue their existing customer programs and practices and to honor any prepetition obligations in respect thereof and (iii) on an interim and final basis, prohibiting the Debtors' utilities service providers from altering, refusing or discontinuing service and establishing certain procedures for determining adequate assurance of payment.

4.  Financial Operations

The Bankruptcy Court issued orders allowing the Debtors to (i) maintain their existing bank accounts and forms, (ii) continue to use existing investment guidelines, (iii) continue their centralized cash management system and (iv) continue the use of the Prepetition Lenders' cash collateral.

## B. CREDITORS' COMMITTEE

On June 26, 2009, the U.S. Trustee, pursuant to its authority under section 1102 of the Bankruptcy Code, appointed the Creditors' Committee.

The current members of the Creditors' Committee are:

| | |
|---|---|
| John J. Gorman<br>8226 Bee Caves Road<br>Austin, TX 78746 | The Coca-Cola Company<br>Attn. Joseph Johnson, Esq.<br>PO Box 1734<br>NAT 2008 Mail Stop<br>Atlanta, GA 30313 |
| Esopus Creek Value<br>Attn. Joseph S. Criscione<br>150 JFK Parkway<br>Ste. 100<br>Short Hills, NJ 07078 | The Bank of New York Mellon<br>Attn. Gary Bush<br>101 Barclay Street<br>Floor 8 West<br>New York, NY 10286 |

Richard Schottenfeld
800 Third Ave.
New York, NY 10022

Whirley Industries
Attn. Susan M. Borland
618 Fourth Ave.
PO Box 988
Warren, PA 16365

HSBC Bank USA, N.A.
Attn. Robert Conrad
10 East 40th Street
New York, NY 10016

The Creditors' Committee has the following advisors:

| Attorneys | Financial Advisors |
|---|---|
| Brown Rudnick LLP<br>Seven Times Square<br>New York, NY 10036 | Peter J. Solomon Company<br>520 Madison Avenue<br>New York, NY 10022 |

Pachulski Stang Ziehl & Jones
919 North Market Street, 17th Floor
Wilmington, DE 19899

Since the appointment of the Creditors' Committee, the Debtors have consulted with the Creditors' Committee concerning the administration of the chapter 11 cases.

## C. REJECTION OF CERTAIN AGREEMENTS

As part of their efforts to reduce their operating expenses, the Debtors engaged in an analysis of their various contracts and agreements (collectively, the "Executory Contracts"), and their unexpired leases. On and after the Petition Date, the Debtors, in consultation with the Prepetition Agent, may reject various Executory Contracts pursuant to orders of the Bankruptcy Court. In accordance with the Plan, all Executory Contracts that exist between the Debtors and any person or entity will be deemed assumed by the Debtors as of the Effective Date, except to the extent previously rejected or as identified for rejection in the Plan and the Plan Supplement. See Section VI.G. of this Disclosure Statement for more information about the Debtors' assumption and rejection of Executory Contracts.

## D. SCHEDULES AND BAR DATE

The Debtors have filed their schedules of assets and liabilities, schedules of current income and expenditures, schedules of Executory Contracts and unexpired leases and statements of financial affairs pursuant to the Bankruptcy Rules and orders of the Bankruptcy Court. The Bankruptcy Court has entered an order establishing January 2, 2010 as the general bar date (the "Bar Date") for each person or entity to file proofs of Claim based on prepetition

RLF1 3518267v.1

Claims against any of the Debtors.[27] In accordance with this order, the Debtors will mail a notice of the Bar Date and a proof of Claim form to all known holders of Claims.

## VI. THE PLAN OF REORGANIZATION

### A. INTRODUCTION

The Debtors believe that (i) through the Plan, holders of Allowed Claims will receive a greater recovery from the estates of the Debtors than the recovery that they would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) the Plan will afford the Debtors the opportunity and ability to continue in business as a viable going concern and preserve ongoing employment for the Debtors' employees.

The Plan is annexed hereto as Exhibit A and forms a part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan.

Statements as to the rationale underlying the treatment of Claims and Preconfirmation Equity Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

### B. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN OF REORGANIZATION

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed. These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims and contingent claims for contribution and reimbursement. Additionally, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

---

[27] The Bankruptcy Court has established December 10, 2009 as the deadline for all governmental units to file Claims.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan of reorganization, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a non-monetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable and contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the consummation date or the date on which amounts owing are actually due and payable, payment in full, in cash, with postpetition interest to the extent appropriate and provided for under the governing agreement (or if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Pursuant to section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the plan. Accordingly, their votes are not solicited. Under the Debtors' Plan, the Claims in Class 1 (Other Priority Claims), Class 2 (Secured Tax Claims), Class 3 (Other Secured Claims), Class 4 (SFTP Prepetition Credit Agreement Claims), Class 6 (SFTP Partnership Parks Claims), Class 7 (SFTP and SFTP Subsidiary Unsecured Claims), Class 10 (SFO Partnership Parks Claims), Class 13 (SFI Partnership Parks Claims), Class 17 (Preconfirmation Subsidiary Equity Interests) and Class 18 (Preconfirmation SFO Equity Interests) are unimpaired, and therefore, the holders of such Claims are "conclusively presumed" to have voted to accept the Plan.

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan of reorganization. For example, a class is deemed to reject a plan of reorganization under section 1126(g) of the Bankruptcy Code if the holders of claims or interests in such class do not receive or retain property under the plan on account of their claims or equity interests. Under this provision of the Bankruptcy Code, the holders of Funtime, Inc. Unsecured Claims (Class 15), Subordinated Securities Claims (Class 16) and Preconfirmation SFI Equity Interests (Class 19) are deemed to reject the Plan because they receive no distribution and retain no property interest under the Plan. Because Class 15 (Funtime, Inc. Unsecured Claims), Class 16 (Subordinated Securities Claims) and Class 19 (Preconfirmation SFI Equity Interests) are

56

deemed to reject the Plan, the Debtors are required to demonstrate that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to such Classes. Among these are the requirements that the plan be "fair and equitable" with respect to, and not "discriminate unfairly" against, the Claims and Preconfirmation Equity Interests in such Classes. For a more detailed description of the requirements for confirmation, see Section IX.B. of this Disclosure Statement, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION; Requirements for Confirmation of the Plan of Reorganization."

Consistent with these requirements, the Plan divides the Allowed Claims against, and Preconfirmation Equity Interests in, the Debtors into the following Classes:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 4 | SFTP Prepetition Credit Agreement Claims | Unimpaired | No (deemed to accept) |
| 5 | SFTP TW Guaranty Claims | Impaired | Yes |
| 6 | SFTP Partnership Parks Claims | Unimpaired | No (deemed to accept) |
| 7 | SFTP and SFTP Subsidiary Unsecured Claims | Unimpaired | No (deemed to accept) |
| 8 | SFO Prepetition Credit Agreement Claims | Impaired | Yes |
| 9 | SFO TW Guaranty Claims | Impaired | Yes |
| 10 | SFO Partnership Parks Claims | Unimpaired | No (deemed to accept) |
| 11 | SFO Unsecured Claims | Impaired | Yes |
| 12 | SFI TW Guaranty Claims | Impaired | Yes |
| 13 | SFI Partnership Parks Claims | Unimpaired | No (deemed to accept) |
| 14 | SFI Unsecured Claims | Impaired | Yes |
| 15 | Funtime, Inc. Unsecured Claims | Impaired | No (deemed to reject) |
| 16 | Subordinated Securities Claims | Impaired | No (deemed to reject) |
| 17 | Preconfirmation Subsidiary Equity Interests | Unimpaired | No (deemed to accept) |
| 18 | Preconfirmation SFO Equity Interests | Unimpaired | No (deemed to accept) |
| 19 | Preconfirmation SFI Equity Interests | Impaired | No (deemed to reject) |

1. Unclassified

(a) Administrative Expense Claims

Administrative Expense Claims are the actual and necessary costs and expenses of the Debtors' Reorganization Cases that are allowed under and in accordance with sections 330, 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code. Such expenses will include, but are not limited to, actual and necessary costs and expenses of preserving the Debtors' estates,

57

actual and necessary costs and expenses of operating the Debtors' businesses, indebtedness or obligations incurred or assumed by the Debtors during the Reorganization Cases and compensation for professional services rendered and reimbursement of expenses incurred. Specifically excluded from Administrative Expense Claims are any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code, which fees or charges, if any, will be paid in accordance with Section 14.7 of the Plan.

Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim will receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors in Possession will be paid in full and performed by the Debtors in Possession or Reorganized Debtors, as the case may be, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions; *provided, further*, that if any such ordinary course expense is not billed or a request for payment is not made within ninety days after the Effective Date, claims for payment of such an ordinary course expense will be barred. The reasonable, documented and unpaid fees and expenses of the Prepetition Agent, including attorneys' fees, will be Allowed Administrative Expense Claims and will be paid without the need for further filing of a proof of Claim and without the need for further Bankruptcy Court approval.

(b)     Professional Compensation and Reimbursement Claims

Professional Compensation and Reimbursement Claims are all Claims of entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code ("Professional Compensation and Reimbursement Claims"). All such entities must file, on or before the date that is forty-five days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred.

Pursuant to the Plan, holders of Allowed Professional Compensation and Reimbursement Claims will be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or allowing any such Administrative Expense Claim. The Reorganized Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course of business without the need for Bankruptcy Court approval.

(c)     Priority Tax Claims

A Priority Tax Claim is any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code, other than any such Claim against Funtime, Inc. ("Priority Tax Claim").

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim will receive, at the option of the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or the Reorganized Debtors, (a) on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to such Allowed Priority Tax Claim or (b) commencing on the Effective Date, or as soon thereafter as is practicable, and continuing over a period not exceeding five years from and after the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject to the option of the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or Reorganized Debtors to prepay the entire amount of the Allowed Priority Tax Claim. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date will be paid in the ordinary course of business as such obligations become due.

2. <u>Classified</u>

(a) <u>Class 1 – Other Priority Claims</u>

Under the Plan, Other Priority Claims include Claims entitled to priority in payment as specified in section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code, such as certain wage, salary and other compensation obligations to employees of the Debtors up to a statutory cap of $10,950 per employee. The Debtors estimate that on the Effective Date, the allowed amount of such claims will aggregate approximately $11.1 million.

Class 1 is Unimpaired by the Plan. Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Priority Claim agrees to a different treatment, each holder of an Allowed Other Priority Claim will receive Cash in an amount equal to such Allowed Other Priority Claim on the later of the Distribution Date and the date such Allowed Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.

(b) <u>Class 2 – Secured Tax Claims</u>

Under the Plan, Secured Tax Claims include any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein and including any related Secured Claim for penalties). The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $8.1 million.

Class 2 is Unimpaired by the Plan. Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

59

Except to the extent that a holder of an Allowed Secured Tax Claim agrees to a different treatment, each holder of an Allowed Secured Tax Claim will receive, at the option of the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or the Reorganized Debtors, (i) on the Distribution Date, or as soon thereafter as is practicable, Cash in an amount equal to such Allowed Secured Tax Claim or (ii) commencing on the Distribution Date, or as soon thereafter as is practicable, and continuing over a period not exceeding five years from and after the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject to the option of the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or Reorganized Debtors to prepay the entire amount of the Allowed Secured Tax Claim.

### (c)     Class 3 – Other Secured Claims

Under the Plan, Other Secured Claims include any Secured Claim other than a Secured Tax Claim, an SFTP Prepetition Credit Agreement Claim or an SFO Prepetition Credit Agreement Claim. The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $0.

Class 3 is Unimpaired by the Plan. Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, at the option of the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or the Reorganized Debtors, (i) on the Distribution Date or as soon thereafter as is practicable, each Allowed Other Secured Claim will be Reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, (ii) each holder of an Allowed Other Secured Claim will receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Distribution Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable or (iii) each holder of an Allowed Other Secured Claim will receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Distribution Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

### (d)     Class 4 – SFTP Prepetition Credit Agreement Claims

Under the Plan, SFTP Prepetition Credit Agreement Claims include Claims held by the Prepetition Lenders and/or the Prepetition Agent, and all other Claims against SFTP or SFTP's subsidiaries arising under the Prepetition Credit Agreement. Class 4 SFTP Prepetition

Credit Agreement Claims are Allowed in the aggregate approximate amount of $1.140 billion, which includes accrued and unpaid default interest through December 31, 2009.[28]

Class 4 is Unimpaired by the Plan. Each holder of an Allowed SFTP Prepetition Credit Agreement Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

On the Distribution Date, each holder of an Allowed Prepetition Credit Agreement Claim shall be paid in full, in Cash, in complete satisfaction of such SFTP Prepetition Credit Agreement Claim.

(e)     Class 5 – SFTP TW Guaranty Claims

Under the Plan, SFTP TW Guaranty Claims include Claims arising under the guaranty by SFTP of obligations owed to Time Warner and certain of its affiliates under the Existing TW Loan, up to a maximum aggregate amount of $10 million.

Class 5 is Impaired by the Plan. Each holder of an SFTP TW Guaranty Claim is entitled to vote to accept or reject the Plan.

On the Effective Date, SFTP's guaranty of the obligations under the Existing TW Loan shall be replaced by an amended and restated guaranty to be executed by Reorganized SFTP in respect of the obligations under the Existing TW Loan.

(f)     Class 6 – SFTP Partnership Parks Claims

Under the Plan, SFTP Partnership Parks Claims include Claims (i) arising under the guaranty by SFTP and SFTP's subsidiaries of obligations owed to Time Warner and certain of its affiliates under the Subordinated Indemnity Agreement, and (ii) arising under the guaranty by SFTP and SFTP's subsidiaries of obligations owed to certain limited partners with interests in the Partnership Parks under the Continuing Guarantee Agreements (as defined in the Plan).

Class 6 is Unimpaired by the Plan. Each holder of an SFTP Partnership Parks Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

On the Effective Date, SFTP's guaranty of the obligations owed to Time Warner and certain of its affiliates under the Subordinated Indemnity Agreement and the Continuing Guarantee Agreements shall be affirmed and continued by Reorganized SFTP.

(g)     Class 7 – SFTP and SFTP Subsidiary Unsecured Claims

Under the Plan, an Unsecured Claim is any Claim against the Debtors other than an Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Secured Tax Claim, Other Secured Claim, Prepetition Credit Agreement Claim, Funtime, Inc. Unsecured Claim, Subordinated Securities Claim or Intercompany Claim, but shall not include any claim that is

---

[28]     Default interest accrues at approximately $1.85 million per month.

disallowed or released, whether by operation of law, Final Order, written agreement, the provisions of this Plan or otherwise. SFTP and SFTP Subsidiary Unsecured Claims include Unsecured Claims against SFTP, SFTP's subsidiaries (other than Funtime, Inc.), or PP Data Services Inc. The Debtors estimate that, on the Effective Date, the Allowed amount of such Claims will aggregate to approximately $27.1 million.

Class 7 is Unimpaired by the Plan. Each holder of an Allowed SFTP and SFTP Subsidiary Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed SFTP and SFTP Subsidiary Unsecured Claim agrees to a different treatment, at the sole option of the Reorganized Debtors (i) each Allowed SFTP and SFTP Subsidiary Unsecured Claim will be Reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each holder of an Allowed SFTP and SFTP Subsidiary Unsecured Claim will be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

(h)    Class 8 – SFO Prepetition Credit Agreement Claims

Under the Plan, SFO Prepetition Credit Agreement Claims include Claims held by the Prepetition Lenders and/or the Prepetition Agent, and all other Claims against SFO arising under the Prepetition Credit Agreement.

Class 8 is Impaired by the Plan. Each holder of an SFO Prepetition Credit Agreement Claim is entitled to vote to accept or reject the Plan.

On the Effective Date, SFO's guaranty of the obligations under the Prepetition Credit Agreement shall be discharged. All Liens and security interests granted to secure such obligations, whether prior to or during the Reorganization Cases, shall be terminated and of no further force or effect.

(i)    Class 9 – SFO TW Guaranty Claims

Under the Plan, SFO TW Guaranty Claims include Claims arising under the guaranty by SFO of obligations owed to Time Warner and certain of its affiliates under the Existing TW Loan, up to a maximum aggregate amount of $10 million.

Class 9 is Impaired by the Plan. Each holder of an SFO TW Guaranty Claim is entitled to vote to accept or reject the Plan.

On the Effective Date, SFO's guaranty of the obligations under the Existing TW Loan shall be replaced by an amended and restated guaranty to be executed by Reorganized SFO in respect of the obligations under the Existing TW Loan.

(j)    Class 10 – SFO Partnership Parks Claims

Under the Plan, SFO Partnership Parks Claims include Claims (i) arising under the guaranty by SFO of obligations owed to Time Warner and certain of its affiliates under the

Subordinated Indemnity Agreement, and (ii) arising under the guaranty by SFO and SFO's subsidiaries of obligations owed to certain limited partners with interests in the Partnership Parks under the Continuing Guarantee Agreements.

Class 10 is Unimpaired by the Plan. Each holder of an SFO Partnership Parks Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

On the Effective Date, SFO's guaranty of the obligations under the Subordinated Indemnity Agreement and the Continuing Guarantee Agreements shall be affirmed and continued by Reorganized SFO.

(k)     Class 11 – SFO Unsecured Claims

Under the Plan, an SFO Unsecured Claim is any Unsecured Claim against SFO. SFO Unsecured Claims include, without limitation, SFO Note Claims. The Debtors estimate that, on the Effective Date, the Allowed amount of such Claims will aggregate to approximately $420.0 million.

Class 11 is Impaired by the Plan. Each holder of an SFO Unsecured Claim is entitled to vote to accept or reject the Plan.

On the Distribution Date, each holder of an Allowed SFO Unsecured Claim shall receive its Distribution Pro Rata Share of approximately 22.89% of the New Common Stock[29], in full and complete satisfaction of such SFO Unsecured Claim. Additionally, each Accepting SFO Noteholder shall have the limited right to participate in the Offering pursuant to the terms of the Offering Procedures to purchase its Limited Offering Pro Rata Share, subject to dilution by the Long-Term Incentive Plan.[30] Notwithstanding the foregoing, the Reorganized Debtors shall pay, on or as soon as reasonably practicable after the Effective Date, all Indenture Trustee Fees and Expenses arising under the 2016 Notes Indenture, in its capacity as Indenture Trustee thereunder, and the fees and expenses of legal and financial advisors of each of the Backstop Purchasers as provided in the Approval Order and the Backstop Commitment Agreement, in full in Cash, without application to or approval of the Bankruptcy Court and without a reduction to the recoveries of the holders of the 2016 Notes. Notwithstanding the foregoing, to the extent any Indenture Trustee Fees and Expenses arising under the 2016 Notes Indenture are not paid (including, without limitation, any fees or expenses incurred in connection with any unresolved litigation relating to any disputed claims), the Indenture Trustee for the 2016 Notes may assert its

---

[29]     This amount does not attribute any value associated with the SFO Note Guaranty Claim, which value is attributed in Class 14 (SFI Unsecured Claims).

[30]     The net effect of the Offering, (i) assuming the Offering is fully subscribed for by Eligible Holders, and (ii) as a result of the application of each Eligible Holder's Limited Offering Pro Rata Share, all Eligible Holders (including Backstop Purchasers solely in their capacity as Eligible Holders) would acquire approximately 25% of the New Common Stock issued in the Offering (or approximately 4%, excluding purchases by Backstop Purchasers that are Eligible Holders), and the Backstop Purchasers would acquire approximately 75% of such New Common Stock (or approximately 96%, including purchases affected by Backstop Purchasers in their capacity as Eligible Holders).

charging lien against any recoveries received on behalf of its holders for payment of such unpaid amounts.

(l)      Class 12 – SFI TW Guaranty Claims

Under the Plan, SFI TW Guaranty Claims include Claims arising under the guaranty by SFI of obligations owed to Time Warner and certain of its affiliates under the Existing TW Loan, up to a maximum aggregate amount of $10 million.

Class 12 is Impaired by the Plan. Each holder of an SFI TW Guaranty Claim is entitled to vote to accept or reject the Plan.

On the Effective Date, SFI's guaranty of the obligations under the Existing TW Loan shall be replaced by an amended and restated guaranty to be executed by Reorganized SFI in respect of the obligations under the Existing TW Loan.

(m)      Class 13 – SFI Partnership Parks Claims

Under the Plan, SFI Partnership Parks Claims include Claims arising under the guaranty by SFI of obligations owed to Time Warner and certain of its affiliates under the Subordinated Indemnity Agreement.

Class 13 is Unimpaired by the Plan. Each holder of an SFI Partnership Parks Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

On the Effective Date, SFI's guaranty of obligations owed to Time Warner and certain of its affiliates under the Subordinated Indemnity Agreement shall be affirmed and continued by Reorganized SFI.

(n)      Class 14 – SFI Unsecured Claims

Under the Plan, an SFI Unsecured Claim is an Unsecured Claim against SFI. SFI Unsecured Claims include, without limitation, Claims arising under the 2010 Notes Indenture, 2013 Notes Indenture, 2014 Notes Indenture, 2015 Notes Indenture, and SFO Note Guaranty Claims. The Debtors estimate that, on the Effective Date, the Allowed amount of such Claims will aggregate to approximately $1.346 billion.

Class 14 is Impaired by the Plan. Each holder of an SFI Unsecured Claim is entitled to vote to accept or reject the Plan.

On the Distribution Date, each holder of an Allowed SFI Unsecured Claim shall receive its Distribution Pro Rata Share of approximately 7.34% of the New Common Stock[31], subject to dilution by the Long-Term Incentive Plan, in full and complete satisfaction of such SFI Unsecured Claim. Notwithstanding the foregoing, the Reorganized Debtors shall pay, on or as soon as reasonably practicable after the Effective Date, all Indenture Trustee Fees and Expenses

---

[31]      This amount includes the value attributed to the SFO Note Guaranty Claim.

arising under the 2010 Notes Indenture, the 2013 Notes Indenture, the 2014 Notes Indenture and the 2015 Notes Indenture, in their capacities as Indenture Trustee thereunder, in full in Cash, without application to or approval of the Bankruptcy Court and without a reduction to the recoveries of the holders of the SFI Unsecured Claims. Notwithstanding the foregoing, to the extent any Indenture Trustee Fees and Expenses arising under the 2010 Notes Indenture, the 2013 Notes Indenture, the 2014 Notes Indenture and the 2015 Notes Indenture are not paid (including, without limitation, any fees or expenses incurred in connection with any unresolved litigation relating to any disputed claims), the Indenture Trustee for such notes may assert its charging lien against any recoveries received on behalf of its holders for payment of such unpaid amounts.

(o)    Class 15 - Funtime, Inc. Unsecured Claim

Funtime, Inc. Unsecured Claims include any Unsecured Claim or Claim of a governmental unit of the kind entitled to priority in payment as specified in section 502(i) and 507(a)(8) of the Bankruptcy Code against Funtime, Inc.

Class 15 is Impaired by the Plan. Each holder of Funtime, Inc. Unsecured Claims is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

Each holder of a Funtime, Inc. Unsecured Claim shall not receive or retain any interest or property under the Plan on account of such Funtime, Inc. Unsecured Claim.

(p)    Class 16 – Subordinated Securities Claims

Subordinated Securities Claims include any Claim against any of the Debtors, whether or not the subject of an existing lawsuit, (i) arising from rescission of a purchase or sale of shares of stock, debt securities or any other securities, if any, of any of the Debtors or an Affiliate of the Debtors, (ii) for damages arising from the purchase or sale of any security, (iii) for violations of the securities laws, misrepresentations or any similar Claims, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, but not limited to, any attorneys' fees, other charges or costs incurred on account of the foregoing claims or (iv) except as otherwise provided for in the Plan, for reimbursement, contribution or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim, including Claims based upon allegations that the Debtors made false and misleading statements and engaged in other deceptive acts in connection with the sale of securities. The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $0.

Class 16 is Impaired by the Plan. Each holder of a Subordinated Securities Claim is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

Each holder of an Allowed Subordinated Securities Claim will not receive or retain any interest or property under the Plan on account of such Allowed Subordinated Securities Claim. The treatment of Subordinated Securities Claims under the Plan is in accordance with and gives effect to the provisions of section 510(b) of the Bankruptcy Code.

(q)     Class 17 – Preconfirmation Subsidiary Equity Interests

Preconfirmation Subsidiary Equity Interests include all instruments evidencing an ownership interest in a Debtor other than SFI or SFO, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests, all as of the Effective Date. Each Preconfirmation Subsidiary Equity Interest shall be deemed Allowed under the Plan.

Class 17 is Unimpaired by the Plan. Each holder of a Preconfirmation Subsidiary Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

On the Effective Date, Preconfirmation Subsidiary Equity Interests shall be Reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(r)     Class 18 – Preconfirmation SFO Equity Interests

Preconfirmation SFO Equity Interests include all instruments evidencing an ownership interest in SFO, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests, all as of the Effective Date. Each Preconfirmation SFO Equity Interest shall be deemed Allowed under the Plan.

Class 18 is Unimpaired by the Plan. Each holder of a Preconfirmation SFO Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

On the Effective Date, Preconfirmation SFO Equity Interests shall be Reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(s)     Class 19 – Preconfirmation SFI Equity Interests

Preconfirmation SFI Equity Interests include all instruments evidencing an ownership interest in SFI, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests, all as of the Effective Date.

Class 19 is Impaired by the Plan. Each holder of a Preconfirmation SFI Equity Interest is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

On the Effective Date, the Preconfirmation SFI Equity Interests will be cancelled and the holders of Preconfirmation SFI Equity Interests will not be entitled to, and will not receive or retain, any property or interest in property on account of such Preconfirmation SFI Equity Interests under the Plan.

3.     Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims

Under the Plan, an Insured Claim is that portion of any Claim arising from an incident or occurrence alleged to have occurred prior to the Effective Date: (i) as to which any

66

Insurer is obligated pursuant to the terms, conditions, limitations, and exclusions of its Insurance Policy, to pay any cost, expense, judgment, settlement, or contractual obligation with respect to the Debtors, or (ii) that any Insurer otherwise agrees to pay as part of a settlement or compromise of a claim made under the applicable Insurance Policy.

Distributions under the Plan to each holder of an Allowed Insured Claim shall be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is within the Debtors' SIR. Amounts in excess of the applicable SIR amount shall be recoverable only from the available Insurer and the Debtors shall be discharged to the extent of any such excess. Nothing in the Plan will constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any entity may hold against any other entity, including the Debtors' Insurer.

4.    Special Provision Regarding Unimpaired Claims

Except as otherwise explicitly provided in the Plan, nothing therein will be deemed to be a waiver or relinquishment of any rights, counterclaims or defenses the Debtors, the Reorganized Debtors or the Majority Backstop Purchasers may have, whether at law or in equity, with respect to any Unimpaired Claim.

## C.    MEANS OF IMPLEMENTING THE PLAN

1.    Intercompany Claims

Notwithstanding anything to the contrary in the Plan, Intercompany Claims, at the election of the Reorganized Debtor, and with the consent of Time Warner (to the extent adversely affected thereby and which consent shall not be unreasonably withheld) and the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), holding such Claim will be (i) adjusted, released, waived and/or discharged as of the Effective Date, (ii) contributed to the capital of the obligor, or (iii) Reinstated and left Unimpaired. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Reorganized Debtors.

The only Intercompany Claim related to SFI is a net liability in the amount of $30.2 million owed to an Affiliate Debtor. Accordingly, no value for Intercompany Claims has been attributed to SFI.

2.    Restructuring and Other Transactions

(a)    Restructuring Transactions

On the Effective Date, the following transactions ("Restructuring Transactions") will be effectuated in the order set forth below:

(i)    Simultaneously, (A) all of the Preconfirmation Equity Interests in SFI and SFO will be cancelled, and (B) in consideration for SFI making available the New Common Stock to satisfy certain of SFO's obligations to its creditors and certain of SFI's obligations to its

67

creditors, all of the new equity interests in Reorganized SFO will be issued to Reorganized SFI and all of the new equity interests in Reorganized SFTP will be issued to Reorganized SFO on behalf of the holders of Allowed SFO Unsecured Claims and Allowed SFI Unsecured Claims, respectively, in full satisfaction of their Claims (and in proportion to the relative distributions to be made on account of their Claims); and

(ii)     thereafter, Reorganized SFI will, on behalf of SFO and SFI, contribute all of the New Common Stock in the Reorganized SFI to the applicable Disbursing Agent for distribution on behalf of SFO and SFI to the holders of Allowed SFO Unsecured Claims and Allowed SFI Unsecured Claims, respectively, and in full and complete satisfaction of the Reorganized Debtors' obligations under Sections 4.11 and 4.14 of the Plan.

(b)     Cancellation of Existing Securities and Agreements

Except (i) as otherwise expressly provided in the Plan, (ii) with respect to Executory Contracts or unexpired leases that have been assumed by the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), (iii) for purposes of evidencing a right to distributions under the Plan, or (iv) with respect to any Claim that is Reinstated and rendered Unimpaired under the Plan, on the Effective Date, the Prepetition Credit Agreement, the Unsecured Notes Indentures and all Unsecured Notes issued thereunder, all Preconfirmation SFI Equity Interests and other instruments evidencing any Claims against the Debtors shall be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors thereunder shall be discharged; *provided, however*, that the Unsecured Notes and each Unsecured Note Indenture shall continue in effect solely for the purposes of (i) allowing each Indenture Trustee or its agents to make distributions to holders of Unsecured Notes; (ii) allowing holders of the Unsecured Notes to receive distributions hereunder; and (iii) preserving the rights and liens of each Indenture Trustee with respect to its respective Indenture Trustee Fees and Expenses to the extent not otherwise paid. An Unsecured Note Indenture shall terminate completely upon the completion of all distributions to the holders of the applicable Unsecured Notes and the payment in full of the applicable Indenture Trustee Fees and Expenses.

(c)     Surrender of Existing Securities

Subject to the rights of each Indenture Trustee to assert its respective charging lien to the extent its respective Indenture Trustee Fees and Expenses are not paid pursuant to the Plan, each holder of Unsecured Notes is required to surrender such note(s) to the Indenture Trustee, or in the event such note(s) are held in the name of, or by a nominee of, the Depository Trust Company, the Disbursing Agent will seek the cooperation of the Depository Trust Company to provide appropriate instructions to the Indenture Trustee. No distributions under the Plan will be made for or on behalf of any such holder unless and until such note is received by the Indenture Trustee or appropriate instructions from the Depository Trust Company are received by the Indenture Trustee, or the loss, theft or destruction of such note is established to the reasonable satisfaction of the Indenture Trustee, which satisfaction may require such holder to (a) submit a lost instrument affidavit and an indemnity bond and (b) hold the Debtors, the Reorganized Debtors, the Majority Backstop Purchasers, the Disbursing Agent and Indenture Trustee harmless in respect of such note and any distributions made in respect thereof. Upon

68

compliance with this section by a holder of any Unsecured Note, such holder will, for all purposes under the Plan, be deemed to have surrendered such note. Any holder of Unsecured Notes that fails to surrender such note(s) or satisfactorily explain its nonavailability to the Indenture Trustee within one year of the Effective Date will be deemed to have no further Claim against the Debtors and the Reorganized Debtors (or their property) or the Indenture Trustee in respect of such Claim and will not participate in any distribution under the Plan.

(d)     Issuance of New Common Stock

The issuance by Reorganized SFI of the New Common Stock on and after the Effective Date is authorized pursuant to the Plan without the need for any further corporate action and without any further action by holders of Claims or Preconfirmation Equity Interests. As provided in the Postconfirmation Organizational Documents, which will be included with the Plan Supplement, New Common Stock may be issued in more than one series, will be identical in all respects and will have equal rights and privileges. In compliance with section 1123(a)(6) of the Bankruptcy Code, the Postconfirmation Organizational Documents will provide that Reorganized SFI will not issue nonvoting equity securities to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code. All of the New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued and fully-paid and non-assessable.

(e)     Incurrence of New Indebtedness

The Plan provides for the Debtors to incur new indebtedness upon the Effective Date, consisting of a senior secured credit facility to be provided to SFTP (the "Exit Facility") by JPMorgan Chase Bank, N.A. ("JPMCB"), J.P. Morgan Securities Inc. ("JPMSI"), Bank of America, N.A. ("BANA"), Banc of America Securities LLC ("BAS"), Barclays Bank PLC ("BBPLC"), Barclays Capital, the investment banking division of BBPLC ("BC"), Deutsche Bank Trust Company Americas ("DB") and Deutsche Bank Securities Inc. ("DBSI") and together with JPMCB, JPMSI and BANA, BBPLC, BC and DB, collectively, the "Commitment Parties") and a syndicate of lenders chosen by JPMSI, BAS, BC and DBSI (the "Exit Facility Lenders"). Such Exit Facility is described below.

The Exit Facility, as contemplated in the commitment letter and related term sheet and fee letter executed by the Commitment Parties and SFTP on December 15, 2009 (the "Commitment Parties' Commitment Papers"), will consist of an eight hundred million dollar ($800,000,000) senior secured credit facility[32] comprised of a $150,000,000 revolving loan facility (the "Exit Revolving Loan") and a $650,000,000 term loan facility[31] (the "Exit Term Loan" and together with the Exit Revolving Loan, collectively, the "Exit Facility Loans"). Interest on the Exit Facility will accrue at an annual rate equal to LIBOR + 4.25%, with a 2.00% LIBOR floor and a 1.50% commitment fee on the Exit Revolving Loans on the average daily unused portion of the Exit Revolving Loans. The principal amount of the Exit Revolving Loans will be due and payable five years from the closing date of the Exit Facility and the principal amount of the Exit Term Loan will be due and payable six years from the closing date of the Exit Facility. The loan agreement governing the Exit Facility (the "Exit Facility Loan Agreement") will require quarterly payments on the Exit Term Loan in an amount equal to 0.25% of the initial

---

[32]     The Exit Facility and Exit Term Loan could be increased by up to $30 million in certain circumstances.

aggregate principal amount of the Exit Term Loan and the remainder of the balance shall be paid in one final payment on the date that is six years after the closing date of the Exit Facility and is prepayable at any time at the option of SFTP. The Exit Facility will be guaranteed by SFI, SFO and each of the current and future direct and indirect domestic subsidiaries of SFTP; provided that to the extent SFTP acquires any non-wholly owned direct or indirect subsidiary after the closing date such subsidiary shall not be required to be a guarantor and/or pledgor of the Exit Facility (together with SFTP, collectively, the "Exit Financing Loan Parties"). The proceeds of the Exit Term Loan together with the net proceeds from the Offering will be used to repay the outstanding amounts owed under the Prepetition Credit Agreement and the Exit Revolving Loans will be used to meet working capital and other corporate needs of the Debtors, thereby facilitating their emergence from bankruptcy. Based upon the scheduled Confirmation Hearing dates of March 8, 2010 through March 19, 2010 and therefore an assumed emergence date in mid-April 2010, the exit revolver will be significantly drawn at emergence to fund normal seasonal borrowings, incremental professional fees associated with the reorganization and the confirmation litigation (estimated to be approximately $9 million per month) and additional default interest on the Prepetition Credit Agreement (estimated to be approximately $1.85 million per month). The Exit Facility will be secured by first priority liens upon substantially all existing and after-acquired assets of the Exit Financing Loan Parties. The Exit Facility Loan Agreement will contain certain representations, warranties and affirmative covenants, including minimum interest coverage and maximum senior leverage maintenance covenants. In addition, the Exit Facility Loan Agreement will contain restrictive covenants that limit, among other things, the ability of the Exit Financing Loan Parties to incur indebtedness, create liens, engage in mergers, consolidations and other fundamental changes, make investments or loans, engage in transactions with affiliates, pay dividends, make capital expenditures and repurchase capital stock. The Exit Financing Loan Agreement will contain certain events of default, including payment, breaches of covenants and representations, cross defaults to other material indebtedness, judgment, changes of control and bankruptcy events of default. The Commitment Parties' commitment is subject to certain customary conditions and market "flex" provisions that could result in material changes to the pricing of the Exit Facility as well as confirmation of the Plan, the retention of the existing senior management of the Debtors continuing as the senior management of SFI following consummation of the Plan. In addition the Debtors' payment or other binding obligations under the Commitment Parties' Commitment Papers would be subject to bankruptcy court approval.

The Debtors have executed documents evidencing the same together with other documents that the Exit Facility Lenders have required to consummate the Exit Facility and the transactions contemplated thereby. In accordance with the Plan, the Reorganized Debtors' entry into the Exit Facility Loans and the incurrence of the indebtedness thereunder on the Effective Date will be authorized without the need for any further corporate action and without any further action by holders of Claims or Preconfirmation Equity Interests.

Notwithstanding the foregoing, it being acknowledged and agreed that the Majority Backstop Purchasers shall have the right to (i) approve any term or provision in the Exit Facility Loan Documents that constitutes a material change to any term or condition set forth in the Commitment Parties' Commitment Papers, and (ii) approve all terms and conditions of the Exit Facility not set forth, or left as "to be determined," "customary" or similar descriptions therein, in the Commitment Parties' Commitment Papers.

70

3. <u>Exemption from Securities Laws</u>

The Plan contemplates the issuance of the New Common Stock (collectively, the "<u>1145 Securities</u>")[33] to holders of Allowed SFO Unsecured Claims and Allowed SFI Unsecured Claims, as the case may be. In reliance upon section 1145 of the Bankruptcy Code, the offer and issuance of 1145 Securities will be exempt from the registration requirements of the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), and equivalent provisions in state securities laws. Section 1145(a) of the Bankruptcy Code generally exempts from such registration requirements the issuance of securities if the following conditions are satisfied: (i) the securities are issued or sold under a chapter 11 plan by (a) a debtor, (b) one of its affiliates participating in a joint plan with the debtor or (c) a successor to a debtor under the plan and (ii) the securities are issued entirely in exchange for a claim against or interest in the debtor or such affiliate or are issued principally in such exchange and partly for cash or property. The Debtors believe that the exchange of 1145 Securities for Claims against the Debtors under the circumstances provided in the Plan (other than with respect to entities deemed statutory underwriters, as described below) will satisfy the requirements of section 1145(a) of the Bankruptcy Code.

The 1145 Securities to be issued pursuant to the Plan will be deemed to have been issued in a public offering under the Securities Act and, therefore, may be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b)(1) of the Bankruptcy Code (a "<u>statutory underwriter</u>"). In addition, such securities generally may be resold by the holders thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states. However, holders of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(i) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (i) purchases a claim or interest with a view to distribution of any security to be received in exchange for the claim or interest, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan or (iv) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.

An entity that would not be deemed an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act is not deemed to be an "underwriter" under section 2(a)(11) of the Securities Act with respect to securities received under section 1145(a)(1) which are transferred in "ordinary trading transactions" made on a national securities exchange. Persons that receive New Common Stock should note, however, that there can be no assurances that such securities will be listed on an exchange. What constitutes "ordinary trading

---

[33]  1145 Securities shall not include securities received by underwriters, if any, in connection with the issuance of New Common Stock.

transactions" within the meaning of section 1145 of the Bankruptcy Code is the subject of interpretive letters by the staff of the SEC. Generally, ordinary trading transactions are those that do not involve (i) concerted activity by recipients of securities under a plan of reorganization, or by distributors acting on their behalf, in connection with the sale of such securities, (ii) use of informational documents in connection with the sale other than the disclosure statement relating to the plan, any amendments thereto and reports filed by the issuer with the SEC under the Securities Exchange Act of 1934, as amended (the "Securities Exchange Act") or (iii) payment of special compensation to brokers or dealers in connection with the sale.

The term "issuer" is defined in section 2(4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the voting securities of such issuer. Additionally, the legislative history of section 1145 of the Bankruptcy Code provides that a creditor who receives at least 10% of the voting securities of an issuer under a plan of reorganization will be presumed to be a statutory underwriter within the meaning of section 1145(b)(i) of the Bankruptcy Code.

The Debtors believe that any securities to be issued under the Long-Term Incentive Plan (the "Management Securities") as provided under the Plan will be issued on a Registration Statement of Form S-8 or otherwise exempt from the registration requirements of the Securities Act, pursuant to section 4(2) of the Securities Act, as transactions by an issuer not involving any public offering, and equivalent exemptions in state securities laws.

Resales by persons that receive Management Securities or persons deemed to be "underwriters" that receive 1145 Securities pursuant to the Plan (collectively, the "Restricted Holders") would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Restricted Holders may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 under the Securities Act, to the extent available, and in compliance with applicable state and foreign securities laws. Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell restricted securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that the person holds the securities for a six-month period (with respect to a reporting issuer), current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the SEC. The Debtors cannot assure, however, that adequate current public information will exist with respect to the Company and therefore, that the safe harbor provisions of Rule 144 of the Securities Act will be available. Under Rule 144(b)(1)(i) of the Securities Act, a non-affiliate Restricted Holder may sell such restricted

securities even if adequate current public information is not available so long as such holder has held the restricted securities for one year; *provided, however,* such holder must still satisfy the other conditions of Rule 144. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144 or any other applicable exemption from registration.

Pursuant to the Plan, certificates evidencing New Common Stock or Management Securities received by Restricted Holders or by a holder that the Debtors determine is an underwriter within the meaning of section 1145 of the Bankruptcy Code will bear a legend substantially in the form below:

> THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

Any person or entity entitled to receive New Common Stock who the Company determines to be a statutory underwriter that would otherwise receive legended securities as provided above, may instead receive certificates evidencing New Common Stock without such legend if, prior to the distribution of such securities, such person or entity delivers to the Company (i) an opinion of counsel reasonably satisfactory to the Company to the effect that the New Common Stock to be received by such person or entity is not subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code and may be sold without registration under the Securities Act and (ii) a certification that such person or entity is not an "underwriter" within the meaning of section 1145 of the Bankruptcy Code.

Any holder of a certificate evidencing 1145 Securities bearing such legend may present such certificate to the transfer agent for the 1145 Securities in exchange for one or more new certificates not bearing such legend or for transfer to a new holder without such legend at such time as (i) such securities are sold pursuant to an effective registration statement under the Securities Act, (ii) such holder delivers to the Company an opinion of counsel reasonably satisfactory to the Company to the effect that such securities are no longer subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code or (iii) such holder delivers to the Company an opinion of counsel reasonably satisfactory to the Company to the effect that (x) such securities are no longer subject to the restrictions pursuant to an exemption under the Securities Act and such securities may be sold without registration under the Securities Act or (y) such transfer is exempt from registration under the Securities Act, in which event the certificate issued to the transferee shall not bear such legend.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN

AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT ALL POTENTIAL RECIPIENTS OF SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES REGARDING COMPLIANCE WITH THE FEDERAL AND STATE SECURITIES LAWS.

4.     The Offering

The Plan also contemplates that Accepting SFO Noteholders shall have the right to participate in the Offering. The Debtors believe that any shares of New Common Stock issued pursuant to the Offering to Accepting SFO Noteholders or the Backstop Purchasers as provided under the Plan will be exempt from the registration requirements of the Securities Act, pursuant to section 4(2) of the Securities Act and Regulation D promulgated thereunder, as transactions by an issuer not involving any public offering, and equivalent exemptions in state securities laws. Thus, the shares of New Common Stock being issued in the Offering are "restricted securities" within the meaning of Rule 144 under the Securities Act and accordingly may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except in transactions that are exempt from, or in transactions not subject to, the registration requirements of the Securities Act and in compliance with any applicable state securities laws. The New Common Stock issued in the Offering shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

5.     Registration Rights Agreement and Securities Exchange Listing

On the Effective Date, Reorganized SFI expects to enter into a registration rights agreement (the "Registration Rights Agreement"), in form and substance acceptable to the Majority Backstop Purchasers, with each holder of greater than 5%, on a fully diluted basis, of the New Common Stock. Pursuant to the Registration Rights Agreement, holders collectively owning at least 20% of the outstanding shares of the New Common Stock party thereto would have the right to require Reorganized SFI to effect registered, underwritten secondary offerings of such holders' New Common Stock acquired pursuant to the Plan or the Offering on terms and conditions to be negotiated and reflected in such Registration Rights Agreement. Holders of the New Common Stock entitled to demand such registrations shall be entitled to request an aggregate of three such registrations (or such provisions that the Postconfirmation Board adopts), and shall have customary piggyback registration rights. A form of the Registration Rights Agreement will be included in the Plan Supplement.

In addition, it is expected that Reorganized SFI will continue as a public reporting company under the Securities Exchange Act. Reorganized SFI expects that it will seek to obtain a listing for the New Common Stock on a national securities exchange to be determined at a later date.

74

6. Continued Corporate Existence

Except as otherwise provided in the Plan, each Debtor will continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except with respect to the Postconfirmation Organizational Documents (or other formation documents) that are amended by the Plan, the Plan Supplement or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval. Notwithstanding the foregoing, on or as of the Effective Date, or as soon as practicable thereafter, and without the need for any further action, the Reorganized Debtors may: (i) cause any or all of the Reorganized Debtors to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors or (iii) engage in any other transaction in furtherance of the Plan.

**D.      [INTENTIONALLY OMITTED]**

**E.      PLAN PROVISIONS GOVERNING DISTRIBUTION**

1. The Distribution Date

Distributions with respect to holders of Allowed Claims will be made on the applicable Distribution Date. For purposes of the Plan, the Distribution Date is the earliest of the following dates that occurs after any Claim is Allowed: (a) the Effective Date, or as soon thereafter as is practicable, (b) a Subsequent Distribution Date or (c) a Final Distribution Date.

Subsequent Distribution Dates will occur on the twentieth day after the end of each calendar quarter after the occurrence of the Effective Date, until the Final Distribution Date.

The Final Distribution Date will occur on a date after (i) the deadline for the Debtors or the Reorganized Debtors to interpose objections to Claims has passed, (ii) all such objections have been resolved by signed agreement with the Debtors or Reorganized Debtors and/or Final Order, as may be applicable, and (iii) all Claims that are Contingent Claims or Unliquidated Claims have been estimated, but in any event, the Final Distribution Date shall be no later than thirty days thereafter, or such later date as the Bankruptcy Court may establish, upon request by the Reorganized Debtors, for cause shown.

2. Distributions on Account of Allowed General Unsecured Claims

All Allowed general Unsecured Claims held by a single creditor against a single Debtor shall be aggregated and treated as a single Claim against such Debtor. At the written request of the Reorganized Debtors or the Disbursing Agent, any creditor holding multiple Allowed general Unsecured Claims must provide to the Reorganized Debtors or the Disbursing Agent, as the case may be, a single address to which any distributions will be sent.

75

3.     Date of Distributions

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.

4.     Disbursing Agent

All distributions under the Plan will be made by Reorganized SFI as Disbursing Agent or such other entity designated by Reorganized SFI as a Disbursing Agent. No Disbursing Agent will be required to give any bond or surety or other security for the performance of their duties.

5.     Expenses of the Disbursing Agent

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent (including, without limitation, taxes and reasonable attorneys' fees and expenses) on or after the Effective Date will be paid in Cash by the Reorganized Debtors in the ordinary course of business.

6.     Rights and Powers of Disbursing Agent

The Disbursing Agent will be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof. In furtherance of the rights and powers of the Disbursing Agent, the Disbursing Agent will have no duty or obligation to make distributions to any holder of an Allowed Claim unless and until such holder executes and delivers, in a form acceptable to the Disbursing Agent, any documents applicable to such distributions.

7.     Delivery of Distributions

(a)     Distributions to Last Known Address

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim will be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or its agents, as applicable, unless the Debtors or Reorganized Debtors have been notified in writing of a change of address by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules. Nothing in the Plan will be deemed to require the Reorganized Debtors to attempt to locate any holder of an Allowed Claim.

76

(b)     Distributions to an Indenture Trustee

The Indenture Trustee will be the Disbursing Agent for the holders of Unsecured Notes Claims. Accordingly, distributions for the benefit of the holders of such Claims will be made to the Indenture Trustee under the applicable Unsecured Notes Indenture. The Indenture Trustees will, in turn, promptly administer the distribution to the holders of such Allowed Claims in accordance with the Plan and the applicable Unsecured Notes Indenture. The distribution of New Common Stock to the respective Indenture Trustees will be deemed a distribution to the respective holder of an Allowed Claim. Upon delivery of the distributions required under the Plan to the Indenture Trustee, the Reorganized Debtors will be released of all liability with respect to the delivery of such distributions.

(c)     Distributions to Prepetition Agent

The Prepetition Agent will be the Disbursing Agent for the holders of Class 4 SFTP Prepetition Credit Agreement Claims and Class 8 SFO Prepetition Credit Agreement Claims. Accordingly, distributions for the benefit of Class 4 and Class 8 Claims shall be made to the Prepetition Agent. The Prepetition Agent will, in turn, promptly administer the distribution to the holders of Allowed Claims in Class 4 and Class 8, in accordance with the Plan and the Prepetition Credit Agreement. The issuance, execution and delivery of the Exit Facility Loan Documents, will be deemed a distribution to the respective holders of Allowed Class 4 and Class 8 Claims. Upon delivery of the distributions required under the Plan as provided in this paragraph, the Reorganized Debtors will be released of all liability with respect to the delivery of such distributions.

8.      Unclaimed Distributions

All distributions under the Plan that are unclaimed for a period of one year after distribution thereof will be deemed unclaimed property under section 347(b) of the Bankruptcy Code and will revest in the Reorganized Debtors, and any entitlement of any holder of any Claims to such distributions will be extinguished and forever barred.

9.      Distribution Record Date

The Claims register will be closed on the Distribution Record Date, and any subsequent transfer of any Claim will be prohibited. The Debtors and the Reorganized Debtors will have no obligation to recognize any transfer of any such Claims occurring after the close of business on such date.

The Distribution Record Date shall be December 2, 2009.

10.     Manner of Payment

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer, or as otherwise required or provided in an applicable agreement. All distributions of Cash, New Common Stock and Subscription Rights (as such term is defined in the Offering Procedures), as applicable, to the creditors of each of the Debtors under the Plan will be made by, or on behalf of, the applicable Debtor.

77

11.    No Fractional Distributions

No fractional shares of New Common Stock will be distributed and no Cash will be distributed in lieu of such fractional shares. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock will be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) will be rounded to the next lower whole number, with no further payment therefor. The total number of authorized shares of New Common Stock to be distributed to holders of Allowed Claims will be adjusted as necessary to account for the foregoing rounding.

12.    Limitation on Cash Distributions

No payment of Cash less than one-hundred dollars ($100) will be made to any holder of an Allowed Claim unless a request for such payment is made in writing to the Reorganized Debtors.

13.    Setoffs and Recoupment

The Debtors may, but will not be required to, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), setoff against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtors or Reorganized Debtors of any such claim they may have against such claimant.

14.    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution will be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

## F.    PROCEDURES FOR TREATING DISPUTED CLAIMS

1.    Objections

As of the Effective Date, objections to, and requests for estimation of, Administrative Expense Claims and Claims against the Debtors may be interposed and prosecuted only by the Reorganized Debtors. Such objections and requests for estimation will be served on the respective claimant and filed with the Bankruptcy Court on or before the latest of: (i) one hundred twenty days after the Effective Date or (ii) such later date as may be fixed by the Bankruptcy Court (the "Objection Deadline"); *provided*, *however*, that with respect to Claims that, as of the Objection Deadline, are subject to a pending claim objection, contested matter or adversary proceeding (an "Initial Objection") wherein the Reorganized Debtors' objection to

78

such claim is ultimately denied, the Objection Deadline will be extended to the latter of: (a) sixty days from the date on which the Bankruptcy Court enters an order denying such Initial Objection or (b) sixty days from the date on which any appellate court enters a Final Order reversing or vacating an order of the Bankruptcy Court granting such Initial Objection; *provided, further*, that with respect to Claims that (i) are filed (whether as an amended Claim, new Claim, or otherwise) after the Effective Date and (ii) that are not otherwise subject to adjustment, expunction or disallowance pursuant to the terms of the Plan, the Objection Deadline will be one hundred twenty days after the date on which such Claim was filed. Nothing in the Plan will affect the Debtors' or the Reorganized Debtors' ability to amend the Schedules in accordance with the Bankruptcy Code and the Bankruptcy Rules.

2.      Adjustment to Certain Claims Without a Filed Objection

Any Claim that has been settled, paid and satisfied, or amended and superseded, may be adjusted or expunged on the Claims register by the Reorganized Debtors without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court. In addition, all Claims filed on account of an employee benefit will be deemed satisfied and expunged from the Claims register as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit, without any further notice to or action, order or approval of the Bankruptcy Court.

3.      No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim or Administrative Expense Claim is Disputed, no payment or distribution provided in the Plan will be made on account of such Claim or Administrative Expense Claim unless and until such Disputed Claim or Disputed Administrative Expense Claim becomes Allowed.

4.      Distributions After Allowance

To the extent that a Disputed Claim or Disputed Administrative Expense Claim ultimately becomes an Allowed Claim or Allowed Administrative Expense Claim, distributions (if any) will be made to the holder of such Allowed Claim or Allowed Administrative Expense Claim in accordance with the provisions of the Plan.

5.      Resolution of Administrative Expense Claims and Claims

On and after the Effective Date, the Reorganized Debtors will have the authority to compromise, settle or otherwise resolve or withdraw any objections to Administrative Expense Claims and Claims against the Debtors and to compromise, settle or otherwise resolve any Disputed Administrative Expense Claims and Disputed Claims against the Debtors without approval of the Bankruptcy Court.

6.      Estimation of Claims

The Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed

Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 7. Interest

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest thereon, except as may be required by Final Order or applicable bankruptcy and non-bankruptcy law.

### 8. Disallowance of Certain Claims

Any Claims held by Persons from which property is recoverable under section 542, 543, 550 or 553 of the Bankruptcy Code or by a Person that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and such Persons may not receive any distributions on account of their Claims until such time as such Causes of Action against such Persons have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by that Person have been turned over or paid to the Reorganized Debtors.

### 9. Indenture Trustee as Claim Holder

Consistent with Bankruptcy Rule 3003(c), the Reorganized Debtors will recognize proofs of Claim timely filed by any Indenture Trustee in respect of any Claims under the Unsecured Notes Indentures. Accordingly, any Claim arising under the Unsecured Notes Indentures, proof of which is filed by the registered or beneficial holder of Unsecured Notes, will be disallowed as duplicative of the Claim of the applicable Indenture Trustee, without any further action of the Bankruptcy Court.

### 10. Offer of Judgment

The Reorganized Debtors are authorized to serve upon a holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 will apply to such offer of judgment. To the extent the holder of a Claim must pay the costs incurred by the Reorganized Debtors after the

80

making of such offer, the Reorganized Debtors are entitled, in consultation with the Majority Backstop Purchasers, to set off such amounts against the amount of any distribution to be paid to such holder without any further notice to or action, order or approval of the Bankruptcy Court.

11. <u>Amendments to Claims</u>

On or after the Effective Date, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim filed without authorization will be deemed disallowed in full and expunged without any further action.

12. <u>Claims Paid and Payable by Third Parties</u>

A Claim will be disallowed without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. No distributions under the Plan will be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged from the Claims register without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

13. <u>Personal Injury Claims</u>

All Personal Injury Claims are Disputed Claims. No distributions will be made on account of any Personal Injury Claim unless and until such Claim is liquidated and becomes and Allowed Claim. Any Personal Injury Claim which has not been liquidated prior to the Effective Date and as to which a proof of claim was timely filed in the Reorganization Cases, shall be determined and liquidated in the administrative or judicial tribunal in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction.

## G. PROVISIONS GOVERNING EXECUTORY CONTRACTS AND UNEXPIRED LEASES

1. <u>Assumption or Rejection of Executory Contracts and Unexpired Leases</u>

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all Executory Contracts and unexpired leases that exist between the Debtors and any person or entity will be deemed assumed by the Debtors as of the Effective Date, except for any Executory Contract or unexpired lease (1) that has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (2) as to which a motion for approval of the rejection of such Executory Contract or unexpired lease has been filed and served prior to the Effective Date or (3) that is specifically designated as a contract or lease to be rejected on Schedules 8.1(A) (Executory Contracts) or 8.1(B) (unexpired leases), which schedules shall be contained in the

Plan Supplement; *provided, however,* that the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), reserve the right, on or prior to the Effective Date, to amend Schedules 8.1(A) and 8.1(B) to delete any Executory Contract or unexpired lease therefrom or add any Executory Contract or unexpired lease thereto, in which event such Executory Contract(s) or unexpired lease(s) will be deemed to be, respectively, either assumed or rejected as of the Effective Date. The Debtors will provide notice of any amendments to Schedules 8.1(A) and/or 8.1(B) to the parties to the Executory Contracts and unexpired leases affected thereby. The listing of a document on Schedules 8.1(A) or 8.1(B) will not constitute an admission by the Debtors or the Majority Backstop Purchasers that such document is an Executory Contract or an unexpired lease or that the Debtors have any liability thereunder.

> 2. Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases

Entry of the Confirmation Order will, subject to and upon the occurrence of the Effective Date, constitute approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the Executory Contracts and unexpired leases assumed pursuant to the Plan, and of the rejection of the Executory Contracts and unexpired leases rejected pursuant to the Plan.

> 3. Inclusiveness

Unless otherwise specified on Schedules 8.1(A) or 8.1(B) of the Plan Supplement, each Executory Contract and unexpired lease listed or to be listed therein will include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 8.1(A) or 8.1(B).

> 4. Cure of Defaults

Except to the extent that a different treatment has been agreed to by the parties, within thirty days after the Effective Date, the Reorganized Debtors will cure any and all undisputed defaults under any Executory Contract or unexpired lease assumed by the Debtors pursuant to the Plan, in accordance with section 365(b) of the Bankruptcy Code. All disputed defaults that are required to be cured will be cured either within thirty days of the entry of a Final Order determining the amount, if any, of the Reorganized Debtors' liability with respect thereto, or as may otherwise be agreed to by the parties. Notwithstanding Section 8.1 of the Plan, the Debtors, subject to the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), will retain the right to reject any of their Executory Contracts or unexpired leases that are the subject of a dispute concerning amounts necessary to cure any defaults, in which event the Reorganized Debtors will make their election to reject such Executory Contracts and unexpired leases within thirty days of the entry of a Final Order determining the amount required to be cured.

82

5.     <u>Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan</u>

Proofs of Claim for damages arising out of the rejection of an Executory Contract or unexpired lease must be filed with the Bankruptcy Court and served upon the attorneys for the Debtors or, on and after the Effective Date, the Reorganized Debtors, no later than thirty days after the later of (a) notice of entry of an order approving the rejection of such Executory Contract or unexpired lease, (b) notice of entry of the Confirmation Order, (c) notice of an amendment to Schedules 8.1(A) or (B) of the Plan Supplement (solely with respect to the party directly affected by such modification) or (d) notice of the election of the Debtors (subject to the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld)) to reject as described in the preceding paragraph. All such proofs of Claim not filed within such time will be forever barred from assertion against the Debtors and their estates or the Reorganized Debtors and their property.

6.     <u>Indemnification Obligations</u>

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Petition Date to indemnify, defend, reimburse or limit the liability (i) of directors, officers or employees who are directors, officers or employees of the Debtors on or after the Confirmation Date, respectively, against any claims or causes of action as provided in the Debtors' articles of organization, certificates of incorporation, bylaws, other organizational documents or applicable law and (ii) arising under the Prepetition Credit Agreement shall survive confirmation of the Plan, remain unaffected thereby and not be discharged, irrespective of whether such indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before or after the Petition Date.

7.     <u>Insurance Policies</u>

Unless specifically rejected by a prior order of the Bankruptcy Court, all of the Debtors' Insurance Policies which are executory, if any, and any agreements, documents or instruments relating thereto, including obligations under expired insurance policies, will be assumed under the Plan. Nothing contained in this Section VI.G.7. will constitute or be deemed a waiver of any cause of action that the Debtors or Reorganized Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

Notwithstanding anything to the contrary in this Disclosure Statement, Plan or the Confirmation Order (including, without limitation, any other provision that purports to be preemptory or supervening or grants an injunction or release): (a) nothing therein, amends, modifies, waives or impairs the terms of the insurance policies and agreements and the rights and obligations of the parties thereunder, (b) the Reorganized Debtors shall be liable for all of the Debtors' obligations and liabilities, whether now existing or hereafter arising, under the insurance policies and agreements, (c) the claims of the insurers arising against the Debtors under insurance policies and related agreements (i) shall be Allowed Administrative Expense Claims, (ii) shall be due and payable in the ordinary course of business by the Debtors (or after the Effective Date, by the Reorganized Debtors) pursuant to the terms of the insurance policies and agreements and (iii) shall not be discharged or released by the Plan or the Confirmation

RLF1 3518267v.1

Order without the requirement to file or serve a request for payment of any Administrative Expense Claim, and (d) nothing therein limits, diminishes, or otherwise alters or impairs the Debtors', Reorganized Debtors' and/or the insurers' defenses, claims, causes of action, or other rights under applicable non-bankruptcy law with respect to the insurance policies and related agreements.

### 8. Benefit Plans

Notwithstanding anything contained in the Plan to the contrary, unless rejected by order of the Bankruptcy Court, the Reorganized Debtors will continue to honor, in the ordinary course of business, the Benefit Plans of the Debtors, including Benefit Plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated.

### 9. Retiree Benefits

Unless rejected by order of the Bankruptcy Court, on and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors will continue to pay all retiree benefits of the Debtors (within the meaning of and subject to section 1114 of the Bankruptcy Code) for the duration of the period for which the Debtors had obligated themselves to provide such benefits and subject to the right of the Reorganized Debtors to modify or terminate such retiree benefits in accordance with the terms thereof.

## H. CORPORATE GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS

### 1. General

On the Effective Date, the management, control and operation of Reorganized SFI and the other Reorganized Debtors shall become the general responsibility of the Postconfirmation Board.

### 2. Postconfirmation Board

Reorganized SFI shall have a new board of directors, which shall consist of nine directors, including the chief executive officer of Reorganized SFI. The Majority Backstop Purchasers shall select the initial directors of the Postconfirmation Board, a majority of the members of which shall be independent, and in that selection process will consider certain members of the current board of directors identified by the chief executive officer of Reorganized SFI. All such directors shall stand for election annually. The individuals selected by the Majority Backstop Purchasers to serve on the initial Postconfirmation Board shall be listed in the Plan Supplement.

### 3. Filing of Postconfirmation Organizational Documents

On the Effective Date, or as soon thereafter as practicable, to the extent necessary, the Reorganized Debtors will file their Postconfirmation Organizational Documents, as required or deemed appropriate, with the appropriate Persons in their respective jurisdictions of

incorporation or establishment.

4.    Officers of the Reorganized Debtors

The officers of the Debtors immediately prior to the Effective Date will serve as the initial officers of the Reorganized Debtors on and after the Effective Date. Such officers will serve in accordance with applicable non-bankruptcy law, any employment agreement with the Reorganized Debtors and the Postconfirmation Organizational Documents.

5.    Long-Term Incentive Plan

Effective as of the Effective Date, the Debtors shall implement a management incentive plan for management, selected employees and directors of Reorganized SFI, providing incentive compensation in the form of stock options and/or restricted stock in Reorganized SFI equal to 10% of the New Common Stock, determined on a fully diluted basis. Immediately following the Effective Date, the aggregate allocations to management under the Long-Term Incentive Plan shall consist of 3.75% of the New Common Stock, determined on a fully diluted basis, in the form of restricted stock, which will vest in annual installments over a four year period, commencing on the effective date of the Employment Agreements (April 1, 2009), and 3.75% of the New Common Stock, determined on a fully diluted basis and with an exercise price based on a $1.335 billion total enterprise value, in the form of options, which will only vest at the expiration of the above four year period. Such stock and options shall be allocated as follows consistent with their respective Employment Agreements:

|  | Aggregate Allocation of New Common Stock in Restricted Stock | Aggregate Allocation of New Common Stock in Options |
|---|---|---|
| Mark Shapiro | 1.25% | 1.25% |
| Jeffrey Speed | 0.625% | 0.625% |
| Mark Quenzel | 0.375% | 0.375% |
| Michael Antinoro | 0.375% | 0.375% |
| Louis Koskovolis | 0.375% | 0.375% |
| Andrew Schleimer | 0.375% | 0.375% |
| James Coughlin | 0.375% | 0.375% |

Of the 10% referenced above, any additional allocations (other than those specified above) following the Effective Date shall be determined by the Postconfirmation Board.

The solicitation of votes on the Plan will include, and will be deemed to be, a solicitation for approval of the Long-Term Incentive Plan and the initial grants made thereunder. Entry of the Confirmation Order will constitute approval of the Long-Term Incentive Plan.

6.    Directors & Officers Insurance

In addition to the Reorganized Debtors assuming all existing common law, contractual, statutory indemnification obligations, including, without limitation, those included in the constitutive documents, of the Debtors in favor of the directors and officers as described in