Section VI.G.2. of this Disclosure Statement, the Reorganized Debtors may purchase director and officer liability insurance for the directors and officers of the Reorganized Debtors (in form and substance satisfactory to the Postconfirmation Board).

       7.     <u>Name of Reorganized SFI</u>

On the Effective Date and as reflected in the Postconfirmation Organizational Documents, Reorganized SFI shall be named "Six Flags Entertainment Corporation."

## I.    CONDITIONS PRECEDENT TO EFFECTIVE DATE

       1.     <u>Conditions Precedent to Effectiveness</u>

The Effective Date will not occur, and the Plan will not become effective, unless and until the following conditions are satisfied in full or waived in accordance with Section 11.2 of the Plan:

       (a)     The Confirmation Order, in form and substance acceptable to (i) Time Warner (to the extent set forth in the TW Commitment Papers) and (ii) the Majority Backstop Purchasers in their discretion exercised reasonably, shall have been entered by March 31, 2010, and becomes a Final Order by April 15, 2010, or, if not a Final Order, is not subject to any stay;

       (b)     The conditions precedent to the effectiveness of the Exit Facility Loans and the New TW Loan are satisfied or waived by the parties thereto and the Reorganized Debtors have access to funding under the Exit Facility Loans and the New TW Loan;

       (c)     The Offering shall have been consummated;

       (d)     All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably;

       (e)     All authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan have been obtained and not revoked; and

       (f)     All conditions set forth in the Backstop Commitment Agreement (including, without limitation, each of the conditions set forth in the New Common Stock Term Sheet attached thereto) have been satisfied.

       2.     <u>Waiver of Conditions</u>

Each of the conditions precedent in Section 11.1 of the Plan may be waived in accordance with Section 11.2 of the Plan, in whole or in part, by the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld); *provided, however,* that in no event shall the conditions set forth in clauses (a)(i) and (b) of Section 11.1 of the Plan be waived without the consent of Time Warner (with respect to clause (b), only to the

RLF1 3518267v.1

extent set forth in the TW Commitment Papers). Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action on the part of the Bankruptcy Court.

3.    Satisfaction of Conditions

Except as expressly provided or permitted in the Plan, any actions required to be taken on the Effective Date will take place and will be deemed to have occurred simultaneously, and no such action will be deemed to have occurred prior to the taking of any other such action. In the event that one or more of the conditions specified in Section 11.1 of the Plan have not occurred or otherwise been waived pursuant to Section 11.2 of the Plan, (a) the Confirmation Order will be vacated, (b) the Debtors and all holders of Claims and interests, including any Preconfirmation Equity Interests, will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (c) the Debtors' obligations with respect to Claims and Preconfirmation Equity Interests will remain unchanged and nothing contained herein will constitute or be deemed a waiver or release of any Claims or Preconfirmation Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

## J.    EFFECT OF CONFIRMATION

1.    Vesting of Assets

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Debtors, their properties and interests in property and their operations will be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the estates of the Debtors will vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan. From and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules, subject to the terms and conditions of the Plan.

2.    Binding Effect

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan will bind any holder of a Claim against, or Preconfirmation Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or interests including any Preconfirmation Equity Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a distribution under the Plan.

3.    Discharge of Claims and Termination of Preconfirmation Equity Interests

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan will terminate all Preconfirmation SFI Equity Interests and discharge all existing debts and Claims of any kind, nature or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section

1141 of the Bankruptcy Code. Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and Preconfirmation SFI Equity Interests will be, and will be deemed to be, discharged and terminated, and all holders of such Claims and Preconfirmation SFI Equity Interests will be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees or any of their assets or properties, any other or further Claim or Preconfirmation SFI Equity Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of interest and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

> ### 4.   Discharge of Debtors

Upon the Effective Date, in consideration of the distributions to be made under the Plan and except as otherwise expressly provided in the Plan, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Preconfirmation SFI Equity Interest and any Affiliate of such holder will be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Preconfirmation SFI Equity Interests, rights and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such Persons will be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Preconfirmation SFI Equity Interest in the Debtors.

> ### 5.   Exculpation

None of the Exculpated Parties, and the Exculpated Parties' respective current or former officers, directors, employees, accountants, financial advisors, investment bankers, agents, restructuring advisors and attorneys, and each of their respective agents and representatives (but, in each case, solely in connection with their official capacities in the Reorganization Cases), will have or incur any liability for any Claim, cause of action or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Reorganization Cases, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Reorganization Cases, the Plan, this Disclosure Statement or any contract, instrument, document or other agreement related thereto; *provided, however,* that the foregoing will not affect the liability of any Person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.

> ### 6.   **Limited Releases**

**Except as otherwise expressly provided or contemplated by the Plan, the Plan Supplement or the Confirmation Order, effective as of the Confirmation Date but subject to the occurrence of the Effective Date, and in consideration of the services of and other forms of consideration being provided by (a) the Debtors; (b) the Prepetition Agent; (c) the Prepetition Lenders; (d) the Backstop Purchasers; (e) each Indenture Trustee; (f) Time Warner, other than claims arising from or with respect to ordinary course of business arrangements among SFI and its affiliates, on the one hand, and Time Warner, on**

88

the other hand, including without limitation, advertising, marketing, or similar commercial arrangements and any trade payables with respect thereto; (g) the members of the Creditors' Committee (but solely in their capacity as such); and (h) for subsections (a) through (g), each of their respective present and former directors, officers, members, employees, affiliates, agents, financial advisors, restructuring advisors, attorneys and representatives who acted in such capacities after the Petition Date (the parties set forth in subsections (a) through (h), being the "Released Parties"), the Debtors, their respective chapter 11 estates and the Reorganized Debtors and all holders of Claims that accept the Plan shall release, waive and discharge unconditionally and forever each of the Released Parties from any and all Claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: (i) taking place before the Petition Date in connection with or relating to any of the Debtors or any of their direct or indirect subsidiaries; and (ii) in connection with, related to, or arising out of these Reorganization Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder; provided that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct or the gross negligence of any Released Party unless such Released Party acted in good faith and in a manner that such Released Party reasonably believed to be in or not opposed to the best interests of the Debtors, and with respect to any criminal action or proceeding, had no reasonable cause to believe such Released Party's conduct was unlawful.**

7. Avoidance Actions/Objections

Other than any releases granted under the Plan, by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, the Reorganized Debtors will have the right to prosecute any and all avoidance or equitable subordination actions, recovery causes of action and objections to Claims under sections 105, 502, 510, 542 through 551 and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession.

8. **Injunction or Stay**

**Except as otherwise expressly provided in the Plan, the Plan Supplement or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims against, or Preconfirmation SFI Equity Interests in, the Debtors are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Preconfirmation SFI Equity Interest against any of the Reorganized Debtors or any of the Released Parties, to the extent of the release provided for in Section VI.J.6. hereof, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor or any of the Released Parties, to the extent of the release provided for in Section VI.J.6. hereof, with respect to such Claim or Preconfirmation SFI Equity Interest, (c) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor or any of the Released Parties,**

89

to the extent of the release provided in Section VI.J.6. hereof, or against the property or interests in property of any Reorganized Debtor or any of the Released Parties with respect to such Claim or Preconfirmation SFI Equity Interest, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to any Reorganized Debtor or any of the Released Parties, to the extent of the release provided in Section VI.J.6. hereof, or against the property or interests in property of any Reorganized Debtor or any of the Released Parties with respect to such Claim or Preconfirmation SFI Equity Interest and (e) pursuing any Claim released pursuant to the Plan.

Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, that are in existence on the Confirmation Date will remain in full force and effect until the Effective Date; *provided, however,* that no such injunction or stay will preclude enforcement of parties' rights under the Plan and the related documents.

## K.    RETENTION OF JURISDICTION

The Bankruptcy Court will have exclusive jurisdiction of all matters arising out of, or related to, the Reorganization Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation:

(a)    To hear and determine pending applications for the assumption or rejection of Executory Contracts or unexpired leases and the allowance of cure amounts and Claims resulting therefrom;

(b)    To determine any and all adversary proceedings, applications and contested matters;

(c)    To hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(d)    To hear and determine any timely objections to, or requests for, estimation of Disputed Administrative Expense Claims and Disputed Claims, in whole or in part;

(e)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(f)    To issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(g)    To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h)    To hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated thereby, any agreement, instrument or other document

governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court; *provided, however*, that any dispute arising under or in connection with the Exit Facility Loans or the New TW Loan will be determined in accordance with the governing law designated by such applicable documents;

(i)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld)), prior to the Effective Date or request by the Reorganized Debtors after the Effective Date for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

(j)     To hear and determine all disputes involving the existence, scope and nature of the discharges granted under the Plan, the Confirmation Order or the Bankruptcy Code;

(k)     To issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(l)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     To hear and determine any rights, Claims or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(n)     To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(o)     To enter a final decree closing the Reorganization Cases; and

(p)     To hear any other matter not inconsistent with the Bankruptcy Code.

## L.     MISCELLANEOUS PROVISIONS

### 1.     Effectuating Documents and Further Transactions

On or before the Effective Date, and without the need for any further order or authority, the Debtors will file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance reasonably satisfactory to the Majority Backstop Purchasers as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan (which consent shall not be unreasonably withheld, except with respect to any provision in the Plan or action or inaction of the Debtors pursuant to the Plan under which the consent rights of the Majority Backstop Purchasers are not subject to a reasonableness requirement, in which case the consent of the Majority Backstop Purchasers shall not be subject to a reasonableness requirement). The Reorganized Debtors are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures and other

91

agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

        2.      <u>Withholding and Reporting Requirements</u>

        In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution under the Plan will comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan will be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

        3.      <u>Corporate Action</u>

        On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the managers or directors of one or more of the Debtors or Reorganized Debtors, as the case may be, will be in effect from and after the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors or the Reorganized Debtors are incorporated or established, without any requirement of further action by the managers or directors of the Debtors or the Reorganized Debtors. On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors will, if required, file their amended articles of organization or certificates of incorporation, as the case may be, with the Secretary of State of the state in which each such entity is (or will be) organized, in accordance with the applicable general business law of each such jurisdiction.

        4.      <u>Modification of Plan</u>

        Alterations, amendments or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, but only after consultation with and consent to such alteration, amendment or modification by Time Warner (to the extent set forth in the TW Commitment Papers) and the Majority Backstop Purchasers (which consent shall not be unreasonably withheld, except with respect to any provision in the Plan or action or inaction of the Debtors pursuant to the Plan under which the consent rights of the Majority Backstop Purchasers are not subject to a reasonableness requirement, in which case the consent of the Majority Backstop Purchasers shall not be subject to a reasonableness requirement); provided that the Plan, as altered, amended or modified satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code and the Debtors have complied with section 1125 of the Bankruptcy Code. The Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation, but only after consultation with and consent to such alteration, amendment or modification by Time Warner (to the extent set forth in

92

the TW Commitment Papers) and the Majority Backstop Purchasers (which consent shall not be unreasonably withheld, except with respect to any provision in the Plan or action or inaction of the Debtors pursuant to the Plan under which the consent rights of the Majority Backstop Purchasers are not subject to a reasonableness requirement, in which case the consent of the Majority Backstop Purchasers shall not be subject to a reasonableness requirement), provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications. A holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Debtors, with the consent of Time Warner (to the extent set forth in the TW Commitment Papers) and the Majority Backstop Purchasers (which consent shall not be unreasonably withheld, except with respect to any provision in the Plan or action or inaction of the Debtors pursuant to the Plan under which the consent rights of the Majority Backstop Purchasers are not subject to a reasonableness requirement, in which case the consent of the Majority Backstop Purchasers shall not be subject to a reasonableness requirement), may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Preconfirmation Equity Interests.

5.   Revocation or Withdrawal of the Plan

The Debtors, with the consent of Time Warner (to the extent set forth in the TW Commitment Papers) and the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. Subject to the foregoing sentence, if the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan will be deemed null and void. In such event, nothing contained in the Plan will constitute or be deemed a waiver or release of any Claims or Preconfirmation Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

6.   Plan Supplement

The Plan Supplement and the documents contained therein will be in form, scope and substance satisfactory to the Debtors, with the consent of Time Warner (to the extent set forth in the TW Commitment Papers) and the Majority Backstop Purchasers (which consent shall not be unreasonably withheld, except with respect to any provision in the Plan or action or inaction of the Debtors pursuant to the Plan under which the consent rights of the Majority Backstop Purchasers are not subject to a reasonableness requirement, in which case the consent of the Majority Backstop Purchasers shall not be subject to a reasonableness requirement), and will be filed with the Bankruptcy Court no later than five (5) Business Days before the deadline for voting to accept or reject the Plan, provided that the documents included therein may

thereafter be amended and supplemented, subject to the consent of Time Warner (to the extent set forth in the TW Commitment Papers) and the Majority Backstop Purchasers (which consent shall not be unreasonably withheld, except with respect to any provision in the Plan or action or inaction of the Debtors pursuant to the Plan under which the consent rights of the Majority Backstop Purchasers are not subject to a reasonableness requirement, in which case the consent of the Majority Backstop Purchasers shall not be subject to a reasonableness requirement), prior to execution, so long as no such amendment or supplement materially affects the rights of holders of Claims. The Plan Supplement and the documents contained therein are incorporated into and made a part of the Plan as if set forth in full therein.

7.    Payment of Statutory Fees

On or before the Effective Date, all fees payable under section 1930 of chapter 123 of title 28 of the United States Code will be paid in Cash. Following the Effective Date, all such fees will be paid by the applicable Reorganized Debtor until the earlier of the conversion or dismissal of the applicable Reorganization Case under section 1112 of the Bankruptcy Code or the closing of the applicable Reorganization Case pursuant to section 350(a) of the Bankruptcy Code.

8.    Dissolution of the Creditors' Committee

On the Effective Date, except as provided below, the Creditors' Committee will be dissolved and the members thereof will be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Reorganization Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants and other agents, if any, will terminate, except for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

9.    Exemption from Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the issuance of New Common Stock, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan will not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

10.    Expedited Tax Determination

The Debtors, with the consent of the Majority Backstop Purchasers (which consent shall not be unreasonably withheld), and the Reorganized Debtors are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Petition Date through and including the Effective Date.

11.    Exhibits/Schedules

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full therein.

12.    Substantial Consummation

On the Effective Date, the Plan will be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

13.    Severability of Plan Provisions

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall, at the request of the Debtors, subject to the consent of Time Warner (to the extent set forth in the TW Commitment Papers) and the Majority Backstop Purchasers (which consent shall not be unreasonably withheld, except with respect to any provision in the Plan or action or inaction of the Debtors pursuant to the Plan under which the consent rights of the Majority Backstop Purchasers are not subject to a reasonableness requirement, in which case the consent of the Majority Backstop Purchasers shall not be subject to a reasonableness requirement), have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

14.    Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or Plan Supplement provides otherwise (in which case the governing law specified therein will be applicable to such exhibit), the rights, duties and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its principles of conflict of laws.

95

15.    Notices

All notices, requests and demands to or upon the Debtors and the Majority Backstop Purchasers must be in writing (including by facsimile transmission) to be effective and, unless otherwise expressly provided under the Plan, will be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> SIX FLAGS, INC.
> 1540 Broadway
> New York, NY 10036
> Attn:  James Coughlin
> Telephone:     (212) 652-9380
> Facsimile:     (212) 354-3089
>
> *with a copy to:*
>
> *On behalf of the Debtors*
>
> PAUL, HASTINGS, JANOFSKY & WALKER LLP
> 191 North Wacker Drive, 30th Floor
> Chicago, Illinois  60606
> Telephone: (312) 499-6000
> Facsimile:  (312) 499-6100
> Attn:   Paul E. Harner
>           Steven T. Catlett
>
> *- and -*
>
> PAUL, HASTINGS, JANOFSKY & WALKER LLP
> 75 East 55th Street
> New York, New York  10022
> Telephone: (212) 318-6000
> Facsimile:  (212) 319-4090
> Attn:   William F. Schwitter
>
> *- and -*
>
> RICHARDS, LAYTON & FINGER, P.A.
> One Rodney Square
> 920 North King Street
> Wilmington, Delaware 19801
> Telephone:  (302) 651-7700
> Facsimile:  (302) 651-7701
> Attn:   Daniel J. DeFranceschi
>
> *- and -*

96

*On behalf of the Majority Backstop Purchasers*

AKIN GUMP STRAUSS HAUER & FELD
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Attn:  Ira Dizengoff
       Shaya Rochester

   *- and -*

DRINKER BIDDLE & REATH LLP
1100 N. Market Street
Wilmington, Delaware 19801-1254
Telephone: (302) 467-4213
Facsimile: (302) 467-4201
Attn:  Howard A. Cohen


# VII.  PROJECTIONS AND VALUATION ANALYSIS

## A.  CONSOLIDATED CONDENSED PROJECTED FINANCIAL STATEMENTS

### 1.  Responsibility for and Purpose of the Projections

As a condition to confirmation of a Plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. This standard is generally referred to as "feasibility". In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management has analyzed the ability of the Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business.

The Debtors believe that the Plan meets the Bankruptcy Code's feasibility requirement that Plan confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan.

### 2.  Pro Forma Financial Projections

In connection with the development of the Plan, and for the purposes of determining whether the Plan satisfies the feasibility standard, Six Flags analyzed its ability to satisfy financial obligations while maintaining sufficient liquidity and capital resources. In this regard Six Flags, in consultation with their advisors, has prepared projected consolidated statements of operations and projected consolidated statements of cash flows of Six Flags for the years ending December 31, 2009 through 2013, and the projected consolidated balance sheets of SFI as at December 31, 2009, 2010, 2011, 2012 and 2013 (collectively, the "Projections").

The Projections, which are set forth in Exhibit C to this Disclosure Statement, are based on a number of assumptions, and while Six Flags has prepared the Projections in good faith and believe the assumptions to be reasonable, it is important to note that Six Flags can provide no assurance that such assumptions will ultimately be realized. The Projections should be read in conjunction with the assumptions and qualifications outlined in Exhibit C, as well as those risk factors described in Article VIII of this Disclosure Statement and in Six Flags' Quarterly Report on Form 10-Q for the second quarter of 2009 and with the audited consolidated financial statements for the fiscal year ended December 31, 2008 contained in Six Flags' 2008 Form 10-K and with Six Flags' second quarter 2009 Form 10-Q (the "2009 10-Q"). Because these documents contain important information, users of this document are encouraged to read them. The forms 10-K and 10-Q are available free from Six Flags at www.sixflags.com and the SEC at www.sec.gov.

The Projections were prepared by the Debtors in October 2009 and reflect the anticipated impact of the Plan and actual results through September 2009. Therefore, the Projections assume that the Plan will be implemented in accordance with its stated terms. The Projections are inherently uncertain as they are based on estimates and assumptions that rely on the forecast of key economic variables, including (but not limited to) unemployment, consumer confidence, personal savings rates and consumer spending trends which impact attendance at the theme parks and demand for in-park and other products and services, U.S. amusement and theme park industry projections, capital market conditions, the ability to manage increases in its costs (particularly labor and utilities), working capital needs and capital expenditures, and the ability to maintain good customer relations and appropriately manage the growth of operations. In addition, the Projections make assumptions with regard to certain operations that are not majority owned by Six Flags, including dcp, and therefore results of operating decisions and strategic direction could vary materially from the forecast since Six Flags does not ultimately control these entities. Although considered reasonable by Six Flags as of the date hereof, the Projections are subject to significant business, economic and competitive uncertainties. Accordingly, such projections, estimates and assumptions are not necessarily indicative of current values (including equity value), or future performance, which may be significantly less favorable or more favorable than as set forth.

**SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.** The Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act, as amended by the Private Securities Litigation Reform Act of 1995. Forward-looking statements can be identified by words such as "anticipates," "intends," "plans," "seeks," "believes," "estimates," "expects" and similar references to future periods. Examples of forward-looking statements include, but are not limited to, our ability to successfully consummate a restructuring plan.

Forward-looking statements are based on Six Flags' current expectations and assumptions regarding our business, the economy and other future conditions. Because forward-looking statements relate to the future, by their nature, they are subject to inherent uncertainties, risks and changes in circumstances that are difficult to predict. The Debtors' actual results may differ materially from those contemplated by the forward-looking statements. The Debtors caution you therefore that you should not rely on any of these forward-looking statements as

98

statements of historical fact or as guarantees or assurances of future performance. These risks and uncertainties include, but are not limited to, statements the Debtors make regarding: (i) the Debtors' ability to prosecute, confirm and consummate the chapter 11 plan, (ii) the potential adverse impact of the chapter 11 filing on Six Flags' global operations, management and employees, (iii) risks associated with third parties seeking and obtaining court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a plan of reorganization, to appoint a chapter 11 trustee or to convert the cases to chapter 7 cases, (iv) customer response to the chapter 11 filing, (v) the adequacy of cash flows from operations, available cash and available amounts under our credit facilities to meet future liquidity needs, or (vi) Six Flags' continued viability, operations and results of operations. Additional important factors that could cause actual results to differ materially from those in the forward-looking statements include regional, national or global political, economic, business, competitive, market and regulatory conditions and include the following:

- factors impacting attendance, such as local conditions, contagious diseases, events, disturbances and terrorist activities;

- accidents occurring at our parks;

- adverse weather conditions;

- competition with other theme parks and other entertainment alternatives;

- changes in consumer spending patterns;

- pending, threatened or future legal proceedings; and

- other factors that are described as "Risk Factors" in the 2009 10-Q or are included with the Company's filings with the United States Bankruptcy Court for the District of Delaware.

The Projections assume an Effective Date of December 31, 2009 with Allowed Claims and Allowed interests treated as described in the Plan. If the Debtors do not emerge from chapter 11 as currently scheduled, additional Administrative Expenses will be incurred until such time as a plan of reorganization is confirmed and becomes effective. These Administrative Expenses could significantly impact Six Flags' cash flows if the Effective Date is materially later than the Effective Date assumed in these Projections. The Debtors estimate that professional fees associated with the reorganization and the confirmation-related litigation will be approximately $9 million per month.

A more complete discussion of these factors and other risks applicable to Six Flags' business is contained in Item 1A of Six Flags' Annual Report on Form 10-K for the year ended December 31, 2008, and in the 2009 10-Q.

Any forward-looking statement made by Six Flags' in the Projections, or on Six Flags' behalf by Six Flags' directors, officers or employees related to the information contained herein, speaks only as of the date of the Projections. Factors or events that could cause Six

Flags' actual results to differ may emerge from time to time, and it is not possible for Six Flags to predict all of them. Six Flags undertake no obligation to publicly update any forward-looking statement, whether as a result of new information, future developments or otherwise.

Six Flags does not, as a matter of course, publish their business plans and strategies or projections or anticipated financial position or results of operations. Accordingly, the Six Flags does not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to holders of Claims or interests after the Confirmation Date, or to include such information in documents required to be filed with the SEC (if any) or otherwise make such information public.

**THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD PUBLIC DISCLOSURE OR COMPLIANCE WITH PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH THE GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, PUBLISHED GUIDELINES OF THE SEC, THE RULES AND REGULATIONS PROMULGATED BY THE SEC REGARDING PROJECTIONS OR THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS REGARDING PROJECTIONS OR FORECASTS. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY INDEPENDENT CERTIFIED ACCOUNTANTS.**

**ALTHOUGH EVERY EFFORT WAS MADE TO BE ACCURATE, THE PROJECTIONS ARE ONLY AN ESTIMATE, AND ACTUAL RESULTS MAY VARY CONSIDERABLY FROM THE PROJECTIONS. IN ADDITION, THE UNCERTAINTIES WHICH ARE INHERENT IN THE PROJECTIONS INCREASE FOR LATER YEARS IN THE PROJECTION PERIOD, DUE TO INCREASED DIFFICULTY ASSOCIATED WITH FORECASTING LEVELS OF ECONOMIC ACTIVITY AND SIX FLAGS' PERFORMANCE AT MORE DISTANT POINTS IN THE FUTURE. CONSEQUENTLY, THE PROJECTED INFORMATION INCLUDED HEREIN SHOULD NOT BE REGARDED AS A REPRESENTATION BY THE DEBTORS, THE DEBTORS' ADVISORS OR ANY OTHER PERSON THAT THE PROJECTED RESULTS WILL BE ACHIEVED. IMPAIRED CREDITORS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THE FOLLOWING PROJECTIONS IN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VIII. OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

The Projections assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of the Reorganized Debtors, (iii) there will be no change in generally accepted accounting principles in the United States that will have a material effect on the reported financial results of the Reorganized Debtors, (iv) the application of Fresh Start Reporting will not materially change the Debtors' revenue accounting procedures and (v) there will be no material contingent or unliquidated litigation or indemnity Claims applicable to the Reorganized Debtors, including

100

with regards to the Partnership Parks. To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and considered reasonable by the Debtors when taken as a whole, the assumptions and estimates underlying the Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Projections are only an estimate and, therefore, necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. The Projections should therefore not be regarded as a representation by the Debtors or any other person that the results set forth in the Projections will be achieved. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The Projections should be read together with the information, the assumptions, qualifications and footnotes to tables containing the Projections (which include projected statements of operations, projected balance sheets and projected statements of cash flows) set forth herein as set forth in Exhibit C to this Disclosure Statement and included in the Debtors' other financial statements as publicly filed with the SEC.

## B.     VALUATION

THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE EQUITY VALUE ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. SUCH TRADING VALUE, IF ANY MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZATION VALUE RANGES ASSOCIATED WITH THE VALUATION ANALYSIS.

Houlihan Lokey has advised Six Flags with respect to the reorganization value of Six Flags on a going concern basis post-reorganization. The estimated range of reorganization value of Six Flags was derived by separately valuing SFTP and the limited partnership interests in the Partnership Parks held indirectly by SFI (each assuming a sum-of-the-parts analysis, as described below). Solely for purposes of the Plan, the estimated range of reorganization value for Six Flags was assumed to be approximately $1.25 billion to $1.55 billion (with a midpoint value of approximately $1.40 billion) as of an assumed Effective Date of December 31, 2009. The table below summarizes the components of the estimated range of reorganization value for Six Flags.

### Estimated Range of Reorganization Value

| ($ in billions) | Low | Midpoint | High |
|---|---|---|---|
| Enterprise Value - SFTP | $1.21 | $1.35 | $1.49 |
| Equity Value-Partnership Parks | 0.04 | 0.05 | 0.06 |
| **Estimated Total Enterprise Value** | **$1.25** | **$1.40** | **$1.55** |

As mentioned, the estimated reorganization value for SFTP is based on a sum-of-the-parts analysis, including (i) going concern value provided by the sixteen (16) operating

101

theme and water parks that are owned and operated by SFTP; (ii) the ownership stake of dcp held by SFTP; (iii) the ownership stake of the hotel-waterpark called "Six Flags Great Escape Lodge & Indoor Waterpark" based in Lake George, New York ("HWP"), which is held by SFTP; (iv) estimated valuations for certain non-operating assets, including excess land at certain of SFTP's parks (based on recent market appraisal reports), (v) the note issued by Parc 7F Operations Corporation (the "Parc 7 Note") that is held by SFTP and (vi) net operating loss tax benefits ("NOLs"), held by Six Flags entities, as a consolidated tax filer. The estimated range of reorganization value for SFTP was assumed to be approximately $1.21 billion to $1.49 billion (with a midpoint value of approximately $1.35 billion).

In valuing the Partnership Parks, Houlihan Lokey considered the significant contingent liabilities associated with each of SFOT and SFOG (i.e. the Partnership Park "puts" that may be exercised by other limited partners, as described in Section III.D. of this Amended Disclosure Statement), and therefore, Houlihan Lokey analyzed multiple scenarios which assumed various levels of potential "puts" exercised by third party holders of the partnership units and weighted each scenario based on a probability determined by its extensive due diligence. The projections for the Partnership Parks utilized in this analysis extended past the long-range plan projection period and certain assumptions related to improved growth in anticipated future cash flows in these extended year projections have been modified from those utilized on August 20, 2009. An indicative equity valuation range was derived using the weighted average conclusion of each scenario's Discounted Cash Flow Analysis (described below) and after taking into account an estimated $30.2 million of debt outstanding under the Existing TW Loan, as of the assumed Effective Date of December 31, 2009. The estimated equity contribution from the Partnership Parks at SFI was assumed to be approximately $35.8 million to $63.2 million, with a midpoint value of $49.5 million. The equity contribution of the Partnership Parks served as the basis in determining an appropriate direct equity allocation to the SFI Unsecured Claims. Additionally, as a further confirmation of the weighting and conclusion for the various scenarios, Houlihan Lokey also utilized a Monte Carlo simulation of potential outcomes relative to the exercise of the "puts" at the Partnership Parks. In the cases of an amount of Partnership Park "puts" above that which Six Flags could fund or otherwise finance, it is possible that Six Flags could default on those obligations and pursuant to the Partnership Park agreements, be required to relinquish its ownership stake in the Partnership Parks to Time Warner. No impact of the potential loss of the Warner Bros. intellectual property licenses has been factored into the valuation analysis, in the event that, as a result of such a default, Warner Bros. elects to terminate the Warner Bros. licenses in favor of Six Flags. However, the Company believes the costs to de-brand and re-brand under different intellectual property could be extensive and burdensome. Lastly, as a confirmation to the valuation conclusions derived herein, Houlihan Lokey analyzed the underlying valuation assumptions and conclusions versus recent proposals received regarding restructuring alternatives.

**HOULIHAN LOKEY'S ESTIMATE OF A RANGE OF ENTERPRISE VALUES DOES NOT CONSTITUTE AN OPINION AS TO FAIRNESS FROM A FINANCIAL PERSPECTIVE OF THE CONSIDERATION TO BE RECEIVED UNDER THE PLAN OR OF THE TERMS AND PROVISIONS OF THE PLAN. THE ESTIMATED RANGE OF THE REORGANIZATION VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF DECEMBER 31, 2009, REFLECTS WORK PERFORMED BY HOULIHAN LOKEY ON THE BASIS OF INFORMATION IN RESPECT OF THE**

BUSINESS AND ASSETS OF SIX FLAGS AVAILABLE TO HOULIHAN LOKEY AS OF NOVEMBER 6, 2009 AND AS FURTHER REFINED THROUGHOUT THESE CHAPTER 11 CASES. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT HOULIHAN LOKEY'S CONCLUSIONS, HOULIHAN LOKEY DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATE.

Based upon the estimated range of the reorganization value of Six Flags (assuming a sum-of-the-parts, as described) of between approximately $1.25 billion and $1.55 billion and assumed total debt of $650.3 million (including $650.0 million in New Term Loan[34] and $0.3 million of capital leases, but excluding any potential underfunded pension liability, an estimated $30.2 million of debt outstanding under the Existing TW Loan and amounts outstanding under certain capital leases and revolving credit facilities at SFOT and SFOG (as these claims are deducted prior to the calculation of equity value contribution to SFI, as described above) as of the Effective Date, assuming an Effective Date of December 31, 2009), Houlihan Lokey has estimated the range of equity value for Six Flags  between approximately $598 million and $903 million, with a mid-point equity value of $751 million. Assuming the issuance of 30 million shares of New Common Stock pursuant to the Plan, the imputed estimate of the range of equity values on a per share basis for Six Flags is between $19.93 and $30.10 per share, with a midpoint value of $25.03 per share. The per share equity value range of $19.93 to $30.10 assumes that the shares related to the initial grant of any options or restricted stock to be issued or granted pursuant to the Long-Term Incentive Plan (see Section 10.5 of the Plan, entitled, "Long-Term Incentive Plan") are outstanding.

The foregoing estimate of the reorganization value of Six Flags is based on a number of assumptions, including a successful reorganization of the Six Flags entities' business and finances in a timely manner, the implementation of Six Flags' business plan, the achievement of the forecasts reflected in the Projections, consummation of the New Term Loan and Exit Facility, as contemplated in the Plan, the continuing leadership of the existing management team, market conditions as of November 6, 2009 continuing through the assumed Effective Date of December 31, 2009, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein. Based upon the scheduled Confirmation Hearing dates of March 8, 2010 through March 19, 2010 and therefore an assumed emergence date in mid-April 2010, the exit revolver will be significantly drawn at emergence to fund normal seasonal borrowings, incremental professional fees associated with the reorganization and the confirmation litigation (estimated to be approximately $9 million per month) and additional default interest on the Prepetition Credit Agreement (estimated to be approximately $1.85 million per month).

With respect to the Projections prepared by the management of Six Flags and included in Exhibit C to this Amended Disclosure Statement, Houlihan Lokey assumed that such Projections have been reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of Six Flags as to the future operating and financial performance of Six Flags. Houlihan Lokey's estimate of a range of reorganization values assumes that Six Flags' Projections will be achieved by Six Flags in all material respects,

---

[34]     The Exit Facility and Exit Term Loan could be increased by up to $30 million in certain circumstances.

including revenue growth, increases in attendance, in-park spending, operating margins, earnings and cash flow, including for those entities in which SFTP or SFI holds minority ownership interests. Certain of the results forecasted by the management of Six Flags are significantly better than the recent historical results of operations of Six Flags. As a result, to the extent that the estimate of enterprise values is dependent upon Six Flags performing at the levels set forth in the Projections, such analysis must be considered speculative. If the business performs at levels below those set forth in Exhibit C, such performance may have a material impact on the Projections and on the estimated range of values derived therefrom.

Six Flags consolidates the non-debtor entities that own Six Flags Over Texas, Six Flags Over Georgia and Six Flags White Water Atlanta, as Six Flags has the most significant economic interest because it receives a majority of these entity's expected losses or expected residual returns and has the ability to make decisions that significantly affect the results of the activities of these entities. The equity interests owned by nonaffiliated parties in these entities are reflected in the accompanying Condensed Consolidated Projected Balance Sheets as redeemable noncontrolling interests. The portion of earnings from these parks owned by non-affiliated parties in these entities is reflected as net income attributable to noncontrolling interests in the accompanying Condensed Consolidated Projected Statements of Operations.

IN ESTIMATING THE RANGE OF THE REORGANIZATION VALUE AND EQUITY VALUE OF SIX FLAGS, HOULIHAN LOKEY:

- REVIEWED CERTAIN HISTORICAL FINANCIAL INFORMATION OF SIX FLAGS (BOTH ON A CONSOLIDATED AND PARK-BY-PARK BASIS) FOR THE MOST RECENT 5 YEARS AND INTERIM PERIODS, PLUS ADDITIONAL DETAIL ON CERTAIN PARKS GOING BACK TO THEIR DATE OF OWNERSHIP BY SIX FLAGS OR ITS PREDECESSORS;

- REVIEWED CERTAIN INTERNAL FINANCIAL AND OPERATING DATA OF SIX FLAGS, INCLUDING THE PROJECTIONS, WHICH WERE PREPARED AND PROVIDED TO HOULIHAN LOKEY BY SIX FLAGS' MANAGEMENT AND WHICH RELATE TO SIX FLAGS' BUSINESS AND ITS PROSPECTS;

- MET WITH CERTAIN MEMBERS OF SIX FLAGS' CORPORATE AND PARK MANAGEMENT TO DISCUSS SIX FLAGS' OPERATIONS, FINANCIAL PERFORMANCE AND OPERATING TRENDS, COST-CUTTING MEASURES TAKEN AND CAPITAL EXPENDITURE PROGRAMS;

- CONDUCTED VISITS OF SEVERAL PARKS;

- REVIEWED PUBLICLY AVAILABLE FINANCIAL DATA AND CONSIDERED THE MARKET VALUE OF PUBLIC COMPANIES THAT HOULIHAN LOKEY DEEMED GENERALLY COMPARABLE TO THE OPERATING BUSINESS OF SIX FLAGS;

- REVIEWED VARIOUS SECURITIES AND ECONOMIC ANALYST RESEARCH REPORTS ON THE LEISURE INDUSTRY AND SIX FLAGS;

- CONSIDERED RELEVANT PRECEDENT TRANSACTIONS IN THE LEISURE INDUSTRY;

- REVIEWED THE TERMS OF THE MOST RECENT COMPETITIVE CAPITAL TERM SHEETS RECEIVED BY SIX FLAGS;

- REVIEWED UPDATED THIRD-PARTY REAL ESTATE REPORTS TO UNDERSTAND THE POTENTIAL VALUE OF CERTAIN EXCESS, NON-OPERATING REAL ESTATE ASSETS;

- REVIEWED THE COMPANY'S NOLS AND ANTICIPATED TAX BENEFIT POSITION POST-RESTRUCTURING, BASED UPON REVIEW BY THE COMPANY'S EXTERNAL TAX COUNSEL;

- CONSIDERED CERTAIN ECONOMIC AND INDUSTRY INFORMATION RELEVANT TO THE OPERATING BUSINESS;

- REVIEWED DOCUMENTS AND PLEADINGS PREPARED BY SIX FLAGS AND/OR ITS PROFESSIONALS IN CONNECTION WITH THE CHAPTER 11 CASES; AND

- CONDUCTED OTHER STUDIES, ANALYSES, INQUIRIES AND INVESTIGATIONS HOULIHAN LOKEY DEEMED NECESSARY AND APPROPRIATE.

ALTHOUGH HOULIHAN LOKEY CONDUCTED A REVIEW AND ANALYSIS OF SIX FLAGS' BUSINESS, OPERATING ASSETS AND LIABILITIES AND SIX FLAGS' BUSINESS PLAN, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY SIX FLAGS, AS WELL AS PUBLICLY AVAILABLE INFORMATION. IN ADDITION, HOULIHAN LOKEY DID NOT INDEPENDENTLY VERIFY MANAGEMENT'S PROJECTIONS IN CONNECTION WITH SUCH ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF SIX FLAGS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH.

ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.

IN THE CASE OF SIX FLAGS, THE ESTIMATES OF THE REORGANIZATION VALUE PREPARED BY HOULIHAN LOKEY REPRESENT THE HYPOTHETICAL REORGANIZATION VALUE OF SIX FLAGS. SUCH ESTIMATES

WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED REORGANIZATION ENTERPRISE VALUE OF SIX FLAGS THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF SIX FLAGS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES AND ACTUAL OUTCOMES AND RESULTS MAY DIFFER MATERIALLY FROM THOSE SET FORTH HEREIN. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES.

1.    Valuation Methodology

Houlihan Lokey performed a variety of analyses and considered a variety of factors in preparing the valuation of Six Flags (assuming the sum-of-the-parts analysis, as described). Several generally accepted valuation techniques for estimating Six Flags' enterprise value were used. Houlihan Lokey primarily relied on three methodologies: comparable public company analysis, discounted cash flow analysis, and precedent transactions analysis. Houlihan Lokey placed equal weighting on each of these analyses and made judgments as to the significance of each analysis in determining Six Flags' indicated enterprise value range. Houlihan Lokey's valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to Six Flags' enterprise value.

In addition to the three methodologies above, as previously mentioned, Houlihan Lokey analyzed certain valuation assumptions and indications implied by recently received restructuring proposals provided by third parties.

106

In preparing its valuation estimate, Houlihan Lokey performed a variety of analyses and considered a variety of factors, some of which are described herein. The following summary does not purport to be a complete description of the analyses and factors undertaken to support Houlihan Lokey's conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized.

(a) Comparable Public Company Analysis

A comparable public company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company. It establishes a benchmark for asset valuation by deriving the value of "comparable" assets, standardized using a common variable such as revenues, earnings, and cash flows. The analysis includes a detailed multi-year financial comparison of each company's income statement, balance sheet, and cash flow statement. In addition, each company's performance, profitability, margins, leverage and business trends are also examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses (in this case, theme parks and leisure), business plans and associated risks, target market segments, recent financial and operating performance, growth prospects, market presence, size, margins and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. While Houlihan Lokey has analyzed a variety of potentially comparable companies for the theme park operations of Six Flags, this analysis is particularly difficult in this case, as there is only one truly comparable company to Six Flags' theme parks that is publicly traded, namely Cedar Fair LP, which also operates theme parks, although it has other operations such as hotels. Other potentially comparable companies are either not in directly comparable businesses, are private (e.g. Universal, Tussauds Group) or are divisions of much larger companies (e.g. Disney, Anheuser Busch InBev, which has agreed to sell its theme park division in a pending transaction), which make such comparisons ineffective for valuation purposes. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value.

In performing the Comparable Public Company Analysis for the theme parks, the following publicly traded companies in the theme park and leisure sectors were deemed generally comparable to Six Flags in some or all of the factors described above and were selected: Cedar Fair LP, Great Wolf Resorts, Inc., Vail Resorts, Inc., International Speedway Corporation and Speedway Motorsports, Inc. As mentioned above, while Houlihan Lokey examined other potentially comparable companies, those were excluded for the reasons already mentioned. Houlihan Lokey analyzed the current trading value for the comparable companies as a multiple of projected fiscal years 2009 and 2010 earnings before interest, taxes, depreciation, and amortization ("EBITDA"). Given the current general economic conditions, particularly as related to discretionary consumer spending, and in an attempt to not overly emphasize a difficult

107

operating season, Houlihan Lokey applied multiples to EBITDA for fiscal years 2009 and 2010 in an effort to "normalize" projected earnings variances. As such, the derived multiples were applied to Six Flags' Adjusted EBITDA (as defined in Exhibit C to this Amended Disclosure Statement) for the twelve months ending December 31, 2009 and December 31, 2010 to determine the range of enterprise value.

(b)     Precedent Transactions Analysis

Precedent transactions analysis estimates value by examining publicly announced merger and acquisition transactions. An analysis of the disclosed purchase price as a multiple of various operating statistics reveals industry acquisition multiples for companies in similar lines of businesses to Six Flags. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to Six Flags. As the majority of the recent precedent transactions were for individual theme parks or isolated groups of theme parks, versus a consolidated group with associated corporate overhead, Houlihan Lokey specifically focused on prices paid as a multiple of EBITDA, in determining a range of values for Six Flags.

Additionally, in identifying benchmark transactions and selecting a range of appropriately applicable multiples for those transactions deemed comparable, Houlihan Lokey also examined current general economic conditions and consumer spending trends, as well as the appetite, cost and availability of leverage and other recent capital market conditions and the impact that is having on transactions and applicable multiples witnessed since September 2008, including the form of consideration paid and the number of transactions. Taking into consideration these factors, Houlihan Lokey adjusted the pre-September 2008 precedent transaction multiples to conclude at an estimate of total enterprise value, after reviewing transactions and implied multiples during the period before the financial market disruption, versus available relevant information during the post-market disruption period. Houlihan Lokey also took into consideration two directly comparable transactions, Universal Japan (closed May 2009) and Busch Entertainment Corporation (announced October 2009), both announced since the financial market disruption in the Fall of 2008.

These multiples are then applied to Six Flags' projected Adjusted EBITDA for the fiscal years ending December 31, 2009 and December 31, 2010 to determine the total enterprise value or value to a potential buyer.

Unlike the comparable public company analysis, the valuation in this methodology includes a "control" premium, representing the purchase of a majority or controlling position in a company's assets. Thus, this methodology generally produces higher valuations than the comparable public company analysis. However, given the current economic and capital market conditions, it's unclear from the relevant data from comparable transactions since the Fall of 2008, whether that is presently the case. Other aspects of value that manifest itself in a precedent transaction analysis include the following:

- Circumstances surrounding a sale transaction may introduce "diffusive quantitative results" into the analysis (e.g., an additional premium may be extracted from a buyer in the case of a competitive bidding contest).

108

- The market environment is not identical for transactions occurring at different periods of time.

- Circumstances pertaining to the financial position of a company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

As with the comparable company analysis, because no acquisition used in any analysis is identical to a target transaction, valuation conclusions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations and prospects of each. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions for which public data is available also limits this analysis.

(c)     Discounted Cash Flow Approach

The discounted cash flow ("DCF") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to consolidated Six Flags. The expected future cash flows have two components: the present value of the projected unlevered after-tax free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the Projections). Houlihan Lokey's discounted cash flow valuation is based on the business plan Projections of Six Flags' operating results. Houlihan Lokey discounted the projected cash flows using Six Flags' estimated weighted average cost of capital.

This approach relies on the Company's ability to project future cash flows with some degree of accuracy. Because Six Flags' Projections reflect significant assumptions made by Six Flags' management concerning anticipated results, the assumptions and judgments used in the Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized. Houlihan Lokey cannot and does not make any representations or warranties as to the accuracy or completeness of Six Flags' Projections.

THE ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DETERMINED BY HOULIHAN LOKEY REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE REORGANIZATION EQUITY VALUE OF SIX FLAGS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. ANY SUCH VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE REORGANIZATION EQUITY

VALUE RANGE FOR SIX FLAGS ASSOCIATED WITH HOULIHAN LOKEY'S VALUATION ANALYSIS.

      (d)     Potential Disputes Regarding Valuation

        Resilient Capital Management, LLC ("Resilient"), a holder of PIERS, believes that the Plan described in this Disclosure Statement is premised upon a significant undervaluation of the Debtors' business. According to Resilient, a fair and accurate valuation of the Debtors' business would yield substantial value for holders of PIERS, as well as common equity holders. Resilient reserves its right to put forth valuation evidence to challenge the Debtors' valuation at any future confirmation hearing with respect to the Plan described in this Disclosure Statement.

## VIII. CERTAIN FACTORS AFFECTING THE DEBTORS

### A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

      1.     Risk of Non-Confirmation of the Plan of Reorganization

        Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

      2.     Non-Consensual Confirmation

        In the event any impaired class of claims or equity interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes. See Section IX.B.2. of this Disclosure Statement, entitled "Confirmation of the Plan of Reorganization; Requirements for Confirmation of the Plan of Reorganization; Requirements of Section 1129(b) of the Bankruptcy Code." Because Class 15 (Funtime, Inc. Unsecured Claims), Class 16 (Subordinated Securities Claims) and Class 19 (Preconfirmation SFI Equity Interests) are deemed to reject the Plan, these requirements must be satisfied with respect to such Classes. The Debtors believe that the Plan satisfies these requirements.

      3.     Risk of Delay in Confirmation of the Plan

        Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing. As with any judicial proceeding, there are risks of unavoidable delay with a chapter 11 proceeding and there are risks of objections from certain stakeholders, including objections from the holders of Unsecured Notes and any Prepetition Lenders that vote to reject the Plan. Any material delay in the confirmation of the Plan, or the threat of rejection of the Plan by the Bankruptcy Court, would not only add substantial expense and uncertainty to the process, but also would adversely affect

the Company's operations during this period since its operations depend, in substantial part, upon the support of a large group of licensors, lessors, vendors, suppliers, guests, sponsors and employees. Moreover, the mere filing of a "bankruptcy case," even, as is the case here, one pursuant to a pre-arranged plan has adverse effects on the business and operations of the Debtors.

## B. ADDITIONAL FACTORS TO BE CONSIDERED

### 1. The Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 2. No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Reorganization Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

### 3. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward looking and contains estimates and assumptions which might ultimately prove to be incorrect and projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and the projections and estimates herein should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

### 4. The Amount of Claims Could Be More Than Projected

The general Bar Date for filing proofs of Claim has not occurred. The Allowed amount of Claims in each class could be significantly more than projected, which in turn, could cause the value of distributions to be diluted substantially. If the Claims asserted against the Debtors exceed Projections, it may reduce the value of distributions to the holders of Claims, if applicable and impair the value of the New Common Stock being distributed to the holders of the Accepting SFO Noteholders through the Offering.

### 5. Debtors Could Withdraw the Plan

Under the Plan, the Debtors could withdraw the Plan with respect to any Debtors and proceed with confirmation of the Plan with respect to any other Debtors.

RLF1 3518267v.1

6.     No Legal or Tax Advice Is Provided to You by this Disclosure Statement

The contents of this Disclosure Statement should <u>not</u> be construed as legal, business or tax advice. Each creditor or Preconfirmation Equity Interest holder should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her or its Claim or Preconfirmation Equity Interest.

This Disclosure Statement is <u>not</u> legal advice to you. This Disclosure Statement may <u>not</u> be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

7.     No Admission Made

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Preconfirmation Equity Interests.

8.     Even If the Plan Is Confirmed, the Debtors Will Continue To Face Risks

The Plan contemplates, among other things, the exchange of New Common Stock for certain Claims against the Debtors. The Plan is generally designed to reduce the amount of the Company's indebtedness and cash interest expense and improve its liquidity as well as its financial and operational flexibility in order to generate long-term growth. Even if the Plan is consummated, the Company will continue to face a number of risks, including certain risks that are beyond its control, such as further deterioration or other changes in economic conditions, changes in its industry, changes in consumer demand for, and acceptance of, its parks and products, inflation in energy and other expenses. In addition, the Company will continue to face risks related to purchase obligations contained in the Partnership Parks Agreements. For example, in light of the deterioration in the U.S. economy, investors in the Partnership Parks may "put" a greater amount of their investments to SFI than they otherwise would. Some of these concerns and effects typically become more acute when a chapter 11 case continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guaranty that the Plan will achieve its stated goals.

9.     The Debtors' Business May Be Negatively Affected If They Are Unable To Assume Key Executory Contracts.

As described above, the Plan provides for the assumption of all of the Debtors' Executory Contracts and real property leases, except for such leases or contracts that are expressly rejected. In assuming these Executory Contracts and leases, the Debtors expect to seek to preserve the benefit and value of these agreements. In certain situations, including with respect to many of the Debtors' important licenses and intellectual property, counterparties will have the opportunity to object to the assumption of these Executory Contracts. Accordingly, there is a risk that counterparties may object to the Debtors' assumption of Executory Contracts (including important licenses and intellectual property), and if those counterparties succeed, the Debtors would lose the benefits of these agreements. The Company believes that many of these contracts, including, without limitation, license agreements for the Warner Bros., DC Comics, Hanna-Barbara and Thomas the Tank Engine and Friends characters, as well as The Wiggles and

112

the Debtors' sponsorship agreements, are important to the operation of the Company's parks and the guest experience at those parks.

10. Business Factors and Competitive Conditions

(a) General Economic Conditions

In their financial projections, the Debtors have assumed that the general economic conditions of the United States economy will improve over the next several years. The improvement of economic conditions is subject to many factors outside the Debtors' control, including interest rates, inflation, unemployment rates, consumer spending, war, terrorism and other such factors. Any one of these or other economic factors could have a significant impact on the operating performance of the Company. There is no guaranty that economic conditions will improve, or remain stable, in the near term.

(b) Business Factors

The Debtors believe that they will succeed in implementing and executing their business plan for the benefit of all constituencies. However, there are risks that the goals of the Debtors' going-forward business plan and operational strategies will not be achieved. In such event, the Debtors may be unable to refinance maturing term debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated herein or become subject to further insolvency proceedings. Holders of Claims in impaired Classes will receive equity in Reorganized SFI under the Plan; however, in the event of further restructurings or insolvency proceedings, the equity interests of such persons could be substantially diluted or even cancelled.

(c) Puts from Partnership Parks

As noted herein, the holders of Partnership Park LP Interests have the right to issue "put" notices each April. In April 2009, the aggregate amount "put" to Six Flags was approximately $65.5 million, which exceeded the Company's ability to satisfy such obligations and necessitated the additional financing described in Section III.D. of this Disclosure Statement.

The amount of future "puts" could have a material adverse effect on the Reorganized Debtors. There can be no assurance that the Company will be able to fund future "put" obligations without additional sources of financing. Should the Company be unable to obtain such financing, the business prospects of the Company could be materially and adversely affected, including, but not limited to, potential loss of the Debtors' interest in the Partnership Parks.

(d) Competitive Conditions

The Company's parks compete with other theme, water and amusement parks and with other types of recreational facilities and forms of entertainment, including movies, sports attractions and vacation travel. The Company's business is also subject to factors that affect the recreation and leisure time industries generally, such as general economic conditions, including relative fuel prices and changes in consumer spending habits. The principal

113

competitive factors of a park include location, price, the uniqueness and perceived quality of the rides and attractions, the atmosphere and cleanliness of the park and the quality of its food and entertainment. Almost all of the Company's parks feature "thrill rides." While the Company carefully maintains the safety of its rides, there are inherent risks involved with these attractions. An accident or an injury (including water-borne illnesses on water rides) at any of the Company's parks or at parks operated by its competitors, particularly accidents or injuries that attract media attention, may reduce attendance at the Company's parks, causing a decrease in revenues.

(e)    Seasonal Operations and Adverse Weather Conditions

The Company's operations are seasonal. Approximately 80% of the Company's annual park attendance and revenue occurs during the second and third calendar quarters of each year. As a result, when adverse weather conditions or other unforeseeable events that affect attendance at the Company's parks occur during its operating season, particularly during the peak season of July and August, there is only a limited period of time during which the impact of those conditions or events can be mitigated. Accordingly, such conditions or events may have a disproportionately adverse effect on the Company's revenues and cash flow. In addition, most of the Company's expenses for maintenance and costs of adding new attractions are incurred when the parks are closed in the mid to late autumn and winter months. For this reason, a sequential quarter to quarter comparison is not a good indication of the Company's performance or of how it will perform in the future.

Because most of the attractions at the Company's theme parks are outdoors, attendance at its parks is adversely affected by bad weather and forecasts of bad weather. The effects of bad weather on attendance can be more pronounced at the Company's water parks. Bad weather and forecasts of bad or mixed weather conditions can reduce the number of people who come to the Company's parks, which negatively affects its revenues. Although the Company believes that its ownership of many parks in different geographic locations reduces the effect that adverse weather can have on its consolidated results, the Company believes that its operating results in certain years were adversely affected by abnormally hot, cold and/or wet weather in a number of its major U.S. markets. In addition, since a number of the Company's parks are geographically concentrated in the eastern portion of the United States, a weather pattern that affects that area could adversely affect a number of its parks. Also, bad weather and forecasts of bad weather on weekend days have greater negative impact than on weekdays because weekend days are typically peak days for attendance at the Company's parks.

(f)    Reliance on Employees

A critical asset of the Debtors is their personnel, who have the ability to leave the Debtors and deprive the Debtors of the manpower and expertise essential for performance of the Debtors' business. The nature of the Debtors' business requires the Debtors to be able to recruit, train and continuously improve the performance of their employee base to meet guest service expectations. Deterioration of the Debtors' business, loss of a significant number of employees or the inability to hire sufficient numbers of qualified employees could have a material adverse effect on the Reorganized Debtors.

The Debtors' successful transition through the restructuring process is dependent in part on the ability to retain and motivate their management and employees. There can be no assurance that the Reorganized Debtors will be able to retain or employ qualified management and personnel. Should the Reorganized Debtors be unable to retain the services of a large part of their management team, the business prospects of the Reorganized Debtors could be materially and adversely affected.

(g)     Other Factors

Other factors that holders of Claims should consider are potential regulatory and legal developments that may impact the Company. Although these and other such factors are beyond the Company's control and cannot be determined in advance, they could have a significant impact on the Company's operating performance.

11.     Variances from Projections

The fundamental premise of the Plan is the reduction of the Debtors' debt levels and the implementation and realization of the Debtors' business plan, as reflected in the Projections contained in this Disclosure Statement. The Projections reflect numerous assumptions concerning the anticipated future performance of Six Flags, some of which may not materialize. Such assumptions include, among other items, assumptions concerning the general economy, the ability to make necessary capital expenditures, the ability to establish market strength and the ability to stabilize and grow the Company's customer base and control future operating expenses. The Debtors believe that the assumptions underlying the Projections are reasonable. However, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may affect the actual financial results of the Company. Therefore, the actual results achieved throughout the periods covered by the Projections necessarily will vary from the projected results, and such variations may be material and adverse.

## C.     CERTAIN TAX MATTERS

For a summary of certain federal income tax consequences of the Plan to holders of Claims and to the Debtors, see Article XI of this Disclosure Statement, entitled "Certain Federal Income Tax Consequences of the Plan."

## IX. CONFIRMATION OF THE PLAN OF REORGANIZATION

## A.     CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization. As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the confirmation hearing for March 8, 2010 at 9:00 a.m. (prevailing Eastern Time). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or interests held or asserted by the objector against the Debtors' estate(s) or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon counsel for the Debtors, (i) Paul, Hastings, Janofsky & Walker LLP and (ii) Richards, Layton & Finger, P.A., so as to be received no later than 2:00 p.m. (prevailing Eastern Time) on March 1, 2010.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## B.     REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF REORGANIZATION

### 1.     Requirements of Section 1129(a) of the Bankruptcy Code

#### (a)     General Requirements

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(1)     The Plan complies with the applicable provisions of the Bankruptcy Code.

(2)     The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(3)     The Plan has been proposed in good faith and not by any means proscribed by law.

(4)     Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Reorganization Cases, or in connection with the Plan and incident to the Reorganization Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(5)     The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

116

(6)     With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test" below.

(7)     Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan.

(8)     Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative expenses and priority claims other than priority tax claims will be paid in full on the Effective Date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding six years after the date of assessment of such claims, of a value, as of the Effective Date, equal to the allowed amount of such claims.

(9)     At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

(10)    Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  See discussion of "Feasibility" below.

(11)    The Plan provides for the continuation after the Effective Date of payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits, if any.

(b)     Best Interests Test

As described above, the Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The gross amount of cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the

117

commencement of the chapter 7 case. The next step is to reduce that total by the amount of any claims secured by such assets, the costs and expenses of the liquidation and such additional administrative expenses and priority claims that may result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below). Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the chapter 11 case and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code and any other committee so appointed. Moreover, in a chapter 7 liquidation, additional claims would arise by reason of the breach or rejection of obligations incurred, and Executory Contracts or leases entered into, by the Debtors both prior to, and during the pendency of, the chapter 11 cases.

The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full, with interest. The Debtors believe that in a chapter 7 case, holders of SFI Unsecured Claims, SFO Unsecured Claims, and SFTP and SFTP Subsidiary Unsecured Claims would receive no distributions of property. Accordingly, the Plan satisfies the rule of absolute priority.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail and (iii) substantial increases in claims which would be satisfied on a priority basis, the Debtors have determined that confirmation of the Plan will provide each creditor and equity holder with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

Moreover, the Debtors believe that the value of any distributions from the liquidation proceeds to each class of allowed claims in a chapter 7 case would be the same or less than the value of distributions under the Plan because such distributions in a chapter 7 case may not occur for a substantial period of time. In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for a year or more after the completion of such liquidation in order to resolve the claims and prepare for distributions. In the event litigation

118

were necessary to resolve claims asserted in the chapter 7 case, the delay could be further prolonged and administrative expenses further increased.

**The Debtors' liquidation analysis is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the assets of the Debtors. The analysis is based upon a number of significant assumptions which are described. The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.**

(c)     Liquidation Analysis

The Debtors' chapter 7 liquidation analysis and assumptions are set forth in Exhibit D to this Disclosure Statement.

(d)     Feasibility

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their financial obligations as contemplated thereunder. As part of this analysis, the Debtors have prepared the Projections contained in Article VII of this Disclosure Statement, entitled "Projection and Valuation Analysis," and in Exhibit C to this Disclosure Statement.

These Projections are based upon the assumption that the Plan will be confirmed by the Bankruptcy Court, and for projection purposes, that the Effective Date of the Plan and its substantial consummation will take place on December 31, 2009. Based upon the scheduled Confirmation Hearing dates of March 8, 2010 through March 19, 2010 and therefore an assumed emergence date in mid-April 2010, the exit revolver will be significantly drawn at emergence to fund normal seasonal borrowings, incremental professional fees associated with the reorganization and the confirmation litigation (estimated to be approximately $9 million per month) and additional default interest on the Prepetition Credit Agreement (estimated to be approximately $1.85 million per month). The Exit Facility and Exit Term Loan could be increased by up to $30 million in certain circumstances. The Projections include balance sheets, statements of operations and statements of cash flows. Based upon the Projections, the Debtors believe they will be able to make all payments required to be made pursuant to the Plan.

2.     Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

No Unfair Discrimination. This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."