## APPENDIX I

## RIGHTS OFFERING PROCEDURES

The following Offering Procedures set forth the terms and conditions of the Offering (as defined below).

## ARTICLE I
## DEFINITIONS

As used in this <u>Appendix I</u>, the following terms shall have the respective meanings specified below and be equally applicable to the singular and plural of terms defined. Capitalized terms used in this <u>Appendix I</u> and not otherwise defined herein shall have the respective meanings provided in the Plan.

1.1     ***2016 Notes*** means those certain 12.25% unsecured notes due 2016 and issued by SFO under the 2016 Notes Indenture.

1.2     ***2016 Notes Indenture*** means that certain indenture, dated June 16, 2008, between SFO, as issuer, SFI, as guarantor, and HSBC Bank USA, N.A., as trustee, pursuant to which the 2016 Notes were issued, as amended from time to time.

1.3     ***Accepting SFO Noteholder*** means an Eligible Holder that votes to accept the Plan.

1.4     ***Accredited Investor*** means an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act.

1.5     ***Approval Order*** means that order, in form and substance satisfactory to the Debtors and Majority Backstop Purchasers, authorizing and approving the Backstop Commitment Agreement.

1.6     ***Backstop Commitment*** means the "Backstop Commitment" as defined in the Backstop Commitment Agreement.

1.7     ***Backstop Commitment Agreement*** means that certain commitment agreement executed by and between the Debtors and each of the Backstop Purchasers in connection with the Offering, attached hereto as <u>Annex A</u>, pursuant to which the Backstop Purchasers agreed to backstop the Offering in the respective percentages set forth on <u>Schedule I</u> of the New Common Stock Term Sheet.

1.8     ***Backstop Purchasers*** means those certain Persons signatory to the Backstop Commitment Agreement, each of which has agreed to backstop the Offering on the terms and subject to the conditions set forth in the Backstop Commitment Agreement.

1.9     ***Eligible Holder*** means an SFO Noteholder who is an Accredited Investor as of the Offering Record Date.

RLF1 3518267v.1

1.10  **Limited Offering Pro Rata Share** means (x) the total principal amount of 2016 Notes held by an Eligible Holder divided by (y) four times the aggregate principal amount of all 2016 Notes outstanding as of the Petition Date.

1.11  **Majority Backstop Purchasers** means the Backstop Purchasers that collectively hold a majority of the aggregate commitment percentage set forth on Schedule I of the New Common Stock Term Sheet.

1.12  **New Common Stock Term Sheet** means that certain term sheet attached to the Backstop Commitment Agreement as Exhibit A thereto.

1.13  **Offering** means the offering of $450.0 million in aggregate of New Common Stock (i) to each Eligible Holder in respect of its Limited Offering Pro Rata Share and (ii) to the extent less than the full Offering Amount is issued to the Eligible Holders, to the Backstop Purchasers.

1.14  **Offering Amount** means $450.0 million.

1.15  **Offering Participant** means an Accepting SFO Noteholders who participates in the Offering.  For the avoidance of doubt, a Backstop Purchaser (i) shall be entitled to participate in the Offering in its capacity as a SFO Noteholder if it votes to accept the Plan and (ii) shall remain a Backstop Purchaser whether or not it votes to accept the Plan.

1.16  **Offering Procedures** means the rights offering procedures, setting forth the terms and conditions of the Offering, in substantially the form set forth in this Appendix I.

1.17  **Offering Record Date** means December 2, 2009.

1.18  **Offering Subscription Purchase Price** means, for each holder of Subscription Rights, such holder's Limited Offering Pro Rata Share multiplied by the Offering Amount.  For purposes of the Offering, the New Common Stock shall be priced on the basis of an assumed enterprise value of SFI of $1.335 billion on the Effective Date.

1.19  **SFO Noteholders** means, collectively, the "Holders" under and as defined in the 2016 Notes Indenture.

1.20  **SFO Unsecured Claim** means any Allowed Unsecured Claim against SFO.  SFO Unsecured Claims include, without limitation, Claims against SFO arising under or related to the 2016 Notes Indenture.

1.21  **Subscription Agent** means Kurtzman Carson Consultants LLC, in its capacity as a subscription agent in connection with the Offering.

1.22  **Subscription Commencement Date** means the date on which the Order approving the Disclosure Statement is entered.

RLF1 3518267v.1

1.23    ***Subscription Expiration Date*** means March 3, 2010, as specified in the Subscription Form, which shall be the final date that an Eligible Holder may elect to subscribe for the Subscription Rights.

1.24    ***Subscription Form*** means the form to be used by an Offering Participant pursuant to which such holder may exercise its respective Subscription Rights, which shall be in form and substance acceptable to the Majority Backstop Purchasers.

1.25    ***Subscription Payment Date*** means the Subscription Expiration Date or such other date to be designated by the Majority Backstop Purchasers, by which such Offering Subscription Purchase Price shall be due.

1.26    ***Subscription Period*** means the period of time between the Subscription Commencement Date and the Subscription Expiration Date.

1.27    ***Subscription Rights*** means the non-transferable, non-certified subscription rights to purchase New Common Stock in connection with the Offering, on the terms and subject to the conditions set forth in the Offering Procedures.

1.28    ***Unsubscribed Shares*** means those shares of New Common Stock to be issued in connection with the Offering (based on the Offering Amount) that are not, or can not be, subscribed for and purchased by Eligible Holders pursuant to the Offering prior to the Subscription Expiration Date.

## ARTICLE II

## THE OFFERING

2.1    **Issuance of Subscription Rights.**

(a)    *Offering.* Each of the Eligible Holders shall be entitled to receive Subscription Rights entitling such participant to subscribe for up to its Limited Offering Pro Rata Share of New Common Stock to be issued pursuant to the Offering.

(b)    *Equity Ownership in Reorganized SFI.* After giving effect to the issuance of New Common Stock pursuant to the SFO Unsecured Claims distribution, the Offering Participants and the Backstop Purchasers shall be entitled to receive approximately 69.77% of the total outstanding New Common Stock of Reorganized SFI on the Effective Date, which amount shall be subject to dilution in connection with awards issued on or after the Effective Date under the Long-Term Incentive Plan.

The Backstop Purchasers, on the terms and subject to the conditions of the Backstop Commitment Agreement, shall subscribe for and purchase all Unsubscribed Shares as of the Subscription Expiration Date.

RLF1 3518267v.1

## 2.2    Subscription Period.

The Offering shall commence on the Subscription Commencement Date and shall expire on the Subscription Expiration Date.  Each Offering Participant intending to participate in the Offering must affirmatively elect to exercise its respective Subscription Rights on or prior to the Subscription Expiration Date.  After the Subscription Expiration Date, the Unsubscribed Shares shall be treated as acquired by the Backstop Purchasers on the terms and subject to the conditions contained in the Backstop Commitment Agreement and the Plan, and any exercise of such Subscription Rights by any entity other than its Backstop Purchasers (or any affiliate or permitted assignee of such Backstop Purchasers in accordance with the Backstop Commitment Agreement) shall be null and void and there shall be no obligation to honor any such purported exercise received by the Subscription Agent after the Subscription Expiration Date, regardless of when the documents relating to such exercise were sent.

## 2.3    Subscription Purchase Price.

Each Offering Participant choosing to exercise its Subscription Rights shall be required to pay such participant's Offering Subscription Purchase Price for New Common Stock.

## 2.4    Exercise of Subscription Rights.

In order to exercise the Subscription Rights, each Offering Participant must: (a) return a duly completed Subscription Form to the Subscription Agent so that such form is actually received by the Subscription Agent on or before the Subscription Expiration Date; and (b) pay to the Subscription Agent (on behalf of the Debtors) on or before the Subscription Expiration Date such Offering Participant's Offering Subscription Purchase Price in accordance with the wire instructions set forth on the Subscription Form delivered to the Subscription Agent along with the Subscription Form.

Each Offering Participant may exercise all or any portion of such Offering Participant's Subscription Rights pursuant to the Subscription Form, but the exercise of any Subscription Rights shall be irrevocable.  If the Subscription Agent for any reason does not receive from a given Offering Participant: (a) a duly completed Subscription Form on or prior to the Subscription Expiration Date; and (b) immediately available funds in an amount equal to such Offering Participant's Offering Subscription Purchase Price on or prior to the third Business Day prior to the Confirmation Hearing, such Offering Participant shall be deemed to have relinquished and waived its right to participate in the Offering.

The payments made in accordance with the Offering shall be deposited and held by the Subscription Agent in a trust or escrow account, or similarly segregated account or accounts which shall be separate and apart from the Subscription Agent's general operating funds and any other funds subject to any lien or similar encumbrance and which segregated account or accounts shall be maintained for the purpose of holding the money for administration of the Offering until the Effective Date.  In the event the Effective Date does not occur within fifteen (15) days after the Confirmation Hearing, the funds will be returned to the Offering Participants unless a later date is selected at the joint option of the Debtors and the Majority

RLF1 3518267v.1

Backstop Purchasers, but in no event later than thirty (30) days after the Confirmation Hearing. The Subscription Agent shall not use such funds for any other purpose prior to such date and shall not encumber or permit such funds to be encumbered with any lien or similar encumbrance.

In order to facilitate the exercise of the Subscription Rights, on or promptly after the Subscription Commencement Date, the Subscription Form shall be provided by mail, electronic mail or facsimile transmission to each SFO Noteholder that any Backstop Purchaser knows to be an Eligible Holder or who identifies itself as an Eligible Holder to the Subscription Agent, together with appropriate instructions for the proper completion, due execution and timely delivery of the Subscription Form, as well as instructions for the payment of the applicable Subscription Purchase Price for that portion of the Subscription Rights sought to be exercised by such Offering Participant.

2.5    **Offering Procedures.**

Notwithstanding anything contained herein to the contrary, the Majority Backstop Purchasers (subject to the Debtors consent, which shall not be unreasonably withheld) may modify these Offering Procedures or adopt such additional detailed procedures consistent with the provisions of these Offering Procedures to more efficiently administer the exercise of the Subscription Rights; provided, however, that the Majority Backstop Purchasers shall provide prompt written notice to the Offering Participants of any material modification to these Offering Procedures.

2.6    **Transfer Restriction: Revocation.**

The Subscription Rights are not transferable. Any such transfer or attempted transfer shall be null and void, and no purported transferee shall be treated as the holder of any Subscription Rights. Once an Offering Participant has properly exercised its Subscription Rights, such exercise cannot be revoked, rescinded or modified.

2.7    **Offering Backstop.**

(a)    *General.* On the terms and subject to the conditions in the Backstop Commitment Agreement, the Backstop Purchasers have agreed to subscribe for and purchase on the Effective Date, at the aggregate Offering Subscription Purchase Price therefor, all Unsubscribed Shares as of the Subscription Expiration Date according to the respective percentages set forth on Schedule I of the New Common Stock Term Sheet. The Backstop Purchasers shall pay to the Subscription Agent, by wire transfer in immediately available funds one business day prior to the Confirmation Hearing, Cash in an amount equal to the aggregate Offering Subscription Purchase Price attributable to such Unsubscribed Shares as provided in the Backstop Commitment Agreement; provided, that such funds shall be immediately refunded to the Backstop Purchasers if the Effective Date does not occur within fifteen (15) days of the Confirmation Hearing unless otherwise decided by the Majority Backstop Purchasers. The Subscription Agent shall deposit such payment into the same trust or escrow account into which were deposited the Offering Subscription Purchase Price payments of Offering Participants on the exercise of their Subscription Rights. The Subscription Agent shall give the Debtors and the Backstop Purchasers by e-mail and electronic facsimile transmission written notification setting

forth a true and accurate calculation of the number of Unsubscribed Shares, together with the aggregate Offering Subscription Purchase Price therefor (the "***Backstop Purchase Notice***") as soon as practicable after the Subscription Expiration Date. In addition, the Subscription Agent shall notify the Backstop Purchasers, on each Friday during the Subscription Period and on each Business Day during the five (5) Business Days prior to the Subscription Expiration Date (and any extensions thereto), or more frequently if requested by the Backstop Purchasers, of the aggregate number of Subscription Rights known by the Subscription Agent to have been exercised pursuant to the Offering as of the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be.

(b)     *Payment*. Subscription Agent shall determine the number of Unsubscribed Shares, if any, in good faith, and provide the Debtors and the Backstop Purchasers with a Backstop Purchase Notice that accurately reflects the number of Unsubscribed Shares as so determined. On the Effective Date, the Backstop Purchasers shall purchase only such number of Unsubscribed Shares as are listed in the Backstop Purchase Notice, without prejudice to the rights of the Backstop Purchasers to seek later an upward or downward adjustment if the number of Unsubscribed Shares in such Backstop Purchase Notice is inaccurate. Delivery of the Unsubscribed Shares shall be made to the account of the Backstop Purchasers (or to such other accounts as the Backstop Purchasers may designate) on the Effective Date against application by the Subscription Agent of the Offering Subscription Purchase Price payments of Offering Participants on the exercise of their Subscription Rights to a bank account in the United States specified by the Debtors to the Backstop Purchasers at least 24 hours in advance. All Unsubscribed Shares shall be delivered with any and all issue, stamp, transfer or similar taxes or duties payable in connection with such delivery duly paid by the Debtors or the Reorganized Debtors to the extent required under the Confirmation Order or applicable law.

(c)     *Transfer of Backstop Commitment*. Notwithstanding anything contained herein to the contrary, the Backstop Purchasers, in their sole discretion, may designate that some or all of the Unsubscribed Shares be issued in the name of, and delivered to, one or more of its affiliates, or to other financial institutions, in each case, reasonably acceptable to the Debtors.

(d)     *Conditions Precedent to Obligations of Backstop Purchasers*. The obligations of the Backstop Purchasers to purchase New Common Stock shall be conditioned upon satisfaction of each of the following; provided, that any or all of the following conditions may be waived in writing by the Majority Backstop Purchasers:

(i)     the Postconfirmation Organizational Documents shall be in form and substance acceptable to the Majority Backstop Purchasers;

(ii)     the Registration Rights Agreement shall be in form and substance acceptable to the Majority Backstop Purchasers;

(iii)     except as otherwise provided, the Plan, the Disclosure Statement, the Solicitation Order, the Confirmation Order and any Plan supplemental documents (collectively, the "***Plan Documents***") shall be in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably;

A-63

(iv)     all motions and other documents to be filed with the Bankruptcy Court in connection with the Offering, and payment of the fees contemplated under the Plan, the Backstop Commitment Letter, the New Common Stock Term Sheet and under these Offering Procedures shall be in form and substance acceptable to the Majority Backstop Purchasers;

(v)     all motions and other documents to be filed with the Bankruptcy Court in connection with the approval of the Postconfirmation Organizational Documents shall be in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably;

(vi)     all reasonable out-of-pocket fees and expenses (including reasonable fees and expenses of counsel and, if applicable, the fees and expenses of financial advisors) required to be paid to the Backstop Purchasers under the Plan, the Backstop Commitment Letter, the New Common Stock Term Sheet and/or these Offering Procedures have been paid;

(vii)     the Bankruptcy Court shall have entered the Approval Order, in form and substance satisfactory to the Majority Backstop Purchasers;

(viii)     the Adjusted EBITDA (as such term is defined in the Debtors' financial release dated as of November 2, 2009) for the twelve (12) months ending November 30, 2009 shall exceed $180 million;

(ix)     any and all governmental and third party consents and approvals necessary in connection with the Offering, the execution and filing where applicable, of the Postconfirmation Organizational Documents and the transactions contemplated hereby and thereby shall have been obtained and shall remain in effect;

(x)     the Exit Facility Loan Documents and the documents governing the New TW Loan (as such terms are defined in the Plan) shall be in form and substance acceptable to the Majority Backstop Purchasers; and

(xi)     The Plan shall have become, or simultaneously with the issuance of the Shares will become, effective.

2.8     **Breakup Fees and Expenses.**

Under the Backstop Commitment Agreement, in the event that the Debtors enter into a financing transaction with parties other than the Backstop Purchasers or do not issue the New Common Stock on the terms and subject to the conditions set forth in the Plan and New Common Stock Term Sheet, the Debtors shall pay to the Backstop Purchasers an aggregate breakup fee in Cash equal to 2.5% of the Offering Amount, which fee shall be fully earned upon entry of an order of the Bankruptcy Court authorizing the Debtors to execute the Backstop Commitment Agreement and shall be payable in full on the Effective Date.

Under the Backstop Commitment Agreement, upon the confirmation of any plan of reorganization, the Debtors shall pay all reasonable out-of-pocket fees and expenses

of the Backstop Purchasers to the extent provided in such Backstop Commitment Agreement (including reasonable fees and expenses of counsel and, if applicable, the fees and expenses of financial advisors) on or before the effective date of such plan of reorganization.

### 2.9  Distribution of the New Common Stock.

On the Effective Date, Reorganized SFI shall distribute the New Common Stock purchased by each Offering Participant that has properly exercised its Subscription Rights to such holder and to the Backstop Purchasers. If the exercise of a Subscription Right would result in the issuance of a fractional share of New Common Stock, then the number of shares of New Common Stock to be issued in respect of such Subscription Right shall be rounded down to the closest whole share.

### 2.10  Exemption from Registration under the Securities Act.

The Offering is being made to Eligible Holders only. The New Common Stock issued pursuant to the Offering to the Offering Participants shall be exempt from registration under the Securities Act by virtue of section 4(2) thereof. Unlike the New Common Stock issued to holders of Allowed SFO Unsecured Claims, the New Common Stock issued to the Offering Participants pursuant to the Offering will not be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code.

### 2.11  Validity of Exercise of Subscription Rights.

All questions concerning the timeliness, viability, form and eligibility of any exercise of Subscription Rights shall be determined by the Majority Backstop Purchasers, whose good faith determinations shall be final and binding. The Majority Backstop Purchasers, in their discretion, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights. Subscription Forms shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Majority Backstop Purchasers determine in their discretion. The Majority Backstop Purchasers shall use commercially reasonable efforts to give notice to any Offering Participants regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such participant and, may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Majority Backstop Purchasers nor the Subscription Agent shall incur any liability for failure to give such notification.

### 2.12  Indemnification of Backstop Purchasers.

The Debtors or the Reorganized Debtors, as the case may be, agree to indemnify and hold harmless the Backstop Purchasers and their respective present and former directors, officers, partners, members, representatives, employees, agents, attorneys, financial advisors, restructuring advisors and other professional advisors (each an "***Indemnified Person***") from and against any and all losses, claims, damages, liabilities and expenses, joint or several, to which any such Indemnified Person may incur, have asserted against it or be involved in as a result of or arising out of or in any way related to the Plan, the Offering, the Backstop Commitment

Agreement or the transactions contemplated hereby or thereby, including without limitation distribution of the Subscription Rights, the purchase and sale of New Common Shares in the Offering and purchase and sale of Unsubscribed Shares to the Backstop Purchasers pursuant to the Backstop Commitment Agreement or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any of such Indemnified Persons is a party thereto, and to reimburse each of such Indemnified Persons within 10 days after demand for any legal or other expenses incurred in connection with any of the foregoing; provided, however, that the foregoing indemnity shall not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from the willful misconduct or gross negligence of such Indemnified Person.

Notwithstanding any other provision to the contrary, no Indemnified Person shall be liable for any special, indirect, consequential or punitive damages in connection with its activities related to the Plan, the Offering, the Backstop Commitment Agreement or the transactions contemplated hereby or thereby. The terms set forth in this section 2.12 shall survive termination of the Backstop Commitment Agreement and shall remain in full force and effect regardless of whether the Offering is consummated.

RLF1 3518267v.1

**AVENUE CAPITAL MANAGEMENT**
**FIDELITY MANAGEMENT & RESEARCH CO. AND CERTAIN AFFILIATES**
**HAYMAN ADVISORS, L.P.**
**J.P. MORGAN INVESTMENT MANAGEMENT INC.**
**NORTHEAST INVESTORS TRUST**
**THIRD POINT, LLC**
**WHITEBOX ADVISORS, LLC**

November 6, 2009 (as amended on or about November 30, 2009, and as further amended as of December 16, 2009)

Six Flags, Inc.
1540 Broadway
New York, NY 10036

  Attention: Mr. Jeffrey Speed
       Chief Financial Officer

  Re:  $450,000,000 Common Stock Backstop Commitment

Ladies and Gentlemen:

Reference is made to the chapter 11 bankruptcy cases, lead case no. 09-12019 (the "Chapter 11 Cases"), currently pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), in which Six Flags, Inc. and certain of its affiliates are debtors and debtors in possession (collectively, the "Debtors"). Reference is further made to: (i) a Chapter 11 plan of reorganization that will be filed by the Debtors concurrently herewith (as such plan of reorganization may be modified or amended from time to time, the "Plan") and (ii) a disclosure statement that will accompany the Plan (as it may be modified or amended from time to time, the "Disclosure Statement"). Capitalized terms used in this letter agreement (the "Backstop Commitment Agreement") and not otherwise defined herein shall have the meanings provided in the Plan.

The Plan proposes, among other things, to obtain exit financing required for the emergence of the Debtors from Chapter 11 by offering (the "Offering") to eligible holders of pre-petition claims with respect to Six Flags Operations, Inc. ("SFO") 12¼% Senior Notes due 2016 (the "Eligible Holders") a limited right to participate in $450 million in the aggregate (the "Offering Amount") of new common stock (the "New Common Stock") of Six Flags, Inc. ("SFI"), subject to dilution in connection with awards issued on or after the Effective Date under the Long Term Incentive Plan, as more fully described in the Plan and the offering

procedures ("Offering Procedures") established in the Plan.[1] Pursuant to the Plan and Offering Procedures, each Eligible Holder will receive an offer to participate in the Offering based on its respective Limited Pro Rata Share holdings and will be required to accept such offer by the Subscription Expiration Date as and to the extent set forth in the Offering Procedures. For purposes of the Offering, the term "Limited Pro Rata Share" means (x) the total principal amount of SFO 12¼% Senior Notes (the "SFO Notes") held by an Eligible Holder divided by (y) four times the aggregate principal amount of all SFO Notes outstanding as of the Petition Date.

To provide assurance that the Offering will be fully subscribed and that the Offering is consummated in respect of the entire Offering Amount, the undersigned (collectively, the "Backstop Purchasers") hereby commit, severally and not jointly, to backstop the Offering (the "Backstop Commitment") in the respective percentages set forth on Schedule I of the term sheet relating to the issuance of the New Common Stock (the "New Common Stock Term Sheet") attached hereto as Exhibit A, and on the terms described herein and in the Plan. Each Backstop Purchaser shall fund its pro rata share of the Unsubscribed Shares (as defined in the Offering Procedures) one business day prior to the hearing conducted by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time (the "Confirmation Hearing"). Such funds shall be held in an escrow or trust account to be designated by the Backstop Purchasers and shall be immediately refunded if the Effective Date does not occur within fifteen (15) days following the Confirmation Hearing, unless otherwise extended by the Majority Backstop Purchasers. "Majority Backstop Purchasers" means the Backstop Purchasers that collectively hold a majority of the aggregate commitment percentage set forth on Schedule I of the New Common Stock Term Sheet.

The Debtors hereby agree that, in the event that the Debtors enter into a financing transaction with parties other than the Backstop Purchasers or do not issue the New Common Stock on the terms set forth in the Plan and the New Common Stock Term Sheet, the Debtors shall pay to the Backstop Purchasers an aggregate break up fee equal to 2.5% of the Offering Amount (the "Break Up Fee"), which fee shall be fully earned upon entry of the Approval Order (as defined below) by the Bankruptcy Court and shall be payable in full in Cash upon the confirmation of any Chapter 11 plan of reorganization (other than the Plan) or liquidation with respect of the Debtors.

The agreement of the Backstop Purchasers hereunder is conditioned upon satisfaction of each of the conditions set forth in the Plan, the Offering Procedures and New Common Stock Term Sheet, including (without limitation) the entry of an order of the Bankruptcy Court on or before December 21, 2009, in form and

---

[1] The Plan also contemplates paying off the Prepetition Credit Agreement Claims with the proceeds of the Offering and the Exit Term Loan (as such terms are defined in the Plan).

substance satisfactory to the Majority Backstop Purchasers, which order shall (without limitation) authorize the Debtors to execute this Backstop Commitment Agreement and authorize and approve the transactions contemplated herein and the New Common Stock Term Sheet, including (without limitation) the payment of all consideration and fees contemplated herein and therein, and authorize the indemnification provisions set forth in this Backstop Commitment Agreement, which order shall become a final order not subject to stay, appeal or modification (absent the prior written consent of the Majority Backstop Purchasers) on or before January 6, 2010 (the "Approval Order"). Notwithstanding any other provision herein, no Break Up Fee shall be payable if any non-Debtor party hereto is in breach of its obligations hereunder as of the date on which the Break Up Fee would otherwise be earned or payable unless one or more other Backstop Purchasers have assumed such breaching party's obligations hereunder.

The obligation of the Backstop Purchasers is further conditioned upon (a) the Adjusted EBITDA (as such term is defined in the Debtors' financial release dated as of November 2, 2009) for the twelve (12) months ending November 30, 2009 exceeding $180 million, (b) entry into documentation governing the Exit Revolving Loans, the Exit Term Loan and the New TW Loan (as such terms are defined in the Plan) that is satisfactory in form and substance to the Majority Backstop Purchasers and (c) entry by the Bankruptcy Court of an order (which has become final) confirming the Plan (with such changes as are satisfactory to the Majority Backstop Purchasers) (the Plan in the form confirmed by the Bankruptcy Court, the "Confirmed Plan"), and such Confirmed Plan becoming effective, on or before April 23, 2010.

Whether or not the transactions contemplated hereby are consummated, the Debtors agree to: (x) pay within 10 days of demand the reasonable and documented fees, expenses, disbursements and charges of the Backstop Purchasers incurred previously or in the future relating to the exploration and discussion of the restructuring of the Debtors, alternative financing structures to the Backstop Commitment or to the preparation and negotiation of this Backstop Commitment Agreement, the Plan, the Offering Procedures, the New Common Stock Term Sheet, the Plan Documents or the Postconfirmation Organizational Documents (including, without limitation, in connection with the enforcement or protection of any rights and remedies under the Postconfirmation Organizational Documents) and, in each of the foregoing cases, the proposed documentation and the transactions contemplated thereunder, including, without limitation, the fees and expenses of counsel to the Backstop Purchasers, and the financial advisors to the Backstop Purchasers and (y) indemnify and hold harmless the Backstop Purchasers and their respective general partners, members, managers and equity holders, and the respective officers, employees, affiliates, advisors, agents, attorneys, financial advisors, accountants, consultants of each such entity, and to hold the Backstop Purchasers and such other persons and entities (each an "Indemnified Person") harmless from and against any and all losses, claims, damages, liabilities and expenses, joint or several, which any such person or

entity may incur, have asserted against it or be involved in as a result of or arising out of or in any way related to this letter, the matters referred to herein, the Plan, the New Common Stock Term Sheet, the proposed Backstop Commitment contemplated hereby, the use of proceeds thereunder or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any of such Indemnified Persons is a party thereto, and to reimburse each of such Indemnified Persons upon 10 days of demand for any legal or other expenses incurred in connection with any of the foregoing; provided, however, that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from the willful misconduct or gross negligence of such Indemnified Person. Notwithstanding any other provision of this letter, no Indemnified Person will be liable for any special, indirect, consequential or punitive damages in connection with its activities related to the Backstop Commitment and the Offering. The terms set forth in this paragraph survive termination of this Backstop Commitment Agreement and shall remain in full force and effect regardless of whether the documentation for the Offering is executed and delivered.

This letter (a) is not assignable by the Debtors without the prior written consent of the Majority Backstop Purchasers (and any purported assignment without such consent shall be null and void), and (b) is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. Notwithstanding the foregoing, the Backstop Purchasers may assign all or any portion of their obligations hereunder to one or more financial institutions reasonably acceptable to SFI; provided, that no Debtor's consent shall be required for such an assignment to another Backstop Purchaser or an affiliate of a Backstop Purchaser. Upon any such assignment (other than an assignment with the Debtors' consent or an assignment to another Backstop Purchaser), the obligations of the Backstop Purchasers in respect of the portion of their obligations so assigned shall not terminate. In the event that any Backstop Purchaser fails to meet its obligations under this Backstop Commitment Agreement, the non-breaching Backstop Purchasers shall have the right, but not the obligation, to assume such obligations in such manner as they may agree.

This Backstop Commitment Agreement sets forth the agreement of the Backstop Purchasers to fund the Backstop Commitment on the terms described herein and shall be considered withdrawn if the Backstop Purchasers have not received from the Debtors a fully executed counterpart to this Backstop Commitment Agreement **on or before November 6, 2009 at 11:59 PM (ET)**, unless such deadline is extended by the Majority Backstop Purchasers.

The obligations of the Backstop Purchasers to fund the Backstop Commitment shall terminate and all of the obligations of the Debtors (other than the obligations of the Debtors to (i) pay the reimbursable fees and expenses, (ii) satisfy their

indemnification obligations and (iii) pay the Break Up Fee, in each case, as set forth herein) shall be of no further force or effect, upon the giving of written notice of termination by the Majority Backstop Purchasers, in the event that any of the items set forth in the New Common Stock Term Sheet under the heading "Termination of Backstop Commitments" occurs, each of which may be waived in writing by the Majority Backstop Purchasers.

THIS COMMITMENT LETTER WILL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

This Backstop Commitment Agreement may not be amended or waived except in writing signed by the Debtors and the Majority Backstop Purchasers. This Backstop Commitment Agreement may be executed in any number of counterparts, each of which will be an original, and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of this Backstop Commitment Agreement by facsimile or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Backstop Commitment Agreement.

This Backstop Commitment Agreement and the Plan are part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Backstop Commitment Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Backstop Commitment Agreement.

Execution of this Backstop Commitment Agreement by a Backstop Purchaser shall be deemed a direction by such Backstop Purchaser to direct HSBC Bank USA, National Association ("HSBC"), as indenture trustee, under that certain Indenture, dated as of June 16, 2008, between and among SFO, SFI and HSBC, to (a) engage Akin Gump Strauss Hauer & Feld LLP, as special counsel, effective as of June 13, 2009, with respect to any and all legal services on behalf of holders of SFO Notes related to the Chapter 11 Cases, (b) engage Drinker Biddle & Reath LLP, as local Delaware counsel, effective as of September 4, 2009, with respect to any and all legal services on behalf of holders of SFO Notes related to the Chapter 11 Case and (c) engage Barclays Capital Inc. pursuant to the terms of Barclays Capital's engagement letter dated October 8, 2009.

Notwithstanding anything contained herein, each Backstop Purchaser acknowledges that its decision to enter into this Backstop Commitment Agreement has been made by such Backstop Purchaser independently of any other Backstop Purchaser.

RLF1 3518267v.1

This Backstop Commitment Agreement constitutes the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral, between the parties hereto with respect to the subject matter hereof and shall become effective and binding upon (i) the mutual exchange of fully executed counterparts and (ii) the entry of the Approval Order.

The undersigned represent that they have the authority to execute and deliver this Backstop Commitment Agreement on behalf of their respective affiliate Backstop Purchasers listed on Schedule I to the New Common Stock Term Sheet.

[SIGNATURE PAGES FOLLOW]

RLF1 3518267v.1

If the foregoing is in accordance with your understanding of our agreement, please sign this letter in the space indicated below and return it to us.

Very truly yours,

[SIGNATURE PAGES TO FOLLOW]

ACCEPTED AND AGREED THIS 6th DAY OF
NOVEMBER, 2009:

SIX FLAGS, INC.

By: _____
Name: Jeffrey R. Speed
Title: Chief Financial Officer

**AVENUE CAPITAL MANAGEMENT**

By: _____
Name:
Title:

[SIGNATURES CONTINUE ON FOLLOWING PAGES]

**Fidelity Summer Street Trust: Fidelity Capital &
Income Fund**

By: _____
    Name:
    Title:        Paul Murphy
                Assistant Treasurer

**Master Trust Bank of Japan Ltd Re: Fidelity US High Yield**

By: _____

Name:

Title:          Paul Murphy
                Assistant Treasurer

**Fidelity Advisor Series I: Fidelity Advisor High Income Advantage Fund**

By: _____
   Name:
   Title:      Paul Murphy
              Assistant Treasurer

**Fidelity Puritan Trust: Fidelity Puritan Fund**

By: _____

Name:

Title:          Paul Murphy

               Assistant Treasurer

**Fidelity Advisor Series I: Fidelity Advisor Leveraged Stock Fund**

By: _____

Name:
Title:       Paul Murphy
             Assistant Treasurer

**Fidelity Summer Street Trust: Fidelity High Income Fund**

By: _____

      Name:

      Title:       Paul Murphy

                   Assistant Treasurer

[COMMITMENT LETTER SIGNATURE PAGE]

**Fidelity Advisor Series II: Fidelity Advisor
Strategic Income Fund**

By: _____

Name:

Title:         Paul Murphy
              Assistant Treasurer

**Fidelity School Street Trust: Fidelity Strategic Income Fund**

By: _____

    Name:

    Title:           Paul Murphy
                   Assistant Treasurer

**Fidelity Funds - US High Income**

By: _____

Name:

Title:        Paul Murphy
           Assistant Treasurer

**Fidelity Investments Canada ULC, As Trustee Of
The Fidelity American High Yield Fund**

By: _____

     Name:

     Title:          Paul Murphy

                    Assistant Treasurer

[COMMITMENT LETTER SIGNATURE PAGE]

Fidelity Investments Canada ULC, As Trustee Of
The Fidelity Canadian Asset Allocation Fund

By: _____

     Name:
     Title:           Paul Murphy
                Assistant Treasurer

[COMMITMENT LETTER SIGNATURE PAGE]

Fidelity Investments Canada ULC, As Trustee of
The Fidelity Balanced High Income Fund

By: _____

Name:
Title:          Paul Murphy
              Assistant Treasurer

**Variable Insurance Products Fund V: Strategic Income Portfolio**

By: _____

Name:

Title:        Paul Murphy
              Assistant Treasurer

**Fidelity Central Investment Portfolios LLC:**
**Fidelity High Income Central Fund 2**

By: _____
    Name:
    Title:      Paul Murphy
                Assistant Treasurer

[COMMITMENT LETTER SIGNATURE PAGE]

**Illinois Municipal Retirement Fund**

By: _____

    Name:

    Title:                      Dave Censorio

                                Vice President

[COMMITMENT LETTER SIGNATURE PAGE]

The Japan Trustee Service Bank LTD Re: MATB
Fidelity High Yield Bond Open Mother

By: _____

    Name:

    Title:               Dave Censorio

                         Vice President

[COMMITMENT LETTER SIGNATURE PAGE]

**Fidelity Global Bond Series-US Dollar Monthly Income-US High Yield Pool**

By: _____

    Name:

    Title:

                          Dave Censorio

                          Vice President

[COMMITMENT LETTER SIGNATURE PAGE]

**IG CAA High Yield Sec**

By: _____

    Name:

    Title:                  Dave Censorio

                             Vice President

**[COMMITMENT LETTER SIGNATURE PAGE]**

The Japan Trustee Services Bank LTD Re: STB
Fidelity Strategic Income Fund Mother

By: _____
    Name:
    Title:

                              Dave Censorio
                              Vice President

[COMMITMENT LETTER SIGNATURE PAGE]

**HAYMAN CAPITAL MASTER FUND, LP**

By: Hayman Advisors, L.P., its general partner

By: _____
Name:
Title:
        Debby LaMoy
        **Chief Operating Officer**
        **Hayman Advisors, LP**

[SIGNATURES CONTINUE ON FOLLOWING PAGES]

**J.P. MORGAN INVESTMENT MANAGEMENT INC., NOT IN ITS INDIVIDUAL CAPACITY BUT ACTING AS INVESTMENT MANAGER WITH FULL DISCRETIONARY AUTHORITY OVER THE ACCOUNTS IDENTIFIED BELOW:**

By:
Name: <u>James P. Shanahan, Jr.</u>
Title: <u>Managing Director</u>

<u>2016 Notes:</u>

JP Morgan High Yield Bond Fund

Principal Funds Inc. – High Yield I

JP Morgan Income Builder Fund

Commingled Pension Trust Fund (High Yield Bond) of JPMorgan Chase Bank, N.A.

Pacholder High Yield Fund, Inc.

JP Morgan Investment Funds – JPM Global Income Fund

JP Morgan Strategic Income Opportunities Fund

JP Morgan Investment Funds – Income Opportunity Fund

JP Morgan Distressed Debt Fund

$
Principal Face Amount of 2016 Notes

[SIGNATURES CONTINUE ON FOLLOWING PAGES]

[COMMITMENT LETTER SIGNATURE PAGE]

**THIRD POINT LLC**

By: _____
    Name:
    Title:    Mendy R Haas
              CFO

[SIGNATURES CONTINUE ON FOLLOWING PAGES]

**WHITEBOX ADVISORS, LLC**

By: _____

    Name: Jonathan Wood
    Title: Chief Operating Officer

[SIGNATURES CONTINUE ON FOLLOWING PAGES]

Commitment Letter

NORTHEAST INVESTORS TRUST

By: _[signature]_
Name: BRUCE H MONRAD
Title: Trustee, at individually

[BACKSTOP COMMITMENT AGREEMENT SIGNATURE PAGE]

# Exhibit A

## New Common Stock Term Sheet

# SIX FLAGS, INC.

## $450,000,000 COMMON STOCK

### <u>Summary of Principal Terms</u>

The following Summary of Principal Terms (this "**New Common Stock Term Sheet**") provides an outline of a proposed Common Stock offering by the Issuer identified below in connection with and upon the emergence of the Issuer and its affiliates (collectively, the "**Debtors**") from chapter 11 proceedings pursuant to a chapter 11 plan of reorganization, the terms of which are described in more detail in the Backstop Commitment Agreement (defined below) to which this New Common Stock Term Sheet is attached (the "**Plan**"). The actual terms and conditions upon which any purchaser might purchase the Shares are subject to execution and delivery of definitive legal documentation, by all required parties and such other terms and conditions as are determined by the parties. This New Common Stock Term Sheet and the information contained herein is strictly confidential and may not be shared with any person or entity without the prior written consent of the Majority Backstop Purchasers (as defined below). Unless otherwise defined herein, each capitalized term used in this New Common Stock Term Sheet shall have the same meaning ascribed to such term in the Plan.

| | |
|---|---|
| **Issuer:** | Six Flags, Inc. (the "*Issuer*"). |
| **Securities Offered:** | $450,000,000 in the aggregate (the "*Offering Amount*") of Common Stock (the "*Shares*"). |
| **Offering:** | The Shares, representing 69.77% of the New Common Stock of the Issuer on the Effective Date (as defined below), subject to dilution in connection with awards issued on or after the Effective Date under the Long-Term Incentive Plan, will be offered on a limited basis and as provided in the Offering Procedures (the "*Offering*") (i) to each Eligible Holder its Limited Offering Pro Rata Share and (ii) to the extent less than all of the Shares are issued to the Accepting SFO Noteholders, to the entities which agree to backstop the Offering pursuant to the Backstop Commitment Agreement (defined below), the initial list of which is set forth on <u>Schedule I</u> hereto (the parties listed on Schedule I, the "*Backstop Purchasers*").[1] For the avoidance of doubt, a Backstop Purchaser shall be entitled to participate in the Offering |

---

[1] The net effect of the Offering, (i) assuming the Offering is fully subscribed for by Eligible Holders and (ii) as a result of the application of each Eligible Holder's Limited Offering Pro Rata Share, all Eligible Holders (including Backstop Purchasers solely in their capacity as Eligible Holders) would acquire approximately 25% of the Shares (or approximately 4%, excluding purchases by Backstop Purchasers that are Eligible Holders), and the Backstop Purchasers would acquire approximately 75% of the Shares (or approximately 96% of the Shares, including purchases by Backstop Purchasers in their capacity as Eligible Holders).

in its capacity as a SFO Noteholder.

On the terms and subject to the conditions set forth in that certain backstop commitment agreement, dated as of November 6, 2009 (as amended on or about November 30, 2009, and as further amended as of December 16, 2009, the "***Backstop Commitment Agreement***"), each Backstop Purchaser will severally commit to purchase its respective Commitment Percentage of Shares in the aggregate principal amount equal to $450,000,000. For purposes hereof, a Backstop Purchaser's "***Commitment Percentage***" is the percentage for such Backstop Purchaser set forth on <u>Schedule I</u> hereto. Subject to the terms and conditions of the Backstop Commitment Agreement, the rights to subscribe for the purchase of the Shares shall be non-transferrable.

The Offering will only be made to accredited investors in a fashion that will be exempt from registration under the Securities Act of 1933 as amended (the "***1933 Act***").

**Purchase Price:** The Offering will be at a purchase price based upon an assumed enterprise value of the Issuer on the Effective Date of $1.335 billion.

**Use of Proceeds:** Proceeds of the Shares may only be used to make payments required to be made on and after the Effective Date under the Plan, including, without limitation, repayment of all amounts owing under the Prepetition Credit Agreement.

**Fees:** In the event the Issuer enters into a financing transaction with parties other than the Backstop Purchasers or does not issue the Shares on the terms set forth in this New Common Stock Term Sheet, the Debtors shall pay to the Backstop Purchasers an aggregate break up fee in Cash equal to 2.5% of the Offering Amount (the "***Break Up Fee***"), which fee shall be fully earned upon entry of the Approval Order by the Bankruptcy Court and shall be payable in full in Cash upon the confirmation of any Chapter 11 plan of reorganization (other than the Plan) or liquidation with respect of the Debtors.

**Registration Rights:** To the extent contemplated by the Plan, Purchasers of Shares may be entitled to become party to a Registration Rights Agreement all in form and substance satisfactory to the Majority Backstop Purchasers.

**Conditions Precedent To the Closing:** The obligation of the Backstop Purchasers to purchase the Shares will be conditioned upon satisfaction of each of the following; <u>provided</u>, that each of the following conditions may be waived in

A-77

writing by the Majority Backstop Purchasers:

- The Postconfirmation Organizational Documents shall be in form and substance acceptable to the Majority Backstop Purchasers;

- The Registration Rights Agreement shall be in form and substance acceptable to the Majority Backstop Purchasers;

- Except as otherwise provided, the Plan, the Disclosure Statement, the Solicitation Order, the Confirmation Order and any Plan supplemental documents (collectively, the "***Plan Documents***") shall be in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably;

- All motions and other documents to be filed with the Bankruptcy Court in connection with the offer and sale of the Shares, and payment of the fees contemplated under the Plan, the Backstop Commitment Agreement, this New Common Stock Term Sheet and the Offering Procedures shall be in form and substance satisfactory to the Majority Backstop Purchasers;

- All motions and other documents to be filed with the Bankruptcy Court in connection the approval of the Postconfirmation Organizational Documents shall be in form and substance satisfactory to the Majority Backstop Purchasers;

- All reasonable out-of-pocket fees and expenses (including reasonable fees and expenses of counsel and the fees and expenses of financial advisors) required to be paid to the Backstop Purchasers under the Plan, the Backstop Commitment Agreement, this New Common Stock Term Sheet and/or the Offering Procedures have been paid;

- The Bankruptcy Court shall have entered an order (the "***Approval Order***"), in form and substance acceptable to the Majority Backstop Purchasers, which order shall (without limitation) authorize the Debtors to execute the Backstop Commitment Agreement and authorize and approve the transactions contemplated therein and herein, including (without limitation) the payment of all consideration and fees contemplated under the Backstop Commitment Agreement and this New Common Stock Term Sheet, and authorize the indemnification provisions set forth in the Backstop Commitment Agreement, which order shall be in full force and effect and shall not have been reversed, vacated or stayed

RLF1 3518267v.1

and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Majority Backstop Purchasers;

- The Adjusted EBITDA (as such term is defined in the Debtors' financial release dated as of November 2, 2009) for the twelve (12) months ending on November 30, 2009 shall exceed $180 million;

- Any and all governmental and third party consents and approvals necessary in connection with the offer and sale of the Shares, the execution and filing where applicable, of the Postconfirmation Organizational Documents and the transactions contemplated hereby and thereby shall have been obtained and shall remain in effect;

- The Exit Facility Loan Documents and the documents governing the New TW Loan (as such terms are defined in the Plan) shall be in form and substance acceptable to the Majority Backstop Purchasers; and

- The Plan shall have become, or simultaneously with the issuance of the Shares will become, effective.

**Termination of Backstop Commitments:** The commitment of the Backstop Purchasers to purchase the Shares set forth in the Backstop Commitment Agreement (the "***Backstop Commitment***") shall terminate and all of the obligations of the Debtors (other than the obligations of the Debtors to pay the reimbursable fees and expenses and the Break Up Fee and to satisfy their indemnification obligations set forth in the Backstop Commitment Agreement) shall be of no further force or effect, at the election of and upon the giving of written notice of termination by the Majority Backstop Purchasers, in the event that any of the following occurs, each of which may be waived in writing by the Majority Backstop Purchasers:

- the Plan and Disclosure Statement, each in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably, are not filed by the Debtors with the Bankruptcy Court on or before November 6, 2009;

- the Bankruptcy Court fails to enter the Approval Order on or before December 21, 2009;

- the Solicitation Order, in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably, has not been entered by the Bankruptcy Court on or before December 21, 2009;

- the Debtors fail to commence a solicitation of votes for

A-79

acceptance of the Plan on or before December 24, 2009;

- the Approval Order does not become final on or before January 6, 2010;

- the Postconfirmation Organizational Documents, each in form and substance acceptable to the Majority Backstop Purchasers, are not filed under a Plan Supplement on or before the date that is ten days prior to the voting deadline on the Plan;

- the Confirmation Order, in form and substance acceptable to the Majority Backstop Purchasers in their discretion exercised reasonably, has not been entered by the Bankruptcy Court on or before March 31, 2010;

- the Confirmation Order shall not have become a final order by April 15, 2010;

- the Effective Date does not occur on or before April 23, 2010; provided, that the terminating party is not then in material breach of its obligations hereunder;

- the withdrawal, amendment, modification or filing of a pleading seeking to amend or modify, the Plan, the Disclosure Statement or any document related to the Plan or Disclosure Statement (including, without limitation, any motion, notice, exhibit, appendix or order) by the Debtors, which withdrawal, amendment, modification or filing is inconsistent with this New Common Stock Term Sheet;

- the filing by the Debtors of any motion or other request for relief seeking (i) to voluntarily dismiss any of the Chapter 11 Cases, (ii) conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code, or (iii) appointment of a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

- the entry of an order by the Bankruptcy Court (i) dismissing any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) appointing a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases; or (iv) making a finding of fraud, dishonesty, or misconduct by any officer or director of the Debtors;

- a material breach by the Debtors of any of their obligations under this New Common Stock Term Sheet or the Backstop Commitment Agreement that is not cured within five (5) business days after receipt of written notice thereof to the

A-80

Debtors from the Majority Backstop Purchasers;

- any court of competent jurisdiction or other competent governmental or regulatory authority issues an order making illegal or otherwise restricting, preventing, or prohibiting the restructuring set forth in this New Common Stock Term Sheet in a manner that cannot be reasonably remedied by the Debtors or the Majority Backstop Purchasers; and

- one or more of the conditions precedent to occurrence of the Effective Date set forth in this New Common Stock Term Sheet or to the obligations of the Backstop Purchasers set forth in the Backstop Commitment Agreement is not satisfied or, in the judgment of the Majority Backstop Purchasers, becomes impossible to satisfy on or before the Effective Date.

**Effective Date:**  The effective date of the Plan as ordered by the Bankruptcy Court, it being anticipated that such date will occur on or before April 23, 2010 (the "*Effective Date*").

**Expenses:**  Whether or not the transactions contemplated hereunder or the Backstop Commitment Agreement are consummated, the Debtors shall pay within 10 days of demand the reasonable and documented fees, expenses, disbursements and charges of the Backstop Purchasers incurred previously or in the future relating to the exploration and discussion of the restructuring of the Debtors, alternative financing structures to the Backstop Commitment or to the preparation and negotiation of the Backstop Commitment Agreement, the Plan, the Offering Procedures, this New Common Stock Term Sheet, the Plan Documents or the Postconfirmation Organizational Documents (including, without limitation, in connection with the enforcement or protection of any of rights and remedies under the Postconfirmation Organizational Documents) and, in each of the foregoing cases, the proposed documentation and the transactions contemplated thereunder, including, without limitation, the fees and expenses of counsel to the Backstop Purchasers, and the financial advisors to the Backstop Purchasers.

**Exhibit B**
**Order**

[FINAL ORDER TO BE INSERTED]

**Exhibit C**
**Projected Financial Information**

# PROJECTED FINANCIAL INFORMATION
# SIX FLAGS, INC.

For purposes of developing the Plan and evaluating its feasibility, Six Flags prepared the following financial projections reflecting its estimate of its expected consolidated financial position, results of operations, and cash flows for the years 2009 – 2013 on the basis of presentation and in accordance with the significant assumptions disclosed herein (the "Projections"). Accordingly, the Projections reflect Six Flags' judgment, as of the date of the Amended Disclosure Statement, of expected future operating and business conditions, which are subject to change.

Six Flags consolidates the non-debtor entities that own Six Flags Over Texas, Six Flags Over Georgia and Six Flags White Water Atlanta, as Six Flags has the most significant economic interest because it receives a majority of these entity's expected losses or expected residual returns and has the ability to make decisions that significantly affect the results of the activities of these entities. The equity interests owned by nonaffiliated parties in these entities are reflected in the accompanying Condensed Consolidated Projected Balance Sheets as redeemable noncontrolling interests. The portion of earnings from these parks owned by non-affiliated parties in these entities is reflected as net income attributable to noncontrolling interests in the accompanying Condensed Consolidated Projected Statements of Operations.

Six Flags is required to make an annual offer to purchase at specified prices up to a maximum number of 5% per year (accumulating to the extent not purchased in any given year) of limited partnership units in the underlying partnerships that own Six Flags Over Texas and Six Flags over Georgia and Six Flags White Water Atlanta. For purposes of the Projections, Six Flags has assumed that $30.0 million of limited partnership units will be purchased annually as a result of the annual offer, split between the Partnership Parks based on the same proportions as the partnership units tendered in 2009, which was approximately $58.5 million out of a total of approximately $65.5 million of total units tendered. Six Flags has made reasonable and conservative assumptions regarding the annual amount of limited partnership units in the Partnership Parks that it will be required to purchase in future years based upon the sharp increase in the amount it was required to purchase in 2009. The increase in amount of limited partnership units Six Flags was required to purchase in 2009 was driven by the Company's uncertain future and high debt to equity levels, and the decision of the general partner of Six Flags Over Texas to tender some of his units, and to not purchase his ratable share of units tendered by limited partners of Six Flags Over Texas, a departure from his practice in prior years. Because of the chapter 11 cases, Six Flags reasonably assumes that the amount of limited partnership units it will be required to purchase in future years will be higher than historical levels (which have averaged approximately $3 million per year prior to 2009, assuming no purchase of tendered units by the general partners of Six Flags Over Texas and Six Flags Over Georgia).

Six Flags has also included in the Projections the results of its parks in Mexico City, Mexico and Montreal, Canada (the "Foreign Parks"). The Foreign Parks are not debtors in these chapter 11 cases. However, the debtors own all of the significant interests in the entities that own and operate the Foreign Parks and will continue to exercise their financial and operating control upon the Effective Date.

C-2

Additionally, consistent with historical publicly filed financial documents, the Projections do not consolidate 100% of the financial results of dcp and HWP, as SFTP owns only a minority equity interest in those entities. Therefore, the Projections incorporate SFTP's equity in earnings from dcp and HWP on a forecasted basis, which is SFTP's share of dcp's and HWP's results.

All estimates and assumptions shown in the Projections were developed by Six Flags. The assumptions disclosed herein are those that Six Flags believes to be significant to the Projections. Although Six Flags is of the opinion that these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, such as (i) attendance at the theme parks; (ii) in-park spending, which is driven largely by discretionary consumer income and spending trends; (iii) the general economic conditions; (iv) adverse weather conditions; (v) the size and demographic make-up of the regional market served by each theme park; (vi) the ability to attract sponsorship and licensing revenues; and (vii) changes to Six Flags' cost structure, particularly with regards to labor and benefits. Despite Six Flags' efforts to foresee and plan for the effects of changes in these circumstances, Six Flags cannot predict their impact with certainty. Consequently, actual financial results could vary significantly from the Projections.

THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY SIX FLAGS OR ANY OTHER PERSON AS TO THE ACCURACY OF THE PROJECTIONS OR THAT ANY PROJECTIONS SET FORTH HEREIN WILL BE REALIZED.

THE PROJECTIONS WERE PREPARED BY SIX FLAGS; THEY HAVE NOT BEEN AUDITED OR REVIEWED BY INDEPENDENT ACCOUNTANTS. THE SIGNIFICANT ASSUMPTIONS USED IN THE PREPARATION OF THE PROJECTIONS ARE STATED HEREIN.

THE PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN.

As the Projections reflect annual estimated results, Six Flags has assumed, for the purpose of the Projections, actual results through September 2009 and that the Plan will be confirmed and that the Effective Date and the initial distributions take place as of December 31, 2009.

The Projections reflect the application of "Fresh Start" accounting rules. However, the effect on the Condensed Consolidated Balance Sheets of the Effective Date has been assumed to be limited to increasing Stockholders' Equity to an estimated fair value of $700 million, removing the balances for unsecured debt and mandatorily redeemable preferred stock that will be extinguished by the chapter 11 proceedings and writing off approximately $731 million of the unamortized goodwill balance. Additionally, the Condensed Consolidated Statement of Operations for 2009 includes in Other Expense, Net the costs of the reorganization, such as legal and other professional fees and the write-off of unamortized debt origination costs, discounts and premiums associated with debt subject to compromise by the chapter 11 proceedings. However, the Condensed Consolidated Statement of Operations for 2009 does not include the debt extinguishment gains or write-off of goodwill that would occur as a result of the implementation of the Plan.

C-3

The following financial information is included in the Projections for Six Flags:

- Projected Condensed Consolidated Balance Sheets of Six Flags as of December 31 for each of the fiscal years from 2009 through 2013;

- Projected Condensed Consolidated Statements of Operations of Six Flags for each of the fiscal years ending December 31 for the period from 2009 through 2013; and

- Projected Condensed Consolidated Statements of Cash Flows of Six Flags for each of the fiscal years ending December 31 for the period from 2009 through 2013.

The Projected Condensed Consolidated Balance Sheets present stockholders' equity as a single line item, and do not distinguish between common stock, paid-in capital and retained earnings or accumulated deficit. The Projected Condensed Consolidated Statements of Operations present operating results that include certain non-GAAP measures, such as Modified EBITDA, Modified EBITDA Margin, Minority Interest EBITDA, Equity in Earnings EBITDA, Adjusted EBITDA, Adjusted EBITDA Margin, EBITDA, EBIT, and EBT. Adjusted EBITDA is defined as the Company's net income (loss) before cumulative effect of changes in accounting principles, discontinued operations, income tax expense (benefit), other expense, early repurchase of debt (formerly an extraordinary loss), equity in operations of partnerships, minority interest in earnings (losses), interest expense (net), amortization, depreciation, stock-based compensation, gain (loss) on disposal of assets, interests of third parties in the Adjusted EBITDA of three parks that are less than wholly owned (consisting of the Partnership Parks), plus our interest in the Adjusted EBITDA of Six Flags Great Escape Lodge & Indoor Waterpark and dcp. Modified EBITDA is defined as Adjusted EBITDA plus the interests of third parties in the Adjusted EBITDA of the four parks that are less than wholly owned less our interest in the Adjusted EBITDA of Six Flags Great Escape Lodge & Indoor Waterpark and dcp. Free Cash Flow is defined as Adjusted EBITDA excluding (i) cash interest expense (net) and debt issuance costs, dividends and taxes paid in cash and (ii) capital expenditures, net of property insurance recoveries. Six Flags generally does not present these measures in its audited historical financial statements, nor does Six Flags present line items in the same format in its audited historical financial statements as used in the Projected Condensed Consolidated Statements of Operations. The Projected Condensed Consolidated Statements of Operations do not disclose estimated income/ (loss) per share of Six Flags common stock, which is typically presented with audited historical consolidated statements of operations, and the Projections do not provide detail that might otherwise accompany condensed consolidated financial statements prepared in accordance with generally accepted accounting principles. For example, Projected Condensed Consolidated Statements of Cash Flows do not provide details of investing and financing activities.

Unless noted otherwise herein, the Projections have been prepared on the basis of generally accepted accounting principles, consistent with those currently utilized by Six Flags in the preparation of its consolidated financial statements. The Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth herein, the risk factors identified in Article VIII to the Amended Disclosure Statement and in the Quarterly Report on Form 10-Q for the quarter ended June 30, 2009 and with the audited consolidated

financial statements for the fiscal year ended December 31, 2008 contained in Six Flags' 2008 Form 10-K and with Six Flags' second quarter 2009 Form 10-Q. Because these documents contain important information, users of this document are encouraged to read them. The forms 10-K and 10-Q are available free on Six Flags' website (www.sixflags.com) and from the SEC at www.sec.gov.

**WHILE SIX FLAGS BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT ANY PROJECTIONS WILL BE REALIZED.**

## A.    INTRODUCTION AND GENERAL ASSUMPTIONS

Six Flags is the largest regional theme park operator in the world. After giving effect to the sale of seven parks in April 2007, the Company owns or operates 20 parks, including 18 operating domestic parks, one park in Mexico and one park in Canada. The 20 parks (which excludes the New Orleans park which has not operated since the damage sustained from Hurricane Katrina in late August 2005) had attendance of approximately 25.3 million during the 2008 season. Due to a variety of factors mentioned throughout the Amended Disclosure Statement, and as more fully described herein, attendance, in-park spending trends, and sponsorship/licensing revenues have declined during the 2009 operating season.

In 1998, Six Flags acquired the former Six Flags, which had operated regional theme parks under the Six Flags name for nearly forty years and established an internationally recognized brand name. Six Flags has worldwide ownership of the "Six Flags" brand name. To capitalize on this name recognition, 18 of the parks (excluding The Great Escape in Lake George, New York and La Ronde in Montreal, Canada) are branded as "Six Flags" parks.

Six Flags holds exclusive long-term licenses for theme park usage throughout the United States (except the Las Vegas metropolitan area), Canada, Mexico and other countries of certain Warner Bros. and DC Comics characters. These characters include Bugs Bunny, Daffy Duck, Tweety Bird, Yosemite Sam, Batman, Superman and others. In addition, the Company has certain rights to use the Hanna-Barbera and Cartoon Network characters, including Yogi Bear, Scooby-Doo, The Flintstones and others. Six Flags uses these characters to market its parks and to provide an enhanced family entertainment experience. The licenses include the right to sell merchandise featuring the characters at the parks, and to use the characters in Six Flags' advertising, as walk-around characters and in theming for rides, attractions and retail outlets. Six Flags believes using these characters promotes increased attendance, supports higher ticket prices, increases lengths-of-stay and enhances in-park spending.

Six Flags' parks are located in geographically diverse markets across North America. The theme parks offer a complete family-oriented entertainment experience. Six Flags' theme parks generally offer a broad selection of state-of-the-art and traditional thrill rides, water attractions, themed areas, concerts and shows, restaurants, game venues and retail outlets. In the aggregate, during 2008, Six Flags theme parks offered more than 800 rides, including over 120 roller coasters, making Six Flags the leading provider of "thrill rides" in the theme park industry.

RLF1 3518267v.1

Six Flags parks compete directly with other theme parks, water and amusement parks and indirectly with all other types of recreational facilities and forms of entertainment within their market areas, including movies, sports attractions and vacation travel. Accordingly, Six Flags' business is and will continue to be subject to factors affecting the recreation and leisure time industries generally, such as general economic conditions and changes in discretionary consumer spending habits. See those risk factors described in Article VIII to the Amended Disclosure Statement. Within each park's regional market area, the principal factors affecting direct theme park competition include regional economic trends, location, price, the uniqueness and perceived quality of the rides and attractions in a particular park, the atmosphere and cleanliness of a park and the quality of its food and entertainment offerings.

## B.  FYE 2009 – 2013 PLAN PROJECTIONS - MAJOR ASSUMPTIONS

The Projections make certain assumptions with respect to economic and business conditions for the period of 2009 through 2013. The assumptions underlying the Projections take into account recent trends in attendance, in-park spending and sponsorship/licensing as a basis for projecting future revenue growth, both organically through Six Flags' recurring customer-base as well as considering the ability to attract new customers. Furthermore, Six Flags has incorporated the impact of its most recent information regarding costs, including its capital expenditure programs, such that the Projections take into account the expected operating and cash flow impacts.

**Net Sales:**

Six Flags' revenue is primarily derived from the sale of tickets for entrance to the parks, the sale of food, merchandise, games and attractions inside our parks as well as sponsorship, licensing and other fees.

Sales reflect attendance and in-park expectations at each of Six Flags' theme parks, including the Partnership Parks. In preparing the Projections, revenues were divided into specific categories, including: season pass sales, other ticket sales, sponsorship and licensing, and various categories of consumer spending within Six Flags' theme parks (e.g. food and beverage, games and attractions, merchandise, etc). Each category was projected based on management's expectations to achieve revenue growth within the framework of current attendance trends. While recent trends have shown a slowdown in discretionary consumer spending, it is anticipated that in future periods attendance and spending trends, and consequently revenues, will stabilize and show moderate growth.

**Cash Operating Expenses:**

Cash Operating Expenses consist of operating expenses excluding non-cash items such as depreciation and amortization, share-based compensation and gains and losses on the sale of assets. Six Flags' principal costs of operations include salaries and wages, employee benefits, advertising, outside services, maintenance, utilities and insurance. A large portion of our expenses is relatively fixed. Costs for full-time employees, maintenance, utilities, advertising and insurance do not vary significantly with attendance. However, Six Flags' still aggressively manages expenses and as

shown in the Projections, currently expects Cash Operating Expenses for 2009 to be below those shown in the Projections filed on August 20, 2009. As a result of these expense reductions, management reviewed and where appropriate revised some of the underlying assumptions for Cash Operating Expenses for 2010 through 2013.

**Deferred Taxes and Provision for Income Taxes:**

The issuance under the Plan of the New Common Stock, along with the cancellation of existing Equity Interests through the Plan, is expected to cause an ownership change to occur with respect to the Reorganized Debtors as of the Effective Date. As a result, section 382 of the Internal Revenue Code ("IRC") will apply to limit Six Flags' use of its consolidated NOLs after the Effective Date. Additionally, the Debtors' ability to use any remaining capital loss carry-forwards and tax credits may be limited.

However, the NOL analysis provided by Six Flags' external tax counsel indicates that Six Flags will have sufficient NOLs and a sufficient annual utilization limit to offset its federal regular taxable income during the projection period. For purposes of the Projections, the Condensed Consolidated Balance Sheets reflect the net deferred tax liability that is expected to exist immediately prior to the Effective Date. No adjustment to the balance has been made to reflect changes in the amount of NOLs resulting from the Plan or the extent to which such NOLs could be used to offset deferred tax liabilities. After the Effective Date, changes in the net deferred tax liabilities reflect the difference between income taxes estimated at a 39.5% rate and income taxes that are paid in cash. Potential book and tax basis differences in capital expenditures and other potential new temporary differences have not been reflected in the net deferred tax liability on the Condensed Consolidated Balance Sheets. The Projections provide for the payment of federal alternative minimum tax, as well as certain state and foreign taxes, estimated to total $10.0 million annually.

**Share-Based Compensation:**

The Condensed Consolidated Statements of Operations assume share-based compensation expense of $2.7 million, $23.2 million, $10.4 million, $6.3 million and $1.5 million for 2009, 2010, 2011, 2012 and 2013, respectively. The actual expense to be incurred will be driven by several factors, including the quantity and qualities of the share-based grants as well as the fair market value and volatility of the underlying stock.

**Other Non-Cash Expenses:**

Other non-cash expenses consist primarily of assumed net losses on the disposal of assets in the ordinary course of business.

**Debt Extinguishment Gain:**

The Condensed Consolidated Statement of Operations for 2009 does not reflect the debt extinguishment gain that would occur as a result of the adoption of the Plan. Such a gain would be the difference between the fair value of the consideration

provided to the holders of compromised debt and the carrying amount of the debt prior to its settlement.

**Discontinued Operations:**

The income for discontinued operations has been assumed to total approximately $1.5 million for 2009, primarily related to the New Orleans park.

**Capital Expenditures:**

Six Flags regularly makes capital investments for new rides and attractions at its parks. Six Flags purchases both new and used rides and attractions. In addition, Six Flags rotates rides among parks to provide fresh attractions. Six Flags believes that the selective introduction of new rides and attractions, including family entertainment attractions, is an important factor in promoting each of the parks in order to achieve market penetration and encourage longer visits, which lead to increased attendance and in-park spending.

In addition, Six Flags generally makes capital investments in the food, retail, games and other in-park areas to increase per capita guest spending. Six Flags also makes annual enhancements in the theming and landscaping of our parks in order to provide a more complete family-oriented entertainment experience. Six Flags also invests in information technology designed to generate revenue, improve efficiency and to reduce operating costs.

As part of the annual budgeting process, the Company evaluates and prioritizes capital investments for the upcoming operating year and beyond. Based on the 2010 budgeting process that is currently underway, management refined its view on capital investment needs and reduced capital expenditures for 2010 through 2013 from those shown in the Projections filed on August 20, 2009.

**Cash:**

It is assumed that interest at an annual rate of approximately 1.0% for 2009 and 1.5% thereafter will be earned on surplus cash balances. The Exit Revolving Loans are assumed to be necessary to enable Six Flags to fund future working capital and other general operating needs, on an ongoing basis. For these purposes, it is forecasted that $0 will be required as of the Effective Date under the Exit Revolving Loans as the Projections assumed a December 31, 2009 Effective Date. Based upon the scheduled Confirmation Hearing dates of March 8, 2010 through March 19, 2010 and therefore an assumed emergence date in mid-April 2010, the exit revolver will be significantly drawn at emergence to fund normal seasonal borrowings, incremental professional fees associated with the reorganization and the confirmation litigation (estimated to be approximately $9 million per month) and additional default interest on the Prepetition Credit Agreement (estimated to be approximately $1.85 million per month). In addition, the Exit Facility and Exit Term Loan could be increased by up to $30 million in certain circumstances.

**Debt:**

The Plan contemplates the entry by Six Flags into an Exit Facility, which will consist of the Exit Term Loan and the Exit Revolving Loans. The Projections assume the Exit Term Loan in the amount of $650.0 million[1], a six-year maturity date, an interest rate of four and one quarter percentage points (4.25%) above LIBOR, with a LIBOR floor of 2.00%, quarterly principal payments of approximately $1.6 million, and no excess cash flow principal payments.

The Projections assume Exit Revolving Loans with a maximum availability on the Effective Date of $150 million, a maturity of five years, an interest rate of four and one quarter percentage points (4.25%) above LIBOR, with a LIBOR floor of 2.00%, and an unused line fee of one and one half percentage points (1.50%). The Exit Revolving Loans will be used to finance seasonal working capital and other general corporate needs on an ongoing basis. Based upon the scheduled Confirmation Hearing dates of March 8, 2010 through March 19, 2010 and therefore an assumed emergence date in mid-April 2010, the exit revolver will be significantly drawn at emergence to fund normal seasonal borrowings, incremental professional fees associated with the reorganization and the confirmation litigation (estimated to be approximately $9 million per month) and additional default interest on the Prepetition Credit Agreement (estimated to be approximately $1.85 million per month).

The Plan also contemplates the entry by Six Flags into the New TW Loan. The Projections assume the New TW Loan will be used to finance future "put" obligations after the Company funds the first $10.0 million to $15.0 million (depending on the year), a five year maturity, and interest at five and one quarter percentage points (5.25%) above LIBOR, with a LIBOR floor of 2.50%.

**Stockholders' Equity:**

Stockholders' Equity in the Projections has been assumed to have a fair value of $700 million at the Effective Date, with the book value changed during the projection period by the net income (loss) attributable to Six Flags excluding share-based compensation. No contributions, distributions or other changes in equity are assumed in the Projections.

**Future Business Opportunities:**

The Projections assume that there are no strategic acquisitions, ventures, divestitures and other new business opportunities that could be pursued by Six Flags outside of Six Flags' existing operations and investments.

---

[1] The Exit Facility and Exit Term Loan could be increased by up to $30 million in certain circumstances.

RLF1 3518267v.1

## Projected Condensed Consolidated Balance Sheets

($ in thousands)

| | | | December 31 | | |
|---|---|---|---|---|---|
| | 2009P | 2010P | 2011P | 2012P | 2013P |
| **Assets:** | | | | | |
| Cash | $35,066 | $54,543 | $95,577 | $180,657 | $309,561 |
| Accounts Receivable | 18,437 | 18,880 | 19,149 | 19,216 | 19,343 |
| Inventories | 19,115 | 20,125 | 20,626 | 21,282 | 21,760 |
| Prepaid Expenses and other | 41,267 | 41,783 | 43,065 | 42,795 | 43,133 |
| **Total Current Assets** | $113,885 | $135,331 | $178,417 | $263,950 | $393,797 |
| Net Property Plant & Equipment | 1,517,349 | 1,452,554 | 1,379,359 | 1,295,598 | 1,211,269 |
| Other Assets | 432,509 | 424,616 | 424,187 | 426,979 | 420,893 |
| **Total Assets** | $2,063,743 | $2,012,501 | $1,981,963 | $1,986,527 | $2,025,959 |
| **Liabilities and Equity** | | | | | |
| Accounts Payable | $22,143 | $19,774 | $20,381 | $20,253 | $20,413 |
| Accrued Expenses | 102,606 | 99,041 | 102,081 | 101,440 | 102,240 |
| Other Current Liabilities | 19,091 | 19,493 | 20,204 | 20,387 | 20,736 |
| **Total Current Liabilities** | $143,840 | $138,308 | $142,666 | $142,080 | $143,389 |
| Long-Term Debt (Including Current Portion) | $686,844 | $676,843 | $652,507 | $634,500 | $628,000 |
| Liabilities from Discontinued Operations | | | | | |
| Other Long-Term Liabilities | 60,892 | 57,992 | 48,992 | 46,092 | 43,193 |
| Deferred Income Taxes | 116,233 | 112,764 | 125,906 | 150,712 | 184,976 |
| Redeemable Noncontrolling Interests | 355,933 | 325,933 | 295,933 | 265,933 | 235,933 |
| Mandatorily Redeemable Preferred Stock | | | | | |
| Total Stockholders' Equity | 700,000 | 700,662 | 715,960 | 747,209 | 790,468 |
| **Total Stockholders' Equity and Liabilities** | $2,063,743 | $2,012,501 | $1,981,963 | $1,986,527 | $2,025,959 |

## Projected Condensed Consolidated Statements of Operations

($ in thousands)

| | | | Years Ended December 31 | | |
|---|---|---|---|---|---|
| | 2009P | 2010P | 2011P | 2012P | 2013P |
| Net Sales | $915,568 | $953,263 | $1,002,205 | $1,028,617 | $1,058,244 |
| Cost of Sales | 77,087 | 81,158 | 83,180 | 85,825 | 87,752 |
| **Gross Profit** | 838,481 | 872,105 | 919,025 | 942,792 | 970,492 |
| *Gross Margin* | *91.6%* | *91.5%* | *91.7%* | *91.7%* | *91.7%* |
| Cash Operating Expenses | 625,000 | 619,000 | 638,000 | 634,000 | 639,000 |
| **Modified EBITDA** | $213,481 | $253,105 | $281,025 | $308,792 | $331,492 |
| *Modified EBITDA Margin* | *23.3%* | *26.6%* | *28.0%* | *30.0%* | *31.3%* |
| Less Minority Int. EBITDA/Equity in Earnings EBITDA | (23,481) | (22,105) | (20,025) | (17,792) | (15,493) |
| **Adjusted EBITDA** | $190,000 | $231,000 | $261,000 | $291,000 | $316,000 |
| *Adjusted EBITDA Margin* | *20.8%* | *24.2%* | *26.0%* | *28.3%* | *29.9%* |
| Less Depreciation & Amortization | 142,647 | 149,177 | 155,074 | 160,520 | 166,065 |
| Less Other Non-Cash Expenses | 7,540 | 7,500 | 5,000 | 5,000 | 5,000 |
| **EBIT** | $63,294 | $96,428 | $120,951 | $143,272 | $160,427 |
| Less Interest Expense (Net) | (100,809) | (56,057) | (51,512) | (48,562) | (46,644) |
| Less Other Expense (Net) | (156,708) | (23,838) | (10,851) | (6,593) | (1,722) |
| **EBT** | ($194,223) | $16,533 | $58,588 | $88,117 | $112,061 |
| Less Taxes | (2,936) | (6,531) | (23,142) | (34,806) | (44,264) |
| Less Discontinued Operations | 1,478 | 0 | 0 | 0 | 0 |
| **Net Income / (Loss)** | ($195,681) | $10,002 | $35,446 | $53,311 | $67,797 |
| Less: Net Income attributable to noncontrolling interests | (35,072) | (32,629) | (30,549) | (28,316) | (26,016) |
| **Net Income / (Loss) attributable to Six Flags, Inc** | ($230,753) | ($22,627) | $4,897 | $24,995 | $41,781 |

C-10

### *Projected Condensed Consolidated Statements of Cash Flows*

| ($ in thousands) | Years Ended December 31 | | | | |
|---|---|---|---|---|---|
| | 2009P | 2010P | 2011P | 2012P | 2013P |
| **Cash Flow from Operating Activities** | | | | | |
| Net Income / (Loss) | ($195,681) | $10,002 | $35,446 | $53,311 | $67,797 |
| Depreciation and Amortization | 142,647 | 149,177 | 155,074 | 160,520 | 166,065 |
| Net Change in Working Capital | 14,737 | (7,501) | 2,305 | (1,038) | 366 |
| Other Cash Flows from Operations | 45,030 | 31,450 | 25,093 | 38,610 | 43,192 |
| Cash Flow from Operating Activities | $6,733 | $183,108 | $217,918 | $251,403 | $277,420 |
| **Cash Flow From Investing** | ($85,898) | ($91,000) | ($92,000) | ($90,000) | ($86,000) |
| **Cash Flow From Financing** | ($96,520) | ($72,630) | ($84,885) | ($76,323) | ($62,516) |
| Effect of Exchange Rate | 419 | | | | |
| Net Cash Flow | ($175,266) | $19,478 | $41,033 | $85,080 | $128,904 |
| Beginning Cash and Cash Equivalents | $210,332 | $35,066 | $54,543 | $95,577 | $180,657 |
| Ending Cash and Cash Equivalents | $35,066 | $54,543 | $95,577 | $180,657 | $309,561 |
| **Free Cash Flows:** | | | | | |
| Adjusted EBITDA | $190,000 | $231,000 | $261,000 | $291,000 | $316,000 |
| Capital Spending (Net) | (100,017) | (91,000) | (86,000) | (81,000) | (86,000) |
| Cash Interest & Cash Taxes | (92,096) | (57,879) | (55,138) | (52,162) | (50,244) |
| Free Cash Flow | ($2,113) | $82,121 | $119,862 | $157,838 | $179,755 |

C-11

**Exhibit D**
**Liquidation Analysis**

## Six Flags, Inc.
## Liquidation Analysis

As described in the Plan, the Debtors believe that the Plan as proposed, whereby the Debtors are reorganized as a going concern with continuing operations, yields the best result for the Debtors, its customers, employees and creditors. Based upon the following hypothetical analysis (the "Liquidation Analysis"), the Debtors believe that the Plan meets the "best interest of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code (described in Section IX.B. of the Amended Disclosure Statement), and that each Holder of an impaired claim will receive under the Plan value on the Effective Date that is not less than the value such holder would receive if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. The Debtors believe the Liquidation Analysis and the conclusions set forth herein are fair and accurate, and represent management's best judgment with regard to the results of a liquidation of the Debtors under chapter 7. The analysis was prepared for this purpose alone to assist the Bankruptcy Court in making this determination, and should not be used for any other purpose. Collateral values discussed herein may be different than amounts referred to in the Plan.

The hypothetical Liquidation Analysis is shown on a consolidated basis for SFTP and its subsidiaries, which excludes all assets from the non-debtor Partnership Parks (as defined), as those assets are not available for liquidation by the creditors of Six Flags. As for Six Flags' ownership stakes in the Partnership Parks, as described further below, those equity interests and intercompany claims are assumed to be relinquished pursuant to the Subordinated Indemnity Agreement (as described in Section III.D. to the Amended Disclosure Statement). The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation-related costs that would be realized if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code. Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by management of the Debtors and by the Debtors' professionals, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors and management, and are also based upon assumptions with respect to certain liquidation decisions which could be subject to change. The Liquidation Analysis has not been audited or reviewed by independent accountants.

THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

This Liquidation Analysis was prepared with the assistance of Houlihan Lokey, financial advisors to the Company. The Liquidation Analysis is based on the Company's balance sheet as of September 30, 2009 (with certain adjustments, particularly to cash and the treatment of the Partnership Parks' assets, as described in the footnotes below), and is predicated on the assumption that the Debtors would commence liquidation under chapter 7 on or close to November 30, 2009. Except where noted in the footnotes below, the balance sheet as of September 30, 2009 is assumed to be the best reflection of book value for the assets to be liquidated if the Debtors were to be liquidated in accordance with chapter 7 of the Bankruptcy Code.

The Liquidation Analysis is based, *inter alia*, upon the assumptions discussed below.

- The Liquidation Analysis assumes that the liquidation of the Debtors' estate would commence on or shortly after November 30, 2009 and would be substantially completed within a nine-month period. Any deviation from or delay of this time frame could have a material impact on the wind-down costs, Administrative Expense and Other Priority Claims, proceeds from asset sales, and the ultimate recovery to the creditors of the Debtors' estates. In addition, if the implementation of the liquidation plan were to be delayed, there is a possibility that the Debtors would sustain significant operating losses during the delay period, thus adversely impacting the net liquidation value of the estates.

- It is also assumed that the liquidation of the Debtors would commence under the direction of a chapter 7 trustee and would continue for a period of nine months, during which time all of the Debtors' assets would either be sold or conveyed to the respective lien holders, and the cash proceeds, net of liquidation-related costs, together with the cash on hand, would then be distributed to creditors. The liquidation period would allow for the collection of receivables to the extent recoverable, the orderly sale of both fixed and short-term assets and intellectual property and the wind-down of daily operations. For certain assets, estimates of the liquidation values were made for each asset individually. For other assets, liquidation values were assessed for general classes of assets by estimating the percentage recoveries that a trustee might achieve through an orderly disposition.

- The Liquidation Analysis assumes the orderly liquidation and wind down of all Debtors assets and also of the non-Debtor subsidiaries, but excluding the Partnership Parks. The Liquidation Analysis assumes that liquidation proceeds would be distributed in accordance with Bankruptcy Code section 726. In any liquidation there is a general risk of unanticipated events, which could have a significant impact on the projected cash receipts and disbursements. These events include difficulties in the current general economic condition and any changes thereto, changes in consumer preferences, and changes in the market value of the Debtors' assets.

In addition to these assumptions and the specific assumptions listed in the notes to the Liquidation Analysis, there are significant areas of uncertainty that exist with respect to this Liquidation Analysis:

**UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND ITS ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS AND THEIR MANAGEMENT. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS**

**WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD MATERIALLY DIFFER FROM THE RESULTS SET FORTH HEREIN.**

The liquidation itself would likely trigger certain priority payments that otherwise would not be due in the ordinary course of business. These priority payments would be made in full before any distribution of proceeds to pay general Unsecured Claims or to make distributions in respect of equity interests. The liquidation would likely prompt certain other events to occur including the rejection of remaining Executory Contracts, unexpired leases and other agreements and defaults under agreements with customers and suppliers. Such events would likely create a much larger number of unsecured creditors and would subject the chapter 7 estates to considerable additional claims. No attempt has been made to estimate additional general Unsecured Claims that may result from liquidation under chapter 7.

The Liquidation Analysis assumes that the amount of contingent litigation claims against the Debtors is de minimis. However, due to general uncertainties with respect to the outcome of contingent litigation matters, the actual value of such claims remains uncertain. Accordingly, the estimated recovery percentages could be impacted by the outcome of such contingent litigation matters.

The Liquidation Analysis assumes that there are no recoveries from the pursuit of any potential preferences, fraudulent conveyances, or other causes of action and does not include the estimated costs of pursuing such actions.

This Liquidation Analysis is also based upon assumptions with regard to liquidation decisions that are subject to change. Accordingly, there can be no assurances that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo, such a liquidation.

| ($ in millions) | Note | Book Value 9/30/2009 (A) | Less: Partnership Parks | Book Value Six Flags less Partnership Parks | Estimated Recovery Rate Low | High | Ext. Liquidation Proceeds Low | High |
|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents (Pro Forma for 11/30/09) | (B) | $197.0 | $3.0 | $194.0 | 100% -- | 100% | $194.0 -- | $194.0 |
| Accounts receivable | (C) | 48.8 | 6.6 | 42.2 | 80% -- | 90% | 33.8 -- | 38.0 |
| Inventories | (D) | 25.6 | 3.8 | 21.8 | 35% -- | 49% | 7.5 -- | 10.8 |
| Prepaid expenses and other current assets: | (E) | 39.3 | 6.9 | 32.5 | 7% -- | 14% | 2.2 -- | 4.6 |
| Deposits and other assets: | (F) | 109.0 | 0.3 | 108.7 | 37% -- | 63% | 40.1 -- | 68.0 |
| Intercompany | (G) | | 7.1 | (7.1) | 0% -- | 0% | 0.0 -- | 0.0 |
| Property and equipment (net) | (H) | 1,528.4 | 199.7 | 1,328.7 | 10% -- | 16% | 151.8 -- | 250.1 |
| Intangible assets (net) | (I) | 1,060.2 | 159.1 | 901.1 | 0% -- | 2% | 0.0 -- | 18.3 |
| **Total Estimated Gross Liquidation Proceeds** | | | | | | | **$429.5 --** | **$583.8** |
| | | | | | | | | |
| **Wind-down Administrative Expenses & Fees:** | | | | | | | | |
| Chapter 7 Trustee Fees and Expenses | (J) | | | | 3.0% | 3.0% | $7.1 -- | $11.7 |
| Professional Fees and Expenses | (K) | | | | | | 27.0 -- | 45.0 |
| Employee Expenses/wind-down costs | (L) | | | | | | 45.0 -- | 45.0 |
| **Total Distributable Value** | | | | | | | **$350.4 --** | **$482.1** |
| | | | | | | | | |
| **SFTP Claims** | | | | | | | | |
| Revolver | (M) | $272.5 | | | 30.8% | 42.4% | $84.0 -- | $115.6 |
| Term Loan | (M) | 842.1 | | | 30.8% | 42.4% | 259.6 -- | 357.1 |
| L/Cs | (M) | 2.2 | | | 30.8% | 42.4% | 0.7 -- | 0.9 |
| Interest Swap | (M) | 20.0 | | | 30.8% | 42.4% | 6.2 -- | 8.5 |
| **Total SFTP Credit Agreement Claims** | | **$1,136.8** | | | **30.8%** | **42.4%** | **$350.4 --** | **$482.1** |
| **Value Remaining for SFTP Unsecured Creditors** | | | | | | | **$0.0 --** | **$0.0** |
| SFTP Credit Agreement Deficiency Claim | (M) | $720.5 | | | 0.0% | 0.0% | $0.0 -- | $0.0 |
| SFTP Deficiency Claim | | Contingent; Undetermined | | | 0.0% | 0.0% | 0.0 -- | 0.0 |
| SFTP General Unsecured Claims | | 27.1 | | | 0.0% | 0.0% | 0.0 -- | 0.0 |
| **Total SFTP Creditors** | | **$1,163.9** | | | **30.1%** | **41.4%** | **$350.4 --** | **$482.1** |
| **Value Remaining for SFO Unsecured Creditors** | | | | | | | **$0.0 --** | **$0.0** |
| **SFO Unsecured Claims** | | | | | | | | |
| SFO 12.25% Sr Notes due 2016 | (M) | $420.0 | | | 0.0% | 0.0% | $0.0 -- | $0.0 |
| SFO Deficiency Claim | | Contingent; Undetermined | | | 0.0% | 0.0% | 0.0 -- | 0.0 |
| SFO General Unsecured Creditors | | 0.0 | | | 0.0% | 0.0% | 0.0 -- | 0.0 |
| **Total SFO Unsecured Claims** | | **$420.0** | | | **0.0%** | **0.0%** | **$0.0 --** | **$0.0** |
| **Value Remaining for SFO Unsecured Creditors** | | | | | | | **$0.0 --** | **$0.0** |
| **SFI Unsecured Claims** | | | | | | | | |
| SFI 9.625% Sr. Notes due 2014 | (M) | $330.9 | | | 0.0% | 0.0% | $0.0 -- | $0.0 |
| SFI 8.875% Sr. Notes due 2010 | (M) | 135.3 | | | 0.0% | 0.0% | 0.0 -- | 0.0 |
| SFI 9.75% Sr. Notes due 2013 | (M) | 144.6 | | | 0.0% | 0.0% | 0.0 -- | 0.0 |
| SFI 4.5% Sr. Notes due 2015 | (M) | 287.2 | | | 0.0% | 0.0% | 0.0 -- | 0.0 |
| SFI Guarantee of SFO 12.25% Sr Notes due 2016 | (M) | 420.0 | | | 0.0% | 0.0% | 0.0 -- | 0.0 |
| SFI Deficiency Claim | | Contingent; Undetermined | | | 0.0% | 0.0% | 0.0 -- | 0.0 |
| SFI General Unsecured Claims | | 27.9 | | | 0.0% | 0.0% | 0.0 -- | 0.0 |
| **Total SFI Claims** | | **$1,346.0** | | | **0.0%** | **0.0%** | **$0.0 --** | **$0.0** |
| **Value Remaining for Equity** | | | | | | | **$0.0 --** | **$0.0** |

D-5

*NOTES TO LIQUIDATION ANALYSIS*

### Note A – Book Values as of September 30, 2009

Unless stated otherwise below, the book values used in the Liquidation Analysis are the unaudited net book values as of September 30, 2009 and are assumed to be a proxy for the asset value as of November 30, 2009.

### Note B – Cash and Cash Equivalents

Cash and cash equivalents consists of all cash or liquid investments with maturities of three months or less in banks or operating accounts and are assumed to be fully recoverable. Due to the large fluctuations in cash, particularly during Six Flags' operating season, cash and cash equivalents are estimated as of November 30, 2009, but exclude cash and cash equivalents of the non-Debtor Partnership Parks as those are not direct assets of Six Flags. Cash and cash equivalents as of September 30, 2009 were $262.1 million. Through November 30, 2009, cash and cash equivalents are projected to decrease by $65.1 million to $197.0 million.

### Note C – Accounts Receivable

Accounts Receivable consists of trade receivables, tickets sold on consignment, group sales, and other miscellaneous receivables. Estimated proceeds realizable from short-term and long-term accounts receivable are based on management's assessment of the ability of the Debtors to collect on their accounts, taking into consideration the type of receivable, credit quality, aging and any concessions that might be required to facilitate the collection of certain accounts receivable. Recovery rates for accounts receivable are assumed to be between 80% and 90% of outstanding receivables. Accounts receivable recoveries exclude Partnership Park receivables.

### Note D – Inventory

Inventory consists primarily of food and beverage, retail merchandise, and games. Inventory recovery rates on an aggregate basis are estimated to range from 35% to 49% of book value. These estimates assume limited market demand given the Company's specific and often uniquely branded inventory and a general discount for liquidation. Inventory recoveries exclude Partnership Park inventories.

### Note E – Prepaid Expenses and Other Current Assets

Prepaid expenses and other current assets include prepayments for maintenance, advertising, insurance and other various operating expenses, as well as spare parts needed to service rides and attractions. The Liquidation Analysis reflects a range of recovery rates based on specific types of assets and management's estimates of the likelihood of recovery on those assets. Spare parts recovery rates are estimated at 10% – 20% of book value and prepaid expenses recovery rates are estimated at 0% to 10% of book value, based on management's estimates.

D-6

*Note F – Deposits and Other Assets*

Deposits and Other Assets consist of deposits for items such as insurance and utilities, investments in dcp, HWP and the Parc 7 Note. The Liquidation Analysis assumes that recovery rates range from 37% to 63% based on management's estimates.

*Note G – Intercompany*

The Intercompany assets consist of short-term advances related to expenses incurred by the Debtors on behalf of the Partnership Parks.

*Note H  – Property, Plant and Equipment, Net*

Net property, plant and equipment includes, (i) land, buildings and improvements, (ii) rides and attractions, and (iii) equipment, furniture, fixtures, vehicles, animals, costumes and props. Recovery rates on rides and attractions and buildings and building improvements range from 2% to 10% of book value, based on recent and historic dispositions of similar assets.  With respect to land and land improvements, management estimates that the parks' land would recover between 90% to 100% of book value, given the relatively low carrying book value reflected on the balance sheet as of September 30, 2009.  However, given the current environment surrounding real estate, it is possible that actual results could be significantly less in a liquidation scenario.  Additionally, it is estimated that land improvements would recover 2% to 10% under a liquidation scenario.  The actual value ultimately recovered in a liquidation scenario may differ from the estimates provided by management as the value of Debtors' properties is dependent on prevailing conditions in the real estate market as well the general state of the financing markets.

*Note I – Intangible Assets*

Intangible assets consist mainly of Goodwill, and are assumed to have minimal value in a liquidation scenario.

*Note J – Trustee Fees & Expenses*

Compensation for the chapter 7 trustee will be limited to fee guidelines in section 326(a) of the Bankruptcy Code.  The Debtors' management has assumed trustee fees of 3% of the gross proceeds (excluding cash) in the liquidation.

*Note K – Other Professional Fees & Expenses*

Compensation for the chapter 7 trustee's counsel and other legal, financial and professional services during the chapter 7 proceedings is estimated to range from $3 million to $5 million per month beginning at the commencement of the liquidation proceedings throughout the nine-month wind-down period.

*Note L – Employee Expenses / Wind-Down Costs*

It is assumed that the Debtors assume the chapter 7 liquidation process will take nine months to complete. Corporate payroll and operating costs during liquidation are based on the assumption that certain functions would be required during the liquidation process in order for an orderly wind down of the business and the plants. Costs would include costs associated with shutting down the parks as well as salaries of certain operating and maintenance employees, and severance and bonus pay that would be incurred during a chapter 7 liquidation. These operating expenses during the wind-down period are estimated to be approximately $5 million per month.

*Note M – Pre-petition Claim*

Pre-petition Credit Agreement Claims reflect principal and accrued, but unpaid interest, including 2% accrued post-petition default interest through the commencement of the chapter 7 case on November 30, 2009. The "SFTP Credit Agreement Deficiency Claim" reflects the accrued claim as of November 30, 2009, less the midpoint of estimated recoveries on the SFTP Secured Credit Agreement Claims. Unsecured Claims are estimated based on principal and accrued, but unpaid interest, as of the chapter 11 filing date of June 13, 2009.

D-8