## Exhibit A-2

**Blackline of Long-Term Incentive Plan**

## SIX FLAGS ENTERTAINMENT CORPORATION
## STOCK INCENTIVE PLAN

1. **Introduction.**

(a) *Purpose.* Six Flags Entertainment Corporation, a Delaware corporation (the "Company") hereby establishes this equity-based incentive compensation plan to be known as the "Six Flags Entertainment Corporation Stock Incentive Plan" (the "Plan"), for the following purposes: (i) to enhance the Company's ability to attract highly qualified personnel; (ii) to strengthen its retention capabilities; (iii) to enhance the long-term performance and competitiveness of the Company; and (iv) to align the interests of Plan participants with those of the Company's shareholders.

(b) *Effective Date.* This Plan shall become effective on the effective date of the Company's ~~Modified~~ Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code ("Plan of Reorganization"), dated as of ~~December 18, 2009,~~April 1, 2010, as the same may be further amended or modified ("Effective Date").

(c) *Definitions.* Terms in the Plan and any Appendix that begin with an initial capital letter have the defined meaning set forth in *Appendix I* or elsewhere in this Plan, in either case unless the context of their use clearly indicates a different meaning.

(d) *Effect on Other Plans, Awards, and Arrangements.* This Plan is not intended to affect and shall not affect any stock options, equity-based compensation, or other benefits that the Company or its Affiliates may have provided, or may separately provide in the future, pursuant to any agreement, plan, or program that is independent of this Plan.

(e) *Appendices.* Incorporated by reference and thereby part of the Plan are the terms set forth in the following appendices:

| | |
|---|---|
| Appendix I | Definitions |

2. **Types of Awards**. The Plan permits the granting of the following types of Awards according to the Sections of the Plan listed here:

| | |
|---|---|
| Section 5 | Stock Options |
| Section 6 | Share Appreciation Rights (SARs) |
| Section 7 | Restricted Shares, Restricted Share Units (RSUs), and Unrestricted Shares |
| Section 8 | Deferred Share Units (DSUs) |
| Section 9 | Performance and Cash-settled Awards |
| Section 10 | Dividend Equivalent Rights |

3. **Shares Available for Awards.**

(a) *Generally,* ~~Subject~~subject to Section 13 below, a total of ~~3,000,000~~_____ Shares shall be available for issuance under the Plan as of the Effective Date, and if and to the extent the Delayed Draw Equity Purchase (as defined in the Plan of Reorganization) is consummated, up to

_____ additional Shares shall be available for issuance under the Plan.[1] One-third of the total Shares available for issuance under the Plan shall be available for grants of Restricted Shares or Restricted Share Units. The Shares deliverable pursuant to Awards shall be authorized but unissued Shares, or Shares that the Company otherwise holds in treasury or in trust.

(b)     *Replenishment; Counting of Shares.* Any Shares reserved for Plan Awards will again be available for future Awards if the Shares for any reason will never be issued to a Participant or Beneficiary pursuant to an Award (for example, due to its settlement in cash rather than in Shares, or the Award's forfeiture, cancellation, expiration, or net settlement without the issuance of Shares). Further, and to the extent permitted under Applicable Law, the maximum number of Shares available for delivery under the Plan shall not be reduced by any Shares issued under the Plan through the settlement, assumption, or substitution of outstanding awards or obligations to grant future awards as a condition of the Company's or an Affiliate's acquiring another entity. On the other hand, Shares that a Person owns and tenders in payment of all or part of the exercise price of an Award or in satisfaction of applicable Withholding Taxes shall not increase the number of Shares available for future issuance under the Plan. Awards settled in cash will not count against the maximum number of Shares issuable under the Plan.

(c)     *ISO Share Reserve.* The number of Shares that are available for ISO Awards shall not exceed ~~the total number set forth in Section 3(a) above~~_____ Shares (as adjusted pursuant to Section 13 of the Plan, and as determined in accordance with Code Section 422).

4.    **Eligibility.**

(a)     *General Rule.* Subject to the express provisions of the Plan, the Committee shall determine from the class of Eligible Persons those Persons to whom Awards may be granted. Each Award shall be evidenced by an Award Agreement that sets forth its Grant Date and all other terms and conditions of the Award, that is signed on behalf of the Company (or delivered by an authorized agent through an electronic medium), and that, if required by the Committee, is signed by the Eligible Person as an acceptance of the Award. The grant of an Award shall not obligate the Company or any Affiliate to continue the employment or service of any Eligible Person, or to provide any future Awards or other remuneration at any time thereafter.

(b)     *Option and SAR Limits per Person.* During the term of the Plan, no Participant may receive Options and SARs that relate to more than 50% of the maximum number of Shares issuable under the Plan as of its Effective Date, as such number may be adjusted pursuant to Section 13(a) below.

(c)     *Replacement Awards.* Subject to Applicable Law (including any associated shareholder approval requirements), the Committee may, in its sole discretion and upon such terms as it deems appropriate, require as a condition of the grant of an Award to a Participant that the Participant, with the Participant's consent, surrender for cancellation some or all of the Awards or other grants that the Participant has received under this Plan or otherwise. An Award conditioned upon such

---

[1] The first amount of Shares will be 15% of the total Shares on a fully diluted basis as of the Effective Date and the second amount of Shares will take in account the maximum number of Shares that may be issued in connection with the Delayed Draw Equity Purchase.

surrender may or may not be the same type of Award, may cover the same (or a lesser or greater) number of Shares as such surrendered Award, may have other terms that are determined without regard to the terms or conditions of such surrendered Award, and may contain any other terms that the Committee deems appropriate. ~~In the case of Options and SARs, these other terms may not involve an exercise price that is lower than the exercise price of the surrendered Option or SAR unless the Company's shareholders approve the grant itself or the program under which the grant is made pursuant to the Plan~~<u>However, neither the Company nor the Committee shall, without shareholder approval, either (a) allow for a "repricing" within the meaning of federal securities laws applicable to proxy statement disclosures, or (b) cancel an outstanding Option or SAR whose exercise price is greater than Fair Market Value at the time of cancellation for the purpose of reissuing the Option or SAR to the Participant at a lower exercise price or granting a replacement award of a different type.</u>

5.    **Stock Options.**

(a)    *Grants.*  Subject to the special rules for ISOs set forth in the next paragraph, the Committee may grant Options to Eligible Persons pursuant to Award Agreements setting forth terms and conditions that are not inconsistent with the Plan, that may be immediately exercisable or that may become exercisable in whole or in part based on future events or conditions, that may include vesting or other requirements for the right to exercise the Option, and that may differ for any reason between Eligible Persons or classes of Eligible Persons, ***provided*** in all instances that:

(i)    the exercise price for Shares subject to purchase through exercise of an Option shall not be less than 100% of the Fair Market Value of the underlying Shares on the Grant Date; and

(ii)    no Option shall be exercisable for a term ending more than ten years after its Grant Date.

(b)    *Special ISO Provisions.*  The following provisions shall control any grants of Options that are denominated as ISOs.

(i)    <u>Eligibility.</u>  The Committee may grant ISOs only to Employees (including officers who are Employees) of the Company or an Affiliate that is a "parent corporation" or "subsidiary corporation" within the meaning of Code Section 424.

(ii)    <u>Documentation.</u>  Each Option that is intended to be an ISO must be designated in the Award Agreement as an ISO, ***provided*** that any Option designated as an ISO will be a Non-ISO to the extent the Option fails to meet the requirements of Code Section 422.  In the case of an ISO, the Committee shall determine on the Date of Grant the acceptable methods of paying the exercise price for Shares, and it shall be included in the applicable Award Agreement.

(iii)    <u>$100,000 Limit.</u>  To the extent that the aggregate Fair Market Value of Shares with respect to which ISOs first become exercisable by a Participant in any calendar year (under this Plan and any other plan of the Company or any

Affiliate) exceeds U.S. $100,000, such excess Options shall be treated as Non-ISOs. For purposes of determining whether the U.S. $100,000 limit is exceeded, the Fair Market Value of the Shares subject to an ISO shall be determined as of the Grant Date. In reducing the number of Options treated as ISOs to meet the U.S. $100,000 limit, the most recently granted Options shall be reduced first. In the event that Code Section 422 is amended to alter the limitation set forth therein, the limitation of this paragraph shall be automatically adjusted accordingly.

(iv)     <u>Grants to 10% Holders</u>. In the case of an ISO granted to an Employee who is a Ten Percent Holder on the Grant Date, the ISO's term shall not exceed five years from the Grant Date, and the exercise price shall be at least 110% of the Fair Market Value of the underlying Shares on the Grant Date. In the event that Code Section 422 is amended to alter the limitations set forth therein, the limitation of this paragraph shall be automatically adjusted accordingly.

(v)     <u>Substitution of Options</u>. In the event the Company or an Affiliate acquires (whether by purchase, merger, or otherwise) all or substantially all of outstanding capital stock or assets of another corporation or in the event of any reorganization or other transaction qualifying under Code Section 424, the Committee may, in accordance with the provisions of that Section, substitute ISOs for ISOs previously granted under the plan of the acquired company provided (A) the excess of the aggregate Fair Market Value of the Shares subject to an ISO immediately after the substitution over the aggregate exercise price of such shares is not more than the similar excess immediately before such substitution, and (B) the new ISO does not give additional benefits to the Participant, including any extension of the exercise period.

(vi)     <u>Notice of Disqualifying Dispositions</u>. By executing an ISO Award Agreement, each Participant agrees to notify the Company in writing immediately after the Participant sells, transfers or otherwise disposes of any Shares acquired through exercise of the ISO, if such disposition occurs within the earlier of (A) two years of the Grant Date, or (B) one year after the exercise of the ISO being exercised. Each Participant further agrees to provide any information about a disposition of Shares as may be requested by the Company to assist it in complying with any applicable tax laws.

(c)     *Method of Exercise.* Each Option may be exercised, in whole or in part (***provided*** that the Company shall not be required to issue fractional shares) at any time and from time to time prior to its expiration, but only pursuant to the terms of the applicable Award Agreement, and subject to the times, circumstances and conditions for exercise contained in the applicable Award Agreement. Exercise shall occur by delivery of both written notice of exercise to the secretary of the Company, and payment of the full exercise price for the Shares being purchased. The methods of payment that the Committee may in its discretion accept or commit to accept in an Award Agreement include:

(i)        cash or check payable to the Company (in U.S. dollars);

(ii)        other Shares that (A) are owned by the Participant who is purchasing Shares pursuant to an Option, (B) have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which the Option is being exercised, (C) are all, at the time of such surrender, free and clear of any and all claims, pledges, liens and encumbrances, or any restrictions which would in any manner restrict the transfer of such shares to or by the Company (other than such restrictions as may have existed prior to an issuance of such Shares by the Company to such Participant), and (D) are duly endorsed for transfer to the Company;

(iii)        a net exercise by surrendering to the Company Shares otherwise receivable upon exercise of the Option;

(iv)        a cashless exercise program, pursuant to which a Participant may elect to concurrently provide irrevocable instructions (A) to such Participant's broker or dealer to effect the immediate sale of the purchased Shares and remit to the Company, out of the sale proceeds available on the settlement date, sufficient funds to cover the exercise price of the Option plus all applicable taxes required to be withheld by the Company by reason of such exercise, and (B) to the Company to deliver the certificates for the purchased Shares directly to such broker or dealer in order to complete the sale; or

(v)        any combination of the foregoing methods of payment.

The Company shall not be required to deliver Shares pursuant to the exercise of an Option until the Company has received sufficient funds to cover the full exercise price due and all applicable Withholding Taxes required by reason of such exercise.

Notwithstanding any other provision of the Plan to the contrary, no Participant who is a Director or an "executive officer" of the Company within the meaning of Section 13(k) of the Exchange Act shall be permitted to make payment with respect to any Awards granted under the Plan, or continue any extension of credit with respect to such payment with a loan from the Company or a loan arranged by the Company in violation of Section 13(k) of the Exchange Act.

(d)      *Exercise of an Unvested Option.* The Committee in its sole discretion may allow a Participant to exercise an unvested Option, in which case the Shares then issued shall be Restricted Shares having analogous vesting restrictions to the unvested Option.

(e)      *Termination of Continuous Service.* The Committee may establish and set forth in the applicable Award Agreement the terms and conditions on which an Option shall remain exercisable, if at all, following termination of a Participant's Continuous Service. The Committee may waive or modify these provisions at any time. To the extent that a Participant is not entitled to exercise an Option at the date of his or her termination of Continuous Service, or if the Participant (or other person entitled to exercise the Option) does not exercise the Option to the extent so entitled within the time specified in the Award Agreement or below (as applicable), the Option shall terminate and the Shares underlying the unexercised portion of the Option shall revert to the Plan and become available for future Awards.

The following provisions shall apply to the extent an Award Agreement does not specify the terms and conditions upon which an Option shall terminate when there is a termination of a Participant's Continuous Service:

| Reason for terminating Continuous Service | Option Termination Date |
|---|---|
| (I) By the Company for Cause, or what would have been Cause if the Company had known all of the relevant facts. | Termination of the Participant's Continuous Service, or when Cause first existed if earlier. |
| (II) Disability of the Participant. | Within one year after termination of the Participant's Continuous Service. |
| (III) Retirement of the Participant after age 60 with five years or more of Continuous Service. | Within one year after termination of the Participant's Continuous Service. |
| (IV) Death of the Participant during Continuous Service or within 90 days thereafter. | Within one year after termination of the Participant's Continuous Service. |
| (V) Other than due to Cause or the Participant's Disability, Retirement, or Death. | Within 90 days after termination of the Participant's Continuous Service. |

If there is a Securities and Exchange Commission blackout period (or a Committee-imposed blackout period) that prohibits the buying or selling of Shares during any part of the ten day period before the expiration of any Option based on the termination of a Participant's Continuous Service (as described above), the period for exercising the Options shall be extended until ten days beyond when such blackout period ends. Notwithstanding any provision hereof or within an Award Agreement, no Option shall ever be exercisable after the expiration date of its original term as set forth in the Award Agreement.

6. **SARs.**

(a) *Grants.* The Committee may grant SARs to Eligible Persons pursuant to Award Agreements setting forth terms and conditions that are not inconsistent with the Plan; ***provided*** that:

(i) the exercise price for the Shares subject to each SAR shall not be less than 100% of the Fair Market Value of the underlying Shares on the Grant Date;

(ii) no SAR shall be exercisable for a term ending more than ten years after its Grant Date; and

(iii) each SAR shall, except to the extent an SAR Award Agreement provides otherwise, be subject to the provisions of Section 5(e) relating to the effect of a termination of Participant's Continuous Service ~~and Section 5(f) relating to buyouts, in each case~~ with "SAR" being substituted for "Option."

(b)     *Settlement.* Subject to the Plan's terms, an SAR shall entitle the Participant, upon exercise of the SAR, to receive Shares having a Fair Market Value on the date of exercise equal to the product of the number of Share as to which the SAR is being exercised, and the excess of (i) the Fair Market Value, on such date, of the Shares covered by the exercised SAR, over (ii) an exercise price designated in the SAR Award Agreement. Notwithstanding the foregoing, an SAR Award Agreement may limit the total settlement value that the Participant will be entitled to receive upon the SAR's exercise, and may provide for settlement either in cash or in any combination of cash or Shares that the Committee may authorize pursuant to an Award Agreement. If, on the date on which an SAR or portion thereof is to expire, the Fair Market Value exceeds the per Share exercise price of such SAR, then the SAR shall be deemed exercised and the Participant will be entitled to receive the settlement proceeds otherwise payable had the Participant affirmatively exercised the SAR on that date.

(c)     *SARs related to Options.* The Committee may grant SARs either concurrently with the grant of an Option or with respect to an outstanding Option, in which case the SAR shall extend to all or a portion of the Shares covered by the related Option, and shall have an exercise price that is not less than the exercise price of the related Option. An SAR shall entitle the Participant who holds the related Option, upon exercise of the SAR and surrender of the related Option, or portion thereof, to the extent the SAR and related Option each were previously unexercised, to receive payment of an amount determined pursuant to Section 6(b) above. Any SAR granted in tandem with an ISO will contain such terms as may be required to comply with the provisions of Code Section 422.

(d)     *Effect on Available Shares.* At each time of a exercise of an SAR that is settled in Shares, only those Shares that are issued or delivered in settlement of the exercise shall be counted against the number of Shares available for Awards under the Plan; ***provided*** that the number of Shares that are issued or delivered pursuant to the exercise of an SAR shall not exceed the number of Shares specified in the Award Agreement as being subject to the SAR Award.

## 7.     **Restricted Shares, RSUs, and Unrestricted Share Awards.**

(a)     *Grant.* The Committee may grant Restricted Share, RSU, or Unrestricted Share Awards to Eligible Persons, in all cases pursuant to Award Agreements setting forth terms and conditions that are not inconsistent with the Plan. The Committee shall establish as to each Restricted Share or RSU Award the number of Shares deliverable or subject to the Award (which number may be determined by a written formula), and the period or periods of time (the "**Restriction Period**") at the end of which all or some restrictions specified in the Award Agreement shall lapse, and the Participant shall receive unrestricted Shares (or cash to the extent provided in the Award Agreement) in settlement of the Award. Such restrictions may include, without limitation, restrictions concerning voting rights and transferability, and such restrictions may lapse separately or in combination at such times and pursuant to such circumstances or based on such criteria as selected by the Committee, including, without limitation, criteria based on the Participant's duration of employment, directorship or consultancy with the Company, individual, group, or divisional performance criteria, Company performance, or other criteria selection by the Committee. The Committee may make Restricted Share and RSU Awards with or without the requirement for payment of cash or other consideration. In addition, the Committee may grant Awards hereunder in the form of Unrestricted Shares which shall vest in full upon the Grant Date or such other date as the Committee may determine or which the Committee may issue pursuant to

any program under which one or more Eligible Persons (selected by the Committee in its sole discretion) elect to pay for such Shares or to receive Unrestricted Shares in lieu of cash bonuses that would otherwise be paid.

(b) *Vesting and Forfeiture.* The Committee shall set forth, in an Award Agreement granting Restricted Shares or RSUs, the terms and conditions under which the Participant's interest in the Restricted Shares or the Shares subject to RSUs will become vested and non-forfeitable. Except as set forth in the applicable Award Agreement or as the Committee otherwise determines, upon termination of a Participant's Continuous Service for any reason, the Participant shall forfeit his or her Restricted Shares and RSUs to the extent the Participant's interest therein has not vested on or before such termination date; ***provided*** that if a Participant purchases Restricted Shares and forfeits them for any reason, the Company shall return the purchase price to the Participant to the extent either set forth in an Award Agreement or required by Applicable Laws.

(c) *Certificates for Restricted Shares.* Unless otherwise provided in an Award Agreement, the Company shall hold certificates representing Restricted Shares and dividends (whether in Shares or cash) that accrue with respect to them until the restrictions lapse, and the Participant shall provide the Company with appropriate stock powers endorsed in blank. The Participant's failure to provide such stock powers within ten days after a written request from the Company shall entitle the Committee to unilaterally declare a forfeiture of all or some of the Participant's Restricted Shares.

(d) *Section 83(b) Elections.* A Participant may make an election under Code Section 83(b) (the "**Section 83(b) Election**") with respect to Restricted Shares. A Participant who has received RSUs may, within ten days after receiving the RSU Award, provide the Committee with a written notice of his or her desire to make Section 83(b) Election with respect to the Shares subject to such RSUs. The Committee may in its discretion convert the Participant's RSUs into Restricted Shares, on a one-for-one basis, in full satisfaction of the Participant's RSU Award. The Participant may then make a Section 83(b) Election with respect to those Restricted Shares; provided that the Participant's Section 83(b) Election will be invalid if not filed with the Company and the appropriate U.S. tax authorities within 30 days after the Grant Date of the RSUs replaced by the Restricted Shares.

(e) *Deferral Elections for RSUs.* To the extent specifically provided in an Award Agreement, a Participant may irrevocably elect, in accordance with Section 8 below, to defer the receipt of all or a percentage of the Shares that would otherwise be transferred to the Participant ~~both more than 12 months after the date of the Participant's deferral election and~~ upon the vesting of an RSU Award provided the election is made on or before the 30th day following the Grant Date of the RSU Award and at least 12 months in advance of the earliest date the RSU Award could vest. If the Participant makes this election, the Company shall credit the Shares subject to the election, and any associated Shares attributable to Dividend Equivalent Rights attached to the Award, to a DSU account established pursuant to Section 8 below on the date such Shares would otherwise have been delivered to the Participant pursuant to this Section.

(f) *Issuance of Shares upon Vesting.* As soon as practicable after vesting of a Participant's Restricted Shares (or of the right to receive Shares underlying RSUs), the Company shall deliver to the Participant, free from vesting restrictions, one Share for each surrendered and vested Restricted Share (or deliver one Share free of the vesting restriction for each vested RSU), unless an Award

Agreement provides otherwise and subject to Section 11 regarding Withholding Taxes. No fractional Shares shall be distributed, and cash shall be paid in lieu thereof.

8. **DSUs.**

(a) *Elections to Defer.* The Committee may make DSU awards to Eligible Persons who are Directors, Consultants, or members of a select group of management or highly compensated Employees (within the meaning of ERISA) pursuant to Award Agreements (regardless of whether or not there is a deferral of the Eligible Person's compensation), and may permit select Eligible Persons to irrevocably elect, on a form provided by and acceptable to the Committee (the "**Election Form**"), to forego the receipt of cash or other compensation (including the Shares deliverable pursuant to any RSU Award) and in lieu thereof to have the Company credit to an internal Plan account a number of DSUs having a Fair Market Value equal to the Shares and other compensation deferred. These credits will be made at the end of each calendar quarter (or other period determined by the Committee) during which compensation is deferred. In general, subject to Section 7(e) regarding deferral of Restricted Shares and Restricted Share Units and to Section 9(e) regarding deferral of Performance Awards, Election Forms must be submitted to the Committee no later than December 31st of the calendar year preceding the calendar year in which the Eligible Person first performs the services that are attributable to the compensation being deferred. Notwithstanding the foregoing, any Eligible Person who first becomes eligible to defer compensation under the Plan and is not eligible to defer or otherwise accrue an amount of deferred compensation under any other plan or arrangement that (i) is maintained by the Company or any other Affiliate that would be considered a single employer with the Company pursuant to Code Sections 414(b) or 414(c) and (ii) constitutes a single plan under Treasury Regulation §1.409A-1(c)(2)(A), may submit his or her Election Form to the Committee no later than 30 days after the date the Eligible Person first becomes eligible to defer compensation under the Plan; however, the Election Form may relate only to compensation that is to be paid for services performed after the date the Election Form is submitted to the Committee. The Committee may reject any Election Form that it determines in its sole discretion does not satisfy the requirements of this paragraph. The Committee may unilaterally make Awards in the form of Deferred Share Units, regardless of whether or not the Participant foregoes other compensation.

(b) *Vesting.* Unless an Award Agreement expressly provides otherwise, each Participant shall be 100% vested at all times in any Shares subject to DSUs.

(c) *Issuances of Shares.* Unless an Award Agreement expressly provides otherwise, the Company shall settle a Participant's DSU Award, by delivering one Share for each DSU, in five substantially equal annual installments that are issued before the last day of each of the five calendar years that end after the date on which the Participant incurs a "separation from service" within the meaning of Treasury Regulations §1.409A-1(h) and as further described in Section 8(e) hereof ("Separation from Service"), subject to —

(i) the Participant's right to elect a different form of distribution, only on a form provided by and acceptable to the Committee, that permits the Participant to select any combination of a lump sum and annual installments that are triggered by, and completed within ten years following, the last day of the Participant's Separation from Service, and

(ii)     the Company's acceptance of the Participant's distribution election form executed at the time the Participant elects to defer the receipt of cash or other compensation pursuant to Section 8(a), *provided* that the Participant may change a distribution election through any subsequent election that (A) the Participant delivers to the Company at least one year before the date on which distributions are otherwise scheduled to commence pursuant to the Participant's initial distribution election, and (B) defers the commencement of distributions by at least five years from the originally scheduled distribution commencement date.

Fractional shares shall not be issued, and instead shall be paid out in cash

Notwithstanding anything in this Plan or an Award Agreement to the contrary, if, at the time of the Participant's Separation from Service, the Participant is a "specified employee" (within the meaning of Section 409A of the Code and Treasury Regulation Section 1.409A-1(i)), the Company will not pay or provide any "Specified Benefits" (as defined herein) during the six-month period beginning after the date of the Participant's Separation from Service (the "409A Suspension Period"). In the event of a Participant's death, however, the Specified Benefits shall be paid to the Participant's Beneficiary without regard to the 409A Suspension Period. For purposes of this Plan, "Specified Benefits" are any portion of the Participant's DSU Award that would be subject to Section 409A additional taxes if the Company were to pay it on account of the Participant's Separation from Service. Within 14 calendar days after the end of the 409A Suspension Period, the Participant shall be paid a lump-sum payment equal to any Specified Benefits delayed during the 409A Suspension Period.

(d)     *Emergency Withdrawals.* In the event that a Participant suffers an unforeseeable emergency within the contemplation of this Section, the Participant may apply to the Committee for an immediate distribution of all or a portion of the Participant's DSUs. The unforeseeable emergency must result from a sudden and unexpected illness or accident of the Participant, the Participant's spouse, or a dependent (within the meaning of Code Section 152) of the Participant, casualty loss of the Participant's property, or other similar extraordinary and unforeseeable conditions beyond the control of the Participant. The Committee shall, in its sole and absolute discretion, determine whether a Participant has a qualifying unforeseeable emergency, may require independent verification of the emergency, and may determine whether or not to provide the Participant with cash or Shares. Examples of purposes which are not considered unforeseeable emergencies include post-secondary school expenses or the desire to purchase a residence. In no event will a distribution be made to the extent the unforeseeable emergency could be relieved through reimbursement or compensation by insurance or otherwise, or by liquidation of the Participant's nonessential assets to the extent such liquidation would not itself cause a severe financial hardship. The amount of any distribution hereunder shall be limited to the amount necessary to relieve the Participant's unforeseeable emergency plus amounts necessary to pay taxes reasonably anticipated as a result of the distribution. The number of Shares subject to the Participant's DSU Award shall be reduced by any Shares distributed to the Participant and by a number of Shares having a Fair Market Value on the date of the distribution equal to any cash paid to the Participant pursuant to this Section. For all DSUs granted to Participants who are U.S. taxpayers, the term "unforeseeable emergency" shall be interpreted in accordance with Code Section 409A.

(e)  *Separation from Service.*  For purposes of this Section 8, a Participant incurs a Separation from Service when the Participant ceases to perform services for the Company and any entity that would be considered a single employer with the Company under Code section 414(b) or 414(c) (but modified by substituting 50 percent for 80 percent each place it appears in Code section 1563(a)(1), (2) and (3), for purposes of Code section 414(b), and each plan it appears in Treas. Reg. § 1.414(c)-2, for purposes of Code section 414(c)) (collectively "Employer") for any reason.  A Separation from Service will be deemed to occur if the Employer and the Participant reasonably anticipate that the Participant shall perform no further services (whether as an employee or an independent contractor) or that the level of *bona fide* services the Participant will perform in the future (whether as an employee or an independent contractor) will permanently decrease to no more than 20 percent of the average level of *bona fide* services performed (whether as an employee or independent contractor) over the immediately preceding 36-month period.  A Participant on an authorized, *bona fide* leave of absence shall experience a Separation from Service on the first day of the seventh (7th) month of such leave, unless the Participant's right to reemployment with an Employer is provided either by statute or contract.  A leave of absence constitutes a *bona fide* leave of absence only if there is a reasonable expectation that the Participant will return to perform services for the Employer.  For purposes of the 36-month period described above, (a) a Participant who is on a paid *bona fide* leave of absence is treated as providing *bona fide* services at a level of equal to the level of services that the Participant would have been required to perform to receive the compensation paid during the leave of absence, and (b) unpaid *bona fide* leaves of absence are disregarded.

9.  **Performance and Cash-Settled Awards.**

(a)  *Performance Units.*  Subject to the limitations set forth in paragraph (b) hereof, the Committee may in its discretion grant Performance Awards, including Performance Units to any Eligible Person, including Performance Unit Awards that (i) have substantially the same financial benefits and other terms and conditions as Options, SARs, RSUs, or DSUs, but (ii) are settled only in cash.  All Awards hereunder shall be made pursuant to Award Agreements setting forth terms and conditions that are not inconsistent with the Plan.

(b)  *Performance Compensation Awards.*  Subject to the limitations set forth in this Section, the Committee may, at the time of grant of a Performance Unit, designate such Award as a "**Performance Compensation Award**" (payable in cash or Shares) in order that such Award constitutes, and has terms and conditions that are designed to qualify as, "qualified performance-based compensation" under Code Section 162(m).  With respect to each such Performance Compensation Award, the Committee shall establish, in writing within the time required under Code Section 162(m), a "**Performance Period**," "**Performance Measure(s)**", and "**Performance Formula(e)**" (each such term being defined below).  Once established for a Performance Period, the Performance Measure(s) and Performance Formula(e) shall not be amended or otherwise modified to the extent such amendment or modification would cause the compensation payable pursuant to the Award to fail to constitute qualified performance-based compensation under Code Section 162(m).

A Participant shall be eligible to receive payment in respect of a Performance Compensation Award only to the extent that the Performance Measure(s) for such Award is achieved and the Performance Formula(e) as applied against such Performance Measure(s) determines that all or some portion of such Participant's Award has been earned for the Performance Period.  As soon as

practicable after the close of each Performance Period, the Committee shall review and certify in writing whether, and to what extent, the Performance Measure(s) for the Performance Period have been achieved and, if so, determine and certify in writing the amount of the Performance Compensation Award to be paid to the Participant and, in so doing, may use negative discretion to decrease, but not increase, the amount of the Award otherwise payable to the Participant based upon such performance

(c)     *Limitations on Awards.*  The maximum Performance Award and the maximum Performance Compensation Award that any one Participant may receive for any one Performance Period, without regard to time of vesting or exercisability, shall not together exceed 750,000 Shares, as adjusted pursuant to Section 13 below (or, for Performance Units to be settled in cash, U.S. $5,000,000).  Any amounts earned in excess of these limitations, if any, will be deferred until the first taxable year in which the Committee reasonably anticipates that the Company's tax deduction for such amounts will not be disallowed under Code Section 162(m).

(d)     *Definitions.*

(i)     "**Performance Formula**" means, for a Performance Period, one or more objective formulas or standards established by the Committee for purposes of determining whether or the extent to which an Award has been earned based on the level of performance attained or to be attained with respect to one or more Performance Measure(s).  Performance Formulae may vary from Performance Period to Performance Period and from Participant to Participant and may be established on a stand-alone basis, in tandem or in the alternative.

(ii)     "**Performance Measure**" means one or more of the following selected by the Committee to measure the performance of the individual Participant, the Company or of an Affiliate or a division, department, park, region or function of the Company or any Affiliate in which the Participant is employed for a Performance Period, whether in absolute or relative terms (including, without limitation, terms relative to a peer group or index): basic, diluted, or adjusted earnings per share; sales or revenue; earnings before interest, taxes, and other adjustments (in total or on a per share basis); basic or adjusted net income; returns on equity, assets, capital, revenue or similar measure; economic value added; working capital; total shareholder return; expenses, cash flow, margin, attendance, and product development, product market share, licensing, mergers, acquisitions, sales of assets of Affiliates or business units. Each such measure shall be, to the extent applicable, determined in accordance with generally accepted accounting principles as consistently applied by the Company (or such other standard applied by the Committee) and, if so determined by the Committee, and in the case of a Performance Compensation Award, to the extent permitted under Code Section 162(m), adjusted to omit the effects of extraordinary items, gain or loss on the disposal of a business segment, unusual or infrequently occurring events and transactions and cumulative effects of changes in accounting principles, or other events or circumstances that render the Performance Measures unsuitable.  Performance Measures may vary from Performance Period to Performance Period and from Participant to Participant, and may be established on a stand-alone basis, in tandem or in the alternative.

(iii)  "**Performance Period**" means one or more periods of time (of not less than one fiscal year of the Company), as the Committee may designate, over which the attainment of one or more Performance Measure(s) will be measured for the purpose of determining a Participant's rights in respect of an Award.

(e)  *Deferral Elections*.  At any time prior to the date that is both at least six months before the close of a Performance Period ~~(or shorter or longer period that the Committee selects)~~ with respect to a Performance Award and at which time vesting or payment is substantially uncertain to occur, the Committee may permit a Participant who is a member of a select group of management or highly compensated employees (within the meaning of ERISA) to irrevocably elect, on a form provided by and acceptable to the Committee, to defer the receipt of all or a percentage of the cash or Shares that would otherwise be transferred to the Participant upon the vesting of such Award.  If the Participant makes this election, the cash or Shares subject to the election, and any associated interest and dividends, shall be credited to an account established pursuant to Section 8 hereof on the date such cash or Shares would otherwise have been released or issued to the Participant pursuant to this Section.

10.  **Dividend Equivalent Rights**.  The Committee may grant Dividend Equivalent Rights to any Eligible Person, and may do either pursuant to an Award Agreement that is independent of any other Award, or through a provision in another Award (other than an Option or SAR) that Dividend Equivalent Rights attach to the Shares underlying the Award.  For example, and without limitation, the Committee may grant a Dividend Equivalent Right in respect of each Share subject to a Restricted Stock Award, Restricted Stock Unit Award, Deferred Stock Unit, or Performance Share Award.

(a)  <u>Nature of Right</u>.  Each Dividend Equivalent Right shall represent the right to receive amounts based on the dividends declared on Shares as of all dividend payment dates during the term of the Dividend Equivalent Right as determined by the Committee.  Unless otherwise determined by the Committee, a Dividend Equivalent Right shall expire upon termination of the Participant's Continuous Service, provided that a Dividend Equivalent Right that is granted as part of another Award shall expire only when the Award is settled or otherwise forfeited.

(b)  <u>Settlement</u>.  Unless otherwise provided in an Award Agreement, Dividend Equivalent Rights shall be paid out on the (i) on the date dividends are paid to the Company's shareholders if the Award occurs on a stand-alone basis, and (ii) on the vesting or later settlement date for another Award if the Dividend Equivalent Right is granted as part of it.  Payment of all amounts determined in accordance with this Section shall be in Shares, with cash paid in lieu of fractional Shares, provided that the Committee may instead provide in an Award Agreement for cash settlement of all or part of the Dividend Equivalent Rights.  Only the Shares actually issued pursuant to Dividend Equivalent Rights shall count against the limits set forth in Section 3 above.

(c)  <u>Other Terms</u>.  The Committee may impose such other terms and conditions on the grant of a Dividend Equivalent Right as it deems appropriate in its discretion as reflected by the terms of the Award Agreement. The Committee may establish a program under which Dividend Equivalent Rights may be granted in conjunction with other Awards.  The Committee may also authorize, for any Participant or group of Participants, a program under which the payments with respect to Dividend Equivalent Rights may be deferred pursuant to the terms and conditions determined under Section 9 above.

11. **Taxes; Withholding.**

(a) *General Rule.* Participants are solely responsible and liable for the satisfaction of all taxes and penalties that may arise in connection with Awards including without limitation any taxes or penalties arising under Code Section 409A, and neither the Company, any Affiliate, nor any of their employees, directors, or agents shall have any obligation to mitigate, indemnify, or to otherwise hold any Participant harmless from any or all of such taxes. The Company's obligation to deliver Shares (or to pay cash) to Participants pursuant to Awards is at all times subject to their prior or coincident satisfaction of all required Withholding Taxes. Except to the extent otherwise either provided in an Award Agreement or thereafter authorized by the Committee, the Company or any Affiliate will satisfy required Withholding Taxes that the Participant has not otherwise arranged to settle before the due date thereof –

     (i)    first from withholding the cash otherwise payable to the Participant pursuant to the Award;

     (ii)    then by withholding and cancelling the Participant's rights with respect to a number of Shares that (A) would otherwise have been delivered to the Participant pursuant to the Award, and (B) have an aggregate Fair Market Value equal to the Withholding Taxes (such withheld Shares to be valued on the basis of the aggregate Fair Market Value thereof on the date of the withholding); and

     (iii)    finally, withholding the cash otherwise payable to the Participant by the Company.

The number of Shares withheld and cancelled to pay a Participant's Withholding Taxes will be rounded up to the nearest whole Share sufficient to satisfy such taxes, with cash being paid to the Participant in an amount equal to the amount by which the Fair Market Value of such Shares exceeds the Withholding Taxes.

(b) *U.S. Code Section 409A.* To the extent that the Committee determines that any Award granted under the Plan is subject to Code Section 409A, the Award Agreement evidencing such Award shall incorporate the terms and conditions required by Code Section 409A. To the extent applicable, the Plan and Award Agreements shall be interpreted in accordance with Code Section 409A and Department of Treasury regulations and other interpretive guidance issued thereunder, including without limitation any such regulations or other guidance that may be issued after the Effective Date. Notwithstanding any provision of the Plan to the contrary, the Committee may adopt such amendments to the Plan and the applicable Award Agreement or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, that the Administrator determines are necessary or appropriate (i) to exempt the Award from Code Section 409A and/or preserve the intended tax treatment of the benefits provided with respect to the Award, or (ii) to comply with the requirements of Code Section 409A and related Department of Treasury guidance and thereby avoid the application of any penalty taxes under such Section.

(b) *U.S. Code Section 280G.* If any accelerated vesting, benefits or payments received or realized by a Participant pursuant to an Award either alone or together with other accelerated

vesting, benefits or payments that the Participant receives or realizes or is then entitled to receive or realize from the Company or any of its affiliates would constitute an "excess parachute payment" within the meaning of Section 280G of the Code, the accelerated vesting, benefits or payments provided to the Participant under the Award will be reduced by reducing the amount of accelerated vesting, benefits or payments payable to the Participant to the extent necessary so that no portion of the Participant's accelerated vesting, benefits or payments will be subject to the excise tax imposed by Section 4999 of the Code and any corresponding and/or applicable state law provision. Notwithstanding the foregoing, a reduction will be made under the previous sentence only if, by reason of that reduction, the Participant's net after tax benefit exceeds the net after tax benefit he or she would realize if the reduction were not made. For purposes of this paragraph, "net after tax benefit" means the sum of (i) the total amount received or realized by the Participant pursuant to the Award that would constitute a "parachute payment" within the meaning of Section 280G of the Code, plus (ii) all other accelerated vesting, payments or benefits that the Participant receives or realizes or is then entitled to receive or realize from the Company and any of its affiliates that would constitute a "parachute payment" within the meaning of Section 280G of the Code and any corresponding and applicable state law provision, less (iii) the amount of federal and state income taxes payable with respect to the payments or benefits described in (i) and (ii) above calculated at the maximum marginal individual income tax rate for each year in which payments or benefits are realized by the Participant (based upon the rate in effect for that year as set forth in the Code at the time of the first receipt or realization of the foregoing), less (iv) the amount of excise taxes imposed with respect to the payments or benefits described in (i) and (ii) above by Section 4999 of the Code and any corresponding and applicable state law provision.

(c~~d~~)  *Unfunded Tax Status.*  The Plan is intended to be an "unfunded" plan for incentive compensation.  With respect to any payments not yet made to a Person pursuant to an Award, nothing contained in the Plan or any Award Agreement shall give the Person any rights that are greater than those of a general creditor of the Company or any Affiliate, and a Participant's rights under the Plan at all times constitute an unsecured claim against the general assets of the Company for the collection of benefits as they come due.  Neither the Participant nor the Participant's duly-authorized transferee or Beneficiaries shall have any claim against or rights in any specific assets, Shares, or other funds of the Company.

12.  **Non-Transferability of Awards.**

(a)  *General.*  Except as set forth in this Section, or as otherwise approved by the Committee, Awards may not be sold, pledged, assigned, hypothecated, transferred or disposed of in any manner other than by will or by the laws of descent or distribution.  The designation of a death Beneficiary by a Participant will not constitute a transfer.  An Award may be exercised, during the lifetime of the holder of an Award, only by such holder, by the duly-authorized legal representative of a holder who is Disabled, or by a transferee permitted by this Section.

(b)  *Limited Transferability Rights.*  The Committee may in its discretion provide in an Award Agreement that an Award in the form of a Non-ISO, Share-settled SAR, Restricted Shares, or Performance Shares may be transferred to a Permitted Transferee (as defined below), subject to the following terms and conditions and such other terms and conditions as the Committee may provide in the Award Agreement:  (i) an Award transferred to a Permitted Transferee shall not be assignable or transferable by the Permitted Transferee other than by will or the laws of descent and distribution; (ii) an Award transferred to a Permitted Transferee shall continue to be subject to all

the terms and conditions of the Award as applicable to the Participant (other than the ability to further transfer the Award); and (iii) the Participant and the Permitted Transferee shall execute any and all documents requested by the Committee, including, without limitation documents to (A) confirm the status of the transferee as a Permitted Transferee, (B) satisfy any requirements for an exemption for the transfer under applicable federal, state and foreign securities laws, (C) satisfy any tax withholding and reporting requirements associated with the Award and (D) evidence the transfer. For purposes of this Section 12(b), "Permitted Transferee" shall mean, with respect to a Participant, any "family member" of the Participant, as defined under the instructions to use of the Form S-8 Registration Statement under the Securities Act, or any other transferee specifically approved by the Committee after taking into account any state, federal, local or foreign tax and securities laws applicable to transferable Awards.

(c)     *Death.* In the event of the death of a Participant, any outstanding Awards issued to the Participant shall automatically be transferred to the Participant's Beneficiary (or, if no Beneficiary is designated or surviving, to the person or persons to whom the Participant's rights under the Award pass by will or the laws of descent and distribution).

13.     **Change in Capital Structure; Change in Control; Etc.**

(a)     *Changes in Capitalization.* The Committee shall equitably adjust the number of Shares covered by each outstanding Award, and the number of Shares that have been authorized for issuance under the Plan but as to which no Awards have yet been granted or that have been returned to the Plan upon cancellation, forfeiture, or expiration of an Award, as well as the exercise or other price per Share covered by each such outstanding Award, to reflect any increase or decrease in the number of issued Shares resulting from a stock-split, reverse stock-split, stock dividend, combination, recapitalization or reclassification of the Shares, merger, consolidation, change in form of organization, or any other increase or decrease in the number of issued Shares effected without receipt of consideration by the Company. In the event of any such transaction or event, the Committee may (and shall if the Company is not the surviving entity or the Shares are otherwise no longer outstanding) provide in substitution for any or all outstanding Awards under the Plan such alternative consideration (including cash or securities of any surviving entity) as it may in good faith determine to be equitable under the circumstances and may require in connection therewith the surrender of all Awards so replaced. In any case, such substitution of cash or securities shall not require the consent of any person who is granted Awards pursuant to the Plan. Except as expressly provided herein, or in an Award Agreement, if the Company issues for consideration shares of stock of any class or securities convertible into shares of stock of any class, the issuance shall not affect, and no adjustment by reason thereof shall be required to be made with respect to the number or price of Shares subject to any Award.

(b)     *Dissolution or Liquidation.* In the event of the dissolution or liquidation of the Company other than as part of a Change of Control, each Award will terminate immediately prior to the consummation of such dissolution or liquidation, subject to the ability of the Committee to exercise any discretion authorized in the case of a Change in Control.

(c)     *Change in Control.* In the event of a Change in Control but subject to the terms of any Award Agreements or employment-related agreements between the Company or any Affiliates and any Participant, each outstanding Award shall be assumed or a substantially equivalent award shall be substituted by the surviving or successor company or a parent or subsidiary of such successor

company (in each case, the "**Successor Company**") upon consummation of the transaction. Notwithstanding the foregoing, instead of having outstanding Awards be assumed or replaced with equivalent awards by the Successor Company, the Committee may in its sole and absolute discretion and authority (and where so stated shall), without obtaining the approval or consent of the Company's shareholders or any Participant with respect to his or her outstanding Awards, take one or more of the following actions (with respect to any or all of the Awards, and with discretion to differentiate between individual Participants and Awards for any reason):

     (i)     (A) to the extent required pursuant to the terms of an employment agreement between the Company and a Participant that was in effect on or as of the Effective Date, or (B) if an Award is not assumed or substituted by the Successor Company or the stock or securities to be subject to any Award that would be so assumed or substituted is not publicly traded on an established securities market (excluding any transaction where the Successor Company is a subsidiary of a parent corporation whose shares or securities are publicly traded on an established securities market and the assumed or substituted Awards are subject to such shares or securities in the parent corporation), the Committee may (and shall with respect to Awards granted ~~on or~~pursuant to any employment agreement that was filed in connection with the ~~Effective Date)~~Plan of Reorganization) accelerate the vesting of such Awards so that Awards shall fully vest (and, to the extent applicable, become fully exercisable) immediately prior to consummation of the Change in Control (or, if earlier and applicable, a record date necessary for the Company's shareholders of record to receive the consideration payable in connection with the Change in Control) as to the Shares that otherwise would have been unvested and provide that repurchase rights of the Company with respect to Shares issued pursuant to an Award shall lapse as to the Shares subject to such repurchase right;

     (ii)     arrange or otherwise provide for the payment of cash or other consideration to Participants in exchange for the satisfaction and cancellation of outstanding vested Awards (with the Committee determining the amount payable to each Participant based on the fair market value, on the date of the Change in Control, of the Award being cancelled, based on any reasonable valuation method selected by the Committee and, if the consideration payable to the Company or its shareholders in connection with the Change in Control is all cash, vested Options and SARs that have a per Share exercise price greater than the Fair Market Value per Share immediately prior to the consummation of the Change in Control may be cancelled for zero consideration);

     (iii)     except as forth in clause (i) of Section 13(c), terminate all or some unvested Awards upon the consummation of the transaction. To the extent that an Award is not exercised prior to consummation of a transaction in which the Award is not being assumed or substituted, such Award shall terminate upon such consummation;

     (iv)     make such other modifications, adjustments or amendments to outstanding Awards or this Plan as the Committee deems necessary or appropriate, subject however to the terms of Section 13 above.

Notwithstanding the above and unless provided otherwise in an Award Agreement or in an employment agreement with the Participant, in the event a Participant is Involuntarily Terminated on or within 12 months (or other period set forth in an Award Agreement) following a Change in

Control, then any Award that is assumed or substituted pursuant to this Section above shall accelerate and become fully vested (and become exercisable in full in the case of Options and SARs), and any repurchase right applicable to any Shares shall lapse in full. The acceleration of vesting and lapse of repurchase rights provided for in the previous sentence shall occur immediately prior to the effective date of the Participant's Involuntary Termination, unless an Award Agreement provides otherwise.

14. **Termination, Rescission and Recapture of Awards.**

(a) Each Award under the Plan is intended to align the Participant's long-term interests with those of the Company. Accordingly, to the extent provided in an Award Agreement, the Company may terminate any outstanding, unexercised, unexpired, unpaid, or deferred Awards ("**Termination**"), rescind any exercise, payment or delivery pursuant to the Award ("**Rescission**"), or recapture any Shares (whether restricted or unrestricted) or proceeds from the Participant's sale of Shares issued pursuant to the Award ("**Recapture**"), if the Participant does not comply with the conditions of subsections (b), (c), and (e) hereof (collectively, the "**Conditions**").

(b) A Participant shall not, without the Company's prior written authorization, disclose to anyone outside the Company, or use in other than the Company's business, any proprietary or confidential information or material, as those or other similar terms are used in any applicable patent, confidentiality, inventions, secrecy, or other agreement between the Participant and the Company with regard to any such proprietary or confidential information or material.

(c) Pursuant to any agreement between the Participant and the Company with regard to intellectual property (including but not limited to patents, trademarks, copyrights, trade secrets, inventions, developments, improvements, proprietary information, confidential business and personnel information), a Participant shall promptly disclose and assign to the Company or its designee all right, title, and interest in such intellectual property, and shall take all reasonable steps necessary to enable the Company to secure all right, title and interest in such intellectual property in the United States and in any foreign country.

(d) Upon exercise, payment, or delivery of cash or Common Stock pursuant to an Award, the Participant shall certify on a form acceptable to the Company that he or she is in compliance with the terms and conditions of the Plan and, if a severance of Continuous Service has occurred for any reason, shall state the name and address of the Participant's then-current employer or any entity for which the Participant performs business services and the Participant's title, and shall identify any organization or business in which the Participant owns a greater-than-five-percent equity interest.

(e) If the Company determines, in its sole and absolute discretion, that (i) a Participant has violated any of the Conditions or (ii), (ii) a Participant has breached any non-competition, non-solicitation, conflict of interest or duty of loyalty covenant in any written employment-related agreement between the Participant and the Company, or (iii) to the extent a Participant does not have an employment-related agreement with the Company with the covenants described in clause (ii) and the Participant during his or her Continuous Service, or within one year after its termination for any reason, a Participant (x) has rendered services to or otherwise directly or indirectly engaged in or assisted, any organization or business that, in the judgment of the Company in its sole and absolute discretion, is or is working to become competitive with the Company; (y) has solicited any

non-administrative employee of the Company to terminate employment with the Company; or (z) has engaged in activities which are materially prejudicial to or in conflict with the interests of the Company, including any breaches of fiduciary duty or the duty of loyalty, then the Company may, in its sole and absolute discretion, impose a Termination, Rescission, and/or Recapture with respect to any or all of the Participant's relevant Awards, Shares, and the proceeds thereof.

(f)     Within ten days after receiving notice from the Company of any such activity described in Section 14(e) above, the Participant shall deliver to the Company the Shares acquired pursuant to the Award, or, if Participant has sold the Shares, the gain realized, or payment received as a result of the rescinded exercise, payment, or delivery; *provided*, that if the Participant returns Shares that the Participant purchased pursuant to the exercise of an Option (or the gains realized from the sale of such Common Stock), the Company shall promptly refund the exercise price, without earnings, that the Participant paid for the Shares. Any payment by the Participant to the Company pursuant to this Section shall be made either in cash or by returning to the Company the number of Shares that the Participant received in connection with the rescinded exercise, payment, or delivery. It shall not be a basis for Termination, Rescission or Recapture if after termination of a Participant's Continuous Service, the Participant purchases, as an investment or otherwise, stock or other securities of such an organization or business, so long as (i) such stock or other securities are listed upon a recognized securities exchange or traded over-the-counter, and (ii) such investment does not represent more than a five percent (5%) equity interest in the organization or business.

(g)     Notwithstanding the foregoing provisions of this Section, the Company has sole and absolute discretion not to require Termination, Rescission and/or Recapture, and its determination not to require Termination, Rescission and/or Recapture with respect to any particular act by a particular Participant or Award shall not in any way reduce or eliminate the Company's authority to require Termination, Rescission and/or Recapture with respect to any other act or Participant or Award. Nothing in this Section shall be construed to impose obligations on the Participant to refrain from engaging in lawful competition with the Company after the termination of employment that does not violate subsections (b), (c), or (e) of this Section, other than any obligations that are part of any separate agreement between the Company and the Participant or that arise under Applicable Law.

(h)     All administrative and discretionary authority given to the Company under this Section shall be exercised by the most senior human resources executive of the Company or such other person or committee (including without limitation the Committee) as the Committee may designate from time to time.

(i)     If any provision within this Section is determined to be unenforceable or invalid under any Applicable Law, such provision will be applied to the maximum extent permitted by Applicable Law, and shall automatically be deemed amended in a manner consistent with its objectives and any limitations required under Applicable Law. ~~Notwithstanding the foregoing, but subject to any contrary terms set forth in any Award Agreement, this Section shall not be applicable to any Participant from and after his or her termination of Continuous Service after a Change in Control~~.

15.    **Recoupment of Awards.** Unless otherwise specifically provided in an Award Agreement, and to the extent permitted by Applicable Law, the Committee may in its sole and absolute discretion, without obtaining the approval or consent of the Company's shareholders or of any

Participant, require that any Participant reimburse the Company for all or any portion of any Awards granted under this Plan ("**Reimbursement**"), or the Committee may require the Termination or Rescission of, or the Recapture associated with, any Award, if and to the extent—

(a)      the granting, vesting, or payment of such Award was predicated upon the achievement of certain financial results that were subsequently the subject of a material financial restatement;

(b)      in the Committee's view the Participant either benefited from a calculation that later proves to be materially inaccurate, or engaged in fraud or misconduct that caused or partially caused the need for a material financial restatement by the Company or any Affiliate; and

(c)      a lower granting, vesting, or payment of such Award would have occurred based upon the conduct described in clause (b) of this Section.

In each instance, the Committee will, to the extent practicable and allowable under Applicable Laws, require Reimbursement, Termination or Rescission of, or Recapture relating to, any such Award granted to a Participant; provided that the Company will not seek Reimbursement, Termination or Rescission of, or Recapture relating to, any such Awards that were paid or vested more than three years prior to the first date of the applicable restatement period.

16.      **Relationship to other Benefits**.  No payment pursuant to the Plan shall be taken into account in determining any benefits under any pension, retirement, savings, profit sharing, group insurance, welfare or other benefit plan of the Company or any Affiliate except to the extent otherwise expressly provided in writing in such other plan or an agreement thereunder.

17.      **Administration of the Plan.**  The Committee shall administer the Plan in accordance with its terms, provided that the Board may act in lieu of the Committee on any matter.  The Committee shall hold meetings at such times and places as it may determine and shall make such rules and regulations for the conduct of its business as it deems advisable.  In the absence of a duly appointed Committee, the Board shall function as the Committee for all purposes of the Plan.

(a)      *Committee Composition.*  The Board shall appoint the members of the Committee. If and to the extent permitted by Applicable Law, the Committee may authorize one or more executive officers to make Awards to Eligible Persons other than themselves.  The Board may at any time appoint additional members to the Committee, remove and replace members of the Committee with or without Cause, and fill vacancies on the Committee however caused.

(b)      *Powers of the Committee.*  Subject to the provisions of the Plan, the Committee shall have the authority, in its sole discretion:

(i)      to grant Awards and to determine Eligible Persons to whom Awards shall be granted from time to time, and the number of Shares, units, or dollars to be covered by each Award;

(ii)      to determine, from time to time, the Fair Market Value of Shares;

(iii)      to determine, and to set forth in Award Agreements, the terms and conditions of all Awards, including any applicable exercise or purchase price, the installments

and conditions under which an Award shall become vested (which may be based on performance), terminated, expired, cancelled, or replaced, and the circumstances for vesting acceleration or waiver of forfeiture restrictions, and other restrictions and limitations;

(iv)     to approve the forms of Award Agreements and all other documents, notices and certificates in connection therewith which need not be identical either as to type of Award or among Participants;

(v)     to construe and interpret the terms of the Plan and any Award Agreement, to determine the meaning of their terms, and to prescribe, amend, and rescind rules and procedures relating to the Plan and its administration;

(vi)     to the extent consistent with the purposes of the Plan and without amending the Plan, to modify, to cancel, or to waive the Company's rights with respect to any Awards, to adjust or to modify Award Agreements for changes in Applicable Law, and to recognize differences in foreign law, tax policies, or customs;

(vii)     in the event that the Company establishes, for itself or using the services of a third party, an automated system for the documentation, granting, settlement, or exercise of Award, such as a system using an internet website or interactive voice response, to implement paperless documentation, granting, settlement, or exercise of Awards by a Participant may be permitted through the use of such an automated system; and

(viii)     to make all interpretations and to take all other actions that the Committee may consider necessary or advisable to administer the Plan or to effectuate its purposes.

Subject to Applicable Law and the restrictions set forth in the Plan, the Committee may delegate administrative functions to individuals who are Directors or Employees.

(d)     *Local Law Adjustments and Sub-plans.*  To facilitate the making of any grant of an Award under this Plan, the Committee may adopt rules and provide for such special terms for Awards to Participants who are located within the United States, foreign nationals, or who are employed by the Company or any Affiliate outside of the United States of America as the Committee may consider necessary or appropriate to accommodate differences in local law, tax policy or custom.  Without limiting the foregoing, the Company is specifically authorized to adopt rules and procedures regarding the conversion of local currency, taxes, withholding procedures and handling of stock certificates which vary with the customs and requirements of particular countries. The Company may adopt sub-plans and establish escrow accounts and trusts, and settle Awards in cash in lieu of shares, as may be appropriate, required or applicable to particular locations and countries.

(c)     *Action by Committee.*  Unless otherwise established by the Board or in any charter of the Committee, a majority of the Committee shall constitute a quorum and the acts of a majority of the members present at any meeting at which a quorum is present, and acts approved in writing by all members of the Committee in lieu of a meeting, shall be deemed the acts of the Committee. Each member of the Committee is entitled to, in good faith, rely or act upon any report or other information furnished to that member by an officer or other employee of the Company or any

Affiliate, the Company's independent certified public accounts, or any executive compensation consultant or other professional retained by the Company to assist in the administration of the Plan.

(d) *Deference to Committee Determinations.* The Committee shall have the discretion to interpret or construe ambiguous, unclear, or implied (but omitted) terms in any fashion it deems to be appropriate in its sole discretion, and to make any findings of fact needed in the administration of the Plan or Award Agreements. The Committee's prior exercise of its discretionary authority shall not obligate it to exercise its authority in a like fashion thereafter. The Committee's interpretation and construction of any provision of the Plan, or of any Award or Award Agreement, and all determination the Committee makes pursuant to the Plan shall be final, binding, and conclusive. The validity of any such interpretation, construction, decision or finding of fact shall not be given de novo review if challenged in court, by arbitration, or in any other forum, and shall be upheld unless clearly made in bad faith or materially affected by fraud.

(e) *No Liability; Indemnification.* Neither the Board nor any Committee member, nor any Person acting at the direction of the Board or the Committee, shall be liable for any act, omission, interpretation, construction or determination made in good faith with respect to the Plan, any Award or any Award Agreement. The Company and its Affiliates shall pay or reimburse any member of the Committee, as well as any Director, Employee, or Consultant who in good faith takes action on behalf of the Plan, for all expenses incurred with respect to the Plan, and to the full extent allowable under Applicable Law shall indemnify each and every one of them for any claims, liabilities, and costs (including reasonable attorney's fees) arising out of their good faith performance of duties on behalf of the Plan. The Company and its Affiliates may, but shall not be required to, obtain liability insurance for this purpose.

(f) *Expenses.* The expenses of administering the Plan shall be borne jointly and severally by the Company and its Affiliates.

18. **Modification of Awards and Substitution of Options.** Within the limitations of the Plan, the Committee may modify an Award to accelerate the rate at which an Option or SAR may be exercised, to accelerate the vesting of any Award, to extend or renew outstanding Awards, to accept the cancellation of outstanding Awards to the extent not previously exercised, or to make any change that the Plan would permit for a new Award. However, ~~except in connection with a Change in Control or as approved by the Company's shareholders for any period during which it is subject to the reporting requirements of the Exchange Act, the Committee may not~~neither the Company nor the Committee shall, without shareholder approval, either (a) allow for a "repricing" within the meaning of federal securities laws applicable to proxy statement disclosures, or (b) cancel an outstanding Option or SAR whose exercise price is greater than Fair Market Value at the time of cancellation for the purpose of reissuing the Option or SAR to the Participant at a lower exercise price, or granting a replacement award of a different type, ~~or otherwise allowing for a "repricing" within the meaning of applicable federal securities laws~~. Notwithstanding the foregoing, no modification of an outstanding Award may materially and adversely affect a Participant's rights thereunder unless either (i) the Participant provides written consent to the modification, ~~or (ii)~~(ii) the amendment is required by Applicable Law or (iii) before a Change in Control, the Committee determines in good faith that the modification is not materially adverse to the Participant.

19. **Plan Amendment and Termination.** The Board may amend or terminate the Plan as it shall deem advisable; ~~provided that no change shall be made that increases the total number of~~

~~Shares reserved for issuance pursuant to Awards (except pursuant to Section 13 above) unless such change is authorized by the shareholders of the Company~~plan amendments shall be subject to approval of the Company's shareholders to the extent the Board determines such approval is required by Applicable Laws. A termination or amendment of the Plan shall not materially and adversely affect a Participant's rights under an Award previously granted to him or her, unless the Participant consents in writing to such termination or amendment. ~~Notwithstanding the foregoing, the Committee may amend the Plan to comply with changes in tax or securities laws or regulations, or in the interpretation thereof~~or, the case of an amendment, the amendment is required by Applicable Law. Furthermore, neither the Company nor the Committee shall, without shareholder approval, either (a) allow for a "repricing" within the meaning of federal securities laws applicable to proxy statement disclosures, or (b) cancel an outstanding Option or SAR whose exercise price is greater than Fair Market Value at the time of cancellation for the purpose of reissuing the Option or SAR to the Participant at a lower exercise price or granting a replacement award of a different type.

20.    **Term of Plan**. If not sooner terminated by the Board, this Plan shall terminate at the close of business on the date ten years after its effective date as determined under Section 1(b) above. No Awards shall be made under the Plan after its termination.

21.    **Governing Law**. The terms of this Plan shall be governed by the laws of the State of Delaware, within the United States of America, without regard to the State's conflict of laws rules.

22.    **Laws and Regulations.**

(a)    *General Rules.*    This Plan, the granting of Awards, the exercise of Options and SARs, and the obligations of the Company hereunder (including those to pay cash or to deliver, sell or accept the surrender of any of its Shares or other securities) shall be subject to all Applicable Law. In the event that any Shares are not registered under any Applicable Law prior to the required delivery of them pursuant to Awards, the Company may require, as a condition to their issuance or delivery, that the persons to whom the Shares are to be issued or delivered make any written representations and warranties (such as that such Shares are being acquired by the Participant for investment for the Participant's own account and not with a view to, for resale in connection with, or with an intent of participating directly or indirectly in, any distribution of such Shares) that the Committee may reasonably require, and the Committee may in its sole discretion include a legend to such effect on the certificates representing any Shares issued or delivered pursuant to the Plan.

(b)    *Black-out Periods.*    Notwithstanding any contrary terms within the Plan or any Award Agreement, the Committee shall have the absolute discretion to impose a "blackout" period on the exercise of any Option or SAR, as well as the settlement of any Award, with respect to any or all Participants (including those whose Continuous Service has ended) to the extent that the Committee determines that doing so is either desirable or required in order to comply with applicable securities laws.

23.    **No Shareholder Rights.**  Neither a Participant nor any transferee or Beneficiary of a Participant shall have any rights as a shareholder of the Company with respect to any Shares underlying any Award until the date of issuance of a share certificate to such Participant, transferee, or Beneficiary for such Shares in accordance with the Company's governing instruments and Applicable Law. Prior to the issuance of Shares or Restricted Shares pursuant to an Award, a Participant shall not have the right to vote or to receive dividends or any other rights as a

shareholder with respect to the Shares underlying the Award (unless otherwise provided in the Award Agreement for Restricted Shares), notwithstanding its exercise in the case of Options and SARs. No adjustment will be made for a dividend or other right that is determined based on a record date prior to the date the stock certificate is issued, except as otherwise specifically provided for in this Plan or an Award Agreement.

---

## Appendix I: Definitions

---

As used in the Plan, the following terms have the meanings indicated when they begin with initial capital letters within the Plan:

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls or is controlled by or under common control with such Person. For the purposes of this definition, "control," when used with respect to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person or the power to elect directors, whether through the ownership of voting securities, by contract or otherwise; and the terms "affiliated," "controlling" and "controlled" have meanings correlative to the foregoing.

"**Applicable Law**" means the legal requirements relating to the administration of options and share-based plans under any applicable laws of the United States, any other country, and any provincial, state, or local subdivision, any applicable stock exchange or automated quotation system rules or regulations, as such laws, rules, regulations and requirements shall be in place from time to time.

"**Award**" means any award made pursuant to the Plan, including awards made in the form of an Option, an SAR, a Restricted Share, a RSU, an Unrestricted Share, a DSU, a Performance Award, or Dividend Equivalent Rights, or any combination thereof, whether alternative or cumulative.

"**Award Agreement**" means any written document setting forth the terms of an Award that has been authorized by the Committee. The Committee shall determine the form or forms of documents to be used, and may change them from time to time for any reason.

"**Beneficiary**" means the person or entity designated by the Participant, in a form approved by the Company, to exercise the Participant's rights with respect to an Award or receive payment or settlement under an Award after the Participant's death.

"**Board**" means the Board of Directors of the Company.

"**Cause**" means (unless a different meaning is set forth in the Participant's Award Agreement or employment agreement with the Company in which case that definition shall apply) (A) a Participant's willful and continuing failure (except where due to physical or mental incapacity) to substantially perform his or her duties, which is not remedied within fifteen (15) days after receipt of written notice from the Company specifying such failure; (B) a Participant's willful malfeasance or gross neglect in the performance of his or her duties resulting in material harm to the Company; (C) a Participant's conviction of, or plea of guilty or nolo contendere to, a felony or a misdemeanor involving moral turpitude; (D) the commission by a Participant of an act of fraud or embezzlement against the Company or any Affiliate; or (E) a Participant's willful material breach of any material provision of the Participant's employment agreement with the Company, if any, (as determined in good faith by the Board) which is not remedied within fifteen (15) days after (I) receipt of written

notice from the Company specifying such breach and (II) the opportunity to appear before the Board. For purposes of the preceding sentence, no act or failure to act by the Participant shall be considered "willful" unless done or omitted to be done by the Participant in bad faith or without reasonable belief that the Participant's action or omission was in the best interests of the Company.

"**Change in Control**" means: ~~"Change in Control" shall mean:~~ (A) any "person" (as such term is used in Sections 13(d) and 14(d)(2) of the Exchange Act, but excluding (x) any employee benefit plan of the Company~~)~~ and (y) any Permitted Holder), is or becomes the "beneficial owner" (as defined in ~~Rule 13d-3 under the Exchange Act~~Rules 13d-3 and 13d-5 under the Exchange Act, except that a person shall be deemed to have "beneficial ownership" of all shares that any such person has the right to acquire, whether such right is exercisable immediately or only through the passage of time), directly or indirectly, of ~~securities of the Company representing~~more than thirty-five percent (35%) ~~or more~~ of the ~~combined voting power of the Company's outstanding securities then entitled ordinarily (and apart from rights accruing under special circumstances) to vote for the election of directors; (B~~voting stock of the Company; (B) any transaction, including without limitation any merger, consolidation, tender offer or other transaction (whether effected by the Company or by any other person) or any action (such as a deregistration or delisting of the securities of the Company) taken by the Company or any of its affiliates, the result of which is, in either case, that (1) the Company is no longer a reporting company under the Exchange Act, or (2) the Company Stock is no longer listed on a national securities exchange; (C) at any time, the Continuing Directors (as defined below) cease for any reason to constitute at least a majority of the Board; (~~C~~D) a direct or indirect sale or other transfer of all or substantially all of the assets of the Company ~~or~~ ~~(D~~and its Subsidiaries, taken as a whole, or (E) any merger, consolidation or like business combination or reorganization of the Company, the consummation of which would result in either (x) the occurrence of any event described in clause (A) ~~or (B)~~ above, or (y) the voting securities of the Company outstanding immediately prior to the consummation of such merger, consolidation or like business combination or reorganization not representing (either by remaining outstanding or by being converted into voting securities of the applicable surviving or other entity) more than fifty percent (50%) of the combined voting power of the voting securities of the Company or such surviving or other entity outstanding immediately after such merger, consolidation or like business combination or reorganization; provided, however, that ~~a "Change in Control" shall not be deemed to have occurred by virtue of~~the consummation of the transactions contemplated by the ~~Company's~~ Plan of Reorganization ~~and Disclosure Statement filed as of November 6, 2009 or as amended or supplemented by the Company~~shall not be deemed to constitute a "Change in Control" as of the Effective Date.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Committee**" means the Compensation Committee of the Board or its successor, *provided* that the term "Committee" means (i) the Board when acting at any time in lieu of the Committee, (ii) with respect to any decision involving an Award intended to satisfy the requirements of Code Section 162(m), a committee consisting of two or more Directors of the Company who are "outside directors" within the meaning of Code Section 162(m), and (iii) with respect to any decision relating to a Reporting Person, a committee consisting of solely two or more Directors who are disinterested within the meaning of Rule 16b-3.

"**Company**" means Six Flags Entertainment Corporation, a Delaware corporation; *provided* that in the event the Company reincorporates to another jurisdiction, all references to the term "Company" shall refer to the Company in such new jurisdiction.

"**Company Stock**" means common stock, [$0.01] par value, of the Company. In the event of a change in the capital structure of the Company affecting the common stock (as provided in Section 13), the Shares resulting from such a change in the common stock shall be deemed to be Company Stock within the meaning of the Plan.

"**Consultant**" means any person (other than an Employee or Director), including an advisor, who is engaged by the Company or any Affiliate to render services and is compensated for such services.

"**Continuing Directors**" shall mean, as of any date of determination, any member of the Board who (i) was a member of the Board on the Effective Date or (ii) was nominated for election or elected to the Board with the approval of a majority of the Continuing Directors who were members of the Board at the time of such nomination or election.

"**Continuous Service**" means a Participant's period of service in the absence of any interruption or termination, as an Employee, Director, or Consultant. Continuous Service shall not be considered interrupted in the case of: (i) sick leave; (ii) military leave; (iii) any other leave of absence approved by the Committee, *provided* that such leave is for a period of not more than 90 days, unless reemployment upon the expiration of such leave is guaranteed by contract or statute, or unless provided otherwise pursuant to Company policy adopted from time to time; (iv) changes in status from Director to advisory director or emeritus status; or (iv) transfers between locations of the Company or between the Company and its Affiliates. Changes in status between service as an Employee, Director, and a Consultant will not constitute an interruption of Continuous Service if the individual continues to perform bona fide services for the Company. The Committee shall have the discretion to determine whether and to what extent the vesting of any Awards shall be tolled during any paid or unpaid leave of absence; provided, however, that in the absence of such determination, vesting for all Awards shall be tolled during any such unpaid leave (but not for a paid leave).

"**Deferred Share Units**" or "**DSUs**" mean Awards pursuant to Section 8 of the Plan.

"**Director**" means a member of the Board, or a member of the board of directors of an Affiliate.

"**Disabled**" means for an ISO, the Participant is disabled within the meaning of Code section 22(e)(3) and for any other Award means a condition under which a Participant –

(a)     is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than 12 months, or

(b)     is, by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not

less than 12 months, ~~received~~receiving income replacement benefits for a period of not less than three months under an accident or health plan covering employees of the Company.

"**Dividend Equivalent Rights**" means Awards pursuant to Section 10 of the Plan, which may be attached to other Awards.

"**Eligible Person**" means any Consultant, Director, or Employee and includes non-Employees to whom an offer of employment has been or is being extended.

"**Employee**" means any person whom the Company or any Affiliate classifies as an employee (including an officer) for employment tax purposes, whether or not that classification is correct. The payment by the Company of a director's fee to a Director shall not be sufficient to constitute "employment" of such Director by the Company.

"**Employer**" means the Company and each Subsidiary and Affiliate that employs one or more Participants.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Fair Market Value**" means the fair market value of the Company Stock as of such date based on the then prevailing prices of the Company Stock on the New York Stock Exchange, the American Stock Exchange, NASDAQ or such other stocks exchange as the Company Stock is then listed for trading ( and, if none, as determined by the Committee in good faith based on relevant facts and circumstances).

"**Grant Date**" means the later of (i) the date designated as the "Grant Date" within an Award Agreement, and (ii) date on which the Committee determines the key terms of an Award, *provided* that as soon as reasonably practical thereafter the Committee or its authorized delegate both notifies the Eligible Person of the Award and enters into an Award Agreement with the Eligible Person. For Awards granted on or immediately after the Effective Date, the order of the Bankruptcy court confirming the Company's Plan of Reorganization shall be deemed to constitute the date on which the Committee determines the key terms of such Awards.

"**Incentive Stock Option**" (or "**ISO**") means, an Option that qualifies for favorable income tax treatment under Code Section 422.

"**Involuntary Termination**" means termination of a Participant's Continuous Service under the following circumstances occurring on or after a Change in Control: (i) termination without Cause by the Company or an Affiliate or successor thereto, as appropriate; or (ii) voluntary termination by the Participant within one year following (A) a material reduction in the Participant's job responsibilities, *provided* that neither a mere change in title alone nor reassignment to a substantially similar position shall constitute a material reduction in job responsibilities; (B) an involuntary relocation of the Participant's work site to a facility or location more than 60 miles from the Participant's principal work site at the time of the Change in Control; or (C) a material reduction in Participant's total cash compensation, other than as part of a reduction by ~~the same~~a substantially similar percentage ~~amount~~in the total cash compensation of all other similarly-situated Employees or Directors, as applicable.

**"Non-ISO"** means an Option not intended to qualify as an Incentive Stock Option, as designated in the applicable Award Agreement.

**"Option"** means a right to purchase Company Stock granted under the Plan, at a price determined in accordance with the Plan.

**"Participant"** means any Eligible Person who holds an outstanding Award.

**"Performance Awards"** mean Awards granted pursuant to Section 9.

**"Performance Unit"** means an Award granted pursuant to Section 9(a) of the Plan which may be paid in cash, in Shares, or such combination of cash and Shares as the Committee in its sole discretion shall determine.

**"Permitted Holders"** shall have the meaning set forth in the Exit Facility (as defined in the Plan of Reorganization) as in effect on the Effective Date.

**"Person"** means any natural person, association, trust, business trust, cooperative, corporation, general partnership, joint venture, joint-stock company, limited partnership, limited liability company, real estate investment trust, regulatory body, governmental agency or instrumentality, unincorporated organization or organizational entity.

**"Plan"** means this Six Flags Entertainment Corporation Stock Incentive Plan.

**"Recapture"** and **"Rescission"** have the meaning set forth in Section 14 of the Plan.

**"Reimbursement"** has the meaning set forth in Section 15 of the Plan.

**"Reporting Person"** means an Employee, Director, or Consultant who is subject to the reporting requirements set forth under Rule 16b-3.

**"Restricted Share"** means a Share of Company Stock awarded with restrictions imposed under Section 7.

**"Restricted Share Unit"** or **"RSU"** means a right granted to a Participant to receive Shares or cash upon the lapse of restrictions imposed under Section 7.

**"Retirement"** means a Participant's termination of employment after age 60.

**"Rule 16b-3"** means Rule 16b-3 promulgated under the Exchange Act, as amended from time to time, or any successor provision.

**"SAR"** or **"Share Appreciation Right"** means a right to receive amounts awarded under Section 6.

"**Share**" means a share of Common Stock of the Company, as adjusted in accordance with Section 13 of the Plan.

~~"SAR" or "Share Appreciation Right" means a right to receive amounts awarded under Section 6.~~

"**Subsidiary**" of the Company shall mean: any corporation of which the Company owns, directly or indirectly, more than fifty percent (50%) of the voting stock

"**Ten Percent Holder**" means a person who owns (within the meaning of Code Section 422) stock representing more than ten percent (10%) of the combined voting power of all classes of stock of the Company.

"**Unrestricted Shares**" mean Shares (without restrictions) awarded pursuant to Section 7 of the Plan.

"**Withholding Taxes**" means the aggregate minimum amount of federal, state, local and foreign income, payroll and other taxes that the Company and any Affiliates are required to withhold in connection with any Award.

# SIX FLAGS ENTERTAINMENT CORPORATION

## STOCK INCENTIVE PLAN

As approved by the Bankruptcy
Court on _____  ____,
200_.