# Exhibit B-1

## First Lien Credit Agreement

$890,000,000
FIRST LIEN CREDIT AGREEMENT

among

SIX FLAGS ENTERTAINMENT CORPORATION (FORMERLY KNOWN AS SIX FLAGS, INC.),

SIX FLAGS OPERATIONS INC.,

SIX FLAGS THEME PARKS INC.,
as Borrower,

The Several Lenders
from Time to Time Parties Hereto,

BANK OF AMERICA, N.A. and BARCLAYS CAPITAL,
as Co-Syndication Agents,

DEUTSCHE BANK SECURITIES INC. and GOLDMAN SACHS LENDING PARTNERS LLC,
as Co-Documentation Agents,

and

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent,

Dated as of [●], 2010

J.P. MORGAN SECURITIES INC., BANC OF AMERICA SECURITIES LLC, BARCLAYS CAPITAL AND DEUTSCHE BANK SECURITIES INC.,
as Joint Bookrunners and Joint Lead Arrangers

# TABLE OF CONTENTS

SECTION 1. DEFINITIONS.................................................................................................1
    1.1. Defined Terms .................................................................................1
    1.2. Other Definitional Provisions ........................................................39

SECTION 2. AMOUNT AND TERMS OF TRANCHE B TERM LOAN
              COMMITMENTS.................................................................................40
    2.1. Tranche B Term Loan Commitments ..............................................40
    2.2. Procedure for Term Loan Borrowing ..............................................40
    2.3. Repayment of Tranche B Term Loans.............................................40

SECTION 3. AMOUNT AND TERMS OF THE REVOLVING FACILITIES
              COMMITMENTS AND SWING LINE COMMITMENT.............................41
    3.1. Revolving Credit Commitments ......................................................41
    3.2. Procedure for Revolving Borrowing.................................................41
    3.3. Increase in Revolving Credit Commitments.....................................42

SECTION 4. LETTERS OF CREDIT; SWING LINE LOANS ..................................42
    4.1. L/C Commitment .............................................................................42
    4.2. Procedure for Issuance of Letter of Credit......................................43
    4.3. Fees and Other Charges ..................................................................43
    4.4. L/C Participations ...........................................................................44
    4.5. Reimbursement Obligation of the Borrower.....................................44
    4.6. Obligations Absolute ......................................................................45
    4.7. Letter of Credit Payments ...............................................................45
    4.8. Applications ....................................................................................46
    4.9. Swing Line Commitment..................................................................46
    4.10. Procedure for Swing Line Borrowing; Refunding of Swing Line Loans .............46

SECTION 5. CERTAIN PROVISIONS APPLICABLE TO THE LOANS AND
              THE LETTERS OF CREDIT ...........................................................48
    5.1. Repayment of Loans; Evidence of Debt ..........................................48
    5.2. Commitment Fees, Etc....................................................................48
    5.3. Termination or Reduction of Revolving Credit Commitments ...........49
    5.4. Optional Prepayments.....................................................................49
    5.5. Mandatory Prepayments and Commitment Reductions ....................50
    5.6. Conversion and Continuation Options .............................................51
    5.7. Minimum Amounts and Maximum Number of Eurocurrency Tranches...............52
    5.8. Interest Rates and Payment Dates...................................................52
    5.9. Computation of Interest and Fees ...................................................52
    5.10. Inability to Determine Interest Rate.................................................53
    5.11. Pro Rata Treatment and Payments ..................................................53
    5.12. Requirements of Law......................................................................56
    5.13. Taxes..............................................................................................57
    5.14. Indemnity .......................................................................................59

5.15. Illegality ...................................................................................................... 59
5.16. Change of Lending Office .......................................................................... 60
5.17. Replacement of Lenders under Certain Circumstances ............................. 60
5.18. Loan Auctions ............................................................................................ 60
5.19. Auction Procedures .................................................................................... 61
5.20. Defaulting Lenders ..................................................................................... 63

SECTION 6. REPRESENTATIONS AND WARRANTIES ..................................... 65
6.1. Financial Condition .................................................................................... 65
6.2. No Change .................................................................................................. 65
6.3. Existence; Compliance with Law .............................................................. 66
6.4. Corporate Power; Authorization; Enforceable Obligations ...................... 66
6.5. No Legal Bar .............................................................................................. 66
6.6. Litigation .................................................................................................... 67
6.7. No Default .................................................................................................. 67
6.8. Ownership of Property; Liens .................................................................... 67
6.9. Intellectual Property ................................................................................... 67
6.10. Taxes .......................................................................................................... 67
6.11. Federal Regulations ................................................................................... 68
6.12. Labor Matters ............................................................................................. 68
6.13. ERISA ........................................................................................................ 68
6.14. Investment Company Act; Other Regulations ........................................... 69
6.15. Subsidiaries ................................................................................................ 69
6.16. Use of Proceeds .......................................................................................... 69
6.17. Environmental Matters ............................................................................... 69
6.18. Accuracy of Information, Etc ..................................................................... 71
6.19. Security Documents .................................................................................... 71
6.20. Solvency ..................................................................................................... 72
6.21. Regulation H .............................................................................................. 72
6.22. Parks ........................................................................................................... 72

SECTION 7. CONDITIONS PRECEDENT ............................................................. 72
7.1. Conditions Precedent to Initial Borrowing ............................................... 72
7.2. Conditions to Each Extension of Credit .................................................... 77

SECTION 8. AFFIRMATIVE COVENANTS .......................................................... 78
8.1. Financial Statements and Other Information ............................................. 78
8.2. Notices of Material Events ......................................................................... 80
8.3. Existence, Etc. ............................................................................................ 82
8.4. Insurance ..................................................................................................... 82
8.5. Compliance with Contractual Obligations and Requirements of Law ...... 83
8.6. Additional Collateral, Etc .......................................................................... 83
8.7. Further Assurances ..................................................................................... 86
8.8. Environmental Laws ................................................................................... 86
8.9. Ratings by S&P and Moody's ..................................................................... 86

SECTION 9. NEGATIVE COVENANTS ................................................................. 86

Error! Unknown document property name.

| 9.1. | Leverage Ratios | 86 |
|---|---|---|
| 9.2. | Consolidated Interest Coverage Ratio | 87 |
| 9.3. | Indebtedness | 88 |
| 9.4. | Liens | 92 |
| 9.5. | Prohibition of Fundamental Changes | 95 |
| 9.6. | Restricted Payments | 99 |
| 9.7. | Capital Expenditures | 102 |
| 9.8. | Investments | 103 |
| 9.9. | Prepayment of Certain Indebtedness | 105 |
| 9.10. | Transactions with Affiliates | 106 |
| 9.11. | Changes in Fiscal Periods | 107 |
| 9.12. | Certain Restrictions | 107 |
| 9.13. | Lines of Business | 107 |
| 9.14. | Modifications of Certain Documents | 108 |
| 9.15. | Limitation on Activities of Parent and Holdings | 108 |
| 9.16. | Limitation on Hedging Agreements | 109 |
| 9.17. | Anti-Hoarding | 109 |

| SECTION 10. EVENTS OF DEFAULT | 109 |
|---|---|

| SECTION 11. THE AGENTS | 113 |
|---|---|---|
| 11.1. | Appointment | 113 |
| 11.2. | Delegation of Duties | 114 |
| 11.3. | Exculpatory Provisions | 114 |
| 11.4. | Reliance by Agents | 114 |
| 11.5. | Notice of Default | 115 |
| 11.6. | Non-Reliance on Agents and Other Lenders | 115 |
| 11.7. | Indemnification | 115 |
| 11.8. | Agent in Its Individual Capacity | 116 |
| 11.9. | Successor Agents | 116 |
| 11.10. | Authorization to Release Liens and Guarantees | 117 |
| 11.11. | Authorization to Enter into Intercreditor Agreement | 117 |
| 11.12. | The Arrangers, Co-Syndication Agents and Co-Documentation Agents | 117 |

| SECTION 12. MISCELLANEOUS | 117 |
|---|---|---|
| 12.1. | Amendments and Waivers | 117 |
| 12.2. | Notices | 119 |
| 12.3. | No Waiver; Cumulative Remedies | 121 |
| 12.4. | Survival of Representations and Warranties | 121 |
| 12.5. | Payment of Expenses | 121 |
| 12.6. | Successors and Assigns; Participations and Assignments | 123 |
| 12.7. | Adjustments; Set-off | 126 |
| 12.8. | U.S.A. Patriot Act | 127 |
| 12.9. | Counterparts | 127 |
| 12.10. | Severability | 127 |
| 12.11. | Integration | 127 |
| 12.12. | **GOVERNING LAW** | 127 |

**Error! Unknown document property name.**

12.13. Submission To Jurisdiction; Waivers ................................................................128
12.14. Acknowledgments.........................................................................................128
12.15. Confidentiality .............................................................................................128
12.16. Release of Collateral and Guarantee Obligations ................................................129
12.17. Accounting Changes .....................................................................................130
12.18. Delivery of Lender Addenda ..........................................................................130
12.19. **WAIVERS OF JURY TRIAL**.......................................................................130
12.20. Intercreditor Agreement................................................................................130

**Error! Unknown document property name.**

ANNEXES:

A      Existing Letters of Credit

SCHEDULES:

| | |
|---|---|
| 1.1(a) | Mortgaged Property |
| 6.4 | Consents, Authorizations, Filings and Notices |
| 6.8 | Material Real Properties |
| 6.13 | ERISA |
| 6.15 | Subsidiaries |
| 6.19(a)-1 | UCC Filing Jurisdictions |
| 6.19(a)-2 | UCC Financing Statements to Remain on File |
| 6.19(a)-3 | UCC Financing Statements to be Terminated |
| 6.19(b) | Mortgage Filing Jurisdictions |
| 6.21 | Mortgaged Properties in Flood Zones |
| 6.22 | Existing Parks |
| 9.3(b) | Existing Indebtedness |
| 9.4(b) | Liens |
| 9.8(a) | Existing Investments |
| 9.13 | Business Activities |

EXHIBITS:

| | |
|---|---|
| A | Form of First Lien Guarantee and Collateral Agreement |
| B | Form of Compliance Certificate |
| C | Form of Closing Certificate |
| D | Form of Mortgage |
| E | Form of Assignment and Acceptance |
| F | Form of Legal Opinion of Paul, Hastings, Janofsky & Walker LLP |
| G-1 | Form of Term Note |
| G-2 | Form of Revolving Credit Note |
| G-3 | Form of Swing Line Note |
| H | Form of Prepayment Option Notice |
| I | Form of Exemption Certificate |
| J | Form of Lender Addendum |
| K | Form of Borrowing Notice |
| L | Form of Auction Notice |
| M | Form of Return Bid |
| N | Form of Intercompany Subordinated Note |
| O | Form of Intercreditor Agreement |

FIRST LIEN CREDIT AGREEMENT, dated as of [●], 2010, among SIX FLAGS ENTERTAINMENT CORPORATION (formerly known as SIX FLAGS, INC.), a Delaware corporation ("Parent"), SIX FLAGS OPERATIONS INC., a Delaware corporation ("Holdings"), SIX FLAGS THEME PARKS INC., a Delaware corporation (the "Borrower"), the several banks and other financial institutions or entities from time to time parties to this Agreement (as defined below) (the "Lenders") and JPMORGAN CHASE BANK, N.A., as administrative agent (in such capacity, the "Administrative Agent").

WHEREAS, on June 13, 2009, Parent, Holdings, the Borrower and certain of the Borrower's Domestic Subsidiaries (together with Parent, Holdings and the Borrower, the "Debtors") filed a voluntary petition for relief, Case No. 09-12019, under Chapter 11 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and continued in the possession of their property and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on [●], 2010, the Bankruptcy Court entered the Confirmation Order confirming the Debtors' Modified Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated [●] (as in effect on the date of confirmation thereof and as thereafter may be amended as provided in this Agreement, the "Plan of Reorganization"); and

WHEREAS, in connection with the confirmation and implementation of the Plan of Reorganization, the reorganized Debtors have requested the Lenders to make loans and other credit available to them to enable the reorganized Debtors to, among other things, consummate the transactions contemplated by the Plan of Reorganization, pay related fees and expenses and finance the working capital needs and general corporate purposes of the Borrower, and the Lenders have agreed, subject to the terms and conditions hereof, to enter into this Agreement.

Accordingly, the parties hereto hereby agree as follows:

## SECTION 1. DEFINITIONS

1.1.    Defined Terms. As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"Accepting Lenders": as defined in Section 5.11(d).

"Accounting Changes": as defined in Section 12.17.

"Acquisition": any acquisition, whether in a single transaction or series of related transactions, by Parent or any one or more of its Subsidiaries of (a) all or a substantial part of the assets, or of a business, unit or division, of any Person, whether through purchase of assets or securities, by merger or otherwise; or (b) any Person that becomes a Subsidiary after giving effect to such acquisition.

"Acquisition Parties": SFOG Acquisition A, Inc., a Delaware corporation, SFOG Acquisition B, L.L.C., a Delaware limited liability company, SFOT Acquisition I, Inc., a Delaware corporation, and SFOT Acquisition II, Inc., a Delaware corporation.

"Additional Extensions of Credit": as defined in Section 12.1.

"Administrative Agent": as defined in the preamble hereto.

"Affiliate": any Person that directly or indirectly controls, or is under common control with, or is controlled by, Parent and, if such Person is an individual, any member of the immediate family (including parents, spouse, children) of such individual and any trust whose principal beneficiary is such individual or one or more members of such immediate family and any Person who is controlled by any such member or trust. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") means possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise). Notwithstanding the foregoing, (a) no individual shall be an Affiliate solely by reason of his or her being a director, officer or employee of Parent, Holdings or any of its Subsidiaries and (b) none of the Wholly Owned Subsidiaries of Holdings or HWP shall be Affiliates.

"Agents": the collective reference to the Co-Documentation Agents, the Co-Syndication Agents and the Administrative Agent.

"Aggregate Exposure": with respect to any Lender at any time, an amount equal to the sum of (i) the aggregate then unpaid principal amount of such Lender's Tranche B Term Loans and (ii) the amount of such Lender's Revolving Credit Commitment then in effect or, if the Revolving Credit Commitments have been terminated, the amount of such Lender's Revolving Extensions of Credit then outstanding.

"Aggregate Exposure Percentage": with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the sum of the Aggregate Exposures of all Lenders at such time.

"Agreement": this First Lien Credit Agreement, as amended, supplemented or otherwise modified from time to time.

"Applicable Discount": as defined in Section 5.19(c).

"Applicable Margin": (a) (i) in the case of Revolving Credit Loans or Swing Line Loans which are Base Rate Loans, 3.25% per annum and (ii) in the case of Tranche B Term Loans which are Base Rate Loans, 3.00% and (b) (i) in the case of Revolving Credit Loans which are Eurocurrency Loans, 4.25% per annum and (ii) in the case of Tranche B Term Loans which are Eurocurrency Loans, 4.00%.

"Application": an application, in such form as the relevant Issuing Lender may specify from time to time, requesting such Issuing Lender to issue a Letter of Credit.

"Approved Fund": as defined in Section 12.6(b).

"Arrangers":  the collective reference to J.P. Morgan Securities Inc., Banc of America Securities LLC, Barclays Capital, the investment banking division of Barclays Bank PLC, and Deutsche Bank Securities Inc., in their capacities as joint lead arrangers.

"Asset Sale":  any Disposition of Property or series of related Dispositions of Property (excluding any such Disposition permitted by clauses (i) through (vi) and clauses (ix) through (xii) and clauses (xiv) through (xvii) of Section 9.5(c) except for clause (ii) to the extent referred to therein) which yields gross proceeds to the Parent, or any of its Subsidiaries (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) in excess of $2,500,000.

"Assignee":  as defined in Section 12.6(b)(i).

"Assignment and Acceptance":  an Assignment and Acceptance substantially in the form of Exhibit E.

"Auction": a "Dutch" auction whereby the Borrower offers to purchase Tranche B Term Loans pursuant to the auction procedures set forth in Section 5.19.

"Auction Amount": as defined in Section 5.19(a).

"Auction Notice": as defined in Section 5.19(a).

"Available LC/Swing Line Revolving Commitment":  with respect to any LC/Swing Line Revolving Lender at any time, an amount equal to the excess, if any, of (a) such Lender's LC/Swing Line Revolving Commitment then in effect over (b) such Lender's LC/Swing Line Extensions of Credit then outstanding; provided, that in calculating any Lender's LC/Swing Line Extensions of Credit for the purpose of determining such Lender's Available LC/Swing Line Revolving Commitment pursuant to Section 5.2(a), the aggregate principal amount of Swing Line Loans then outstanding shall be deemed to be zero.

"Available Non-LC/Swing Line Revolving Commitment":  with respect to any Non-LC/Swing Line Revolving Lender at any time, an amount equal to the excess, if any, of (a) such Lender's Non-LC/Swing Line Revolving Commitment then in effect over (b) such Lender's Non-LC/Swing Line Extensions of Credit then outstanding.

"Available Revolving Commitment":  the sum of (a) the Available LC/Swing Line Revolving Commitments and (b) the Available Non-LC/Swing Line Revolving Commitments.

"Bankruptcy Code":  the Federal Bankruptcy Code of 1978, as amended from time to time.

"Bankruptcy Court": as defined in the recitals hereto.

"Base Capital Expenditure Amount": as defined in Section 9.7.

Error! Unknown document property name.

"Base Rate": for any day, a rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Eurocurrency Rate for a one month Interest Period beginning on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%, provided that, for the avoidance of doubt, the Eurocurrency Rate for any day shall be the greater of (i) 2.0% and (ii) the rate appearing on the Reuters Screen LIBOR01 Page (or on any successor or substitute page) at approximately 11:00 a.m. London time on such day. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or such Eurocurrency Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate, the Federal Funds Effective Rate or such Eurocurrency Rate, respectively.

"Base Rate Loans": Loans for which the applicable rate of interest is based upon the Base Rate.

"Beneficial Share Assignment Agreement": the Beneficial Share Assignment Agreement, dated as of April 1, 1998, by and between TW-SPV Co., GP Holdings, Inc. and Parent (as successor Premier Parks Inc.), as the same may be amended on or prior to the Closing Date and as the same may be further modified or amended at any time from time to time, provided such modification or amendment does not violate Section 9.14.

"Benefited Lender": as defined in Section 12.7(a).

"Board": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower": as defined in the preamble hereto.

"Borrower Consolidated Adjusted EBITDA": for any period, for the Borrower and its Subsidiaries (determined on a consolidated basis without duplication in accordance with GAAP) means Parent Consolidated Adjusted EBITDA plus (a) administrative and other corporate charges of Parent that are not allocated to or paid by the Borrower or its Subsidiaries and excluding (b) any portion of Parent Consolidated Adjusted EBITDA (calculated on a net basis, taking into account positive and negative items) attributable to any Person (other than the Borrower or its Subsidiaries) to the extent that the Borrower or any of its Subsidiaries is not the owner of the interests in, or recipients of the cash received from, such Person. The parties hereby agree that the Borrower Consolidated Adjusted EBITDA for the fiscal quarter ending (a) June 30, 2009 was $47,603,000, (b) September 30, 2009 was $190,348,000 and (c) December 31, 2009 was ($15,780,000).

"Borrowing Date": any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans, or issue Letters of Credit, hereunder.

"Business": as defined in Section 6.17(b).

"Business Day": (a) for all purposes other than as covered by clause (b) below, a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close and (b) with respect to all notices and determinations in connection with, and payments of principal and interest on, Eurocurrency Loans, any day which is a Business Day described in clause (a) and which is also a day for trading by and between banks for deposits in Dollars in the London Interbank Eurocurrency market.

"Capex Stub Amount": as defined in the definition of "Excess Cash Flow".

"Capital Expenditures": for any period, expenditures made in cash by Parent or any of its Subsidiaries or any of the Partnership Park Entities (or, for purposes of the definition of "Excess Cash Flow", by the Borrower or any of its Subsidiaries) to acquire or construct fixed assets, plant and equipment (including renewals, improvements and replacements) during such period, computed in accordance with GAAP, but excluding (a) repairs or restorations in respect of any such assets paid in cash, (b) the amount of cash expended (i) with, or in an amount equal to, the Net Cash Proceeds of (A) Recovery Events or (B) awards of compensation arising from the taking by eminent domain or condemnation of assets being replaced, (ii) as part of an Acquisition permitted hereunder (other than an Acquisition permitted by Section 9.5(b)(iii)), or (c) expenditures that are accounted for as capital expenditures made in cash by Parent or any of its Subsidiaries or any of the Partnership Park Entities (or, for purposes of the definition of "Excess Cash Flow", by the Borrower or any of its Subsidiaries) and that actually are paid for by a Person other than Parent or any Subsidiary or any Partnership Park Entity and (d) any non-cash compensation or other non-cash costs reflected as additions to property, plant or equipment in the consolidated balance sheet of Parent and its Subsidiaries or in the balance sheet of any Partnership Park Entity (or, for purposes of the definition of "Excess Cash Flow" in the consolidated balance sheet of the Borrower and its Subsidiaries).

"Capital Lease Obligations": for any Person, all obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) Property to the extent such obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP, and, for purposes of this Agreement, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP.

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Cases": the cases of the Debtors before the Bankruptcy Court.

"Change in Law": (a) the adoption of any law, rule or regulation, (b) the issuance of any administrative guidance, or (c) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority.

- 5 -

"Closing Date": the date on which the conditions precedent set forth in Section 7.1 shall have been satisfied, which date shall be no later than May 28, 2010.

"Code": the Internal Revenue Code of 1986, as amended from time to time.

"Co-Documentation Agents": Deutsche Bank Securities Inc. and Goldman Sachs Lending Partners LLC.

"Collateral": all Property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document.

"Commitment": with respect to any Lender, each of the Tranche B Term Loan Commitment and the Revolving Credit Commitment.

"Commitment Fee Rate": 1.50% per annum.

"Compliance Certificate": a certificate duly executed by a Responsible Officer substantially in the form of Exhibit B.

"Confidential Information Memorandum": the Confidential Information Memorandum dated January, 2010, as supplemented by the Lenders Update Materials, dated April 8, 2010 and furnished to the Lenders prior to the Closing Date.

"Confirmation Order": as defined in Section 7.1(b).

"Consolidated Current Assets": at any date, all amounts (other than cash and Permitted Investments) that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of the Borrower and its Subsidiaries at such date.

"Consolidated Current Liabilities": at any date, all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of the Borrower and its Subsidiaries at such date, but excluding (a) the current portion of interest, income taxes or any Funded Debt of the Borrower and its Subsidiaries and (b), without duplication, all Indebtedness consisting of Revolving Credit Loans or Swing Line Loans, to the extent otherwise included therein.

"Consolidated Interest Coverage Ratio": as at any date, the ratio of (a) Parent Consolidated Adjusted EBITDA for such Measurement Period to (b) Consolidated Interest Expense for such Measurement Period.

"Consolidated Interest Expense": for any Measurement Period, total interest expense that has been paid in cash during such period (including that attributable to Capital Lease Obligations) of Parent and its Subsidiaries for such period with respect to all outstanding Indebtedness of Parent and its Subsidiaries (including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Hedging Agreements in respect of interest rates

to the extent such net costs have been or are required to be paid in cash during such period), minus cash interest income for such Measurement Period.

"Consolidated Leverage Ratio": as at any date, the ratio of (a) Consolidated Total Debt as at such date to (b) Parent Consolidated Adjusted EBITDA for such Measurement Period.

"Consolidated Net Income": of any Person for any period, the consolidated net income (or loss) of such Person and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP; provided, that in calculating Consolidated Net Income for any period, there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary of Parent or is merged into or consolidated with Parent or any of its Subsidiaries, (b) the income (or deficit) of any Person (other than a Subsidiary of Parent) in which Parent or any of its Subsidiaries has an ownership interest accounted for under the equity method, (c) the cumulative effect of a change in accounting principle and changes as a result of the adoption or modification of accounting policies during such period, (d) any effect of income (loss) from the early extinguishment of (i) Indebtedness and (ii) obligations under any Hedging Agreement or other derivative instruments, (e) the effects of non-cash acquisition accounting adjustments and non-cash adjustments from the application of fresh start reporting, (f) any net gains, losses, income or expense attributable to non-controlling interests and (g) the undistributed earnings of any Subsidiary of Parent to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any Contractual Obligation (other than under any Loan Document) or Requirement of Law applicable to such Subsidiary.

"Consolidated Total Debt": as at the last day of any fiscal quarter, the sum of (a) the aggregate outstanding principal amount of all Indebtedness (other than Revolver Indebtedness and the undrawn portion of any outstanding letters of credit) of Parent and its Subsidiaries that would, in conformity with GAAP, be set forth on the balance sheet of Parent and its Subsidiaries on such date (determined on a consolidated basis without duplication in accordance with GAAP), plus (b) the average of the amounts of Revolver Indebtedness outstanding on such last day and on the last day of each of the three immediately preceding fiscal quarters. For purposes of computing clause (b) above, the parties agree that the Revolver Indebtedness as of each of September 30, 2009, December 31, 2009 and March 31, 2010 was $0.

"Consolidated Working Capital": at any date, the difference of (a) Consolidated Current Assets on such date less (b) Consolidated Current Liabilities on such date.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any material agreement, lease, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"Control Investment Affiliate": as to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person primarily for the purpose of making

Error! Unknown document property name.

equity or debt investments in one or more companies. For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Co-Syndication Agents": Bank of America, N.A. and Barclays Capital, the investment banking division of Barclays Bank PLC.

"Debtors": as defined in the recitals hereto.

"Default": any of the events specified in Section 10, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Defaulting Lender": any Lender that has (a) failed to fund any portion of its Revolving Credit Loans or participations in Letters of Credit or Swing Line Loans within three Business Days of the date required to be funded by it hereunder, (b) notified the Borrower, the Administrative Agent, the Issuing Lender, the Swing Line Lender or any Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements generally in which it commits to extend credit, (c) failed, within three Business Days after request by the Administrative Agent, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans and participations in then outstanding Letters of Credit and Swing Line Loans, (d) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three Business Days of the date when due, unless the subject of a good faith dispute, or (e) in the case of a Revolving Credit Lender, becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition by a Governmental Authority or an instrumentality thereof of any equity interest in such Lender or a parent company thereof.

"Delayed Draw Equity Commitment": the commitment of Pentwater Capital Management LP or its Affiliates [(or any assignee or transferee thereof or successor thereto)][1] to Parent to purchase additional shares of common stock of Parent after the Closing Date pursuant to Section 5.2 of the Plan of Reorganization.

"Dick Clark": dick clark productions, inc., a Delaware corporation.

---

[1] Acceptable equity commitment party to be discussed.

"Discount Range": as defined in Section 5.19(a).

"Disposition": with respect to any Property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof, but excluding any termination of the economic and voting rights of GP Holdings Inc. pursuant to the Beneficial Share Assignment Agreement; and the terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disposition Investment": with respect to any Disposition, any promissory notes or other evidences of indebtedness or Investments received by Parent or any of its Subsidiaries in connection with such Disposition.

"Disqualified Capital Stock" shall mean any Capital Stock of Parent that, by its terms (or by the terms of any security or other Capital Stock into which it is convertible or for which it is putable or exchangeable) or upon the happening of any event or condition, (a) matures or is mandatorily redeemable (other than solely for Qualified Capital Stock of Parent), pursuant to a sinking fund or otherwise, (b) is redeemable or exchangeable, in whole or in part, at the option of the holder thereof (other than solely for Qualified Capital Stock of Parent), or (c) provides for the scheduled payment of dividends in cash, in each case prior to the date that is one year after the Tranche B Maturity Date; provided that (i) if such Capital Stock is issued pursuant to any plan for the benefit of employees of Parent or any of its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Capital Stock solely because it may be required to be repurchased by Parent or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations and (ii) any Capital Stock that would not constitute Disqualified Capital Stock but for the provisions thereof giving holders thereof the right to require Parent to purchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" prior to the date that is one year after the Tranche B Maturity Date shall not constitute Disqualified Capital Stock so long as the terms of such Capital Stock provide that the Loans and all other Obligations (other than obligations under Specified Hedging Agreements and Specified Cash Management Agreements) are repaid in full prior to such purchase or redemption.

"Dollars" and "$": lawful currency of the United States of America.

"Domestic Subsidiary": any Subsidiary of Parent organized under the laws of any jurisdiction within the United States of America.

"Environmental Claim": with respect to any Person, any written notice, claim, demand or other communication (collectively, a "claim") by any other Person alleging or asserting such Person's liability for investigatory costs, cleanup costs, governmental response costs, damages to natural resources or other Property, personal injuries, fines or penalties arising out of, based on or resulting from (a) the presence, or Release into the environment, of any Hazardous Material at any location, whether or not owned by such Person, or (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law. The term "Environmental Claim" shall include, without limitation, any claim by any Governmental Authority for enforcement, cleanup, removal,

- 9 -

response, remedial or other actions or damages pursuant to any applicable Environmental Law, and any claim by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the presence of Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment, as a result of any of the foregoing.

"Environmental Laws":  any and all present and future Federal, state, local and foreign laws, rules or regulations, and any orders or decrees, in each case as now or hereafter in effect, relating to the regulation or protection of human health, safety or the environment or to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals or toxic or hazardous substances or wastes into the indoor or outdoor environment, including, without limitation, ambient air, soil, surface water, ground water, wetlands, land or subsurface strata, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, chemicals or toxic or hazardous substances or wastes.

"Environmental Permits":  any and all permits, licenses, approvals, registrations, notifications, exemptions and other authorizations required under any Environmental Law.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate":  any corporation or trade or business that is a member of any group of organizations (a) described in Section 414(b) or (c) of the Code of which Parent is a member and (b) solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the lien created under Section 302(f) of ERISA and Section 412(n) of the Code, described in Section 414(m) or (o) of the Code of which Parent is a member.

"ERISA Event":  any of the following events or conditions:

(a) any Reportable Event;

(b) any failure by any Single Employer Plan to satisfy the minimum funding standards (within the meaning of Sections 412 or 430 of the Code or Section 302 of ERISA) applicable to such Single Employer Plan, whether or not waived, the filing pursuant to section 412(c) of the Code of any request for a waiver of the funding standard with respect with respect to any Plan, or any failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Single Employer Plan;

(c) the distribution under Section 4041 of ERISA of a notice of intent to terminate any Plan or any action taken by Parent or an ERISA Affiliate to terminate any Plan, or the incurrence by Parent or an ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Single Employer Plan;

(d) the institution by the PBGC of proceedings under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Single Employer Plan, or the receipt by Parent or any ERISA Affiliate of a notice from a Multiemployer Plan that such action has been taken by the PBGC with respect to such Multiemployer Plan;

(e) the complete or partial withdrawal from a Multiemployer Plan by Parent or any ERISA Affiliate that results in any Withdrawal Liability (including the obligation to satisfy secondary liability as a result of a purchaser default) or the receipt by Parent or any ERISA Affiliate of notice from a Multiemployer Plan that it is, or is expected to be, in Reorganization, Insolvent or in "endangered" or "critical" status, within the meaning of Section 432 of the Code or Section 305 or Title IV of ERISA or that it intends to terminate or has terminated under Section 4041-A of ERISA;

(f) the institution of a proceeding by a fiduciary of any Multiemployer Plan against Parent or any ERISA Affiliate to enforce Section 515 of ERISA, which proceeding is not dismissed within 60 days;

(g) the adoption of an amendment to any Plan that, pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA, would result in the loss of tax-exempt status of the trust of which such Plan is a part if Parent or an ERISA Affiliate fails to timely provide security to the Plan in accordance with the provisions of such Sections; or

(h) a determination that any Single Employer Plan is, or is expected to be, in "at risk" status (within the meaning of Title IV of ERISA).

"Eurocurrency Base Rate": with respect to each day during each Interest Period pertaining to a Eurocurrency Loan, the higher of (a) 2% per annum and (b) the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on the applicable page of the Reuters Screen LIBOR01 Page as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period. In the event that such rate does not appear on such page, the "Eurocurrency Base Rate" for purposes of this definition shall be determined by reference to such other comparable publicly available service for displaying eurocurrency rates as may be selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which the Administrative Agent is offered deposits in Dollars at or about 11:00 A.M., New York City time, two Business Days prior to the beginning of such Interest Period in the interbank eurocurrency market where its eurocurrency and foreign currency and exchange operations are then being conducted for delivery on the first day of such Interest Period for the number of days comprised therein.

"Eurocurrency Loans": Loans under any Facility for which the applicable rate of interest is based upon the Eurocurrency Rate.

Error! Unknown document property name.

"Eurocurrency Rate":  with respect to each day during each Interest Period, a rate per annum determined for such day in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):



$$\frac{\text{Eurocurrency Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

"Eurocurrency Reserve Requirements":  for any day, as applied to a Eurocurrency Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including, without limitation, basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"Eurocurrency Tranche":  the collective reference to Eurocurrency Loans under any Facility, the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Event of Default":  any of the events specified in Section 10, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Excess Cash Flow":  for any fiscal year of Parent, the difference, if any, of (a) the sum, without duplication, of (i) Borrower Consolidated Adjusted EBITDA less the sum of (1) Consolidated Interest Expense (provided that, for purposes of calculating Excess Cash Flow, Consolidated Interest Expense shall be calculated for the Borrower and its Subsidiaries) and (2) any cash expenditures made during such period on account of any loss, expense or charge, and any cash received during such period on account of any gain, included in the calculation of Consolidated Net Income but excluded in the determination of Parent Consolidated Adjusted EBITDA pursuant to clauses (a)(iv), (v) and (vi) of the definition thereof, in each case for such fiscal year, (ii) the amount of the decrease, if any, in Consolidated Working Capital for such fiscal year (other than any decrease arising from acquisitions by Parent or its Subsidiaries completed during such period or the application of acquisition accounting or fresh start reporting adjustments) and (iii) total pension expenses for such period minus (b) the sum, without duplication, of (i) the aggregate amount actually paid by the Borrower and its Subsidiaries in cash during such fiscal year on account of (A) (1) Capital Expenditures and (2) the amount of Capital Expenditures included as part of the "capital expenditures" budget for such fiscal year in the budget delivered pursuant to Section 8.1(g) and certified by a Responsible Officer at or about the end of such fiscal year as being expected to be made in cash on or prior to March 31 of the immediately following fiscal year and made on or prior to such date (such amount under this subclause (b)(i)(A)(2) being the "Capex Stub Amount") ((minus the principal amount of Indebtedness (other than Revolving Credit Loans) incurred to finance such Capital Expenditures, and excluding any such Capital Expenditures financed with the proceeds of any Reinvestment Deferred Amount and the Capex Stub Amount

deducted in determining Excess Cash Flow for the prior fiscal year of Parent) and (B) cash acquisitions of intellectual property, (ii) the aggregate amount of all optional and regularly scheduled principal payments of the Tranche B Term Loans and other Funded Debt of the Borrower and its Subsidiaries made during such fiscal year (other than in respect of any revolving credit facility to the extent there is not an equivalent permanent reduction in commitments thereunder), (iii) the aggregate amount of all prepayments or repayments of Revolving Credit Loans and Swing Line Loans during such fiscal year to the extent accompanying permanent reductions (to the extent not replaced) of the Revolving Credit Commitments, (iv) the amount of the increase, if any, in Consolidated Working Capital for such fiscal year (other than any increase arising from acquisitions by the Borrower or its Subsidiaries completed during such period or the application of acquisition accounting), (v) the aggregate amount of expenditures actually made by the Borrower and its Subsidiaries in cash during such period (including expenditures for the payment of financing, letter of credit and annual agency fees but excluding expenditures on account of pensions) to the extent that such expenditures are not expensed during such period (with such expenditures to be excluded in the fiscal period when they are expensed), (vi) the amount of cash taxes paid or tax reserves set aside or payable (without duplication) in such period, (vii) the amount of cash payments made on account of pensions in such period, and (viii) the aggregate amount of Restricted Payments made in cash during such fiscal year (to the extent permitted under Section 9.6).

"Excess Cash Flow Application Date": as defined in Section 5.5(c).

"Excluded Foreign Subsidiaries": any Foreign Subsidiary in respect of which either (a) the pledge of all of the Capital Stock of, or any Property of, such Subsidiary as Collateral or (b) the guaranteeing by such Subsidiary of the Obligations, would, in the good faith judgment of Parent, result in adverse tax consequences to Parent, Holdings or the Borrower. Any Subsidiary that Guarantees Indebtedness under any Indenture shall not be an Excluded Foreign Subsidiary.

"Excluded Taxes": with respect to any Agent, any Lender or Transferee (a) net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on any Agent, Lender or Transferee as a result of a present or former connection between such Agent, Lender or Transferee and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from such Agent's, Lender's or Transferee's having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document), (b) branch profits taxes imposed on any Agent, Lender or Transferee by the United States of America, (c) any withholding taxes to the extent attributable to a failure to comply with Section 5.13(e), (d) any backup withholding tax to the extent attributable to a "Notified Payee Underreporting" as described in Section 3406(c) or a notification by the US Internal Revenue Service that the "Taxpayer Identification Number" furnished by such Agent, Lender or Transferee is incorrect, (e) United States withholding taxes that are imposed on amounts payable to such Agent, Lender or Transferee (and in the case of a Participant, the Lender selling the participation to such Participant), except to the extent that such withholding taxes are imposed (i) as a result of a Change in Law after the date the Agent, Lender or Transferee

becomes a party to this Agreement, (ii) as a result of a change in fact after the date the Agent, Lender or Transferee becomes a party to this Agreement that is attributable to the Borrower or other Loan Party (or any Person related to a Borrower or Loan Party), (iii) on such Agent's, Lender's or Transferee's assignor (if any) (or, in the case of a Participant, the Lender selling participations to such Participant) and such Agent's, Lender's or Transferee's assignor was entitled, at the time of assignment (or the sale of the participations), to receive additional amounts from the Borrower with respect to such withholding Taxes pursuant to Section 5.13, or (iv) on an Agent, Lender or Transferee following an assignment, designation of a new lending office, acquisition or the appointment of a successor Agent pursuant to Sections 5.16 or 5.17.

"Existing Credit Agreement": the Second Amended and Restated Credit Agreement, dated as of May 25, 2007, among Parent, Holdings, the Borrower, JPMorgan Chase Bank, N.A., as the administrative agent, and the lenders and other agents party thereto.

"Existing Issuing Lender": JPMorgan Chase Bank, N.A., in its capacity as issuer of any Letter of Credit under the Existing Credit Agreement.

"Existing Letters of Credit": the letters of credit described on Annex A.

"Existing Parks": as defined in Section 6.22.

"Existing Time Warner Facility": the loan facility provided by TW to the Acquisition Parties (and guaranteed by the Borrower, Holdings and Parent) as evidenced by (i) that certain Promissory Note, dated as of May 15, 2009, by and among TW and the Acquisition Parties, in the original principal amount of $52,507,000, and each other loan document entered in connection therewith and (ii) that certain Guarantee Agreement, dated as of May 15, 2009, made by Parent, Holdings and Borrower in favor of TW.

"Facility": each of (a) the Tranche B Term Loan Commitments and the Tranche B Term Loans made thereunder (the "Tranche B Term Loan Facility") and (b) the Revolving Credit Commitments and the extensions of credit made thereunder (the "Revolving Credit Facility").

"Federal Funds Effective Rate": for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by JPMorgan Chase Bank, N.A. from three federal funds brokers of recognized standing selected by it.

"First Lien Debt": as at the last day of any Measurement Period, the sum of (a) the aggregate outstanding principal amount of all Indebtedness (other than Revolver Indebtedness and the undrawn portion of any outstanding letters of credit), including, without limitation, Capital Lease Obligations, of the Borrower and its Subsidiaries that is secured on a first lien basis by property or assets of the Borrower and its Subsidiaries and

that would, in conformity with GAAP, be set forth on the balance sheet of the Borrower and its Subsidiaries on such date (determined on a consolidated basis without duplication in accordance with GAAP), plus (b) the average of the amount of Revolver Indebtedness outstanding on such last day and on the last day of each of the three immediately preceding fiscal quarters.  For purposes of computing clause (b) above, the parties agree that the Revolver Indebtedness as of each of September 30, 2009, December 31, 2009 and March 31, 2010 was $0.

"First Lien Leverage Ratio":  as at any date, the ratio of (a) First Lien Debt as at such date to (b) Borrower Consolidated Adjusted EBITDA for the Measurement Period most recently ended prior to such date.

"Fixed-to-Floating Swap":  as defined in Section 9.16.

"Foreign Benefit Arrangement": as defined in Section 6.13(b).

"Foreign Plan": as defined in Section 6.13(b).

"Foreign Subsidiary":  any Subsidiary of Parent that is not a Domestic Subsidiary.

"Funded Debt":  with respect to any Person at any date of determination, all Indebtedness of such Person of the types described in clauses (a) through (e) of the definition of "Indebtedness" in this Section that matures more than one year from such date of determination.

"Funding Office":  the office specified from time to time by the Administrative Agent as its funding office by notice to the Borrower and the Lenders.

"GAAP":  generally accepted accounting principles in the United States of America as in effect from time to time.

"Governmental Authority":  any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners) having jurisdiction over the Business or the Property of Parent and its Subsidiaries.

"Great Escape Agreements":  collectively, (a) that certain Second Amended and Restated Operating Agreement of HWP dated as of October 29, 2007 among HWP Management, Inc., HWP Development Holdings LLC, BBL HWP LLC, DACWP LLC and Leisure Water LLC, as members, and the following as guarantors or pledgors with respect to certain obligations:  Parent, Donald R. Led Duke, DACWP, LLC and Leisure Water, LLC (as may, subject to Section 9.14, be modified, amended, restated and/or substituted), (b) any and all agreements delivered pursuant thereto or in connection therewith or with the development and operation of the Property described therein, including the financing and refinancing thereof and (c) any and all agreements,

Error! Unknown document property name.

documents or instruments entered into in connection with any expansion or development of the Great Escape's lodge or any hotel or timeshare arrangements located on or adjacent to it.

"Guarantee": a guarantee, an indorsement, a contingent agreement to purchase or to furnish funds for the payment or maintenance of, or otherwise to be or become contingently liable under or with respect to, the Indebtedness, other obligations, net worth, working capital or earnings of any Person, or a guarantee of the payment of dividends or other distributions upon the stock or equity interests of any Person, or an agreement to purchase, sell or lease (as lessee or lessor) Property, products, materials, supplies or services primarily for the purpose of enabling a debtor to make payment of such debtor's obligations or an agreement to assure a creditor against loss, and including, without limitation, causing a bank or other financial institution to issue a letter of credit or other similar instrument for the benefit of another Person, but excluding endorsements for collection or deposit in the ordinary course of business. The terms "Guarantee" and "Guaranteed" used as verbs have the correlative meanings.

"Guarantee and Collateral Agreement": the First Lien Guarantee and Collateral Agreement to be executed and delivered by Parent, Holdings, the Borrower and each Subsidiary Guarantor in favor of the Administrative Agent, substantially in the form of Exhibit A as the same may be amended, supplemented or otherwise modified from time to time.

"Guarantors": the collective reference to Parent, Holdings and the Subsidiary Guarantors.

"Hazardous Material": any chemical or other material or substance which is now or hereafter prohibited, limited or otherwise regulated in any way under any Environmental Law.

"Hedging Agreement": all interest rate or currency swaps, caps or collar agreements, foreign exchange agreements, commodity contracts or similar arrangements entered into by Parent or any of its Subsidiaries providing for protection against fluctuations in interest rates, currency exchange rates, commodity prices or the exchange of nominal interest obligations, either generally or under specific contingencies. For avoidance of doubt, Hedging Agreements shall include any interest rate swap or similar agreement that provides for the payment by Parent or any of its Subsidiaries of amounts based upon a floating rate in exchange for receipt by Parent or such Subsidiary of amounts based upon a fixed rate.

"Holdings": as defined in the preamble hereto.

"HWP": HWP Development LLC, a New York limited liability company.

"Inactive Subsidiary": any Subsidiary of Parent that (a) has aggregate assets with a value not in excess of $100,000, (b) conducts no Business and (c) does not Guarantee any Indebtedness of Parent or any of its Subsidiaries.

- 16 -

"Indebtedness": for any Person, without duplication: (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services, other than (i) trade accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the ordinary course of business so long as such trade accounts payable are payable within 180 days (365 days in the case of payables arising out of the purchase of inventory or Capital Expenditures determined without regard to the exclusion contained in the definition of Capital Expenditures in this Section 1.1) of the date the respective goods are delivered or the respective services are rendered and (ii) any earn-out obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and is not paid after becoming due and payable; (c) Indebtedness of others secured by a Lien on the Property of such Person, whether or not the respective indebtedness so secured has been assumed by such Person; (d) obligations of such Person in respect of letters of credit or similar instruments (including negotiable instruments) issued or accepted by banks and other financial institutions for account of such Person; (e) Capital Lease Obligations of such Person; (f) the liquidation value of all redeemable preferred Capital Stock of such Person to the extent redeemable prior to the date which is 91 days after the later of the (i) Revolving Facility Termination Date and (ii) maturity date of the Tranche B Term Loans, and (g) Indebtedness of others Guaranteed by such Person; provided, however, that the provision by Parent or any of its Subsidiaries of covenants, Guarantees and indemnities that are customary for non-recourse financings (as determined by Parent in good faith) with respect to Indebtedness incurred by a Person that is not a Subsidiary of Parent and that is otherwise non-recourse to Parent and its Subsidiaries shall not be deemed to be Indebtedness. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner to the extent such Indebtedness is recourse, provided that if such Person's liability for such Indebtedness is contractually limited, only such Person's share thereof shall be so included. The amount of Indebtedness for any Person for purposes of clause (c) above shall be deemed equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness, and (ii) the fair market value of the Property encumbered thereby as determined in good faith by such Person. Anything herein to the contrary notwithstanding, the following shall not constitute Indebtedness: (i) obligations under Hedging Agreements, (ii) obligations in respect of any Indebtedness that has been defeased (either covenant or legal) pursuant to the terms of the instrument creating or governing such Indebtedness and (iii) obligations under the Partnership Parks Agreements; provided, that obligations described in the foregoing clause (iii) shall constitute Indebtedness for purposes of Section 10(e).

"Indemnified Liabilities": as defined in Section 12.5.

"Indemnified Taxes": all Taxes (other than Excluded Taxes) and Other Taxes.

"Indemnitee": as defined in Section 12.5.

"Indentures": collectively, any indenture or other agreement pursuant to which Indebtedness of Parent, Holdings or the Borrower may be outstanding at any time, in each case as amended as permitted by this Agreement.

"Insolvent": with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Intellectual Property": the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, copyrights and copyrightable works, copyright licenses, patents, inventions, discoveries and developments, patent licenses, trademarks, service marks, trade names, brand names, corporate names, domain names, logos, trade dress and other source indicators and the goodwill of any business symbolized thereby, trademark licenses, technology, know-how, processes, trade secrets and confidential or proprietary business information, all registrations and applications related thereto, the right to obtain renewals, extensions, substitutions, continuations, continuations-in-part, divisions, reissues, re-examinations or similar legal protections related thereto, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercreditor Agreement": the Intercreditor Agreement, dated as of the date hereof, among the Administrative Agent, the "Administrative Agent" referred to in the Second Lien Credit Agreement, and acknowledged and agreed to by Parent, Holdings, the Borrower and the Subsidiary Guarantors.

"Interest Payment Date": (a) as to any Base Rate Loan, the last day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurocurrency Loan having an Interest Period of three months or shorter, the last day of such Interest Period, (c) as to any Eurocurrency Loan having an Interest Period longer than three months, each day that is three months, or a whole multiple thereof, after the first day of such Interest Period and the last day of such Interest Period and (d) as to any Loan (other than any Revolving Credit Loan and any Swing Line Loan), the date of any repayment or prepayment made in respect thereof.

"Interest Period": as to any Eurocurrency Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurocurrency Loan and ending one, two, three or six months (or, to the extent available to all applicable Lenders, nine or twelve months) thereafter, as selected by the Borrower in its notice of borrowing or notice of conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurocurrency Loan and ending one, two, three or six months (or, to the extent available to all applicable Lenders, nine or twelve months) thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not less than three Business Days prior to the last day of the then

Error! Unknown document property name.

current Interest Period with respect thereto; <u>provided</u> that, all of the foregoing provisions relating to Interest Periods are subject to the following:

  (i)  if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

  (ii)  any Interest Period that would otherwise extend beyond the Revolving Facility Termination Date or beyond the Tranche B Maturity Date, as the case may be, shall end on the Revolving Facility Termination Date or the Tranche B Maturity Date, as applicable; and

  (iii)  any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period.

"<u>Investment</u>": for any Person: (a) the acquisition (whether for cash, Property, services or securities or otherwise) of capital stock, bonds, notes, debentures, partnership or other ownership interests or other securities of any other Person or any agreement to make any such acquisition (including, without limitation, any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such sale); (b) the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person), but excluding any such advance, loan or extension of credit having a stated term not exceeding 360 days arising in connection with the sale of inventory, supplies or patron services by such Person in the ordinary course of business, and excluding also any deposit made by such Person in the ordinary course of business of such Person or as an advance payment in respect of a Capital Expenditure (to the extent the making of such Capital Expenditure will not result in a violation of any of the provisions of Section 9.7); (c) the entering into of any Guarantee of, or other contingent obligation with respect to, Indebtedness or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person, other than any Guarantee under the Partnership Parks Agreements; <u>provided, however,</u> that the provision by Parent or any of its Subsidiaries of covenants, Guarantees and indemnities that are customary for non-recourse financings (as determined by Parent in good faith) with respect to Indebtedness incurred by a Person that is not a Subsidiary of Parent and that is otherwise non-recourse to Parent and its Subsidiaries shall not be deemed an Investment; or (d) the entering into of any Hedging Agreement. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment and shall include any and all fees, expenses, commission costs and charges related to such Investment.

Error! Unknown document property name.

"Investment Grade Rating": a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P.

"IP Percentage": (a) with respect to Indebtedness incurred by the Borrower or any of its Subsidiaries, 100% and (b) with respect to Indebtedness incurred by Parent or Holdings, 25% if (for purposes of this clause (b)) on the applicable date of determination the First Lien Leverage Ratio is greater than 3.25 to 1.00 and 0% otherwise.

"Issuing Lender": JPMorgan Chase Bank, N.A., and any other LC/Swing Line Revolving Lender from time to time designated by the Borrower as an Issuing Lender with the consent of such LC/Swing Line Revolving Lender and the Administrative Agent, or any of their respective affiliates, in each case in its capacity as issuer of any Letter of Credit.

"LC/Swing Line Extensions of Credit": as to any LC/Swing Line Revolving Lender at any time, an amount equal to the sum of (a) the aggregate principal amount of LC/Swing Line Revolving Loans, (b) such Lender's LC/Swing Line Revolving Percentage of the aggregate principal amount of Swing Line Loans then outstanding plus (c) such Lender's LC/Swing Line Revolving Percentage of the L/C Obligations then outstanding.

"LC/Swing Line Revolving Commitment": as to any Lender, the obligation of such Lender, if any, to make LC/Swing Line Revolving Loans and participate in Swing Line Loans and Letters of Credit in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "LC/Swing Line Revolving Commitment" opposite such Lender's name on Schedule 1 to the Lender Addendum delivered by such Lender, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The original aggregate amount of the Total LC/Swing Line Revolving Commitments is $55,000,000.

"LC/Swing Line Revolving Lender": each Lender that has an LC/Swing Line Revolving Commitment or that is the holder of LC/Swing Line Revolving Loans.

"LC/Swing Line Revolving Loans": as defined in Section 3.1.

"LC/Swing Line Revolving Percentage": as to any LC/Swing Line Revolving Lender at any time, the percentage which such Lender's LC/Swing Line Revolving Commitment then constitutes of the Total LC/Swing Line Revolving Commitments (or, at any time after the LC/Swing Line Revolving Commitments shall have expired or been terminated, the percentage which the aggregate amount of such Lender's LC/Swing Line Extensions of Credit then outstanding constitutes of the amount of the Total LC/Swing Line Extensions of Credit then outstanding).

"LC/Swing Line Revolving Subfacility": the LC/Swing Line Revolving Commitments and the LC/Swing Line Revolving Loans made thereunder.

"L/C Commitment": $40,000,000.

Error! Unknown document property name.

"L/C Fee Payment Date":  the last day of each March, June, September and December and the last day of the Revolving Facility Commitment Period.

"L/C Obligations":  at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired amount of the then outstanding Letters of Credit and (b) the aggregate amount of drawings under Letters of Credit that have not then been reimbursed pursuant to Section 4.5.  The L/C Obligations of any Lender shall be its LC/Swing Line Revolving Percentage of the L/C Obligations.

"L/C Participants":  with respect to any Letter of Credit, the collective reference to all the LC/Swing Line Revolving Lenders other than the Issuing Lender that issued such Letter of Credit.

"Lender Addendum":  with respect to any Lender, a Lender Addendum, substantially in the form of Exhibit J, to be executed and delivered by such Lender on the Closing Date as provided in Section 12.18.

"Lenders":  as defined in the preamble hereto.

"Letters of Credit":  as defined in Section 4.1.

"Lien":  with respect to any Property, any mortgage, lien, pledge, charge, security interest or encumbrance having the effect of security in respect of such Property.  For purposes of this Agreement and the other Loan Documents, a Person shall be deemed to own subject to a Lien any Property that it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement (other than an operating lease) relating to such Property.

"Liquidity":  the sum of (a) Unrestricted Cash and Permitted Investments held by the Loan Parties and their consolidated Subsidiaries, (b) the Available Revolving Commitments on such date (with satisfaction of the applicable conditions precedent to Revolving Extensions of Credit to be tested as of such date) and (c) cash proceeds available to be received by the Loan Parties in exchange for the issuance of shares of Parent common stock pursuant to the Delayed Draw Equity Commitment.

"Liquidity Put Threshold Amount": as defined in the New Time Warner Facility as in effect on the Closing Date or as the same may be modified or amended at any time from time to time, provided such modification or amendment does not violate Section 9.14.

"Loan":  any loan made by any Lender pursuant to this Agreement.

"Loan Documents":  this Agreement, the Security Documents, the Applications and the Notes.

"Loan Parties":  Parent, Holdings, the Borrower and each Subsidiary of the Borrower that is a party to a Loan Document.

- 21 -

"Majority Revolving Lenders": the holders of more than 50% of the sum of (a) the Total Non-LC/Swing Line Revolving Commitments then in effect (or, if the Non-LC/Swing Line Revolving Commitments have been terminated, the Total Non-LC/Swing Line Extensions of Credit then outstanding) and (b) the Total LC/Swing Line Revolving Commitments then in effect (or, if the LC/Swing Line Revolving Commitments have been terminated, the Total LC/Swing Line Extensions of Credit then outstanding).

"Majority Term Lenders": the holders of more than 50% of the aggregate unpaid principal amount of the Tranche B Term Loans.

"Margin Stock": "margin stock" within the meaning of Regulations T, U and X of the Board.

"Material Adverse Effect": a material adverse effect on (a) the Loans, (b) the Business, Property or financial condition of Parent and its Subsidiaries taken as a whole or (c) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Administrative Agent or the Lenders hereunder or thereunder.

"Materials of Environmental Concern": any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any hazardous or toxic substances, materials or wastes, defined or regulated as such in or under any Environmental Law, including asbestos, polychlorinated biphenyls and urea-formaldehyde insulation.

"Measurement Period": for any determination under this Agreement, the four consecutive fiscal quarters of Parent or Borrower, as applicable, then last ended for which financial statements are required to be delivered pursuant to Section 8.1(a) or (d).

"Moody's": Moody's Investors Service, Inc. and any successor thereto.

"Mortgaged Properties": the Real Properties listed on Schedule 1.1(a), as to which the Administrative Agent for the benefit of the Lenders has been granted a Lien pursuant to the Mortgages.

"Mortgages": each of the mortgages and deeds of trust encumbering the Mortgaged Properties made by the Loan Party party thereto in favor of, or for the benefit of, the Administrative Agent for the benefit of the Lenders, as delivered on the Closing Date, together with any other mortgages and deeds of trust made by any Loan Party in accordance with Section 8.6(b) in favor of, or for the benefit of, the Administrative Agent for the benefit of the Lenders, substantially in the form of Exhibit D (with such changes thereto as shall be reasonably advisable under the law of the jurisdiction in which such mortgage or deed of trust is to be recorded), in each case as the same may be amended, supplemented, substituted or otherwise modified from time to time.

"Multiemployer Plan": a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds": (a) in connection with any Asset Sale or any Recovery Event, the proceeds thereof received by Parent or any Subsidiary in the form of cash and Permitted Investments (including any such proceeds received in such form by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received) of such Asset Sale or Recovery Event, net of attorneys' fees, accountants' fees, investment banking fees, amounts required to be applied to the repayment of Indebtedness and other obligations secured by a Lien expressly permitted hereunder on, or amount required to be paid under Capital Lease Obligations relating to, any asset which is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to a Security Document) and other customary fees and expenses actually incurred in connection therewith and net of (i) taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements applicable to the transactions) and (ii) any reserve for adjustment in respect of (A) the sale price of such asset or assets established in accordance with GAAP and (B) any liabilities associated with such asset or assets retained by Parent or any of its Subsidiaries after such sale or other disposition thereof and (b) in connection with any issuance or sale of debt securities or instruments or the incurrence of loans or other Indebtedness, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"New Time Warner Facility": the loan facility provided by TW to the Acquisition Parties (and guaranteed by Parent, Holdings, the Borrower and each other of Parent's Subsidiaries that are or become Subsidiary Guarantors pursuant to, or otherwise guarantee obligations under, this Agreement and the other Loan Documents), evidenced by (i) that certain Loan Agreement, dated as of the date hereof, by and among TW and the Acquisition Parties, in the original principal amount of $150,000,000, and each other loan document entered in connection therewith, and (ii) that certain Guarantee Agreement, dated as of the date hereof, made by the Guarantors in favor of TW, in each case, as the same may be refinanced, refunded, replaced or renewed in accordance with Section 9.3(c) and as may be amended, restated, supplemented or otherwise modified from time to time, provided such amendment, restatement, supplement or other modification does not violate Section 9.14.

"New York Collateral": as defined in Section 12.7(a).

"Non-Consenting Lender": in the event that (i) the Borrower or the Administrative Agent has requested the Lenders to consent to a departure or waiver of any provisions of the Loan Documents or to agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of all Lenders or all affected Lenders in accordance with the terms of Section 12.1 or all the Lenders with respect to a certain class of Loans or Commitments and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "Non-Consenting Lender".

Error! Unknown document property name.

"Non-Guarantor Subsidiary": any Subsidiary of the Borrower that is not a Subsidiary Guarantor.

"Non-LC/Swing Line Extensions of Credit": as to any Non-LC/Swing Line Revolving Lender at any time, an amount equal to the aggregate principal amount of Non-LC/Swing Line Revolving Loans made by such Lender.

"Non-LC/Swing Line Revolving Commitment": as to any Lender, the obligation of such Lender, if any, to make Non-LC/Swing Line Revolving Loans in an aggregate principal amount not to exceed the amount set forth under the heading "Non-LC/Swing Line Revolving Commitment" opposite such Lender's name on Schedule 1 to the Lender addendum delivered by such Lender, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The original aggregate amount of the Total Non-LC/Swing Line Revolving Commitments is $65,000,000.

"Non-LC/Swing Line Revolving Percentage": as to any Non-LC/Swing Line Revolving Lender at any time, the percentage which such Lender's Non-LC/Swing Line Revolving Commitment then constitutes of the Total Non-LC/Swing Line Revolving Commitments (or, at any time after the Non-LC/Swing Line Revolving Commitments shall have expired or been terminated, the percentage which the aggregate amount of such Lender's Non-LC/Swing Line Extensions of Credit then outstanding constitutes of the amount of the Total Non-LC/Swing Line Extensions of Credit then outstanding).

"Non-LC/Swing Line Revolving Subfacility": the Non-LC/Swing Line Revolving Commitments and the Non-LC/Swing Line Revolving Loans made thereunder.

"Non-LC/Swing Line Revolving Lender": each Lender that has a Non-LC/Swing Line Revolving Commitment or that is the holder of Non-LC/Swing Line Revolving Loans.

"Non-LC/Swing Line Revolving Loans": as defined in Section 3.1.

"Non-U.S. Lender": as defined in Section 5.13(e).

"Note": any promissory note evidencing any Loan.

"Obligations": the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and Reimbursement Obligations and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans, the Reimbursement Obligations and all other obligations and liabilities of the Borrower to the Administrative Agent or to any Lender (or, in the case of Specified Hedge Agreements and Specified Cash Management Agreements, obligations and liabilities of Parent, Holdings or the Borrower to any Lender or any affiliate of any Lender or any Person that was a Lender or an affiliate of a Lender at the time of entry

Error! Unknown document property name.

into a Specified Hedge Agreement), whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, the Letters of Credit, any Specified Hedge Agreement, any Specified Cash Management Agreement or any other document made, delivered or given by any Loan Party in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise; provided, that (a) obligations of Parent, Holdings or the Borrower under any Specified Hedge Agreement or any Specified Cash Management Agreement shall be secured and guaranteed pursuant to the Security Documents only to the extent that, and for so long as, the other Obligations are so secured and guaranteed and (b) any release of Collateral or Guarantors effected in the manner permitted by this Agreement shall not require the consent of holders of obligations under Specified Hedge Agreements or Specified Cash Management Agreements.

"Operated Properties":  as defined in Section 6.17(a).

"Other Taxes":  any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Parent":  as defined in the preamble hereto.

"Parent Backstop Group":  as defined in Section 7.1(t).

"Parent Consolidated Adjusted EBITDA":  for any period, the sum, for Parent and its Subsidiaries (determined on a consolidated basis without duplication in accordance with GAAP), of the following:

(a)        Consolidated Net Income of Parent and its Subsidiaries for such period excluding those amounts which, in the determination of Consolidated Net Income for such period, have been added or deducted for (i) total interest expense and, to the extent not reflected in such total interest expense, any losses on hedging or other derivative instruments, net of interest income and gains on such hedging obligations, (ii) provisions for federal, state, local and foreign income tax, franchise taxes and similar taxes imposed in lieu of income tax, (iii) depreciation and amortization expense (including, without limitation, amortization of goodwill and other intangible assets) and any impairment of property, equipment, goodwill or other intangible assets, (iv) any effect of extraordinary, non-recurring or unusual gains or losses or expenses and curtailments or modifications to pension and post-retirement employee benefit plans, provided that the amount of cash expenditures added back as a result of this clause (iv) shall not exceed $15,000,000 in any twelve-month period, (v) any net gains or losses of disposed, abandoned or discontinued assets or operations except for income and expenses prior to disposition, (vi) any fees, expenses, commissions, costs or other charges related to (A) any securities offering, Investment, acquisition, disposition or other similar transaction permitted

- 25 -

hereunder or the incurrence of Indebtedness permitted to be incurred hereunder (including any extension, renewal, refinancing or replacement thereof), in each case whether or not successful and whether or not consummated prior to, on, or after the Closing Date, (B) the Cases, the Plan of Reorganization and the transactions contemplated by the Cases and the Plan of Reorganization, and (C) emergence compensation, the termination or settlement of leases and executory contracts, litigation costs and settlements, asset write-ups or write-downs, income and gains recorded in connection with the corporate reorganization effected in connection with the administration of the Debtors' Cases, (vii)(A) any net unrealized gain or loss (after any offset) resulting in such period from obligations under any hedging obligations or other derivative instruments and the application of Statement of Financial Accounting Standards No. 133 and (B) any net unrealized gain or loss (after any offset) resulting in such period from currency translation, in each case to the extent not incurred in cash and (viii) the Consolidated Net Income of any Person (adjusted for items (i) through (vii) of this paragraph (a)) to the extent (A) attributable to interests held by third parties in Subsidiaries of Parent that are not wholly-owned by Parent or (B) attributable to interests in Persons accounted for under the equity method except to the extent of the cash received by Parent or any of its Subsidiaries from such Person, net of the Investments therein, in respect of such period, plus

(b)     any non-cash or stock-based compensation costs or expenses incurred by Parent or any of its Subsidiaries pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, less any cash costs of such plans or agreements incurred during such period.

Calculations of Parent Consolidated Adjusted EBITDA shall be as set forth on Exhibit B attached hereto.

Notwithstanding the foregoing if, during any period for which Parent Consolidated Adjusted EBITDA is being determined, Parent or any of its Subsidiaries shall have consummated any Acquisition or Disposition then, for all purposes of this Agreement, Parent Consolidated Adjusted EBITDA shall be determined on a pro forma basis as if such Acquisition or Disposition had been made or consummated on the first day of such period. The parties hereby agree that Parent Consolidated Adjusted EBITDA for the fiscal quarter ending (a) June 30, 2009 was $53,241,000, (b) September 30, 2009 was $205,755,000 and (c) December 31, 2009 was ($16,926,000).

"Park": collectively, the Existing Parks and any other amusement or attraction park acquired by any of Parent and its Subsidiaries after the date hereof.

"Participant": as defined in Section 12.6(c).

"Participant Register": as defined in Section 12.6(b)(iv).

"Partnership Parks Agreements": (a) the Overall Agreement, dated as of February 15, 1997, among Six Flags Fund, Ltd. (L.P.), Salkin Family Trust, SFG, Inc.,

- 26 -

SFG-I, LLC, SFG-II, LLC, Six Flags Over Georgia, Ltd., SFOG II, Inc., SFOG II Employee, Inc., SFOG Acquisition A, Inc., SFOG Acquisition B, L.L.C., Six Flags Over Georgia, Inc., Six Flags Services of Georgia, Inc., the Borrower and Six Flags Entertainment Corporation and the Related Agreements (as defined therein), (b) the Overall Agreement dated as of November 24, 1997 among Six Flags Over Texas Fund, Ltd., Flags' Directors, L.L.C., FD-II, L.L.C., Texas Flags, Ltd., SFOT Employee, Inc., SFOT Acquisition I, Inc., SFOT Acquisition II, Inc., Six Flags Over Texas, Inc., the Borrower and Six Flags Entertainment Corporation, as amended by the Agreement dated as of December 6, 1999 between and among the foregoing parties and Six Flags Fund II, Ltd., and the Related Agreements (as defined therein), and (c) the Subordinated Indemnity Agreement, and each related agreement entered into in connection therewith (including, without limitation, the Beneficial Share Assignment Agreement, the Subordinated Indemnity Escrow Agreement, dated as of September 28, 2006, by and among Parent, Warner Bros. Entertainment Inc. (as successor to Time Warner Entertainment Company, L.P.), Historic TW Inc. (formerly known as Time Warner Inc.) and the Bank of New York, as the same has been amended, supplemented, waived or otherwise modified on or prior to the Closing Date, and the Acquisition Company Liquidity Agreement dated as of December 8, 2006 by and among Parent, Holdings, Borrower, GP Holdings, Inc., SFOG II, Inc., SFT Holdings, Inc., Time Warner Inc., TW-SPV Co., Warner Bros. Entertainment Inc. (as successor to Time Warner Entertainment Company, L.P.), the Acquisition Parties, SFOG Acquisition A Holdings, Inc., SFOG Acquisition B Holdings, Inc., SFOT Acquisition I Holdings, Inc. and SFOT Acquisition II Holdings, Inc.), in each case, as the same may be modified or amended at any time from time to time, provided such modification or amendment does not violate Section 9.14.

"Partnership Parks Entities": (i) Six Flags Over Georgia II, L.P., a Delaware limited partnership, Texas Flags, Ltd., a Texas limited partnership, GP Holdings Inc., a Delaware corporation, SFOT Acquisition I Holdings, Inc., a Delaware corporation, SFOT Acquisition II Holdings, Inc., a Delaware corporation, SFOG Acquisition A Holdings, Inc., a Delaware corporation, SFOG Acquisition B Holdings, Inc., a Delaware corporation, Six Flags Over Georgia, Inc., a Delaware corporation, and the Acquisition Parties and (ii) any of their respective Subsidiaries.

"Payment Amount": as defined in Section 4.5.

"Payment Office": the office specified from time to time by the Administrative Agent as its payment office by notice to the Borrower and the Lenders.

"PBGC": the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Permitted Acquisition": as defined in Section 9.5(e)(i).

"Permitted Holders": Any fund affiliated with Stark Investments, CQS, Tricadia Capital Management, LLC, 1798 Global Partners, Capital Ventures International, Altai Capital Management, H Partners Management LLC, Bay Harbour Management,

Error! Unknown document property name.

Pentwater Capital Management LP, Fortelus Capital Management LLP, Credit Suisse Securities (USA) LLC and Candlewood Special Situations Master Fund Ltd.

"Permitted Investments": (a) Dollars; (b)(i) Pounds Sterling or Euros or (ii) in the case of any Foreign Subsidiary, such local currencies held by it from time to time in the ordinary course of business; (c) securities issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 24 months or less from the date of acquisition; (d) certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any domestic or foreign commercial bank having capital and surplus of not less than $500,000,000 in the case of U.S. banks and $100,000,000 (or the Dollar equivalent as of the date of determination) in the case of non-U.S. banks; (e) repurchase obligations for underlying securities of the types described in clauses (c), (d) and (h) entered into with any financial institution meeting the qualifications specified in clause (d) above; (f) commercial paper rated at least P-1 by Moody's or at least A-1 by S&P and in each case maturing within 24 months after the date of creation thereof and Indebtedness or preferred stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 24 months or less from the date of acquisition; (g) marketable short-term money market and similar securities having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower) and in each case maturing within 24 months after the date of creation or acquisition thereof; (h) readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from either Moody's or S&P with maturities of 24 months or less from the date of acquisition; (i) readily marketable direct obligations issued by any foreign government or any political subdivision or public instrumentality thereof, in each case having an Investment Grade Rating from either Moody's or S&P with maturities of 24 months or less from the date of acquisition; (j) Investments with average maturities of 12 months or less from the date of acquisition in money market funds; (k) investment funds investing 90% of their assets in securities of the types described in clauses (a) through (j) above; and (l) in the case of Foreign Subsidiaries, substantially similar investments to those set forth in clauses (a) through (k) above denominated in foreign currencies, provided that references to the United States of America (or any agency or instrumentality thereof) shall be deemed to mean foreign countries having a sovereign rating of "A" or better from either S&P or Moody's (or another nationally recognized statistical rating agency selected by the Borrower and reasonably acceptable to the Administrative Agent).

"Permitted Liens": as defined in Section 9.4.

"Permitted Second Lien Refinancing Indebtedness": as defined in Section 9.3(i).

"Person": an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Plan": an employee benefit plan (within the meaning of Section 3(3) of ERISA) and in respect of which Parent or any ERISA Affiliate is (or if such Plan were terminated, would under Section 4062 or Section 4069 of ERISA be deemed to be) an employer as defined in Section 305 of ERISA.

"Plan of Reorganization": as defined in the recitals hereto.

"Platform": as defined in Section 7.1(f).

"Prepayment Date": as defined in Section 5.11(d).

"Prepayment Option Notice": as defined in Section 5.11(d).

"Prime Rate": the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City (the Prime Rate not being intended to be the lowest rate of interest charged JPMorgan Chase Bank, N.A. in connection with extensions of credit to borrowers).

"Pro Forma Balance Sheet": as defined in Section 6.1.

"Property": any right or interest in or to property of any kind whatsoever, whether Real Property, personal or mixed and whether tangible or intangible, including, without limitation, Capital Stock.

"Pro Rata Share": as to any LC/Swing Line Revolving Lender at any time, such Lender's LC/Swing Line Revolving Percentage and as to any Non-LC/Swing Line Revolving Lender at any time, such Lender's Non-LC/Swing Line Revolving Percentage.

"Purchase Money Indebtedness": (a) Indebtedness consisting of the deferred purchase price of Property, conditional sale or other obligations under any title retention agreement, installment sales and other purchase money obligations, in each case where the maturity of such Indebtedness does not exceed the anticipated useful life of the Property being financed, and (b) Indebtedness incurred to finance the acquisition of Property (including Acquisitions), including additions and improvements; provided, however, that any Lien arising in connection with any such Indebtedness shall be limited to the specified asset being financed (or replacement items) or, in the case of Real Property, the Real Property on which such asset is attached; and provided further, that such Indebtedness is incurred within 180 days after such acquisition, addition or improvement by the Borrower or a Subsidiary of such asset.

"Purchase Price": with respect to any Acquisition, the sum (without duplication) of (a) the amount of cash paid by Parent and its Subsidiaries in connection with such Acquisition, (b) the value (as determined for purposes of such Acquisition in accordance

with the applicable acquisition agreement) of all Capital Stock of Parent or any of its Subsidiaries issued or given as consideration in connection with such Acquisition (other than Qualified Net Cash Equity Proceeds applied to finance such Acquisition within 180 days of such Acquisition or Capital Stock of Parent that is issued in connection with and as consideration for an Acquisition), (c) the principal amount (or, if less, the accreted value) at the time of such Acquisition of all Indebtedness incurred, assumed or acquired by Parent and its Subsidiaries in connection with such Acquisition, (d) all additional purchase price amounts in connection with such Acquisition in the form of earnouts, deferred purchase price and other contingent obligations that are required to be recorded as a liability on the balance sheet of Parent and its Subsidiaries in accordance with GAAP, Regulation S-X under the Securities Act of 1933, as amended, or any other rule or regulation of the SEC, (e) all amounts paid by Parent and its Subsidiaries in respect of covenants not to compete, consulting agreements and other affiliated contracts in connection with such Acquisition, and (f) the aggregate fair market value of all other consideration given by Parent and its Subsidiaries in connection with such Acquisition.

"Qualified Capital Stock" shall mean any Capital Stock that is not Disqualified Capital Stock.

"Qualified Counterparty":  with respect to any Specified Hedge Agreement or any Specified Cash Management Agreement, any counterparty thereto that, at the time such Specified Hedge Agreement or such Specified Cash Management Agreement was entered into, was a Lender or an affiliate of a Lender.

"Qualified Net Cash Equity Proceeds":  the Net Cash Proceeds of any offering of Capital Stock of Parent so long as (a) such offering was made in express contemplation of an Acquisition or an Investment, as the case may be, (b) such Capital Stock is not mandatorily redeemable prior to the date that is one year after the Tranche B Maturity Date and (c) such Acquisition or Investment, as the case may be, is consummated within 180 days after receipt by Parent of such Net Cash Proceeds.

"Qualifying Bids" as defined in Section 5.19(c).

"Qualifying Lender" as defined in Section 5.19(d).

"Real Properties":  all real property, including the improvements thereon, owned by, or leased by, Parent, Holdings, the Borrower or its Subsidiaries.

"Recovery Event":  any settlement of or payment in excess of $2,500,000 in respect of any Property or casualty insurance claim or any condemnation proceeding relating to any Property of Borrower or any of its Subsidiaries.

"Refinancing Expenses":  with respect to any refinancing, refunding, replacement or renewal of any Indebtedness, accrued and unpaid interest (or dividends) and premium thereon plus other reasonable amounts paid and fees and expenses incurred in connection therewith.

"Refunded Swing Line Loans":  as defined in Section 4.10(b).

"Refunding Date": as defined in Section 4.10(c).

"Register": as defined in Section 12.6(b)(iv).

"Regulation H": Regulation H of the Board as in effect from time to time.

"Regulation U": Regulation U of the Board as in effect from time to time.

"Reimbursement Obligation": the obligation of the Borrower to reimburse each Issuing Lender pursuant to Section 4.5 for amounts drawn under Letters of Credit issued by such Issuing Lender for the account of the Borrower.

"Reinvestment Deferred Amount": with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by the Borrower or any of its Subsidiaries in connection therewith that, as a result of the delivery of a Reinvestment Notice, are not applied to repay the Loans pursuant to Section 5.5(b).

"Reinvestment Event": any Asset Sale or Recovery Event in respect of which the Borrower has delivered a Reinvestment Notice.

"Reinvestment Notice": a written notice executed by a Responsible Officer of Holdings or the Borrower stating that no Default or Event of Default has occurred and is continuing and that the Borrower (directly or indirectly through a Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale or Recovery Event to acquire, restore or reconstruct assets useful in its business (including for Permitted Acquisitions).

"Reinvestment Prepayment Amount": with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date to acquire, restore, or reconstruct assets useful in business of the Borrower and its Subsidiaries (including for Permitted Acquisitions).

"Reinvestment Prepayment Date": with respect to any Reinvestment Event, the earlier of (a) the date occurring one year after such Reinvestment Event and (b) the date on which the Borrower shall have determined not to, or shall have otherwise ceased to, acquire, restore or reconstruct assets useful in the business of Parent and its Subsidiaries (including for Permitted Acquisitions) with all or any portion of the relevant Reinvestment Deferred Amount.

"Related Transactions": the execution, delivery and performance of the New Time Warner Facility by the parties thereto, the repayment in full of the Existing Time Warner Facility, the amendment to, or amendment and restatement of, supplement or other modification to certain Partnership Parks Agreement or other Contractual Obligations of the Partnership Parks Entities in connection with the Plan of Reorganization and any other transactions consummated in connection with the Plan of Reorganization, including the contemplated rights offering to purchase common stock of Parent.

Error! Unknown document property name.

"Release":  any release, threatened release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Materials through ambient air, soil, surface water, ground water, wetlands, land or subsurface strata that violates or creates any liability under any Environmental Law.

"Reorganization":  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reply Amount": as defined in Section 5.19(b).

"Reply Discount": as defined in Section 5.19(b).

"Reportable Event":  any of the events set forth in Section 4043(c) of ERISA and the regulations issued thereunder, with respect to a Single Employer Plan, as to which the PBGC has not by regulation waived the requirement of Section 4043(a) of ERISA that it be notified within 30 days of the occurrence of such event (provided that a failure of any Single Employer Plan to meet the minimum funding standards of Section 412 or 430 of the Code or Section 302 of ERISA, including, without limitation, the failure to make on or before its due date a required installment under Section 430(j) of the Code, shall be a reportable event).

"Repricing Transaction":  (a) any prepayment of the Tranche B Term Loans using proceeds of Indebtedness incurred by the Borrower from a substantially concurrent incurrence of syndicated term loans for which the interest rate payable thereon on the date of such prepayment is lower than the Eurocurrency Rate on the date of such prepayment plus the Applicable Margin with respect to the Tranche B Term Loans on the date of such prepayment, provided that the primary purpose of such prepayment is to refinance Tranche B Term Loans at a lower interest rate or (b) any repricing of the Tranche B Term Loans pursuant to an amendment hereto resulting in the interest rate payable thereon on the date of such amendment being lower than the Eurocurrency Rate on the date of such prepayment plus the Applicable Margin with respect to the Tranche B Term Loans on the date of such prepayment.

"Required Lenders":  at any time, the holders of more than 50% of the sum of (a) the aggregate unpaid principal amount of the Tranche B Term Loans then outstanding and (b) the Total Revolving Credit Commitments then in effect or, if the Revolving Credit Commitments have been terminated, the Total Revolving Extensions of Credit then outstanding.

"Requirement of Law":  as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Responsible Officer":  as to any Person, the chief executive officer, president, chief financial officer, senior vice president or treasurer of such Person, but in any event,

with respect to financial matters, the chief financial officer, senior vice president-finance or treasurer of such Person.

"Restricted Payment": dividends (in cash, Property or obligations) on, or other payments or distributions on account of, or the setting apart of money for a sinking or other analogous fund for, or the purchase, redemption, retirement or other acquisition of, any shares of any Capital Stock of Parent, Holdings or the Borrower or of any warrants, options or other rights to acquire the same (or to make any payments to any Person (except "earn-out" payments or similar payments in connection with an Acquisition or pursuant to any agreement entered into in connection therewith, in each case where such obligation does not constitute Indebtedness) such as "phantom stock" payments, where the amount thereof is calculated with reference to the fair market or equity value of Parent, Holdings or the Borrower), but excluding dividends payable solely in shares of common stock of Parent, Holdings or the Borrower.

"Revolver Indebtedness": Indebtedness of the Borrower in respect of Revolving Credit Loans and Swing Line Loans.

"Revolving Credit Commitment": as to any Lender, the obligation of such Lender, if any, to make Revolving Credit Loans and participate in Swing Line Loans and Letters of Credit, if applicable, in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "Revolving Credit Commitment" opposite such Lender's name on Schedule 1 to the Lender Addendum delivered by such Lender, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The original aggregate amount of the Total Revolving Credit Commitments is $120,000,000. Each Lender's Revolving Credit Commitment shall be either an LC/Swing Line Revolving Commitment or Non-LC/Swing Line Revolving Commitment as set forth on Schedule 1 to the Lender Addendum delivered by such Lender or such Assignment and Acceptance.

"Revolving Credit Facility": as defined in the definition of "Facility" in this Section 1.1.

"Revolving Credit Lender": each Lender that has a Revolving Credit Commitment or that is the holder of Revolving Credit Loans.

"Revolving Credit Loans": as defined in Section 3.1.

"Revolving Extensions of Credit": as to any Lender, its LC/Swing Line Extensions of Credit or Non-LC/Swing Line Extensions of Credit, as applicable.

"Revolving Facility Commitment Period": the period from and including the Closing Date to the Revolving Facility Termination Date.

"Revolving Facility Termination Date": June 30, 2015.

Error! Unknown document property name.

"Revolving Subfacility": each of (a) the LC/Swing Line Revolving Subfacility and (b) the Non-LC/Swing Line Revolving Subfacility.

"RP Eligible Proceeds": Net Cash Proceeds from Dispositions permitted under Sections 9.5(c)(ii), 9.5(c)(vi), 9.5(c)(vii), 9.5(c)(viii) and 9.5(c)(xiii).

"S&P": Standard & Poor's Ratings Services, a subsidiary of The McGraw-Hill Companies, Inc., and any successor thereto.

"SEC": the Securities and Exchange Commission (or successors thereto or an analogous federal Governmental Authority).

"Second Lien Credit Agreement": the Second Lien Credit Agreement dated as of the date hereof among Parent, Holdings, the Borrower, the Subsidiary Guarantors, the lenders thereunder and Goldman Sachs Lending Partners LLC, as administrative agent thereunder, as the same may be amended (including any amendment and restatement thereof), supplemented or otherwise modified from time to time, and including any agreement, instrument or other document extending the maturity of, refinancing, replacing, renewing, refunding or otherwise restructuring all or a portion of the Indebtedness under such agreement or any successor or replacement agreement and whether by the same or any other agent, lender or group of lenders.

"Second Lien Credit Documents": the Second Lien Credit Agreement and all agreements, instruments and documents executed and delivered pursuant to or in connection with any of the foregoing in connection with the Second Lien Credit Agreement or any Permitted Second Lien Refinancing Indebtedness (including indentures, notes, guarantees, security agreements, mortgages and other collateral documents), in each case, as such agreements, instruments or other documents may be amended, amended and restated, supplemented, modified, refunded, renewed or extended, refinanced, replaced or otherwise restructured as permitted under this Agreement and the Intercreditor Agreement, in whole or in part from time to time with respect to all or any portion of the Indebtedness under such agreement or agreements or any successor replacement agreement or agreements and whether by the same or any other agent, lender or group of lenders.

"Security Documents": the collective reference to the Guarantee and Collateral Agreement (and all assumptions thereof), the Mortgages and all other security documents which shall have been delivered on or prior to the Closing Date, or are hereafter delivered to the Administrative Agent granting a Lien on any Property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document, as the same have been, and on and after the Closing Date shall be modified, amended, amended and restated, restated or supplemented in accordance herewith.

"Senior Secured Debt": as at the last day of any Measurement Period, the sum of (a) the aggregate outstanding principal amount of all Indebtedness (other than Revolver Indebtedness and the undrawn portion of any outstanding letters of credit) of the Borrower and its Subsidiaries hereunder and under the Second Lien Credit Agreement or

- 34 -

that otherwise is secured by property or assets of the Borrower and its Subsidiaries and that would, in conformity with GAAP, be set forth on the balance sheet of the Borrower and its Subsidiaries on such date (determined on a consolidated basis without duplication in accordance with GAAP), plus (b) the average of the amount of Revolver Indebtedness outstanding on such last day and on the last day of each of the three immediately preceding fiscal quarters. For purposes of computing clause (b) above, the parties agree that the Revolver Indebtedness as of each of September 30, 2009, December 31, 2009 and March 31, 2010 was $0.

"Senior Secured Leverage Ratio": as at any date, the ratio of (a) Senior Secured Debt as at such date to (b) Borrower Consolidated Adjusted EBITDA for the Measurement Period most recently ended prior to such date.

"SFO Notes":  as defined in Section 7.1(t).

"Shared Services Agreement":  the Amended and Restated Shared Services Agreement, dated as of January 1, 2006, among Parent, Holdings, the Borrower and PP Data Services Inc., a Subsidiary of Holdings, as the same may be amended in a manner not materially adverse to the interests of the Lenders.

"Single Employer Plan":  any Plan that is covered by Title IV of ERISA, but which is not a Multiemployer Plan.

"Solvent":  with respect to any Person, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (d) such Person will be able to pay its debts as they mature. For purposes of this definition, (i) "debt" means liability on a "claim", (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured and (iii) assets shall include insurance coverage and/or indemnification available with respect to any liability.

"Specified Cash Management Agreement":  any agreement, or any Guarantee of any agreement, providing for treasury, depositary, purchasing card or cash management services, including in connection with any automated clearing house transfers of funds or any similar transactions, between Parent, Holdings, the Borrower or any Subsidiary Guarantor and any Qualified Counterparty.

Error! Unknown document property name.

"Specified Hedge Agreement": any Hedging Agreement entered into by Parent, Holdings, the Borrower or any Subsidiary Guarantor and any Qualified Counterparty.

"Subordinated Indemnity Agreement": the Subordinated Indemnity Agreement, dated as of April 1, 1998, among Parent, GP Holdings Inc., Time Warner Inc., Warner Bros. Entertainment Inc. (as successor to Time Warner Entertainment Company, L.P.), TW-SPV Co., Holdings, the Borrower, SFOG II, Inc. and SFT Holdings, Inc., as the same may be modified or amended at any time from time to time, provided such modification or amendment does not violate Section 9.14.

"Subsidiary": as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership, limited liability company or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person; provided that, notwithstanding the foregoing, each of the Partnership Parks Entities will be deemed to be a Subsidiary of Parent for all purposes under this Agreement, provided further that none of the joint ventures established pursuant to the Great Escape Agreements, any Inactive Subsidiary, Six Flags Over Texas Fund, Ltd. or Six Flags Fund, Ltd. will be deemed to be a Subsidiary of Parent for any purpose under this Agreement. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of Parent.

"Subsidiary Guarantor": each Subsidiary of the Borrower other than (a) any Excluded Foreign Subsidiary, (b) Flags Beverages, Inc., Fiesta Texas Hospitality LLC and any other Subsidiary whose only material asset is a liquor license, (c) HWP, (d) HWP Development Holdings LLC, (e) SFRCC Corp., (f) any Inactive Subsidiary and (g) after the Closing Date, any non-Wholly Owned Subsidiary that does not execute the Guarantee and Collateral Agreement as permitted by Section 8.6.

"Swing Line Commitment": the obligation of the Swing Line Lender to make Swing Line Loans pursuant to Section 4.9 in an aggregate principal amount at any one time outstanding not to exceed $15,000,000.

"Swing Line Exposure": at any time, the aggregate principal amount of all Swing Line Loans outstanding at such time. The Swing Line Exposure of any Lender in respect of any Swing Line Loan shall be its LC/Swing Line Revolving Percentage of the principal amount of such Swing Line Loan.

"Swing Line Lender": JPMorgan Chase Bank, N.A., in its capacity as the lender of Swing Line Loans.

"Swing Line Loans": as defined in Section 4.9.

"Swing Line Participation Amount": as defined in Section 4.10(c).

- 36 -

"Tax Sharing Agreement": that certain Tax Sharing Agreement, effective as of January 1, 1999 and as amended on or prior to the Closing Date, among Parent, Holdings, and those Subsidiaries which are parties thereto, as the same may be modified or amended at any time from time to time, provided such modification or amendment does not violate Section 9.14.

"Taxes": any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority.

"Time Warner": Historic TW Inc. and/or its affiliates.

"Total LC/Swing Line Extensions of Credit": at any time, the aggregate amount of the LC/Swing Line Extensions of Credit of the LC/Swing Line Revolving Lenders outstanding at such time.

"Total LC/Swing Line Revolving Commitments": at any time, the aggregate amount of the LC/Swing Line Revolving Commitments then in effect.

"Total Non-LC/Swing Line Extensions of Credit": at any time, the aggregate amount of the Non-LC/Swing Line Extensions of Credit of the Non-LC Swing Line Revolving Lenders outstanding at such time.

"Total Non-LC/Swing Line Revolving Commitments": at any time, the aggregate amount of the Non-LC/Swing Line Revolving Commitments then in effect.

"Total Revolving Credit Commitments": at any time, the aggregate amount of the Revolving Credit Commitments then in effect.

"Total Revolving Extensions of Credit": at any time, the aggregate amount of the Revolving Extensions of Credit of the Revolving Credit Lenders outstanding at such time.

"Tranche B Maturity Date": June 30, 2016.

"Tranche B Prepayment Amount": as defined in Section 5.11(d).

"Tranche B Term Loan": as defined in Section 2.1.

"Tranche B Term Loan Commitment": as to any Lender, the obligation of such Lender, if any, to make a Tranche B Term Loan to the Borrower hereunder in a principal amount not to exceed the amount set forth under the heading "Tranche B Term Loan Commitment" opposite such Lender's name on Schedule 1 to the Lender Addendum delivered by such Lender, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The aggregate amount of the Tranche B Term Loan Commitments on the Closing Date is $770,000,000.

"Tranche B Term Loan Facility": as defined in the definition of "Facility" in this Section 1.1.

"Tranche B Term Loan Lender": each Lender that has a Tranche B Term Loan Commitment or is the holder of a Tranche B Term Loan.

"Tranche B Term Loan Percentage": as to any Lender at any time, the percentage which the principal amount of such Lender's Tranche B Term Loan then outstanding constitutes of the aggregate principal amount of all Tranche B Term Loans then outstanding.

"Transactions": (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is or is to be a party, the borrowing of Loans, the use of the proceeds thereof and the issuance of Letters of Credit hereunder, (b) the execution, delivery and performance by each Loan Party of the Second Lien Loan Documents to which it is or is to be a party, the borrowings under the Second Lien Loan Documents and the use of the proceeds thereof, and (c) the transactions consummated in connection with the Plan of Reorganization.

"Transferee": as defined in Section 12.15.

"TW": TW-SF LLC, a Delaware limited liability company or its permitted successors and assigns.

"Type": as to any Loan, its nature as a Base Rate Loan or a Eurocurrency Loan.

"Uniform Commercial Code": the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York; provided, however, that in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority (but not attachment) and for purposes of definitions related to such provisions.

"Unrestricted Cash": all cash that is not restricted cash, as determined in accordance with GAAP.

"U.S.A. PATRIOT Act": (a) the Trading with the Enemy Act, as amended, and each of the foreign asset control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, as amended or modified from time to time.

"Wholly Owned Non-Guarantor Foreign Subsidiary": as defined in Section 9.3(f).

Error! Unknown document property name.

"Wholly Owned Subsidiary": with respect to any Person, any corporation, partnership, limited liability company or other entity of which all of the equity securities or other ownership interests (other than, in the case of a corporation, directors' qualifying shares or equity interests held by foreign nationals, in each case to the extent mandated by applicable law) are directly or indirectly owned or controlled by such Person or one or more Wholly Owned Subsidiaries of such Person.

"Withdrawal Liability": liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part 1 of Subtitle E of Title IV of ERISA.

1.2.    Other Definitional Provisions. (a) Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b) As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, accounting terms relating to Parent, Holdings and its Subsidiaries not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP; provided that to the extent any Person does not constitute a Subsidiary of the Parent and the Parent and its Subsidiaries do not own more than a majority of the Capital Stock of such Person, such Person shall not be required to be consolidated with the Parent or any of its Subsidiaries for any purposes of the Loan Documents regardless of the requirements of GAAP.

(c) The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d) Except as specifically provided herein, the meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e) Each reference to the "Credit Agreement" in any Loan Document shall be deemed to be a reference to this Agreement, as amended, restated and supplemented from time to time after the date hereof.

(f) When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

(g) Notwithstanding any other provision contained herein, all computations of amounts and ratios referred to in this Agreement shall be made without giving effect to any election under FASB ASC Topic 825 "Financial Instruments" (or any other financial accounting standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower at "fair value" as defined therein.

Error! Unknown document property name.

# SECTION 2.  AMOUNT AND TERMS OF TRANCHE B
## TERM LOAN COMMITMENTS

2.1.    <u>Tranche B Term Loan Commitments</u>.  Subject to the terms and conditions hereof, the Tranche B Term Loan Lenders severally agree to make term loans denominated in Dollars (each, a "<u>Tranche B Term Loan</u>") to the Borrower on the Closing Date in an amount for each Tranche B Term Loan Lender not to exceed the Tranche B Term Loan Commitment of such Lender.  The Tranche B Term Loans may from time to time be Eurocurrency Loans or Base Rate Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.2 and 5.6.

2.2.    <u>Procedure for Term Loan Borrowing</u>.  The Borrower shall deliver to the Administrative Agent irrevocable notice (which notice must be received by the Administrative Agent prior to 12:00 Noon, New York City time, (i) three Business Days prior to the anticipated Closing Date, in the case of Eurocurrency Loans and (ii) one Business Day prior to the anticipated Closing Date, in the case of Base Rate Loans) requesting that the Tranche B Term Loan Lenders make the Tranche B Term Loans on the Closing Date and specifying the amount to be borrowed.  No Tranche B Term Loan may be converted into or continued as a Eurocurrency Loan having an interest period in excess of one month prior to the date that is 30 days after the Closing Date.  Upon receipt of such notice the Administrative Agent shall promptly notify each Tranche B Term Loan Lender thereof.  Not later than 12:00 Noon, New York City time, on the Closing Date each Tranche B Term Loan Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the Tranche B Term Loan to be made by such Lender.

2.3.    <u>Repayment of Tranche B Term Loans</u>.  The Tranche B Term Loan of each Tranche B Term Loan Lender shall mature in 14 installments, commencing on March 31, 2013, each of which shall be in an amount equal to such Lender's Tranche B Term Loan Percentage multiplied by the amount set forth below opposite such installment and on the date indicated for such installment:

| Installment | Principal Amount |
| --- | --- |
| March 31, 2013 | $1,925,000.00 |
| June 30, 2013 | $1,925,000.00 |
| September 30, 2013 | $1,925,000.00 |
| December 31, 2013 | $1,925,000.00 |
| March 31, 2014 | $1,925,000.00 |
| June 30, 2014 | $1,925,000.00 |
| September 30, 2014 | $1,925,000.00 |
| December 31, 2014 | $1,925,000.00 |
| March 31, 2015 | $1,925,000.00 |
| June 30, 2015 | $1,925,000.00 |
| September 30, 2015 | $1,925,000.00 |
| December 31, 2015 | $1,925,000.00 |
| March 31, 2016 | $1,925,000.00 |
| Tranche B Maturity Date | $744,975,000.00 |

Error! Unknown document property name.

SECTION 3.   AMOUNT AND TERMS OF THE REVOLVING FACILITIES
COMMITMENTS AND SWING LINE COMMITMENT

3.1.    Revolving Credit Commitments. (a) Subject to the terms and conditions hereof, (i) the LC/Swing Line Revolving Lenders severally agree to make revolving credit loans denominated in Dollars ("LC/Swing Line Revolving Loans") to the Borrower from time to time during the Revolving Facility Commitment Period in an aggregate principal amount at any one time outstanding for each LC/Swing Line Revolving Lender which, when added to such Lender's LC/Swing Line Revolving Percentage of the sum of (x) the L/C Obligations then outstanding and (y) the aggregate principal amount of the Swing Line Loans then outstanding, does not exceed the amount of such Lender's LC/Swing Line Revolving Commitment and (ii) the Non-LC/Swing Line Revolving Lenders severally agree to make revolving credit loans denominated in Dollars ("Non-LC/Swing Line Revolving Loans"; together with the LC/Swing Line Revolving Loans, the "Revolving Credit Loans") to the Borrower from time to time during the Revolving Facility Commitment Period in an aggregate principal amount at any one time outstanding for each Non-LC/Swing Line Revolving Lender which does not exceed the amount of such Lender's Non-LC/Swing Line Revolving Commitment. During the Revolving Facility Commitment Period the Borrower may use the Revolving Credit Commitments by borrowing, prepaying the Revolving Credit Loans in whole or in part, and reborrowing, all in accordance with the terms and conditions hereof. The Revolving Credit Loans may from time to time be Eurocurrency Loans or Base Rate Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 3.2 and 5.6, provided that no Revolving Credit Loan shall be made as a Eurocurrency Loan after the day that is one month prior to the Revolving Facility Termination Date.

(b) The Borrower shall repay all outstanding Revolving Credit Loans on or before the Revolving Facility Termination Date.

3.2.    Procedure for Revolving Credit Borrowing. The Borrower may borrow under the Revolving Credit Commitments on any Business Day during the Revolving Facility Commitment Period, provided that the Borrower shall give the Administrative Agent irrevocable notice (which notice must be received by the Administrative Agent prior to 12:00 Noon, New York City time, (a) three Business Days prior to the requested Borrowing Date, in the case of Eurocurrency Loans, or (b) one Business Day prior to the requested Borrowing Date, in the case of Base Rate Loans), specifying (i) the amount and Type of Revolving Credit Loans to be borrowed, (ii) the Revolving Subfacility under which such Revolving Credit Loans are to be borrowed; provided that each borrowing shall be considered to be a Non-LC/Swing Line Revolving Loan to the extent of the aggregate Available Non-LC/Swing Line Revolving Commitments, unless otherwise notified by the Borrower, (iii) the requested Borrowing Date and (iv) in the case of Eurocurrency Loans, the length of the initial Interest Period therefor. Each borrowing of Revolving Credit Loans under the Revolving Credit Commitments shall be in an amount equal to (x) in the case of Base Rate Loans, $1,000,000 or a whole multiple thereof (or, if the then aggregate Available LC/Swing Line Revolving Commitments or Available Non-LC/Swing Line Revolving Commitments, as applicable, are less than $1,000,000, such lesser

- 41 -

amount) and (y) in the case of Eurocurrency Loans, $5,000,000 or a whole multiple of $1,000,000 in excess thereof; provided, that the Swing Line Lender may request, on behalf of the Borrower, borrowings of Base Rate Loans under the Revolving Credit Commitments in other amounts pursuant to Section 4.10. Upon receipt of any such notice from the Borrower, the Administrative Agent shall promptly notify each Revolving Credit Lender thereof. Each Revolving Credit Lender will make its Pro Rata Share of the amount of each borrowing of Revolving Credit Loans available to the Administrative Agent for the account of the Borrower at the Funding Office prior to 12:00 Noon, New York City time, on the Borrowing Date requested by the Borrower in funds immediately available to the Administrative Agent. Such borrowing will then be made available to the Borrower by the Administrative Agent in like funds as received by the Administrative Agent.

3.3.    Increase in Revolving Credit Commitments. The Borrower may, at its option, at any time or from time to time prior to the Revolving Facility Termination Date, increase the Revolving Credit Commitments to be in an aggregate principal amount of up to $150,000,000 by requesting existing Lenders or new lenders to commit to any such increase; provided that (a) no Lender shall be required to commit to any such increase, (b) no such increase shall become effective unless at the time thereof and after giving effect thereto (i) no Default or Event of Default shall have occurred and be continuing, (ii) each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects, except to the extent such representations and warranties expressly relate to an earlier time, in which case such representations and warranties were true and correct in all material respects as of such earlier time, provided, that, to the extent any such representation and warranty is already qualified by materiality or by reference to material adverse effect, such representation shall be true and correct in all respects and (iii) the Administrative Agent shall have received a certificate from the Borrower to the effect of (i) and (ii) of clause (b), (c) the Administrative Agent shall have received a legal opinion reasonably satisfactory to it as to such increase and (d) no Lender or new lender shall become an LC/Swing Line Revolving Lender pursuant to this Section 3.3 unless the Administrative Agent and Issuing Lender shall have given their prior written consent.

SECTION 4.    LETTERS OF CREDIT; SWING LINE LOANS

4.1.    L/C Commitment. (a) Prior to the Closing Date, the Existing Issuing Lender has issued the Existing Letters of Credit under the Existing Credit Agreement, which, from and after the Closing Date, shall constitute Letters of Credit hereunder. Subject to the terms and conditions hereof, each Issuing Lender, in reliance on the agreements of the other LC/Swing Line Revolving Lenders set forth in Section 4.4(a), agrees to issue letters of credit (the letters of credit issued on and after the Closing Date pursuant to this Section 4, the "Letters of Credit") for the account of the Borrower on any Business Day during the Revolving Facility Commitment Period in such form as may be approved from time to time by such Issuing Lender; provided, that no Issuing Lender shall have any obligation to issue any Letter of Credit if, after giving effect to such issuance, (i) the outstanding L/C Obligations would exceed the L/C Commitment, (ii) the sum of (x) the L/C Obligations plus (y) the aggregate principal amount of Swing Line Loans outstanding at any time, plus (z) the aggregate amount of LC/Swing Line Revolving Loans then outstanding would exceed the LC/Swing Line Revolving Commitment or

- 42 -

(iii) the sum of (x) the L/C Obligations, plus (y) the aggregate principal amount of Swing Line Loans outstanding at any time plus (z) the aggregate amount of Revolving Credit Loans then outstanding would exceed the Total Revolving Credit Commitment. Each Letter of Credit shall (i) be denominated in Dollars and (ii) expire no later than the earlier of (x) the first anniversary of its date of issuance and (y) the date which is five Business Days prior to the Revolving Facility Termination Date, provided that any Letter of Credit with a one-year term may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (y) above).

(b) No Issuing Lender shall at any time be obligated to issue any Letter of Credit hereunder if such issuance would conflict with, or cause such Issuing Lender or any L/C Participant to exceed any limits imposed by, any applicable Requirement of Law.

4.2.    Procedure for Issuance of Letter of Credit. The Borrower may from time to time request that an Issuing Lender issue a Letter of Credit by delivering to such Issuing Lender at its address for notices specified herein an Application therefor, completed to the reasonable satisfaction of such Issuing Lender, and such other certificates, documents and other papers and information as such Issuing Lender may request. Upon receipt of any Application, an Issuing Lender will process such Application and the certificates, documents and other papers and information delivered to it in connection therewith in accordance with its customary procedures and shall promptly issue the Letter of Credit requested thereby by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed to by such Issuing Lender and the Borrower (but in no event shall any Issuing Lender be required to issue any Letter of Credit earlier than three Business Days after its receipt of the Application therefor and all such other certificates, documents and other papers and information relating thereto). Promptly after issuance by an Issuing Lender of a Letter of Credit, such Issuing Lender shall furnish a copy of such Letter of Credit to the Borrower. Each Issuing Lender shall promptly furnish to the Administrative Agent, notice of the issuance of each Letter of Credit issued by it (including the amount thereof).

4.3.    Fees and Other Charges. (a) The Borrower will pay a fee on the aggregate daily average drawable amount of all outstanding Letters of Credit issued for the Borrower's account at a per annum rate equal to the Applicable Margin then in effect with respect to Eurocurrency Loans under the Revolving Credit Facility, shared ratably among the LC/Swing Line Revolving Lenders in accordance with their respective LC/Swing Line Revolving Percentages and payable quarterly in arrears on each L/C Fee Payment Date after the issuance date of any such Letter of Credit. In addition, the Borrower shall pay to the relevant Issuing Lender for its own account a fronting fee on the aggregate daily average drawable amount of all outstanding Letters of Credit issued for the Borrower's account by such Issuing Lender of an amount to be agreed upon by the Borrower and the relevant Issuing Lender, payable on such terms as are agreed to by the Borrower and the Issuing Lender.

(b) In addition to the foregoing fees, the Borrower shall pay or reimburse each Issuing Lender for such normal and customary costs and expenses as are incurred or charged by such Issuing Lender in issuing, negotiating, effecting payment under, amending or otherwise administering any Letter of Credit issued for the Borrower's account.

4.4.    L/C Participations.  (a) Each Issuing Lender irrevocably agrees to grant and hereby grants to each L/C Participant, and, to induce each Issuing Lender to issue Letters of Credit hereunder, each L/C Participant irrevocably agrees to accept and purchase and hereby accepts and purchases from each Issuing Lender, on the terms and conditions hereinafter stated, for such L/C Participant's own account and risk an undivided interest equal to such L/C Participant's LC/Swing Line Revolving Percentage in each Issuing Lender's obligations and rights under each Letter of Credit issued by such Issuing Lender hereunder and the amount of each draft paid by such Issuing Lender thereunder.  Each L/C Participant unconditionally and irrevocably agrees with each Issuing Lender that, if a draft is paid under any Letter of Credit issued by such Issuing Lender for which such Issuing Lender is not reimbursed in full by the Borrower in accordance with the terms of this Agreement, such L/C Participant shall pay to such Issuing Lender upon demand at such Issuing Lender's address for notices specified herein an amount equal to such L/C Participant's LC/Swing Line Revolving Percentage of the amount of such draft, or any part thereof, that is not so reimbursed.

(b) If any amount required to be paid by any L/C Participant to an Issuing Lender pursuant to Section 4.4(a) in respect of any unreimbursed portion of any payment made by such Issuing Lender under any Letter of Credit is not paid to such Issuing Lender within three Business Days after the date such payment is due, such L/C Participant shall pay to such Issuing Lender on demand an amount equal to the product of (i) such amount, times (ii) the daily average Federal Funds Effective Rate during the period from and including the date such payment is required to the date on which such payment is immediately available to such Issuing Lender, times (iii) a fraction the numerator of which is the number of days that elapse during such period and the denominator of which is 360.  If any such amount required to be paid by any L/C Participant pursuant to Section 4.4(a) is not made available to such Issuing Lender by such L/C Participant within three Business Days after the date such payment is due, such Issuing Lender shall be entitled to recover from such L/C Participant, on demand, such amount with interest thereon calculated from such due date at the rate per annum applicable to Base Rate Loans under the Revolving Credit Facility.  A certificate of such Issuing Lender submitted to any L/C Participant with respect to any such amounts owing under this Section shall be conclusive in the absence of manifest error.

(c) Whenever, at any time after an Issuing Lender has made payment under any Letter of Credit and has received from any L/C Participant its pro rata share of such payment in accordance with Section 4.4(a), such Issuing Lender receives any payment related to such Letter of Credit (whether directly from the Borrower or otherwise, including proceeds of collateral applied thereto by such Issuing Lender), or any payment of interest on account thereof, such Issuing Lender will distribute to such L/C Participant its pro rata share thereof; provided, however, that in the event that any such payment received by such Issuing Lender shall be required to be returned by such Issuing Lender, such L/C Participant shall return to such Issuing Lender the portion thereof previously distributed by such Issuing Lender to it.

4.5.    Reimbursement Obligation of the Borrower.  The Borrower agrees to reimburse each Issuing Lender for the amount of (a) such draft so paid and (b) any Other Taxes or expenses incurred by such Issuing Lender in connection with such payment (the amounts described in the foregoing clauses (a) and (b) in respect of any drawing, collectively, the "Payment Amount"), on the Business Day that the Borrower receives notice of such draft, if such

Error! Unknown document property name.

notice is received on such day (or if the Borrower shall have received such notice later than 10:00 A.M. New York City time on such Business Day, on the immediately following Business Day). Each such payment shall be made to such Issuing Lender at its address for notices specified herein in Dollars and in immediately available funds. Interest shall be payable on each Payment Amount from the date of the applicable drawing until payment in full at the rate set forth in (i) until the second Business Day following the date of the applicable drawing, Section 5.8(b) and (ii) thereafter, Section 5.8(c). Each drawing under any Letter of Credit shall (unless an event of the type described in Section 10(g), (h) or (i) shall have occurred and be continuing with respect to the Borrower, in which case the procedures specified in Section 4.4(a) for funding by L/C Participants shall apply) constitute a request by the Borrower to the Administrative Agent for a borrowing pursuant to Section 3.2 of Base Rate Loans in the amount of such drawing. The Borrowing Date with respect to such borrowing shall be the first date on which a borrowing of Revolving Credit Loans could be made, pursuant to Section 3.2, if the Administrative Agent had received a notice of such borrowing at the time the Administrative Agent receives notice from the relevant Issuing Lender of such drawing under such Letter of Credit.

4.6.  Obligations Absolute.  The Borrower's obligations under this Section 4 shall be absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment that the Borrower may have or have had against any Issuing Lender, any beneficiary of a Letter of Credit or any other Person. The Borrower also agrees with each Issuing Lender that such Issuing Lender shall not be responsible for, and the Borrower's Reimbursement Obligations under Section 4.5 shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even though such documents shall in fact prove to be invalid, fraudulent or forged, or any dispute between or among the Borrower and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of the Borrower against any beneficiary of such Letter of Credit or any such transferee. No Issuing Lender shall be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit, except for errors or omissions found to have resulted from the gross negligence or willful misconduct of such Issuing Lender. The Borrower agrees that any action taken or omitted by an Issuing Lender under or in connection with any Letter of Credit issued by it for the Borrower's account, or the related drafts or documents, if done in the absence of gross negligence or willful misconduct and in accordance with the standards of care specified in the Uniform Commercial Code of the State of New York, shall be binding on the Borrower and shall not result in any liability of such Issuing Lender to the Borrower.

4.7.  Letter of Credit Payments.  If any draft shall be presented for payment under any Letter of Credit, the relevant Issuing Lender shall promptly notify the Borrower of the date and amount thereof. The responsibility of the relevant Issuing Lender to the Borrower in connection with any draft presented for payment under any Letter of Credit shall, in addition to any payment obligation expressly provided for in such Letter of Credit issued by such Issuing Lender, be limited to determining that the documents (including each draft) delivered under such Letter of Credit in connection with such presentment are substantially in conformity with such Letter of Credit.

- 45 -

4.8.    Applications.  To the extent that any provision of any Application related to any Letter of Credit is inconsistent with the provisions of this Section 4, the provisions of this Section 4 shall apply.

4.9.    Swing Line Commitment.  (a) Subject to the terms and conditions hereof, the Swing Line Lender agrees that, during the Revolving Facility Commitment Period, it will make available to the Borrower in the form of swing line loans denominated in Dollars ("Swing Line Loans") a portion of the credit otherwise available to the Borrower under the LC/Swing Line Revolving Commitments; provided that (i) the aggregate principal amount of Swing Line Loans outstanding at any time shall not exceed the Swing Line Commitment, (ii) the aggregate principal amount of Swing Line Loans outstanding at any time, when aggregated with the L/C Obligations, shall not exceed the LC/Swing Line Revolving Commitments and (iii) the sum of (x) the aggregate principal amount of Swing Line Loans outstanding at any time plus (y) the L/C Obligations plus (z) the aggregate amount of Revolving Credit Loans then outstanding shall not exceed the Total Revolving Credit Commitment.  During the Revolving Facility Commitment Period, the Borrower may use the Swing Line Commitment by borrowing, repaying and reborrowing, all in accordance with the terms and conditions hereof.  Swing Line Loans shall be Base Rate Loans only.

(b) The Borrower shall repay all outstanding Swing Line Loans on or before the Revolving Facility Termination Date.

4.10.    Procedure for Swing Line Borrowing; Refunding of Swing Line Loans. (a) The Borrower may borrow under the Swing Line Commitment on any Business Day during the Revolving Facility Commitment Period, provided, the Borrower shall give the Swing Line Lender irrevocable telephonic notice confirmed promptly in writing (which telephonic notice must be received by the Swing Line Lender not later than 1:00 P.M., New York City time, on the proposed Borrowing Date), specifying (i) the amount to be borrowed and (ii) the requested Borrowing Date.  Each borrowing under the Swing Line Commitment shall be in an amount equal to $500,000 or a whole multiple of $100,000 in excess thereof.  Not later than 3:00 P.M., New York City time, on the Borrowing Date specified in the borrowing notice in respect of any Swing Line Loan, the Swing Line Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the amount of such Swing Line Loan.  The Administrative Agent shall make the proceeds of such Swing Line Loan available to the Borrower on such Borrowing Date in like funds as received by the Administrative Agent.

(b) The Swing Line Lender, at any time and from time to time in its sole and absolute discretion may, on behalf of the Borrower (which hereby irrevocably directs the Swing Line Lender to act on its behalf), on one Business Day's notice given by the Swing Line Lender no later than 12:00 Noon, New York City time, request each LC/Swing Line Revolving Lender to make, and each LC/Swing Line Revolving Lender hereby agrees to make, an LC/Swing Line Revolving Loan to the Borrower, in an amount equal to such LC/Swing Line Revolving Lender's LC/Swing Line Revolving Percentage of the aggregate amount of the Swing Line Loans (the "Refunded Swing Line Loans") outstanding on the date of such notice, to repay the Swing Line Lender.  Each LC/Swing Line Revolving Lender shall make the amount of such LC/Swing Line Revolving Loan available to the Administrative Agent at the relevant Funding Office in

- 46 -

immediately available funds, not later than 10:00 A.M., New York City time, one Business Day after the date of such notice. The proceeds of such LC/Swing Line Revolving Loans shall be made immediately available by the Administrative Agent to the Swing Line Lender for application by the Swing Line Lender to the repayment of the Refunded Swing Line Loans.

(c) If prior to the time a Swing Line Loan would have otherwise been made pursuant to Section 4.10(b), one of the events described in Section 10(g), (h) or (i) shall have occurred and be continuing with respect to the Borrower, or if for any other reason, as determined by the Swing Line Lender in its sole discretion, LC/Swing Line Revolving Loans may not be made as contemplated by Section 4.10(b), each LC/Swing Line Revolving Lender shall, on the date such LC/Swing Line Revolving Loan was to have been made pursuant to the notice referred to in Section 4.10(b) (the "Refunding Date"), purchase for cash an undivided participating interest in the then outstanding Swing Line Loans by paying to the Swing Line Lender an amount (the "Swing Line Participation Amount") equal to (i) such LC/Swing Line Revolving Lender's LC/Swing Line Revolving Percentage times (ii) the sum of the aggregate principal amount of Swing Line Loans then outstanding which were to have been repaid with such LC/Swing Line Revolving Loans.

(d) Whenever, at any time after the Swing Line Lender has received from any LC/Swing Line Revolving Lender such Lender's Swing Line Participation Amount, the Swing Line Lender receives any payment on account of the Swing Line Loans, the Swing Line Lender will distribute to such Lender its Swing Line Participation Amount (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's participating interest was outstanding and funded and, in the case of principal and interest payments, to reflect such Lender's pro rata portion of such payment if such payment is not sufficient to pay the principal of and interest on all Swing Line Loans then due); provided, however, that in the event that such payment received by the Swing Line Lender is required to be returned, such LC/Swing Line Revolving Lender will return to the Swing Line Lender any portion thereof previously distributed to it by the Swing Line Lender.

(e) Each LC/Swing Line Revolving Lender's obligation to make the LC/Swing Line Revolving Loans referred to in Section 4.10(b) and to purchase participating interests pursuant to Section 4.10(c) shall be absolute and unconditional and shall not be affected by any circumstance, including, without limitation, (i) any setoff, counterclaim, recoupment, defense or other right which such LC/Swing Line Revolving Lender or the Borrower may have against the Swing Line Lender, the Borrower or any other Person for any reason whatsoever; (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Section 7.2; (iii) any adverse change in the condition (financial or otherwise) of Parent, Holdings or the Borrower; (iv) any breach of this Agreement or any other Loan Document by Parent, Holdings or the Borrower, any other Loan Party or any other Lender; or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

## SECTION 5.   CERTAIN PROVISIONS APPLICABLE TO
## THE LOANS AND THE LETTERS OF CREDIT

5.1.    Repayment of Loans; Evidence of Debt.  (a) The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the appropriate Lender (i) the then unpaid principal amount of each Revolving Credit Loan and Swing Line Loan made by such Lender to the Borrower, on the Revolving Facility Termination Date (or on such earlier date on which the Loans become due and payable pursuant to Section 10) and (ii) the principal amount of the Tranche B Term Loan made by such Lender to the Borrower, in installments according to the amortization schedule set forth in Section 2.3 (or on such earlier date on which the Loans become due and payable pursuant to Section 10).  The Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans made to it from time to time outstanding from the date of such Loans until payment in full thereof at the rates per annum, and on the dates, set forth in Section 5.8.

(b) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of the Borrower to such Lender resulting from each Loan of such Lender to the Borrower from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c) The Administrative Agent, on behalf of the Borrower, shall maintain the Register pursuant to Section 12.6(b)(iv), and a subaccount therein for each Lender, in which shall be recorded (i) the amount of each Loan made or continued hereunder and any Note evidencing such Loan, the Type of such Loan and each Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) both the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d) The entries made in the Register and the accounts of each Lender maintained pursuant to Section 5.1(b) shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

(e) The Borrower agrees that, upon the request to the Administrative Agent by any Lender, the Borrower will execute and deliver to such Lender a promissory note of the Borrower evidencing any Tranche B Term Loans, Revolving Credit Loans or Swing Line Loans, as the case may be, of such Lender, substantially in the forms of Exhibit G-1, G-2 or G-3, respectively, with appropriate insertions as to date and principal amount.

5.2.    Commitment Fees, Etc.  (a) The Borrower agrees to pay to the Administrative Agent for the account of each LC/Swing Line Revolving Lender and Non-LC/Swing Line Revolving Lender a commitment fee for the period from and including the Closing Date to the last day of the Revolving Facility Commitment Period, computed at the Commitment Fee Rate on the average daily amount of the Available LC/Swing Line Revolving

Commitment and Available Non-LC/Swing Line Revolving Commitment, respectively, of such Lender during the period for which payment is made, payable quarterly in arrears on the last day of each March, June, September and December and on the Revolving Facility Termination Date, commencing on the first of such dates to occur after the date hereof.

(b) The Borrower agrees to pay to the Administrative Agent the fees in the amounts and on the dates from time to time agreed to in writing by the Borrower and the Administrative Agent.

5.3.    Termination or Reduction of Revolving Credit Commitments.  The Borrower shall have the right, upon not less than three Business Days' notice to the Administrative Agent, to (i) terminate the Non-LC/Swing Line Revolving Commitments or, from time to time, to reduce the aggregate amount of the Non-LC/Swing Line Revolving Commitments and (ii) terminate the LC/Swing Line Revolving Commitments or, from time to time, to reduce the aggregate amount of the LC/Swing Line Revolving Commitments; provided, that such termination or reduction shall be permitted only to the extent that (x) with respect to Non-LC/Swing Line Revolving Commitments, after giving effect thereto and to any prepayments of the Non-LC/Swing Line Revolving Loans thereof, the Total Non-LC/Swing Line Extensions of Credit do not exceed the Total Non-LC/Swing Line Revolving Commitments and (y) with respect to LC/Swing Line Revolving Commitments, after giving effect thereto and to any prepayments of the Swing Line Loans made on the effective date thereof, (A) the sum of the aggregate principal amount of Swing Line Loans outstanding at any time shall not exceed the Swing Line Commitment and (B) the sum of (x) the aggregate principal amount of Swing Line Loans outstanding at any time plus (y) the L/C Obligations shall not exceed the LC/Swing Line Revolving Commitments.  Any such reduction shall be in an amount equal to $1,000,000, or a whole multiple thereof, and shall reduce permanently the Revolving Credit Commitments then in effect.

5.4.    Optional Prepayments.  The Borrower may at any time and from time to time prepay the Loans made to it, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Administrative Agent at least three Business Days prior thereto in the case of Eurocurrency Loans and at least one Business Day prior thereto in the case of Base Rate Loans, which notice shall specify the date and amount of prepayment and whether the prepayment is of Eurocurrency Loans or Base Rate Loans; provided, that (a) if a Eurocurrency Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 5.14 and (b) no prior notice is required for the prepayment of Swing Line Loans.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with (except in the case of Revolving Credit Loans that are Base Rate Loans and Swing Line Loans) accrued interest to such date on the amount prepaid.  Partial prepayments of Loans (other than Swing Line Loans) shall be in an aggregate principal amount of $1,000,000 or a whole multiple thereof.  Partial prepayments of Swing Line Loans shall be in an aggregate principal amount of $100,000 or a whole multiple thereof.  Notwithstanding anything to the contrary in this Section 5.4, any prepayment or repricing of the Tranche B Term Loans effected on or prior to the first anniversary of the Closing Date as a result of a Repricing Transaction shall be accompanied by a fee equal to 1.00% of the principal amount of Tranche B Term Loans

Error! Unknown document property name.

prepaid or repriced, unless such fee is waived by the applicable Tranche B Term Loan Lender. If in connection with a Repricing Transaction on or prior to such first anniversary any Lender is replaced as a result of its being a Non-Consenting Lender in respect of such Repricing Transaction pursuant to Section 5.17, such Lender shall be entitled to the fee provided under this Section 5.4.

5.5.    Mandatory Prepayments and Commitment Reductions. (a) If any Indebtedness shall be incurred by Parent, Holdings or the Borrower or any of its Subsidiaries (excluding any Indebtedness permitted by Section 9.3 other than (i) Section 9.3(a) (to the extent pertaining to any refinancing, refund, replacement or renewal of Indebtedness pursuant to the Loan Documents), (ii) Section 9.3(n)(i) (to the extent the Net Cash Proceeds of such Indebtedness are not applied by the Borrower to purchase Tranche B Term Loans pursuant to an Auction as set forth in Section 5.19) and (iii) subclauses (ii) and (iii) of 9.3(n)), then, on the date of such incurrence the Tranche B Term Loans shall be prepaid, by an amount equal to the IP Percentage (or as set forth in Section 9.3(n)(ii)) of the Net Cash Proceeds of such incurrence, as set forth in Section 5.5(d).

(b) If on any date the Borrower or any of its Subsidiaries shall receive Net Cash Proceeds from any Asset Sale or Recovery Event, the Loans shall be prepaid, on or before the date which is five days following the date of receipt of such Net Cash Proceeds, by an amount equal to the amount of such Net Cash Proceeds, as set forth in Section 5.5(d); provided that, notwithstanding the foregoing, no prepayment of the Loans shall be required to be made under this Section 5.5(b) in respect of (i) the Net Cash Proceeds received by the Borrower or any of its Subsidiaries from any Asset Sale or Recovery Event in respect of which a Reinvestment Notice has been delivered (or is delivered within 30 days), so long as, on each Reinvestment Prepayment Date, the Loans shall be prepaid by an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Asset Sale or Recovery Event, as set forth in Section 5.5(d) and (ii) RP Eligible Proceeds, to the extent such RP Eligible Proceeds are used within 90 days of the Disposition which is the source of such RP Eligible Proceeds to make a Restricted Payment permitted to be made under Section 9.6(h), in an aggregate amount not to exceed $300,000,000.

(c) Subject to the last sentence of this paragraph, if, for any fiscal year of the Borrower commencing with the fiscal year ending December 31, 2011, there shall be Excess Cash Flow, then, on the relevant Excess Cash Flow Application Date, the Tranche B Term Loans shall be prepaid by an amount equal to 50% of such Excess Cash Flow during such fiscal year as set forth in Section 5.5(d). Each such prepayment shall be made on July 15 of the following fiscal year, beginning on July 15, 2012 (an "Excess Cash Flow Application Date").

(d) Amounts to be applied in connection with prepayments made pursuant to this Section shall be applied, first, to the prepayment of the Tranche B Term Loans, second, after the Tranche B Term Loans have been prepaid in full, to prepay the Revolving Credit Loans and/or Swing Line Loans pro rata according to the respective Pro Rata Share of the relevant Lender (in each case without any corresponding reduction of the Commitments hereunder), third, to the prepayment of outstanding loans under the Second Lien Credit Agreement and fourth, to cash collateralize outstanding Letters of Credit. The application of any prepayment of Loans under any Facility pursuant to this Section shall be made, first, to Base Rate Loans under such Facility

and, second, to Eurocurrency Loans under such Facility. Each prepayment of the Loans under this Section (except in the case of Revolving Credit Loans and Swing Line Loans) shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid. Pending the final application of Net Cash Proceeds, the Borrower may temporarily prepay outstanding Revolving Credit Loans and/or Swing Line Loans or otherwise make Permitted Investments.

Notwithstanding any of the other provisions of this Section 5.5, so long as no Event of Default shall have occurred and be continuing, if any prepayment of Eurocurrency Loans is required to be made under this Section 5.5 prior to the last day of the Interest Period therefor and less than three months are remaining in such Interest Period, in lieu of making any payment pursuant to this Section 5.5 in respect of any such Eurocurrency Loan prior to the last day of the Interest Period therefor, the Borrower may, in its sole discretion, deposit the amount of any such prepayment otherwise required to be made into a cash collateral account maintained with the Administrative Agent until the last day of such Interest Period, at which time the Administrative Agent shall be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of such Loans in accordance with this Section 5.5. Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent shall also be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of the outstanding Loans in accordance with the relevant provisions of this Section 5.5.

5.6.  Conversion and Continuation Options. (a) The Borrower may elect from time to time to convert Eurocurrency Loans of the Borrower under any Facility to Base Rate Loans under such Facility by giving the Administrative Agent at least two Business Days' prior irrevocable notice of such election, provided that any such conversion of Eurocurrency Loans may be made only on the last day of an Interest Period with respect thereto. The Borrower may elect from time to time to convert Base Rate Loans under any Facility to Eurocurrency Loans under such Facility by giving the Administrative Agent at least three Business Days' prior irrevocable notice of such election (which notice shall specify the length of the initial Interest Period therefor), provided that no Base Rate Loan under a particular Facility may be converted into a Eurocurrency Loan (i) when any Event of Default has occurred and is continuing and the Administrative Agent has, or the Majority Term Lenders or the Majority Revolving Lenders, as applicable, have determined in its or their sole discretion not to permit such conversions or (ii) after the date that is one month prior to the final scheduled termination or maturity date of such Facility. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b) The Borrower may elect to continue any Eurocurrency Loan under any Facility as Eurocurrency Loans upon the expiration of the then current Interest Period with respect thereto by giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Loans, provided that no Eurocurrency Loan under a particular Facility may be continued as such (i) when any Event of Default has occurred and is continuing and the Administrative Agent has, or the Majority Term Lenders or the Majority Revolving Lenders, as applicable, have determined in its or their sole discretion not to permit such continuations or (ii) after the date that is one month prior to the final scheduled termination or maturity date of such Facility, and provided, further, that if the Borrower shall fail to give any

required notice as described above in this paragraph or if such continuation is not permitted pursuant to the preceding proviso, such Loans shall be converted automatically to Base Rate Loans on the last day of such then expiring Interest Period. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

5.7. <u>Minimum Amounts and Maximum Number of Eurocurrency Tranches</u>. Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions, continuations and optional prepayments of Eurocurrency Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the Eurocurrency Loans comprising each Eurocurrency Tranche shall be equal to $5,000,000 or a whole multiple of $1,000,000 in excess thereof and (b) no more than 12 Eurocurrency Tranches shall be outstanding at any one time.

5.8. <u>Interest Rates and Payment Dates</u>. (a) Each Eurocurrency Loan under each Facility shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurocurrency Rate determined for such day plus the Applicable Margin for such Facility.

(b) Each Base Rate Loan under each Facility shall bear interest at a rate per annum equal to the Base Rate <u>plus</u> the Applicable Margin for such Facility.

(c) (i) If all or a portion of the principal amount of any Loan or Reimbursement Obligation shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), all outstanding Loans and Reimbursement Obligations (whether or not overdue) shall bear interest at a rate per annum that is equal to (x) in the case of the Loans, the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section <u>plus</u> 2% or (y) in the case of Reimbursement Obligations, the rate applicable to Base Rate Loans under the Revolving Credit Facility <u>plus</u> 2%, and (ii) if all or a portion of any interest payable on any Loan or Reimbursement Obligation or any commitment fee or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate then applicable to Base Rate Loans under the relevant Facility <u>plus</u> 2% (or, in the case of any such other amounts that do not relate to a particular Facility, the rate then applicable to Base Rate Loans under the Revolving Credit Facility <u>plus</u> 2%), in each case, with respect to clauses (i) and (ii) above, from the date of such non-payment until such amount is paid in full (after as well as before judgment).

(d) Interest shall be payable in arrears on each Interest Payment Date, <u>provided</u> that interest accruing pursuant to paragraph (c) of this Section shall be payable from time to time on demand.

5.9. <u>Computation of Interest and Fees</u>. (a) Interest, fees and commissions payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to Base Rate Loans on which interest is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of a Eurocurrency Rate. Any change in the interest rate on a Loan resulting from a change in the

Base Rate or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

(b) Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error. The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 5.8(a).

5.10. <u>Inability to Determine Interest Rate</u>. If prior to the first day of any Interest Period:

(a) the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Borrower) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurocurrency Rate for such Interest Period, or

(b) the Administrative Agent shall have received notice from the Majority Term Lenders or the Majority Revolving Lenders, as applicable, that the Eurocurrency Rate to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrower and the relevant Lenders as soon as practicable thereafter. If such notice is given (x) any Eurocurrency Loans under the relevant Facility requested to be made on the first day of such Interest Period shall be made as Base Rate Loans, (y) any Loans under the relevant Facility that were to have been converted on the first day of such Interest Period to Eurocurrency Loans shall be continued as Base Rate Loans and (z) any outstanding Eurocurrency Loans under the relevant Facility shall be converted, on the last day of the then current Interest Period with respect thereto, to Base Rate Loans. Until such notice has been withdrawn by the Administrative Agent, no further Eurocurrency Loans under the relevant Facility shall be made or continued as such, nor shall the Borrower have the right to convert Loans under the relevant Facility to Eurocurrency Loans.

5.11. <u>Pro Rata Treatment and Payments</u>. (a) Each borrowing by the Borrower from the Lenders hereunder, each payment by the Borrower on account of any commitment fee or Letter of Credit fee, and any reduction of the Commitments of the Lenders, shall be made <u>pro rata</u> according to the respective Tranche B Term Loan Percentages or Pro Rata Share, as the case may be, of the relevant Lenders.

(b) Each payment (including each prepayment) of the Tranche B Term Loans shall be allocated among the Tranche B Term Loan Lenders holding such Tranche B Term Loans <u>pro rata</u> based on the principal amount of Tranche B Term Loans held by such Tranche B Term Loan Lenders, and shall be applied to the installments of such Tranche B Term Loans <u>pro rata</u> based on the remaining outstanding principal amount of such installments, except with respect to

Error! Unknown document property name.