to the repayments and refinancing of Indebtedness of the Loan Parties that shall occur on the Closing Date, the Loan Parties shall have no material Indebtedness other than under the Loan Documents, the First Lien Credit Documents, the New Time Warner Facility, the Partnership Parks Agreements and certain existing Indebtedness (including certain existing intercompany indebtedness) reasonably satisfactory to the Arranger.

(h) Fees. The Lenders, the Administrative Agent and the Arranger shall have received all fees (including, without limitation, a ticking fee, payable to the Administrative Agent for the benefit of each Lender which has delivered an executed copy of its institutional allocation confirmation, commencing on the date on which each such Lender shall have delivered a copy of its institutional allocation confirmation, or other indication of its commitment to the Facility satisfactory to the Arranger, and ending on the earlier to occur of the date of termination or expiration of the Commitments and the Closing Date, calculated at the rate of 0.50% per annum on the aggregate amount of the Commitments) and the other fees set forth in that certain Fee Letter, dated as of April 7, 2010, between Borrower and the Arranger required to be paid, and all expenses for which invoices have been presented (including reasonable fees, disbursements and other charges of counsel to the Agents), on or before the Closing Date. All such amounts will be paid with proceeds of Loans made on the Closing Date and will be reflected in the funding instructions given by the Borrower to the Administrative Agent on or before the Closing Date.

(i) Business Plan. The Lenders shall have received a satisfactory business plan for fiscal years 2009 through 2015 (and the Borrower shall have demonstrated projected minimum Liquidity of at least $60,000,000 at all times under such business plan), including on a monthly basis through December 31, 2010, and a satisfactory written analysis of the business and prospects of Parent and its Subsidiaries for the period from the Closing Date through final maturity of the Loans and the Commitments, in each case covering such matters and in such level of detail as is customary in comparable financing transactions.

(j) Lien Searches. The Administrative Agent shall have received the results of recent Uniform Commercial Code and other lien searches in each relevant domestic jurisdiction with respect to all Property of the Loan Parties (except that with respect to the Real Property, such lien searches shall be limited to the Mortgaged Properties), and such search shall reveal no Liens on any of the Property of the Loan Parties, except for Permitted Liens or Liens to be discharged prior to or at the Closing Date.

(k) Closing Certificate. The Administrative Agent shall have received a certificate of each Loan Party, dated the Closing Date, substantially in the form of Exhibit C, with appropriate insertions and attachments.

(l) Legal Opinions. The Administrative Agent shall have received the following executed legal opinions:

(i)     the legal opinion of Paul, Hastings, Janofsky & Walker LLP, special counsel to Parent, Holdings and its Subsidiaries, substantially in the form of Exhibit F;

- 57 -

(ii)     the legal opinions of counsel to Holdings and its Subsidiaries in Canada in respect of the pledge of the Capital Stock of Subsidiaries of Holdings incorporated in Canada, in form and substance reasonably satisfactory to the Administrative Agent; and

(iii)     the legal opinions of local counsel in each of the jurisdictions where a Mortgaged Property is located.

Each such legal opinion shall cover such other matters incident to the transactions contemplated by this Agreement as the Administrative Agent may reasonably require.

(m) Pledged Stock; Stock Powers; Acknowledgment and Consent; Pledged Notes. The Administrative Agent shall have received (i) if certificated, the certificates representing the Capital Stock pledged pursuant to the Guarantee and Collateral Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof have been received by the First Lien Administrative Agent or the Administrative Agent, (ii) an Acknowledgment and Consent, substantially in the form of Annex II to the Guarantee and Collateral Agreement, duly executed by any issuer of Capital Stock pledged pursuant to the Guarantee and Collateral Agreement that is not itself a party to the Guarantee and Collateral Agreement and (iii) each promissory note, if any, pledged pursuant to the Guarantee and Collateral Agreement endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank satisfactory to the Administrative Agent) by the pledgor thereof has been received by the First Lien Administrative Agent or the Administrative Agent.

(n) Filings, Registrations and Recordings. Each document (including, without limitation, any Uniform Commercial Code financing statement) required by the Security Documents or under any Requirement of Law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Lenders, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by Section 7.4, including, without limitation, the First Priority Liens), shall have been filed, registered or recorded or shall have been delivered to the Administrative Agent in proper form for filing, registration or recordation.

(o) Mortgages, etc.

(i)     The Administrative Agent shall have received a Mortgage with respect to each Mortgaged Property, executed and delivered by a duly authorized officer of each party thereto.

(ii)     The Borrower shall have ordered (or caused to be ordered) a Bock & Clark Preliminary Evaluation Report for each Mortgaged Property and shall use good faith efforts to cause Bock & Clark to deliver the Preliminary Evaluation Reports.

(iii)     The Administrative Agent shall have received, and the title insurance company issuing the policies or binders referred to in clause (iv) below (the "Title Insurance Company") shall have received, existing surveys or maps of the Parks and all portions of the Mortgaged Properties material to the Business (the "Existing

- 58 -

Surveys"). If and to the extent (A) a Mortgaged Property is not depicted by an Existing Survey or (B) the Existing Survey for a Mortgaged Property does not depict Real Property which is material to the operation of the Business thereon (such Real Property not depicted by an Existing Survey referred to in the foregoing clauses (A) and (B) being referred to as "Uncovered Property"), then at the Administrative Agent's request, made subject to and in accordance with the terms hereof, the Administrative Agent and the Title Insurance Company shall also have received an update to the applicable Existing Survey for the applicable Mortgaged Property, or a supplemental survey (each, a "Supplemental Survey"), depicting in each case, the Uncovered Property, which Supplemental Survey shall (1) be certified to the Administrative Agent and the Title Insurance Company by an independent professional licensed land surveyor reasonably satisfactory to the Administrative Agent in a manner reasonably satisfactory to them, (2) show the perimeter boundaries of the Uncovered Property and all improvements thereon located within 5 feet of the perimeter boundary line of such Uncovered Property and all encroachments of other property onto the Uncovered Property, (3) show all points of access to such Uncovered Property from major public streets, and (4) include a metes and bounds description of such Uncovered Property. For purposes of this Section 5.1(o), the Administrative Agent and the Title Insurance Company shall not be entitled to receive a Supplemental Survey unless the Uncovered Property meets the following "materiality threshold": (i) the Uncovered Property is material to the operation of the Business at the applicable Park as currently conducted, or (ii) the Uncovered Property is required in order to operate the Business at the applicable Park as currently conducted in accordance with Requirements of Law.

(iv)     The Administrative Agent shall have received in respect of each Mortgaged Property a mortgagee's title insurance policy (or policies) or marked up unconditional binder for such insurance, together with such endorsements as the Administrative Agent shall reasonably request, in each case in form and substance, and in an amount, reasonably satisfactory to the Administrative Agent. The Administrative Agent shall have received evidence satisfactory to it that all premiums in respect of each such policy and all related expenses, if any, have been paid.

(v)     The Administrative Agent shall have received with respect to any Mortgaged Property which is located in a "special flood hazard area" (A) a policy of flood insurance that (1) covers such Mortgaged Property, (2) is written in an amount not less than the outstanding principal amount of the Indebtedness secured by such Mortgage that is reasonably allocable to such real property or the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, whichever is less, and (3) has a term ending not later than the maturity of the Indebtedness secured by such Mortgage and (B) confirmation that the Borrower has received the notice required pursuant to Section 208(e)(3) of Regulation H of the Board.

(vi)     The Administrative Agent shall have received a copy of all recorded documents referred to, or listed as exceptions to title in, the title policy or policies referred to in clause (iii) above and a copy of all other material documents affecting the Mortgaged Properties.

- 59 -

(p) <u>Insurance</u>. The Administrative Agent shall have received insurance certificates satisfying the requirements of Section 6.4.

(q) <u>The U.S.A. PATRIOT Act</u>. No later than five Business Days prior to the Closing Date, the Administrative Agent shall have received the documentation and other information as required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the U.S.A. PATRIOT Act.

(r) <u>Pro Forma Compliance</u>. The Loan Parties shall be in <u>pro forma</u> compliance with the financial covenants set forth in Sections 7.1 and 7.2.

(s) <u>First Lien Term Loans</u>. The Borrower shall have borrowed $770,000,000 in aggregate principal amount under the First Lien Credit Agreement.

(t) <u>Equity Proceeds</u>. Parent shall have received (i) net proceeds in a minimum amount of $650,000,000 from the sale of new Parent common stock (comprised of at least (A) $505,500,000 from the sale of Parent common stock pursuant to a rights offering to Parent noteholders that is fully backstopped by a group of Parent noteholders (the "<u>Parent Backstop Group</u>"), (B) $75,000,000 from a direct discounted purchase of Parent common stock by the Parent Backstop Group, (C) $50,000,000 from a direct undiscounted purchase of Parent common stock by the Parent Backstop Group and (D) $19,500,000 from the conversion of claims in respect of the 12 ¼% Notes due 2016 of Holdings (the "<u>SFO Notes</u>")) and (ii) additional equity capital of at least (A) $25,000,000 from the sale of additional common stock pursuant to the Delayed Draw Equity Commitment under which at least $25,000,000 can be raised from the sale of additional common stock if the board of directors of Parent determines that such additional equity contribution is necessary between the date on which the Confirmation Order becomes effective and June 1, 2011, and (B) $50,000,000 from the conversion of claims in respect of the SFO Notes to fund the payment of post-petition interest in respect of the SFO Notes if the Bankruptcy Court allows such claims.

(u) <u>Management, etc</u>. The senior management of the Loan Parties as of November 30, 2009 shall continue to be senior management of Parent upon confirmation of the Plan of Reorganization and no change of such senior management shall have been publicly announced. The business plan for Parent, Holdings and the Borrower on the Closing Date shall be consistent with that described in the Plan of Reorganization.

(v) <u>Representations and Warranties</u>. Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties were true and correct in all material respects as of such earlier date, <u>provided</u>, that, to the extent any such representation and warranty is already qualified by materiality or by reference to material adverse effect, such representation shall be true and correct in all respects.

(w) <u>No Default</u>. No Default or Event of Default shall have occurred and be continuing on the Closing Date or after giving effect to the making of the Loans.

NY\1634561.9

## SECTION 6.  AFFIRMATIVE COVENANTS

Parent, Holdings and the Borrower hereby jointly and severally agree that, so long as any Loan or other amount is owing to any Lender or any Agent hereunder, each of Parent, Holdings and the Borrower shall and shall cause each of their respective Subsidiaries to:

6.1.    Financial Statements and Other Information.  Deliver to the Administrative Agent for prompt distribution to each of the Lenders:

(a) as soon as available and in any event within 90 days after the end of each fiscal year of Parent, consolidated statements of operations, shareholders' equity and cash flows of Parent and its Subsidiaries for such fiscal year and the related consolidated balance sheets of Parent and its Subsidiaries as at the end of such fiscal year, setting forth in each case in comparative form the corresponding consolidated figures for the preceding fiscal year, accompanied by an opinion thereon of independent certified public accountants of recognized national standing, which opinion shall state that such consolidated financial statements present fairly in all material respects the consolidated financial condition and results of operations of Parent and its Subsidiaries as at the end of, and for, such fiscal year in accordance with GAAP (it being agreed that such financial statements will be accompanied by a reconciliation statement to the operations of Borrower and its Subsidiaries) and;

(b) [Reserved];

(c) as soon as available and in any event within 90 days after the end of each fiscal year of each of Texas Flags, Ltd. and Six Flags Over Georgia II, L.P., consolidated statements of operations, partners' equity and cash flows of each of Texas Flags, Ltd. and Six Flags Over Georgia II, L.P. and its Subsidiaries for such fiscal year and the related consolidated balance sheets of each of Texas Flags, Ltd. and Six Flags Over Georgia II, L.P. and its Subsidiaries as at the end of such fiscal year, setting forth in each case in comparative form the corresponding consolidated figures for the preceding fiscal year, accompanied by an opinion thereon of independent certified public accountants of recognized national standing, which opinion shall state that such consolidated financial statements present fairly in all material respects the consolidated financial condition and results of operations of each of Texas Flags, Ltd. and Six Flags Over Georgia II, L.P. and its Subsidiaries as at the end of, and for, such fiscal year in accordance with GAAP;

(d) as soon as available and in any event within 45 days after the end of each of the first three quarterly fiscal periods of each fiscal year of Parent, interim condensed consolidated statements of operations, shareholders' equity and cash flows of Parent and its Subsidiaries for such period and for the period from the beginning of the respective fiscal year to the end of such period, and the related consolidated balance sheets of Parent and its Subsidiaries, as at the end of such period, setting forth in each case in comparative form the corresponding consolidated figures for the corresponding periods in the preceding fiscal year (except that, in the case of balance sheets, such comparison shall be to the last day of the prior fiscal year), accompanied by a reconciliation statement to the operations of Borrower and its Subsidiaries and a certificate of a Responsible Officer of

- 61 -

Parent, which certificate shall state that such consolidated financial statements present fairly in all material respects the interim condensed consolidated financial condition and results of operations of Parent and its Subsidiaries, in each case in accordance with GAAP, consistently applied, as at the end of, and for, such period (subject to normal year-end audit adjustments);

(e) [Reserved];

(f) concurrently with any delivery of financial statements under clause (a) or (d) of this Section 6.1, a certificate of a Responsible Officer of Parent, (i) to the effect that no Default or Event of Default has occurred and is continuing (or, if any Default or Event of Default has occurred and is continuing, describing the same in reasonable detail and describing the action that being taken or proposed to be taken with respect thereto), (ii) setting forth in reasonable detail the computations necessary to determine whether the Loan Parties were in compliance with Sections 7.1, 7.2, 7.3(n)(iii), 7.7 and 7.8(v) as of the end of the respective quarterly fiscal period or fiscal year and (iii) setting forth the aggregate Restricted Payments made pursuant to Section 7.6(c)(i) through (iii) and Section 7.6(e) and including a description of such Restricted Payment or Investment by category and aggregate Investments made pursuant to Section 7.8(g) during the applicable quarterly fiscal period or fiscal year;

(g) as soon as available, and in any event no later than 75 days after the end of each fiscal year of Parent, a detailed consolidated budget for the following fiscal year;

(h) within 45 days after the end of each of the first three fiscal quarters of Parent and within 90 days after each fiscal year of Parent, a narrative discussion and analysis of the financial condition and results of operations of Parent and its Subsidiaries for such fiscal period and, if applicable, for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, as compared to the comparable periods of the previous year;

(i) promptly upon their becoming available, copies of all registration statements and regular periodic reports, if any, that Parent, Holdings or the Borrower shall have filed with the Securities and Exchange Commission (or any governmental agency substituted therefor) or any national securities exchange (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8);

(j) promptly upon receipt thereof, copies of any final management letters (other than special letters) prepared by Parent's independent public accountants with respect to the audit of the financial statements of Parent and its Subsidiaries;

(k) within 15 Business Days after the end of each of the calendar months of June, July, August, September and October, a performance report in respect of the Parks detailing on a Park-by-Park basis attendance and revenue for the preceding calendar

- 62 -

month and showing a comparison to budget, to the same period in the prior year and year-to-date in the prior year; and

(l) from time to time such other information regarding the financial condition, operations, business or prospects of Parent or any of its Subsidiaries (including, without limitation, any Plan or Multiemployer Plan and any reports or other information required to be filed under ERISA), or compliance with the terms of this Agreement, as any Lender or the Administrative Agent may reasonably request.

Notwithstanding the foregoing, the obligations in paragraphs (a), (d) and (h) of this Section 6.1 may be satisfied with respect to financial information of Parent and its Subsidiaries by furnishing Parent's Form 10-K or 10-Q, as applicable, to the extent filed with the SEC.

Documents required to be delivered pursuant to Section 6.1(a), (d), (g), (h) or (i) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which Parent posts such documents, or provides a link thereto on Parent's website on the Internet; or (ii) on which such documents are posted on Parent's or the Borrower's behalf on a Platform; provided that (i) upon written request by the Administrative Agent, Parent or the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) Parent or the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Notwithstanding anything contained herein, in every instance the Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 6.1(f) to the Administrative Agent. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

6.2.    Notices of Material Events.  Furnish the following to the Administrative Agent in writing:

(a) promptly after any executive officer of Parent, Holdings or the Borrower has actual knowledge of facts that would give him or her reason to believe that any Default or Event of Default has occurred, notice of such Default or Event of Default;

(b) as soon as any executive officer of Parent, Holdings or the Borrower has actual knowledge of the facts that would give him or her reason to know of the occurrence thereof, prompt notice of all legal or arbitral proceedings, and of all proceedings by or before any governmental or regulatory authority or agency, and of any material development in respect of such legal or other proceedings, affecting Parent or any of its Subsidiaries that, if adversely determined, could reasonably be expected to result in aggregate liabilities or damages in excess of $5,000,000 over available insurance or indemnification by creditworthy third parties;

- 63 -

(c) (i) as soon as possible, and in any event within ten days after Parent, Holdings or the Borrower knows or has reason to believe that any ERISA Event has occurred or exists, notice of the occurrence of such ERISA Event (and as soon as practicable thereafter, a copy of any report or notice required to be filed with or given to the PBGC by Parent, Holdings or an ERISA Affiliate with respect to such ERISA Event), if such ERISA Event could reasonably be expected to result in aggregate liabilities in excess of $5,000,000 and (ii) promptly following receipt thereof, copies of any documents described in Sections 101(k) or 101(l) of ERISA that Parent, Holdings or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided, that if Parent, Holdings or any of the ERISA Affiliates have not requested such documents or notices from the administer or sponsor of the applicable Multiemployer Plan, then, upon reasonable request of the Administrative Agent, Parent, Holdings and/or its ERISA Affiliates shall promptly make a request for such documents or notices from such administrator or sponsor and Parent shall provide copies of such documents and notices to the Administrative Agent promptly after receipt thereof and further provided that the rights granted to the Administrative Agent in this Section 6.2(c)(ii) shall be exercised not more than once during a 12-month period;

(d) as soon as possible, and in any event within five days prior to the incurrence by Parent of Indebtedness pursuant to any Indenture, notice of such incurrence;

(e) prompt notice of the assertion of any Environmental Claim by any Person against, or with respect to the activities of, Parent or any of its Subsidiaries and notice of any alleged violation of or non-compliance with any Environmental Laws or any Environmental Permits other than any Environmental Claim or alleged violation that, if adversely determined, could not (either individually or in the aggregate) reasonably be expected to result in remediation costs of more than $5,000,000 over available insurance or indemnification by creditworthy third parties or materially adversely affect the operation of any Park; and

(f) prompt notice of any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section 6.2 shall be accompanied by a statement of a Responsible Officer of Parent or the Borrower setting forth in reasonable detail the facts and circumstances of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

6.3.    Existence, Etc.

(a) Preserve, renew and maintain in full force and effect its legal existence under the laws of the jurisdiction of its organization (other than with respect to Inactive Subsidiaries) and (b) take all reasonable action to maintain all rights, privileges (including its good standing), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except (i) in the case of clause (b) above, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect or (ii) in the case of clause (a) or (b) above, pursuant to a transaction permitted by Section 7.5;

- 64 -

(b) pay and discharge all Federal income taxes and all other material taxes, assessments and governmental charges or levies imposed on it or on its income or profits or on any of its Property prior to the date on which penalties attach thereto, except for any such obligation, tax, assessment, charge or levy the payment of which is being contested in good faith and by proper proceedings and against which adequate reserves are being maintained to the extent required by GAAP; provided that, with respect to taxes assessed against Real Properties, such taxes can be contested without payment under applicable law;

(c) maintain and preserve all of its Properties material to the conduct of the Business of Parent, Holdings and its Subsidiaries (taken as a whole) in good working order and condition, except for failures that could not reasonably be expected to result in a Material Adverse Effect;

(d) keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied; and

(e) permit representatives of any Lender or the Administrative Agent, upon reasonable notice and during normal business hours (and, except if a Default shall have occurred and be continuing, not more frequently than once each calendar quarter), to examine, copy and make extracts from its books and records, to visit and inspect any of its Properties, and to discuss its business, finances, condition and affairs with its officers and independent accountants and the park presidents of its Parks, all to the extent reasonably requested by such Lender or the Administrative Agent (as the case may be); provided that, excluding any such visits and inspections during the continuance of an Event of Default, only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.3(e). The Administrative Agent and the Lenders shall give Parent the opportunity to participate in any discussions with Parent's independent public accountants. Notwithstanding anything to the contrary in this Section 6.3(e), none of Parent or any Subsidiary will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information or (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by law or any binding agreement.

6.4.    Insurance.  Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as Holdings and its Subsidiaries) as are customarily carried under similar circumstances by such other Persons.

6.5.    Compliance with Contractual Obligations and Requirements of Law. Comply with Contractual Obligations and Requirements of Laws, unless failure to comply with such Contractual Obligations or Requirements of Law could not (either individually or in the aggregate) reasonably be expected to have a Material Adverse Effect.

- 65 -

6.6. <u>Additional Collateral, Etc.</u> (a) With respect to any personal Property acquired after the Closing Date by Parent, Holdings, the Borrower or any of Parent's Wholly Owned Subsidiaries (other than (w) any personal Property described in paragraph (c) of this Section, (x) any Property subject to a Lien expressly permitted by clauses 7.4(h), (k) and (l), (y) any Property acquired by an Excluded Foreign Subsidiary and (z) any Property acquired after the date hereof to the extent that the creation of a security interest therein would be prohibited by a Contractual Obligation binding on Parent, Holdings, the Borrower or any Subsidiary that is the owner of such Property (including pursuant to the New Time Warner Facility or the Partnership Parks Agreements), provided that such Contractual Obligation existed at the time such Property was acquired and was not entered into in anticipation of such acquisition) as to which the Administrative Agent, for the benefit of the Lenders, does not have a perfected Lien, promptly, and in any event on or prior to 30 days after such acquisition (or such longer period as the Administrative Agent may agree in its reasonable discretion) (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Collateral Agreement or such other documents as the Administrative Agent reasonably deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a security interest in such Property and (ii) take all actions necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a perfected Lien on such Property that is prior and superior in right to any other Person (other than Persons holding Permitted Liens or other encumbrances or rights permitted hereunder), including without limitation, the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be reasonably requested by the Administrative Agent.

(b) With respect to any fee interest in any Real Property having a value (together with improvements thereof) of at least $10,000,000 acquired after the Closing Date by Parent, Holdings, the Borrower or any of Parent's Wholly Owned Subsidiaries (other than any such Real Property owned by an Excluded Foreign Subsidiary, Properties subject to the Great Escape Agreements, Properties subject to the Partnership Parks Agreements or Properties subject to a Lien expressly permitted by clauses (h), (i) and (j) of Section 7.4), promptly, and in any event on or prior to 30 days after such acquisition (or such longer period as the Administrative Agent may agree in its reasonable discretion) (i) execute and deliver a Mortgage that is prior and superior in right to any other Person (other than Persons holding Permitted Liens or other encumbrances or rights permitted hereunder) in favor of the Administrative Agent, for the benefit of the Lenders, covering such Real Property, (ii) if reasonably requested by the Administrative Agent, provide the Administrative Agent with (x) mortgagee title and extended coverage insurance insuring that the Lien of the Mortgage upon such Real Property is prior and superior in right to any other Person (other than Persons holding Permitted Liens or other encumbrances or rights permitted hereunder) in an amount at least equal to the purchase price of such Real Property (or such lesser amount as shall be reasonably acceptable to the Administrative Agent) as well as a current or updated ALTA survey thereof, certified to the Administrative Agent and (y) any consents or estoppels reasonably deemed necessary or advisable by the Administrative Agent in connection with such Mortgage, each of the foregoing in form and substance reasonably satisfactory to the Administrative Agent (<u>provided</u>, that Parent, Holdings, the Borrower and Parent's Wholly Owned Subsidiaries shall only be required to use commercially reasonable good faith efforts to obtain such consents and estoppels) and (iii) if reasonably requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described

- 66 -

above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(c) With respect to any new Wholly Owned Subsidiary (other than an Excluded Foreign Subsidiary or an Inactive Subsidiary) created or acquired after the Closing Date (which, for the purposes of this paragraph, shall include any existing Wholly Owned Subsidiary that ceases to be an Excluded Foreign Subsidiary or an Inactive Subsidiary), by Parent or any of its Wholly Owned Subsidiaries, promptly, and in any event on or prior to 30 days after such creation or acquisition (or such longer period as the Administrative Agent may agree in its reasonable discretion) (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Collateral Agreement as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a perfected Lien that is prior and superior in right to any other Person (other than Persons holding Permitted Liens or other encumbrances or rights permitted hereunder) in the Capital Stock of such new Wholly Owned Subsidiary that is owned by Parent or any of its Wholly Owned Subsidiaries, (ii) deliver to the First Lien Administrative Agent or the Administrative Agent the certificates representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of Parent or such Wholly Owned Subsidiary, as the case may be, and (iii) with respect to any such new Wholly Owned Subsidiary, cause such new Wholly Owned Subsidiary (A) to become a party to the Guarantee and Collateral Agreement and (B) to take such actions necessary or advisable to grant to the Administrative Agent for the benefit of the Lenders a perfected Lien that is prior and superior in right to any other Person (other than Persons holding Permitted Liens or other encumbrances or rights permitted hereunder) in the Collateral described in the Guarantee and Collateral Agreement with respect to such new Wholly Owned Subsidiary, including, without limitation, the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be reasonably requested by the Administrative Agent, and (iv) if reasonably requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(d) With respect to any Wholly Owned Subsidiary or Partnership Park Entity that ceases to be contractually prohibited (and, in the case of any Partnership Park Entity, ceases to be subject to any Requirement of Law (including any fiduciary or similar limitation applicable to the directors or managers thereof) effectively prohibiting it) from becoming a Subsidiary Guarantor or executing the Guarantee and Collateral Agreement or from having all or any portion of its Capital Stock from being pledged under the Guarantee and Collateral Agreement, promptly, and in any event on or prior to 30 days after such Wholly Owned Subsidiary or Partnership Park Entity ceases to be prohibited from being a Subsidiary Guarantor (or such longer period as the Administrative Agent may agree in its reasonable discretion) (i) execute and deliver, or cause to be executed and delivered, to the Administrative Agent such amendments to the Guarantee and Collateral Agreement as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a perfected Lien that is prior and superior in right to any other Person (other than Persons holding Permitted Liens or other encumbrances or rights permitted hereunder) in the Capital Stock of such Person that is owned by Parent or any of its Wholly Owned Subsidiaries, (ii) deliver to the First Lien Administrative Agent or the Administrative Agent the certificates representing such Capital

- 67 -

Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of Parent or such Wholly Owned Subsidiary, as the case may be, and (iii) if applicable, cause such Person (A) to become a party to the Guarantee and Collateral Agreement and (B) to take such actions necessary or advisable to grant to the Administrative Agent for the benefit of the Lenders a perfected Lien that is prior and superior in right to any other Person (other than Persons holding Permitted Liens or other encumbrances or rights permitted hereunder) in the Collateral described in the Guarantee and Collateral Agreement with respect to such new Wholly Owned Subsidiary, including, without limitation, the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be reasonably requested by the Administrative Agent, and (iv) if reasonably requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(e)  With respect to any new Foreign Subsidiary created or acquired after the Closing Date by Parent or any of its Wholly Owned Subsidiaries (other than any Subsidiary of any Excluded Foreign Subsidiary), promptly, and in any event on or prior to 30 days after such creation or acquisition (or such longer period as the Administrative Agent may agree in its reasonable discretion) (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Collateral Agreement or such other documents as the Administrative Agent deems necessary or advisable in order to grant to the Administrative Agent, for the benefit of the Lenders, a perfected Lien that is prior and superior in right to any other Person (other than Persons holding Permitted Liens or other encumbrances or rights permitted hereunder) in the Capital Stock of such new Foreign Subsidiary that is owned by Parent or any of its Wholly Owned Subsidiaries, provided that in no event shall more than 65% of the total outstanding Capital Stock of any such new Foreign Subsidiary be required to be so pledged, (ii) deliver to the First Lien Administrative Agent or the Administrative Agent the certificates representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of Parent or such Wholly Owned Subsidiary, as the case may be, and take such other action as may be necessary or, in the opinion of the Administrative Agent, desirable to perfect the Lien of the Administrative Agent thereon, and (iii) if reasonably requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(f)  Notwithstanding the provisions of this Section, (i) Parent shall not be required to create, or to cause its Wholly Owned Subsidiaries to create, a security interest in the Capital Stock of any Wholly Owned Subsidiary acquired after the date hereof to the extent that the creation of such a security interest would be prohibited by a Contractual Obligation binding on Parent or the Wholly Owned Subsidiary that is the owner of such Capital Stock; provided, that such Contractual Obligation either (x) was negotiated in good faith in an arm's length transaction with a Person that is not an Affiliate of Parent or (y) existed at the time such Subsidiary was acquired and was not entered into in anticipation of such acquisition and (ii) the Partnership Parks Entities and their Property and any other Property of Parent and its Subsidiaries subject to the Partnership Parks Agreements shall be expressly excluded from, and shall not be subject to, any provisions of this Section 6.6 so long as the creation of a security interest under, or the execution of, the Guarantee and Collateral Agreement is prohibited by a Contractual Obligation

- 68 -

binding on the Partnership Park Entities or, with respect to any other Property of Parent and its Subsidiaries, is prohibited by the Partnership Parks Agreements.

6.7. <u>Further Assurances</u>. From time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take all such actions, as the Administrative Agent may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Administrative Agent and the Lenders with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other Property or assets hereafter acquired by Parent or any Subsidiary which may be deemed to be part of the Collateral) pursuant hereto or thereto. Upon the exercise by the Administrative Agent or any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, Parent will, or will cause the relevant Subsidiary to, execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Administrative Agent or such Lender may be required to obtain from Parent or any of its Subsidiaries for such governmental consent, approval, recording, qualification or authorization.

6.8. <u>Environmental Laws</u>. Except to the extent that, in the aggregate, the failure to do so could not reasonably be expected to have a Material Adverse Effect: (a) comply with, and ensure compliance by all tenants and subtenants, if any, with, all applicable Environmental Laws, and obtain and comply with and maintain, and ensure that all tenants and subtenants obtain and comply with and maintain, any and all Environmental Permits, and (b) conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws and promptly comply with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws.

6.9. <u>Ratings by S&P and Moody's</u>. Use commercially reasonable efforts (a) to cause a public corporate credit rating and a facility rating (or the equivalents thereof) in respect of the Facility to be issued by S&P and Moody's within 90 days of the Closing Date and to be maintained thereafter until the Maturity Date and (b) to assure that each such rating is updated or confirmed at least once per year so long as S&P and Moody's are providing such yearly updates and confirmations in the ordinary course.

## SECTION 7. NEGATIVE COVENANTS

Parent, Holdings and the Borrower hereby jointly and severally agree that, so long as any Loan or other amount is owing to any Lender or any Agent hereunder, Parent, Holdings and the Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly:

7.1. <u>Senior Secured Leverage Ratio</u>. Permit the Senior Secured Leverage Ratio as at the last day of any Measurement Period of the Borrower ending on or closest to the applicable date set forth below to exceed the ratio set forth opposite such date:

| Date | Senior Secured Leverage Ratio |
|------|-------------------------------|
| September 30, 2010 | 7.50 to 1.00 |
| December 31, 2010 | 7.50 to 1.00 |
| March 31, 2011 | 7.25 to 1.00 |
| June 30, 2011 | 7.25 to 1.00 |
| September 30, 2011 | 7.25 to 1.00 |
| December 31, 2011 | 6.50 to 1.00 |
| March 31, 2012 | 6.50 to 1.00 |
| June 30, 2012 | 6.50 to 1.00 |
| September 30, 2012 | 6.50 to 1.00 |
| December 31, 2012 | 6.00 to 1.00 |
| March 31, 2013 | 6.00 to 1.00 |
| June 30, 2013 | 6.00 to 1.00 |
| September 30, 2013 | 6.00 to 1.00 |
| December 31, 2013 and thereafter | 5.75 to 1.00 |

7.2.    Consolidated Interest Coverage Ratio.  Permit the Consolidated Interest Coverage Ratio as at the last day of any Measurement Period of the Borrower ending on or closest to the applicable date set forth below to be less than the ratio set forth opposite such date:

| Date | Consolidated Interest Coverage Ratio |
|------|--------------------------------------|
| September 30, 2010 | 1.75 to 1.00 |
| December 31, 2010 | 1.75 to 1.00 |
| March 31, 2011 | 1.75 to 1.00 |
| June 30, 2011 | 1.75 to 1.00 |
| September 30, 2011 | 1.75 to 1.00 |
| December 31, 2011 | 2.00 to 1.00 |
| March 31, 2012 | 2.00 to 1.00 |
| June 30, 2012 | 2.00 to 1.00 |
| September 30, 2012 | 2.00 to 1.00 |
| December 31, 2012 | 2.25 to 1.00 |
| March 31, 2013 | 2.25 to 1.00 |
| June 30, 2013 | 2.25 to 1.00 |
| September 30, 2013 | 2.25 to 1.00 |
| December 31, 2013 | 2.25 to 1.00 |
| March 31, 2014 and thereafter | 2.25 to 1.00 |

provided that for the purpose of determining Consolidated Interest Coverage Ratio for the fiscal quarters ending September 30, 2010, December 31, 2010 and March 31, 2011, Consolidated Interest Expense for the relevant period shall be deemed to equal Consolidated Interest Expense for each such fiscal quarter (and, in the case of September 30, 2010, December 31, 2010 and

March 31, 2011, each previous fiscal quarter commencing after the Closing Date) <u>multiplied</u> by 4, 2 and 4/3, respectively.

7.3.    <u>Indebtedness</u>.  Create, incur or suffer to exist any Indebtedness except:

(a)  Indebtedness of any Loan Party pursuant to any Loan Document and any Indebtedness of such Loan Party incurred to refinance, refund, replace or renew any such Indebtedness;

(b)  Indebtedness of any Person outstanding on the date hereof and listed on Schedule 7.3(b), and any Indebtedness of such Person incurred to refinance, refund, replace or renew any such outstanding Indebtedness, <u>provided</u> that the principal amount (or accreted value, if applicable) of such refinancing, refunding, replacement or renewal of Indebtedness does not exceed the principal amount of Indebtedness (or accreted value, if applicable) being so refinanced, refunded, replaced or renewed plus all interest capitalized in connection therewith, plus the Refinancing Expenses and any costs and premiums associated with such refinancing, refunding, replacement or renewal;

(c)  Indebtedness under the New Time Warner Facility as in effect on the Closing Date and any Indebtedness to Time Warner incurred to refinance, refund, replace or renew the New Time Warner Facility; <u>provided</u> that (i) the terms and conditions of the documentation evidencing the New Time Warner Facility, taken as a whole, are not materially more restrictive to the Loan Parties party thereto than the terms of this Agreement and the other Loan Documents, (ii) the difference between (x) the principal amount of such Indebtedness and (y) the sum of the amount of the Indebtedness being so refinanced plus all interest capitalized in connection therewith and any Refinancing Expenses associated therewith shall be used to fulfill obligations under the Partnership Parks Agreements to purchase limited partnership units pursuant to the liquidity puts therein; (iii) the Guarantees of such Indebtedness provided by the Borrower or any Subsidiary shall not cover any increases in principal or any other liabilities or obligations (other than increases in interest, yield or fees or other modifications that are expressly permitted under this Section 7.3(c)) that are not covered by such Guarantees on the Closing Date (it being understood and agreed that the Guarantees shall be reduced by an amount equal to any principal amount Guaranteed on the Closing Date and repaid on or after such date), unless after giving <u>pro</u> <u>forma</u> effect to the incurrence of such Indebtedness the Senior Secured Leverage Ratio would not exceed 4.50 to 1.00 or the Consolidated Leverage Ratio of Parent would not exceed 5.75 to 1.00; (iv) any increases in the stated rate of interest, aggregate yield and/or fees payable to the lenders thereunder shall not collectively result in additional payments of interest, yield and fees to be made in cash by the Loan Parties until after the scheduled Maturity Date; and (v) none of the stated maturity dates in the documentation for the New Time Warner Facility shall be shortened;

(d)  (i) Indebtedness of any Loan Party to any other Loan Party and (ii) Guarantees by any Loan Party of obligations of any other Loan Party; <u>provided</u> that any intercompany Indebtedness incurred pursuant to clause (i) above shall, at the request of the Administrative Agent, be evidenced by an intercompany note which shall be pledged

- 71 -

to the Administrative Agent as, and to the extent required by, the Guarantee and Collateral Agreement substantially in the form of the Intercompany Subordinated Note attached hereto as <u>Exhibit N</u>; <u>provided, further</u> that the Indebtedness of Parent to Holdings, Borrower or any Subsidiary of Borrower shall only be permitted to the extent such funds may be distributed to Parent in compliance with Section 7.6;

(e) Indebtedness of any Non-Guarantor Subsidiary to Holdings or to any other Subsidiary of Holdings, and Guarantees by Holdings or any Subsidiary of Indebtedness of any such Non-Guarantor Subsidiary, in an aggregate amount outstanding for all such Indebtedness and Guarantees (without duplication), together with the aggregate outstanding amount of Investments in such Non-Guarantor Subsidiaries made as permitted by Section 7.8(v), not exceeding $57,500,000 at any one time outstanding, provided that the aggregate amount of such Indebtedness of, and such Guarantees of Indebtedness of, and Investments made as permitted by Section 7.8(v) in, Foreign Subsidiaries shall not exceed $57,500,000 at any one time outstanding;

(f) Indebtedness of any Non-Guarantor Subsidiary which is both a Wholly Owned Subsidiary and a Foreign Subsidiary (a "<u>Wholly Owned Non-Guarantor Foreign Subsidiary</u>") to any other Wholly Owned Non-Guarantor Foreign Subsidiary, and Guarantees by any Wholly Owned Non-Guarantor Foreign Subsidiary of obligations of any other Wholly Owned Non-Guarantor Foreign Subsidiary;

(g) (i) Indebtedness consisting of Purchase Money Indebtedness (including, for the avoidance of doubt, Indebtedness financing Investments permitted under Section 7.8 in connection with Permitted Acquisitions) and Capital Lease Obligations incurred after the date hereof in an aggregate principal amount not in excess of $115,000,000 at any one time outstanding and (ii) any Indebtedness incurred to refinance, refund, replace or renew the Indebtedness described in the foregoing clause (i), <u>provided</u> that the principal amount (or accreted value, if applicable) of such refinancing, refunding, replacement or renewal of Indebtedness does not exceed the principal amount of the Indebtedness (or accreted value, if applicable) being so refinanced, refunded, replaced or renewed plus all interest capitalized in connection therewith and the Refinancing Expenses;

(h) (i) Indebtedness of any Person outstanding on the date on which such Person becomes a Subsidiary of the Borrower or is merged into or consolidated with or into the Borrower or any of its Subsidiaries in an aggregate principal amount not in excess of $57,500,000 at any one time outstanding; <u>provided,</u> that (A) such Indebtedness was not created in connection with, or in anticipation of, such acquisition and (B) the amount of such Indebtedness is not increased thereafter unless solely as a result of capitalization of interest or otherwise incurred under another subsection of this Section 7.3 substantially contemporaneously with such merger or consolidation, and (ii) any Indebtedness incurred to refinance the Indebtedness described in the foregoing clause (i), <u>provided</u> that the principal amount (or accreted value, if applicable) of such refinancing Indebtedness does not exceed the principal amount of the Indebtedness being so refinanced plus capitalized interest and any Refinancing Expenses associated therewith;

NY\1634561.9

(i) Indebtedness under the First Lien Credit Documents, in an aggregate principal amount not to exceed the Cap Amount at any time outstanding and any Indebtedness incurred to refinance, refund, replace or renew such Indebtedness (or previous refinancing, refunding, replacement or renewal thereof) (any such Indebtedness, "Permitted First Lien Refinancing Indebtedness"); provided that (A) there are no direct or contingent obligors with respect to such Indebtedness other than Persons that are obligors under the Loan Documents, (B) such Indebtedness shall have a final maturity date equal to or later than the final maturity date of the refinanced, refunded, replaced or renewed Indebtedness and a weighted average life to maturity equal to or longer than that of the refinanced Indebtedness, and (C) the terms and conditions of any such Indebtedness, taken as a whole, are not materially less favorable to the Lenders than the terms and conditions of the refinanced, refunded, replaced or renewed Indebtedness and would be permitted for an amendment of the First Lien Credit Agreement under Section 7.14.

(j) Indebtedness representing deferred compensation to employees of Parent and its Subsidiaries incurred in the ordinary course of business;

(k) Indebtedness incurred by Parent and its Subsidiaries in a Permitted Acquisition, any other Investment expressly permitted hereunder or any Disposition, in each case to the extent constituting (i) contingent liabilities in respect of any indemnification, adjustment of purchase price, earn-out, non-compete, consulting, deferred compensation and similar obligations of Parent and its Subsidiaries incurred in connection therewith and (ii) obligations in respect of purchase price adjustments or similar adjustments incurred by Parent or its Subsidiaries under agreements governing Permitted Acquisitions, Investments permitted hereunder or Dispositions;

(l) Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(m) obligations in respect of performance, bid, appeal, stay, customs and surety bonds, performance and completion guarantees, bank guarantees, bankers' acceptances, including in respect of self-insurance, workers compensation claims or other Indebtedness with respect to reimbursement type obligations regarding workers compensation claims, deferred compensation, severance, pension and health and welfare retirement benefits or the equivalent thereof to current and former employees of Parent and its Subsidiaries and similar obligations provided by Parent or any of its Subsidiaries or obligations in respect of letters of credit related thereto, in each case, in the ordinary course of business, existing on the Closing Date or consistent with past practice;

(n) (i) Indebtedness of the Borrower or any of its Subsidiaries, to the extent that the Net Cash Proceeds thereof are used to prepay the First Lien Tranche B Term Loans or to purchase First Lien Tranche B Term Loans pursuant to a First Lien Auction as set forth in Section 5.19 of the First Lien Credit Agreement, (ii) Guarantees by the Borrower or any of its Subsidiaries of unsecured Indebtedness of Parent or Holdings so long as with respect to this clause (ii) 100% (or, if the Senior Secured Leverage Ratio is equal to or less than 4.50 to 1.00, 75%) of the Net Cash Proceeds thereof are used to prepay the First

Lien Tranche B Term Loans or to purchase First Lien Tranche B Term Loans pursuant to a First Lien Auction as set forth in Section 5.19 of the First Lien Credit Agreement, (iii) unsecured Indebtedness of Parent or Holdings so long as with respect to this clause (iii), (A) after giving pro forma effect to the incurrence of such Indebtedness and the use of the Net Cash Proceeds thereof the Consolidated Leverage Ratio would not exceed 5.25 to 1.00 and (B) if after giving pro forma effect to the incurrence of such Indebtedness and the use of the Net Cash Proceeds thereof the Senior Secured Leverage Ratio would exceed 4.5 to 1.00, at least 25% of the Net Cash Proceeds thereof are used to prepay the First Lien Tranche B Term Loans, and (iv) Indebtedness of the Borrower or any of its Subsidiaries, to the extent that the Net Cash Proceeds thereof are used to prepay the Loans or to purchase Loans pursuant to an Auction as set forth in Section 3.18, provided that, in the case of any Indebtedness incurred under either clause (i), (ii), (iii) or (iv) above, (x) after giving effect to such Indebtedness and the use of the Net Cash Proceeds thereof, the Loan Parties shall be in compliance on a pro forma basis with Sections 7.1 and 7.2, (y) any such Indebtedness shall have a scheduled final maturity at least 180 days after the Maturity Date and a weighted average life to maturity at least 180 days longer than the First Lien Tranche B Term Loans and (z) the terms and conditions of such Indebtedness, taken as a whole, shall not be materially more restrictive on the Loan Parties than the terms and conditions contained herein;

(o) other Indebtedness incurred by Parent or any of its Subsidiaries in an amount not to exceed $23,000,000 outstanding at any time;

(p) [Reserved];

(q) cash management obligations and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, employees credit or purchase cards, overdraft protections and similar arrangements, in each case, in connection with deposit accounts;

(r) Indebtedness of GP Holdings, Inc., SFT Holdings, Inc., Six Flags Over Texas, Inc., SFOG II, Inc. and/or the Partnership Parks Entities owed to Parent or to any other Subsidiary of Parent that constitute "affiliate loans" for purposes of the Partnership Parks Agreements;

(s) other Indebtedness of the Partnership Parks Entities and any Guarantees of the obligations thereunder to the extent such Guarantees are not provided by or recourse to a Loan Party; and

(t) Guarantees incurred in the ordinary course of business in respect of obligations to suppliers, advertisers, licensees or similar Persons that are not for borrowed money.

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first

- 74 -

committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased.

7.4. Liens. Create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except the following ("Permitted Liens"):

(a) Liens created pursuant to the Security Documents;

(b) Liens in existence on the date hereof and listed on Schedule 7.4(b) and any extension, modification, renewal or replacement thereof; provided that such extension, modification, renewal or replacement does not increase the outstanding principal amount of the Indebtedness secured thereby except by the amount of the Refinancing Expenses associated therewith or to cover Indebtedness not otherwise prohibited under Section 7.3; provided further that any such Lien does not extend to any additional Property other than after-acquired Property that is affixed or incorporated into the Property covered by such Lien and as otherwise permitted under Section 7.4 or financed by Indebtedness permitted under Section 7.3;

(c) Liens imposed by any Governmental Authority for taxes, assessments and other charges or levies that are (i) not yet due, (ii) being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of Parent or the affected Subsidiaries, as the case may be, to the extent required by GAAP or, in the case of any Foreign Subsidiary, generally accepted accounting principles in effect from time to time in the jurisdiction of organization of such Foreign Subsidiary or (iii) not otherwise required to be paid under Section 6.3(b);

(d) carriers', warehousemen's, mechanics', materialmen's, repairmen's, suppliers', landlords', brokers' or other like Liens arising in the ordinary course of business that are not overdue for a period of more than 30 days (or if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Lien) or that are being contested in good faith and by appropriate proceedings, and Liens securing judgments but only to the extent for an amount and for a period not resulting in an Event of Default under clause (j) of Section 8;

(e) Liens (other than any Liens imposed by ERISA or Code Section 412 or 430 or pursuant to any Environmental Law) not securing Indebtedness or hedging obligations incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security legislation and other similar obligations incurred in the ordinary course of business;

- 75 -

(f) Liens securing obligations in respect of the performance of bids, trade contracts, governmental contracts and leases (other than for Indebtedness for borrowed money including any precautionary Uniform Commercial Code financing statements filed by a lessor with respect to any equipment lease), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(g) easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business and encumbrances consisting of zoning restrictions, easements, licenses, restrictions on the use of Property or minor imperfections in title thereto that, in the aggregate that do not interfere in any material respect with the ordinary conduct of the business of Parent or any of its Subsidiaries;

(h) Liens securing Purchase Money Indebtedness or Capital Lease Obligations to the extent such Indebtedness is permitted to be incurred under Section 7.3(g); provided, that such Liens shall encumber only the Property that is the subject of such Purchase Money Indebtedness or Capital Lease Obligations; provided that individual financings of equipment provided by one lender may be cross-collateralized to other financings of equipment by such lender;

(i) Liens securing Indebtedness to the extent such Indebtedness is permitted under Section 7.3(h); provided, that such Liens shall encumber only the Property that is the subject of such Indebtedness;

(j) Liens pursuant to the Great Escape Agreements or pursuant to leases, concessions and similar arrangements, or other arrangements entered into in the ordinary course of business by Holdings and its Subsidiaries that could not reasonably be expected to have a Material Adverse Effect;

(k) Liens securing any Indebtedness permitted by Section 7.3(i);

(l) Liens on any asset of a Person existing at the time such Person becomes a Subsidiary of the Borrower or is merged into or consolidated with or into the Borrower or any of its Subsidiaries and not created in contemplation of such event;

(m) leases, licenses, subleases or sublicenses (including the provision of software under an open source license) granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of Holdings or any material Subsidiary, taken as a whole, or (ii) secure any Indebtedness;

(n) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(o) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course

- 76 -

of business and (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of set off) and which are within the general parameters customary in the banking industry;

(p) Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 7.8 to be applied against the purchase price for such Investment, (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.5, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien, and (iii) on securities that are the subject of repurchase agreements constituting Permitted Investments;

(q) (i) any interest or title of a lessor under leases entered into by Holdings or any of its Subsidiaries in the ordinary course of business and (ii) ground leases in respect of Real Property on which facilities owned or leased by the Loan Parties are located;

(r) Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of Parent or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of Parent and its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of Parent or any of its Subsidiaries in the ordinary course of business;

(s) Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of the Subsidiaries in the ordinary course of business;

(t) Liens solely on any cash earnest money deposits made by Holdings or any of the Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(u) Liens arising from precautionary Uniform Commercial Code financing statement filings;

(v) other Liens securing Indebtedness or other obligations in an aggregate principal amount at any time outstanding not to exceed $11,500,000;

(w) Liens securing Indebtedness to the extent such Indebtedness is permitted under Sections 7.3(l) and (q);

(x) pledges and deposits in the ordinary course of business securing deductibles, self-insurance, co-payments (or insurance of similar obligations) or liabilities for reimbursement obligations of (including in respect of letters of credit or bank guarantees for the benefit of), insurance carriers providing property, casualty or liability insurance to any Loan Party;

- 77 -

(y) Liens securing Indebtedness permitted by Section 7.3(s); provided that such Lien shall not encumber Property of any Loan Party; and

(z) Liens pursuant to the Partnership Parks Agreements or on limited partnership units owned by any of the Partnership Parks Entities.

7.5.    Prohibition of Fundamental Changes.

(a) Mergers.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that:

(i)    Holdings or any Subsidiary of the Borrower may merge with (A) the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction), provided that (x) the Borrower shall be the continuing or surviving Person and (y) such merger does not result in the Borrower ceasing to be incorporated under the laws of the United States, any state thereof or the District of Columbia or (B) any one or more other Subsidiaries of the Borrower, provided that when any Subsidiary that is a Loan Party is merging with another Subsidiary of the Borrower, a Loan Party shall be the continuing or surviving Person;

(ii)    (A) any Subsidiary of Parent that is not a Loan Party may merge or consolidate with or into any other Subsidiary of Parent; provided that if such Subsidiary is a Loan Party, the Loan Party shall be the continuing or surviving Person and (B) any Subsidiary of Parent may liquidate or dissolve or change its legal form if Parent determines in good faith that such action is in the best interests of Parent and its Subsidiaries and is not materially disadvantageous to the Lenders;

(iii)    any Subsidiary of the Borrower may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or another Subsidiary of the Borrower; provided that if the transferor in such a transaction is a Loan Party, then (A) the transferee must be a Loan Party or (B) to the extent constituting an Investment, such Investment must be permitted Indebtedness or a permitted Investment of a Subsidiary which is not a Loan Party in accordance with Sections 7.3 and 7.8, respectively;

(iv)    so long as no Default exists or would result therefrom, any Subsidiary of Parent may merge with any other Person in order to effect an Investment permitted pursuant to Section 7.5(e) or 7.8; and

(v)    so long as no Default exists or would result therefrom, a merger, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 7.5(c) shall be permitted.

(b) Restrictions on Acquisitions.  Acquire all or substantially all of the business or Property from, or all or substantially all of Capital Stock of, any Person except for (i) purchases of inventory and other Property to be sold or used in the ordinary course of business, (ii) Investments permitted under Sections 7.5(e) and 7.8 and Dispositions permitted under Section

NY\1634561.9

7.5(c)(iii), (iii) Capital Expenditures (to the extent the making of such Capital Expenditures will not result in a violation of any of the provisions of Section 7.7) and (iv) acquisitions made with Qualified Net Cash Equity Proceeds and/or with Qualified Capital Stock of the Parent.

(c) <u>Restrictions on Dispositions</u>. Consummate any Disposition other than (i) any Disposition of any inventory or other Property Disposed of in the ordinary course of business (including allowing any registrations or any applications for registration of any immaterial intellectual property rights to lapse or go abandoned in the ordinary course of business), (ii) sales of used, obsolete or worn out equipment or other Property not used in the business of Parent and its Subsidiaries, <u>provided</u> that (x) in the judgment of Parent, the sale of such equipment or other Property will not result in more than a nominal reduction in the Borrower Consolidated Adjusted EBITDA for the four fiscal quarters following such sale from what it would otherwise have been and (y) to the extent the Net Cash Proceeds from any sale or disposition effected under this clause (ii), together with all other such sales under this clause (ii) in the same year of Parent, exceed $20,000,000 such excess shall be deemed to be an "Asset Sale" and subject to the provisions of Section 3.4(b) (subject to Section 3.10 and without giving effect to the $2,500,000 amount referred to in the definition of "Asset Sale"), (iii) any Disposition of any Property to the Borrower or one of their respective Wholly Owned Subsidiaries which is a Subsidiary Guarantor, (iv) any Disposition of any Property to a Non-Guarantor Subsidiary of the Borrower, <u>provided</u> that the book value of the Property so Disposed of shall be deemed to constitute an Investment under Section 7.8, (v) the sale (whether through a sale, swap or exchange) of any timeshare in any of the campground parks or pursuant to the Great Escape Agreements permitted under Section 7.5(e)(ii), (vi) the sale of other Property having a fair market value not to exceed $28,750,000 in the aggregate for any fiscal year of Parent, (vii) the sale of other Property having a fair market value not to exceed $287,500,000 in the aggregate, <u>provided</u> that with respect to all Dispositions permitted by this clause (vii), (A) such Dispositions shall be made for at least fair market value, as determined in good faith by the board of directors of Parent or the Borrower, and for at least 75% cash or cash equivalent consideration, (B) the requirements of Section 3.4(b) are complied with in connection therewith (subject to Section 3.10) and (C) in connection with any such Disposition as to which the fair market value of the related Property is in excess of $17,250,000, the Borrower shall be in <u>pro</u> <u>forma</u> compliance with Section 7.1 and Section 7.2 (<u>provided</u> that in determining such compliance, the Senior Secured Leverage Ratio shall be deemed to be 0.25 to 1.00 lower than the otherwise applicable Senior Secured Leverage Ratio), (viii) the sale of unused Real Property that is unimproved (except for parking lots) and that is adjacent to a Park, <u>provided</u> that with respect to all Dispositions permitted by this clause (viii), (A) such Dispositions shall be made for at least fair market value as determined in good faith by the board of directors of Parent or the Borrower, and for at least 75% cash or cash equivalent consideration and (B) the requirements of Section 3.4(b) are complied with in connection therewith (subject to Section 3.10)), (ix) Dispositions permitted by Sections 7.3(g), 7.4, 7.5(a), 7.6 and 7.8, (x) Dispositions in the ordinary course of business of Permitted Investments, (xi) leases, subleases, licenses or sublicenses (including the provision of software under an open source license), in each case in the ordinary course of business, which do not materially interfere with the business of Parent and its Subsidiaries, taken as a whole, (xii) Dispositions related to Recovery Events; <u>provided</u> that with respect to all Dispositions permitted by this clause (xii) the requirements of Section 3.4(b) are complied with in connection therewith (subject to Section 3.10), (xiii) Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint

- 79 -

venture arrangements and similar binding arrangements, (xiv) Dispositions of Property (other than Capital Stock of the Partnership Parks Entities) to the extent that (A) such Property is exchanged for credit against the purchase price of similar replacement Property or (B) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property and (C) the fair market value of all Property disposed of pursuant to this clause (xiv) does not exceed $11,500,000, (xv) Dispositions of accounts receivables in connection with the collection or compromise thereof, (xvi) Dispositions in the ordinary course of business consisting of the abandonment of Intellectual Property rights, which in the reasonable good faith determination of Parent or any of its Subsidiaries, are uneconomical, negligible, obsolete or otherwise not material in the conduct of its business, and (xvii) Dispositions of all or any portion of the Property of KKI, LLC.

To the extent any Collateral is Disposed of as expressly permitted by this Section 7.5 to any Person other than Parent or any of its Subsidiaries, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and, if requested by the Administrative Agent, upon the certification by the Borrower that such Disposition is permitted by this Agreement, the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

(d) Sale and Leaseback. Enter into any transaction pursuant to which it shall convey, sell, transfer or otherwise dispose of any Property and, as part of the same transaction or series of transactions, rent or lease as lessee or similarly acquire the right to possession or use of, such Property, or other Property which it intends to use for the same purpose or purposes as such Property, to the extent such transaction gives rise to Indebtedness, unless any Indebtedness arising in connection with such transaction shall be permitted under Section 7.3(g).

(e) Certain Permitted Transactions. Notwithstanding the foregoing provisions of this Section 7.5:

(i)    Permitted Acquisitions. The Borrower, any Subsidiary Guarantor or any Foreign Subsidiary may acquire all or substantially all of the assets or business of, any Person, or of assets constituting a business unit, a line of business or a division of, such Person (whether by way of purchase of assets or stock, by merger or consolidation or otherwise) after the date hereof (each, a "Permitted Acquisition") so long as:

(A) the Loan Parties shall be in pro forma compliance with Sections 7.1 and 7.2 after giving effect to such Permitted Acquisition (as if such Permitted Acquisition had been consummated on the first day of such period), with the Senior Secured Leverage Ratio being deemed, for this purpose, to be 0.25 to 1.00 times lower than that required under Section 7.1; provided, however, that (x) any Indebtedness incurred or repaid in connection with such Permitted Acquisition shall be deemed to have be incurred or repaid, as the case may be, on such first day, and (y) Parent shall have delivered to the Administrative Agent, at least five Business Days prior to the date of any such Permitted Acquisition, a certificate of a Responsible Officer of Parent setting forth computations in reasonable detail demonstrating satisfaction of the foregoing conditions as at the date of such certificate reflecting the terms of the transaction as of such date; provided further that if prior to consummation of such Permitted Acquisition changes are made to the

- 80 -

terms that would alter the computations previously delivered, Parent shall deliver a revised certificate demonstrating satisfaction of the foregoing conditions on the date of the consummation of such Permitted Acquisition;

(B) such Permitted Acquisition (if by purchase of assets, merger or consolidation) shall be effected in such manner so that the acquired business, and the related assets, are owned either by the Borrower, a Subsidiary Guarantor or a Foreign Subsidiary and, if effected by merger or consolidation involving the Borrower, a Subsidiary Guarantor or a Foreign Subsidiary, then the Borrower, such Subsidiary Guarantor or such Foreign Subsidiary shall be the continuing or surviving entity and, if effected by merger or consolidation involving a Wholly Owned Subsidiary of the Borrower, a Wholly Owned Subsidiary shall be the continuing or surviving entity; provided, however, that with respect to any Permitted Acquisition effected in such manner so that the acquired business, and the related assets, are owned by a Foreign Subsidiary, such acquired business, and the related assets, shall be located outside of the United States of America;

(C) the Borrower shall deliver to the Administrative Agent (which shall promptly forward copies thereof to each Lender) (i) as soon as possible and in any event no later than five days prior to the consummation of each such Permitted Acquisition (or, if executed, such earlier date as shall be five Business Days after the execution and delivery thereof), the most recent drafts of the respective agreements or instruments pursuant to which such Permitted Acquisition is to be consummated (including, without limitation, any related management, non-compete, employment, option or other material agreements), any schedules to such agreements or instruments and all other material ancillary documents to be executed or delivered in connection therewith and (ii) promptly following request therefor (but in any event within three Business Days following such request), copies of such other information or documents (including, without limitation, environmental risk assessments) relating to such Permitted Acquisition as the Administrative Agent or the Required Lenders shall have reasonably requested (and which is available, or obtainable within such period by Parent with reasonable efforts);

(D) to the extent applicable, the Borrower shall have complied with the provisions of Section 6.6, including, without limitation, to the extent not theretofore delivered, delivery to (x) the First Lien Administrative Agent or the Administrative Agent of the certificates evidencing 100% (or, in the case of any new Foreign Subsidiary the Capital Stock of which is held by a Domestic Subsidiary, 65%) of the Capital Stock of any new Subsidiary formed or acquired in connection with such Permitted Acquisition, accompanied by undated stock powers executed in blank, and (y) the Administrative Agent of the agreements, instruments, opinions of counsel and other documents required under Section 6.6;

(E) the aggregate Purchase Price for each such Permitted Acquisition shall not exceed $287,500,000 or, at any time the Senior Secured Leverage Ratio is less than 4.75 to 1.00 after giving effect to such Permitted Acquisition and the incurrence of any related Indebtedness, $402,500,000, plus, in each case, the Net Cash Proceeds received from the issuance of Capital Stock of Parent and from the related contribution of cash to

- 81 -

Holdings from Parent, in each case as contributed to the Borrower, that are not otherwise expended pursuant to Sections 7.7 or 7.8(i), plus the portion of any consideration paid with Qualified Net Cash Equity Proceeds and/or in Qualified Capital Stock of Parent; and

(F) immediately prior to such Permitted Acquisition and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing.

(ii)     Other Dispositions.  The Borrower or any of its Subsidiaries may Dispose of (whether through a sale, swap or exchange) any timeshare or fractional interest in any of the campground parks or any assets or interests pursuant to the Great Escape Agreements.

7.6.     Restricted Payments.  Declare or make any Restricted Payment, except that:

(a) each Subsidiary of Parent may make Restricted Payments to, or on behalf of or for the benefit of, Parent to enable Parent to pay out-of-pocket accounting fees, legal fees and other amounts incurred or owing by Parent in the ordinary course of business pursuant to the Shared Services Agreement;

(b) each Subsidiary of Parent may make Restricted Payments to, or on behalf of or for the benefit of, Parent in respect of (i) income tax liabilities of Parent and its Subsidiaries in accordance with the Tax Sharing Agreement and (ii) value added tax, franchise taxes and similar taxes to enable Parent to pay any such taxes imposed on Parent on behalf or on account of its Subsidiaries;

(c) so long as at the time thereof and after giving effect thereto no Default or Event of Default shall have occurred and be continuing, each of Holdings and the Borrower may make Restricted Payments in cash to enable Parent and its Subsidiaries:

(i)     to pay obligations of Parent or any of its Subsidiaries under the Partnership Parks Agreements to the extent such obligations cannot be met with cash flow available to Parent from the Partnership Parks Entities and other payment obligations of Parent or any of its Subsidiaries thereunder and to pay any principal and interest amounts due at maturity under the New Time Warner Facility to the extent such payment obligations or such principal and interest amounts cannot be met with cash flow available to Parent from the Partnership Park Entities and cannot be funded under the New Time Warner Facility; and

(ii)     to purchase limited partnership units under the Partnership Parks Agreements for an amount in any fiscal year of Parent not to exceed the Liquidity Put Threshold Amount for such fiscal year;

(iii)     to make Capital Expenditures for the Partnership Parks Entities, provided that the making of such Capital Expenditures does not violate Section 7.7;

- 82 -

(iv)    to finance any Investment permitted to be made pursuant to Section 7.8; provided that (A) such Restricted Payment shall be made substantially concurrently with the closing or consummation of such Investment and (B) Parent shall, immediately following the closing or consummation thereof, cause (1) all property acquired (whether assets or equity interests) to be contributed to the Borrower or a Loan Party (or a Person that will become a Loan Party upon receipt of such contribution) or (2) the merger (to the extent permitted in Section 7.5(a)) of the Person formed or acquired into the Borrower or a Loan Party in order to consummate such Permitted Acquisition, in each case, in accordance with the requirements of Section 6.6;

(v)    to make cash payments in lieu of the issuance of fractional shares in connection with the exercise of warrants, options or other securities convertible into or exchangeable for equity interests of Parent; provided that any such cash payment shall not be for the purpose of evading the limitations set forth in this Section 7.6 (as determined in good faith by the board of directors or the managing board, as the case may be, of Parent (or any authorized committee thereof));

(vi)    to pay fees and expenses (other than to Affiliates) related to any unsuccessful equity or debt offering permitted by this Agreement not in excess of $2,300,000 in the aggregate; and

(vii)    to pay fees, costs and expenses related to the Transactions and the Related Transactions on the Closing Date;

(d)  to the extent constituting Restricted Payments, Parent and its Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 7.5, 7.8 or 7.10;

(e)  each of the Borrower and Holdings may make other Restricted Payments (including (i) to enable Parent or Holdings to pay principal payments permitted to be due, and interest due, on Indebtedness of Parent or Holdings (excluding principal and interest payments due at maturity under the New Time Warner Facility) and (ii) to enable Parent to redeem warrants that may be issued as part of the Plan of Reorganization); provided that for purposes of distributions under this clause (e), (x) after giving effect to any such Restricted Payment and its use no Default or Event of Default shall exist and the Loan Parties shall be in pro forma compliance with Sections 7.1 and 7.2 and (y) the amount of all such other Restricted Payments in any fiscal year shall not exceed (A) for the fiscal year ended December 31, 2010, the lesser of (1) $11,500,000 and (2) the sum of $5,750,000 plus the difference between the Liquidity Put Threshold Amount and the amount of Restricted Payments made pursuant to Section 7.6(c)(ii) during such fiscal year plus the Excess Cash Flow not applied to prepay First Lien Tranche B Term Loans pursuant to Section 5.5(c) of the First Lien Credit Agreement or Loans pursuant to Section 3.5(c), (B) for the fiscal year ended December 31, 2011, the lesser of (1) $23,000,000 and (2) the sum of $11,500,000 plus the difference between the Liquidity Put Threshold Amount and the amount of Restricted Payments made pursuant to Section 7.6(c)(ii) during such fiscal year plus the Excess Cash Flow not applied to prepay First

- 83 -

Lien Tranche B Term Loans pursuant to Section 3.5(c) or Section 5.5(c) of the First Lien Credit Agreement, (C) for the fiscal year ended December 31, 2012, the lesser of (1) $34,500,000 and (2) the sum of $23,000,000 plus the difference between the Liquidity Put Threshold Amount and the amount of Restricted Payments made pursuant to Section 7.6(c)(ii) during such fiscal year plus the Excess Cash Flow not applied to prepay First Lien Tranche B Term Loans pursuant to Section 3.5(c) or Section 5.5(c) of the First Lien Credit Agreement and (D) for any subsequent fiscal year, $46,000,000;

(f) Parent and its Subsidiaries may make Restricted Payments in the form of noncash repurchases of Capital Stock of Parent deemed to occur upon the exercise of stock options or warrants if such repurchased Capital Stock represents all or a portion of the exercise price of such options or warrants and cash payments in lieu of the issuance of fractional shares in connection with the exercise of such stock options or warrants;

(g) Parent may (i) redeem warrants that may be issued as part of the Plan of Reorganization to the extent it receives a related Restricted Payment under clause (e) of this Section 7.6 and (ii) make any other Restricted Payments required to be made in connection with the Transactions;

(h) Each of Holdings and the Borrower may make Restricted Payments in cash to enable Parent, and Parent may make Restricted Payments from RP Eligible Proceeds in an aggregate amount not to exceed $300,000,000; provided that after giving pro forma effect to (i) each Disposition which is the source of such RP Eligible Proceeds and (ii) the corresponding Restricted Payment, (x) the Senior Secured Leverage Ratio shall not exceed 4.50 to 1.00 (or in the case of RP Eligible Proceeds in respect of a Disposition under 7.5(c)(vii), 4.00 to 1.00) and (y) the Borrower shall have minimum Liquidity of at least $150,000,000;

(i) Each of Holdings and the Borrower may make Restricted Payments in cash in an aggregate amount not to exceed $2,875,000 to enable Parent to repurchase, retire or acquire for value equity interests of Parent from any future, present or former employee or director of Parent or any of its Subsidiaries pursuant to any employee or director equity plan, employee or director stock option plan or any other employee or director benefit plan or any agreement (including any stock subscription or shareholder agreement) with any employee or director of Parent or any of its Subsidiaries; and

(j) Each of Holdings and the Borrower may make Restricted Payments in cash to enable Parent, and Parent may make Restricted Payments to executives of Parent when restricted Capital Stock of Parent vests (in lieu of payment of income tax by such executives).

Nothing herein shall be deemed to prohibit the payment of Restricted Payments by (i) any Subsidiary of Holdings to Holdings or the Borrower or to any other Wholly Owned Subsidiary of Holdings which is a Subsidiary Guarantor, or by an Excluded Foreign Subsidiary to any other Subsidiary of Holdings or (ii) any Subsidiary of Parent (other than Holdings or any of its Subsidiaries) to Parent or to any other Subsidiary of Parent or to prohibit any dividend payments or other distributions payable solely in Capital Stock of such Person.

- 84 -

7.7.    Capital Expenditures.  Make or commit to make any Capital Expenditure, except Capital Expenditures of Parent and its Subsidiaries not exceeding the Base Capital Expenditure Amount during any fiscal year or period of Parent; provided, that (i) the lesser of (x) any such amount referred to above, if not so expended in the fiscal year or period for which it is permitted and (y) 50% of the amount of the Base Capital Expenditure Amount for such fiscal year may be carried over for expenditure in the next succeeding fiscal year and (ii) Capital Expenditures made during any fiscal year shall be deemed made, first, in respect of amounts carried over from the prior fiscal year pursuant to subclause (i) above and, second, in respect of amounts permitted for such fiscal year as provided above.  For purposes of the foregoing, the "Base Capital Expenditure Amount" shall be an amount equal to $115,000,000 for the fiscal year ending December 31, 2010 and an amount equal to $126,500,000 for any subsequent fiscal year plus, in each case, with respect to each fiscal year in which an Acquisition is consummated and the immediately following fiscal year, an amount for each such fiscal year equal to 40% of the EBITDA of the Person so acquired for the four fiscal quarters of such Person immediately preceding the date of such Acquisition (it being understood and agreed that EBITDA shall be calculated as set forth in the definition of "Parent Consolidated Adjusted EBITDA") plus, in each case, the Net Cash Proceeds received from the issuance of Capital Stock of Parent and from the related contribution of cash to Holdings from Parent, in each case as contributed to the Borrower, that are not otherwise expended pursuant to Section 7.5(e) or 7.8(i).

7.8.    Investments.  Make or permit to remain outstanding any Investments except:

(a) Investments outstanding on the date hereof and identified on Schedule 7.8(a);

(b) operating deposit accounts with banks;

(c) Permitted Investments;

(d) Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e) Investments consisting of (i) Indebtedness, Liens, fundamental changes and Restricted Payments permitted under Sections 7.3 (other than Section 7.3(d) with respect to Parent), 7.4, 7.5 and 7.6, respectively and (ii) Investments by the Borrower or any of its Subsidiaries in rides, Intellectual Property assets and related assets so long as the fair market value of the Property that is invested does not exceed $115,000,000 in the aggregate, provided that in the case of any Investment that would be a Capital Expenditure such Investment shall be considered a Capital Expenditure for purposes of Section 7.7 and shall be disregarded for purposes of this Section 7.8;

(f)  (i) Investments (including debt obligations and Capital Stock) received in connection with the bankruptcy or reorganization of any Person or in settlement of delinquent obligations of, or other disputes with, any Person arising in the ordinary

- 85 -

course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment, (ii) the non-cash proceeds of any Disposition permitted by Section 7.5(c) and (iii) limited partnership units purchased pursuant to the Partnership Parks Agreements;

(g) (i) loans and advances to Holdings, Parent or any Partnership Park Entity (or any direct or indirect parent thereof) in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made to Holdings or Parent in accordance with Section 7.6 (with any such loan or advance to be deemed to be a Restricted Payment for purposes of Section 7.6) and (ii) Investments by Parent or any other Subsidiary of Parent in GP Holdings, Inc., SFT Holdings, Inc., Six Flags Over Texas, Inc., SFOG II, Inc. and/or the Partnership Parks Entities that will be used to make or constitute "affiliate loans" for purposes of the Partnership Parks Agreements;

(h) advances of payroll payments to employees in the ordinary course of business;

(i) Investments to the extent that payment for such Investments is made with Qualified Net Cash Equity Proceeds or with the Net Cash Proceeds received (without duplication) from the issuance of Capital Stock of Parent and from the contribution of cash to Holdings from Parent, in each case as contributed to the Borrower and not otherwise expended pursuant to Section 7.5(e) or 7.7 and/or Qualified Capital Stock of Parent;

(j) Investments held by a Subsidiary acquired after the Closing Date or of a corporation merged into the Borrower or merged or consolidated with a Subsidiary of the Borrower in accordance with Section 7.5 after the Closing Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(k) Investments by Parent or any of its Subsidiaries in assets that were Permitted Investments when such Investment was made;

(l) (i) asset purchases (including purchases of inventory, supplies and materials) and (ii) the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons, in each case in the ordinary course of business;

(m) Guarantees by Parent or any of its Subsidiaries of leases (other than capitalized leases) or of other obligations of Subsidiaries that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(n) Investments in joint ventures pursuant to which, among other things, Parent or any of its Subsidiaries is granted intellectual property rights for its Parks;

(o) Investments constituting (i) contributions to the equity of HWP whether directly or through the joint venture contemplated by the Great Escape Agreements, (ii) contributions to such joint venture as contemplated by the Great Escape Agreements and

- 86 -

NY\1634561.9

additional Investments therein and (iii) Investments in a joint venture formed for the lease of property and construction of a time share hotel to be located in Lake George, New York; provided that the aggregate outstanding amount of all such Investments permitted by this clause (o) shall not exceed $11,500,000;

(p) Investments by Parent and its Subsidiaries in Holdings and any Subsidiary of Holdings including Guarantees by Parent or any of its Subsidiaries of obligations of Parent, Holdings, the Borrower or any Subsidiary Guarantor; provided that with respect to Non-Guarantor Subsidiaries, such Investments (together with Indebtedness of any Non-Guarantor Subsidiaries permitted under Section 7.3(e)) may not be in excess of the amount permitted under Section 7.3(e);

(q) Investments by Foreign Subsidiaries in Wholly Owned Subsidiaries which are Foreign Subsidiaries, including Guarantees by Foreign Subsidiaries of obligations of other Wholly Owned Subsidiaries which are Foreign Subsidiaries;

(r) Hedging Agreements entered into in the normal course of business and consistent with industry practice and not for speculative purposes;

(s) Investments received in connection with any Disposition permitted under Section 7.5 or any Disposition to which the Required Lenders shall have consented in accordance with Section 10.1;

(t) any Acquisition permitted by Section 7.5(b) or 7.5(e);

(u) Investments in an aggregate amount of up to but not exceeding $115,000 during any fiscal year in 229 East 79th Street Associates L.P.;

(v) additional Investments (including Investments in any Non-Guarantor Subsidiaries of the Borrower and in Dick Clark) up to but not exceeding the sum of (i) $86,250,000 and (ii) the aggregate amount of Excess Cash Flow for completed fiscal years of the Borrower since the Closing Date not applied or to be applied pursuant to Section 3.5(c) or Section 5.5(c) of the First Lien Credit Agreement minus the amount of Restricted Payments made pursuant to Sections 7.6(c) and 7.6(e); provided that the aggregate amount of Investments permitted by this Section 7.8(v) shall not exceed $115,000,000 at any time outstanding, provided, further that the aggregate amount of Investments in Foreign Subsidiaries, together with the aggregate amount of outstanding Indebtedness of and Guarantees of Indebtedness of Foreign Subsidiaries permitted by Section 7.3(e) shall not exceed $57,500,000 at any time outstanding; provided, still further that notwithstanding the foregoing, additional Investments under this clause (v) may be made with amounts available under Section 7.8(i); and

(w) loans or advances to officers, directors, members of management, employees consultants and independent contractors of Parent or any of its Subsidiaries (i) in an aggregate amount (as to all such officers, directors, members of management, employees, consultants and independent contractors) up to $1,150,000 at any one time outstanding and (ii) in connection with such Person's purchase of equity interests of Parent in an

- 87 -

aggregate amount not to exceed $1,150,000 at any time outstanding, determined without regard to any write-downs or write-offs of such loans or advances.

provided, that neither Parent nor any of its Subsidiaries (other than a Partnership Park Entity) shall make any Investment in any Partnership Park Entity, Holdings, Borrower or any Subsidiary of Parent that is not a Subsidiary Guarantor other than pursuant to Section 7.8(g) and 7.8(e).

7.9.    Prepayment of Certain Indebtedness. Purchase, redeem, retire or otherwise acquire for value, or set apart any money for a sinking, defeasance or other analogous fund for the purchase, redemption, retirement or other acquisition of, or make any voluntary payment or prepayment of the principal of or interest on, or any other amount owing in respect of, or enter into any derivative transaction or similar transaction obligating Holdings or any of its Subsidiaries to make payments to any other Person as a result of a change in market value of, Indebtedness (other than Indebtedness under the First Lien Credit Documents or Permitted First Lien Refinancing Indebtedness) outstanding under any Indenture of Parent or Holdings (it being understood that the following shall be permitted: (a) payments of regularly scheduled principal and interest and mandatory prepayments of Indebtedness of Parent and its Subsidiaries (including, without limitation, any Permitted First Lien Refinancing Indebtedness and the New Time Warner Facility) shall be permitted, (b) payments of the principal amount of Indebtedness (or accreted value, if applicable) of Parent or Holdings shall be permitted, with the Net Cash Proceeds of Indebtedness of Parent or Holdings, as the case may be (to the extent such Indebtedness constitutes a refinancing, refunding, replacement or renewal thereof plus all interest capitalized in connection therewith, any Refinancing Expenses and any costs and premiums associated with such refinancing, refunding, replacement or renewal) and is permitted pursuant to Section 7.3, to the extent not required to prepay any Loans pursuant to Section 3.4, (c) payments with respect to intercompany Indebtedness permitted under this Agreement and owed to a Loan Party, (d) payments with respect to intercompany Indebtedness permitted under this Agreement and owed to Parent so long as immediately prior to and after giving effect thereto no Default or Event of Default shall have occurred and be continuing (it being agreed that in determining compliance with Section 7.6, any such payments shall be deemed to constitute Restricted Payments), (e) payments with respect to intercompany Indebtedness permitted under this Agreement and owed to any Non-Guarantor Subsidiary so long as immediately prior to and after giving effect thereto no Default or Event of Default shall have occurred and be continuing, (f) payments of the principal amount of Indebtedness (or accreted value, if applicable) of Parent or Holdings shall be permitted with Qualified Capital Stock of Parent so long as such Qualified Capital Stock is issued in contemplation of such repayment, and (g) payments of regularly scheduled principal and interest of Indebtedness (or accreted value, if applicable) incurred pursuant to Sections 7.3(g), (h) and (k) to the extent that the assets securing such Indebtedness are Disposed of in compliance with Section 7.5(c)).

7.10.    Transactions with Affiliates. Enter into any transaction with any Affiliate unless such transaction is upon fair and reasonable terms no less favorable to Parent, Holdings, the Borrower or such Subsidiary, as the case may be, than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate. Notwithstanding the foregoing, (i) any Affiliate who is an individual may serve as a director, officer or employee of Parent or any of its Subsidiaries and such Person may receive, and Parent and its Subsidiaries may engage in any transaction or series of transactions related to, reasonable compensation, severance, indemnities

- 88 -

and reimbursement of reasonable expenses, including stock incentive and option plans and agreements relating thereto, (ii) Parent and its Subsidiaries may enter into transactions (other than extensions of credit by Parent or any of its Subsidiaries to an Affiliate) providing for the leasing of Property, the rendering or receipt of services or the purchase or sale of inventory and other Property in the ordinary course of business if the monetary or business consideration arising therefrom would be substantially as advantageous to Parent and its Subsidiaries as the monetary or business consideration that would obtain in a comparable transaction with a Person not an Affiliate, (iii) the Borrower or any of its Subsidiaries may make an Acquisition of assets of any Person which is an Affiliate solely by reason of such Person being controlled by Parent or any of its Subsidiaries and may make Investments in such Person, provided that such Acquisitions and Investments are (A) permitted under Section 7.5(e)(i) or 7.8 and (B) made upon fair and reasonable terms no less favorable to Parent or such Subsidiary, as the case may be, than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate, (iv) Parent or any of its Subsidiaries may enter into any transaction required of it pursuant to (A) Section 7.8, (B) its agreement with Dick Clark, or (C) the Great Escape Agreements, (v) Parent and its Subsidiaries may be parties to and may perform their respective obligations under the Shared Services Agreement and the Tax Sharing Agreement, (vi) Parent or any of its Subsidiaries may perform their duties and obligations under the Partnership Parks Agreements and (vii) Parent or any of its Subsidiaries may enter into or consummate any transaction permitted for it by Sections 7.3(b), 7.3(c), 7.3(d), 7.3(e), 7.3(f), 7.3(i), 7.3(j), 7.3(k), 7.3(n), 7.3(o), 7.3(r), 7.3(s), 7.4(j), 7.4(k), 7.4(l), 7.4(v), 7.5(a), 7.5(c)(iii), 7.5(c)(iv), 7.5(c)(v), 7.5(c)(ix), 7.5(c)(xi), 7.5(c)(xiv), 7.5(e)(ii), 7.6, 7.8(a), 7.8(e), 7.8(f), 7.8(g), 7.8(h), 7.8(i), 7.8(j), 7.8(k), 7.8(l), 7.8(m), 7.8(n), 7.8(o), 7.8(p), 7.8(q), 7.8(s), 7.8(t), 7.8(u), 7.8(v) or 7.8(w).

7.11.  Changes in Fiscal Periods.  Permit the fiscal year of Parent, Holdings or the Borrower to end on a day other than December 31 or change Parent's, Holdings' or the Borrower's method of determining fiscal quarters.

7.12.  Certain Restrictions. Enter into, after the date hereof, any indenture, agreement, instrument or other arrangement that, directly or indirectly, prohibits or restrains, or has the effect of prohibiting or restraining, or imposes materially adverse conditions upon, the incurrence or payment of Indebtedness, the granting of Liens, the declaration or payment of dividends, the making of loans, advances or Investments or the sale, assignment, transfer or other disposition of Property, other than any such prohibition or restraint (a) set forth in any agreement providing for the disposition of Property (so long as such prohibition or restraint relates only to the Property to be disposed of), (b) set forth in any of the Loan Documents, the First Lien Credit Documents, any Indenture (so long as such prohibition or restraint is not, in the good faith judgment of Parent, more restrictive than those required for comparable Indebtedness incurred by comparable entities), or any other document relating to any existing Indebtedness or any Indebtedness referred to in Section 7.3(b), 7.3(c), 7.3(g), 7.3(h), 7.3(i), 7.3(n), 7.3(o) and 7.3(s) (and any comparable prohibitions or restraints in any document governing any Indebtedness incurred to refinance any of the foregoing, so long as such prohibitions or restraints are, in the good faith judgment of Parent, no more restrictive than those applicable to the Indebtedness being refinanced), (c) set forth in any Real Property lease agreement, licenses, joint venture agreements, contracts entered into in the ordinary course of business to the extent that such prohibition or restraint relates only to the Property which is the subject of such instrument and could not reasonably be expected to result in a Material Adverse Effect, (d) set forth in any

- 89 -

instrument relating to a Permitted Lien, so long as such prohibitions or restraints relate only to the Property encumbered by such Permitted Lien and (e) set forth in any Contractual Obligation with respect to (i) negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 7.3(g), 7.3(h) and 7.3(s) but solely to the extent any negative pledge relates to the property financed by or the subject of such Indebtedness, (ii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest, and (iii) customary provisions restricting assignment or transfer of any agreement entered into in the ordinary course of business.

7.13.    Lines of Business.  Engage to any substantial extent in any line or lines of business activity other than the business of owning and operating amusement and attraction parks, and businesses related, ancillary or complementary thereto and the businesses and activities related thereto more fully described on Schedule 7.13 attached hereto.

7.14.    Modifications of Certain Documents.  Consent to any modification, supplement or waiver of:

(a) any provision of the New Time Warner Facility, the effect of which would be materially adverse to the Lenders;

(b) its articles of incorporation or by-laws (or similar constituent documents) in any manner adverse, in any material respect, to the Lenders;

(c) any provision of the Partnership Parks Agreements, the Great Escape Agreements, the Tax Sharing Agreement or any agreement relating to any Permitted Acquisition or any lease of Real Property with respect to any Park if such modification, supplement or waiver would have a Material Adverse Effect;

(d) any provision of the First Lien Credit Documents to the extent prohibited by the Intercreditor Agreement; or

(e) any provision of the First Lien Credit Agreement or any Permitted First Lien Refinancing Indebtedness (i) to increase any applicable margin thereunder (or impose a fee in lieu thereof) by more than 2.0% per annum or (ii) to extend the scheduled maturity of the First Lien Obligations or any Permitted First Lien Refinancing Indebtedness beyond September 30, 2016.

7.15.    Limitation on Activities of Parent and Holdings.  (a)  In the case of Holdings, conduct, transact or otherwise engage in any business or operations other than those incidental to (i) its ownership of the Capital Stock of the Borrower and PP Data Services Inc., (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations in the Loan Documents, the First Lien Credit Documents, the Partnership Parks Agreements and the New Time Warner Facility, or (iv) not otherwise prohibited by the Loan Documents; provided that, notwithstanding anything herein to the contrary, Holdings may not (1) make any Acquisitions (except as expressly contemplated in Section 7.5(b)(ii) in connection with Investments permitted by clause (2) below only), (2) make any Investments except as expressly contemplated by Sections 7.8(a), (b), (c), (e)(i), (g), (h), (k), (m), (n), (o), (p), (r) (in connection with Indebtedness permitted under

- 90 -

Section 7.3(n)(iii) only), (s), (t) (with respect to Section 7.5(b)(ii) in connection with Investments permitted by this clause (2) only), (u) and (w), (3) create any Subsidiaries that are not Subsidiaries of Borrower or any of its Subsidiaries or (4) own any operating entity other than Borrower or act as an operating entity.

(b)   In the case of Parent, conduct, transact or otherwise engage in any business other than those incidental to (i) its ownership of the Capital Stock of its Subsidiaries and the parks subject to the Partnership Parks Agreements, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) its status as a publicly traded company or public filer or as a member of the consolidated group of Parent and its Subsidiaries (including the ability to participate in tax, accounting and other administrative matters or comply with laws relating thereto), (iv) the performance of its obligations in the Loan Documents, the First Lien Loan Documents, the Partnership Parks Agreements and the New Time Warner Facility, (v) any public offering or other issuance of its Capital Stock or (vi) not otherwise prohibited by the Loan Documents; provided that, notwithstanding anything herein to the contrary, Parent may not (1) make any Acquisitions (except as expressly contemplated by Sections 7.5(b)(ii) in connection with Investments permitted by clause (2) below only, 7.5(b)(iii) in connection with the Partnership Park Entities only and 7.5(b)(iv)), (2) make any Investments except as expressly contemplated by Sections 7.8(a), (b), (c), (d), (e)(i), (f)(i), (g), (h), (i), (k), (l)(ii), (m), (n), (p), (r) (in connection with Indebtedness permitted under Section 7.3(n)(iii) only), (s), (t) (with respect to Sections 7.5(b)(ii) in connection with Investments permitted by this clause (2) only, 7.5(b)(iii) in connection with the Partnership Park Entities only and 7.5(b)(iv) only) and (w), (3) create any Subsidiaries that are not either Subsidiaries of the Borrower or the Partnership Parks Entities or (4) own any operating entity other than the Borrower and its Subsidiaries and the Partnership Parks Entities or act as an operating entity (provided that nothing in this Section 7.15(b) shall limit the ability of Parent to enter into sponsorship agreements, licensing agreements, management agreements, supply agreements or other similar agreements in the ordinary course of business).

7.16.   <u>Limitation on Hedging Agreements</u>.  Enter into any Hedging Agreement other than Hedging Agreements entered into for the purpose of mitigating risks to which Parent and its Subsidiaries have actual exposure and not for speculative purposes, in respect of interest rates or foreign exchange rates; provided, that Parent and its Subsidiaries will not enter into any Hedging Agreement providing for payment by Parent or any Subsidiary of amounts based upon a floating interest rate in exchange for receipt by Parent or any Subsidiary of amounts based upon a fixed interest rate (each, a "<u>Fixed-to-Floating Swap</u>") if, on the date of such Hedging Agreement and after giving effect thereto, the sum of (i) the aggregate notional principal amount covered by all such Fixed-to-Floating Swaps plus (ii) the aggregate principal amount of all then outstanding consolidated Indebtedness of Parent and its Subsidiaries (determined without duplication in accordance with GAAP) that as of such date bears interest at a floating rate (and is not effectively bearing interest at a fixed rate through a Hedging Agreement) would exceed 50% of then outstanding consolidated Indebtedness of Parent and its Subsidiaries (determined in accordance with GAAP).

NY\1634561.9

## SECTION 8.  EVENTS OF DEFAULT

If any of the following events shall occur and be continuing:

(a)  the Borrower shall default in the payment when due in accordance with the terms hereof of any principal of any Loan, or shall default for five or more Business Days in the payment when due of any interest on any Loan or any fee or any other amount payable by it hereunder or under any other Loan Document;

(b)  any representation, warranty or certification made or deemed made herein or in any other Loan Document (or in any modification or supplement hereto or thereto) by Parent or any Loan Party, or any certificate furnished to any Lender or the Administrative Agent pursuant to the provisions hereof or thereof, shall prove to have been false or misleading as of the time made or furnished in any material respect, in any such case that could reasonably be expected to (either individually or in the aggregate) materially adversely affect the operations of any material Park or have a Material Adverse Effect;

(c)  (i) Parent, Holdings or the Borrower shall default in the performance of any of its obligations under any of Section 6.2(a), Section 6.6 or Section 7 of this Agreement, and such default shall continue unremedied for a period of 30 days or (ii) an "Event of Default" under and as defined in any Mortgage shall have occurred and be continuing;

(d)  any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in clause (a), (b) or (c) of this Section 8) or any other Loan Document and such failure shall continue unremedied for a period of 30 days after notice thereof to the Borrower by the Administrative Agent or any Lender (through the Administrative Agent);

(e)  any Loan Party shall default in the payment when due of any principal of or interest on any of its Indebtedness aggregating $28,750,000 or more or any Loan Party shall default in the payment when due of any amount aggregating $28,750,000 or more under any Hedging Agreement (in each case after the expiration of all applicable grace periods);

(f)  (i) any event specified in any note, agreement, indenture or other document evidencing or relating to any Indebtedness (other than the First Lien Obligations and the Indebtedness under the Loan Documents) aggregating $28,750,000 or more of any Loan Party shall occur if the effect of such event is to cause, or (with the giving of any notice or the lapse of time or both) to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, such Indebtedness to become due, or to be prepaid in full (whether by redemption, purchase, offer to purchase or otherwise), prior to its stated maturity or any event specified in any Hedging Agreement shall occur if the effect of such event is to cause, or (with the giving of any notice or the lapse of time or both) to permit, termination or liquidation payment or payments aggregating $28,750,000 or more to become due, provided that this clause shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of Property securing such Indebtedness, if such sale or transfer is permitted

- 92 -

hereunder and under the documents providing for such Indebtedness; provided further that such failure is unremedied and is not waived by the holders of such Indebtedness; or (ii) (x) there shall occur an "Event of Default" (under and as defined in the First Lien Credit Agreement) and such "Event of Default" (under and as defined in the First Lien Credit Agreement) shall remain uncured and unwaived for a period in excess of 90 days (other than with respect to an "Event of Default" due to failure to make any payment under the First Lien Credit Agreement or an acceleration under the First Lien Credit Agreement); or (y) there shall occur an "Event of Default" due to failure to make any payment under the First Lien Credit Agreement or an acceleration under the First Lien Credit Agreement;

(g) a proceeding or case shall be commenced, without the application or consent of Parent, Holdings, the Borrower or any Subsidiary, in any court of competent jurisdiction, seeking (i) its reorganization, liquidation, dissolution, arrangement or winding-up, or the composition or readjustment of its debts, (ii) the appointment of a receiver, custodian, trustee, examiner, liquidator or the like of Parent, Holdings, the Borrower or such Subsidiary or of all or any substantial part of its Property, or (iii) similar relief in respect of Parent, Holdings, the Borrower or such Subsidiary under any law relating to bankruptcy, insolvency, reorganization, winding-up, or composition or adjustment of debts, and such proceeding or case shall continue undismissed, or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue unstayed and in effect, for a period of 60 or more days; or an order for relief against Parent, Holdings, the Borrower or any Subsidiary shall be entered in an involuntary case under the Bankruptcy Code or any other applicable bankruptcy, insolvency or similar laws;

(h) Parent, Holdings, the Borrower or any Subsidiary shall (i) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee, examiner or liquidator of itself or of all or a substantial part of its Property, (ii) make a general assignment for the benefit of its creditors, (iii) commence a voluntary case under the Bankruptcy Code or any other applicable bankruptcy, insolvency or similar laws, (iv) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, liquidation, dissolution, arrangement or winding-up, or composition or readjustment of debts, (v) fail to controvert in a timely and appropriate manner, or acquiesce in writing to, any petition filed against it in an involuntary case under the Bankruptcy Code or any other applicable bankruptcy, insolvency or similar laws or take any corporate action for the purpose of effecting any of the foregoing;

(i) Parent, Holdings, the Borrower or any Subsidiary shall admit in writing its inability to, or be generally unable to, pay its debts as such debts become due;

(j) a final judgment or judgments for the payment of money of $28,750,000 or more in the aggregate (exclusive of judgment amounts to the extent covered by insurance or indemnification of creditworthy third parties) shall be rendered by one or more courts, administrative tribunals or other bodies having jurisdiction against Parent, Holdings, the Borrower or any Subsidiary and the same shall not be discharged (or provision shall not be made for such discharge), or a stay of execution thereof shall not be procured, within

- 93 -

60 days from the date of entry thereof, and Parent, Holdings, the Borrower or the relevant Subsidiary shall not, within such period of 60 days, or such longer period during which execution of the same shall have been stayed, appeal therefrom and cause the execution thereof to be stayed during such appeal;

(k) (i) an ERISA Event shall have occurred, (ii) a trustee shall be appointed by a United States district court to administer any Plan; (iii) the PBGC shall institute proceedings to terminate any Plan or Plans, (iv) Parent, Holdings, the Borrower, any Subsidiary or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such entity does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner, or (v) Parent, Holdings, the Borrower, any Subsidiary or any ERISA Affiliate shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan' and in each case in clauses (i) through (v) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect;

(l) any one or more of the following shall occur and be continuing:

(i) any "Person" (as such term is used in Sections 13(d) and 14(d) of the Securities and Exchange Act of 1934 (the "Exchange Act")), [other than the Permitted Holders], is or becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that a person shall be deemed to have "beneficial ownership" of all shares that any such person has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of more than 35% of the voting stock of Parent (for purposes of calculating the voting stock held by a group, the voting stock beneficially owned by a Permitted Holder shall be excluded to the extent such Permitted Holder is part of such group);

(ii) during any period of two consecutive years (commencing immediately following the Closing Date), individuals who at the beginning of such period constituted the board of directors of Parent (together with any new directors whose election by such board of directors or whose nomination for election by Parent's shareholders was approved by a vote of a majority of Parent's directors then still in office who either were directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of Parent's directors then in office;

(iii) any change in control with respect to Parent (or similar event, however denominated) shall occur under and as defined in the First Lien Credit Agreement, any Indenture or other agreement in respect of Indebtedness in an aggregate principal amount of at least $28,750,000 (other than the First Lien Credit Documents) to which Parent or any of its Subsidiaries is a party; or

- 94 -

(iv)     Parent shall cease to own directly or indirectly 100% of the Capital Stock of the Borrower;

(m)(i) any Security Document, after delivery thereof pursuant to Section 5.1 or 6.6, shall for any reason (other than pursuant to the terms hereof or thereof) cease to create a valid and perfected lien, with the priority required by the Security Documents (or other security purported to be created on the applicable Collateral) on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Permitted Liens, except to the extent that any such loss of perfection or priority results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Security Documents and except as to Collateral consisting of real property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not disputed coverage or (ii) the Guarantee contained in Section 2 of the Guarantee and Collateral Agreement shall cease, for any reason, to be in full force and effect or any Loan Party shall so assert;

then, and in any such event, (A) upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under the United States Bankruptcy Code, automatically the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents shall immediately become due and payable, and (B) if such event is any other Event of Default, then, any or all of the following actions may be taken: (i) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, exercise any remedy with respect to the Collateral provided for in any Security Document and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable.

## SECTION 9.   THE AGENTS

9.1.    <u>Appointment</u>.  Each Lender hereby irrevocably designates and appoints the Agents as the agents of such Lender under this Agreement and the other Loan Documents, and each Lender irrevocably authorizes each Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to such Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent.

9.2.    <u>Delegation of Duties</u>.  Each Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be

- 95 -

entitled to advice of counsel concerning all matters pertaining to such duties. No Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

9.3. <u>Exculpatory Provisions</u>. Neither any Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (b) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder. The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

9.4. <u>Reliance by Agents</u>. Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex, electronic mail or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Loan Parties), independent accountants and other experts selected by such Agent. The Agents may deem and treat the payee of any Note as the owner thereof for all purposes unless such Note shall have been transferred in accordance with Section 10.6 and all actions required by such Section in connection with such transfer shall have been taken. Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

9.5. <u>Notice of Default</u>. No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless such Agent shall have received notice from a Lender, Parent, Holdings or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent shall receive such a notice, the Administrative Agent

- 96 -

shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement); provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

9.6.    Non-Reliance on Agents and Other Lenders. Each Lender expressly acknowledges that neither any of the Agents nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender. Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, Property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, Property, financial and other condition and creditworthiness of the Loan Parties and their affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, no Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the Business, Property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of such Agent or any of its officers, directors, employees, agents, attorneys-in-fact or affiliates.

9.7.    Indemnification. The Lenders agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by Parent, Holdings or the Borrower and without limiting the obligation of Parent, Holdings or the Borrower to do so), ratably according to the respective amounts of outstanding Loans held by Lenders in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with the respective amounts of outstanding Loans held by Lenders immediately prior to such date), for, and to save each Agent harmless from and against, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (including, without limitation, at any time following the payment of the Loans) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the

- 97 -

payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct. The Administrative Agent shall have the right to deduct any amount owed to it by any Lender under this Section from any payment made by it to such Lender hereunder. The agreements in this Section shall survive the payment of the Loans and all other amounts payable hereunder.

9.8.     Agent in Its Individual Capacity. Each Agent and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent. With respect to its Loans made or renewed by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

9.9.     Successor Agents. The Administrative Agent may resign as Administrative Agent upon 10 days' notice to the Lenders and the Borrower. If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint a successor agent for the Lenders, which successor agent shall (unless an Event of Default under Section 8(g), (h) or (i) with respect to Parent, Holdings or the Borrower shall have occurred and be continuing) be subject to approval by the Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans. If no successor agent has accepted appointment as Administrative Agent by the date that is 10 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. The Syndication Agent may, at any time, by notice to the Lenders and the Administrative Agent, resign as Syndication Agent hereunder, whereupon the duties, rights, obligations and responsibilities of such Syndication Agent hereunder shall automatically be assumed by, and inure to the benefit of, the Administrative Agent, without any further act by such Syndication Agent, the Administrative Agent or any Lender. After any retiring Agent's resignation as Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

9.10.     Authorization to Release Liens and Guarantees. The Administrative Agent is hereby irrevocably authorized by each of the Lenders to effect any release of Liens or guarantee obligations contemplated by Section 10.16.

NY\1634561.9

9.11. <u>Authorization to Enter into Intercreditor Agreement</u>. The Lenders hereby authorize the Administrative Agent to enter into the Intercreditor Agreement and acknowledge that they will be bound thereby.

9.12. <u>The Arranger, Syndication Agent and Documentation Agent</u>. Neither the Arranger nor the Syndication Agent, nor the Documentation Agent, in its capacity as such, shall have any duties or responsibilities, and none of them shall incur any liability, under this Agreement and the other Loan Documents.

9.13. <u>Withholding Taxes</u>. To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender or Transferee because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding tax ineffective or for any other reason, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.

## SECTION 10. MISCELLANEOUS

10.1. <u>Amendments and Waivers</u>. Neither this Agreement or any other Loan Document, nor any terms hereof or thereof, may be amended, supplemented or modified except in accordance with the provisions of this Section 10.1. The Required Lenders and each Loan Party party to the relevant Loan Document may, or (with the written consent of the Required Lenders) the Administrative Agent and each Loan Party party to the relevant Loan Document may, from time to time, (i) enter into written amendments, supplements or modifications hereto and to the other Loan Documents (including amendments and restatements hereof or thereof) for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (ii) waive, on such terms and conditions as may be specified in the instrument of waiver, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; <u>provided</u>, <u>however</u>, that no such waiver and no such amendment, supplement or modification shall:

(A) forgive the principal amount or extend the final scheduled date of maturity of any Loan, reduce the stated rate of any interest or fee payable hereunder or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Commitment of any Lender, in each case without the consent of each Lender directly affected thereby (it being understood that a waiver of any condition precedent set forth in Section 5.1(v) and (w) or the waiver of any Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender and it being further understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall

- 99 -

not constitute a postponement of any date scheduled for the payment of principal or interest); provided that only the consent of the Required Lenders shall be necessary to amend the default rate of interest set forth in Section 3.7(c) or to waive any obligation of the Borrower to pay interest at such default rate;

(B) amend, modify or waive any provision of this Section or reduce any percentage specified in the definition of Required Lenders, consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement, release all or substantially all of the Collateral, release Parent as a Guarantor or release all or substantially all of the aggregate value of the Guarantees of the Obligations, in each case without the consent of all Lenders (in each case, except as permitted by any Loan Document);

(C) change the percentage specified in the definition of the Required Lenders without the written consent of all Lenders;

(D) amend, modify or waive any provision of Section 9, or any other provision affecting any Agent or Arranger without the consent of such Agent or Arranger directly affected thereby; and

(E) amend, modify or waive any provision of Section 3.10 without the consent of each Lender directly affected thereby.

Any such waiver and any such amendment, supplement or modification effected pursuant to the foregoing shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, Parent, the Lenders, the Administrative Agent and all future holders of the Loans. In the case of any waiver, the Loan Parties, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon. Any such waiver, amendment, supplement or modification shall be effected by a written instrument signed by the parties required to sign pursuant to the foregoing provisions of this Section; provided, that delivery of an executed signature page of any such instrument by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart thereof.

Notwithstanding anything to the contrary contained in this Section 10.1, (a) this Agreement and the other Loan Documents may be amended with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment is delivered in order to cure any ambiguity or defect and such amendment is requested within 30 days of the Closing Date, (b) in the event that the Borrower requests that this Agreement be modified or amended in a manner that would require the unanimous consent of all of the Lenders and such modification or amendment is agreed to by the Required Lenders, then with the consent of the Borrower and the Required Lenders, the Borrower and the Required Lenders shall be permitted to amend the Agreement without the consent of the Non-Consenting Lenders to provide for (i) the termination of the Commitment of each Non-Consenting Lender, (ii) (A) the addition to this Agreement of one or more other

- 100 -

financial institutions (each of which shall be a Lender, an affiliate of a Lender or an Approved Fund), and the making of additional Loans by such new financial institutions or (B) the making of additional Loans by one or more of the Required Lenders (with the written consent thereof), as the case may be, in each case, as may be necessary to repay in full, at par, the outstanding Loans of the Non-Consenting Lenders immediately before giving effect to such amendment and (iii) such other modifications to this Agreement as may be appropriate to effect the foregoing clauses (i), (ii) and (iii).

For the avoidance of doubt, subject to the terms of the First Lien Credit Documents and the Intercreditor Agreement, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and each Loan Party to each relevant Loan Document (x) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest, fees and other amounts in respect thereof (collectively, the "Additional Extensions of Credit") to share ratably in the benefits of this Agreement and the other Loan Documents with the Loans and the accrued interest and fees in respect thereof and (y) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders; provided, however, that no such amendment shall permit the Additional Extensions of Credit to share ratably with or with preference to the Loans in the application of prepayments without the consent of the Required Lenders, and no such amendment shall, without the consent of all Lenders, subordinate any of the Loans, or any of the rights in the Collateral of any Lenders, to any such Additional Extension of Credit.

10.2. <u>Notices</u>. Unless otherwise expressly provided herein, all notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy or electronic mail pursuant to procedures approved by the Administrative Agent), and shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy or electronic mail notice, when received, addressed (i) in the case of Parent, Holdings, the Borrower and the Agents as set forth below, (ii) in the case of the Lenders, as set forth in an administrative questionnaire delivered to the Administrative Agent or on Schedule I to the Lender Addendum to which such Lender is a party or, in the case of a Lender which becomes a party to this Agreement pursuant to an Assignment and Acceptance, in such Assignment and Acceptance or (iii) in the case of any party, to such other address as such party may hereafter notify to the other parties hereto:

| | |
|---|---|
| Parent or Holdings: | c/o Six Flags Operations Inc.<br>1540 Broadway, 15th Floor<br>New York, New York 10036<br>Attention: Chief Financial Officer<br>Telecopy: 212-354-3089<br>Electronic Mail: jspeed@sftp.com<br>Telephone: 212-652-9384 |

NY\1634561.9

| with a copy to: | Six Flags Operations Inc.<br>1540 Broadway, 15th Floor<br>New York, New York 10036<br>Attention: General Counsel<br>Telecopy: 212-354-3089<br>Electronic Mail: jcoughli@sftp.com<br>Telephone: 212-652-9380 |
|---|---|
| The Borrower: | Six Flags Theme Parks Inc.<br>c/o Holdings, as set forth above |
| with a copy to, with respect to<br>Sections 3.12(e), 10.6(b)(ii)<br>and 10.6(c)(ii): | Andrews Kurth LLP<br>450 Lexington Avenue<br>New York, New York 10017<br>Attention: Andrew Feiner<br>Telecopy: 212.813.8170<br>Electronic Mail:<br>andyfeiner@andrewskurth.com<br>Telephone: 212.850.2883 |
| The Administrative Agent or<br>the Syndication Agent: | Goldman Sachs Lending Partners LLC<br>c/o Goldman, Sachs & Co.<br>30 Hudson Street, 36th Floor<br>Jersey City, NJ 07302<br>Attention: SBD Operations<br>Attention: Andrew Caditz<br>Telecopier: (212) 428-1243<br>Email and for delivery of final financial<br>statements for posting: gsd.link@gs.com |
| with a copy to: | Goldman Sachs Lending Partners LLC<br>200 West Street<br>New York, New York 10282-2198<br>Attention: Elizabeth Fischer<br>Telecopier: (212) 902-3000 |

provided that any notice, request or demand to or upon the any Agent or any Lender shall not be effective until received. The attorneys for any party may, but shall not be required to, give any notice on behalf of their respective client.

      10.3. No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of any Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other

- 102 -

or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

10.4. <u>Survival of Representations and Warranties</u>. All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

10.5. <u>Payment of Expenses</u>. The Borrower agrees (a) to pay or reimburse the Administrative Agent and the Arranger for all their reasonable and documented out-of-pocket costs and expenses incurred in connection with the syndication of the Facility (including the charges of Intralinks but excluding fees payable to syndicate members) and the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation, the reasonable fees and disbursements and other charges of one primary counsel to the Administrative Agent (and, if necessary, one local counsel in each relevant jurisdiction (which, for the avoidance of doubt, may include each jurisdiction where a Mortgaged Property is located and, without duplication, each other jurisdiction where a Guarantor is organized)), (b) to pay or reimburse each Lender and the Agents for all their costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents (including in connection with any workout, restructuring or negotiations in respect thereof), including, without limitation, the fees and disbursements of counsel to the Lenders and the Agents, (c) to pay, indemnify, or reimburse each Lender and the Agents for, and hold each Lender and the Agents harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, indemnify or reimburse each Lender, each Agent, their respective affiliates, and their respective officers, directors, trustees, employees, advisors, agents and controlling persons (each, an "<u>Indemnitee</u>") for, and hold each Indemnitee harmless from and against, any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, including, without limitation, any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of Parent or any of its Subsidiaries or any of the Properties and the fees and disbursements and other charges of legal counsel in connection with claims, actions or proceedings by any Indemnitee against any Loan Party hereunder (all the foregoing in this clause (d), collectively, the "<u>Indemnified Liabilities</u>"), <u>provided</u>, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee

- 103 -

or of any director, officer, or employee of such Indemnitee. Without limiting the foregoing, and to the extent permitted by applicable law, Parent agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries so to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts due under this Section shall be payable not later than 30 days after written demand therefor. Statements for amounts payable by the Borrower pursuant to this Section shall be submitted to the attention of the Chief Financial Officer (Telephone No. 212-652-9384) (Fax No. 212-354-3089), at the address of the Borrower set forth in Section 10.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent. The agreements in this Section shall survive repayment of the Loans and all other amounts payable hereunder.

### 10.6. Successors and Assigns; Participations and Assignments

(a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.

(b) (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A) the Borrower, provided that no consent of the Borrower shall be required for an assignment to (x) a Lender, an affiliate of a Lender, an Approved Fund (as defined below) or (y) if an Event of Default has occurred and is continuing or if the principal amount of Loans being assigned to an Assignee is in an aggregate amount of less than $10,000,000, any other Person (other than a natural person); and

(B) the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan to a Lender, an affiliate of a Lender or an Approved Fund.

(ii) Assignments shall be subject to the following additional conditions:

(A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Loans, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless each of the Borrower and the Administrative Agent otherwise consent, provided that (1) no such consent of the Borrower shall be required if an Event of Default

- 104 -

has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its affiliates or Approved Funds, if any;

(B) (1) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500 (payable among the Lenders party to the Assignment and Acceptance), which shall be paid once in connection with simultaneous assignments for a Lender and its affiliates and Approved Funds (provided, however, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment) and (2) the assigning Lender shall have paid in full any amounts owing by it to the Administrative Agent;

(C) the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws; and

(D) the Assignee shall not be a Loan Party; provided that the Borrower may be an Assignee in connection with an Auction.

For the purposes of this Section 10.6, "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an affiliate of a Lender or (c) an entity or an affiliate of an entity that administers or manages a Lender.

(iii)     Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after the effective date specified in each Assignment and Acceptance the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.11, 3.12, 3.13 and 10.5). An Assignee shall not be entitled to the benefits of Section 3.12 unless such Assignee complies with Section 3.12(e). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)     The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and

- 105 -

the Commitments of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register") and shall make such Register available for inspection by the Borrower from time to time upon reasonable prior notice. The entries in the Register shall be conclusive, in the absence of manifest error and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by any Lender from time to time upon reasonable prior notice to the Administrative Agent. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(v)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c) (i) Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 10.1 and (2) directly affects such Participant. Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.11, 3.12 and 3.13 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.7(b) as though it were a Lender, provided such Participant shall be subject to Section 10.7(a) as though it were a Lender.

NY\1634561.9

(ii)     A Participant shall not be entitled to receive any greater payment under Section 3.11 or 3.12 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's written consent.  Any Participant that is a Non-U.S. Lender shall not be entitled to the benefits of Section 3.12 unless such Participant complies with Section 3.12(e).

(d) Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other Person, and this Section shall not apply to any such pledge or assignment of a security interest; <u>provided</u> that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e) The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in paragraph (d) above.

(f) If the Borrower wishes to replace the Loans with ones having different terms, it shall have the option, with the consent of the Administrative Agent and subject to at least three Business Days' advance notice to the Lenders, instead of prepaying the Loans, to (i) require the Lenders to assign such Loans to the Administrative Agent or its designees and (ii) amend the terms thereof in accordance with Section 10.1.  Pursuant to any such assignment, all Loans shall be purchased at par (allocated among the Lenders in the same manner as would be required if such Loans were being optionally prepaid plus payment of any accrued interest and fees thereon and any amounts owing pursuant to Sections 3.10(b) and 3.13).  By receiving such purchase price, the Lenders shall automatically be deemed to have assigned the Loans pursuant to an Assignment and Acceptance, and accordingly no other action by such Lenders shall be required in connection therewith.  The provisions of this paragraph are intended to facilitate the maintenance of the perfection and priority of existing security interests in the Collateral during any such replacement.

10.7.   <u>Adjustments; Set-off</u>.  (a) Except to the extent that this Agreement provides for payments to be allocated to a particular Lender, if any Lender shall at any time receive any payment of all or part of the Obligations owing to it, or receive any Collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 8(g), (h) or (i), or otherwise), in a greater proportion than any such payment to or Collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender (each benefited Lender referred to above, a "<u>Benefited Lender</u>") shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such Collateral, or the proceeds thereof, ratably with each of the Lenders; <u>provided</u>, <u>however</u>, that if all or any portion of such excess payment, benefits or proceeds is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

- 107 -

(b) In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to Parent, Holdings or the Borrower, any such notice being expressly waived by Parent, Holdings and the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of Parent, Holdings or the Borrower, as the case may be. Each Lender agrees promptly to notify Parent and the Administrative Agent after any such setoff and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such setoff and application.

10.8. <u>U.S.A. Patriot Act</u>. Each Lender hereby notifies the Borrower that pursuant to the requirements of the U.S.A. Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Lenders to identify the Borrower in accordance with the U.S.A. Patriot Act.

10.9. <u>Counterparts</u>. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement or of a Lender Addendum by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with Holdings and the Administrative Agent.

10.10. <u>Severability</u>. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.11. <u>Integration</u>. This Agreement and the other Loan Documents represent the entire agreement of the parties hereto with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Arranger, any Agent or any Lender relative to subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

10.12. **<u>GOVERNING LAW</u>. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

10.13. <u>Submission To Jurisdiction; Waivers</u>. Each of the Agents, the Lenders, Parent, Holdings and the Borrower hereby irrevocably and unconditionally:

- 108 -

(a) **ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK (OTHER THAN WITH RESPECT TO ACTIONS BY THE ADMINISTRATIVE AGENT IN RESPECT OF RIGHTS UNDER ANY SECURITY AGREEMENT GOVERNED BY LAWS OTHER THAN THE LAWS OF THE STATE OF NEW YORK OR WITH RESPECT TO ANY COLLATERAL SUBJECT THERETO);**

(b) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to Parent or Holdings, as the case may be, at its address set forth in Section 10.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e) waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

10.14. <u>Acknowledgments</u>. Each of Parent, Holdings and the Borrower hereby acknowledges that:

(a) it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b) neither the Arranger, any Agent nor any Lender has any fiduciary relationship with or duty to Parent, Holdings or the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Arranger, the Agents and the Lenders, on one hand, and Parent, Holdings and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c) no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Arranger, the Agents and the Lenders or among Parent, Holdings, the Borrower and the Lenders.

10.15. <u>Confidentiality</u>. Each of the Agents and the Lenders agrees to keep confidential all non-public information provided to it by any Loan Party pursuant to this Agreement that is designated by such Loan Party as confidential; provided that nothing herein

- 109 -

shall prevent any Agent or any Lender from disclosing any such information (a) to the Arranger, any Agent, any other Lender or any affiliate of any thereof, (b) to any Participant or Assignee (each, a "Transferee") or prospective Transferee that agrees to comply with the provisions of this Section, (c) to any of its employees, directors, agents, attorneys, accountants and other professional advisors, (d) to any financial institution that is a direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section), (e) upon the request or demand of any Governmental Authority having jurisdiction over it, (f) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (g) in connection with any litigation or similar proceeding, (h) that has been publicly disclosed other than in breach of this Section, (i) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or (j) in connection with the exercise of any remedy hereunder or under any other Loan Document.

EACH LENDER ACKNOWLEDGES THAT INFORMATION FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

10.16. Release of Collateral and Guarantee Obligations.

(a) Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of Parent or the Borrower in connection with any Disposition of Property permitted by the Loan Documents, the Administrative Agent shall (without notice to, or vote or consent of, any Lender) take such actions as shall be required to release or subordinate its security interest in any Collateral being Disposed of in such Disposition, and to release or subordinate any guarantee obligations (or execute a subordination, non-disturbance or attornment agreement) under any Loan Document of any Person being Disposed of in such Disposition, to

- 110 -

the extent necessary to permit consummation of such Disposition in accordance with the Loan Documents.

(b) Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations have been paid in full, upon request of Parent, the Administrative Agent shall (without notice to, or vote or consent of, any Lender) take such actions as shall be required to release its security interest in all Collateral, and to release all guarantee obligations under any Loan Document. Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its Property, or otherwise, all as though such payment had not been made.

10.17. <u>Accounting Changes</u>. In the event that any "Accounting Change" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then Parent, the Borrower and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Changes with the desired result that the criteria for evaluating the financial condition of Parent and the Borrower shall be the same after such Accounting Changes as if such Accounting Changes had not been made. Until such time as such an amendment shall have been executed and delivered by Parent, Holdings, the Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred. "<u>Accounting Changes</u>" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC.

10.18. <u>Delivery of Lender Addenda</u>. Each initial Lender shall become a party to this Agreement by delivering to the Administrative Agent a Lender Addendum duly executed by such Lender, the Borrower and the Administrative Agent.

10.19. **WAIVERS OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

10.20. <u>Intercreditor Agreement</u>. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control.

[Remainder of the page intentionally left blank.]

NY\1634561.9

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

SIX FLAGS ENTERTAINMENT CORPORATION

By:_____
Name: Jeffrey R. Speed
Title: Executive Vice President and
       Chief Financial Officer


SIX FLAGS OPERATIONS INC.


By:_____
Name: Jeffrey R. Speed
Title: Executive Vice President and
       Chief Financial Officer


SIX FLAGS THEME PARKS INC.,
  as Borrower


By:_____
Name: Jeffrey R. Speed
Title: Executive Vice President and
       Chief Financial Officer

GOLDMAN SACHS LENDING PARTNERS
LLC, as Administrative Agent and Lender


By: _____
   Name:
   Title:  Authorized Signatory